UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 OCT 12 P 3: 36

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| L-3 COMMUNICATIONS SECURITY AND DETECTION SYSTEMS, INC., )<br>)<br>Plaintiff, )<br>v. )<br>)<br>REVEAL IMAGING TECHNOLOGIES, INC., )<br>)<br>Defendant. ) | C.A. No. 04-11884-NG |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM AGAINST REVEAL IMAGING TECHNOLOGIES, INC.

### INTRODUCTION

Plaintiff's patent infringement suit must be dismissed because L-3 Communications Security and Detection Systems, Inc. ("L-3") has knowingly brought patent infringement claims against the wrong defendant, in the wrong court. Because the allegedly infringing product has been designed, developed and manufactured for the United States Government ("United States"), L-3 can only bring patent infringement claims against the United States and only in the Court of Federal Claims as mandated by 28 U.S.C. § 1498.

Reveal Imaging Technologies, Inc. ("Reveal"), a start-up company, has designed and is manufacturing for the United States an innovative next generation Explosive Detection System ("EDS") to screen airport baggage. Reveal's effort is funded, in large part, by a $4.7 million grant from the Transportation Security Administration ("TSA"), known as the "Phoenix" program.[1] Reveal's EDS baggage screening machine, the CT-80, has been designed and is being

---

[1] In the summer of 2003, both Reveal and L-3 submitted competing proposals to the TSA to design and develop TSA's next generation EDS through the Phoenix program. On September 25, 2003, the TSA awarded Reveal a Phoenix grant, but not L-3. Two months later, various L-3 entities filed a complaint in the Massachusetts Superior Court against Reveal and six of Reveal's employees for alleged violations of non-competition covenants and

manufactured for the United States pursuant to the TSA's specifications and subject to the TSA's review, approval, and testing. Indeed, since the TSA is the <u>exclusive purchaser</u> and operator of EDS machines in the United States, its control, oversight and approval of the CT-80 is almost plenary. The TSA has accepted delivery of two CT-80 machines, which are currently undergoing the TSA's final readiness testing and will undergo final certification shortly. Reveal is manufacturing additional machines in anticipation of purchases by the TSA once the CT-80 is certified.[2] (Buckley Aff. ¶¶9, 17-20).

L-3, which is currently one of only two EDS manufacturers in the country, learned of the CT-80's impending certification at Congressional hearings in July 2004, when members of Congress asked the TSA when it would certify the CT-80. Now, in a last-ditch effort to thwart the deployment of the CT-80, L-3, a multi-billion dollar competitor, has now launched this patent infringement suit seeking treble damages and injunctive relief - - knowing full well that its complaint should have been brought against the United States in the Court of Claims. (Ellenbogen Aff. ¶¶9-13).

Needless to say, Reveal denies that its CT-80 infringes on any of the patents cited by L-3 in its Amended Complaint. However, regardless of L-3's motives and whether the CT-80 infringes on the patents claimed by L-3, Reveal is immune from any infringement claims,

---

purported misappropriation of trade secrets (the "State Action"). In the State Action L-3 has had extensive discovery pursuant to an Agreed-Upon Protective Order of Reveal's highly confidential design and development work for the TSA. Yet, L-3's current bare bones patent infringement complaint makes absolutely no mention of the TSA, the Phoenix Project, or the TSA's plan to purchase and install the next generation EDS machines in airports as soon as possible. (Lipchitz Aff. ¶¶2-3 and Aff. Ex. A; Buckley Aff. Ex. D--L-3's Analogic Complaint at ¶¶16,18,22-24).

[2] Immediately after the September 11, 2001 terrorist attacks, Congress enacted the 2001 Aviation Transportation Security Act ("ATSA") that created the TSA and gave it sole responsibility for the explosive device system ("EDS") certification of baggage screening systems. The ATSA also mandates that effective December 31, 2002 <u>only</u> certified EDS baggage screening systems can be used in our nation's airports. See 49 U.S.C. §44901(d)). The term EDS is defined by the FAA as "an automated device, or combination of devices, which has the ability to detect, in passenger checked baggage, the amounts, types, and configurations of explosive materials as specified by the FAA." See Federal Aviation Administration, "Explosive Detection Systems," 63 Fed. Reg. 18104, 18106 (April 13, 1998).

2

as a matter of law, under 28 U.S.C. § 1498, which was enacted for the very purpose of protecting individuals and firms providing goods and services to the federal government from being subjected to expensive patent infringement claims, possible injunctive relief and punitive damages. The purpose and application of 28 U.S.C. § 1498 to this case is particularly relevant where the U.S. Congress, starting in 2001 and as late as July 2004, has repeatedly voiced its concern that the latest EDS airport baggage screening technology be certified and deployed to our nation's airports as soon as possible. See, e.g., 49 U.S.C. §44912 (the TSA "shall establish and carry out a program to accelerate and expand the research, development, and implementation of technologies and procedures to counteract terrorist acts against civil aviation").

## STATEMENT OF FACTS

### Background on the EDS Industry

The term "EDS," as defined by the FAA, refers to a system that automatically detects explosives in baggage and has passed the EDS Certification criteria of first the FAA and now the TSA. There are currently only two certified EDS companies in the United States: InVision and L-3. Since the TSA is the exclusive customer for EDS machines for airport check-in baggage, it currently must purchase its machines from either InVision or L-3. (Ellenbogen Aff. ¶5; Buckley Aff. ¶9 and Aff. Ex. D at ¶¶16, 30). Current EDS technology is based primarily on the use of computed tomography ("CT") (sometimes also known as "computed axial tomography" ("CAT")) scanning to screen baggage for explosives. In a CT scanner, an X-ray emission source and X-ray detectors are mounted on a rotating gantry that spins around the scanned object. A computer converts measurements of the amount of X-ray transmitted or absorbed during each rotation of the ring measurements into 360° cross-sections or "slice" images of the object. These "slice" images of the contents of each bag are then projected onto a monitor, which a human

3

operator views. The operator then determines whether the bag should be labeled as "suspect" and inspected more thoroughly. As its name implies, Reveal's CT-80 uses this CT technology. (Ellenbogen Aff. ¶¶3-5).

### The September 11th Attacks and Subsequent Congressional Action Recognizing The National Importance of Improving EDS

Following the September 11, 2001 terrorist attacks, Congress made fundamental changes in the way it approached the task of ensuring the safety and security of the civil air transportation system. As a result, both the U.S. House of Representatives and the Senate began holding Congressional hearings in the fall of 2001 on the flaws of aviation security, including the existing technology for screening airplane baggage for explosives. Congress subsequently passed a comprehensive law, the Aviation and Transportation Security Act of 2001 (the "ATSA"), Pub.L. 107-71; 115 Stat. 597 (2001), to address the flaws and prevent another attack like the one on September 11, 2001. (Lipchitz Aff. Ex. C--147 Cong.Rec. S10463-03 at §2 (October 10, 2001); Ex. D—ATSA; and Aff. Ex. F--147 Cong.Rec. H8237-01).

During these Congressional hearings, Congress heard testimony from the Inspector General for the U.S. Department of Transportation that there were only two certified EDS manufacturers in the United States - - InVision and L-3. The Inspector General also reported to Congress that the airline carriers disfavored L-3's EDS technology because it did not work properly, causing the carriers to warehouse L-3's EDS units rather than use them. (Id. at Aff. Ex. E--Congressional Testimony by the Honorable Kenneth Mead before House Subcommittee on Aviation of the Committee on Transportation and Infrastructure, 107th Congress (October 11, 2001) at p. 10; see also pp.3-4 ("reliability issues need to be resolved before additional L-3

4

examiner 6000 machines can be deployed.").[3]

As a result of these public hearings, Congress recognized a need to improve EDS technology as soon as possible. For example, U.S. Representative William Lipinski, a member of the House Subcommittee on Aviation, stated quite clearly at a hearing concerning the deployment and use of aviation security technology:

> <u>These EDS machines, while they are made by InVision, by L-3 Communications or by any other company, are very important in the effort to ensure that terrorists do not have a big opening in our security system through which to destroy our planes</u>. Therefore, it is very disconcerting to me that we are not using the technology currently available to us. I urge all the parties . . . and the EDS companies to work together in an expedited manner to fix whatever has delayed the full utilization of these vital machines. . . . <u>In addition, we should build on our current technology and find a way to make these machines better, smaller, and cheaper so that we can outfit them in every airport in the country</u>.

(Lipchitz Aff. Ex. B--Deployment and Use of Security Technology: Hearing before the House Subcommittee on Aviation of the Committee on Transportation and Infrastructure, 107th Congress (October 11, 2001) at p. 6) (emphasis added).

In order to promote and protect this national interest, the ATSA requires the Under Secretary of Transportation to ensure that all baggage screening must be performed using EDS systems certified by the TSA and that those EDS units had to be in airports by December 31, 2002. (<u>Id.</u> at Aff. Ex. D--ATSA, 115 Stat. 597, 615; 49 U.S.C. §44901(d)). To ensure that the latest EDS technology would be developed and deployed as rapidly as possible, Congress also authorized the TSA to make grants for the acceleration of research, development, testing,

---

[3] Since 2001, L-3's technology and screening products have continued to be publicly criticized. For example, in 2003, numerous newspapers and industry magazines reported on the operational problems associated with L-3's machines, including machines at Logan Airport. (Lipchitz Aff. Exs. Ex. H-- Keith Reed, *Logan Bag-screen System Woes Costly and Compromises Security Memo Says*, Boston Globe, December 5, 2003, at D1); Ex. I--"L-3 Reliability Questioned in Boston Bag Screening System," *Airport Security Report*, Vol. 10, No. 23 (Washington, D.C. Nov. 19, 2003).

5

and evaluation of explosives detection technology that was faster, more cost-effective, and more accurate.[4] (Id. at ATSA, 115 Stat. 597, 637-638; 49 U.S.C. §44912).

Two years after the passage of ATSA, the latest EDS technology still has not been deployed to our nation's airports as noted by the recent findings by the 9/11 Commission Report published on July 22, 2004. Specifically, the Commission found that: "[m]ajor vulnerabilities still exist in cargo and general aviation security. These together with inadequate screening and access controls, continue to present aviation security challenges." (Lipchitz Aff. Ex. G--9/11 Report at p. 391. As a result, the Commission recommended that the "<u>TSA should expedite the installation of advanced (in-line) baggage-screening equipment</u>." (Id. –9/11 Report at p. 393) (emphasis added).

### The U.S. Government Grants Reveal, Not L-3, a Multi-Million Dollar Grant to Develop the Next Generation Explosive Detection System Under the TSA Phoenix Project

Pursuant to ATSA's mandate, in July 2003 the TSA issued a Request for Proposals ("Phoenix RFP") to develop the Next Generation Explosive Detection System meeting the TSA's numerous specifications as set forth in the Phoenix RFP. Although the specifications are extremely detailed, the TSA, to put it simply, requested proposals to design the next generation EDS machine to scan airport baggage. To ensure that TSA's goal was met, TSA would play an active role in evaluating and approving the proposed EDS designs:

> The diverse needs of airports will lead to a number of system solutions for EDS that will include enhanced performance single unit devices, integrated multi-component systems and evolutionary new systems. . . .Installation and operational costs have driven requirements for increased automated operation, reduced operational expenditures, better reliability, improved safety and simpler facility installation. The best technologies underlying each of the concepts submitted will be identified, <u>evaluated for technical maturity and development</u>

---

[4] In addition, in order to make sure that the latest technology is developed and deployed as soon as possible, the ATSA requires the Under Secretary of Transportation to establish a scientific advisory panel, as a subcommittee of the Research, Engineering, and Development Advisory Committee, to advise Congress on, among other things, the development and testing of effective EDS systems. (Id. at ATSA, 115 Stat. 597, 620-621; 49 U.S.C. §44912).

6

> risk. Systems engineering factors, concept of operations (including staffing requirements) and life-cycle cost with operational expenditures will also be evaluated. System requirements are descried in the Phoenix EDS Specification found in Appendix A.

(Buckley Aff. ¶¶3-5 and Aff. Ex. A--Phoenix RFP at §1.1, p.5 (emphasis added); see also Aff. Ex. D at ¶22 ("The Phoenix and Manhattan II are integrated projects which provide substantial government funding for the development and improvement of EDS for checked baggage")). The TSA required that for each Phoenix proposal:

> The proposal shall include the applicant's design process, hardware fabrication and software builds, detection algorithm, configuration management, reliability quality assurance, production, and logistics support. The proposal shall include a section on Design Issues, including identification of moderate and high risks and how they will be addressed, mitigated, and resolved. The proposals shall include a Concept of Operations (ConOps) description with supporting illustrations.

(Buckley Aff. ¶5 and Aff. Ex. A--Phoenix RFP at §2.1, p.5) (emphasis added).

Reveal's CT-80 proposal submitted to the TSA in early August 2003 set forth in detail how Reveal was going to provide the TSA with the next generation EDS machine according to the TSA's specifications. On September 25, 2003, the TSA awarded Reveal a $4.7 million Phoenix grant to develop Reveal's CT-80 screener. The terms of this grant were documented in a Cooperative Research Agreement, which incorporated by reference the terms of the Phoenix RFP and Reveal's grant proposal. (Buckley Aff. ¶¶6-7 and Aff. Ex. C --Cooperative Research Agreement)

### The TSA's Continuous and Systematic Review, Testing and Approval of the CT-80

Since the TSA is the exclusive purchaser and operator of airport EDS, the TSA, in awarding the Phoenix grant, made it clear in the Cooperative Agreement that it would have "substantial involvement" in the design, testing and approval of the CT-80, including:

- "The TSA will be involved in the review of system design and program management of the project. System design, documentation, and software will be subject to the approval of the TSA." (emphasis added).

7

- "The TSA will provide necessary information on explosive detection system requirements and modify the Phoenix specification as required."

- "The TSA will perform verification activities for compliance of the system (and recipient) with project requirements by analysis, test, or other means."

- "The recipient shall submit monthly detailed technical progress reports and detailed invoices. The recipient shall be available for weekly teleconferences and monthly-to-quarterly program reviews, depending on program activity." (emphasis added).

- "The TSA reserves the right to witness tests at the vendor's facility to monitor progress and verify compliance with requirements."

- "The TSA shall retain title to all systems and devices developed or acquired under this project." (emphasis added).

- "The recipient shall provide detailed information on the analysis and decision software of developed systems."

(Buckley Aff. ¶9 and Aff Ex. C--Cooperative Agreement at pp. 3-4) (emphasis added).

The Phoenix Project consists of five phases: two design phases, one system development phase, and two test and evaluation phases, which include final certification. The first test and evaluation phase concerns the operations of the EDS machine itself, while the second test and evaluation phase concerns the EDS machine's ability to integrate into existing airport baggage handling systems. (Buckley Aff. ¶12 and Aff. Ex. A--Phoenix RFP at §2.2, p.6-7). The TSA's approval and oversight of Reveal's design and manufacture at each phase is virtually plenary.

The TSA makes payments of the grant contingent on its approval of Reveal's design and development work in each of the phases. Indeed, the TSA makes it explicitly clear that: "[t]his is a phased project with critical milestones... The recipient shall not begin any phase of the project without prior authorization from the Phoenix R&D Project Manager. The recipient shall not be entitled to reimbursement of costs incurred for work performed or materials acquired for unapproved phases of the project." (Buckley Aff. ¶¶10-13 and Aff. Ex. C--Cooperative

8

Agreement at p.4). The TSA's involvement in the review, testing, and approval of each phase is extensive -- including detailing the content of the operator and maintenance manuals, which must accompany the machines. (Id. at ¶¶9-16 and Aff. Ex. A--Phoenix RPP at Appendix A, §3.1.1.9.1, p. 24-25). This includes almost daily contact with Reveal's Contracting Officer for the project on issues such as coordinating testing, progress reports, design modifications, and the payment of funds to Reveal under the grant upon the successful review and completion of various project milestones. Moreover, much of Reveal's work on the CT-80 has been performed at the TSA's technical testing center in Atlantic City, New Jersey, where it is supervised by the TSA Project Monitor. (Buckley Aff. ¶¶10-11, 13, 16).

Moreover, the TSA has reviewed and approved Reveal's design and development work through the two Phoenix design phases and the system development phase. Indeed, in February of 2004, the TSA's Phoenix Review approved the CT-80's design and authorized Reveal to spend the second tranche of approximately $2.3 million of grant funds to complete its work on the project. Currently, Reveal is undergoing the TSA's final readiness certification tests, which evaluate the system's ability to meet the TSA's functional and performance requirements. As a result, the TSA will conduct the final certification test shortly. (Buckley Aff. ¶13).

Not only has Reveal developed and manufactured its CT-80 according to the TSA's specifications, using the TSA's money, subject to the TSA's continuous and systematic approval, review, and testing of the CT-80 design, but the TSA is also the <u>exclusive</u> final purchaser of the CT-80 for U.S. airports and will operate and maintain the machines using TSA federal employees. (Buckley Aff. ¶¶18-20).

**The TSA Has Already Accepted Delivery of Two CT-80 Machines**

The TSA has already accepted delivery of two (2) CT-80 machines, which have been

identified as government property. Reveal is manufacturing additional machines in anticipation of TSA purchases upon the final certification of the CT-80. (Buckley Aff. ¶18).

**The Timing and Nature of L-3's Patent Infringement Complaint**

On July 14, 2004, Mr. Ellenbogen, the President of Reveal, testified before the U.S. House Subcommittee on Aviation on the subject of the development and deployment of in-line explosive detection systems. An L-3 executive was present at this hearing. At that hearing, the ranking member of the committee expressed his continued concern that Congress was not doing enough to ensure that the latest EDS technology was being developed and deployed as quickly as possible.

> **DEFAZIO [U.S. Representative Peter A. DeFazio (D-OR) Ranking Member]:**
>
> Thank you, Mr. Chairman. Thank you for calling this important oversight hearing.
>
> I share the concern of the chairman about the lack of progress in coming up with modern, integrated systems. And also share his concern about the role that some of our colleagues in Congress have played in this issue.
>
> I remain concerned, as I believe does the chairman, that explosives are a very real threat. . . .But in the area of explosives, unfortunately, I don't think we have made anywhere near that progress.. . .We're not exactly, under this administration, showing a sense of urgency about moving forward with the best available technology in our airports. I want to hear more, particularly from the vendors, about new technology that might be out there superior to what we're using today. So I think this is a very timely hearing. And I look forward to hearing from people who know more about this than I do.

(Ellenbogen Aff. ¶¶10-11 and Aff. Ex. A at pp. 3-4) (emphasis added). Mr. Ellenbogen then proceeded to inform the committee about the progress of the design and manufacture of the CT-80 for the TSA. The Chairman of the Committee, U.S. Representative John Mica, asked the TSA, in the presence of L-3's vice-president and general manager, when Reveal's machine would be certified:

> **MICA [U.S. Representative John Mica (R-FL) Chairman]:**
>
> One of the things I'm hoping to do is to move forward with as many in-line systems as we can where it makes sense. <u>Now, the last witness, Mr. Ellenbogan (sic), testified about some new emerging technology that's being tested for certification. He estimated it might be certified this summer. Do you have any insight as to when this</u>...
>
> **NULL [Randy Null, Acting Assistant Administrator, Aviation Operations, Transportation Security Administration]:**
>
> Yes, sir. They are actually at the labs in Atlantic City now. And our expectation is that if they are able to meet certification <u>that it will be this summer. We are in data collection and starting the certification process here very soon.</u>

(<u>Id.</u> at ¶¶12-13 and Aff. Ex. A at p. 24) (emphasis added). Not only did L-3 realize that the TSA would certify Reveal's CT-80 very soon, L-3 also clearly knew that it was suing the wrong party when it brought this lawsuit about one month after this Congressional hearing.

Specifically, on August 30, 2004, L-3 filed its original complaint against Reveal asserting that its CT-80 allegedly infringes on a patent assigned to it by Vivid Technologies, Inc. ("Vivid"): U.S. Patent No. 6,721,391 ('391 Patent). Twenty-three days later, L-3 filed its Amended Complaint adding infringement claims asserting that the CT-80 infringes two more patents assigned from Vivid: U.S. Patent No. 5,642,393 ('393 Patent); and U.S. Patent No. 5,838,758 ('758 Patent). Although Reveal disputes that it infringes on any of these patents, it does not matter for purposes of this motion to dismiss because Reveal is building its CT-80 for the United States with its authorization and consent. Consequently, 28 U.S.C. §1498 bars L-3's claims as a matter of law.

**ARGUMENT**

I. **L-3'S COMPLAINT MUST BE DISMISSED BECAUSE REVEAL'S DESIGN, DEVELOPMENT, AND MANUFACTURE OF ITS CT-80 FOR THE TSA BARS ALL CLAIMS FOR PATENT INFRINGEMENT**

In an attempt to prevent the deployment of Reveal's CT-80 under the TSA's Phoenix program, L-3 has knowingly brought patent infringement claims against the wrong party -- Reveal. L-3's complaint fails to state a claim for patent infringement against Reveal, as a matter of law, because 28 U.S.C. §1498: (1) immunizes Reveal from claims that it allegedly uses patented systems in its product for the government; and (2) requires L-3 to bring any such claims against the United States in the Federal Claims Court. Section 1498(a) provides, in relevant part:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the <u>owner's remedy shall be by action against the United States in the United States Court of Federal Claims</u> for the recovery of his reasonable and entire compensation for such use and manufacture . . . .
>
> For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States <u>by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government</u>, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a) (emphasis added). Simply put, "[i]f a patented invention is used or manufactured for the government by a private party, that private party cannot be held liable for patent infringement." <u>Crater Corp. v. Lucent Technologies, Inc.</u>, 255 F.3d 1361, 1363-1364 (Fed. Cir. 2001) (affirming Rule 12(b)(6) dismissal of patent claims against government contractor whose work was done under a government project); <u>Croll-Reynolds Co. v. Perini-Leavell-Jones-Vinell</u>, 399 F.2d 913 (5th Cir. 1968) (affirming the dismissal of patent infringement claim where contractor's concrete cooling process was done for government dam project); <u>Virginia Panel</u>

Corp. v. MAC Panel Co., 139 F. Supp.2d 753, 757-758 (W.D. Va. 2001) (holding that sales pursuant to government contracts did not violate injunction because §1498 "immunizes an infringer who uses or manufactures an infringing product for the Government"). Consequently, L-3's entire complaint must be dismissed.

### A. The Policy and History Underlying the Statute is Particularly Significant In This Case Involving The Government's Request for EDS to Protect Our Nation's Airports in the War on Terrorism.

The purpose of 28 U.S.C. §1498 is to relieve individuals and firms providing goods or services to the United States Government from any and all patent infringement liability and the associated "expensive litigation with patentees, possible injunctions, payment of royalties, and punitive damages" by limiting the patentee, and those claiming through him, to a suit against the United States in the Court of Claims. See TVI Energy Corp. v. Blane, 806 F.2d 1057, 1059-1060 (Fed. Cir. 1986) (affirming dismissal of infringement claims where bidder was required to demonstrate the allegedly infringing product as part of the bidding process); Evans v. McDonnell Aircraft Corp., 270 F. Supp. 778, 780-781 (E.D. Mo. 1967) (granting motion to dismiss where government contractor allegedly used patented method to detect whether it left tools behind in the airplanes that it manufactured for the government).

The purpose and history of the statute has special relevance in this case. The statute was originally enacted in 1910; however, the Supreme Court held that the original statute did not protect a government contractor from liability for alleged infringement. As a result, defense procurement was hindered during World War I because contractors were unwilling to enter into broad procurement contracts for the government in light of the possibility of being sued for patent infringement. Consequently, the statute was amended in 1918 at the request of the U.S.

Navy because of its difficulties in procuring goods and services from private manufacturers necessary to meet the military requirements. The purpose of the statute, as amended, was:

> [T]o furnish patentees an adequate and effective remedy for alleged patent infringement, and, at the same time, to free the government from obstructions raised by involvement of its contractors or subcontractors in private litigation.

Evans v. McDonnell Aircraft Corp., 270 F. Supp. 778, 780 (E.D. Mo. 1967); see also TVI Energy Corp., 806 F.2d at 1059-1060 (statute designed to "relieve private Government contractors from expensive litigation with patentees, possible injunctions, payment of royalties, and punitive damages"); Bereslavsky v. Esso Standard Oil Co., 175 F.2d 148, 149-150 (4th Cir. 1949) (discussing history of statute, stating "purpose of amendment was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government").

In this case, the TSA, like the U.S. Navy in the early 1900's, is trying to encourage private manufacturers in a war-time environment to contract with the government to provide products essential to protecting national aviation security. Under ATSA, and as stated repeatedly at Congressional hearings and in the 9/11 Commission Report, it is essential for the TSA to deploy the latest EDS baggage scanning machines as part of the national effort to safeguard our airports. However, L-3's suit effectively constitutes an attack on the federal government's own procurement needs by claiming that Reveal's CT-80 infringes on L-3's patents. Congress specifically amended §1498 to prohibit such conduct. Trojan, Inc. v. Shat-R-Shield, Inc., 885 F.2d 854, 856-857 (Fed. Cir. 1989) (section 1498 was designed to prevent "a patent owner [cutting] the government off from sources of supply, either at the bid stage or during performance of a government contract"). This is not to say that L-3 is without a remedy. Under the statute, L-3 may bring its claims against the United States in the Court of Claims.

### B. Reveal's Design and Manufacture of the CT-80 Is For The TSA and With The TSA's Consent or Authorization.

It is incontrovertible that Reveal's design, development, and manufacture of its CT-80 is "for the government" and "with its authorization or consent." See 28 U.S.C. § 1498. As an initial matter, Reveal's design and manufacture of the CT-80 is "for the government" because the CT-80: (1) is built in response to the TSA's Phoenix RFP; (2) using federal Phoenix Project grant money; (3) subject to the TSA's plenary review and oversight; (4) is reviewed, tested, approved and ultimately certified by the TSA; and (5) has already been delivered to and accepted by the TSA. In addition, the TSA is the <u>exclusive</u> purchaser and operator of airport EDS machines, such as Reveal's CT-80.

Second, the CT-80 has been manufactured with the government's "authorization or consent." Courts readily find such consent or authorization for the purpose of applying 28 U.S.C. §1498 where the government either approves the design of a product, accepts delivery of the product, or pays for the product. See, e.g., Croll-Reynolds Co. v. Perini-Leavell-Jones-Vinell, 399 F.2d 913 (5th Cir. 1968) (affirming the dismissal of patent infringement claim where government approved the defendant's process and paid for the work); Bereslavsky v. Esso Standard Oil Co., 175 F.2d 148, 151 (4th Cir. 1949) (affirming dismissal of plaintiff's patent infringement claim where government's consent was established by its acceptance of allegedly infringing fuel); Croydon Co. v. Unique Furnishings, Ltd., 831 F. Supp. 480, 484-485 (E.D.N.C. 1993) (granting motion to dismiss finding governmental consent where the U.S. Army contracted for library furniture, which alleged infringed on a design patent, and accepted delivery of the furniture); Evans v. McDonnell Aircraft Corp., 270 F. Supp. 778, 781 (E.D. Mo. 1967) ("the Government consents, if it has not done so before, by accepting delivery under the contract"); Cf. Hughes Aircraft Co. v. United States, 534 F.2d 889, 901 (Fed. Cl. 1976) (holding that court had

jurisdiction over the United States for patent infringement where it used of private companies to design and build defense communications satellites for the U.S. Government and with its consent).[5]

Indeed, courts do not adopt a restrictive interpretation that the government must expressly request the patent infringement through its specifications in order for the product to be "for the government and with its consent."

> [T]here is no language in the statute which limits its application to cases where the government contracts expressly for what will infringe, but on the contrary, it applies in any case where the invention of the patent is used or manufactured by or for the United States. <u>To limit the application of the statute to cases where officers of the government intentionally contracts for patent infringement would in very large measure defeat its purpose.</u>

Bereslavsky, 175 F.2d at 150 (emphasis added) (dismissing patent infringement claims where production of allegedly infringing motor fuel was for the government and with its consent); see also Croll-Reynolds Co. v. Perini-Leavell-Jones-Vineld, 399 F.2d 913, 915 (5th Cir. 1968) (affirming the dismissal of patent infringement claims holding it "does not matter that there may have been other cooling devices or systems that might have been used. If some other system had been installed [for the government], another claimant under another patent might be the appellant here").

The Croll-Reynolds Co. case involved a government construction contract requiring that concrete poured into certain forms had to be between 40-50 degrees Fahrenheit. This required the contractor to cool the concrete prior to pouring the forms. The government contract did not require that the cooling be done by any particular method or process. The government contractor

---

[5] In the Hughes Aircraft case, the Federal Claims Court stated that "'authorization or consent' on the part of the Government may be given in many ways other than by letter or other direct form of communication. . ." Although, in that case, the United States had previously provided the private manufacturers with a letter explicitly providing its authorization and consent after litigation had commenced, the U.S. Government, like the TSA in this case, also exercised extensive control over the "Skynet Project," including assisting with "the design, development, procurement, launch and initial orbital support of its satellites . . ." Id. at 895-896.

installed a cooling facility on site, which the government contracting officer approved and paid for. Croll-Reynolds Co., 399 F.2d at 914-915. On appeal the Fifth Circuit rejected the appellant's claim that the cooling process was not created for the government and with its authorization.

> The government approved the cooling equipment and facilities and, as its contract required, made payment for it. <u>The absence of any designation or specification in the contract that would require the use of the appellant's invention does not preclude a finding that there has been use for the Government with the authorization and consent of the Government</u>. . . <u>The approval and payment evidence, conclusively, we think the Government's authorization and consent</u>. It does not matter that there may have been other cooling devices or systems that might have been used.

Id. at 915 (emphasis added).

The facts of the present case are even more compelling than in Croll-Reynolds Co. Specifically, the TSA's control and approval of the CT-80's design started with the Phoenix RFP, which conditioned grant awards on the TSA being provided detailed proposed design information for its evaluation, including: "applicant's design process, hardware fabrication and software builds, detection algorithm, configuration management, reliability quality assurance, production, and logistics support." (See Buckley Aff. ¶¶5, 9-17 and Aff Ex. A--Phoenix RFP at §2.1, p.5). Furthermore, after awarding the Phoenix grant, the TSA has had "substantial involvement" in the design, testing, approval, and final certification of the CT-80. See discussion *supra* at pp. 7-9. Not only has the TSA approved Reveal's design and development of the CT-80 at each of the development phases and paid Reveal grant money upon the successful completion of each phase, the TSA has already accepted delivery of two (2) CT-80 machines, which have been identified as government property. (Buckley Aff. ¶¶18-19).

## CONCLUSION

Where Reveal has developed, manufactured, and delivered its CT-80 for the government's use and according to the Phoenix RFP, using the TSA's money, subject to the TSA's continuous and systematic approval, testing, and final certification test, this Court must dismiss L-3's patent infringement complaint. A rejection of L-3's last-ditch effort to thwart the deployment of the Reveal CT-80 is not only mandated under 28 U.S.C. § 1498, it is consonant with the national interest in ensuring that the latest advanced in-line EDS machines requested by and contracted for the TSA be deployed as soon as possible to protect United States Aviation. See 49 U.S.C. §40101(d)(1); §44912 (the TSA "shall establish and carry out a program to accelerate and expand the research, development, and implementation of technologies and procedures to counteract terrorist acts against civil aviation").

Respectfully submitted,

**REVEAL IMAGING TECHNOLOGIES, INC.,**

By its attorneys,

Thomas R. Murtagh (BBO #365220)
Joseph D. Lipchitz (BBO #632637)
Jason A. Mirabito (BBO # 349440)
Mintz, Levin, Cohn, Ferris, Glovsky
  and Popeo, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

Date: October 12, 2004

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by mail/hand on: 10/12/04