MICA:

It was the ranking member. It was not me.

LIPINSKI:

OK. Obviously, either the ranking member or the chairman want me to shut up, so I will do so.

Let me just say that it's supposed to be $90 million for O'Hare and Midway. And it's estimated O'Hare is going to be $75 million; that leaves $15 million only for Midway. That's how I understand it. Is that how you understand it?

NULL:

I would have to get back to you, sir, on that exact breakdown. I'm reasonably familiar with O'Hare, but I don't remember the cost associated with Midway.

LIPINSKI:

OK. Midway is the fastest growing airport in the country.

NULL:

Yes, sir.

LIPINSKI:

Thank you, Mr. Chairman.

MICA:

Thank you.

That was not me tapping. It was the ranking member and just let the record...

LIPINSKI:

You mean the fellow who I used to, when I was the ranking member...

MICA:

... reflect that the former ranking...

LIPINSKI:

... I used to let him ask questions immediately?

MICA:

Let the record reflect that the former ranking member went two minutes and 54 seconds over time, which exceeded the amount of time that anyone has consumed on this panel today, just for the record.

LIPINSKI:

Well, I want to thank you very much for that extra time.

MICA:

He gave me a hard time about my opening statement the other day, so this is inside the ballpark.

Mr. Ehlers?

EHLERS:

Thank you, Mr. Chairman, for giving me a target to shoot for now.

(LAUGHTER)

A couple of questions. First of all, Dr. Null, with the in-line systems it seems like things are going much more rapidly and so forth.

One major issue that we've discussed and have not resolved has to do with the packages that get shipped on the airplane. And with this new automated in-line system, would it be easy to accommodate those packages which are being

shipped? They can be handled during some of the dead time between the passenger rushes, et cetera?

NULL:

Provided it's bulk packages that are of the right size, they certainly could be used in the in-line systems. It becomes a logistics issue of how the freight handling piece is managed and whether or not there is a readily accessible port of entry into the baggage handling systems.

But if that's the case, there's certainly nothing that would prevent us from using those systems for packages.

EHLERS:

All right. Thank you.

Ms. Coutu, you commented on your testimony that the in-line installation and on-screen resolution have dramatically reduced the number of bags that must go through secondary trace screening. Which of those two is the important, the in-line installation or the on- screen resolution?

COUTU:

They are both equally important for cost savings, Congressman.

EHLERS:

No, but we're talking about how many bags must go through secondary trace screening. Why is the system better?

COUTU:

That would be on-screen resolution which reduces that. On-screen resolution allows the operators of the EDS equipment to clear some of the alarms from the machine.

EHLERS:

You mean they view it a second time rather than going through a secondary tracing?

COUTU:

They are allowed to analyze the data and the images provided by the EDS equipment. And using the approved TSA threat resolution protocol they are allowed to clear some of the alarms. Without on-screen resolution every bag alarmed by an EDS machine must go to secondary screening which we use electronic trace detection to do right now.

EHLERS:

So when you say increased on-screen resolution what does that mean, that's simply better resolution or they take different views of it or what?

COUTU:

No, actually we have not implemented on-screen resolution system-wide at even the existing in-line EDS sites at this point. And that needs to be expedited.

EHLERS:

A related question: Mr. Barber, you're hoping to use multi-view tomography, which, obviously, is the next step forward, but other companies have attempted to use it and failed the certification process. In what ways is your system different or is it just the company that's different?

BARBER:

The system is actually a little older design. It actually passed the criteria for detection but failed in false alarm. It has excessive numbers of false alarms, so it would not be useful as a stand-alone system, but by combining it with an eXaminer, a CT system to handle the false alarms, you use a system of systems approach, put both systems together, and when you do a cost assessment of that you get a considerable savings; approaching 20 percent in your initial year and operational cost savings approaching 10 percent each year annually thereafter.

It's really in the managing of the false alarm rate. It was absolutely correct for the system to fail certification originally because there's no way, as a stand-alone system, the MVT could -- that the airports could handle all the alarm rate. But by

combining systems and being creative with system solutions we believe there can be a considerable savings.

We've had that discussion with the tech center at Atlantic City and we're currently working through a potential process for testing it.

EHLERS:

Let me understand. You send it through a standard system first and then if there's an alarm you look at it through the tomographic system or vice versa?

BARBER:

You look at it first with the MVT, and then with a high alarm rate you send the alarms, without any operator interference, to the CT equipment that is currently in place, but you put them in tandem and let the CT equipment satisfy the alarms and drive down the alarm rate as they currently do. Since, in the case of our equipment, the current alarm rates across the country are running about 17 percent.

Then any subsequent bags that are alarmed can be done with on- screen resolution, as Ms. Coutu alluded to.

At John Wayne Airport and at Logan the on-screen resolution process were clearing in excess and on average of 70 percent of the bags. So 17 percent alarms clearing 70 percent of those that reduces the number of bags that go to search substantially, sir.

EHLERS:

All right. I'm interested in the technical stuff, but since my time's expired and I believe in following the lights, I'll yield back at this point.

But I do want to pursue that. If both of your firms would send me some technical information, I'd appreciate that.

BARBER:

Be happy to, sir.

EHLERS:

Thank you.

MICA:

I thank the gentleman.

Ms. Berkley?

BERKLEY:

Thank you, Mr. Chairman.

Thank you, all, very much for being here. I enjoyed everyone's testimony very, very much; most informative.

Dr. Null, do you think you could answer the question -- I didn't think I would still be here to ask this question -- but the question that I posed at the end of my opening statement regarding the EDS system at McCarran Airport?

NULL:

Well, I think there were two parts to the question, one on the 90/10 and one on the electrical piece.

BERKLEY:

I think Mr. Porter was the 90/10, but I'm going to ask that...

NULL:

OK.

BERKLEY:

... in a minute in his absence. But could you talk to me about what the glitch is with the EDS system and the wiring?

NULL:

My understanding is that there was some wording issues in the LOI and the way it was done. I did have some discussions with the chief technology officers group this morning. And, in fact, they have already issued that and had issued it here recently to Boeing to complete that work. And the CTO will be contacting Randall Walker to make sure that that is in progress.

You're absolutely right, it makes no sense to put equipment in place and not put stuff -- no electrical to it.

BERKLEY:

Could I ask you to make sure that they contact him, because as of this morning they had not and he's anxiously awaiting a word from above?

I also want to make sure that we're on the same page, that McCarran is still short of screeners and that whatever the technology does to lessen the number of screeners necessary, that they should not be reassigned to another airport, that they should be reassigned within McCarran Airport, because we have tremendous screening needs and we don't want to lose the baggage screeners when they could be screening passengers going through the security system.

NULL:

We will absolutely support the wait time requirements and the new capacity that Las Vegas is putting in place in the checkpoints.

BERKLEY:

That's great, thank you.

And in Mr. Porter's absence I think I would be remiss if I didn't ask my colleague's question. But you told the committee that the TSA was awaiting the outcome of the congressional deliberations on the issue of 75/90. Given the fact that the House and Senate funding bills don't include the administration's request of 75 percent, is it safe to assume that the TSA should plan on 90 percent for the next fiscal year? What is safe to assume?

NULL:

If that resolution is where we end up we will follow along.

BERKLEY:

Well, assuming that the 90 percent requirement remains in place, what are your plans and what is your timeline for reimbursing existing LOI airports?

NULL:

Well, if the share stays at 90 percent there will be a couple of things happen. One, we will immediately reengage with the existing LOI's to look at renegotiation of how that extra payment will occur. The other challenge that we will have is that our budget will be extremely challenged and we probably will have a number of airports where we will have jeopardy of going non-compliant because of our non- LOI activity won't be funded.

BERKLEY:

Thank you very much.

I'd like to just mention that I agreed with Mr. Plavin's testimony if this Congress is going to keep mandating additional security measures, very expensive ones, we ought to put our money where our mouths are and not expect the airports or the airlines to absorb this cost because they're not going to be able to. And I'm very supportive of funding it adequately so you all can do your jobs.

MICA:

I thank the gentlelady.

Mr. Beauprez?

BEAUPREZ:

Thank you, Mr. Chairman.

And thanks to the panel for a very good hearing.

Dr. Null, I'll probably just focus on you and not break the pattern that seems to be very well developed here.

But thanks very much to the testimony we heard from the others; particularly, Mr. Gobb, I was pleased to hear of your experience. And I actually want to focus on that a little bit.

The other three panelists on this end talked a lot about technology and I applaud them for what they're doing. The private sector in America is always pretty good when given a challenge, coming up with a solution and an ever-more efficient and fiscally affordable solution. What I want to focus on, Doctor, is a little bit of that, especially the operational efficiency, Mr. Gobb, that you experienced.

I used to be in banking so I'm looking at it from that perspective. It appears to me that one of the easiest things in the world to attract the financing community's interest would be exactly the experience that you had, the life of these machines -- and now I'm getting out of my realm of comfort, but I think it's seven to 10 years, something like that. So if you came to me and said, "I want to finance it over that sort of a period of time and guess what, Mr. Banker, I can pay for this thing in a year and a half, plus or minus; every airport's going to be a little different," I'm going to get excited about that loan.

Do we need, Doctor, two things, perhaps -- and I'm hearing this from the FSD at Denver Airport. Do we need more flexibility for each of these airports to perhaps pursue as creative and efficient a plan for their own airport, both from a design equipment standpoint, but also a financing standpoint? And do we need to get more aggressive nationally with both that local flexibility, but also the financing arrangements?

NULL:

I think that's absolutely the case. And, in fact, we have had a number of discussions with OMB looking at alternate -- I mean, what are the financing options. So those discussions will continue.

NULL:

We will welcome other suggestions on how one can proceed with this. But the airports themselves certainly can step out and go forward with in-line systems while we determine the government's ability or how they will pay for it.

I think that we clearly have got to provide more flexibility to the airports in terms of construction and design and we have been moving that direction away from the original general contractor approach that we took.

All of our, whether they're LOIs or OTAs, today are under the management of the airports themselves. So they work with the design companies. They work with the construction companies. We provide oversight and consultation in the design approvals. And that's our approach forward is to do more and more of that approach.

BEAUPREZ:

I would just finish, Mr. Chairman, by stating I hope -- I mean, assertions that have been made here noted that Congress could always write bigger checks, just make it go away. I expect every hearing room on every subject all over Capitol Hill gets much the same kind of claim raised.

But I would hope, especially given your very good experience, that we would say, "Let's go out there and see if there isn't a smarter way to leverage the dollars that are generated in the system to accomplish the end in sight as effectively, as quickly and efficiently as possible."

With that, Mr. Chairman, I'll yield back.

MICA:

I thank the gentleman.

Ms. Millender-McDonald?

MILLENDER-MCDONALD:

Thank you, Mr. Chairman. Thank you for holding such an interesting meeting, you and the ranking member, as we try to look at how we will sufficiently deploy these explosive device systems.

Mr. Null, given that we are in conference right now trying to pass the TLU (ph) bill at $275 billion, how do you present such a proposition to this administration for seeking to get $5 billion for a new in-line explosive devise system and in-line EDS system? How do you present that to the administration?

NULL:

Well, I don't know that we've ever proposed to submit a $5 billion bill. I mean, there are...

MILLENDER-MCDONALD:

Or even a small amount thereof, any increase, any amount of money for any mode of transportation or services?

NULL:

All we can do at this point in time is present what we know the total bill could be and then we are looking for balance of what our total requirement is from an agency and a department standpoint. And we work and negotiate with them on what that level ends up being. That is where we are.

MILLENDER-MCDONALD:

Certainly before 9/11 and subsequent to 9/11 we put about $11 billion in airports and air transportation to try to circumvent more terrorist threats; that's with air marshals, the whole nine yards, it's about $11 billion I'm told. With that -- and you say that we are near the 100 percent level of installing EDS machines, then how do we go back now and ask for more funding when we've put so much in to the aviation, and given the fact that now port security has become, as it seems, the largest threat when it comes to terrorism?

NULL:

Well I think, again, it's balancing the security equation. It's making sure that that is our number one priority.

We clearly have got situations where there's financial payback, but I have to balance the other requirements of rail and mass transit and ports. So if I can live with what I have and maintain the appropriate level of security I will do that. And then as I can, over time, I will replace through the life cycle, that equipment and get more efficient over time.

I don't necessarily spend the whole $5 billion up front. I look at it over a longer-term period of replacement.

MILLENDER-MCDONALD:

With your putting part of this in-line EDS machines in two of the 20 major airports, how much money does one have to -- the airport authority have to put in

before you kick in the amount, or we kick in the amount that is necessary to install the in- line EDS machines?

NULL:

Well the way the letters of intent operate, we come to an agreement with the airport authority on what the total cost of that system is going to be for both the belt systems and the reconstruction of the airport.

The letter of intent then requires the airport to come up with the initial capital, either through a bond raise or whatever may be the vehicle, then we initiate the construction. We then pay, in addition to the LOI, for all the equipment costs and the actual installation of the equipment itself. And then payback occurs over a three- to five-year time window based on when they're expending their funds. And then at this point it's a 75 percent coverage of that total cost. But at the end of the day the airport has to come up with the initial capital to generate this.

MILLENDER-MCDONALD:

And, of course, I have the Los Angeles Airport and I will tell Lipinski, who's left, that I think Long Beach is the fastest growing commercial airport with 300 percent increase.

But with airports talking about they're having to expend more funding when the alert level goes up, they really do not have the propensity to -- in my opinion, looking at both Long Beach Airport, L.A. Airport and the senior member on this committee for California looking at San Francisco now -- the capacity to spend a lot of money in the redevelopment or the expansion to improve and include this in- line EDS. So they will not have the money to come up front with whatever their portionality is to meet with what the feds would put up, it seems to me.

Have you been met with that?

NULL:

There are a couple of ways that I've seen it. One is...

MILLENDER-MCDONALD:

But, you know, with the security, with they're having to increase security...

NULL:

Right.

MILLENDER-MCDONALD:

... they're just bursting at the seams.

NULL:

Well, AIPs, which was used, does do an up-front payment from the government. And it's at 75 percent coverage level, but it's money up-front. The LOI structure that we have the authority from Congress on is an up-front payment in total by the airport and then we pay back over time.

I think the question is whether or not there are other vehicles that may be out there that could help give some relief to the airport authorities that have got financial issues.

MILLENDER-MCDONALD:

We will subsidize them. We will pay back the funding that they used for the initial improvements?

NULL:

That's the way the letters of intent work.

MILLENDER-MCDONALD:

So we will be putting that money up.

So, Mr. Plavin, you're saying that the feds must put up all of this money; that is a proposition that we are still grappling with in trying to get the $275 billion for this six-year transportation bill.

PLAVIN:

As I understand the $275 billion, it's really to continue to honor the federal government's commitment to the letters of intent that have already been issued to airports. My point simply was...

MILLENDER-MCDONALD:

No, it is for operational purposes in six years.

PLAVIN:

I think that's an additional appropriation.

My point that I was making earlier was that airports can step up and do this, provided that they have some idea that over some period of time the federal government will honor its commitment to pay back the funds.

They don't have any funds from any other place. They basically can find the cash. They can issue bonds. They can do leaseback agreements. But they don't have the wherewithal to actually front the money without some sort of promise that they're going to get it back.

And it doesn't need to be an LOI. There are other mechanisms that the government has used for many years. And I would just like to argue...

MILLENDER-MCDONALD:

I would like to know where those mechanisms are.

PLAVIN:

Well, I think we've used them. The transit people use it in full funding grant agreements. The government issues guarantees. We have the airport tanker leasing program, for example, that's a mechanism. That's an alternative. It doesn't even have to be that specific.

But I think the point is that we can't front that money without some indication that it's going to be paid back over time. And then Congress has to figure out a way to let us know.

We're not talking about two years or three years. It might be 10 years, but it has to be something that's firm and that's something that people can count on.

MILLENDER-MCDONALD:

But in the meantime we must deal with the EDS machines, Mr. Null, and also increasing, as Ms. Berkley said, TSA screeners. They're short too in a lot of these airports.

Mr. Chairman, I just wanted to ask Mr. Coutu one question when she speaks about the efficiency and best security in the in-line EDS machines. But what happens as the baggage is going on this conveyer belt and there are some suspicious types of items in some of those bags? Who and how do we get those bags off? And as Mr. Ehlers says, it becomes a secondary type of screening process.

COUTU:

The process right now -- there are two processes, depending on whether TSA has implanting the on-screen resolution at the airport or not -- and Dr. Null can probably address this far better than can I -- they are training people to train the operators how to use the on-screen resolution. They intend to implement it, but it is not fully implanted.

If it is and there is an alarm, a suspicious item, as you've called it, in the bag, the operator may use the tools in the explosive detection system to try to resolve that alarm. If they cannot resolve that alarm, it goes to secondary screening, which is done with electronic trace detection equipment.

If there is no on-screen resolution what happens right now in an in-line system is the bag that alarms is immediately sent by the bag handling system down into the threat resolution room for a secondary screening.

MILLENDER-MCDONALD:

So we're not talking about a substantial loss of jobs then if there is a secondary screening, which means that has to be handled manually or by human element, if you will, in that secondary process? Am I correct on that?

COUTU:

That is correct.

MILLENDER-MCDONALD:

Mr. Chairman, I'm sorry that I don't have any more time. I would have had a lot of more questions. But thank you for the hearing.

MICA:

I would be glad to submit them. And Mr. DeFazio moves that we keep the record open for at least two additional weeks to allow that, without objection, so ordered.

MILLENDER-MCDONALD:

Thank you, Mr. Chairman.

MICA:

Ms. Norton?

NORTON:

I really have only one question. I want to understand this process of letters of intent.

As I understand it, the reason that this EDS equipment is so important and so desirable is because of what it does to enhance security even more; for example, the higher explosive detection capability, the reduction in false positives.

Now, I have looked at the list of airports that have letters of intent. I look at the list of eight. Then there's another list that has approved plans that is awaiting federal funding.

You heard Mr. Lipinski ask about the special -- indeed unique -- rules regarding Reagan National. So I am absolutely perplexed. I have to ask you -- indeed, I find it very hard to understand that the one region most likely to be attacked, we are constantly told, the region where the entire federal presence is located, where the Congress is located, where the Supreme Court is located, where the White House is located, where general aviation is shutdown -- the only general aviation shutdown in the entire country, that that airport -- or should I say those airports -- neither Reagan National nor Dulles is on the list of eight or the list of 12 to receive letters of intent.

Would you kindly explain how that could possibly be?

NULL:

Well, first of all let me address DCA.

DCA actually has a very robust EDS capability today: Although it's not in-line, 100 percent of the bags at DCA go through CAT scan explosive detection systems. So it's not a security issue with DCA. It's an efficiency issue.

Dulles we think long term is probably a good candidate for in- line systems. It's just a question of timing and when it is appropriate and there is funding available. There is not a design on the table for Dulles right now. And, in fact, with letters of intent, they have to request a letter of intent from the airport authority.

At BWI I think we are close to a design that makes sense going on. And, in fact, we're going in-line with the new terminal for Southwest at BWI.

So there's, sort of, different flavors of the three airports in the area. But all of which, from a security standpoint, are covered right now. We will look more for the efficiencies going forward rather than a security issue.

NORTON:

All right, so you're telling me that without the EDS Reagan, at least, is already where it would be with an EDS?

NULL:

In terms of the detection capability it is. It clearly could be more efficient with in-line than it is with lobby, but we are at 100 percent EDS coverage at DCA today.

NORTON:

How about Dulles?

NULL:

Dulles is a combination of both ETD and EDS because of the distributed nature of the logistics of the baggage handling capabilities. But it does have a fairly large amount of -- a large content of EDS. There's just also a component of ETD. Our desire over time is clearly to replace that with EDS. And if we...

NORTON:

Has anything been requested from Dulles?

NULL:

Not that I recall, but I will have to get back with you. I think there is a desire, but I don't think we've had an actual request from them. But I will clearly get back to you on that.

NORTON:

If you assure me that without EDS that all we have are questions of efficiency does mean a lot, of course, to us as well. But if what we're dealing with is other airports that don't have -- that had absolute security needs that we have, and that is what you're telling me...

NULL:

Yes, ma'am.

NORTON:

... and that those security needs are being met at DCA...

NULL:

Yes, ma'am.

NORTON:

... then I certainly would accept that others should have preference who don't have our level of security. I would ask you to bear in mind the unique nature of DCA whenever any such equipment is considered.

NULL:

Yes, ma'am.

NORTON:

Thank you, Mr. Chairman.

MICA:

I thank the gentlelady.

Just a couple of concluding questions.

I think you testified, Mr. Ellenbogan, that you received $5 million in R&D grants from TSA, is that correct?

ELLENBOGAN:

Just under $5 million; about $4.75 million under the Phoenix program.

MICA:

How much has Invision gotten?

COUTU:

I would have to get back to you on that because that's over a 10-year period you want to know.

MICA:

Well, even the last couple of years. Actually I'm only interested in the last period of time since September 11th.

COUTU:

OK. Very little, probably in the $10 million range. We've funded something like 88 percent of our R&D out of our own pocket since that period of time.

MICA:

Well, $10 million is somewhat significant.

And L-3?

BARBER:

Just under $2 million.

MICA:

Dr. Null, do you know that I'm a strong advocate of R&D and bringing us to the next generation of screening technology?

We had authorized in the original TSA legislation some $50 million, of which the senator from the state of Washington took a good chunk of that and diverted it to other purposes. And then we had the delay in funding by Congress for TSA activities. And I think you took $62 million or $63 million of $75 million and diverted it to salaries the second year. So very little was spent on R&D.

And then the current year we're in, I understand you have access to about $150 million for R&D, is that correct?

NULL:

That's correct.

MICA:

How much of that is obligated?

NULL:

I would have to get back with you on the exact amount, but I know the majority of it has been...

MICA:

So that $75 million (inaudible)?