UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| L-3 COMMUNICATIONS, SECURITY AND DETECTION SYSTEMS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 04-11884-NG (Magistrate Judge Judith Gail Dein) |
| v. | ) ) ) ) | |
| REVEAL IMAGING TECHNOLOGIES, INC., | ) ) ) | |
| Defendant. | ) ) | |

**REVEAL'S OPPOSITION TO L-3'S MOTION FOR EXPEDITED BRIEFING
ON L-3'S MOTION FOR A PRELIMINARY INJUNCTION AND
REQUEST TO STAY ALL PROCEEDINGS ON L-3'S MOTION**

**INTRODUCTION**

L-3 Communications, Security and Detection Systems, Inc. ("L-3"), in the guise of a motion for a preliminary injunction, seeks reconsideration of several motions already presented and decided by this Court (one of which, L-3's most recent unsuccessful motion for summary judgment, is currently pending before Judge Gertner on L-3's Objection to this Court's Report and Recommendation). In a patently disingenuous argument, L-3 asserts that its motion for reconsideration is appropriately brought on an expedited basis as a motion for a preliminary injunction pursuant to a "procedure recently suggested by the Court." (See L-3's Mem. at 1.) In fact, in response to the most recent of L-3's unsuccessful barrage of motions for summary judgment, this Court warned that only if "there's a crisis beforehand" should L-3 file any

motions addressing the substance of this litigation before November 10, 2005. L-3 has the audacity to treat this warning as an invitation.[1/]

The fictional "crisis" alleged by L-3 is that Reveal has sold eight (8) of its CT-80 Explosive Detection Systems ("EDS"s) to the Transportation Safety Administration ("TSA"), all subject to the immunity granted by 28 U.S.C. § 1498, and will be submitting a response to a Request for Proposal ("RFP") to provide additional EDS machines recently published by the TSA — a process which also is subject to Section 1498.  See Declaration of Michael Ellenbogen ¶ 3, Ex. A ("Ellenbogen Decl.").  Under Section 1498, L-3 cannot sue Reveal for patent infringement. If it has a claim, it must be brought in the Court of Federal Claims against the United States government. L-3 does not even address the pivotal Section 1498 issues which preclude any patent infringement claim based on sales to the TSA.  For that reason alone, its motion should be rejected.  (See Mem. in Support of Def.'s Rule 12(b)(6) Mot. to Dismiss, Dkt. Entry. No. 8.)

Thirteen (13) companies, including L-3, attended a TSA presentation on this RFP. Ellenbogen Decl. ¶ 3.  No decision has been made by the TSA, and no purchase contract has been issued by the TSA. Despite L-3's lies to the contrary, Reveal is not "flooding the market" with its "ever-increasing stockpile of infringing goods."  (L-3's Mem. at 4.)  Nothing has changed, except L-3's increased rage that the TSA might exhibit continued interest in purchasing the CT-80.[2/]  This entire process is subject to the application of Section 1498 and is beyond the

---

[1/]   L-3's characterizations of the State Court proceeding and the relevant facts concerning this case are equally misleading, absurd and inaccurate.

[2/]   L-3 asserts that the current RFP from the TSA is for $263 million, but then inconsistently acknowledges that Reveal's present opportunity is to provide the TSA up to $25 million in CT-80s. (Compare L-3's Mem. at 8, 9 with Decl. of Allen R. Barber ¶ 6.)  In contrast, L-3 admits to sales of $150 million per year.  (L-3's Mem. at 43 n.16.)  It is difficult to understand how Reveal's potential toehold with the TSA creates a "crisis" for L-3. Plainly, it is L-3's intention to bludgeon Reveal with escalating costs so that it cannot enter this market and continue in business.

reach of any claim in this proceeding. Reveal has made no foreign sales and has not entered into any agreements for any foreign sales. Ellenbogen Decl. ¶ 6.

Based on this "crisis," L-3 presents a patchwork of arguments already rejected by the Court on the merits, or because they were prematurely made. There is no potential for imminent harm to L-3 and no basis for either the request for an expedited hearing or the motion for reconsideration in the guise of a preliminary injunction.[3] Reveal respectfully requests that L-3's motions be denied outright or, at a minimum, deferred until November 10, 2005, to be raised at the same time as any summary judgment motions. Furthermore, L-3's current and repeated actions make clear that Reveal's pending Motion to Stay should be granted.[4]

## FACTUAL BACKGROUND

L-3 and Reveal agree on one thing — that Reveal has developed a smaller, less expensive EDS machine that is ideal for use in smaller, regional airports. (See L-3's Mem. at 2, 8-9, 42-43.) The development of Reveal's CT-80 was supported by a Phoenix Project grant from the TSA for the development of a next generation EDS. Reveal has now sold eight (8) of its CT-80 machines to the TSA under a program for Pilot and Operational Testing ("pilot program"). Ellenbogen Decl. ¶ 3. That pilot contract included the standard authorization and consent language, which purposefully tracks the language and therefore the protections of Section 1498. That provision is found at Section 3.5-1 of the pilot contract and is also on the FAA website as part of the standard contract language at http://fast.faa.gov:

   3.5-1: Authorization and Consent

---

[3]   L-3 was well aware of this prior to filing its motion. Reveal's counsel reiterated these facts in the "meet and confer" discussion with L-3's counsel. In that discussion, L-3 was unable to explain what harm was imminent in light of (a) the lack of any foreign sales; and (b) the provisions of Section 1498. The subsequent exchange of correspondence on this issue is attached as Exhibit A to the Declaration of Michael T. Renaud, Esq. ("Renaud Decl."). It is a travesty that L-3 then filed its motion.

[4]   L-3 has argued throughout that Reveal is only hoping to delay the progress of this case. However, upon receipt of Reveal's Motion to Stay, L-3 notified Reveal that it was pulling its witnesses who were scheduled to be deposed last week and this week. Renaud Decl. Ex. B.

> (a) The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent:
>
> (1) Embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract or
>
> (2) Used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with
>
> (i) Specifications or written provisions forming a part of this contract or
>
> (ii) Specific written instructions given by the Contracting Officer directing the manner of performance. The entire liability to the Government for infringement of a patent of the United States may be determined solely by the provisions of the "Indemnity" clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.
>
> (b) The Contractor agrees to include, and require inclusion of, this clause, suitably modified to identify the parties, in all subcontracts at any tier for supplies or services (including construction, architect-engineer services, and materials, supplies, models, samples, and design or testing services. However, omission of this clause from any subcontract does not affect this authorization and consent.)

Declaration of Michael T. Renaud, Esq. ¶ 3 ("Renaud Decl."). This same provision is also part of the draft contract, which has been provided to entities requesting information about the RFP that is the subject of L-3's present motion. Ellenbogen Decl. ¶ 4. Plainly, the pilot contract and the pending RFP all are covered by Section 1498.

Reveal has not made any sales other than the eight (8) CT-80s sold to the TSA. Reveal is not "stockpiling" CT-80s. In fact, Reveal's entire manufacturing inventory is located at its Bedford, Massachusetts, facility, where the entire manufacturing inventory consists of twelve (12) CT-80 machines in varying stages of production produced in anticipation of the RFP from the TSA. As a start-up, it does not have the funds to manufacture any significant number of CT-80s without an agreement for their purchase. Ellenbogen Decl. ¶ 5.

In addition to the straightforward Section 1498 issue, this Court already has decided that, because there have not been any non-U.S. governmental sales, damages discovery is appropriately deferred. (Dkt. Entry No. 44 and 48.) This Court has also rejected L-3's motion for summary judgment on invalidity issues. (Dkt. Entry No. 77.) This Court then recommended that L-3's motion for summary judgment on infringement with respect to the two patents at issue in the current motion (the '393 and the '758 patents) be denied. (Dkt. Entry No. 87.) L-3 has opposed that Report and Recommendation, which is pending before the District Court Judge. (Dkt. Entry No. 88.)

In sum, the Court has already addressed all of the issues raised in L-3's most recent motion, and there is no "crisis" or even any changed circumstances which merits a reconsideration, expedited briefing or even a hearing on the preliminary injunction request.

## ARGUMENT

There is no basis for expedited briefing, or even any hearing, on L-3's motion, because L-3 has not and cannot satisfy the standards for a preliminary injunction which include: (1) a reasonable likelihood of success on the merits; (2) the risk of irreparable harm to the plaintiff; (3) the balance of harms; and (4) the impact of an order on the public interest. National Steel Car, Ltd. v. Canadian Pacific Ry., 357 F.3d 1319, 1325 (Fed. Cir. 2004)  In particular, the alleged harm to be suffered must be real, imminent and immediate. Fundicao Tupy S.A. v. United States, 841 F.2d 1101, 1102-03 (Fed. Cir. 1988). A preliminary injunction is extraordinary relief that is available *only* in the rarest of cases. Mazurek v. Armstrong, 520 U.S. 968, 973 (1997) (calling a preliminary injunction "an extraordinary and drastic remedy") (quoting 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948 at 129-30 (2d ed.

1995)); MercExchange, L.L.C. v. eBay, Inc., 401 F.3d 1323, 1339 (Fed. Cir. 2005) (preliminary injunction is "available only on a special showing of need for relief *pendente lite*").

L-3 misapplies each of the factors articulated by the courts and wholly ignores the significant negative impact of a preliminary injunction on the public interest, including the U.S. Government's anti-terrorism efforts being implemented by the TSA in order to prevent acts of terrorism targeted at American airports. Moreover, as is discussed below, such relief is seldom granted in patent infringement cases. Cf. John G. Mills, The Developing Standard for Irreparable Harm in Preliminary Injunctions to Prevent Patent Infringement, 81 J. PAT. & TRADEMARK OFF. SOC'Y 51, 71 (1999). Such relief would be particularly inappropriate here where L-3 has asserted two untested patents as the basis for its request for a preliminary injunction,[5] including the '393 patent on which the U.S. Patent and Trademark Office ("PTO") has recently ordered a reexamination, having found Reveal's request for such a reexamination to have raised a "substantial new question of patentability."[6] For this reason alone, the Court should reject this motion. See, e.g., National Steel Car Ltd., 357 F.3d at 1320; Genentech, Inc. v. Novo Nordisk, A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997).

### 1. There Is No Potential Irreparable Harm To L-3

Reveal has sold eight (8) CT-80 EDS machines, all to the TSA. The TSA has very recently issued an open procurement RFP for the purchase of Explosive Detection Systems. Reveal intends to respond to that RFP. So, apparently, does L-3. The RFP package includes the draft form contract which, in turn, includes Section 3.5-1, the Authorization and Consent clause.

---

[5] L-3's motion for preliminary injunction focuses on just two of the six patents-in-suit. These two patents, the '393 and '798 patents, are the same patents that were the subject of L-3's recent unsuccessful summary judgment motion, presently the subject of L-3's pending objection to Judge Gertner.

[6] The PTO ordered the reexamination of the '393 patent, which is one of six patents asserted by L-3 in this litigation. The PTO found that a "substantial new question of patentability affecting claims 1–39 of [the '393 patent] to Krug et al. is raised by the request for reexamination" in view of the Peschmann prior art reference (U.S. Patent No. 5,367,552). A copy of the notice from the PTO has been filed with the Court as an exhibit to Reveal's Notice of Patent Office Decision to Order Reexamination of '393 Patent. (Dkt. Entry No. 97.)

Ellenbogen Decl. ¶¶ 3, 4.  Hence, this entire process is subject to Section 1498. As this Court was informed this past January, Reveal has marketed the CT-80 outside of the U.S., but there have been no sales and there are no pending agreements for foreign sales. There is no "crisis."

In the absence of any "crisis," Reveal respectfully requests that the Court consider whether L-3 seeks, as Reveal alleges in its counterclaim in this action, to use the cost of litigation to drive Reveal out of business. Its intent and approach are malicious, anticompetitive and grossly inappropriate. As in the State Court litigation, L-3 is also making this case a "monument to over-litigation," precisely to overwhelm Reveal.  Renaud Decl. Ex. C at 4.  L-3 faces no risk of immediate harm and, therefore, a preliminary injunction is not warranted.  <u>Biogen Idec MA Inc. v. Trustees of Columbia University in the City of New York</u>, 332 F. Supp. 2d 286, 295 (D. Mass. 2004).

    **2.** **<u>L-3's Motion Is Truly A Motion To Reconsider And Should Be Denied Outright</u>**

L-3 seeks reconsideration of the following issues: (1) the Court's decision to defer damages discovery; (2) the Court's decision on L-3's motion for summary judgment on invalidity; and (3) the Court's Report and Recommendation on L-3's motion for summary judgment of infringement, which is pending before the District Court Judge.

L-3 has not provided any cogent reason for reconsideration of any of these motions. L-3 does not even address the pivotal Section 1498 issue. Consequently, its current motion should be rejected and these issues should be deferred at a minimum until November 10, 2005.

### 3. L-3 Has No Likelihood Of Success

There is no need for expedited briefing or a hearing on this motion, or to expedite discovery on damages because, among other things, L-3 does not have a likelihood of success on the merits. While this motion is not intended as a response on the merits to L-3's forty-eight (48) page brief, a few comments on the merits of these claims demonstrate that L-3 has no real claim and there is no basis for an expedited hearing, or further briefing at this time.

First, and it cannot be repeated enough, L-3 does not even address Reveal's immunity to L-3's claims under Section 1498. Under 28 U.S.C. § 1498, Reveal cannot be held liable to L-3 for sales of its CT-80 to the TSA since these products were designed, developed and manufactured for the United States government.[7/] See Crater Corp. v. Lucent Technologies, Inc., 255 F.3d 1361, 1364 (Fed. Cir. 2001) (affirming dismissal of claims because "if a patented invention is used or manufactured for the government by a private party, that private party cannot be held liable for patent infringement"); Virginia Panel Corp. v. MAC Panel Co., 139 F. Supp. 2d 753, 757-58 (W.D. Va. 2001) (holding that 28 U.S.C. § 1498 "immunizes an infringer who uses or manufactures an infringing product for the Government"). If L-3 had a cause of action for patent infringement based on Reveal's sales of the CT-80 to the TSA, § 1498 mandates that L-3 bring that action only against the United States, and only in the Court of

---

[7/]   Section 1498 provides that:

"*Whenever an invention* described in and covered by a patent of the United States is *used or manufactured by or for the United States* without license of the owner thereof or lawful right to use or manufacture the same, the *owner's remedy shall be by action against the United States in the United States Court of Federal Claims* for the recovery of his reasonable and entire compensation for such use and manufacture.
…
For purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States *by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government*, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498 (emphasis added).

Federal Claims.  See 28 U.S.C. § 1498 ("the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation").

In TVI Energy Corporation v. Blane, 806 F.2d 1057 (Fed. Cir. 1986), the Federal Circuit decided a case where a patent owner brought an infringement suit against a bidder for a government contract to supply the military with disposable thermal targets for use in weapon training exercises. There, the patentee argued unsuccessfully that § 1498 did not grant the accused infringer any immunity since the defendant was "merely bidding for a government contract" and the United States had no obligation to accept any bid or enter into a contract with any of the bidders.  TVI Energy Corp., 806 F.2d at 1059.  Rejecting the patentee's argument, the appeals court held that "authorization or consent" by the United States was expressed by the bidding requirements for the specific contract and that for purposes of statutory immunity from suit, authorization or consent could be expressed in a form other than an authorization or consent letter and in proper circumstances could be implied.  See id. at 1060.  In this case, where the design, development and manufacture of the CT-80 by Reveal was supported by the Phoenix Project grant, and the pilot contract and current RFP *expressly adopt the statutory authorization and consent language*, there is no legitimate question that Reveal is immune from liability under 28 U.S.C. § 1498.

Second, L-3 argues at length that "validity cannot even be challenged, let alone defeated." (L-3's Mem. at 3.)  This is a truly brazen statement in light of the fact that the PTO has accepted Reveal's Request for Reexamination of the '393 patent expressly stating that the issues presented in that request raise a "substantial new question of patentability affecting claims 1-39 of [the '393 patent]." (See Dkt. Entry No. 97.)  Based on that statement by the PTO alone,

9

the motion should be denied. The Requests for Reexamination of the '758 patent, and the other four patents that are the subject of L-3's most recent amended complaint, are pending. A copy of these requests was submitted to the Court with Reveal's Motion to Stay. (Dkt. Entry No. 92.)

Third, with respect to infringement (which, of course, is not relevant to the only sales at issue which are to the TSA), L-3's argument is as misleading and inaccurate as it is with respect to virtually every other detail. As admitted by L-3, both the '393 and '758 patents are directed to a two-step procedure for baggage inspection. (E.g., L-3's Mem. at 17, 20.) Step one involves an x-ray projection scan which generates a two-dimensional image of the item similar to a photograph, i.e., the image is projected onto a plane forming a two-dimensional image perpendicular to the x-ray source and x-ray detectors. See Renaud Decl. Ex. D, ¶ 11 (Affidavit of Norbert J. Pelc[8]). This basic x-ray technology has been available for over one hundred years. In some instances, however, detection of objects of interest (e.g., an explosive) can be obscured by the location of other structures in the same x-ray path. Id.

Computed tomography ("CT"), in contrast, is a method which can use a number of different energy sources (including x-ray, MRI, ultrasound) to reconstruct images of cross-sections or slices through the item in the same plane as the rotating source and detector. See id.; Renaud Decl. Ex. E at 10-12. The first commercial CT systems were developed in the early 1970s. Renaud Decl. Ex. D, ¶ 12. In CT systems, the source and detector are typically located on a rotating gantry. Id. ¶ 13. A large number of "views" (200 to more than 1000) are collected as the gantry rotates one revolution around an item, and the resulting data is collected and reconstructed using a reconstruction algorithm to produce what is known as a CT slice. Id. ¶ 17.

---

[8] The Affidavit of Norbert J. Pelc, executed on July 25, 2005, was submitted by Reveal with its summary judgment papers in the parallel State Court litigation. It is included hereto as Exhibit D to the Declaration of Michael T. Renaud, Esq.

In short, computed tomography is recognized as an extremely complex image reconstruction process that is entirely distinct from x-ray projection scans. Renaud Decl. Ex. E at 10.

As stated in the '393 and '758 patents, the computing power available in the early 1990s dictated that it:

> takes a relatively long time to process each CT scan and so it is not suitable to be solely responsible for detecting and indicating suspect specific materials on-line in real time. Coupling a CT scanner **1002** with a dual energy x-ray inspection device as shown schematically in FIG. 18 A, increases the algorithmic efficiency of the baggage inspection, the dual energy x-ray scanner serving to indicate suspect slices in the baggage ….

'758 Patent, col. 32, lines 29-33.

The '758 patent then teaches an x-ray projection scan which identifies a suspicious area followed by a single CT slice through that suspicious area to conserve computing power and time. The '758 patent distinguishes between x-ray projection scans and CT technology throughout the patent. See, e.g., '758 Patent FIG 18; col. 32, lines 19-44. In contrast, the CT-80 takes a "helical" CT scan of an item followed by a subsequent CT scan of any suspicious area detected because today there is sufficient computing power to process real time helical CT scans.[9/] L-3's claim construction that an x-ray scan followed by CT is the same as CT followed by CT is inconsistent with the invention, the terminology and the purposes of its patent. See, e.g., id., col. 32, lines 19-29 ("x-ray inspection device can be used in conjunction with a [CT scanner] … but [since it] takes a relatively long time to process each CT scan … it is not suitable to be solely responsible for detecting and indicating suspect specific materials on-line in real time.").

Presumably L-3 will argue that FIG 18 B in the two patents at issue here shows the use of a CT capable machine performing both the x-ray projection pre-screen and subsequent CT. The

---

[9/]    Helical CT scans are the result of the item moving through the rotating gantry. Each rotation of the gantry produces a CT slice, as the item is conveyed. Renaud Decl. Ex. D, ¶ 26.

11

x-ray projection scan in that context can be generated by keeping the x-ray detector source and detector stationary in the CT capable machine. In that context, L-3 will argue that Figure 18 B teaches the use of a CT scan followed by a CT scan. That is plainly an inaccurate and inconsistent reading of the patent. For example, in two of L-3's patents, L-3 incorporates by reference Image Reconstruction from Projections, Gabor T. Hermann (Academic Press 1980). See '926 Patent, col. 3, lines 50-51; '806 Patent, col. 3, lines 54-55. In his textbook, Dr. Hermann debunks this tenuous argument when he discusses the operation of a CT capable machine where the source and detector are stationary. He states that:

> This mode of operation is *not* CT, it is just an alternative way of taking x-ray images. In the CT mode, the patient is kept stationary, but the tube and detector unit rotate (together) around the patient.

Renaud Decl. Ex. E at 10. Similarly, the '393 patent distinguishes in the same manner between x-ray projection scans taken with a stationary source and detector and entirely distinct CT scans. See, e.g., '393 Patent, col. 9, lines 3-7.

In L-3's recent filing in the State Court action, L-3 also consistently admits the differences between x-ray projection scans and CT scans. Renaud Decl. Ex. F at 2 ("The VCT-30 is an EDS system that uses a computed tomography ("CT") scanner, rather than just a conventional x-ray scanner.").) In sum, in contrast to L-3's argument, x-ray followed by CT is not the same as a CT scan followed by a CT scan and there is no basis for infringement of the '758 patent.

There are additional non-infringement defenses, but L-3's arguments fail in so many ways that they are not addressed here in full. Indeed, the foregoing is only a brief discussion of the matters raised by L-3 in its two filed summary judgment motions, which this Court deemed untimely. At the appropriate time designated by the Court, Reveal is prepared to address fully L-

3's claims as to both infringement and invalidity. In the meantime, though, this motion should be denied.

### 4. L-3 Cannot Satisfy The Public Policy And Balance Of Harms Standard

This motion should also be deferred or denied outright based upon consideration of the strong public interest disfavoring injunctive relief that would prevent the TSA from obtaining the CT-80 EDS in accordance with its Congressional directive to expeditiously deploy the CT-80 at airports for baggage screening and for the protection and security of the United States airline industry and the traveling public. See Renaud Decl. Ex. G (excerpts from March 3, 2005 Congressional hearing regarding TSA appropriations). L-3 attempts to dismiss the negative impact a preliminary injunction would have on the TSA's anti-terrorism efforts by calling such post-9/11 concerns for public safety "shortsighted" and without any citing any authority implying that the courts or anyone else is in agreement with L-3's position. (L-3's Mem. at 46.) However, as recognized by Judge Allan van Gestel in granting Reveal's motion for summary judgment on L-3's contract based claims in the related state court litigation, "[i]t would be difficult to conceive of a greater public interest than that presented … here." Renaud Decl. Ex. H at 8) (Mem. and Orders on Various Motions, Dec. 2, 2004). Indeed, the economic consequences notwithstanding, the state court announced it would not "issue any order that disturbs or is harmful to [the] public interest" being addressed by the TSA vis-à-vis the deployment of an in-line EDS like the CT-80. Id. at 7-8.

There are three EDS manufacturers certified by the TSA. L-3 seeks to decrease the number to two, which would severely limit competition and the TSA's ability to perform its duties. The public policy implications of this result alone should condemn L-3's motion and conduct. See also Cordis Corp. v. Boston Scientific Corp., No. Civ. A. 03-027-SLR, Civ. A. 03-

283-SLR, 2003 WL 22843072, at *4 (D. Del. Nov. 21, 2003). A copy of the <u>Cordis</u> decision is attached as Exhibit I to the Renaud Declaration.

Finally, the balance of harms weighs strongly in favor of Reveal. Denial or deferral of the motion will allow the TSA to consider Reveal's proposal, which because of Section 1498 should not even be at issue in this litigation. Furthermore, L-3 is a multi-billion dollar company. A denial of the motion will have no material impact on L-3. In contrast, a grant of the motion will effectively kill Reveal, put all of its employees out of work and destroy the company.

## CONCLUSION

For all of the foregoing reasons, Reveal requests that this Court deny L-3's motion for expedited briefing, deny L-3's motion for expedited damages discovery and defer consideration of L-3's motion for a preliminary injunction until November 10, 2005, at which time L-3 can re-file the motion, as appropriate.

Respectfully submitted,

**REVEAL IMAGING TECHNOLOGIES, INC.,**

By its attorneys,

Dated: August 15, 2005

/s/ H. Joseph Hameline
H. Joseph Hameline (BBO # 218710)
A. Jason Mirabito (BBO # 349440)
Michael T. Renaud (BBO # 629783)
Mintz, Levin, Cohn, Ferris, Glovsky
  and Popeo, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

LIT 1536563v2

14