IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| L-3 COMMUNICATIONS SECURITY AND DETECTION SYSTEMS, INC.<br><br>　　　　　Plaintiff,<br><br>v.<br><br>REVEAL IMAGING TECHNOLOGIES, INC.<br><br>　　　　　Defendant. | Civil Action No. 04-11884 NG<br>(Magistrate Judge Judith Gail Dein) |

**L-3'S OPPOSITION TO MOTION TO STAY**

Michael A. Albert, BBO #558566
James J. Foster, BBO #553285
Robert M. Abrahamsen, BBO #636635
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, Massachusetts 02210
Tel.: 617.646.8000

COUNSEL FOR PLAINTIFF L-3

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     SUMMARY OF ARGUMENT ................................................................................. 2

III.    PROCEDURAL BACKGROUND............................................................................ 3

IV.     ARGUMENT ............................................................................................................. 5

   A.   This Litigation and the Reexamination Should Proceed in Parallel
        Because They Are Distinct Proceedings with Different Purposes and Outcomes.............. 5

   B.   All of the Factors to Be Considered Weigh Against Granting a Stay. ............................. 6

        1.    The Stay Request is Calculated to Tactically Benefit Reveal and Prejudice L-3. .......... 7

              (i)   Reveal's Strategic Delay in Filing for Reexamination Long After It
                    Knew About Prior Art Is Alone a Sufficient Basis for Denying the Stay. .................. 7

              (ii)  Filing Reexamination Requests on Six Patents in Litigation Would
                    Be Ill-advised if Resolution on the Merits Were the Good-Faith Purpose. ................. 9

              (iii) Reveal's Immunity Argument Is Without Merit, and L-3
                    Will Be Prejudiced if a Stay Is Granted. ................................................................... 11

        2.    This Litigation Has Progressed Beyond the Stage at
              Which a Stay Might Have Been Appropriate. ........................................................... 14

              (i)   Stays Are Denied Once Parties Have Engaged in Substantial Discovery. ................. 15

              (ii)  This Case Can Be Resolved on the Merits Now...................................................... 16

        3.    The Reexamination Proceeding Will Not Simplify the Issues in this Case.................. 17

              (i)   The '393 Patent: Assignor Estoppel Precludes Reveal from
                    Introducing Any Results of the Reexamination Proceedings in this Case.................. 20

              (ii)  The '879 Patent: The Reexamination Request Is Fatally Flawed
                    Because It Relies upon an L-3 Patent that, as a Matter of Law, Cannot
                    Be Applied As Prior Art Against the '879 Patent in the Manner Asserted. .............. 21

              (iii) The '758 Patent: Reveal's Request Relies on Irrelevant Prior Art
                    Not Even Remotely Related to Baggage Inspection................................................. 23

              (iv)  The '391 Patent: Reveal's Request Relies on L-3's Own Products or
                    Irrelevant Prior Art Not Even Remotely Related to Baggage Inspection.................. 24

              (v)   The '806 and '946 Patents: Reveal's Request Relies Entirely on the Patents' Own
                    Specification Which Is Plainly Legally Improper. ......................................................... 25

              (vi)  A Wait and See Attitude Should Be Avoided in View of the Prejudice to L-3 that
                    Would Result from the Delay Incumbent in a Stay. ....................................................... 26

   C.   A Stay Pending Completion of Reexamination Proceedings
        Could Delay this Case for Years................................................................................ 27

   D.   Reveal's Arguments Relating to Terrorism and Airport Safety Are Misplaced.............. 29

V.      CONCLUSION........................................................................................................ 30

## TABLE OF AUTHORITIES

**CASES**

Accent Designs Inc. v. Jan Jewelry Designs Inc.,
    32 U.S.P.Q.2d 1036 (S.D.N.Y. 1994) ........................................................................ 5

Agar Corporation v. Multi-Fluid,
    983 F. Supp. 1126 (S.D. Tex. 1997) ........................................................................ 15

American Fence Co., Inc. v. MRM Security Systems, Inc.,
    710 F.Supp. 37 (D.Conn. 1989) ........................................................................ 20

Biogen IDEC MA Inc., v. Trustees of Columbia Univ.,
    332 F.Supp. 2d 286 (D.Mass 2004) ........................................................................ 28

Bloom Eng'g Co. v. North Am. Mfg. Co.,
    129 F.3d 1247 (Fed. Cir. 1997) ........................................................................ 19

C.R. Bard, Inc. v. M3 Sys., Inc.,
    157 F.3d 1340  (Fed. Cir. 1998) ........................................................................ 25

Crater Corp. v. Lucent Techs. Inc.,
    255 F.3d 1361 (Fed. Cir. 2001) ........................................................................ 12

Diamond Scientific Co. v. Ambico, Inc.,
    848 F.2d 1220 (Fed. Cir. 1988) ........................................................................ 21

DuPont v. Phillips,
    711 F. Supp 1205 (D. Del. 1989) ........................................................................ 27

Enprotech Corp. v. Autotech Corp.,
    15 U.S.P.Q.2d 1319 (N.D. Ill. 1990) ........................................................................ 17, 18

Ethicon, Inc. v. Quigg,
    849 F.2d 1422 (Fed. Cir. 1988) ........................................................................ 5, 17, 28

Evans v. McDonnell Aircraft Corp,
    395 F.2d 359 (8th Cir. 1968) ........................................................................ 13

Freeman v. Minn. Mining & Mfg. Co.,
    661 F.Supp 886 (D. Del. 1987) ........................................................................ 7, 8

Gladish v. Tyco Toys, Inc.,
    29 U.S.P.Q.2d 1718 (E.D. Cal. 1993) ........................................................................ 6, 15, 18

Goodrich Flight Systems  Insight Instruments,
    22 U.S.P.Q.2d 1832 (S.D. Ohio 1992) ........................................................................ 14

Grain Processing Corp. v. American Maize-Prods. Co.,
    840 F.2d 902 (Fed. Cir. 1988) ........................................................................ 26

Hybritech, IBC v. Abbott Lab.,
    849 F.2d 1446 (Fed. Cir. 1988) ........................................................................ 29

In re Dembiczak,

175 F.3d 994 (Fed. Cir. 1999) ........................................................................ 25, 26

In re Fine,
    837 F.2d 1071 (Fed. Cir. 1988) ................................................................ 25

In re Oetiker,
    977 F.2d 1443 (Fed. Cir. 1992) ................................................................ 25

In re Rouffet,
    149 F.3d 1350 (Fed. Cir. 1998) ................................................................ 25

Interconnect Planning Corp. v. Feil,
    774 F.2d 1132 (Fed. Cir. 1985) ................................................................ 26

Kaufman Co. v. Lantech, Inc.,
    807 F.2d 970 (Fed. Cir. 1986) .................................................................... 6

King Instruments Corp. v. Perego,
    65 F.3d 941 (Fed. Cir. 1995) .................................................................... 29

Manville Sales Corp., v. Paramount Systems, Inc.,
    917 F.2d 544 (Fed. Cir. 1990) ................................................................ 12

Neff Instrument Corp. v. Cohu Electronics, Inc.,
    269 F.2d 668 (9th Cir. 1959) ................................................................ 13

Northill Co., Inc. v. Danforth,
    51 F.Supp. 928 (N.D. Cal. 1942) .......................................................... 13

Output Technology Corp. v. Dataproducts Corp.,
    22 U.S.P.Q. 2d 1072 (W.D. Wash. 1991) .......................................... 15

Pall Corp. v. Micron Separations, Inc.,
    66 F.3d 1211 (Fed. Cir. 1995) ................................................................ 18

Remington Arms Co. v. Modern Muzzleloading, Inc.,
    1998 WL 1037920 (M.D.N.C. Dec. 17, 1998) ............................ 6, 7, 8, 9

Riverwood Intern. Corp. v R. A. Jones & Co., Inc.,
    324 F.3d 1346 (Fed. Cir. 2003) .............................................................. 22

Rohm & Haas Co. v. Brotech Corp.,
    24 U.S.P.Q.2d 1369 (D. Del. 1992) ........................................................ 6

Starlight Associates v. Berkey-Colortran, Inc.,
    201 U.S.P.Q. 307 (S.D.N.Y. 1978) .................................................... 8, 27

Systron-Donner Corp. v. Polomar Scientific Corp.,
    239 F.Supp 148 (N.D. Cal. 1965) ........................................................ 13

Toro Co. v. L.R. Nelson Corp.,
    223 U.S.P.Q. 636 (C.D. Ill. 1984) ............................................................ 7

Wayne Automation Corporation v. R.A. Pearson Company,
    782 F. Supp. 516 (E.D. Wash. 1991) .................................................... 11

Whistler Corp. v. Dynascan Corp.,

1993 U.S. Dist. LEXIS 3850 (N.D. Ill. March 25, 1993) ........................................................ 17

Xerox Corp. v. 3Com Corp.,
  69 F. Supp. 2d 404 (W.D.N.Y. 1999) ............................................................... passim

**STATUTES**

35 U.S.C. § 102 .............................................................................................. 21, 22

35 U.S.C. § 103 ...................................................................................... 21, 22, 23, 25

35 U.S.C. § 271 ..................................................................................................... 12

35 U.S.C. § 307 ....................................................................................................... 5

**OTHER AUTHORITIES**

A. Parker, "Problem Patents: Is Reexamination Truly a Viable Alternative to Litigation,"
  3 No. Car. J. L. & Tech. 305 (2002) ............................................................................ 9

Amy L. Magas, Comment, When Politics Interfere with Patent Reexamination,
  4 J. Marshall Rev. of Intell. Prop. L. 160 (2004) ........................................................ 10

MPEP § 2225 ....................................................................................................... 23

MPEP § 2240 ....................................................................................................... 20

# I.  __INTRODUCTION__

Reveal has sought to have this case stayed for several years, pending meritless patent reexamination requests filed solely as a tactical move to justify the stay.  Reveal does so based on prior art that it was well aware of months before the reexamination requests – a fact which alone routinely leads courts to deny stays.  Its motion is in furtherance of its ongoing strategy to delay resolution of the lawsuit so as to entrench itself in the market – another fact which alone leads courts to deny stays.  Finally, its request comes as discovery is winding down and summary judgment motions are imminent.  Indeed, L-3 had already filed a dispositive motion several months ago, and at the June 28, 2005 hearing on Reveal's request to stay that motion, Reveal represented to this Court that it merely needed some more discovery before the merits of the case could be considered in November.  At the time it made that representation, Reveal in fact had no intent to allow the matter to be resolved in November – it had already filed two of the six reexamination requests that form the basis for its current motion to stay.

Reveal further misleads when it claims that reexaminations are handled expeditiously by the PTO.  The average delay involved in a single reexamination proceeding is about two years.  Many last longer (often over four years, as the PTO's Director has recently testified).  If this case were stayed – at least in the absence of a preliminary injunction[1] – L-3's patent rights would effectively be destroyed, as the nature of certain key markets for the products at issue (in particular, the small and mid-size airport market, domestic and international) is such that the early adoption of a system entrenches that system in the market.  If Reveal succeeds at its latest dilatory ploy, this case will be a model of how "justice delayed is justice denied."

---

[1] L-3 has filed a motion for a preliminary injunction (D.I. 94).

## II. <u>SUMMARY OF ARGUMENT</u>

Courts consider several factors in determining whether to stay patent litigation pending reexamination by the PTO. These factors are (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in the case; and (3) how far along the case has come. All of these factors favor L-3 and militate against a stay.

Reveal's intent in filing for reexamination of all six patents-in-suit and moving to stay this case is transparent. Because the patent owner almost always comes out of a reexamination in an even stronger position, requesting patent reexamination is commonly viewed as an unwise litigation tactic – at least on the merits. As a dilatory tactic, however, a reexamination can be quite effective. If Reveal can avoid a preliminary injunction and put off a resolution on the merits for several years, it will become so firmly entrenched in the marketplace that, as a practical matter, it would be impossible for Reveal to be extricated, even once it is found to infringe L-3's patents. Reveal should not be permitted to abuse the reexamination process as a tactical move to buy itself time and thereby put L-3 at a disadvantage.

A stay will not simplify the issues in this case. A reexamination is an *ex parte* proceeding limited to issues of patentability of presented claims in light of limited types of prior art, and the results are not binding on the Court. Thus, even if the PTO confirms all of L-3's claims without amendment, Reveal will doubtless raise the same validity arguments over the same art before this Court. Moreover, there are many forms of evidence and legal issues that are outside the scope of a reexamination. After a delay of several years, the parties will be right back in court relitigating the same issues raised in the reexamination, as well as the additional issues that could not be raised before the PTO.

This case has progressed long past the point when a stay might have been appropriate. Numerous cases hold that when the parties have engaged in substantial discovery and a dispositive motion is pending, the time for a stay has passed. Voluminous discovery has occurred here, and is winding to a close shortly. Given the substantial time and expense that both the parties and the Court have already invested in this case, a stay would be inefficient and contrary to precedent.

Finally, Reveal has known about the prior art on which its reexamination requests are based for at least several months and, in some cases, much longer. In fact, at least two of the references it submitted to the PTO are attributed to its own CEO, and were created long before this litigation started. The case law is clear that when a party to litigation delays a request for reexamination, even for a shorter time period than Reveal did here, a stay should be denied. That is precisely the situation here. The Court should deny Reveal's Motion.

### III. PROCEDURAL BACKGROUND

L-3 has consistently sought a just, speedy, and inexpensive determination on the merits of this case. Reveal has consistently sought delay. Indeed, nearly every paper that has been filed in this matter has related either to an attempt by Reveal to delay (over L-3's objection), or to L-3's attempt to seek a swift resolution on the merits (over Reveal's objection).

As the Court may recall, this matter began with Reveal filing a motion to dismiss the action based on an affirmative defense under 28 U.S.C. § 1498 (D.I. 8). Reveal misleadingly argued that defense was a "silver bullet" that could dispose of the entire case. That argument consumed four months, and ultimately failed.

Reveal then sought and obtained a bar on "damages discovery," ostensibly so that it could resolve the issues of infringement and validity. Reveal justified that limit on discovery by

again arguing that it had a "silver bullet" on one or both of those issues that would dispose of this entire case and thus avoid the need for damages discovery. To identify that "silver bullet," L-3 served interrogatories asking Reveal to state the basis for its contentions of non-infringement and invalidity. Reveal, however, was either unwilling or unable to provide any meaningful responses to those interrogatories. (D.I. 59, Ex. A, Interrogatories 1 and 5). L-3 thus moved for partial summary judgment first on validity (D.I. 57), and then on infringement (D.I. 79). Reveal never filed a substantive response to either of those motions. Instead, it sought further delay. Once again, Reveal had no "silver bullet."

At the June 28, 2005 hearing on Reveal's request to stay proceedings on L-3's summary judgment motion on infringement, Reveal persuaded the Court to allow it until November, on the grounds that by then it would have completed discovery and would be ready to address the merits. But even as it was making that argument, Reveal had already filed two of the six reexamination requests now at issue – in other words, it had already developed and begun implementing its plan to avoid reaching any such resolution by November (or indeed anytime in the foreseeable future).

Reveal is now before this court with its newest "silver bullet" argument, this time alleging that its reexamination requests could moot issues in this case. This latest move, like the earlier ones, is calculated solely to delay the resolution of this matter and thereby gain an irreversible foothold in the marketplace. Enough is enough. All factors weigh against entry of a stay. The request for stay should be denied.

# IV. ARGUMENT

### A. This Litigation and the Reexamination Should Proceed in Parallel Because They Are Distinct Proceedings with Different Purposes and Outcomes.

The PTO is likely to grant all six of Reveal's requests to reexamine the patents, because the threshold to get in that door is very low. Virtually all such requests (97%) are granted, as Reveal itself points out. The question is not whether Reveal will be allowed to start the reexamination process, but rather whether that process is likely to lead to any materially different outcome to this case, or eliminate the need to litigate the issues. The odds on that issue are quite different – only 10% of patents are ultimately invalidated by a reexamination, and as discussed below, Reveal has not made much of a case for any of these six to be among them. Moreover, because of the nonbinding nature of the proceedings, Reveal will doubtless be back here to argue the very same prior art even if the patent office (as expected) confirms L-3's patents once again.

Numerous courts have thus observed that both litigation and reexamination can proceed at the same time. E.g., Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1428 (Fed. Cir. 1988) (noting that the presumed awkwardness of the PTO and court reaching different conclusions "is more apparent than real"); accord Accent Designs Inc. v. Jan Jewelry Designs Inc., 32 U.S.P.Q.2d 1036, 1039 (S.D.N.Y. 1994); Xerox Corp. v. 3Com Corp., 69 F. Supp. 2d 404, 407 (W.D.N.Y. 1999). Reexamination proceedings and court actions are "distinct proceedings, with distinct parties, purposes, procedures and outcomes." Ethicon, 849 F.2d at 1427. There will be no real duplication if both proceed. Id.

Moreover, each of the patents is, and remains, valid and enforceable throughout the pendency of the reexamination proceedings, and after the proceedings have concluded, unless every single one of the claims of the patent is held unpatentable. 35 U.S.C. § 307(a); Kaufman

Co. v. Lantech, Inc., 807 F.2d 970, 977 (Fed. Cir. 1986) ("All the reexamination claims have continuous effect from the date of the original patent.").

**B.  <u>All of the Factors to Be Considered Weigh Against Granting a Stay.</u>**

In determining whether to allow litigation and PTO proceedings to proceed in parallel, courts consider the following factors:

> (1) **Prejudice** – whether a stay would unfairly prejudice or present a clear tactical disadvantage to the non-moving party;

> (2) **Delay** – whether the party seeking the stay is using it as a dilatory tactic;

> (3) **Effect on Issues** – whether a stay will simplify the issues in question and trial of the case, including the probable effect on the litigation that granting a stay would have; and

> (4) **Stage of the Case** – whether the case has progressed past the initial stages of the lawsuit and discovery has been taken.

E.g., Xerox, 69 F. Supp. 2d at 406; Remington Arms Co. v. Modern Muzzleloading, Inc., No. 2:97CV00660, 1998 WL 1037920, at 3 (M.D.N.C. Dec. 17, 1998). Specifically,

> [a]mong the considerations to be balanced are hardships to the parties resulting from the granting or denial of the stay as well as "the orderly course of justice measured in terms of simplifying or complicating the issues, proof, and questions of law which could be expected to result from a stay."

Gladish v. Tyco Toys, Inc., 29 U.S.P.Q.2d 1718, 1719 (E.D. Cal. 1993).

Where the issuance of a stay "tends to defeat, rather than accomplish the goal of just, speedy, and inexpensive determination of the dispute," the court should deny the stay.  Rohm & Haas Co. v. Brotech Corp., 24 U.S.P.Q.2d 1369, 1372 (D. Del. 1992).  The court's analysis depends on the particular set of facts before it.  Gladish, 29 U.S.P.Q.2d at 1719.

As discussed in detail below, Reveal's tactics in this litigation all point to one goal, which is to avoid a decision on the merits as long as possible in order to gain an irreversible foothold in the marketplace.  Not only will a stay (at least in the absence of a preliminary injunction)

severely prejudice L-3, but it will not simplify the issues in this case or in any way result in a faster or less expensive determination of this dispute.

    **1.   The Stay Request is Calculated to Tactically Benefit Reveal and Prejudice L-3.**

Where a party seeks to abuse the reexamination process for the purpose of gaining a tactical advantage in the litigation, courts deny requests for a stay.  "Parties should not be permitted to abuse the process by applying for reexamination after protracted, expensive discovery or trial preparation."  Remington Arms, 1998 WL at 2 (internal citations omitted).  See also Toro Co. v. L.R. Nelson Corp., 223 U.S.P.Q. 636, 638 (C.D. Ill. 1984) (acknowledging that the defendant "seriously questions plaintiff's good faith in interposing the motion for stay, in view of the timing of the same in the procedural sequence of the litigation"); Freeman v. Minn. Mining & Mfg. Co., 661 F.Supp 886, 888 (D. Del. 1987) ("To allow 3M to now use the reexamination process to get this case stayed would be to allow a defendant to use the reexamination as a mere dilatory tactic.").  There is ample evidence, as discussed below, that Reveal did not file these requests for reexamination in good faith, but rather to gain tactical advantage, and that L-3 will be prejudiced if a stay is granted.

    **(i)   Reveal's Strategic Delay in Filing for Reexamination Long After It Knew About Prior Art Is Alone a Sufficient Basis for Denying the Stay.**

Numerous courts identify a party's delay in requesting a reexamination with the PTO after it discovers prior art as a determinative factor in denying a stay.  For example, in Remington Arms, the defendant waited three months after discovering prior art before requesting a reexamination of the plaintiff's patent, and then moved to stay the infringement lawsuit pending the reexamination.  The court denied the defendant's motion for a stay, noting that "[t]he most compelling reason for denying the stay . . . is Defendant's unjustified delay in requesting" the reexamination at issue.  Id., 1998 WL 1037920 at 3.  See also Xerox, 69 F. Supp.

2d at 406 (denying stay where defendants knew of references cited as prior art in request for reexamination at least eight months before seeking reexamination); <u>Freeman</u>, 661 F. Supp. at 888 (noting that stay would be denied where defendant knew about three documents that formed the basis for its reexamination petition eight months prior to filing such petition).  <u>See</u> <u>also</u> <u>Starlight Associates v. Berkey-Colortran, Inc.</u>, 201 U.S.P.Q. 307 (S.D.N.Y. 1978) (denying stay where party waited six months after becoming aware of existence of prior art to file for reissue application).

Like the defendants in <u>Remington Arms</u>, <u>Xerox</u>, and <u>Freeman</u>, Reveal could have requested reexamination long ago.  Indeed, at least as early as February 2005 – six months ago – Reveal was aware of the primary references upon which it based its reexamination requests, and had already formed the opinion by that time that those references "may constitute prior art that renders L-3's patents invalid."  (Ex. A).[2]  At least two of the references cited by Reveal were those of its own CEO, Michael Ellenbogen.  Reveal obviously knew about those references before L-3 even initiated this suit a year ago—they were from 1996 and 1998.  (D.I. 92, Ex. E at 2-3).  Reveal, however, made the tactical choice not to pursue a reexamination in the early stages of this litigation.

It was not until just before L-3 filed its Motion for Partial Summary Judgment of Infringement (D.I. 79) and discovery was well underway that Reveal sought refuge in the PTO.  Rather than responding on the merits to L-3's Motion, Reveal filed an "emergency" motion to stay the infringement determination, claiming it required further discovery to resolve issues of

---

[2] The exhibits referenced in this memorandum are attached to the accompanying declaration of Robert M. Abrahamsen.  The patents were produced to L-3 under the accompanying cover letter on February 18, 2005.  Abrahamsen Decl. ¶ 2.

claim construction. (D.I. 83, 84).[3]  The Court held a hearing on Reveal's motion to stay on June 28.  But at the very time Reveal was standing before this Court on that day, representing that the parties could reach summary judgment in November if only the Court would allow the "orderly" completion of discovery (6/28/05 Tr. at 12), Reveal in fact had no intention of proceeding to a prompt final resolution.  Prior even to filing its "emergency motion," Reveal had <u>already</u> filed a request for reexamination for two of the patents in suit, and was evidently preparing additional such requests for filing.  Just weeks after this hearing at which Reveal had agreed to a November date for summary judgment, it completed its remaining four reexamination requests and filed this motion to stay.

Thus, based on the timing of Reveal's recent actions alone, it is apparent that Reveal's reexamination requests are, in fact, pretextual.  As in <u>Remington Arms</u>, Reveal's request should be denied because it waited at least several months (and likely even longer) after it knew of the alleged prior art upon which it has based its requests for reexamination.

**(ii)    Filing Reexamination Requests on Six Patents in Litigation Would Be <u>Ill-advised if Resolution on the Merits Were the Good-Faith Purpose.</u>**

It is doubtful that Reveal genuinely expects the PTO proceedings to improve its position on the merits in this litigation.  Many commentators have noted that requests for reexamination are generally an unwise tactic by a patent litigation defendant, at least if the merits are the requester's genuine concern.  <u>See</u>, <u>e.g.</u>, A. Parker, "Problem Patents: Is Reexamination Truly a Viable Alternative to Litigation?" 3 No. Car. J. L. & Tech. 305, 311 (2002) (structure of reexamination process has "resulted in most practitioners advising their clients against the option of reexamination to prove the invalidity of another's patent. Instead, practitioners advised clients

---

[3] As claim construction is a pure issue of law for the Court, as to which evidence extrinsic to the patent and its file history is rarely of any relevance, it is questionable how any discovery Reveal might take could possibly affect the outcome on such issues.

to challenge the validity of the patent in court.") (copy attached as Ex. B); Amy L. Magas, Comment, When Politics Interfere with Patent Reexamination, 4 J. Marshall Rev. of Intell. Prop. L. 160, 164 (2004) ("the reexamination process did not function as Congress intended. Third parties (persons who are neither the patentee nor a representative of the USPTO) generally did not use *ex parte* reexamination because it was too one-sided. The patent owner almost always prevailed and emerged in a stronger position to sue the third party.") (copy attached as Ex. C). Reveal is well-represented and doubtless aware of this common wisdom. Had Reveal requested reexamination of only one of L-3's patents, that decision would have raised eyebrows as a risky litigation tactic.[4] That it requested reexamination of all six of the patents L-3 has asserted leaves little room for doubt that it sought reexamination for a reason unrelated to the merits, namely the lengthy delay it hopes will result if a stay is granted.

Even if delay were only part (and not all) of Reveal's motive for seeking reexamination, a motion for stay should still be denied. See Xerox Corp., 69 F. Supp. 2d at 407 (holding that a request for stay that had "at least some dilatory tactical motive behind it" would result in prejudice to the non-movant).

Reveal's CT-80 system relies heavily upon L-3's patented technology. Reveal is thus building a market position and reputation based upon the use of technology L-3 invested heavily in developing and to which L-3 has been conferred the exclusive right to practice under the Patent Statute. At the same time, L-3's market position and reputation are being injured

---

[4] Filing a reexamination request as a defendant is almost never done. For example, while 3,075 patent lawsuits were filed in 2004, (Ex. D at 137), the statistics Reveal cites indicate that only 135 of the reexaminations sought in that period related to pending litigation. The Patent Office statistics do not indicate how many of those 135 requests were filed by defendants. It is likely that the majority of those reexaminations were filed by patent owners (not defendants) who wanted to strengthen their patents upon discovery of prior art brought to their attention during litigation. It is revealing that only a negligible percentage of accused infringers file for reexamination on the patents asserted against them.

irreparably.  (See D.I. 98 at 41-45).  A just and speedy resolution of this lawsuit is the vehicle the patent system envisions to end that harm to L-3.  L-3 will thus be put at a serious tactical disadvantage and will be severely prejudiced if a stay is granted.

> ### (iii)    Reveal's Immunity Argument Is Without Merit, and L-3 Will Be Prejudiced if a Stay Is Granted.

Courts recognize that potential competitive harm in the marketplace justifies the denial of a stay in a patent infringement suit.  E.g., Wayne Automation Corporation v. R.A. Pearson Company, 782 F. Supp. 516, 519 (E.D. Wash. 1991) (denying stay where stay would result in "unfair competitive advantage").  Reveal does not deny that L-3 will be harmed in the marketplace should the stay be granted.  Instead, Reveal relies on an assumption that it will be immunized for government sales.  (Rev. Mem. at 7).  This assumption is erroneous in two respects.  First, Reveal has never indicated that its sales will be restricted to the U.S. Government, and in fact has admitted that it is aggressively marketing its product to non-governmental entities.  These sales would clearly be beyond the scope of any immunity defense. Second, even sales to the Government may not be immunized, either because (1) the devices in question were manufactured without a Government contract requesting them or (2) the Government may not authorize Reveal to infringe L-3's patents.  For example, Reveal's ongoing manufacture and use of its infringing CT-80 system, stockpiled for general inventory, is not immunized.

Reveal's argument ignores the extensive sales and marketing efforts it has been engaged in overseas.  Reveal's international sales representatives have already bid against L-3 on several key contracts (D.I. 102, Ex. A), and there is no indication that Reveal has any intention of ceasing its aggressive efforts to market and sell its CT-80 product to overseas customers.  Any sales Reveal makes to entities other than the U.S. Government could not possibly be immunized

under 28 U.S.C. § 1498.  The fact that L-3 will be provided with notification of such sales is of little consolation.  The irreparable damage in the marketplace will have been done.

Furthermore, whether Reveal is immune from liability under 28 U.S.C. § 1498 is an affirmative defense on which Reveal bears the burden of proof.  Manville Sales Corp., v. Paramount Systems, Inc., 917 F.2d 544, 555 (Fed. Cir. 1990); Crater Corp. v. Lucent Techs. Inc., 255 F.3d 1361, 1364 (Fed. Cir. 2001).  Through discovery requests, L-3 asked that Reveal produce any evidence it believes supports its defense of immunity under § 1498.  (See Ex. E at 4 ("Request No. 5   Documents or things Reveal contends supports its defense of immunity under 28 U.S.C. § 1498.").  Other than an unsubstantiated Declaration (D.I. 103) Reveal filed just recently with the Court, L-3 has been provided with no documents or other evidence whatsoever indicating that the Government has given Reveal its "authorization and consent" to do anything.[5]

Finally, Reveal admits that it has been actively manufacturing CT-80's for general inventory and using CT-80's for testing and development in the absence of any U.S. Government contract calling for such manufacture or use.[6]  (D.I. 103, ¶ 5).  Reveal does not deny that a large manufacturing facility in Kentucky has been engaged and is gearing up to produce, or is already in the process of producing, about 100 additional CT-80's, also for general inventory.  (D.I. 99, ¶ 8, 9).  Each such manufacture and use of a CT-80 is a discrete act of infringement under 35 U.S.C. § 271(a) ("whoever without authority makes, uses, offers to sell or sells any patented invention . . .") (emphasis added) for which Reveal is liable, even if the U.S. Government were to ultimately purchase one or more of such earlier-manufactured or used units and confer upon

---

[5] The "pilot program contract" reference in the Ellenbogen Declaration has not been produced to L-3.

[6] The recently-submitted Ellenbogen Declaration (D.I. 103) confirms that Reveal has been actively using three CT-80s in house and currently has at least twelve CT-80 machines in inventory. (D.I. 103, ¶ 5).

Reveal its "authorization or consent" in connection with such a purchase (neither of which Reveal has shown will happen and which therefore remains purely speculative).

The case law makes clear that any manufacturing or use of CT-80s by Reveal without a U.S. Government contract requiring such manufacture or use and conferring "authorization or consent" for the same is not done "for" the U.S. Government or with the "authorization or consent" of the U.S. Government, and thus falls outside the scope of § 1498. Evans v. McDonnell Aircraft Corp, 395 F.2d 359 (8th Cir. 1968) (vacating district court's dismissal under Rule 12(b)(6) because genuine fact issue existed as to whether contractor's "manufacturing operations were exclusively oriented to the United States Government"); Northill Co., Inc. v. Danforth, 51 F. Supp. 928, 929 (N.D. Cal. 1942) (finding § 1498 did not immunize defendant from manufacture and testing of anchors that *might* be sold to non-U.S. Government customers); Systron-Donner Corp. v. Polomar Scientific Corp., 239 F.Supp 148, 150 (N.D. Cal. 1965) (sale of five accelerometers to U.S. Government contractor did not immunize defendant against claim that its earlier acts of manufacturing and selling those five accelerometers infringed a patent because authorization and consent had not been given at the time those acts were committed); Neff Instrument Corp. v. Cohu Electronics, Inc., 269 F.2d 668, 673 (9th Cir. 1959). Such manufacture or use might support marketing efforts toward entities other than the U.S. Government, or non-governmental sales channels for the products. Id.

Reveal's unauthorized stockpiling of infringing products provides it with an unfair advantage in the marketplace, because having such units on hand places it in a superior position to receive sales contracts.[7] In addition, once such sales contracts are awarded, customers and

_____

[7] Reveal quibbles over whether twelve CT-80's, each selling for approximately $350,000, constitute a "stockpile." Ellenbogen Declaration (D.I. 103, ¶5). But Reveal does not deny that it has engaged an independent manufacturer in Kentucky to make about 100 additional CT-80's.

vendors are typically locked into relationships spanning a number of years, including not only sales contracts but also long-term contracts for installation, maintenance, support, spare parts, etc. (D.I. 99, ¶ 9); <u>B. F. Goodrich Flight Systems v. Insight Instruments</u>, 1992 WL 193112**,** 22 U.S.P.Q.2d 1832, 1844 (S.D. Ohio 1992), <u>aff'd</u>, 991 F.2d 810 (Fed. Cir. 1993) (finding irreparable harm through erosion of customer confidence and the loss of customers who purchased infringing products because "Once you lose a customer, he's gone forever").

  As demonstrated in L-3's Motion for a Preliminary Injunction (D.I. 94), L-3 will be subjected to immediate, substantial, and irreparable harm if Reveal is not enjoined from further infringement immediately.  Reveal, of course, wants to continue to infringe as long as possible – particularly in the context of an industry where early adoption can be the key to success.  The potential for several years of delay, under these circumstances, would be highly prejudicial to L-3.  Failure to allow this case to proceed to resolution promptly would effectively allow procedure to trump the substance of L-3's patent rights.  Reveal should not be able to avoid judgment on the merits by its abuse of the reexamination process.

  **2. This Litigation Has Progressed Beyond the Stage**
    **at Which a Stay Might Have Been Appropriate.**

  This case has been pending for just about a year.  The parties are well into discovery and have invested substantial expense and time.  Voluminous paper discovery has been exchanged, depositions on the merits are winding to a close, and L-3 has already had occasion to advance (but not reach closure on) summary judgment motions on both validity and infringement. The case is well beyond any point at which a stay might arguably have been appropriate, even assuming Reveal had meritorious reexamination references (which it does not).

    **(i)**    **Stays Are Denied Once Parties Have Engaged in Substantial Discovery.**

It is well recognized that it is inappropriate to stay a case once substantial discovery has taken place.  For example, in <u>Output Technology Corp. v. Dataproducts Corp.</u>, 22 U.S.P.Q.2d 1072, 1074 (W.D. Wash. 1991), the court denied the defendant's motion to stay pending a reexamination where the parties had already exchanged interrogatories and requests for production.  In <u>Agar Corporation v. Multi-Fluid</u>, 983 F. Supp. 1126, 1128 (S.D. Tex. 1997), the court observed that "[a]lthough the discovery stage has not yet been completed, it has also not just begun."  The court thus denied a motion to stay, noting that the case was "in its later stages of litigation."  In <u>Gladish v. Tyco Toys, Inc.</u>, 29 U.S.P.Q.2d at 1720, the court denied a motion to stay where the discovery cutoff date was three months away and a summary judgment motion was "forthcoming."

This case has proceeded at least as far into discovery as <u>Output Technology</u>, <u>Agar Corporation</u>, and <u>Gladish</u>.  More than 75,000 pages of documents have been exchanged between the parties in this litigation.  <u>Abrahamsen Decl.</u> ¶ 12.  In addition, more than twenty subpoenas have been issued to non-parties, resulting in the production of more than 6,000 additional document pages as well several CD-ROMs encompassing voluminous additional materials such as emails and other electronic documents in their native format.  <u>Id.</u>

L-3 served its first set of document requests in October 2004, and has since served two additional sets of interrogatories and one additional set of document requests, as well as having taken three depositions of Reveal pursuant to Fed. R. Civ. P. 30(b)(6) (in January and May of this year).  Reveal has also served three sets of document requests as well as a set of interrogatories and an amended set of interrogatories.  In addition to the depositions L-3 has already taken, five additional depositions are scheduled to be completed within the next three

weeks, and four depositions noticed by Reveal are scheduled to be completed within the next two weeks. Discovery, in short, is drawing to a close. The discovery deadline on infringement and validity is now less than two months away. If there ever was an appropriate time for Reveal to move for a stay pending reexamination, it has long since passed.

Reveal could have requested a reexamination and moved for a stay before most of this discovery had taken place. Instead, it waited until substantial time and money had already been invested. See Xerox, 69 F. Supp. 2d at 407 (denying stay where "[s]ubstantial time and expense have been invested in this litigation by the parties and the Court."). Rather than materially advancing the resolution of this litigation, a stay at this stage would clearly represent a significant setback in the case schedule.

**(ii)    This Case Can Be Resolved on the Merits Now.**

In February, the Court set September 15, 2005 as the date by which the parties were to have completed their discovery on the issues of infringement and validity of L-3's patents.[8] (D.I. 44, ¶ 2). At Reveal's urging, that date was later moved to October 1, 2005, about six weeks from now. (D.I. 77, ¶ 5(ix)).

L-3 has already taken all of the discovery it will require to conclusively prove infringement of four of its patents, namely, the '391, '879, '393, and '758 patents. L-3 also expects that the handful of depositions it has noticed for the next three weeks will provide it with the discovery it will require to prove infringement of the other two. Thus, barring some unforeseen circumstance, L-3 is fully prepared to meet the October 1 fact discovery completion

---

[8] Discovery on damages and on Reveal's antitrust counterclaim are currently on a different track.

deadline.[9]  The Court should not allow Reveal, at this stage in the proceedings, to again delay

this litigation through procedural detours.  Enprotech Corp. v. Autotech Corp., 15 U.S.P.Q.2d

1319, 1320 (N.D. Ill. 1990) ("We are too far along the road to justify halting the journey while

the defendant explores an alternate route.").

Moreover, as demonstrated in connection with L-3's Motion for Preliminary Injunction

(D.I. 98 at 11-41), the issues of whether two of L-3's patents (the '393 and '758 patents) are

infringed and valid are straightforward and ripe for a decision on the merits now.  There is

absolutely no reason to delay resolution of those issues.

### 3.  The Reexamination Proceeding Will Not Simplify the Issues in this Case.

Staying this case until the conclusion of the reexamination proceedings will not narrow

the issues in this action.  Reveal argued (Rev. Mem. at 13) that "the Court will benefit from the

expertise afforded by the PTO," but provided no analysis of the facts of this case and no

indication as to how the PTO's "expertise" might conceivably be beneficial to the Court.  In fact,

this Court can receive many forms of evidence and address many issues that cannot be received

or addressed in the ex parte reexamination proceedings at the PTO.

In addition, even on the limited issues that the PTO can address, its determinations will

not remove those issues from the litigation.  Significantly, a confirmation of validity by the PTO

(which is the likely outcome of all of Reveal's requests) would not be binding on Reveal or this

Court.  Ethicon, 849 F.2d at 1428; Whistler Corp. v. Dynascan Corp., No. 88 C 8368, 1993 U.S.

---

[9] In its memorandum (Rev. Mem. at 9), Reveal pointed out, apparently to support an argument that L-3 has been dragging its feet in discovery, that L-3 had only recently produced a handful of documents.  Reveal's representation that those documents were "responsive to basic document requests served by Reveal several months ago," however, was inaccurate.  Reveal had sent L-3 a letter asking for those documents for the very first time on July 25. (Ex. F).  Reveal then followed up that letter with a formal request for the same documents under F. R. Civ. Pro. 34 on August 1. (Ex. G, Request Nos. 2-8).  L-3 thus produced those documents quite promptly after they were requested.

Dist. LEXIS 3850, at 19 (N.D. Ill. March 25, 1993). Accordingly, an eventual reconfirmation by the PTO of the validity of L-3's patents will not stop Reveal from raising the very same invalidity arguments over the very same art in this Court. The validity issues ultimately will be addressed by this Court no matter what the PTO decides.

The only circumstance in which reexamination could possibly avoid the need for trial or resolution on summary judgment is if the PTO were to invalidate every one of the thirty-six asserted claims in L-3's six patents. That won't happen. As Reveal concedes, the PTO invalidates (on average) only 10% of the patents it reexamines. (Rev. Mem. at 12). Thus, even if the merits of Reveal's reexamination requests were statistically average – and they are far from it – it could be expected that the validity of at least five of the six asserted patents would survive reexamination and ultimately need to be addressed by the Court. Given the weakness of Reveal's reexamination requests, it is more likely that all of the patents will survive. Of course, infringement of any one valid patent claim suffices to warrant injunctive and other relief. Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1220 (Fed. Cir. 1995).

Since the reexamination requests are unlikely to alleviate the need for litigation, the Court should deny the motion for a stay. Gladish, 29 U.S.P.Q.2d at 1720 (denying motion for stay where "[a]fter the reexamination, the parties would be right back in this court."); Enprotech, 15 U.S.P.Q.2d at 1320 (denying stay, noting "if any of the claims survived we would be right back here to litigate….").

Given the unusual and risky decision to file for reexamination on not just one but all six patents in suit, one might expect the reexamination requests to be based upon compelling prior art and solid legal principles. Far from it. Inspection of Reveal's requests shows them to be little more than the byproduct of a perceived need to get *something* on file with the PTO for each

- 18 -

patent in suit, in the hope of making a stay appear superficially appealing.  The reexamination

requests do not stand up to even cursory scrutiny.[10]  Accordingly, it is no wonder that Reveal

does not discuss the merits of its requests to justify the extraordinary measure of staying the case

at this juncture, but instead attempts to hide behind PTO statistics.

L-3's patent claims are likely to be reconfirmed (albeit after the usual considerable delay

inherent in PTO procedure), in the face of Reveal's dubious reexamination requests.  A few

examples are cited below to demonstrate the likelihood that the validity of the challenged patent

claims will be upheld.  In short, Reveal cannot show (and has not even seriously attempted to

show) a likelihood that duplication of effort would be avoided by halting this case now and

waiting (possibly for years) until the reexamination requests are resolved.[11]

Reveal touts the fact that 97% of reexamination requests are granted as a reason for

justifying a stay in this case.  (Rev. Mem. at 12). But that is not the relevant figure here.  True,

the PTO's standard for allowing a reexamination to proceed is very low – the examiner need

only find that a "substantial new question of patentability" has been presented, which as Reveal

correctly notes is almost automatically done (the process does not even require a prima facie

showing of unpatentability, let alone proof).[12]

---

[10] As discussed below, the PTO agrees to review nearly all reexamination requests pro forma
(97%).  In the vast majority of reexaminations, the PTO upholds the patents at issue.  The fact
that the PTO has already granted two requests for such review (and is likely to grant the others)
plainly does not mean that these requests have any merit.

[11] Even if some claims were ultimately amended during reexamination, the Court would likely
still need to construe the original claims to determine whether the amendments introduced a
substantive change.  Bloom Eng'g Co. v. North Am. Mfg. Co., 129 F.3d 1247, 1250 (Fed. Cir.
1997) ("Determination of whether a claim change during reexamination is substantive requires
analysis of the scope of the original and reexamined claims[.]") (emphasis added).

[12] The Manual of Patent Examining Procedure explains the low threshold required to grant a
request for reexamination:

> The decision on the request for reexamination has as its object either the granting or
> denial of an order for reexamination. [*continued on next page*]

The question is thus not whether the PTO will allow the process to begin, but whether the examiner will ultimately deem the claims to be unpatentable.  Almost every properly filled-out request meets the low threshold for a reexamination to proceed.  The figure of greater relevance is that only 10% of patents subjected to the reexamination process are invalidated.

> **(i)** **The '393 Patent: Assignor Estoppel Precludes Reveal from Introducing Any Results of the Reexamination Proceedings in this Case.**

Even if Reveal had a basis for a reexamination that might succeed, its efforts in that regard would still be moot, as it is precluded from offering any such evidence here.  As discussed in L-3's Memorandum in Support of Its Motion for Preliminary Injunction (D.I. 98 at 30-34), Reveal is estopped from challenging the validity of the '393 patent under the doctrine of assignor estoppel, and this estoppel precludes Reveal from introducing the results of the reexamination in this litigation.  American Fence Co., Inc. v. MRM Security Systems, Inc., 710 F.Supp. 37, 42 (D. Conn. 1989) ("Even if upon reexamination the U.S. Patent Office finds that the [asserted] patent is invalid, the defendants will be unable to assert that finding, because the doctrine of assignor estoppel prevents them from challenging the validity of the [asserted] patent").  To hold otherwise would undermine the very principle of that doctrine, i.e., to "prevent[] one who has

---

This decision is based on whether or not "a substantial new question of patentability" is found. **A final determination as to unpatentability of the claims is not made in the decision; this determination will be made during the examination stage of the reexamination proceedings.**

[…]

It is not necessary that a "*prima facie*" case of unpatentability exist as to the claim in order for "a substantial new question of patentability" to be present as to the claim. Thus, **"a substantial new question of patentability" as to a patent claim could be present even if the examiner would not necessarily reject the claim as either fully anticipated by, or obvious in view of, the prior art patents or printed publications.**

MPEP § 2240-2242 (emphasis added).  Portions of the MPEP cited in this memorandum are included in Ex. H.

assigned the rights to a patent (or patent application) from later contending that what was assigned is a nullity," Diamond Scientific Co. v. Ambico, Inc., 848 F.2d 1220, 1224 (Fed. Cir. 1988).

That the reexamination requests can have no impact on the issues involving the '393 patent alone warrants denying a stay of this case. There is no reason to wait several years for a determination by the PTO that cannot possibly impact the merits of the '393 patent in the case, particularly in view of the fact that both infringement and validity of this patent are ripe for summary judgment now.

    **(ii)    The '879 Patent: The Reexamination Request Is Fatally Flawed Because It Relies upon an L-3 Patent that, as a Matter of Law, Cannot Be Applied <u>As Prior Art Against the '879 Patent in the Manner Asserted.</u>**

Reveal's sole basis for requesting reexamination of the '879 patent is that the asserted claims are alleged to be invalid under 35 U.S.C. § 103 as being obvious over L-3's own U.S. Patent No. 6,218,943 ("the '943 patent") in combination with two other references. That argument is fatally flawed. The patent statute on its face makes clear that the '943 patent is not available as prior art against the '879 patent to show obviousness under § 103 as alleged by Reveal.

Two sections of the patent statute are relevant. First, 35 U.S.C. § 102 defines a number of distinct classes of "prior art" and establishes the requirement that a claim be novel to be patentable. Second, 35 U.S.C. § 103 imposes the further requirement that a claim be non-obvious over the prior art to be patentable. In general, any of the classes of prior art defined in § 102 can be used as prior art in an obviousness analysis under § 103, but with one major exception, relevant here, relating to prior art that is owned by the same entity that owns the patent claim.

Reveal asserted that the '943 patent is available as prior art to the '879 patent under the class of prior art defined in 35 U.S.C. § 102(e), relating to an earlier filed patent application. Reveal further asserted that, together with two other references, the '943 patent renders the asserted claims of the '879 patent obvious under § 103. (D.I. 92, Ex. H). However, § 103(c)(1) explicitly excludes the use of § 102(e) prior art to show obviousness under § 103 when, as was the case here, "the subject matter and the claimed invention were, at the time the claimed invention was made, owned by the same person or subject to an obligation of assignment to the same person." 35 U.S.C. § 103(c)(1); Riverwood Intern. Corp. v R. A. Jones & Co., Inc., 324 F.3d 1346, 1355 n.2 (Fed. Cir. 2003). The purpose of the limitation on the classes of prior art available under § 103(c)(1) is to prevent non-public developments by an entity from being an obstacle to patent protection on future developments by that same entity.

At all relevant times, the inventors of both the '943 and '879 patents had either already assigned or were under an obligation to assign their inventions to a common entity. The '943 patent therefore cannot be used to show obviousness of any claims of the '879 patent under § 103. Accordingly, Reveal's sole argument in support of this reexamination request fails as a matter of law.

Significantly, the critical issue concerning common ownership will not be known to the PTO when determining whether to grant the reexamination request because of several name changes L-3 has undergone. On its face, the '943 patent is assigned to Vivid Technologies, Inc. The PTO will likely not know that this is the same entity as L-3.[13] Reveal certainly knows this,

---

[13] L-3 has changed names a number of times. Its original name was Vivid Technologies, Inc. On June 9th, 2000, it changed its name to PerkinElmer Detection Systems, Inc. On July 12, 2002, it changed its name to L-3 Communications Security and Detection Systems Corporation Delaware. On June 28, 2004, it changed its name to L-3 Communications Security and Detection Systems, Inc.

but chose not to disclose that outcome-determinative detail to the PTO.  At this point, L-3 is precluded from communicating with the PTO about the reexamination request until the PTO decides whether to grant it.  MPEP § 2225.  After this reexamination request is granted, it will be a simple matter for L-3 to establish common ownership, and any rejection under 35 U.S.C. § 103 will be readily overcome.  However, this likely will not be for several months, as the PTO's decision on this reexamination request is not due until November 1, 2005.  L-3 has no ability to inform the PTO of the common ownership issue before then.

There simply is no reason to stay this case to await the inevitable result that even though Reveal's legally flawed reexamination request will be granted, the resulting reexamination will have no impact on the scope of the '879 patent.

Reveal is ably represented by experienced patent counsel.  It is undoubtedly familiar with the well-known provision of the patent statute limiting the use of commonly assigned prior art under 35 U.S.C. § 103(c)(1).  That they would base a reexamination request on such fatally deficient grounds demonstrates the lengths to which Reveal has gone to get *something* on file for each of the patents in suit.  While this flaw in Reveal's reexamination request for the '879 patent is perhaps the most facially glaring, the others fare no better.

### (iii)    The '758 Patent: Reveal's Request Relies on Irrelevant Prior Art Not Even Remotely Related to Baggage Inspection

The '758 patent is directed to a baggage inspection system for detecting a specific material of interest (e.g., a plastic explosive) within a package or suitcase. Incredibly, Reveal's reexamination request for the '758 patent relies almost exclusively on U.S. Patent No. 4,803,639 (Steele), which is directed to an inspection system for detecting flaws in manufactured parts such as turbine blades for jet engines.

Reveal's reliance on such irrelevant prior art again shows that it has simply grasped at any basis to get something on file with the PTO relating to each of L-3's patents, knowing that the threshold review involved in allowing the reexamination to begin is cursory. Reveal does not expect – or need – to win; it just wants to argue for the lengthy delay that a stay would occasion. As discussed above, the PTO grants virtually all reexam requests pro forma. On the merits, however, the likelihood of all of L-3's claims ultimately being maintained over such irrelevant prior art is very high.

>              (iv)    **The '391 Patent: Reveal's Request Relies on L-3's Own Products or Irrelevant Prior Art Not Even Remotely Related to Baggage Inspection.**

Reveal's reexamination request for the '391 patent relies upon four references that fall into two classes.

First, two of the references relate to predecessor products developed by L-3. To credit Reveal's assertions, one must believe that when it decided to invest the significant funds to procure the '391 patent to cover newly developed features, L-3 somehow overlooked that such features already existed in its old products. That is not the case, as both references clearly fail to disclose one or more critical limitations of the '391 patent claims.[14]

Second, the other two references are not related to baggage screening systems at all. Rather, one (U.S. Patent No. 5,761,064) is directed to an automated semiconductor wafer defect management system, and the other (Nicolet) describes automated X-ray inspection strategies for printed circuit board assemblies. While the request (like virtually all others) will almost certainly be granted, it would be astonishing if the PTO did not ultimately confirm the validity of the '391 claims over these references.

---

[14] The analysis Reveal provided in its reexamination requests conveniently glossed over these glaring deficiencies. (D.I. 92, Ex. E at 5-14)

(v)     **The '806 and '946 Patents: Reveal's Request Relies Entirely on the Patents' Own Specifications Which Is Plainly Legally Improper.**

In requesting reexamination of the '806 and '946 patents (collectively "the Eberhard patents"), Reveal asserted that it would have been obvious under 35 U.S.C. § 103 for one of ordinary skill in the art to have employed certain three-dimensional connectivity analysis techniques that had been used in the medical imaging field to analyze data acquired by an explosives detection system.  It is black letter law that to support an obviousness rejection based on a combination of prior art references, there must be some showing that one of ordinary skill in the art, at the time of the invention, would have been motivated to make the allegedly obvious combination.  E.g., In re Oetiker, 977 F.2d 1443, 1447 (Fed. Cir. 1992) ("[T]here must be some reason, suggestion, or motivation found in the prior art whereby a person of ordinary skill in the field of the invention would make the combination.").  Motivation is often the critical component to an obviousness analysis, as it prevents hindsight from being improperly used in the analysis. In re Rouffet, 149 F.3d 1350, 1358 (Fed. Cir. 1998) ("the suggestion to combine requirement stands as a critical safeguard against hindsight analysis and rote application of the legal test for obviousness"); In re Dembiczak, 175 F.3d 994, 999 (Fed. Cir. 1999) ("Our case law makes clear that the best defense against the subtle but powerful attraction of a hindsight-based obviousness analysis is rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references"); C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1352 (Fed. Cir. 1998) (describing "teaching or suggestion or motivation [to combine]" as an "essential evidentiary component of an obviousness holding"); In re Fine, 837 F.2d 1071, 1075 (Fed. Cir. 1988) (evidence of teaching or suggestion "essential" to avoid hindsight).

The only evidence Reveal pointed to in its reexamination requests on the critical issue of motivation was a portion of the specifications of the Eberhard patents themselves wherein the

- 25 -

inventors explained *their inventive appreciation* that certain techniques used in the medical imaging field could be employed in connection with explosive detection systems. (E.g., D.I. 92, Ex. G at 4-5).

Reveal's reliance on the specifications of the patents themselves to purportedly establish motivation for rendering the invention obvious is inexplicable.  It is black letter law that it is improper to rely upon the contents of an applicant's specification as the source of motivation to combine the teachings of two or more prior art references.  Grain Processing Corp. v. American Maize-Prods. Co., 840 F.2d 902, 907 (Fed. Cir. 1988) ("Care must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit'"); Interconnect Planning Corp. v. Feil, 774 F.2d 1132, 1138 (Fed. Cir. 1985) ("The invention must be viewed not with the blueprint drawn by the inventor, but in the state of the art that existed at the time.");  In re Dembiczak, 175 F.3d 994, 999 (Fed. Cir. 1999) (criticizing the "hindsight syndrome wherein that which only the inventor taught is used against its teacher").

As demonstrated above, Reveal's obviousness analysis (such as it is) is fatally flawed. Even more egregiously, during the prosecution of the Eberhard patents, the examiner explicitly considered whether it would have been obvious to employ the teachings of a medical imaging reference in an explosives detection system and determined that it would not have been.  Reveal is noticeably silent as to why the PTO would now take the contrary view.

###### (vi)    A Wait and See Attitude Should Be Avoided in View of the Prejudice to L-3 that Would Result from the Delay Incumbent in a Stay.

The granting of two of the reexamination requests provides no justification for staying this case to see what happens with those and the others.  As discussed above, the granting of the requests is not an indication that the PTO believes the claims to be unpatentable, as the standard

for granting a request is much lower and virtually all requests are granted. As may be seen from

the discussion above, the substance of the requests will not withstand close scrutiny. In the case

of the '879 request, Reveal does not even tell the PTO the whole story, so that even if the request

is granted, there will be no merit to the challenge to L-3's patent. Lack of merit, however, will

not prevent the reexamination process from consuming years of L-3's time, which absent a

preliminary injunction would destroy its opportunity to use its legitimate patent rights to develop

the market that Reveal is presently misappropriating.

Any potential benefit of awaiting the PTO's determination is outweighed by the prejudice

to L-3 caused by this significant delay.   Xerox, 69 F. Supp. 2d at 408; DuPont v. Phillips, 711 F.

Supp 1205, 1208 (D. Del. 1989) n.9 ("Where such a stay could result in a tactical advantage to

one party of the other, this Court will not employ its discretion to stay the ordinary course of its

proceedings simply because the outcome of the Patent Office proceedings may moot the issues

remanded"); Starlight, 201 U.S.P.Q. at 307 (denying motion to stay pending reissue because

"[a]ny benefit to be obtained by waiting the decision of the Patent Office, whose decision would

be relevant to only some of the issues in this case, is outweighed by the additional delay

involved.")

Thus, in this case, where Reveal's request for stay is calculated solely to interpose delay

and give it a tactical advantage, the stay request should be denied, and the matter should be

resolved in this Court, according to the very schedule that Reveal recently represented it could

work with.

### C.  A Stay Pending Completion of Reexamination
### Proceedings Could Delay this Case for Years.

The motion for stay should also be denied because the litigation can resolve the dispute

much more expediently than the reexamination requests.  Biogen IDEC MA Inc., v. Trustees of

Columbia Univ., 332 F.Supp. 2d 286, 295 (D. Mass 2004). Indeed, fact discovery will be closed in this case (on October 1) before the PTO has even decided whether to grant four of the reexamination requests (a decision not scheduled to occur until late October).

Reveal misleadingly suggests that reexamination proceedings are generally resolved quickly by the PTO and that a stay pending the outcome of the proceedings here would not introduce a significant delay in this case. In particular, it argues that reexamination proceedings are supposed to proceed with "special dispatch" (Rev. Mem. at 5), and twice asserted (Rev. Mem. at 5, 9) that "Congress intended the reexamination process to settle patent validity disputes more quickly … than litigation."

While Congress may very well have "intended" the process to achieve speedy results, precisely the opposite occurs in practice. Reexamination proceedings last an average of 21.7 months. (Ex. I, ¶ 7). Recent testimony of Jon Dudas, Director of the PTO, indicated that, in spite of the statute requiring the PTO to conduct reexamination proceedings with "special dispatch":

> [T]oday, a large number of reexamination proceedings have been pending before the USPTO for more than four years without resolution.

(Ex. J at 6) (emphasis added). Appeals to the Board of Patent Appeals and Interferences, and subsequently to the Federal Circuit, can result in additional years of delay. Significantly, even after the lengthy delay, the reexamination results are not determinative. Reveal would still be allowed to challenge the validity of the patents, even based on the same prior art. Ethicon, 849 F.2d at 1428.

Accordingly, a stay pending the outcome of reexamination proceedings would likely delay this case at least two years, and perhaps significantly longer. The litigation, by contrast, is ready for resolution on the merits now, and the discovery allowed by the Court is on track to be

concluded well before the recent scheduling order's November 10 date for summary judgment motions.

### D. **Reveal's Arguments Relating to Terrorism and Airport Safety Are Misplaced**

A final word is warranted regarding Reveal's appeal to matters of public interest and national security. Reveal's allusion to September 11 and airport safety issues is obviously designed to strike a nerve, and no doubt previews the kinds of arguments it plans to make to a factfinder several years down the line if it were granted a stay and given the opportunity to entrench itself in the market. Reveal's argument is not just legally irrelevant; it is also wrong as a matter of public policy. The undeniable public interest in safe air travel is enhanced by the development of better, more cost-effective, and more accurate explosive detection technology. The very purpose of the patent system is to provide incentives for – and investment in – the development of such technology. See King Instruments Corp. v. Perego, 65 F.3d 941, 950 (Fed. Cir. 1995) ("The encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.") (citation omitted); Hybritech, IBC v. Abbott Lab., 849 F.2d 1446, 1457 (Fed. Cir. 1988) ("the principal value of a patent is its statutory right to exclude"). A lengthy delay in resolution of this case would, as a practical matter, deprive L-3 of the benefit of its patents, undermining these public policies. Public policy favors a quick resolution of this action, not several years of protracted litigation at the PTO and before this Court.

## V.  <u>CONCLUSION</u>

For the forgoing reasons, Reveal's motion to stay should be DENIED.

Respectfully submitted,

L-3 COMMUNICATIONS SECURITY
AND DETECTION SYSTEMS, INC.,

By its attorneys,

August 18, 2005
　　　___/s/ Michael A. Albert___
Michael A. Albert, BBO #558566
James J. Foster, BBO #553285
Robert M. Abrahamsen, BBO #636635
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, Massachusetts 02210
Tel.: 617.646.8000
Fax: 617.646.8646
malbert@wolfgreenfield.com