EXHIBIT C

# THE JOHN MARSHALL
# REVIEW OF INTELLECTUAL PROPERTY LAW



## WHEN POLITICS INTERFERE WITH PATENT REEXAMINATION

### AMY L. MAGAS

#### ABSTRACT

Reexamination was created to reconfirm the presumed validity of a patent without requiring the patentee to endure the expense of litigation. The Patent Act allows anyone to request reexamination of a patent based on newly discovered prior art. Upon finding that the request raises a substantial new question of patentability, the Director of the United States Patent and Trademark Office may order reexamination. Even if a request is not made, the Director may *sua sponte* order a reexamination. Such reexaminations are only initiated when questions of public policy arise and there is no interest by *any other person*. However, in practice, the decision to order reexamination is made by officials other than the Director based upon public outcry under a different standard than set forth in Title 35. This practice forces independent inventors into a reexamination that may take many years to complete and results in claims being invalidated or revised. Two recent reexaminations of high profile patents have created controversy among patent practitioners. The reexaminations were ordered after an independent or small entity inventor received a substantial judgment against a large company. In both cases, the Director *sua sponte* ordered an *ex parte* reexamination while the judicial proceedings of the case were still ongoing.

Copyright © 2004 The John Marshall Law School



Cite as Amy L. Magas, Comment, *When Politics Interfere with Patent Reexamination,* 4 J. MARSHALL REV. INTELL. PROP. L. 160 (2004).

WHEN POLITICS INTERFERE WITH PATENT REEXAMINATION

AMY L. MAGAS[*]

A patent should function as a leveler whereby an individual or small company may be able to hold his or its rights of property against the pressure of the strongest adversary. It should have a protective character like that of a high powered rifle in the hands of a puny man beset by a wildly charging bull elephant.[1]

## INTRODUCTION

The Supreme Court has stated that patent law achieves three goals:[2] (1) rewarding invention; (2) stimulating further innovation by promoting the disclosure of inventions; and (3) assuring that ideas in the public domain remain there through the stringent requirements of the patenting process.[3] In exchange for disclosure of his invention, the inventor is rewarded with a time-limited right to exclude others from making, using, selling, offering to sell or importing the patented invention in the United States.[4] The high cost of patenting and litigation to protect the rights in that patent creates a chilling effect on the ability of independent inventors to seek patents even when those inventors repeatedly demonstrate their ability to successfully innovate and develop new products.[5] The patenting process is expensive due to high United States Patent and Trademark Office ("USPTO") fees and costs associated with patent prosecution.[6] Furthermore, the average patent litigation costs

---

[*] J.D. Candidate I.P., January 2005, The John Marshall Law School, B.S. Mechanical Engineering, Iowa State University, 1999. The author would like to thank the staff of The John Marshall Review of Intellectual Property Law for their editorial assistance, especially Joanna Gunderson, Dan Lechleiter, Bob Barz, Erin Fox, John Gabala, Larry Kasoff, Todd Rinner, and Sherry Rollo. The author would also like to thank Rhea Ramsey for her research assistance.

[1] Donald W. Banner, *Patent Law Harmonization*, 1 U. BALT. INTELL. PROP. L.J. 9 (1992) (quoting United States Patent and Trademark Office Commissioner Conway Coe's testimony at the Temporary National Economic Committee Hearings in 1939).

[2] Aronson v. Quick Point Pencil Co., 440 U.S. 257, 262 (1979).

[3] *See generally*, 35 U.S.C. §§ 101, 102, 103, 112 (2000) (setting forth the numerous requirements an inventor must meet to obtain a patent).

[4] 1 DONALD S. CHISUM, CHISUM ON PATENTS § 1 (2004); *see also* JANICE M. MUELLER, AN INTRODUCTION TO PATENT LAW 14 (Aspen 2003) (explaining that similar to the rights of a property owner to prevent others from entering his land, a patent owner can prevent others from making, using, selling, offering to sell or importing his invention into this country without his express authorization).

[5] *See* generally, MUELLER, *supra* note 5, at 377 (patent prosecution is the time consuming and costly process of obtaining a patent, which involves filing an application with the USPTO and then responding to any rejections or objections made by the agency as well as paying appropriate fees).

[6] *See* H.R. Rep. No. 96-1307, pt. 1., at 4 (1980), *reprinted* in 1980 U.S.C.C.A.N. 6460, 6463 (the cost of patent litigation is an impossible burden for inventors); *see also* AM. INTELL. PROP. LAW ASS'N, 2003 REPORT OF THE ECONOMIC SURVEY 22 (setting forth average costs of litigation); *FY2005 Fee Schedule*, USPTO (Oct. 2, 2004), *available at* http://www.uspto.gov/go/fees/fee2004oct1.htm (last visited Nov. 9, 2004) [hereinafter FY2005 Fee Schedule] (for an example of a current USPTO fee schedule).

around one million dollars.[7]  In addition, there are some who contend that a patent is worthless if it is not commercialized.[8]  Thus, some inventors opt for trade secret protection.  Such protection, while less costly, is easily lost and does not benefit the public.[9]

Independent and small entity[10] inventors may not have the financial resources to defend and enforce a patent.  Therefore, alternative enforcement and defense mechanisms, such as granting an exclusive license to a licensing firm or patent reexamination, must be used.[11]  Granting an exclusive license to a licensing firm provides an independent or small entity inventor with business, technical and legal resources that would not be available such an inventor enforced and defended the patent on its own.[12]

---

[7] Allen M. Leung, *Legal Judo: Strategic Applications of Reexamination Versus an Aggressive Adversary (Part I)*, 84 J. PAT. & TRADEMARK OFF. SOC'Y 471, 495 n.9 (2002) (proposing patent reexamination as a solution to the scenario of an independent or small entity inventor being threatened with patent infringement by an aggressive larger company).  In suits with less than $1 million at stake, the median costs per party through discovery and trial is $290 thousand and $500 thousand, respectively. AM. INTELL. PROP. LAW ASS'N, 2003 REPORT OF THE ECONOMIC SURVEY 22.  In suits where there is $1 million to $25 million at stake, the median costs per party through discovery and trial is $1 million and $2 million, respectively. *Id.*  In suits were there is more than $25 million at stake, the median costs per party through discovery and trial is $2.5 million and $4 million, respectively. *Id.*

[8] Mueller, supra note 5, at 14 (patent rights are negative rights, in other words the patentee receives the right to exclude others from making, using, selling, or offering to sell the invention); *see also* Andy Gibbs, *Your Patent Is Worthless!*, PAT. CAFÉ MAG. (Nov. 1, 1998), *at* http://www.cafezine.com/printable_template.asp?deptid=19&articleid=156 (last visited Nov. 9, 2004) (arguing that only three to five out of one hundred inventors will ever succeed in commercializing their patent).

[9] Protecting trade secrets serves two basic functions: providing a means to preserve standards of commercial ethics and encouraging innovation.  Eric S. Tautfest, *Temptations to Take: Misappropriation of Trade Secrets, Damages and Remedies*, 7 COMP. L. REV. & TECH. J. 117, 117 (2003).  In contrast to patents or copyrights, trade secret protection has no statutory limitation and can, conceivably, continue forever. *Id.*  Whereas patent or copyright protection extends only to certain types of materials or information, trade secret protection extends to a wide range of information.  In addition, trade secrets are not publicly disclosed; with patents, the entire patent file and its contents become public property; *see* 37 C.F.R. § 1.211(a) (2004) (unless express written notice is given, patent applications are published eighteen months after the patent application is filed).

[10] In this paper, "small" is used to depict patenting entities such as independent inventors or small-sized businesses, referred to in the USPTO as "small entities."  37 C.F.R. § 1.27 (2004).  Generally, a client is a small entity if the client has fewer than 500 employees; *see* James Goepel, *Small Businesses Aren't Always Small Entities at the USPTO*, INTELL. PROP. TODAY (May 2003), *available at* http://www.iptoday.com/may03/goepel.pdf (last visited Nov. 9, 2004).  Establishment of small entity status allows the payment of certain reduced patent fees. 35 U.S.C. § 41(h) (2000).

[11] David Lux & Marcia L. Rorke et al., *From Invention to Innovation: Commercialization of New Technology by Independent and Small Business Inventors, Department of Energy* 6, MOHAWK RESEARCH CORP., (1991), *available at* http://www.eere.energy.gov/inventions/docs/fromi2i.pdf (last visited Nov. 9, 2004) (explaining that there are two ways to commercialize, either license the patent to someone who can make and/or sell it or do it yourself).

[12] Small entity status is generally not affected unless the licensing firm has more than 500 employees.  *See* 13 C.F.R § 121.802 (2004) (defining what constitutes a small business to be one with no more than 500 employees and no standing interest in or by a company of the same).

Reexamination provides a low-cost[13] alternative to litigation because it confirms the presumed validity of the patent over the prior art which is the basis for the reexamination.[14] Reexamination allows *anyone* to request review of an issued patent in light of prior art[15] cited by the requester.[16]   In addition, the Director[17] of the USPTO is given the power to *sua sponte* order an *ex parte*[18] reexamination based upon the standards set forth by Congress and the USPTO.[19] In practice, however, the Manual of Patent Examining Procedure ("MPEP") notes that other USPTO officials actually order the *sua sponte* reexaminations.[20]

---

[13] *Compare* FY2005 Fee Schedule, *supra* note 6 (listing fees for various USPTO procedures such as the fee for an *ex parte* patent reexamination as $2,520), *and* AM. INTELL. PROP. LAW ASS'N, 2003 REPORT OF THE ECONOMIC SURVEY 20 (showing median prosecution fees for an original patent application in the USPTO to be around $9000 and median prosecution fees for an amendment to be about $2000), *with* Leung, *supra* note 7, at 495 n.9 (stating that the average patent litigation costs about $1 million).

[14] 11 DONALD S. CHISUM ON PATENTS § 11.07 [4] (2004).  The function of reexamination is to reevaluate those patents that are issued by the USPTO and thereafter the validity is found to be questionable, thus, the process improves the reliability of the patent system; *see In re* Etter, 756 F.2d 852, 857 (Fed. Cir. 1985).

[15] Prior art constitutes references which may be used to determine the novelty and nonobviousness of claimed subject matter in a patent application or patent.  1 Chisum on Patents, Scope (2004).  It includes both documentary sources (patents and publications from anywhere in the world) and non-documentary sources (things known, used or invented in the United States). *Id.* A reference must be within the art pertinent to the invention in question or an analogous art. *Id.* In addition, a reference must be dated prior to the applicant's date of invention or, in the case of statutory bars, more than one year prior to his date of application for a patent. *Id.*

[16] *Id.* At the completion of a reexamination, the USPTO issues a reexamination certificate that becomes part of the official patent document.  35 U.S.C. § 307 (2000).  This certificate serves three purposes: (1) to cancel a claim determined to be unpatentable; (2) to confirm a claim determined to be patentable; or (3) to incorporate any proposed amended claims or new claims determined to be patentable; *see* MUELLER, *supra* note 5, at 215.

[17] On March 29, 2000, the title of the head of the USPTO was changed from "commissioner" to "director."  Sabra Chartrand, *What's in a Name? A Sign of Other Changes at the United States Patent and Trademark Office*, N.Y. TIMES, Apr. 3, 2000, at C6.  The Director of the USPTO is appointed by the President, with the advice and consent of the Senate. 35 U.S.C. § 3(a)(1) (2000).  In order to be appointed, the proposed Director must be a professional with a background and experience in patent or trademark law. *Id.* The Director is responsible for policy direction and management of the USPTO as well as for the issuance of patents and the registration of trademarks. *Id.* § 3(a)(2)(A).

[18] As the name implies, the *ex parte* reexamination proceedings are generally conducted "*ex parte*" which means the third party requester is not involved in the proceeding after the initial time period required for the patent owner to file a statement related the declaration of the reexamination. 35 U.S.C. § 305 (2000).

[19] *See* 35 U.S.C. § 303 (2000); 37 C.F.R. § 1.520 (2004).  The prior art used in an *ex parte* reexamination request is typically in the form of patents or printed publications.  35 U.S.C. § 301. *See generally, Pat. Reexam. and Small Bus. Innovation: Hearing Before the Subcomm. on Courts, the Internet, and Intell. Prop. of the Comm. on the Judiciary House of Representatives*, 107th Cong. 44 (2002) (prepared statement of Nancy J. Linck, Senior Vice President, Gen. Counsel & Sec'y, Guilford Pharmals, Inc.) [hereinafter *Patent Reexam. Hearings*]; James D. Myers & Robert W. Glatz, Strengthening and Weakening the Patent Through Reexamination and Reissue, Presented at the Practicing L. Inst. Pat. Litig. Seminar, Atlanta, GA (Oct. 19, 1997), *available at* http://www.myersbigel.com/pat_articles/pat_article11.htm (last visited Nov. 9, 2004).

[20] MANUAL OF PATENT EXAMINING PROCEDURE § 2239 (8th ed., rev. 2, 2004) [hereinafter MPEP].  The MPEP is published to provide USPTO patent examiners, applicants, attorneys, agents

The USPTO issues nearly 200,000 patents annually.[21] In the twenty-two years during which the law has provided for director-ordered reexaminations, approximately 6,800 reexamination requests have been made, but only 157 (two percent) were ordered *sua sponte* by the Director (or his previous equivalent the commissioner).[22] Recently, USPTO officials ordered the reexamination of two highly publicized patents. They claimed that their authority to order the reexaminations resulted from the substantial outcry that ensued in response to the USPTO's allowing the patents to issue.[23]

Section I discusses the options an independent inventor has to enforce a patent, and why the reexamination procedure is crucial to independent inventors. Section II provides the background to the patent reexamination practice and discusses problems with that process. Section III provides an overview of current cases involving director-ordered patent reexaminations. Section IV discusses the problems with director-ordered reexaminations, and Section V proposes solutions to those problems which include appointing the Director from within the USPTO, government funding for USPTO employee's salaries, reevaluation of whether the procedures the USPTO uses to order reexaminations follow the statute and making order by the Director for reexamination immediately appealable to the Board of Patent Appeals and Interferences.

## I. BACKGROUND TO THE REEXAMINATION PROCESS

### A. The History of Patent Reexamination

As a result of the growing number of patents held invalid based upon prior art, Congress enacted the 1980 Reexamination Act (which permits *ex parte* reexamination).[24] The *ex parte* process of patent reexamination provides a low-cost means of resolving certain questions of validity as an alternative to litigation.[25]

---

and representatives of applicants with reference to practices and procedures relative to prosecution of patent applications before the USPTO. *Id.* at *Foreward.* The MPEP contains instructions for patent examiners, as well as other material in the nature of information and interpretation, and outlines the current procedures which patent examiners are required or authorized to follow during appropriate cases in the examination of a patent application. *Id.* The MPEP has the force of neither law nor rules. *Id.*

[21] Jonathan Krim, *'Outcry' Triggers Rare Patent Review*, SEATTLE TIMES, Nov. 13, 2003, at E2.

[22] Sean A. Passino et al., *Reexaminations are Ordered Due to 'Public Outcry'; In Two Instances, the Commissioner Relied on Old Standard in New Way*, NAT'L L. J. May 10, 2004, at S2.

[23] *Id.*

[24] 35 U.S.C. §§ 301–308; *see also* Stuart J.H. Graham et al., *Patent Quality Control: A Comparison of U.S. Patent Reexaminations and European Patent Oppositions*, 2–3 (Nov. 2, 2002), *available at* http://emlab.berkeley.edu/users/bhhall/papers/GHHM%20Nov02.pdf (last visited Nov. 9, 2004). The Reexamination Act parallels the post-grant opposition procedure found in the European patent system. *Id.*

[25] *See* Kristen Jakobsen Osenga, *Rethinking Reexamination Reform: Is it Time for Corrective Surgery, or is it Time to Amputate?*, 14 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 217, 245–46 (2003); Gerald J. Mossinghoff et al., *Post-Grant Review of Patents: Enhancing the Quality of the Fuel of Interest*, 85 J. PAT. & TRADEMARK OFF. SOC'Y 231, 235–36 (2003).

However, the reexamination process did not function as Congress intended.[26] Third parties (persons who are neither the patentee nor a representative of the USPTO) generally did not use *ex parte* reexamination because it was too one-sided. The patent owner almost always prevailed and emerged in a stronger position to sue the third party.[27] The system was also criticized as being biased in favor of patent owners because third parties were allowed only minimal participation.[28] In response to that criticism, Congress enacted *inter partes* reexamination as part of the American Inventors Protection Act of 1999.[29] Although *inter partes* reexamination offers third parties greater participation in reexamination procedures, it also imposes upon them severe estoppel and appeal repercussions.[30]

## B. The Interaction Between the Courts and the USPTO

The patent office examines patent applications and grants patents, which are then enforced or challenged in federal court.[31] A patent application is reviewed by an examiner at the USPTO after it is filed.[32] If the application receives a final rejection, the applicant can appeal to the USPTO Board of Patent Appeals and Interferences ("BPAI").[33] If the applicant is not satisfied with the result at the BPAI, it can either sue in the U.S. District Court for the District of Columbia[34] ("DDC") to compel the

---

[26] *See* Dale L. Carlson & Jason Crain, *Speech: Reexamination: A Viable Alternative to Patent Litigation?*, 3 YALE SYMP. L. & TECH. 2, 3–4 (2000).

[27] *Id.* at 3 (due to the structure of *ex parte* reexamination it is widely believed that the process is a way for the patentee to "take [a patent] that was invalid, in view of the [] prior art, and infringed but the 3rd party, and end up with a patent that is valid and still infringed by [that] third party").

[28] *Id.; see also* 35 U.S.C. § 304 (2000) (setting forth the procedure for *ex parte* reexamination which is very similar to the prosecution process).

[29] *See generally* American Inventors Protection Act of 1999, Pub. L. No. 106-113, 113 Stat. 1501 (codified as amended in scattered sections of 35 U.S.C.).

[30] 35 U.S.C. §§ 311–318 (2000). The third-party requester is permitted to file a response to each statement filed by the patentee throughout the entire reexamination process. *Id.* § 314(b)(2). A patent owner can appeal an adverse decision by the examiner to the USPTO Board of Patent Appeals and Interferences (BPAI) and if unsuccessful there, to the Federal Circuit. *Id.* § 315(a). The third-party requester in *inter partes* reexamination can only appeal an adverse decision as far as BPAI. *Id.* § 315(b)–(c). If the patentee appeals to the Federal Circuit, the third-party requester cannot participate. *Id.* Furthermore, a third-party requester is prevented from raising the same validity issues in any subsequent litigation of the patent in federal court. *Id.*

[31] MUELLER, *supra* note 5, at 30. The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents. 28 U.S.C. § 1338(a) (2000).

[32] 35 U.S.C. § 134 (2000).

[33] The Board of Patent Appeals and Interferences is an administrative body within the USPTO that hears appeals from patent examiners' decisions in refusals to grant patents, *ex parte* patent examination, *ex parte* and *inter partes* reexamination proceedings, interferences, and refusals to reissue patents. *Id.* §§ 6, 306, 315. The board is comprised of the Director, Commissioner for Patents, Commissioner for Trademarks, and administrative patent judges. *Id.* §§ 6, 134.

[34] *Id.* § 145. The Court of Appeals for the Federal Circuit hears appeals from decisions of the DDC in civil actions to obtain a patent under 35 U.S.C. § 145 and in civil actions of interference under 35 U.S.C § 146. *Id.* § 146. Parties who have lost an interference or had their claims rejected by the USPTO in *ex parte* prosecution can bring a lawsuit against the Director of the agency at the DDC. *Id.* § 306. Should the plaintiff prevail, the DDC will issue an order authorizing the USPTO to

office to issue the patent or appeal directly to the U.S. Court of Appeals for the Federal Circuit ("CAFC").[35]

Upon issuance of a patent, the patentee can enforce it through civil litigation in federal district court, or a potential infringer may seek a declaratory judgment.[36] In either case, appeals can be taken to the CAFC and, from there, possibly to the United States Supreme Court.[37]

In the situation where a federal court has ruled on the merits of a patent, but reexamination is still an option under the guidelines, the federal court decision will be considered controlling with respect to those claims held invalid by the court.[38] Where a reexamination of a patent in litigation has already commenced, courts may stay proceedings to await the reexamination results.[39] A stay often leads to simplification of the litigation due to the cancellation, clarification or limitation of claims by the re-examiner.[40]

### C. Reexamination can Help Independent Inventors Enforce Patents

Historically, the most important inventions have come from independent inventors.[41] While an estimated three to five percent of all patents are infringed,

---

issue a patent. The advantage of using this procedural route is that the plaintiff can put new evidence before the DDC that was not considered by the USPTO; *see* MUELLER, *supra* note 5, at 34. New evidence cannot be presented on a direct appeal to the CAFC because evidence for direct appeals must be on the record that was before the USPTO. 35 U.S.C. § 144.

[35] *Id.* § 141. Prior to 1982, patent appeals were taken to the appropriate federal regional circuit court of appeals; *see* MUELLER, *supra* note 5, at 32. Concerns over forum-shopping and lack of national uniformity in patent law prompted Congress in 1982 to create the CAFC, a new appellate court. *Id.*

[36] 28 U.S.C. § 2201 (2000). A declaratory judgment action is an action initiated by an accused infringer against a patentee seeking a declaration from a federal district court that he does not infringe the patent in suit and/or that the patent is invalid and/or unenforceable. *Id.* Before a declaratory judgment action can be filed, the accused infringer/declaratory plaintiff (1) must have a reasonable apprehension of being sued for patent infringement, and (2) must be engaging in present activity which could constitute infringement or must have taken concrete steps with the intent to conduct such activity. *Id.*

[37] *Id.* § 141.

[38] 37 C.F.R. § 1.565 (2004); *see also* MPEP, *supra* note 20, § 2286.

[39] The patentee in *inter partes* reexamination can request a stay of federal court litigation which can only be denied if the court "determines that a stay would not serve the interests of justice." 35 U.S.C. § 318. For *ex parte* reexamination, a stay is entirely in the discretion of the federal district court; *see* Ethicon v. Quigg, 849 F.2d 1422, 1426 (Fed. Cir. 1988).

[40] *Ethicon*, 849 F.2d at 1426 (explaining that reexamination can help eliminate the trial of patent claim validity or at the very least provide the court with the expert examiner's opinion thereto).

[41] *See generally*, Dr. David L. Hill, Testimony Before the House Comm. on the Judiciary, Subcomm. on Courts and Intell. Prop. (Feb. 26, 1997), *available at* http://www.house.gov/judiciary/4129.htm (last visited Nov. 9, 2004) (quoting Daniel Hamberg, *Invention in the Industrial Research Laboratory*, 71 J. POL. ECON. 95, 96 (1963) (noting that in 1958, Professor John Jewkes showed that out of 61 important inventions and innovations of the 20th century, which the authors selected for analysis, over half of them stemmed from independent or small entity inventors)).

only a small fraction of these are ever enforced by the patentee.[42]  The patentee has two primary options to protect his patent rights.  The patentee can enforce his rights by suing infringers, or by selling some or all of the rights to another via license or assignment agreements.[43]  However, individual patent owners generally are unable to license on their own because they lack licensing expertise, resources and credibility.[44]  In addition, the cost of negotiating a license agreement and enforcing patent rights poses a formidable barrier to the average patentee which results in a decrease of the value of the investment in his patent.[45]  Knowing that the average patentee does not have the required knowledge or financial backing and that very few patents are enforced, large-company infringers often take a calculated risk and blatantly ignore patent rights.[46]  This is particularly problematic for independent and small entity inventors because they do not have the ability to either dedicate the resources necessary to identify and pursue licensing opportunities or wage costly battles over their patent rights in district court.[47]

An alternative is to have the patentee strengthen his patent rights via reexamination.  Reexamination reconfirms the presumed validity of the patent over the prior art cited by the requestor without the expense of litigation.[48]  The current reexamination process allows a USPTO official to order patent reexamination based upon public disapproval of the patent.[49]  This backdoor policy is tenuous and easily abused.[50]  Therefore, perhaps the reexamination process itself needs to be reexamined.

### D. Directors of the USPTO and Director-Ordered Reexaminations

Although rooted in the United States Constitution,[51] the American patent system was founded under the Patent Act of 1790.[52]  Under this act, the Secretary of State, the Secretary of War and the Attorney General constituted a board which

---

[42] Passino, *supra* note 22, at S2.  A patentee is the owner of a patent; the entity holding legal title in the patent.  MUELLER, *supra* note 5, at 376.  A patentee includes not only the person to whom the patent was issued, but also his successors in title.  *Id.*  The patentee is not necessarily the same entity as the inventor of the patented invention.  *Id.*

[43] *See* 35 U.S.C. § 271 (a) (setting forth what constitutes infringement of a patent); 35 U.S.C. § 261 (in addition patent rights are assignable).

[44] *See generally,* TechSearch, *Why Use TechSearch?, at* http://www.techsearch-llc.com/why.html (last visited Nov. 9, 2004) [hereinafter TechSearch] (explaining the reasons that a patent holder would want to use the services of a patent licensing firm—specifically—TechSearch).

[45] *Id.*

[46] *Id.*  Copying is evidence of willful infringement; *see* Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1260 (Fed. Cir. 1997).

[47] *See* TechSearch, *supra* note 44.

[48] MUELLER, *supra* note 5, at 214.

[49] *See* 35 U.S.C. § 303 (2000).

[50] *See* Passino, *supra* note 22, at S2 (arguing that by using a public outcry standard the USPTO is opening the door to allowing the losers in trial court to force the patentees into lengthy reexamination).

[51] Congress has the power to "promote the Progress of Science and useful Arts, by securing for limited Time to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. CONST. art. I, § 8, cl. 8.

[52] *See generally* Patent Act of 1790, ch. 7, § 4, 1 Stat. 109 (repealed 1793).

considered all applications for patents.[53]   Today, that board is an administrative body, the USPTO, which is part of the U.S. Department of Commerce.[54] The Director of the USPTO is appointed by the President with the advice and consent of the Senate.

Reexamination can be requested by anyone based on any previously submitted prior art or prior art that is cited in the request.[55]  Within three months of the request, the Director will determine whether "a substantial new question of patentability" is raised as to any claim in the patent.[56]  If a substantial question of patentability is raised by the patents, a reexamination order is made.  The order for reexamination is not appealable until the reexamination is complete.[57]

Additionally, the MPEP permits a USPTO employee to suggest a reexamination. When a USPTO employee becomes aware of an "unusual fact situation"[58] in a patent, which he considers to clearly warrant reexamination, he can prepare a memorandum setting forth such facts.[59]  This memorandum is then submitted to the Office of the Patent Legal Administration ("OPLA") through a supervisory chain of command.[60]  If

---

[53]  *See* William I. Wyman, *The Patent Office and Invention Since 1845 – How the Government Has Kept Pace With the Inventor,* 112 SCI. AM. 533, 533 (June 5, 1915).  Thomas Jefferson, the first Secretary of State, was the first Commissioner of Patents and the first Patent Examiner.  *Id.*  It is said that Thomas Jefferson personally examined and determined the patentability of every application filed during his first years in office as head of the State Department. *Id.*  The grant of a patent was not only a procedure of exceeding dignity, being signed by the President, the Secretary of State and the Attorney General, but was issued with some reluctance.  *Id.*  Only three patents were issued in 1790.  *Id.*

[54]  35 U.S.C. § 3 (2000); *see also* Michael Felton, *The Patent Machine · In Go Applications, Out Come Patents or Rejections, but What's Inside?,* PATS. & PROP. (Sept. 2001), *at* http://pubs.acs.org/subscribe/journals/mdd/v04/i09/html/09patents.html (last visited Nov. 9, 2004). In the past, the USPTO fell under different jurisdictions such as the State Department and the Department of the Interior. *Id.*

[55]  35 U.S.C. § 302 (2000).

[56]  35 U.S.C. § 303(a) (2000) (stating that the Director can consider any patents or publications to determine whether there exists a substantial new question of patentability exists); *cf.* MPEP, *supra* note 20, § 2242 (requiring prior art patents or printed publications to be reviewed and a substantial likelihood that a reasonable examiner would consider them important to be present, prior to making a determination of whether reexamination should be ordered).  A prior art patent or printed publication raises a substantial question of patentability where there is a substantial likelihood that a reasonable examiner would consider the prior art patent or printed publication important in deciding whether or not the claim is patentable. 37 C.F.R. § 1.56 (2000).  The existence of a substantial new question of patentability is not precluded by the fact that a patent or printed publication was previously cited by or to the Office or considered by the Office.  35 U.S.C. § 303(a). Once it becomes apparent that there is no new question of patentability, it is improper to conduct a reexamination. *In re* Recreative Techs. Corp., 83 F.3d 1394, 1396 (Fed. Cir. 1996); *see also In re* Hiniker Co., 150 F.3d 1362, 1365 (Fed. Cir. 1998).

[57]  *See generally* Joy Mfg. Co. v. Nat'l Mine Serv. Co., Inc., 810 F.2d 1127 (Fed. Cir. 1987); Heinl v. Godici, 143 F. Supp. 2d 593 (D. Va. 2001); Patlex Corp. v. Quigg, 680 F. Supp. 33 (D.D.C. 1988); *see also* 35 U.S.C. § 303.

[58]  MPEP, *supra* note 20, § 1003, No. 17 (providing that an "unusual fact situation" is present in reviewing the patent, prosecution history and prior art if two conditions are met:  (1) there is a "compelling reason" to order reexamination and (2) at least one claim in a patent is *prima facie* unpatentable over prior patents or printed publications).

[59]  *Id.* § 2239.  The employee must include a proposed rejection of all appropriate claims, the patent file, and any prior art with the memorandum.  *Id.*

[60]  *Id.*

approved for reexamination, the OLPA prepares a decision that is signed by the Deputy Commissioner for Patent Examination Policy and the patent is then reexamined.[61]

In addition, the Director can, at any time, *sua sponte* determine whether a substantial new question of patentability is raised by any submitted prior art or other prior art discovered by him.[62]  Director-ordered reexaminations are rare and traditionally have been issued only for overly-broad patents.[63]  The MPEP states that director-ordered reexaminations will be initiated on a very limited basis, such as where a general pubic policy question is at issue and there is no interest by *any other person*.[64]   Normally, requests from outside the USPTO urging the Director to undertake reexamination on his own initiative are not considered.[65]

However, the MPEP notes that, in practice, the decision to order reexamination at the Director's initiative is normally made by the Deputy Commissioner for Patent Examination Policy[66] after a review of all the facts concerning the patent.[67]   The MPEP also states that the order for reexamination may be made by the Director, the Deputy Director for Patents, or the Commissioner for Patents.[68]

## II. RECENT DIRECTOR-ORDERED REEXAMINATIONS

Two recent reexaminations of high profile patents ordered by high ranking USPTO officials have created controversy among patent practitioners.  Each case demonstrates different reasons Directors should not be given the power to *sua sponte* order reexaminations.  In both cases, after trial but before completion of the judicial process, *sua sponte* reexaminations were ordered by the Deputy Commissioner for

---

[61] *USPTO Organizational Structure*, at http://www.uspto.gov/web/menu/offices.html (last visited Nov. 9, 2004).  The Deputy Commissioner for Patent Examination Policy is one of three deputy commissioners under the Commissioner for Patents.  The Commissioner for Patents is appointed by the Secretary of Commerce. 35 U.S.C. § 3(b)(2)(A) (2000).  Although not defined anywhere for reference, previous reexamination orders have stated that a "compelling reason" includes circumstances where "a significant concern about the patentability of the claimed subject matter has been expressed by a substantial segment of the industry *and/or* there is substantial media publicity adverse to the patent alleging conspicuous unpatentability of the claims." U.S. Pat. Reexam. Serial No. 90/006,831 (declared Oct. 30, 2003).

[62] 35 U.S.C. § 303(a).

[63] *Patent Reexam. Hearings, supra* note 19, at 16.  *See, e.g.*, U.S. Pat. Reexam. Serial No. 90/006,289 (May 21, 2002) (method of swinging on a swing); U.S. Pat. Reexam. Serial No. 90/006,068 (Aug. 20, 2001) (painting kit and related method); U.S. Pat. Reexam. Serial No. 90/006,067 (Aug. 20, 2001) (method and system for measuring leadership effectiveness); U.S. Pat. Reexam. Serial No. 90/005,622 (ordered Mar. 3, 2000) (apparatus for and the method of automatically downloading and storing internet web pages); U.S. Pat. Reexam. Serial No. 90/005,592 (Dec. 21, 1999) (date formatting and sorting for dates spanning the turn of the century); U.S. Pat. Reexam. Serial No. 90/004,669 (July 15, 1997) (storm alert for emergencies, ordered by commissioner).

[64] *See* MPEP, *supra* note 20, § 2239.

[65] 37 C.F.R § 1.520 (2000).  *See also* MPEP, *supra* note 20, § 2239.

[66] *See USPTO Organizational Structure*, at http://www.uspto.gov/web/menu/offices.html (last visited Nov. 9, 2004).

[67] MPEP, *supra* note 20, § 2239.

[68] *Id.*

Patent Examination Policy (as opposed to the Director) in parallel with the normal—but incomplete—judicial processes.[69]

## A. Eolas Technologies, Inc. v. Microsoft Corporation

While at the University of California, Michael Doyle, an employee of Eolas Technologies ("Eolas") and inventor, obtained U.S. Patent No. 5,838,906 (the '906 patent),[70] which disclosed a method of sending interactive software applications over the Internet.[71]  Eolas brought a patent infringement action against Microsoft Corporation for infringing the '906 patent.[72]  Eolas alleged Microsoft began using the technology in its Web browser soon after the patent was filed and continued to use it after the patent issued in 1998.[73]  Eolas claimed that a license had been offered to Microsoft but the offer was declined.[74]  Microsoft defended by alleging inequitable conduct[75] by Doyle for withholding information from the USPTO.[76]  Microsoft based this defense on their belief that Doyle had material information in its possession during the prosecution of the '906 patent that it failed to disclose to the USPTO.[77]  At trial, Microsoft did not succeed in its inequitable conduct defense because there was not enough evidence to prove intent to deceive the USPTO as required under the doctrine of inequitable conduct.[78]  On August 11, 2003, the jury awarded Eolas 521 million dollars in damages for Microsoft's infringement of the '906 patent.[79]

---

[69] While the patents were being reexamined, appeals to the CAFC were filed in both cases. *See* U.S. Pat. Reexam. Serial No. 90/006,491-5 (ordered Dec. 26, 2003) (appeal pending NTP Inc. v. Research in Motion Ltd., No. 03-1615 (Fed. Cir. 2004)); U.S. Pat. Reexam Serial No. 90/006,831 (ordered by Director Oct. 30, 2003) (appeal pending Eolas Techs., Inc. v. Microsoft Corp., No. 04-1234 (Fed. Cir. 2004)).

[70] Patents are abbreviated by using the last three digits of the number assigned by the USPTO, hence the '906 patent. *See* DONALD S. CHISUM ET AL., PRINCIPLES OF PATENT LAW: CASES AND MATERIALS 82 n.13 (3d ed. 2004).

[71] Eolas Techs., Inc. v. Microsoft Corp., No. 99 C 0626, 2000 WL 1898853, at *2 (N.D. Ill. Dec. 29, 2000) (*Markman* hearing determination).

[72] *See* Eolas Techs., Inc. v. Microsoft Corp., 65 U.S.P.Q.2d (BNA) 1090, 1091 (N.D. Ill. 2002) (opinion of the court regarding partial summary judgment).

[73] *Id.*

[74] Eolas Techs., Inc. v. Microsoft Corp., No. 99 C 0626, 2003 WL 1903989, at *1 (N.D. Ill. Apr. 17, 2003) (courts denial of partial summary judgment regarding willful infringement).

[75] Inequitable conduct is committed when information material to patentability is withheld or false material information is supplied to the USPTO with the intent to deceive. *See* Jay P. Kesan & Marc Banik, *Re-Engineering Patent Law: The Challenge of New Technologies: Part I: Administrative Law Issues: Patents as Incomplete Contracts: Aligning Incentives for R&D Investment with Incentives to Disclose Prior Art*, 2 WASH. U. J.L. & POL'Y 23, 39 (2000); *see also* 37 C.F.R. § 1.56 (2004) (setting forth the inventors duty to disclose).

[76] Eolas Techs., Inc. v. Microsoft Corp., No. 99 C 0626, 2003 WL 22078029, at *1 (N.D. Ill. Sept. 3, 2003).

[77] *Id.*

[78] *Id.* at *9.

[79] World Wide Web Consortium's Citation of Prior Art under 35 U.S.C. § 301 AND 37 C.F.R. § 1.501 in Relation to U.S. Patent No. 5,838,906 at 1, U.S. Pat. Reexam. Serial No. 90/006,831 (ordered Oct. 30, 2003), *available at* http://www.w3.org/2003/10/301-filing.html; *see also* Card-Beckles, *supra* note 72, at 6 (the jury's special verdict awarded Eolas $521 million based on a

In October 2003, the World Wide Web Consortium ("W3C") announced that it was seeking a reexamination of the Eolas patent because it threatened to undermine the smooth operation of the Internet.[80] The Director of the W3C, Tim Berners-Lee, sent a letter to the USPTO requesting a director-ordered *ex parte* reexamination of the '906 patent. Berners-Lee cited *his own* prior writings and that of software developer Dave Raggett, which according to W3C constituted prior art.[81] Citing the request by Berners-Lee, on October 30, 2003, the USPTO Deputy Commissioner for Patent Examination Policy, Stephen G. Kunin, initiated a reexamination of the Eolas patent.[82] The Deputy Commissioner claimed his authority to impose a reexamination originated in the MPEP standard that USPTO employees use to notify USPTO officials of an unusual fact pattern in a patent. The Deputy Commissioner's "compelling reason"—as required by the MPEP for the USPTO to suggest reexamination based on an unusual fact situation—was "a substantial outcry from a widespread segment of the . . . industry."[83] According to the order, this outcry created an extraordinary situation for which a director-ordered reexamination was the appropriate remedy.[84]

It has been suggested that the leaders of the USPTO have opened the door to a pre-appeal reexamination that disrupts the judicial system.[85] This disruption is caused by the USPTO undertaking the reexamination of the '906 patent at the same time as its validity is examined in a federal district court.[86] The decision to order the

---

reasonable royalty of $1.47 per unit of the more than 354 million copies of Microsoft's Windows Web-enabled operating system sold).

[80] World Wide Web Consortium's Citation of Prior Art under 35 U.S.C. § 301 AND 37 C.F.R. § 1.501 in Relation to U.S. Patent No. 5,838,906, *supra* note 79, at 1.

[81] *Id.* In addition to this request, the Director of the W3C sent a letter to the Director of the USPTO stating that:

> [W]e urge you to initiate a reexamination of the '906 patent in order to prevent substantial economic and technical damage to the operation of World Wide Web. As a result of a recent infringement judgment against Microsoft Corporation based on the '906 patent, they have stated publicly that they intend to redesign the Internet Explorer browser to avoid infringing the '906 patent. Although Microsoft's proposed redesign covers only a small portion of its entire browser program, it would render millions of Web pages and many products of independent software developers incompatible with Microsoft's product . . . the practical impact of withholding unrestricted access to the patented technology from use by the Web community will be to substantially impair the usability of the Web for hundreds of millions of individuals in the United States and around the world.

Letter from Tim Berners-Lee, Director, World Wide Web Consortium, to Hon. James E. Rogan, Under Secretary of Commerce for Intellectual Property, Director, USPTO (Oct. 28, 2003), *available at* http://www.w3.org/2003/10/27-rogan.html (last visited Nov. 9, 2004).

[82] *See* Director Initiated Order for Reexamination at 2, U.S. Pat. Reexam. Serial No. 90/006, 831 (ordered Oct. 30, 2003).

[83] *Id.*

[84] *Id.*

[85] Passino, *supra* note 22, at S2 (arguing that this will lead losers at trial to file reexamination requests to further draw out the litigation process).

[86] Eolas Techs. v. Microsoft Corp., 70 U.S.P.Q.2d 1939, 1944 (N.D. Ill. 2004). The court denied Microsoft's motion to suspend the final decision until the USPTO completed its reexamination of the '906 patent arguing that to stay such proceeding when they are already well into the briefing period would not be proper and would materially prejudice Eolas. *Id.* at 1945.

reexamination of the Eolas patent goes against the general policy of the USPTO that it will act in harmony with the courts and not 'relitigate' in a reexamination proceeding an issue of patentability which has been resolved on the merits by a federal court.[87] Furthermore, the request for reexamination was not made properly under the statute; the request[88] was initiated by the Deputy Commissioner for Patent Examining and Policy, not the Director. Notably, the request for reexamination was made informally by Berners-Lee, citing *his own* work as prior art, which either was not sent to the USPTO or not thought to warrant examination by the USPTO at least until after the district court ruling. The '906 patent is currently undergoing reexamination.[89] Microsoft filed an appeal on June 3, 2004, arguing that U.S. Judge James B. Zagel of the Northern District of Illinois "distorted the proceedings in a profound and fundamental way" by improperly limiting evidence about the existence of alleged prior art regarding an earlier browser.[90]

### B. NTP, Inc. v. Research in Motion, Ltd.

In January 2000, NTP,[91] a holding company,[92] contacted Research In Motion ("RIM"), the Canadian manufacturer of BlackBerry® handheld computers, to extend an offer for RIM to license NTP's patents covering the use of radio frequency wireless communications in electronic mail systems.[93] After RIM refused the license proposal, NTP sued RIM in federal court and won a $53.7 million jury verdict in November 2002.[94]

Although the court found no compelling reason to deny NTP's motion for a permanent injunction[95] preventing RIM from selling nine current BlackBerry® models and their respective software, the court did find that RIM would be irreparably injured if a stay was not granted.[96] The court stayed the permanent injunction pending RIM's appeal to the CAFC.[97]

---

[87] A final judicial holding of claim invalidity or unenforceability after all appeals have been taken, is controlling on the USPTO; *see* 37 C.F.R. § 1.565 (2004); MPEP, *supra* note 20, § 2286. In such cases, a substantial new question of patentability would not be present as to the claims finally held invalid or unenforceable. MPEP, *supra* note 20, § 2242. A non-final holding of claim invalidity or unenforceability will not be controlling on the question of whether a substantial new question of patentability is present. *Id.*

[88] *See* Director Initiated Order for Reexamination, *supra* note 82, at 9 (the order was signed by the Deputy Commissioner for Patent Examination Policy).

[89] *See generally*, U.S. Pat. Reexam. Serial No. 90/006,831 (ordered Oct. 30, 2003).

[90] *See* Eolas Techs. v. Microsoft Corp., No. 04-1234 (Fed. Cir. 2004) (appeal pending).

[91] NTP, Inc. v. Research in Motion, Ltd., 261 F.Supp.2d 423, 425 (E.D. Va. 2002).

[92] A holding company is a company formed to control other companies, usually confining its role to owning stock and supervising management. BLACK'S LAW DICTIONARY 275 (7th ed. 1999).

[93] The patents that were eventually found to be infringed by RIM are U.S. Pat. Nos.: 5,436,960, 5,438,611, 5,625,670, 5,631,946, 5,819,172 and 6,067,451. *See NTP, Inc.*, 261 F.Supp.2d at 425–26.

[94] *NTP*, 2003 WL 23100881, at *1. The final order issued an injunction enjoining RIM from selling, using or importing its BlackBerry software devices in the United States. *Id.*

[95] NTP, Inc. v. Research in Motion, Ltd., No. Civ. A. 3:01CV767, 2003 WL 23100881, at *1 (E.D. Va. Aug. 5, 2003) (final order of the district court).

[96] *Id.*

[97] *Id.*

In late December 2002, the USPTO responded to concern about the NTP decision from the telecommunications industry by commencing a director-ordered *ex parte* reexamination of four NTP patents involved in the RIM litigation.[98]   The reexamination was premised upon "a drumbeat from the industry, more diverse than just one company."[99] These reexaminations are still pending.[100]

After the Director ordered reexamination of the NTP patents, Congress unexpectedly entered the patent fray between RIM and NTP in January 2003.  The Chief Administrative Officer of the House of Representatives, James Eagen III, sent a letter to counsel for both parties advocating a resolution to the patent dispute that did not halt RIM's operations. In this letter, Eagan stated that any disruption of the RIM's service would "significantly impact the ability of the House to conduct its business and maintain communications between members and staff."[101]   James Wallace, attorney for NTP, said he could reach no other conclusion except that "[i]t appears likely . . . that RIM stirred up the pot with the Congress and the patent office."[102]  Congressional officials said RIM did nothing to prompt the sending of the letter.[103]

### III. ANALYSIS

Many giant corporations have no need of a patent system . . . [They] would be glad to compete on size, nationwide service, high volume, strong finance, and prompt delivery. They can kill off smaller competitors on any of those bases, unless the small competitor has a patent on a product someone wants to buy.[104]

As demonstrated above, big companies infringing small inventors' patents is not news.  However, a lone inventor wins a judgment against a big company *is* big news.[105]  In fact, in the past few years, there have been a remarkable number of lawsuits and judgments involving small inventors with sizable claims against large corporations involving patent infringement, fraud and breach of contract.[106]

---

[98] J. Scott Orr, *Congress Enters Struggle Over Blackberry Patent*, NEWHOUSE NEWS SERVICE, Feb. 2003, *at* http://newhouse.live.advance.net/archive/orr022003.html (last visited Nov. 9, 2004).

[99] *Id.*

[100] *Id.*

[101] *Id.* The House has issued almost 3000 BlackBerry devices to House members and staff and invested in over $6 million in the supporting proprietary technology. *Id.*

[102] *Id.*

[103] *Id.*

[104] *See* Banner, *supra* note 1, at 10 (citing Howard T. Markey, Some Patent Problems – Philosophical, Philological and Procedural, 80 F.R.D. 203, 210 (1978, 1979)).

[105] *See* Ellen Paris, *David v. Goliath – Inventors Invent. Big Companies Steal. And You Can't Fight it Because You Don't Have the Money to Win – or Can You?*, ENTREPRENEUR.COM, Nov. 1999, *available at* http://www.entrapreneur.com/mag/article/0%2C1539%2C231419%2C00.html (last visited Nov. 9, 2004) (presenting the dilemma of a small patent owner who is faced with the daunting task of taking a big company to court to enforce his patent rights).

[106] Hal Meyer, *David Beats Goliath*, PAT. CAFÉ MAGAZINE, Dec. 15, 1997, *at* http://www.cafezine.com/printable_template.asp?deptid=19&articleid=107 (last visited Nov. 9, 2004)

Small inventors face substantial hurdles when bringing an enforcement action against a giant corporation. First, independent inventors lack the financial resources necessary to compete with a large corporation.[107]  Independent inventors may win large settlements against the large companies, but those same companies can in turn force patentees into reexaminations that can take several years to complete (not including the cost and time if there is an appeal), despite the "special dispatch" provision.[108]  If independent inventors succeed in winning a large judgment in court, the large companies at the other end of that verdict may attempt to convince the Director or other USPTO officials to order the reexamination.[109]  Furthermore, critics argue that the United States is setting a bad example for the rest of the world because other countries may follow suit and begin to order reexaminations in response to industry requests.[110]

### A. Financing Options for Small Entities with Limited Financial Resources

The rights which a patentee secures in his patent give him the right to exclude others from his invention.[111]  An inventor can make a profit by licensing or assigning his patent to another for a fee.[112]  In addition, if the technology is highly desirable in the marketplace, the inventor may choose to keep rights in the patent to himself and become the sole producer of that desirable technology.[113]  Generally a patent owner will either use the patent to start a business (to sell the technology) or license rights in the patent.[114]  Both options have advantages and disadvantages.  Licensing requires minimal effort on the part of the inventor and gives the inventor money up front.[115]  Granting an exclusive license[116] to a licensing firm greatly strengthens the

(setting forth several instances where inventors secured large verdicts against large corporations similar to Eolas and RIM).

[107] Id.

[108] See Ethicon v. Quigg, 849 F.2d 1422, 1426 (Fed. Cir. 1988). In Ethicon, a suit brought by a third party requester, the Commissioner's decision to stay a reexamination proceeding pending the outcome of litigation in a district court was found to violate the statutory requirement that reexamination proceedings be "conducted with special dispatch." Id.  Basically, once the reexamination is commenced, the requester has a right to have a reexamination proceed, and the district court has jurisdiction to adjudicate that right. Id.

[109] See 35 U.S.C. § 303 (2000). The decision to order reexamination at the Director's initiative is normally made by the Deputy Commissioner for Patent Examination Policy. MPEP, supra note 20, § 2239.  However, it apparently may also be made by the Director, the Deputy Director or the Commissioner for Patents. Id.

[110] See Passino, supra note 22, at 3.

[111] 35 U.S.C. § 154 (a)(1); see also 35 U.S.C. § 271 (a).

[112] See MPEP, supra note 20, § 301 (noting that a patentee may license or assign his rights in the patent).

[113] A patentee can choose to keep a true monopoly over the patented technology for up to twenty years starting from the application filing date. See 35 U.S.C. § 154(a)(2) (setting forth the patent protection term).

[114] See generally, Rorke, supra note 11, at 7 (recommending that patentees seek professional assistance when negotiating patent licenses or assignments).

[115] Id.

[116] The exclusive license prevents the patent owner (or any other party to whom the patent owner might wish to sell a license) from competing with the exclusive licensee, as to the geographic

inventor's resources by putting teams of professionals to work at licensing or enforcing the patent.[117]    Financial obstacles to the inventor may be of little consequence to exclusive licensees either because they are in the sole business of enforcing patents or because they simply are in a better financial position to profit from the patented technology.[118]  In addition, it is the responsibility of licensing firms to find licensees.  They may perceive uses and explore markets that were not anticipated by the inventor, thereby generating more income.[119]    Granting an exclusive license also frees the inventor to pursue activities other than enforcing his patent rights or seeking licensees.[120]

However, licensing has limitations.  First, the independent inventor may not find an exclusive licensee.  Second, by granting an exclusive license, the independent inventor loses control over the technology, reducing the inventor's involvement in his patent.[121]  Any further licensing and enforcement is then left to the excusive licensee.

Conversely, the inventor may start a business in order to keep control of his invention and profits.[122]  The most significant disadvantage to starting a new business is that many new businesses fail.[123]  Common reasons for business failure include inadequate financing, poor business judgment, and poor management skills.[124]  Oftentimes the inventor's time and money are quickly exhausted.[125]

Ideally corporations should be scared of patent holders.  A patentee should be viewed as a technology giant, whose vengeance can crush a corporation for infringing its patents.[126]  Currently, this is not the case.  Many patents that are infringed are never enforced and large corporations take advantage of this fact.  However, independent inventors can use patent licensing firms to maximize their patent rights.  Licensing firms have the business, technical and legal experience necessary to negotiate licenses and to initiate lawsuits against potential infringers.[127]  As such, when working with a licensing firm the independent or small entity inventor at least ensures that large corporations will understand that infringement will not be tolerated absent consequences.  Furthermore, licensing firms have the financial resources to underwrite the costs associated with civil lawsuits, including legal expenses.[128]  A licensing firm's purported purpose is to help independent and small entity inventors maximize their rights in their inventions.[129]

---

region, the length of time, and/or the field of use, set forth in the license agreement.  *See* 35 U.S.C. § 261 (rights in a patent are assignable); *see also* MPEP, *supra*, note 20, §301.

[117] *See* Rorke, *supra* note 11, at 7.

[118] *Id.*

[119] *Id.*

[120] *Id.*

[121] *Id.* (setting forth that often times the inventor may lose total control of his technology for a long period of time, even perhaps forever).

[122] *Id.* at 8.

[123] *Id.* (listing a number of disadvantages to starting your own business).

[124] *Id.*

[125] *Id.*

[126] Commissioner Conway P. Coe, Temporary National Economic Committee Hearings - Part III, at 856 (1939), *reprinted in* Banner, *supra* note 1, at 9.

[127] *Id.*

[128] *Id.*

[129] *Id.*

### B. The USPTO: Authority of the Director and Other USPTO Officials

In 1991, the USPTO was cut off from general tax revenues and required to subsist entirely on fees[130] for its operating budget.[131] The argument for this change was that inventors should directly pay for the USPTO's services because they used those government services to acquire a limited monopoly on their inventions.[132] By subsisting only on patent fees, examiners know that their year-end bonuses depend on productivity.[133] This may cause examiners to treat small entities,[134] which pay lower fees, differently than large entities.

The American Inventors Protection Act of 1999 gave the USPTO more managerial freedom by converting the office into a performance-based organization.[135] As a result, its management has been promoted and now receives bonuses for meeting office goals.[136] Moreover, the organization has greater freedom in hiring personnel and purchasing supplies and services.[137] USPTO officials now measure performance in terms of their output. The result is that the USPTO operates as if it were a manufacturing company turning out product by processing patent applications.[138]

---

[130] FY2005 Fee Schedule, *supra* note 6. By statute, the USPTO is authorized to grant a patent when an applicant satisfies certain requirements, including the payment of appropriate fees. 37 C.F.R §§ 1.16–1.19 (2004). Additionally, throughout the life of the patent, the USPTO requires the patent holder to periodically pay maintenance fees. 37 C.F.R. § 1.20 (2004).

[131] James Gleick, *Patently Absurd -- Part 2: Big vs. Small: Politics Out of Joint*, N.Y. Times, March 12, 2000, 44 (Magazine), at 47. However, each year the administration and Congress appropriate only a portion of these fees to the next year's USPTO budget, using the balance to fund other government projects. *Id.*

[132] *Id.*

[133] *Id.* As pointed out by then Commissioner of Patents W.E. Simonds, even in 1892 the political ties of the patent office where a concern:

> [t]he Patent Office is no more political in its nature than is a well-regulated court of law, and it would be just as reasonable to appoint and remove the judges of the Federal courts on a political basis as it is to do that same thing by the Commissioner of Patents. The fortunes of a political party cannot be advanced or retarded by what is done in the Patent Office. It is a business office, in close touch with the business interests of the country, and everything in and about it should proceed upon a business basis.

W. E. Simonds, 1892 ANN. REP. FOR THE COMMISSIONER OF PATS. vi.

[134] *See* Goepel, *supra* note 10.

[135] As a performance-based organization, the USPTO is committed to accountability by having clear objectives, specific measurable goals, customer service standards, and targets for improved performance. *See* Richard Maulsby, *USPTO Becomes Performance-Based Organization*, USPTO TODAY, Spring 2000, at 6. In exchange for its commitment to accountability, the USPTO has been granted new managerial flexibility such as autonomy over the budget, hiring and procurement. *Id.* at 7. Such flexibility will enable the USPTO to operate more like a business than the administrative office that it is. *Id.*

[136] *See Patent Reform Legislation Becomes Law*, RADIO FREE PTO (Pat. Office Prof'l Ass'n, Washington D.C.) Dec. 1999--Jan. 2000, *at* http://www.popa.org/newsletters/decjan99.shtml (last visited Nov. 9, 2004).

[137] Maulsby, *supra* note 135, *at* 6.

[138] *See* Gleick, *supra* note 131, at 47.

In turn, officials treat their large-entity fee-paying patent applicants as their customers: "*the more the better*."[139]  The boost in the drive to push more patents through the USPTO means officials are more inclined to listen to their higher-paying customers' complaints about so-called overly-broad patents granted to independent inventors.[140]  It is complaints such as these that can prompt director-ordered reexaminations.[141]

The Director is responsible for providing policy direction and management supervision for the USPTO and for the issuance of patents and registration of trademarks.[142]  The Director is supposed to perform his duties fairly, impartially and equitably.[143]  This being said, past directors of the USPTO often have been criticized for their abuse of authority within the USPTO.[144]  This abuse of authority is exemplified in the cases of *Ex parte Akamatsu*[145] and *Ex parte Alappat*.[146]

In *Ex parte Akamatsu*, the patent examiner rejected claims as unpatentable subject matter under 35 U.S.C. § 101.[147]  The original BPAI panel reversed this rejection.  However, the BPAI chairman prevented the mailing of that decision and formed a special second panel consisting only of politically elected USPTO management officials.[148]  The new panel overruled the first BPAI decision and upheld the examiner's original rejection, making no mention of the earlier, contrary decision in their written opinion.[149]

---

[139] *Id.  See generally*, Simonds, *supra* note 133, at vi.  Ahead of his time, in 1893 then Commissioner Simonds noted the possibility of this danger explaining that:

> [t]he appointment of the Commissioner of Patents and the Assistant Commissioner ought at once and forever to cease to be political, their salaries should be increased, and they should hold office on the tenure of good behavior.  These positions are, first of all judicial in their nature.  Unless the persons who make these decisions have a previous training and education fitting them for these judicial duties, their performances are but a cruel travesty of true judicial action.  Given fitness, it is still in the highest degree important that the lines upon which these judicial decisions are rendered should be stable and certain and not liable to change as the Office shifts from person to person at short intervals.

*Id.*

[140] Gleick, *supra* note 131, at 46 (arguing that although small inventors can and do get the patents, it is the big corporations that can afford to litigate them – hence – the big corporations win).

[141] *Id.*; *see* J. Scott Orr, *Congress Enters Struggle Over Blackberry Patent*, NEWHOUSE NEWS SERVICE, Feb. 2003, *at* http://newhouse.live.advance.net/archive/orr022003.html (last visited Nov. 9, 2004); Matt Hicks, *W3C Seeks Re-examination of Eolas Browser Patent*, EWEEK.COM, Oct. 29, 2003, *at* http://www.eweek.com/article2/0,4149,1490613,00.asp (last visited Nov. 9, 2004).

[142] 35 U.S.C. § 3(a)(2)(A) (2000).

[143] *Id.*

[144] *See* Jeffrey W. Rennecker, *Ex Parte Appellate Procedure in the Patent Office and the Federal Circuit's Respective Standards of Review*, 4 TEX. INTELL. PROP. L.J. 335, 338 (Spring 1996).

[145] 22 U.S.P.Q.2d (BNA) 1915 (Pat. App.1992).

[146] 23 U.S.P.Q.2d (BNA) 1340 (Pat. App.1992), *rev'd*, 33 F.3d 1526, (Fed. Cir. 1994).  For consistency in this comment, in discussing both *Ex parte* Akamatsu and *Ex parte* Alappat, the word "commissioner" has been changed to "director" to reflect new USPTO titles.  *See generally*, Chartrand, *supra* note 17.

[147] 22 U.S.P.Q.2d (BNA) at 1915.

[148] *See* Rennecker, *supra* note 144, at 338; Alan L. Koller, Ph.D., J.D., *The Role of the Patent Commissioner in Designating Panels from the Board of Patent Appeals and Interferences*, 34 IDEA 185, 186 (1994) (arguing that the commissioner manipulated the panels to get a desired outcome).

[149] *See* Rennecker, *supra* note 144, at 375–76.

In *Ex parte Alappat*, the examiner also rejected claims as unpatentable, non-statutory subject matter under 35 U.S.C. § 101.[150] This time, a panel of three examiners-in-chief designated by the Director reversed the examiner's rejection. In response, the original examiner, arguing that the panel's decision conflicted with USPTO policy, requested reconsideration of the panel decision by a new expanded panel.[151] A new panel was formed, this time with eight members, including the five USPTO management officials who were members of the second panel in *Ex parte Akamatsu*, discussed above. The five administrative members of the newly constituted panel then issued a majority opinion affirming the examiner's § 101 rejection, thus overturning the original panel's decision.[152] The three examiners-in-chief who formed the original panel dissented for the same reasons as in their earlier opinion.[153]

The decisions in *Akamatsu* and *Alappat* both resulted in considerable debate throughout the patent community. Several examiners-in-chief sent memoranda to the Director complaining that he was pre-deciding cases and then designating or "stacking" the BPAI panels to achieve a desired outcome.[154] Members of the bar also expressed concern over the Director's role in setting USPTO policy through the adjudications of the BPAI.[155] Additionally, aside from forcing Akamatsu and Alappat to endure additional costs, time and frustration, the examiners-in-chief expressed their concern that the Director had frustrated and offended the Board by impinging upon its independence.[156] In turn, the Director prepared a memorandum in defense of his exercises of authority over the Board.[157]

As a result of the uproar, the CAFC reviewed *Ex Parte Alappat* en banc to address these issues.[158] The court held that the Director had the authority to form a second panel for reconsideration of an initial panel decision under 35 U.S.C. § 7.[159] The CAFC further held that legislative history did not demonstrate that Congress

---

[150] 23 U.S.P.Q.2d (BNA) at 1340.

[151] *See* Rennecker, *supra* note 144, at 376.

[152] *See id.*

[153] *See id.*

[154] *See id.* at 338 (recounting that the Director, unsatisfied with the determination of the first BPAI panel as it purportedly conflicted with USPTO policy, requested reconsideration by an expanded BPAI panel with eight members—which was granted).

[155] *See id.* (noting that the Director's selection of the new members of the eight member BPAI panel apparently turned on their concurrence with his view of the proper outcome of the case).

[156] *See id.*

[157] In a Commissioner's Memorandum to the Members of the BPAI of April 29, 1992, Commissioner Harry Manbeck and Deputy Commissioner Douglas Comer replied:

> [i]n a particular case, the Commissioner may deem it appropriate to establish legal policy for the Patent and Trademark Office, which he believes to be consistent with the applicable law, through entry of a decision by the Board of Patent Appeals and Interferences. There is no limitation in the statute as to when the members of a panel may be designated. Hence, at any time prior to entry of a decision by the Board, the Commissioner may designate, or re-designate, a panel.

Harry Manbeck, *Correspondence Between Board Members and PTO Commissioner on Board Independence*, 44 PAT. TRADEMARK & COPYRIGHT J. (BNA) 43 (May 14, 1992).

[158] *Ex parte* Kuriappan P. Alappat et al., 33 F.3d 1526, 1531–31 (Fed. Cir. 1994). Rennecker, *supra* note 144, at 339.

[159] *Ex parte* Kuriappan P. Alappat et al., 33 F.3d at 1533, 1534.

intended to impose any limitations on the Director's designation practices.[160] Although the court reversed the decision of the second BPAI panel,[161] holding Alappat's patent was within the patentable subject matter guidelines of 35 U.S.C. § 101, the CAFC ultimately concluded that the Director's actions were a valid exercise of his powers.[162]

### C. The Director-Ordered Reexamination Procedure

The procedure for a Director's *sua sponte* ordering of an *ex parte* patent reexamination has been abused. Any person is allowed to present the USPTO with prior art that the person believes to have some bearing on the validity of a patent.[163] The prior art will become part of the official patent file if the person citing the prior art explains in writing its importance.[164] Any person is allowed to file a request for reexamination of any patent claim based on this cited prior art.[165] Therefore, § 301 allows for submission of prior art to the patent office so that anyone else (*e.g.*, a USPTO employee or member of the public) can request reexamination, while § 302 takes § 301 one step further and allows anyone to request reexamination.

The Director may, upon his own initiative, look at the patent in question with or without consideration of other documents or a formal request for reexamination as required under § 302.[166] The Director can then determine whether a substantial new question of patentability is raised by the prior art submitted in the request.[167] The Director is permitted to initiate reexamination proceedings even though no request for reexamination has been filed.[168] An order by the Director that no substantial new question of patentability exists is both final and not appealable.[169] A finding by the Director that a substantial new question of patentability does exist results in a reexamination proceeding. This finding is not appealable until the reexamination is complete.

### IV. PROPOSAL

The first part of this section proposes two solutions to the problems created by the USPTO becoming a performance-based organization and having a director that is politically appointed. The first proposed solution is to require that the salaries of

---

[160] *Id.* at 1532.

[161] *Id.* at 1536.

[162] *Id.* at 1536 (leaving open the question of whether Congress should act to legislatively limit the power of the Commissioner to order such a rehearing and appoint the panel therefor).

[163] 35 U.S.C. § 301 (2000).

[164] *Id.*

[165] 35 U.S.C. § 302.

[166] 35 U.S.C. § 303(a).

[167] *Id.*

[168] 35 U.S.C. § 304.

[169] *See generally* Joy Mfg. Co. v. Nat'l Mine Serv. Co., Inc., 810 F.2d 1127 (Fed. Cir. 1987); Heinl v. Godici, 143 F. Supp. 2d 593 (D. Va. 2001); Patlex Corp. v. Quigg, 680 F. Supp. 33 (D.D.C. 1988); *see also* 35 U.S.C. § 303.

patent officials and examining personnel be funded by the government, while patent filing fees be used for administrative costs and for improving the patenting process. This would cease USPTO officials and examiners financial motivations to place a high priority on large entity patents while lowering the costs to obtain and maintain a patent. The second proposed solution is to have the Director of the USPTO promoted from within the patent office with the additional requirement that he or she have a set number of years of patent office experience. This solution would ensure that the Director has a standard experience level and would help to ensure that politics and large companies and not a primary loyalty for the Director's decisions.

The second part of this section proposes solutions to the problem of the abuse of authority that is occurring in the USPTO regarding *sua sponte* orders of reexaminations. The first proposed solution is for the USPTO to simply follow the rules prescribed by Congress. The Director of the USPTO should only be permitted to order reexaminations when there is a general policy question at issue. The second proposed solution is to allow director-ordered reexamination orders to be immediately appealable to the BPAI. This solution would work to minimize influences from the political arena and ensure that the Director has a check upon his authority before the reexamination process commences.

### A. *The Government Should Fund USPTO Examiners' and Officials' Salaries and the Director Should be Promoted from within the USPTO*

USPTO examiners' and officials' wages should be funded by the government. Performance-based systems often are abused by people whose only goal is to meet quotas.[170] The same result is inevitable in the USPTO. The patent system is supposed to reward invention and promote disclosure, thus stimulating further innovation.[171] Because the government inevitably benefits through the promotion of science and the useful arts, it should contribute to the process and pay the examiners' salaries. Necessarily, there will be administrative costs, such as those associated with filing, storing, and keeping records of patents and patent applications. Application fees should be applied to these costs. Currently, the USPTO is funded solely from user fees.[172] Government funding of a portion of these fees would lower the burden on independent and small entity inventors to fund the costs of obtaining a patent, thus furthering the purpose of the patent system by promoting the disclosure of ideas.[173] This means less incentive for examiners to lend an ear to their bank-rolling big corporate clients when it comes down to which patents may warrant reexamination.

In addition, the Director should be required to have experience in both patents and trademarks and be promoted from within the USPTO. This insures that the

---

[170] *See* Gleick, *supra* note 131, at 47.
[171] *See* Aronson v. Quick Point Pencil Co., 440 U.S. 257, 262 (1979) (rehashing these three constant principles of the patent system).
[172] FY2005 Fee Schedule, *supra* note 6.
[173] *See* Brian Kahin, *The Expansion of the Patent System: Politics and the Political Economy,* FIRST MONDAY, 2001, *at* http://www.firstmonday.dk/issues/issue6_1/kahin (last visited Nov. 9, 2004); Felton, *supra* note 54.

Director has a certain level of recent USPTO experience and politics are not overly influential in the Director's decisions.[174] Under 35 U.S.C § 3, the Director currently is not required to be promoted from within the USPTO.[175] Furthermore, the Director is not required to have any experience in the USPTO, just a professional background and experience in patent or trademark law.[176] In addition to the possibility that the Director has absolutely no patent law background, the Director having mere professional experience is a problem because it allows the Director to bring recent personal experiences to his job which were developed outside of the USPTO.[177]

From a reexamination standpoint, a director's personal experiences can greatly impact whether there is a "substantial new question of patentability" as required by the statute,[178] especially when the appointment process is political. For example, the Director may own stock in the company that is suggesting he *sua sponte* order a patent reexamination. Alternatively, the Director may have previously worked or litigated against the company requesting reexamination. These companies may have political influence which could endanger the Director's appointment. To alleviate this obvious conflict of interest, the Director should have several years experience within the USPTO immediately before beginning his or her appointment as Director.[179] The Director must be knowledgeable in both patents and trademarks. Furthermore, promoting the Director from within the USPTO would help to eliminate government influences over the patenting process because the Director's position would then be more of a promotion than an appointment similar to any other business. In addition, it would help to avoid situations such as those seen in *RIM*, where it was suggested that a member of Congress may have influenced the Director's decision to reexamine the NTP patents.

### B. The USPTO Should Follow the Laws that Congress Established by Clarifying Authority and Abolishing Abuses Thereof

The USPTO should follow the laws that Congress has established.[180] In order to do so, problems must be recognized and remedied. The MPEP states that the Director normally orders *sua sponte* reexaminations only when a general public policy question is at issue and there is no interest by *any other person* but practice has shown this not to be the case.[181] The USPTO plainly is not following the rules Congress prescribed in 35 U.S.C. § 303. The decision to order reexamination at the

---

[174] As was seen in *Eolas* and *RIM*. *See, e.g., Eolas* Techs., Inc. v. Microsoft Corp., 65 U.S.P.Q.2d (BNA) 1090 (N.D. Ill. 2002), *appeal docketed*, No. 04-1234 (Fed. Cir. 2004); NTP, Inc. v. Research in Motion, Ltd., 261 F.Supp.2d 423 (E.D. Va. 2002).

[175] 35 U.S.C. § 3(a) (2000).

[176] *Id.*

[177] Thomas Ewbank, 1851 ANN. REP. OF THE COMMISSIONER OF PATS., pt. 1, 10 (the Commissioner for patents in 1851 argued in proposing the structure of the USPTO that "the arts and sciences have no affinities with and should not be linked to temporary politics").

[178] *See* 35 U.S.C. § 303 (2000).

[179] *Patent Reexam. Hearings, supra* note 19, at 36.

[180] The current powers and responsibilities of the office are distinctly defined by Congress and set forth in Title 35. *See* 35 U.S.C. § 6.

[181] MPEP, *supra* note 20, § 2212. This was not the case in either *NTP* or *Eolas. See generally, supra*, Section III. (A) & (B).

Director's initiative normally is made by the Deputy Commissioner for Patent Examination Policy.[182]  In addition, whenever a USPTO official, other than the Director, *sua sponte* orders an *ex parte* patent reexamination, his decision is based upon the presence of an unusual fact situation in the patent, not a substantial new question of patentability (the standard followed by the Director).  Furthermore, when citing the presence of an unusual fact situation, the USPTO employee ordering reexamination can refer to significant concerns about the patentability of the claimed subject matter as heard from industry *or* media which are publicity adverse to the patent.[183]

First, *anyone* (including the Director) can request reexamination of an issued patent based upon prior art.[184]  Second, most director-ordered reexaminations are not, in practice, truly "director" ordered.[185]  However, the statutes actually state that *only* the Director can order such reexaminations.[186]  In addition, other USPTO officials have claimed to have authority to initiate reexaminations based upon a different standard than that followed by the Director.[187]  In order to initiate a proper director-ordered reexamination, the Director must find that the prior art presented to the USPTO in the reexamination request or any other prior art raises a substantial new question of patentability.[188]

There should not be a need for a USPTO employee or examiner to have a greater reason (a *prima facie* unpatentable claim) to *suggest* that a patent be reexamined at the request of the Director than that required of the Director (a substantial new question of patentability).[189]  Furthermore, the "compelling reason" criterion allows for the situation where a USPTO employee is influenced by industry or the media.[190]  If correct about their patentability concerns, both the industry and the media should be more than capable of supporting their claims and should either request reexamination under § 302 or submit prior art under § 301 and pay the *ex parte* reexamination fee.  The duality of the standards is redundant and the current practice under the MPEP should either be modified to meet the statute or abandoned.

Elimination of reexaminations ordered by USPTO officials other than the Director and limitation of director-ordered reexaminations to those prescribed by law would help ensure the following: (1) reexamination fees are paid for each patent that is reexamined; (2) prior art is submitted to the USPTO through the proper channels proscribed by § 301 so that it becomes part of the patent file; and (3) the amount of outside influence in deciding to reexamine a patent is minimized.

---

[182] *See* 35 U.S.C. § 303 (2000); *cf.* MPEP § 2239.

[183] *See* U.S. Pat. Reexam. Serial No. 90/006,831 (declared Oct. 30, 2003) (stating the reason to be a substantial outcry from the industry and media).

[184] 35 U.S.C. § 302.

[185] *See* MPEP, *supra* note 20, § 2239; *see, e.g.*, U.S. Pat. Reexam. Serial No. 90/006, 831 (the *Eolas* reexamination was ordered by the Deputy Commissioner for Patent Examination Policy) .

[186] 35 U.S.C. §§ 303–304 (2004).

[187] *See* 35 U.S.C. § 303 (substantial question of patentability); *cf.* MPEP, *supra* note 20, § 2239 (prima facie unpatentable).

[188] 35 U.S.C. § 303.

[189] *Id.; cf.* MPEP, *supra* note 20, § 2239.

[190] *Id.; see USPTO Organizational Structure, supra* note 66.

### C. Director-Ordered Reexamination Orders Should be Immediately Appealable to the BPAI

Orders for reexamination should be immediately appealable to the BPAI. Currently, case law and the MPEP state that a *sua sponte* order for reexamination is not immediately appealable even though the harm to the inventor could be irreparable.[191] If the patentee is forced into reexamination,[192] the result is a costly process which can take several years to complete and can result in delays in licensing opportunities. Furthermore, there is no means for the patentee to confront an order for reexamination.[193] Worse yet, it is possible that the reexamination was ordered *sua sponte* by someone without the express statutory authority to do so.[194] As opposed to an extensive reexamination, an immediate appeal would allow a patentee confront (and explain away) the prior art cited in the order before beginning the actual reexamination which could take several years to complete.[195] Furthermore, by allowing the patentee to immediately challenge on appeal the Director's reasons for ordering the reexamination, the process would comply more with the statutory notion that patents are presumed to be valid.[196] By requiring that the appeal be immediately heard by a panel of administrative judges there would be some assurance for the inventor that the Director who initiated the reexamination did not abuse his authority.

---

[191] Case law has determined that a substantive determination by the Director to institute reexamination is not subject to review by the courts until a final agency decision in the reexamination proceeding has issued. *See* Joy Mfg. Co. v. Nat'l Mine Serv. Co., Inc., 810 F.2d 1127, 1130 (Fed. Cir. 1987); Heinl v. Godici, 143 F. Supp. 2d 593, 600 (D. Va. 2001) (noting that "there is no provision granting us direct review" of the decision to institute a reexamination and that direct review of reexamination decisions by the Board of Patent Appeals provides sufficient protection against harassing and duplicative examinations); Patlex Corp. v. Quigg, 680 F. Supp. 33, 35 (D.D.C. 1988); (noting that the Director's threshold determination merely triggers the reexamination proceeding; it does not affect the validity of the patent).

[192] The Administrative Procedure Act has been used unsuccessfully in the courts to attempt to appeal an order for reexamination. Patlex Corp. v. Quigg, 680 F. Supp. 33, 35 (D.D.C. 1988). The Administrative Procedure Act provides for judicial review of agency action unless such action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2) (2000). This discretionary procedure applies whenever "congressional intent to preclude judicial review is fairly discernible in the detail of the legislative scheme." Block v. Community Nutrition Institute, 467 U.S. 340, 351 (1984).

[193] Although the Director, Commissioner for Patents, and Commissioner for Trademarks are part of BPAI, and there is still the risk of a stacked panel, more people determining the existence of a substantial new question of patentability would further validate such a finding. 35 U.S.C. § 6 (2000).

[194] Only in "appropriate circumstances" may a petition may be filed to vacate an *ultra vires* reexamination order. 37 C.F.R. § 1.181(a)(3) (2004). "Appropriate circumstances" include: (1) when the reexamination order is not based on prior patents or printed publications; (2) all claims of the patent were held to be invalid by a final decision of a Federal Court; (3) reexamination was ordered for the wrong patent; (4) reexamination was ordered based on a duplicate copy of the request; or (5) the reexamination order is based wholly on prior art previously considered in an earlier concluded examination of the patent by the Office (*e.g.*, the application which matured into the patent, a prior reexamination, an interference proceeding). MPEP, *supra* note 20, § 2246.

[195] *See generally*, Passino, *supra*, note 22, at S2 (noting a reexamination can take, at times, up to ten years to complete).

[196] 35 U.S.C. § 282 (2000) ("A patent shall be presumed valid.").

## V. CONCLUSION

Therefore, to avoid the many problems with the current reexamination procedure, the USPTO should consider a comprehensive reevaluation of the process on many levels. First, the decision to order a reexamination should be immediately appealable to the Board of Patent Appeals and Interferences. In addition, the Director should be promoted from within the USPTO to provide a solid background for the position and protect the position from being overly political. On that same note, funding for the USPTO should be underwritten by the government to ensure that the political consequences of viewing patent applicants as customers do not shade the impartiality of any examiners or USPTO officials. Furthermore, the guidelines within the MPEP which refer to the procedure for initiating reexaminations should be revised to coincide with the guidelines provided by Congress in Title 35. In so doing, the USPTO and Congress ensure that the independent or small entity inventor is not short changed by the patent process. After all, it is the piece of paper we call a patent which protects even the smallest of inventors and serves as the weapon used to shoot down even the greatest of adversaries.

EXHIBIT D

## Table C-2A.
## U.S. District Courts—Civil Cases Commenced, by Nature of Suit, During the 12-Month Periods Ending September 30, 2000 Through 2004

| NATURE OF SUIT | 2000 | 2001 | 2002 | 2003 | 2004 | Percent Change 2004/2003 |
|---|---|---|---|---|---|---|
| TOTAL CASES | 259,517 | 250,907 | 274,841 | 252,962 | 281,338 | 11.2 |
| CONTRACT ACTIONS, TOTAL | 53,625 | 43,148 | 35,843 | 31,263 | 29,404 | -6.0 |
| INSURANCE | 7,517 | 7,874 | 8,793 | 8,629 | 8,460 | -2.0 |
| MARINE | 2,446 | 2,505 | 2,122 | 1,912 | 1,676 | -12.4 |
| MILLER ACT | 769 | 580 | 528 | 442 | 386 | -12.7 |
| NEGOTIABLE INSTRUMENTS | 495 | 605 | 595 | 524 | 440 | -16.0 |
| RECOVERY OF OVERPAYMENTS AND ENFORCEMENT OF JUDGMENTS | 24,838 | 13,409 | 5,651 | 3,073 | 2,830 | -7.9 |
| DEFAULTED STUDENT LOANS | 24,404 | 12,952 | 5,212 | 2,525 | 2,438 | -3.5 |
| VETERANS' OVERPAYMENT | 43 | 118 | 98 | 84 | 18 | -78.6 |
| OTHER | 391 | 339 | 341 | 464 | 374 | -19.4 |
| OTHER CONTRACT ACTIONS | 17,560 | 18,195 | 18,154 | 16,683 | 15,612 | -6.4 |
| REAL PROPERTY ACTIONS, TOTAL | 6,711 | 7,290 | 8,059 | 7,373 | 5,845 | -20.7 |
| CONDEMNATION OF LAND | 1,243 | 1,506 | 938 | 408 | 197 | -51.7 |
| FORECLOSURE | 4,209 | 4,458 | 5,592 | 5,319 | 4,306 | -19.1 |
| RENT, LEASE, AND EJECTMENT | 175 | 196 | 216 | 160 | 169 | 5.6 |
| TORTS TO LAND, INCLUDING PRODUCT LIABILITY | 377 | 388 | 353 | 791 | 385 | -51.3 |
| OTHER REAL PROPERTY ACTIONS | 707 | 742 | 960 | 695 | 788 | 13.4 |
| TORT ACTIONS, TOTAL | 36,586 | 33,663 | 62,919 | 45,054 | 55,023 | 22.1 |
| PERSONAL INJURY, TOTAL | 32,621 | 29,789 | 58,997 | 39,563 | 50,594 | 27.9 |
| PERSONAL INJURY/ PRODUCT LIABILITY, TOTAL | 14,428 | 12,307 | 41,135 | 21,611 | 34,100 | 57.8 |
| AIRPLANE | 164 | 118 | 120 | 101 | 100 | -1.0 |
| MARINE | 54 | 39 | 42 | 34 | 32 | -5.9 |
| MOTOR VEHICLE | 421 | 654 | 564 | 609 | 618 | 1.5 |
| ASBESTOS | 7,187 | 5,041 | 26,818 | 1,562 | 1,471 | -5.8 |
| OTHER | 6,602 | 6,455 | 13,591 | 19,305 | 31,879 | 65.1 |
| OTHER PERSONAL INJURY, TOTAL | 18,193 | 17,482 | 17,862 | 17,952 | 16,494 | -8.1 |
| AIRPLANE | 747 | 714 | 846 | 659 | 483 | -26.7 |
| MARINE | 2,006 | 2,164 | 1,978 | 1,814 | 1,841 | 1.5 |
| MOTOR VEHICLE | 4,690 | 4,535 | 4,525 | 4,460 | 4,229 | -5.6 |
| ASSAULT, LIBEL, AND SLANDER | 801 | 623 | 693 | 892 | 668 | -25.1 |
| FEDERAL EMPLOYERS LIABILITY ACT | 1,108 | 1,067 | 944 | 975 | 782 | -19.8 |
| MEDICAL MALPRACTICE | 1,526 | 1,429 | 1,463 | 1,607 | 1,313 | -18.3 |
| OTHER | 7,315 | 6,950 | 7,413 | 7,525 | 7,178 | -4.6 |

# Table C-2A. (September 30, 2004—Continued)

| NATURE OF SUIT | 2000 | 2001 | 2002 | 2003 | 2004 | Percent Change 2004/2003 |
|---|---|---|---|---|---|---|
| PERSONAL PROPERTY DAMAGE, TOTAL | 3,965 | 3,874 | 3,922 | 5,491 | 4,429 | -19.4 |
| FRAUD, INCLUDING TRUTH IN LENDING | 2,265 | 2,224 | 2,359 | 3,860 | 2,909 | -24.6 |
| OTHER PERSONAL PROPERTY DAMAGE | 1,700 | 1,650 | 1,563 | 1,631 | 1,520 | -6.8 |
| ACTIONS UNDER STATUTES, TOTAL | 162,583 | 166,792 | 168,010 | 169,253 | 191,017 | 12.9 |
| ANTITRUST | 858 | 723 | 826 | 762 | 752 | -1.3 |
| BANKRUPTCY, TOTAL | 3,361 | 2,950 | 4,100 | 3,305 | 4,145 | 25.4 |
| APPEAL (28 U.S.C. 158) | 2,785 | 2,519 | 2,636 | 2,658 | 2,822 | 6.2 |
| WITHDRAWAL (28 U.S.C. 157) | 576 | 431 | 1,464 | 647 | 1,323 | 104.5 |
| BANKS AND BANKING | 205 | 214 | 251 | 223 | 366 | 64.1 |
| CIVIL RIGHTS, TOTAL | 40,908 | 40,910 | 40,420 | 40,516 | 40,239 | -0.7 |
| VOTING | 167 | 195 | 234 | 147 | 173 | 17.7 |
| EMPLOYMENT | 21,032 | 21,157 | 20,955 | 20,507 | 19,746 | -3.7 |
| HOUSING AND ACCOMMODATIONS | 1,284 | 1,249 | 1,313 | 1,315 | 1,222 | -7.1 |
| WELFARE | 80 | 61 | 71 | 65 | 61 | -6.2 |
| OTHER CIVIL RIGHTS | 18,345 | 18,248 | 17,847 | 18,482 | 19,037 | 3.0 |
| COMMERCE | 891 | 584 | 595 | 538 | 470 | -12.6 |
| ENVIRONMENTAL MATTERS | 886 | 1,807 | 790 | 947 | 978 | 3.3 |
| DEPORTATION | 213 | 217 | 325 | 278 | 316 | 13.7 |
| PRISONER PETITIONS, TOTAL | 58,257 | 58,805 | 55,295 | 54,378 | 55,330 | 1.8 |
| MOTIONS TO VACATE SENTENCE | 6,341 | 8,644 | 6,107 | 5,832 | 7,157 | 22.4 |
| HABEAS CORPUS—GENERAL | 24,945 | 24,664 | 23,863 | 23,070 | 23,344 | 1.2 |
| HABEAS CORPUS—DEATH PENALTY | 274 | 202 | 236 | 243 | 225 | -7.4 |
| MANDAMUS AND OTHER | 1,192 | 1,157 | 1,125 | 1,160 | 1,175 | 1.3 |
| CIVIL RIGHTS | 14,151 | 13,435 | 14,039 | 14,690 | 15,478 | 5.4 |
| PRISON CONDITION | 11,354 | 10,683 | 9,925 | 9,383 | 7,971 | -15.1 |
| FORFEITURE AND PENALTY, TOTAL | 2,320 | 1,938 | 2,119 | 2,073 | 2,146 | 3.5 |
| AGRICULTURAL ACTS | 57 | 46 | 47 | 49 | 43 | -12.3 |
| FOOD AND DRUG ACT | 110 | 58 | 69 | 72 | 42 | -41.7 |
| DRUG-RELATED SEIZURE OF PROPERTY | 1,117 | 953 | 1,200 | 1,217 | 1,292 | 6.2 |
| AIR TRAFFIC REGULATIONS | 7 | 4 | 6 | 19 | 6 | -68.4 |
| OCCUPATIONAL SAFETY AND HEALTH ACT | 4 | 1 | 5 | 6 | 7 | - |
| OTHER FORFEITURE AND PENALTY SUITS | 1,025 | 876 | 792 | 710 | 756 | 6.5 |

## Table C-2A. (September 30, 2004—Continued)

| NATURE OF SUIT | 2000 | 2001 | 2002 | 2003 | 2004 | Percent Change 2004/2003 |
|---|---|---|---|---|---|---|
| LABOR LAWS, TOTAL | 14,142 | 15,195 | 18,285 | 17,318 | 18,330 | 5.8 |
| FAIR LABOR STANDARDS ACT | 1,935 | 1,960 | 3,904 | 2,751 | 3,617 | 31.5 |
| LABOR MANAGEMENT RELATIONS ACT | 1,542 | 1,445 | 1,529 | 1,618 | 1,641 | 1.4 |
| LABOR MANAGEMENT REPORTING AND DISCLOSURE ACT | 101 | 129 | 84 | 101 | 81 | -19.8 |
| RAILWAY LABOR ACT | 137 | 115 | 126 | 101 | 111 | 9.9 |
| ERISA * | 9,124 | 10,292 | 11,232 | 11,304 | 11,421 | 1.0 |
| OTHER LABOR LITIGATION | 1,303 | 1,254 | 1,410 | 1,443 | 1,459 | 1.1 |
| PROTECTED PROPERTY RIGHTS, TOTAL | 8,738 | 8,314 | 8,254 | 8,934 | 9,590 | 7.3 |
| COPYRIGHT | 2,050 | 2,446 | 2,094 | 2,448 | 3,007 | 22.8 |
| PATENT | 2,484 | 2,520 | 2,700 | 2,814 | 3,075 | 9.3 |
| TRADEMARK | 4,204 | 3,348 | 3,470 | 3,672 | 3,508 | -4.5 |
| SECURITIES, COMMODITIES, AND EXCHANGES | 2,678 | 3,538 | 3,465 | 3,189 | 3,094 | -3.0 |
| SOCIAL SECURITY LAWS, TOTAL | 15,629 | 17,074 | 18,322 | 17,127 | 15,873 | -7.3 |
| DISABILITY INSURANCE | 8,122 | 8,623 | 8,739 | 7,931 | 7,061 | -11.0 |
| SUPPLEMENTAL SECURITY INCOME | 6,762 | 7,361 | 8,313 | 7,792 | 7,916 | 1.6 |
| RETIREMENT AND SURVIVORS BENEFITS | 855 | 1,004 | 1,164 | 1,324 | 831 | -37.2 |
| OTHER | 90 | 86 | 106 | 80 | 65 | -18.8 |
| RICO ** | 829 | 724 | 760 | 743 | 777 | 4.6 |
| STATE REAPPORTIONMENT SUITS | 2 | 13 | 24 | 1 | 5 | - |
| TAX SUITS | 907 | 1,020 | 1,151 | 1,244 | 1,314 | 5.6 |
| CUSTOMER CHALLENGE | 12 | 16 | 7 | 11 | 16 | 45.5 |
| FREEDOM OF INFORMATION ACT | 341 | 325 | 271 | 283 | 315 | 11.3 |
| CONSTITUTIONALITY OF STATE STATUTES | 288 | 254 | 256 | 267 | 317 | 18.7 |
| OTHER STATUTORY ACTIONS | 10,918 | 12,171 | 12,494 | 17,116 | 36,644 | 114.1 |
| OTHER ACTIONS, TOTAL | 12 | 14 | 10 | 19 | 49 | 157.9 |

NOTE: PERCENT CHANGE NOT COMPUTED WHERE BASE IS LESS THAN 10.
* ERISA = EMPLOYEE RETIREMENT INCOME SECURITY ACT.
** RICO = RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS.