# EXHIBIT J

Case 1:04-cv-11884-NG   Document 107-5   Filed 08/18/2005   Page 1 of 16

STATEMENT OF

THE HONORABLE JON W. DUDAS

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY
AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE

SUBCOMMITTEE ON INTELLECTUAL PROPERTY
COMMITTEE ON THE JUDICIARY
United States Senate

"The Patent System: Today and Tomorrow"

APRIL 21, 2005

**Introduction**

Chairman Hatch, Ranking Member Leahy, and Members of the Subcommittee:

Thank you very much for inviting me to testify today. I commend you for holding this hearing appropriately named the "Patent System: Today and Tomorrow." This is a particularly appropriate time to reflect upon the incredible success of innovation and of our patent system in the United States. It was 215 years ago this month that our young nation adopted its first patent statute. On April 5, 1790, your predecessors in the Senate passed the final version of the statute, and President George Washington signed it into law on April 10.

The benefits of our patent system have always been obvious to Americans. You are familiar with Article 1, Section 8, Clause 8 of the U.S. Constitution, granting Congress the power "to promote the progress of science and the useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." James Madison wrote in one of the Federalist Papers, "The utility of this power will scarcely be questioned." He was right. That clause was adopted into the Constitution without a dissenting vote -- without even any recorded debate.

The need for a statutory system to examine and grant patents was just as obvious. President Washington signed the first patent statute 215 years ago -- before our nation even had its 13th state. History has repeatedly affirmed the wisdom of this decision of our Nation's founders. The tremendous ingenuity of American inventors, coupled with

1

an intellectual property system that encourages and rewards innovation, has propelled our nation from a small agrarian society to the world's preeminent technological and economic superpower.

The flexibility and strength of our patent system have helped entire industries flourish, rather than perish. Everyone has benefited from the innovative products encouraged by this system. And all of the technology encouraged by the patent system finds its way to the public domain within 20 years -- freely available to any and all.

The success of the patent system is not limited to the United States. It is the basis for economic development in nations throughout the world. Unfortunately, a growing chorus of critics is asking if the fundamental patent system that has been so critical to the growth of innovation and economic success in the United States and other nations will enhance or hinder development in their nations.

Today, many of the nations questioning the efficacy of an intellectual property system have become hotbeds for the manufacture and export of counterfeit goods. Unsurprisingly, some of the nations that allow their citizens to counterfeit and pirate others' intellectual property are the very ones questioning a system that encourages and rewards innovation, and discourages copying and free riding.

**The USPTO Today and Prominent Issues**

In the last several years, intellectual property (IP) assets have become an ever more essential ingredient of economic vitality. In the past, raw materials and other tangible goods were the main drivers of an economy. Today, economic success depends increasingly on intangible, information-based assets, such as the creativity of employees and the knowledge gained from research. As a result, intellectual property-based industries, such as biotechnology and entertainment, now represent the largest single sector of the U.S. economy. In fact, IP industries export more American value to the world than the automobile, automobile parts, agricultural, and aircraft industries combined.

As the clearinghouse for U.S. intellectual property rights, the USPTO is an important catalyst for U.S. economic growth. Through the grant of patents and the registration of trademarks, the USPTO promotes the economic vitality of businesses and entrepreneurs, paving the way for investment capital, research and scientific development.

We are proud of our 200 year-old legacy of partnership with America, providing the tools for our nation to become a technological and economic giant. **To continue this partnership, we must remain the best patent-examination system in the world. To ensure on-going success, the USPTO must focus on improved quality and productivity. To ensure timely grant of rights, we must reduce our backlog of patent applications by increasing our efficiency and taking advantage of our automation efforts.**

**Intellectual Property: Increasing Importance and Complexity**
Globally, intellectual property protection is more relevant than ever. Worldwide, 12 million patent applications are pending –in the European Patent Office, the Japan Patent Office, and various national patent offices. Without question, the growing importance of intellectual property protection has a direct impact on the USPTO. Patent applications in the United States have more than doubled since 1992. In the last five years alone, biotechnology-related patent filings at the USPTO increased 46 percent, while pharmaceutical and chemical-related filings climbed 42 percent. As a result, the USPTO issued more patents *last year alone (173,000) than it did during the first 40 years of its existence.*

While the sheer volume of applications is staggering, the technical complexity of patent applications is escalating rapidly. In 1905, more than one-third of U.S. patent filings were bicycle-related. Today, the USPTO routinely examines patent applications in areas such as nanotechnology, bio-informatics, and combinatorial chemistry - - art areas that didn't even exist one hundred years ago. Some patent applications are received on CD-ROMs, containing literally the equivalent of millions of pages of data on paper.

**The Patent Applications Backlog**
The dual trends of increased volume and complexity of patent applications filed pose significant challenges for the USPTO. While the volume and technical complexity of patent applications have increased significantly, our capacity to examine patent applications has not risen at the same rate. The result is a pending-application backlog of historic proportions. In essence, we face a unique historical challenge: how to handle record levels of complex work in an efficient manner, without the benefit of a precise role model.

Patent pendency (the amount of time a patent application is pending before a patent is issued) now averages more than two years. In more complex art areas such as data-processing technologies, average pendency stands at more than three years. Without fundamental changes in the way USPTO operates, average pendency in these areas could double by 2008. Moreover, without intervention, the backlog of applications awaiting a first review by an examiner could grow from its current level of approximately 500,000, to over 1,000,000 by 2010.

To put these pendency numbers in perspective, in 1981 when the U.S. patent system was faced with a workload crunch, *U.S. News & World Report* published an article on the situation entitled "Patent System a Drag on Innovation." At that time, average patent pendency was 22 months and the backlog of unexamined cases was 190,000. Today, as the numbers above show, the pendency predicament is far more dramatic.
The problem arises because both the nature of technology and the nature of the marketplace make long processing delays unacceptable -- and unsustainable.

If intellectual property protection is to continue to serve its purpose as a catalyst for technological innovation and economic growth, the USPTO must fundamentally break with the status quo. If we are to issue quality patents and register quality trademarks in a

timely manner, we must fundamentally reform the way we do business. Fortunately, Mr. Chairman, thanks to the leadership you and many of your colleagues in the House have shown, the USPTO has been appropriated the funds we need to face these challenges. We know, however, that simply using appropriated resources will not alone do the job. We must be prudent in developing the processes that will make the patent system more effectively serve its purposes.

**Summary of Critical Issues**
Due to the record growth that began in the 1990s and continues today, the USPTO is facing a record workload crisis. The rate of growth of patent applications has slowed, but we continue to receive record numbers of applications every year. Unless the bold new actions described below are taken, progress on our quality enhancement and electronic government initiatives will be in jeopardy, the backlog of unexamined patent applications will skyrocket, and average patent pendency will dramatically increase.

## USPTO: Working to Improve our Patent System

Given our workload challenges, we are considering a variety of internal reforms that will continue to enhance patent quality and address our increasing pendency challenges. It is our responsibility not only to do everything we can to perfect the patent system in the United States -- something you too are doing by holding this hearing. We must actively educate the world that it is fundamentally the best patent system.

The right fundamentals alone though are not enough. I am the first to acknowledge that even the best system in the world can and must improve. Today, we are implementing a range of improvements and are building on existing initiatives. We are also working on a series of potential legislative improvements to the system. The future requires that we work both domestically and with our international counterparts to develop the best patent system – in terms of patent quality and performance - for inventors both here at home and abroad.

We applaud the Committee for examining our patent system with an eye to improvements that it can make. We are also looking internally at the improvements that the USPTO can make through the authority that Congress has given it.

Making commitments and keeping them has led to some successes throughout the USPTO organization, including the implementation of the President's Management Agenda and the *21st Century Strategic Plan*. The USPTO is now better equipped to handle the many important challenges that face our nation and our IP system at home and abroad.

Earlier this year, the USPTO announced additional initiatives that will improve quality and efficiency—**increasing transparency, internally improving *ex parte* reexamination, and saving applicants tens of millions of dollars by revamping our process concerning the submission of appeal briefs by applicants during the**

4

**examination process.** We continue to make commitments, and we will continue to keep them.

**Improving Transparency and Enhancing Quality**
As a measure to enhance quality and public confidence in our office, I have committed the USPTO to provide improved transparency in our operations. The USPTO will continue to report to the public more information, better information, and more meaningful information about our office and its performance. You will see us measure ourselves more often, more intensely, and with more useful data -- data that will not only report quality and pendency statistics at the USPTO, but will present a basis for improvement.

While implementing electronic tools to assist employees of the USPTO in doing their jobs, the USPTO has also provided Public PAIR -- the Patent Application Information Retrieval system -- to assist and benefit the public. Public PAIR allows anyone access to the entire file history of an application, including access to images of every paper of record for every published application in our database. With the click of a mouse, Public PAIR provides innovators information that is critical to understanding how a technology is evolving. This will help American industry better target its research and development investments, and be more responsive to the demands of the national and global marketplaces. Its counterpart for unpublished applications -- Private PAIR -- lets applicants access the entire file history of their applications in our Image File Wrapper ("IFW") database, saving time for both applicants and examiners. These systems are truly milestones of achievement for the agency.

In the past, our pre-grant sampling of allowed patent applications showed an error rate that fluctuated between 3 percent and 7 percent. Our metrics were not as effective as they could have been in helping us evaluate and train our examiners about what went wrong and how to avoid that type of error in the future. Starting with the *21st Century Strategic Plan*, we re-assessed ourselves. Today, we conduct more general reviews and more in-process reviews. We now have meaningful data from which to calculate quality baselines. We use that information to identify points of error, and thereby to adjust training and interactions with examiners to improve our processes and our examination.

We now review more work, and we review it in a smarter way. In some areas, we have tripled our number of reviews. We are looking at our error rates more deeply, and dissecting the issues causing errors. We can and are developing specialized training for examiners based on results from in-process reviews of our examiner's work. And, as an enhanced quality measure, we have expanded a "second-pair-of-eyes" review in certain technology areas.

Finally, until recently, our pendency measures were not meaningful enough from the perspective of managing an office. Old ways of measuring pendency did not illuminate all issues and could be misleading. As noted above, precise information regarding both pendency and our backlog is critical to informed management decisions. I have directed that our pendency statistics be supplemented by additional measures that more fully

reflect the current state of affairs in the USPTO, with the goal of identifying specific ways in which we can improve.

Our users will now know more of what we know. Provided with better information, our customers can have enhanced insight to the patent-examination process and will be encouraged to offer constructive recommendations for systemic improvement.

**Improving the Reexamination Process**
Many of the quality issues raised and debated today in the patent system are within our reexamination system. Without entering the debate on the limitations of *inter partes* reexamination, legislative improvements, or even post-grant review, there is no question that the USPTO can do much to improve the reexamination process.

By way of background, we are focused on improving the reexamination process because it is an opportunity for the public to assess patentability without resorting to costly litigation. An *ex parte* reexamination proceeding is conducted within the USPTO when any person, including the patentee, submits a substantial new question as to the patentability of the subject matter of an issued patent. The statute authorizing reexamination proceedings requires the USPTO to conduct this process with "special dispatch." Frequently, these proceedings require more than 100 hours of examiner time to complete. And today, a large number of reexamination proceedings have been pending before the USPTO for more than four years without resolution. We are just as dissatisfied with these results as are the stakeholders in the system.

As I mentioned earlier, reexamination proceedings are important to patent owners and to the public as a means of resolving the issue of patentability without resorting to the high-cost option of litigation. In these proceedings, both timeliness and correctness of the decision are important to all parties to provide certainty of intellectual property rights. Therefore, we have an especially important duty to get it right here with special dispatch. However, many reexams are complex and time-consuming. Sometimes there is intentional delay on the part of those outside the USPTO, which can add to the time it takes us to process reexams.

**Proposed Reexamination Improvements**
To address issues of timeliness and correctness of the decision, the USPTO will implement a new process for handling reexamination proceedings. Our goal is that, by the end of FY 2005, we will have resolved all instances of *ex parte* reexamination proceedings that have been pending with an examiner for more than two years. Specifically, of the current 1,200 pending *ex parte* reexamination proceedings, we hope to resolve 420, or over one-third of our current reexamination workload. If we had not undertaken this challenge, the total number of reexaminations pending for more than two years would have risen to 600 by the end of this year. An additional commitment is that, by the end of FY 2005, the USPTO will set a defined time period for all future *ex parte* reexamination proceedings to be completed before the examiner, and the period will be less than the two years achieved in fiscal year 2005.

A similar clean-up effort is being conducted for all *inter partes* reexamination proceedings now pending before the USPTO. To address the issue of the correctness of the decision, the USPTO will require supervisory review of all USPTO decisions in any reexamination proceeding. It is expected that this process will employ a panel of least three supervisors and senior patent examiners. Further, by the end of this fiscal year, the USPTO will establish firm processing time periods for all reexamination proceedings ordered (after the Office order for reexamination) on or after October 1, 2005, for both *ex parte* and *inter partes* reexamination proceedings.

**Making Pre-Brief Appeal Conferences More Citizen-Centered**
Pre-Brief Appeal Conferences are another area where we are implementing the President's Management Agenda mandate that government be citizen-centered (not bureaucracy-centered) and results-oriented, by eliminating certain patent processing costs for citizens.

Today, when an applicant wants to appeal a patent rejection with the Board of Patent Appeals and Interferences (BPAI), the applicant must file a Notice of Appeal and an Appeal Brief outlining why the examiner's position is in error. The next step is an Appeal Conference with the examiner who decided the claims were not patentable, joined by the examiner's supervisor and another experienced examiner or supervisor. Only after this conference does the examiner prepare an Examiner's Answer explaining why the application is not allowable.

Currently, after the Appeal Conference, approximately 60 percent of cases are <u>not</u> forwarded to the BPAI for a decision. A conservative estimate of costs to applicants for preparing and filing the 60 percent of the Appeal Briefs that are never forwarded to the BPAI is $30,000,000. To save applicants at least $30,000,000 annually, the USPTO will implement a program in the third quarter of FY 2005 that allows applicants to request an Appeal Conference <u>before</u> preparing an Appeal Brief.

For a Pre-Appeal Brief Conference, it is not necessary for the members of the Appeal Conference to review the full Appeal Brief to determine whether the examiner's action on that particular application was proper and should proceed to appeal. If the Appeal Conference determines that the examiner's decision was not proper, the applicant will be notified that an appeal to the BPAI is not necessary at this time, thereby saving the applicant the cost of preparing and filing an Appeal Brief. If the Appeal Conference determines that examiner's decision was proper, the applicant will be notified to file an Appeal Brief in order for the application to go forward to the BPAI for a judicial decision. To assist in this evaluation, the USPTO has this month (April 2005) initiated a new pilot program to create a corps of appeal conference specialists, who will be trained in the way that the BPAI judges would review an appeal once it reached the Board.

**Post-Grant Review**
As part of our *21st Century Strategic Plan*, we proposed a legislative initiative – Post-Grant Review – to address patent quality, as well as the badly needed patent litigation reform that is being advocated in many quarters. Post-Grant Review has great support

among all major patent interest groups, including the bar, technology companies, academicians, and others seeking patent reform. Simply put, "post-grant review" will give the public another vehicle for reviewing the quality of issued patents. We believe our proposal promotes innovation by ensuring that the patent system is fair to all. By "fairness," we mean it promotes a patent system where flaws in issued patents can be quickly and expertly revealed, without exposing a patent holder to frivolous or even mischievous review and uncertainty. We look forward to working with the Committee in helping it design the most effective and fair post-grant review process.

**Other Reform Initiatives**
We have increasingly recognized that, when the USPTO receives 375,000 patent applications a year, the task of maintaining and improving a sound patent system must be shared by patent applicants and their representatives, as well as by the USPTO. One aspect of the Strategic Plan addressed the concept of shared responsibility through a proposal for mandatory continuing legal education for registered patent practitioners with respect to laws affecting practice before the USPTO. We are currently developing the means for making such education equally available to all practitioners via the Internet and through Continuing Legal Education (CLE) providers.

As an agency, we are focusing our operational improvement initiatives on our examiners and other employees who are keys to the success of the patent system. We are using a better training process, and are updating our employees' skills throughout their careers.

I do not purport to have all the answers to address all the challenges faced by the patent system. However, I can assure you that we are reviewing the USPTO's role as part of the system, and we will welcome the opportunity to share what we learn with you and how we believe we can appropriately address the issue of application quality.

I certainly will not shy away from focusing on how we can improve processes at the USPTO. As you know, we have spent the last three years doing just that, and I am thankful that you passed legislation that will give us many of the tools we need to make the necessary improvements. I fully appreciate that you will hold the USPTO agency accountable for addressing shortcomings and am confident that we will deliver results on issues of concern.

<u>**Over Two Full Centuries of Partnership With Customers**</u>

Our system continues to prove its strength through the new inventions described in patent applications we see every day, the growth of investment, and the fact that the Office receives record numbers of applications each year (i.e., 375,000 new patent applications last year alone). We encourage new applications. Unfortunately, many of the applications we are examining are not new. In fact, an important exacerbating factor with respect to the tremendous volume of the workload is the amount of rework cases we see in the form of "continuation" applications. While there may have been a time where the system could afford duplication and redundancy, that time has passed.

We have an incredibly dedicated core of patent examiners and technical support staff. I have met with hundreds of examiners individually, collectively, in tech center meetings, at union meetings, at retirement parties, and just walking the halls. Those who stay and make a career at the USPTO are dedicated, engaged, and knowledgeable. They not only know their art, but also are keenly aware of the outside pressures on our office. Interestingly, the number-one challenge I hear from examiners is that of problems with incoming application quality! The comments from our examiners emphasize to me, possibly more than anything else, how much of a shared responsibility patent quality is and improvement to the patent system.

**The Impact of "Continuations" on the USPTO**
Last year, more than 100,000 of the 355,000 applications filed with the USPTO were iterations of applications that had previously been reviewed by an examiner. That is, more than one-third of the applications received last year were not, strictly speaking, "new." Rather, they represented a form of re-work. This rework is a significant challenge for reaching new applications, because so-called continuations represent additional work on subject matter that has already been reviewed in examination and – in some instances – even issued as a patent. Continuations, or "re-work," can take a variety of forms. A "continuation," per se, is a second application for the same invention claimed in a prior nonprovisional application and filed before the original prior application becomes abandoned or patented. A "divisional application" is a later-filed application for an independent or distinct invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier or parent application. An "RCE" (request for continued examination) is available in an application where prosecution is closed, at the request of the applicant. Given the ever-increasing workloads we face, it is necessary and appropriate for all to consider whether some restrictions should be placed upon so-called "continuation" practices.

**Patent Applications and the Number of Claims**
Patent applicants include, as part of their application, patent claims that ultimately define the legal metes and bounds of the protection when a patent is granted. Thanks to your efforts last year, the USPTO now receives additional funding to support our examination function through fees based upon the number of claims presented for examination. Tying increased fees to increased numbers of claims inserts the right monetary incentives in the system. What is not immediately evident is that even a relatively small number of applications containing a large number of claims present efficiency challenges. Complexity of analysis is directly related to the number of claims presented, and large numbers of claims immediately affect our examiners' ability to conduct the high-quality examination we all expect from our patent system. It is not solely a question of time. Large numbers of claims may involve numerous interactions with possibilities not envisioned by even the applicant. Accordingly, the burden imposed by such large-claim applications – even when received in relatively small numbers -- can impede our ability promptly to examine applications relating to other inventions. At the same time, we must certainly recognize the legitimate need for applicants to present large numbers of claims in some applications.

9

What we must do is find the right balance. We must find ways in which inventors can submit large numbers of claims when needed, while making it feasible for examiners to effectively analyze a plethora of claims. Currently, about 7 percent of applications present about 25 percent of the patent claims we examine. That is, a minority of applicants (7%) creates more than 25% of the claims-review work. We are considering the possibility of requiring applicants who file these so-called "super-sized" applications to help us by identifying the relevant issues.

**Increased Applicant Responsibility**
We are also considering additional rules changes that would require those applicants who place relatively greater stresses on the system to assist the USPTO with efficient processing of applications. For example, applications filed with large numbers of claims represent challenges to timely processing, particularly for examination. Applications filed with large numbers of prior art references, without any guidance as to which references the applicants believes to be most relevant, have an impact on efficient examination. We believe that the patent system as a whole is better served where applicants work in partnership with the USPTO to take responsibility for efficient processing of applications. We want a patent examination system that "gets it right" the first time. Concentrating our review on the most pertinent information relevant to patentability is an efficient means to "get it right" the first time. For applicants, quick, accurate focus on relevant prior art means their applications are properly assessed, and amendments or changes to the patent application and claims can be suggested with confidence. Ensuring such a focused examination is a joint responsibility of the examiner and the applicant. By working to improve the ways that the best, most relevant information comes before the examiner, we will best achieve the goal we all share of high-quality patent grants that have the respect and trust of the entire patent community, both domestically and internationally.

## **The USPTO and Tomorrow**

The USPTO is a team of 7,000 people, including scientists, engineers, and PhDs, many of whom spend their time considering how we might improve our patent system. A multitude of others outside of the USPTO also are reflecting upon our system, and are likely to approach you with suggested changes.

While we have much to be proud about in our system, there is much talk about whether our patent system should be reformed. Two recent reports by the Federal Trade Commission and the National Academies of Sciences call for a variety of patent system reforms. While such studies have earned enormous attention from the media, it is important to underscore that much of what they discuss is not new. In fact, several of the proposals suggested reflect ideas that were first developed and discussed by the USPTO.

At the USPTO, we have had experts working on patent-reform issues for decades. We welcome the discussion of many of these initiatives as part of a legislative package that you may introduce later this year. We presently are hearing of legislative proposals in

three general categories: operational issues; litigation reform; and convergence of international laws and best practices. In my view, each of these discussions must center on how the patent system encourages innovation, and how well it serves the public at large.

In my capacity as the Under Secretary of Commerce for Intellectual Property and the Director of the Office that must examine these applications, I am pleased to work with you on patent reform on behalf of the Administration. **We are grateful for your support and enactment of the revised fee schedule last November that will help fund the Plan. Since the bill that passed was different from the Administration's original submission, we are working to ensure that the USPTO's strategic goals can be met, consistent with the parameters of the modified fee schedule in place for two years. We need to work creatively to achieve the gains in light of the record workload that patent system faces today.**

Like you, we are tasked with looking at patent issues from every angle. We must look at them from the perspective of the independent inventor, who may be the next Thomas Edison, to the perspective of a large, successful company that believes its innovations are being frivolously undermined by unnecessary legal obstacles. We must look at these proposals from the perspective of an economic superpower negotiating treaties to create a better intellectual property system internationally, to the perspective of the American consumer who may not care about patents but is affected greatly by the effects of our patent system.

The increasing importance of trade in IP industries to the world economy has also increased calls for substantive harmonization and cooperation among intellectual property offices. At the same time, it has put pressure on the international organizations concerned with intellectual property. As we at the USPTO are working internally to improve our systems, we are also working with our trading partners to ensure that the world IP system becomes more effective.

### Developments in International Patent Law

A strong U.S. patent system is not enough for American innovators, whether in established businesses, independent entrepreneurs and start-ups, or non-profits. While patent rights are territorial, the opportunities and challenges in the international arena are incredible, both in the near- and long- term. Critics have observed that there is growing anti-IP sentiment internationally -- and in some domestic circles. This sentiment has even, in some instances, spilled into the World Intellectual Property Organization (WIPO). The simplest patent harmonization efforts recently have been met with obstruction and procedural tactics. We must work hard to achieve a consensus at WIPO, and ideally, we should have every nation agree on intellectual property reforms. We cannot have a few nations obstructing the process on reforms that will benefit them and the rest of the world.

The USPTO has been successful in launching a process to bring together interested international parties to establish a work plan for progress on substantive patent law

harmonization. In February 2005, we held an inaugural meeting in the United States, which was attended by 20 nations, the European Union, and the European Patent Office. This meeting resulted in the unanimous decision to establish a technical working group for the express purpose of discussing certain areas of patent law harmonization.[1]

Building on this momentum, subsequent WIPO-sponsored consultations resulted in a general statement regarding a suitable work plan for proceeding with patent law harmonization within WIPO.[2] Continuing work on these parallel tracks will lead us closer to immediate benefits that will inure to the patent community and patent offices worldwide. This dual approach will be encouraged for other IP-related issues as well.

However, a challenge we face is the use of Patent Cooperation Treaty (PCT) fees paid to WIPO. At WIPO, less than $1 out of every $3 goes to the Office of the Patent Cooperation Treaty (PCT). As a result, the United States and a handful of other developed nations effectively are the net donors to the WIPO, while the remaining 174 nations are net receivers. These net receivers are the beneficiaries of the fees Americans pay, which do not go to PCT operations.

I am happy to say we were successful in protecting against further PCT fee increases last year at WIPO. We staunchly opposed a proposal and then stopped a provision that would have raised fees another 12.7 percent more than the previous year's. This saved U.S. applicants more than $20 million annually.

We must keep in mind that proposals exist to fundamentally change the WIPO charter and philosophy -- from one that promotes intellectual property and its protection to a more amorphous charter of "balancing" intellectual property rights. We have no quarrels with "balance," -- in fact, we believe our current system and international norms are properly balanced. But simply put, this new "balancing act" is a strategy to water down intellectual property protection, and the U.S. will fight this. Clearly, our future efforts around the world on IP issues hold even greater opportunities and challenges as we continue to promote strong, global IP protection that keeps pace with technological development.

## Conclusion

I take this opportunity to reiterate to you, the Members of the Subcommittee, our commitment to ensuring that USPTO's practices and policies promote the innovation and dissemination of new technologies. While we work to improve our system by internal reform of USPTO operations, we realize that additional measures within the domain of Congress can also make invaluable contributions.

The overwhelming evidence of the history of the U.S. patent system suggests that strong intellectual property protection supports, rather than impedes, innovation. Indeed, for more than 200 years, our patent system has helped American industry flourish, creating countless jobs for our citizens. Advanced technologies have been -- and continue to be --

nurtured and developed in our nation to a degree that is unmatched in the rest of the world. In many instances, the availability of patent protection has been integral to these advancements.

In this regard, the USPTO and the Administration look forward to continuing to work with you and the Members of the Subcommittee as you develop reform legislation to ensure that the U.S. patent system remains the envy of the world.

Thank you, Mr. Chairman.

## Notes

1   **Statement and Participants of the Exploratory Meeting of Interested Parties Concerning the Future of Substantive Patent Law Harmonization, held February 3-4, 2005, in Alexandria, Virginia**

The Participants of the Exploratory Meeting of Interested Parties Concerning the Future of Substantive Patent Law Harmonization, held February 3-4, 2005 in Alexandria, Virginia, wishing to promote and facilitate progress on certain key issues under consideration in the World Intellectual Property Organization (WIPO), agree to convene future meetings to consider:

> o substantive patent law harmonization issues, notably the Trilateral "first package," as developed by the United States Patent and Trademark Office, the European Patent Office and the Japan Patent Office and set forth in WIPO Document WO/GA/31/10; and
> o issues with regard to intellectual property and development, including proposals for a WIPO Development Agenda and proposals relating to genetic resources, with a view to seeking a common basis for further discussions in WIPO.

> \* The Participants agree that the following parties will be invited to participate in the future meetings: all Members of WIPO Group B, Member States of the European Union, the European Commission, Member States of the European Patent Organization, and the European Patent Office.

> \* The Participants further agree to have regular, intersessional meetings of subgroups to address the issues reference in Paragraph 1.

Participants were Australia, Belgium, Canada, Czech Republic, Denmark, Germany, France, Hungary, Ireland, Italy, Japan, Lithuania, Luxembourg, Netherlands, Portugal, Romania, Slovak Republic, Spain, Sweden, Switzerland, United Kingdom, and the United States.

2   **Statement and Participants of Informal Consultations in Casablanca on February 16, 2005**

Statement Adopted at the End of Informal Consultations
in Casablanca on February 16, 2005

1. Following the mandate given to him by the WIPO General Assembly in September 2004, the Director General of WIPO convened informal consultations concerning future sessions of the Standing Committee of Patents (SCP) in Casablanca, Morocco, on February 16, 2005.

The consultations were **attended** by delegates from Brazil, Chile, China, France, Germany, India, Italy, Japan, Malaysia, Mexico, Morocco, Russian Federation, Switzerland, United Kingdom, United States of America, African Regional Industrial Property Organization (ARIPO), Eurasian Patent Office (EAPO), European Patent Office (EPO), African Intellectual Property Organization (OAPI) and the European Union. Dr. R.A. Mashelkar, Director General of the Council of Scientific and Industrial Research (CSIR) and Secretary of the Department of Scientific and Industrial Research in India, chaired the consultations.

2. The consultations were held in a positive spirit. The delegates strongly endorsed the importance of multilateralism, in particular, in WIPO. The consultations resulted in the development of a proposed action plan for the near future.

3. There was broad agreement that the objectives of the future work program of the SCP should be to address issues with a view to improving the quality of granted patents, thus avoiding unwarranted encroachments on the public domain, and to reducing unnecessary duplication of work among Patent Offices, which should produce benefits by making the patent system more accessible and cost-effective.

4. In order to achieve these objectives, the meeting agreed that the following six issues should be addressed in an accelerated manner within WIPO with a view to progressive development and codification of international intellectual property law: prior art, grace period, novelty, inventive step, sufficiency of disclosure and genetic resources. These issues should be addressed in parallel, accelerated processes, the first four issues (prior art, grace period, novelty and inventive step) in the SCP and the other two issues (sufficiency of disclosure and genetic resources) in the Intergovernmental Committee on Intellectual Property and Genetic Resources, Traditional Knowledge and Folklore (IGC). Each of the SCP and the IGC should agree on a timetable and report progress on the development of their discussions of the issues to the other.

5. The meeting underlined the importance of the continued active pursuit of discussions and work within WIPO on issues related to development and intellectual property so that a robust, effective and actionable WIPO Development Agenda could emerge.

6. The meeting recommended to the Director General of WIPO

   (a) to call on Member States for proposals on the International Development Agenda for discussion at the April 2005 session of the Intersessional Intergovernmental Meeting (IIM),

   (b) to convene the next session of the SCP in May 2005 to consider and endorse the objectives and work program set out above,

   (c) to convene the next session of the IGC in June 2005 to consider and endorse the objectives and work program set out above, and

   (d) to transmit the decisions of the above meetings to the General Assembly in September 2005 for its consideration, including a time frame for the conclusion of these issues within WIPO.

7. The meeting expressed its warm thanks and gratitude to the authorities of the Kingdom of Morocco for hosting the consultations.

The delegate of Brazil did not associate himself with the foregoing text.