UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| L-3 COMMUNICATIONS, SECURITY AND DETECTION SYSTEMS, INC., <br>                Plaintiff, <br><br> v. <br><br><br> REVEAL IMAGING TECHNOLOGIES, INC., <br>                Defendant. | C.A. No. 04-11884-NG <br> (Magistrate Judge Judith Gail Dein) |

**REVEAL'S SUPPLEMENTAL MEMORANDUM**
**REGARDING IMMUNITY UNDER 28 U.S.C. § 1498**

**INTRODUCTION**

A patent owner's exclusive remedy for alleged patent infringement with respect to *any product sold to the United States Government* (here the Transportation Security Administration or "TSA") is an action in the Court of Federal Claims. The first paragraph of Section 1498(a) states that "[w]henever an invention . . . is used or manufactured by or for the United States" patent infringement claims concerning that invention "shall be by action against the United States in the United States Court of Federal Claims." 28 U.S.C. § 1498. In turn, the direct vendor of a product to the Government is granted immunity from suit. Trojan, Inc. v. Shat-R-Shield, Inc., 885 F.2d 854, 856 (Fed. Cir. 1989); see also Chisum on Patents, Vol. 5, § 16.06(3)(b)-(c) (pp. 16-281, 16-289). In the same vein, "a patent owner may not use its patent to cut the government off from sources of supply, either at the bid stage or during performance of a government contract." 885 F.2d at 856-57. And courts consistently protect the Government's

ability under Section 1498 to procure needed technology by holding that the Government's purchase and acceptance of a vendor's product is *per se* authorization under Section 1498(a), so that the vendor -- in this case Reveal -- is immune from claims of patent infringement with respect to the manufacture and sale of its CT-80 Explosive Detection System ("EDS") to the TSA.  Id.; see also Evans. v. McDonnell Aircraft Corp., 270 F. Supp. 778, 781 (D. Mo. 1967), *vacated on other grounds*, 395 F.2d 359 (8th Cir. 1968) (Government consented under Section 1498 by accepting delivery).

In this case, the CT-80 was developed with TSA funds and pursuant to TSA's detailed specifications, was certified as an EDS by the TSA after lengthy testing by the TSA and modifications required by the TSA before it certified the CT-80, and the TSA has already purchased and accepted eight (8) of Reveal's CT-80 machines pursuant to a pilot contract.  The current TSA procurement is for a broader roll-out of this important technology.  The TSA has funded, specified, tested, certified, purchased, accepted -- pursuant to a contract that specifically includes an entire section entitled "Authorization and Consent" -- and now uses Reveal's CT-80 for airport baggage screening.  In addition, members of Congress and TSA officials have repeatedly and publicly advertised future purchases and Governmental use of Reveal's CT-80 as vital to ameliorating this country's airport baggage screening problems.  No more compelling case can be found for the application of Section 1498.  L-3's hollow and transparently anti-competitive plea to derail the Government's present procurement of additional CT-80 machines flies directly in the face of the language and intent of Section 1498 and the overwhelming thrust of the governing caselaw.

In addition to the broad protection afforded direct vendors to the United States, Section 1498 also authorizes the Government to further protect its procurement process by granting

immunity to any tier contractor, subcontractor or service provider by extending its "authorization or consent" to that entity to practice an invention. Unlike the first paragraph of Section 1498 which grants *per se* immunity with respect to any product directly purchased or used by the United States, the second paragraph authorizes the United States to extend this immunity to others by expressly or impliedly extending its "authorization or consent." Consequently, the standard authorization or consent form in United States contracts grants immunity to all use and manufacture of any invention in "performing the contract or subcontract at any tier." However, this language is superfluous with respect to sales by Reveal to the TSA because Reveal's immunity flows from the first paragraph of Section 1498, not the second. Moreover, there is no reason to believe that future contracts for the same product, between the same parties, will not include the same form language that was in the Pilot Contract to protect the provision of goods and services by subcontractors. Even if implied or express authorization or consent pursuant to the second paragraph of Section 1498 were necessary, there is no better case for its application.

## **FACTUAL BACKGROUND**[1]

In August 2003 the TSA awarded Reveal, then a fledgling start-up, a $4.7 million Phoenix Project grant. The goal of the Phoenix Project was to develop a "next generation" explosive detection system ("EDS") for screening baggage in American airports.[2] Reveal then

---

[1] In this section Reveal summarizes the history of the CT-80's development and the Congressional directives and comment concerning the product. These facts are laid out in more detail in the Supplemental Declaration of Michael Ellenbogen ("Ellenbogen Supp. Decl."), which accompanies this memorandum.

[2] The TSA required that for each Phoenix proposal:

> The proposal shall include the *applicant's design process, hardware fabrication and software builds, detection algorithm, configuration management, reliability quality assurance, production, and logistics support*. The proposal shall include a section on Design Issues, including identification of moderate and high risks and how they will be addressed, mitigated, and resolved. The proposals shall include a Concept of Operations (ConOps) description with supporting illustrations.

Ellenbogen Supp. Decl. ¶10.

3

proceeded to continue the development of its CT-80 machine with the Phoenix grant funds, and pursuant to the Government's specifications contained in the Cooperative Research and Development Agreement ("CRDA") that flowed from the award.[3]  Reveal's progress under the CRDA was dictated and measured in Government-defined phases.  As the CRDA stated, "[t]his is a phased project with critical milestones. . . .  The recipient shall not begin any phase of the project without prior authorization from the Phoenix R&D Project Manager."  Ellenbogen Supp. Decl. ¶ 18.  The product of the grant and CRDA is the CT-80, the TSA's certification of which makes Reveal one of three companies that has a TSA-certified EDS.  Moreover, the CT-80 fulfills an important niche in the protection of the airways as it can be used at smaller regional airports because it is small and light enough to fit in an airport check-in desk.  Id. ¶ 25.

In December 2004, after extensive and highly confidential testing at the Government's secure laboratory in Atlantic City and following modifications to the CT-80 ordered by the TSA, the TSA certified the CT-80 as an EDS.  Id.  The Department of Homeland Security ("DHS") has designated certain details and operations of the CT-80 as "Sensitive Security Information," ("SSI"), pursuant to 49 C.F.R. 1520, thereby imposing significant Government security protections.  The TSA's certification is a prerequisite for any use or sale of the CT-80 to the United States, Reveal's only customer to date.  Id. ¶¶ 3-5.  Reveal is one of only three companies with a product certified by the TSA to screen checked baggage -- L-3 and General Electric (formerly known as InVision) are the other two -- and the CT-80 is the only EDS small enough to fit in an airport check-in desk.  Id. ¶ 25.

Shortly after the TSA's certification of the CT-80, the Government contracted with Reveal, under a pilot program, to purchase -- the *only* purchase to date of any CT-80 units -- eight (8) machines.  The Government included in this sole-source Pilot Contract the form

---

[3] Ellenbogen Supp. Decl. ¶ 13.

contract section entitled "Authorization and Consent." This provision is found at Section 3.5-1 of the Pilot Contract and is also on the FAA website as part of the standard contract language at http://fast.faa.gov. The provision reads as follows:

> 3.5-1: Authorization and Consent
>
> (a) *The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent:*
>
> (1) Embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract or
>
> (2) Used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with
>
> (i) Specifications or written provisions forming a part of this contract or
>
> (ii) Specific written instructions given by the Contracting Officer directing the manner of performance. The entire liability to the Government for infringement of a patent of the United States may be determined solely by the provisions of the "Indemnity" clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.
>
> (b) The Contractor agrees to include, and require inclusion of, this clause, suitably modified to identify the parties, in all subcontracts at any tier for supplies or services (including construction, architect-engineer services, and materials, supplies, models, samples, and design or testing services. However, omission of this clause from any subcontract does not affect this authorization and consent.)[4]

Id. ¶ 27 (emphasis added). The Government subsequently accepted delivery of these machines and deployed them to various airports around the country, including JFK Airport in New York City. Id. ¶¶ 26, 28.

The development of the CT-80 included lengthy testing of and modifications to the CT-80 at the TSA's testing facilities. Reveal continues to work with the TSA at its direction to

---

[4] Notably, much of the focus of the form provision is to grant immunity to subcontractors of any tier which provide goods or services for the fulfillment of the contract.

5

collect computed tomography data from scanned luggage and uses that data to test and refine its system.  Id. ¶ 23.

Throughout this process, various Government officials, including the Chairman of the House Appropriations Subcommittee On Homeland Security, have repeatedly and publicly emphasized that the Government funded the design and manufacture of the CT-80, and now purchased the machines, because the Government believes that the CT-80 offers a superior solution to certain baggage screening deficiencies at our country's airports.  Representative Hal Rogers, Chairman of the Subcommittee On Homeland Security, at a March 3, 2005 hearing, asked the TSA to specify in its proposed 2006 budget "clear plans for how emerging technologies, *such as Reveal*, will be installed at airports to expedite the screening of checked baggage for explosives at those airports . . . ."  Id. ¶ 40.  Four months later, at a July 20, 2005 hearing of the House Subcommittee on Economic Security, Infrastructure Protection, and Cybersecurity, on the subject of "Improving Aviation Security," Clifford A. Wilke, Assistant Administrator and Chief Technical Officer of the Department of Homeland Security, stated,

> The Reveal CT-80 *provides TSA* with a smaller and less expensive EDS unit to include in its planning. At certain airports, the Reveal CT-80 may be appropriate to install as standalone units within and/or immediately behind airline ticket counters at airports. They would replace screening currently performed using ETD. For FY 2005, TSA has available for obligation $30 million to purchase and install CT-80s, of which about $25 million would be used to purchase the actual units and $5 million would be devoted to installation.

Id. ¶ 42.  Similarly, on July 28, 2005 Thomas Blank, Acting Deputy Administrator of the Department of Homeland Security stated at a hearing of the House Subcommittee on Economic Security, Infrastructure Protection, and Cybersecurity, "*TSA is also testing* a newly certified EDS unit the Reveal CT-80 that should *provide TSA* with an alternative to in-line systems for some airports."  Id. ¶ 43.  At the same hearing, William DeCota, Director of Aviation for the The Port

Authority of New York And New Jersey expressed his gratitude to the Government for choosing airports under his control as pilot sites for the CT-80:

> We also are grateful to have been the recipients at Newark Liberty and JFK airports of the pilot test deployment of the new Reveal CT-80 baggage screening equipment. These devices are smaller, though slower, than the [InVision] CTX 5500 and 9000 equipment now consuming much of the lobby areas of our terminals, and may in some situations provide alternatives to costly modifications to our facilities.

Id. ¶ 44.

Recently, the Government issued a Request For Proposals ("RFP") for a "Reduced Size EDS unit," accompanied by a form draft contract. This public invitation to bid was a so-called "Indefinite Delivery, Indefinite Quantity" ("ID/IQ") invitation, i.e., any vendor selected by the Government at this stage will sell at least *one* EDS to the TSA. Id. ¶¶ 30-31. Additional purchases will be subject to contracts or purchase orders negotiated and executed directly with the vendors. Id. ¶ 31. Included in the RFP were approximately seventy (70) pages of detailed and highly confidential specifications and requirements for the EDS systems. Indeed, only certain companies are able to obtain the RFP and they must sign confidentiality agreements to do so. The responses to the RFP had to address each requirement and state that the proposed product met those TSA specifications or include a detailed description of how the specification or requirement would be met through subsequent development and design. Id. ¶ 35. Reveal's responses to the RFP were similarly highly confidential and as a result, are not produced with this memorandum. Id. ¶ 36.

The detailed specifications and requirements of the RFP make clear that any EDS purchased as a result is manufactured "for" the Government and is covered by the first paragraph of Section 1498.

Included with the draft RFP was a "draft" ID/IQ contract.  That draft included the same form "Authorization and Consent" language which was in the Pilot Contract.  Shortly thereafter, the RFP issued with a contract form that did not contain this provision.  Id. ¶ 32.  The TSA has stated to Reveal that this was done so that the form would be consistent with prior RFPs issued in this industry.  Id. ¶ 33.  There has been no indication by the TSA that it was intended that the TSA's purchase of EDSs pursuant to the RFP would be exempt from application of Section 1498.  As noted above and confirmed in Chisum on Patents, § 16.06 (3)(b)-(c) (pp. 16-281 to 16-298), there is *per se* immunity with respect to purchases by the United States Government.  For this reason, the contract provision at issue is superfluous in the context of direct vendors.  This provision applies to other tiers of subcontractors, service providers or component suppliers.  Moreover, Reveal will request that this provision be appropriately included in the Purchase Order for any sales of the CT-80 to protect these lower tier vendors and the procurement process. Id. ¶ 34.

The law is clear that where a vendor sells a product to the Government, the vendor is immune under Section 1498 from suit for infringement.  The facts that Reveal manufactured the CT-80 at the express direction of the Government, the Government certified the CT-80, the RFP contained detailed specifications in the current RFP and the Government is purchasing and will now use the CT-80 only adds suspenders to an already bullet-proof belt with respect to the application of Section 1498.

## ARGUMENT[5]

### A. Reveal Is Cloaked With *Per Se* Immunity For Design, Development, Manufacture, Bidding And Sales To The TSA – No Authorization Or Consent Is Required.

The Federal Circuit Court of Appeals has held that, "Section 1498(a) would be emasculated if a patent holder could enjoin bidding to supply infringing products," Trojan, Inc. v. Shat-R-Shield, Inc., 885 F.2d 854, 856 (Fed. Cir. 1989), and so L-3's motion for a preliminary injunction is doomed at the outset. Indeed, the "Congressional intent" that drove enactment of Section 1498 was "to allow the Government to procure whatever it wished regardless of possible patent infringement." TVI Energy Corp. v. Blane, 806 F.2d 1057, 1060 (Fed. Cir. 1986).[6]

Not only is L-3's motion for a preliminary injunction ill-fated in the face of Section 1498, but so too is L-3's entire infringement case.[7] "In short, use or manufacture for the United States is immune from suit for patent infringement in the district courts against the user or manufacturer." W.L. Gore & Assoc. Inc. v. Garlock, Inc., 842 F.2d 1275 (Fed. Cir. 1988). The Garlock court explained "[t]he patentee takes his patent from the United States subject to the government's eminent domain rights to obtain what it needs from manufacturers and to use the

---

[5] In connection with this memorandum, Reveal has submitted an appendix of legal authorities in which the Court may find each of the cases, as well as the "Chisum On Patents" section, cited herein.

[6] As the TVI Energy court held, "28 U.S.C. § 1498 was adopted originally in 1910 and later amended in 1918. The Congressional history of § 1498 makes it clear that *the policy behind the 1918 amendment was to relieve private Government contractors from expensive litigation with patentees, possible injunctions, payment of royalties, and punitive damages. The amendment provided that the patentees' sole remedy was a suit against the United States in the Court of Claims*. The Act was amended in 1918 at the behest of the Secretary of the Navy who cited difficulties in procuring goods from private manufacturers necessary to meet military requirements of World War I. H.R. 10858, 65th Cong., 2d Sess., 36 Cong. Rec. 7961 (1918)." TVI Energy, Inc., 806 F.2d 1057, 1059-60 (citing Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 339 (1928) ("This section was enacted in 1918, at the height of the First World War, to encourage private concerns to manufacture crucial products and to perform vital services for the U.S. Government, even where such activities might generate claims of patent infringement. Apparently the risk and burden of patent infringement litigation had impeded performance of these functions for the Government by private concerns; and this legislation was enacted to shift those burdens to the Government") (footnote omitted); Leesona Corp. v. United States, 599 F.2d 958, 967 (Ct. Cl. 1979); Calhoun v. United States, 453 F.2d 1385, 1391 (Ct. Cl. 1972) (footnote omitted)).

[7] The court need not reach the merits of L-3's infringement claims because, as explain in this memorandum, Reveal is immune from suit under Section 1498. Reveal reiterates here its position that those claims are invalid and have no merit.

9

same. The government has graciously consented, in the same statute, to be sued in the Claims Court . . . for what would be infringement if by a private person." Id. at 1283.

Where, as in the case of Reveal's CT-80, a product is manufactured by a private party for direct purchase and use by the United States, there is *per se* immunity. The "authorization or consent language" in Section 1498 is superfluous and this Court need not even reach the question of whether in this context the Government granted implied authorization and consent. Rather, "the decisions generally hold that acceptance by the government of an accused product . . . brings the matter within Section 1498 even if the contract could be fulfilled with other noninfringing products." Chisum On Patents, Vol. 5, § 16.06(3)(c) (p. 16-289). Section 1498 protects Reveal's sale and the Government's purchase *per se* and without the need for any further analysis. See Trojan Inc. v. Shat-R-Shield, 885 F.2d at 856.

In cases where the Government is the purchaser of the product, the courts have repeatedly and consistently held that the immunity granted by Section 1498 applies. See, e.g., Croll-Reynolds Co. v. Perini-Leavell-Jones-Vinell, 399 F.2d 913 (5th Cir. 1968) (affirming the dismissal of patent infringement claim where government approved the defendant's process and paid for the work, and holding "The approval and payment evidence, conclusively, we think the Government's authorization and consent"); Bereslavsky v. Esso Standard Oil Co., 175 F.2d 148, 151 (4th Cir. 1949) (affirming dismissal of plaintiff's patent infringement claim where Government's consent was established by its acceptance of allegedly infringing fuel); Croydon Co. v. Unique Furnishings, Ltd., 831 F. Supp. 480, 484-485 (E.D.N.C. 1993) (granting motion to dismiss and finding governmental consent where the United States Army contracted for library furniture, which allegedly infringed on a design patent, and accepted delivery of the furniture);

Evans v. McDonnell Aircraft Corp., 270 F. Supp. 778, 781 (E.D. Mo. 1967) ("the Government consents, if it has not done so before, by accepting delivery under the contract").

In addition to immunity with respect to the sale of the product, the courts have recognized that the initial design, development work and bidding on the Government contract are all protected by Section 1498. Otherwise, the Government procurement process would be crippled. As stated by the Federal Circuit in Garlock:

> What Garlock wants is freedom to bid on and participate in the sale to the government of products which, or the process of making which, infringe Gore's patents. In our view, the statute, 28 U.S.C. § 1498(a), which the injunction is said to contravene, assures it that right without interference from Gore-automatically.

Id. at 1282; see also TVI Energy Corp. v. Blane, 806, F.2d 1057, 1060 (Fed. Cir. 1986); Robishaw Eng'g, Inc. v. United States, 891 F. Supp. 1134 (E.D. Va. 1995); Raymond Eng'g Inc. v. Miltope Corp., 231 U.S.P.Q. 575, 577 (S.D.N.Y. 1986).

### B.  Implied or Express Authorization Or Consent Is Only Relevant With Respect to Subcontractors Or Service Providers.

Only in the context of an indirect or lower tier component supplier, or in a contract for certain services, as opposed to the direct sale of a product to the United States, have Courts found that the implied or express "authorization and consent" is relevant to the invocation of the Section 1498 defense. For example, in Carrier Corp. v. United States, 534 F.2d 244 (Ct. Cl. 1976), "the patented invention allegedly used in the performance of [defendant's] contract" was a device used to lift garbage dumpsters on and off a truck. "Obviously," the court held, "such a device had usefulness only with respect to [defendant's] duty to regularly pick up and empty all refuse containers at the base. It has no usefulness at all in relation to the function performed *by the Government.*" 534 F.2d at 247. Since the device was used only by the contractor to complete a service, as opposed to being sold for the Government's use, the Court held, ". . . if

11

there was any use of plaintiff's patented invention, such use was by the contractor and not by the Government." Id.; see also Larson v. United States, 26 Cl. Ct. 365, 368-69 (1992) (holding that authorization and consent was not implied where splints were used by health care providers to provide services to patients, not the Government, who were then reimbursed by Medicare) (citing Carrier Corp., 208 Ct. Cl. 678)).

Similarly, in Riles v. Amerada Hess Corp., 999 F. Supp. 938 (S.D. Tex. 1998), the court denied a defendant off-shore oil-driller's motion for declaratory judgment based on Section 1498. The oil-driller argued that since the Government benefited financially from its leases, which allowed the drilling activities, its actions were conducted "for" the Government. Id. at 940. The court stated, "[t]he primary purpose of Section 1498(a) is to allow the United States Government to purchase goods and services for performance of Governmental functions without the threat that the work will not be completed because the supplier or contractor is enjoined for patent infringement." Id. The court found this situation outside the scope of Section 1498, however, because "the leases at issue do not require Defendant to drill in a certain manner, nor does the Government require or condition approval of the drilling plan on particular procedures for installation of the drilling platform. The Government simply makes the land available and receives a royalty for doing so." Id. (Footnote omitted).

In Windsurfing Int'l., Inc. v. Ostermann, 534 F. Supp. 581 (S.D.N.Y. 1982), a court again emphasized that only if the use is not for or by the Government, implied authorization and consent may not be found. In this case an Olympic windsurfer sought a temporary restraining order and preliminary injunction based on his argument that since the United States Olympic Committee ("USOC") had designated the "use of [the sailboard] as the official Olympic equipment for an event," and since the USOC had been designated by Congress to run the

12

Olympic Games, such use was "for" the United States under Section 1498. Id. at 586. After acknowledging that the intent of Section 1498 is "primarily to permit the government to purchase goods or services for the performance of governmental functions without the threat that the work would not be carried out because its supplier or contractor was enjoined from or feared a suit for infringement of a patent," Id. at 587-88 (citing Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 343 (1928) and Coakwell v. United States, 372 F.2d 508, 510 (Ct. Cl. 1967)), the court denied the defendant's motions. The court reasoned that "there has been no showing that the government has any particular interest in which sailboard is used in the boardsailing event," and "[i]t is clear that the Olympic Games can be run without using the Windgliders. Accordingly, it does not follow from the authorization to run the Games that the United States has authorized this alleged patent infringement." Id. at 588.

In direct contrast to the vendors and putative infringers in Carrier Corp., Larson, Riles and Windsurfing Int'l, Reveal is selling a product directly to the United States Government, pursuant to the Government's specifications and requirements, for use by the Government, and so the Government can perform a vital and statutorily required function. For all these reasons Reveal's situation is starkly distinct from those of the defendants in the cases cited above, and Reveal is protected by the immunity provided under Section 1498.

### C.     Even If Authorization Or Consent Were Required, Plainly It Exists In The Present Context.

Reveal's development of the CT-80 EDS was furthered with grant money obtained from the United States Government to meet the detailed specifications and requirements of that grant and to obtain TSA EDS certification. The development of the CT-80 included detailed testing of, and modifications to, the CT-80 at the TSA test facility to meet the specific TSA's certification requirements. After certification, the TSA issued a Pilot Contract to purchase eight

(8) CT-80s for its initial commercial testing and use. The TSA has continued to monitor the performance and specifications of the machine. Congress has pressed the TSA to deploy additional CT-80s and has authorized the funds to do so as part of a larger EDS procurement which is the subject of the current RFP. Ellenbogen Supp. Decl. ¶ 35.

Reveal has tendered its proposal which addresses each of the many Government requirements and specifications in the TSA's seventy (70) page requirements document. Id. ¶ 36. These facts clearly compel a finding of implied consent by the United States if such a finding were necessary, which is not the case because of the *per se* application of Section 1498 to direct sales to the United States.

For example, in TVI Energy Corp. v. Blane, 806 F.2d 1057 (Fed. Cir. 1986), the Court affirmed a district court's dismissal of claims against a defendant who bid on a government contract and who, like Reveal, was required by the Government to submit its product for testing and demonstration. 806 F.2d at 1060. Acknowledging the predicate that "[i]n proper circumstances, Government authorization can be implied," the Court rested its decision on the reasoning that "*Government authorization was expressed by the specific requirement that [the defendant] demonstrate, under the guidelines of the bidding procedure, the allegedly infringing targets at Fort Knox*." Id. (Emphasis added). Here, the Government required much more of Reveal than simple demonstration of the CT-80; it has been intimately involved in its development, certification and now the detailed specifications for the current procurement.

In Hughes Aircraft Co. v. United States, 534 F.2d 889, 901 (Ct. Cl. 1976), the Federal Court of Claims recognized that there is no,

> requirement that authorization or consent necessarily appear on the face of a particular contract. On the contrary, 'authorization or consent' on the part of the Government may be given in many ways other than by letter or other direct form of communication -- e.g., by contracting officer instructions, by specifications or

> drawings which impliedly sanction and necessitate infringement, by post hoc intervention of the Government in pending infringement litigation against individual contractors.

534 F.2d at 901.  In <u>Hughes</u>, the product was sold to the United Kingdom, but had been developed for the United States to support its role in a joint project with the United Kingdom. The <u>Hughes</u> court found that Section 1498 protected the defendant where, like here, the United States had previously provided the private manufacturer with explicit authorization and consent after litigation had commenced, (Ellenbogen Supp. Decl. ¶ 27), and the Government exercised extensive control over the product at issue, including assisting with "the design, development, procurement, launch and initial orbital support of its satellites . . . ."  534 F.2d at 895-896.  In short, the product, although sold to the U.K., was manufactured for the United States Government and therefore Section 1498 applied.

In <u>John J. McMullen Assoc. Inc., v. State Bd. Of Higher Educ.</u>, 268 F. Supp. 735 (D. Or. 1967), where a contractor incorporated an allegedly infringing component into a ship used for oceanographic research that was directed and financed by the Government, the court held,

> Where the Government finances the manufacture of a device and grants it to a private agency with the stipulation that it can only be used for specified purposes, and such use advances recognized vital interests of the U.S. Government, the conclusion is inescapable that such manufacture and use were 'for' the U.S. Government.

268 F. Supp. at 739.  The Government granted Reveal $4.7 million in the wake of September 11th to further the vital interest of building an EDS that might better secure the nation's airports. The CT-80 was required to pass TSA's certification tests before the TSA would purchase and deploy any CT-80, which it has now done.  Ellenbogen Supp. Decl. ¶¶ 3, 8 and 25.  Here, as in <u>McMullen</u>, "the conclusion is inescapable" that Reveal manufactured the CT-80 "for" the Government and any use of the CT-80 is "for" and by the Government.

15

L-3 may argue that the Government must require infringement for Section 1498 to shield Reveal from L-3's infringement allegations. This argument lacks any foundation. As the Fourth Circuit recognized in Bereslavsky with regard to Section 1498:

> . . . there is no language in the statute which limits its application to cases where the government contracts call expressly for what will infringe, but on the contrary, it applies in any case where the invention of the patent is used or manufactured by or for the United States. *To limit the application of the statute to cases where officers of the government intentionally contracts for patent infringement would in very large measure defeat its purpose.*

Bereslavsky, 175 F.2d at 150 (emphasis added).

L-3 may also argue that the absence of the "authorization or consent" provision from the form contract which was presented with the recent RFP creates a negative inference with respect to the application of Section 1498. This argument fails for three reasons. First, in the context of a direct sale by Reveal to the TSA such a provision is irrelevant because Section 1498 applies automatically. Second, even if authorization or consent were at issue, the facts here are at least as compelling as the cases cited above in which service providers or entities, which were not selling directly to the government, were found to be providing services "for the United States" within the meaning of Section 1498. Finally, there is no adverse inference because the purchase order or contracts to Reveal has not issued. Consistent with the Pilot Contract, which was an agreement directly with Reveal for the purchase of CT-80 EDSs, it is expected that any future orders for the CT-80 will contain that language to protect all tiers of contractors on the CT-80. Ellenbogen Supp. Decl. ¶¶ 33-34.

## **CONCLUSION**

For all of the reasons set forth above, Reveal respectfully requests that L-3's motion for a preliminary injunction be denied and that this Court enter a decision that all sales to the TSA (including all related design, testing, development, manufacture and bidding) is subject to Section 1498 and immune from claims of patent infringement in this Court.

                                            Respectfully submitted,

                                            **REVEAL IMAGING TECHNOLOGIES, INC.,**

                                            By its attorneys,

Dated: September 13, 2005         /s/ H. Joseph Hameline_____
                                            H. Joseph Hameline (BBO # 218710)
                                            A. Jason Mirabito (BBO # 349440)
                                            Michael T. Renaud (BBO # 629783)
                                            Mintz, Levin, Cohn, Ferris, Glovsky
                                                and Popeo, P.C.
                                            One Financial Center
                                            Boston, MA 02111
                                            (617) 542-6000

LIT 1540463v.2