UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| L-3 COMMUNICATIONS, SECURITY AND DETECTION SYSTEMS, INC.,<br>　　　　　Plaintiff,<br><br>　　　　v.<br><br><br>REVEAL IMAGING TECHNOLOGIES, INC.,<br>　　　　　Defendant. | C.A. No. 04-11884-NG<br>(Magistrate Judge Judith Gail Dein)<br><br>*REDACTED* |

### SUPPLEMENTAL DECLARATION OF MICHAEL ELLENBOGEN

I, Michael Ellenbogen, do hereby declare and state as follows based on personal knowledge:

1.　I am the president of Reveal Imaging Technologies, Inc. ("Reveal"). I have more than a decade of experience in security screening at airports and selling related products to the U.S. Government.

2.　I submit this declaration in support of Reveal's Supplemental Memorandum Regarding Immunity Under 28 U.S.C. § 1498.

**The Phoenix Project**

3.　More than a decade before September 11th Congress resolved to tighten its control over airport security. As part of that effort, it enacted the Aviation Security Improvement Act of 1990 (the "Av. Sec. Act"), Pub. L. 101-604; 104 Stat. 3066 (1990). The legislation directed the FAA to "accelerate and expand the research, development, and implementation of technologies and procedures to counteract terrorist acts against civil aviation." The Av. Sec. Act

also directed the FAA to initiate a program to test and evaluate airport baggage screening machines to detect explosives in different quantities and configurations. Section 320(a) of this legislation -- the "General Rule" -- states:

> No deployment or purchase of any explosive detection equipment pursuant to section 108.7(b)(8) and 108.20 of title 14, Code of Federal Regulations, or any similar rule, shall be required after the date of the enactment of this section, *unless the Administrator certifies that, based on the results of tests conducted* pursuant to protocols developed in consultation with expert scientists from outside the Federal Aviation Administration, *such equipment alone or as part of an integrated system can detect under realistic air carrier operating conditions the amounts, configurations, and types of explosive material which would be likely to be used to cause catastrophic damage to commercial aircraft.*

**Exhibit A** at 13.

4. Immediately after September 11th, Congress enacted the Aviation and Transportation Security Act of 2001 (the "ATSA"), Pub. L. 107-71; 115 Stat. 597 (2001). The ATSA mandated that the Under Secretary of Transportation ensure that all baggage screening be performed using Explosive Detection Systems ("EDSs") certified by the Transportation Security Administration ("TSA"). The term EDS is defined by the Federal Aviation Administration ("FAA") as "an automated device, or combination of devices, which has the ability to detect, in passenger checked baggage, the amounts, types, and configurations of explosive materials as specified by the FAA." See FAA, "Explosive Detection Systems," 63 Fed. Reg. 18104, 18106 (April 13, 1998). "EDS" has become a very specific and universally recognized term within the aviation security industry, describing a system that automatically detects explosives in baggage and has passed the EDS Certification criteria of the FAA or TSA. The ATSA further directed that by December 31, 2002 all commercial airports screen all checked luggage using TSA-certified EDSs. The ATSA also charged TSA with making grants for the acceleration of

research, development, testing, and evaluation of EDS technology that is faster, more cost-effective, and more accurate.

5.  The ATSA effectively "federalized" airport screening by taking all responsibility for screening airport baggage away from the airlines and placing it in the hands of TSA. Under ATSA, TSA is responsible for, among other things:

- "screening of all passengers and property, including United States mail, cargo, carry-on and checked baggage";

- "day-to-day Federal security screening operations for passenger air transportation";

- "develop[ing] standards for hiring and retention of security screening personnel"; and

- "train[ing] and test[ing] security personnel"

See 49 U.S.C. §§ 114(e); 44901(a), attached hereto as **Exhibit B**.

6.  On July 18, 2003 TSA issued the Phoenix Request for Proposals ("Phoenix RFP"), which contains over fifty (50) pages of detailed specifications concerning TSA's exact requirements for its next generation EDS machine. A copy of the Phoenix RFP is attached hereto as **Exhibit C**.

7.  Many of TSA's detailed specifications mandated that the EDS developed through the Phoenix Project be compatible with existing TSA and U.S. airport databases and technology, with which the EDS would be integrated. For example:

- "File Transfer Protocol (FTP) shall be utilized for transferring data files, and operational parameter updates, between TSA server and the EDS." **Exhibit C** § 3.1.1.5.3.1.

- "EDS systems are required to work in a secure command, control, and communications (C3) environment at the transportation terminals in which they will be deployed." Id. § 3.1.1.5.3.1.

3

- "The EDS FTP server shall restrict access to TSA provided username/passwords." Id. § 3.1.1.5.3.1.

- "The compressed files [in the FDRS] shall be capable of being decompressed on the TSA server . . . ." Id. § 3.1.1.5.3.2.

- "TSA server acting as the FTP client will initiate a control connection specifying the parameters of the data connection (data port, transfer mode, representation type, and structure). Once the connection is opened, TSA server (FTP Client) will send a username and password to the EDS to access its FTP server file system. The EDS shall authenticate TSA server by verifying/validating the username and password. The EDS shall execute FTP commands upon authentication of TSA Server. The EDS server shall close the open FTP connection after disconnect from TSA server and return to a ready/normal state." Id. § 3.1.1.5.3.3(b).

- "The EDS shall: Be operable by screeners/operators meeting personnel requirements specified in the Aviation & Transportation Security Act, Public Law 107-7." Id. § 3.1.1.9(a).

- "The EDS shall provide a mode of operation that permits maintenance personnel . . . to perform field/site radiation compliance test to verify compliance with 21 CFR 1020.40." Id. § 3.1.1.10.

- The Integrated EDS shall include a [Programmable Logic Controller] PLC with the software required to interface with an airport Master PLC. The PLC software shall function in accordance with 'Interface Specification For Integration if PLC With Inline Baggage Handling System PLC', Section 8." Id. § 3.1.1.13.

- "The EDS shall be compatible with existing airport electrical infrastructure and capable of operating on commercially available power at US airports." Id. § 3.2.1.1.

8. In addition, the Phoenix RFP mandated that the Government would conduct further "Operation Testing on production representative systems to assess operational effectiveness and suitability when *used* by representative field operators in the intended operational environment." **Exhibit C -- Phoenix RFP** § 4.1.5 at 31 (emphasis added).

9. The Phoenix RFP contemplates sale of EDSs to the TSA for the TSA's exclusive use. The Phoenix RFP also presents in detail, in Section 6, what access specified TSA employees (including the Federal Security Director, Vendor Maintenance Technician, Assistant

4

Deputy Federal Security Director, Screening Manager, Checkpoint Security Supervisor, Screener-in-Charge, and Screeners/Operators) must have to the EDS and each of its databases and functions. **Exhibit C** -- Phoenix RFP § 6 at 47.

10. In the Phoenix RFP, TSA also emphasized that it would play an active role in evaluating, approving and overseeing the continuing development of the EDSs proposed in response to the Phoenix RFP. So the TSA could approve or reject proposed designs, with or without additional modifications or conditions, TSA required that:

> The *proposal shall include the applicant's design process, hardware fabrication and software builds, detection algorithm, configuration management, reliability quality assurance, production, and logistics support*. The proposal shall include a section on Design Issues, including identification of moderate and high risks and how they will be addressed, mitigated, and resolved. The proposals shall include a Concept of Operations (ConOps) description with supporting illustrations.

**Exhibit C** -- Phoenix RFP § 2.1 at 5 (emphasis added).

11. In response to TSA's Phoenix RFP, Reveal submitted a proposal based on its CT-80 on August 6, 2003. A copy of Reveal's proposal is attached as **Exhibit D**.

12. One of Reveal's goals since it was incorporated was to design and manufacture a baggage-screening product to meet TSA specifications, that would pass TSA certification, and would then be purchased and used by TSA in U.S. airports.

13. On September 25, 2003, TSA awarded Reveal a $4.7 million Phoenix Project grant to further develop Reveal's CT-80. The award was memorialized in a Cooperative Research and Development Agreement ("CRDA"), which incorporated by reference the terms of the Phoenix RFP and Reveal's proposal. A copy of the CRDA is attached hereto as **Exhibit E**.

### TSA's Systematic Review, Testing, Modification and Certification of the CT-80

14. TSA is the exclusive purchaser and operator of EDSs for aviation checked baggage inspection in this country. As such, in awarding the Phoenix Project grant to Reveal

TSA mandated in the CRDA that it would have "substantial involvement" in the design, testing and approval of the CT-80. This mandate was reflected throughout the CRDA, including in the following provisions:

- "TSA will be involved in the review of system design and program management of the project. *System design, documentation, and software will be subject to the approval of TSA.*"  **Exhibit E** -- CRDA at 3 (emphasis added).

- "TSA will provide necessary information on explosive detection system requirements and modify the Phoenix specification as required." Id.

- TSA will perform verification activities for compliance of the system (and recipient) with project requirements by analysis, test, or other means." Id.

- The recipient shall submit monthly detailed technical progress reports and detailed invoices. The recipient shall be available for weekly teleconferences and monthly-to-quarterly program reviews, depending on program activity." Id. at 4.

- "TSA reserves the right to witness tests at the vendor's facility to monitor progress and verify compliance with requirements." Id.

- "The recipient shall provide detailed information on the analysis and decision software of developed systems." Id.

15. As mandated by the Phoenix RFP and CRDA, TSA regularly conducted on-site inspections of the continuing development of the CT-80 at Reveal's facility in Bedford, Massachusetts, as well as meetings held at TSA's Technical Center in Atlantic City, New Jersey, to ensure compliance with the RFP's and CRDA's requirements. The Phoenix RFP stated, "Throughout the project, the vendor will perform developmental test and evaluation of subsystems as jointly agreed upon between the vendor and TSA." **Exhibit C** -- Phoenix RFP § 2.2 at 5.

16. Throughout the development and certification process, James Buckley, Reveal's Contracting Officer, was in frequent contact with TSA's Contracting Officer, Andy Lee, and members of the Phoenix Review Board.

17. The Phoenix Review Board is a multi-disciplinary board made up of TSA officials responsible for different functions relating to airport baggage screening, including officials responsible for: (1) certifying the design and development of screeners; (2) coordinating and training TSA federal personnel that operate the airport baggage screeners; and (3) coordinating with the various U.S. airports concerning their needs, concerns and issues relating to airport baggage screening. The Phoenix Review Board, in consultation with TSA's Contracting Officer and Technical Monitor, authorized the payment of Phoenix grant money to Reveal based on its approval of Reveal's work in each phase of the Phoenix project. As a result, Reveal's Contracting Officer coordinated with TSA on project progress, evaluation and testing, approval of each phase of the project, and payment of grant money to Reveal upon TSA's approval of Reveal's work in each phase of the project.

18. The Phoenix Project consisted of five phases: two design phases, one system development phase, and two test and evaluation phases, which include certification. The CRDA explicitly states: "[t]his is a phased project with critical milestones. . . . The recipient shall not begin any phase of the project without prior authorization from the Phoenix R&D Project Manager. The recipient shall not be entitled to reimbursement of costs incurred for work performed or materials acquired for unapproved phases of the project." **Exhibit E -- CRDA at 4.**

19. In February 2004 the Phoenix Review Board approved Reveal's design and development work on the CT-80 during the two design phases and the system development phase and subsequently authorized Reveal to move into the final phase of the project. At that

time Reveal was authorized to spend a second tranche of $2.3 million of the Phoenix Project grant to complete the CT-80's development, including the TSA testing and certification process.

20.  TSA's involvement in the review, testing, and approval of each phase of the Phoenix Project was extensive. The Phoenix RFP provides:

> **4.1 Test Planning/procedures**
>
> The test and evaluation process shall be used *to assure that the EDS has met the requirements of the EDS specification, associated interface requirements and control documents, and algorithm description.* All vendor testing shall be conducted according to Government approved test plans, test cases, and test procedures and may be witnessed by an authorized Government representative(s).
>
> **4.1.2 Vendor DT&E**
>
> *Vendor DT&E testing includes test and evaluation of the engineering design and developmental process by determining incrementally the degree to which functional engineering specifications are attained.* Verification shall proceed from the unit level through integrated verification of functional areas and interfaces within the complete system, and to the complete system, in as near an operational configuration and environment as practical.

**Exhibit C** -- Phoenix RFP, Appendix §§ 4.1-4.1.2 at 31 (emphasis added).

21.  In addition to TSA's involvement in, and approval of, each phase of the Phoenix Project, TSA also conducted the EDS certification of the CT-80. As provided in the Phoenix RFP:

> **4.2 Verification Methods**
>
> All EDS development will undergo test and evaluation to verify that the EDS meets system specification requirements. The verification methods (Analysis, Demonstration, Inspection, and Test) described below are mandatory for EDS requirements verification.

Id. § 4.2 at 31-33.

22.  Much of Reveal's work on the CT-80 has been and continues to be performed at TSA's Technical Center in Atlantic City, New Jersey, supervised by the TSA Technical Monitor.

8

A CT-80 was delivered to the TSA Technical Center in the fourth phase of the Phoenix Project to be run and modified as requested by the TSA in subsequent phases of the Project.

23.     In addition, during the development phases of the Phoenix Project the TSA placed a CT-80 at New York City's JFK Airport and Reveal, under the TSA's supervision, collected computed tomography data of luggage and used that data to refine the system.

24.     Throughout the late summer, fall and early winter of the 2004, and pursuant to Section 4.1.4 -- "Government Certification Testing" -- of the Phoenix RFP, the CT-80 underwent extensive testing, adjustment and retesting at the TSA's Atlantic City Technical Center. During this period the CT-80 was prepared for certification testing -- a phase of the Phoenix Project referred to as "Readiness Testing" -- and then the TSA conducted the actual certification tests. Under Section 4.1.4 of the Phoenix RFP, TSA stated that it would "conduct certification testing to verify compliance to all TSA EDS Certification Criteria for automated bag inspection as set forth in Federal Register, April 13, 1998: 'Criteria for Certification of Explosives Detection Systems', Volume 63, Number 70.'" These extensive and rigorous certification tests evaluated the system's ability to meet TSA's functional and performance requirements, which are classified as SSI.

25.     In December 2004, the CT-80 passed TSA's certification tests with a throughput of 79 bags per hour. TSA considers the CT-80 to be a slow EDS machine that is small and light enough to be placed in an airport lobby or check-in desk, and efficient enough to help satisfy the ATSA's directive of screening 100% of the country's checked baggage. Only two other baggage screening system suppliers have had baggage screening machines certified as EDSs by the TSA: plaintiff L-3 Communications Security and Detection Systems, Inc. ("L-3") and General Electric (formerly known as InVision).

**Reveal's Pilot Program & The TSA's July 2005 Request For Proposals**

26.  On March 30, 2005 the TSA executed a contract with Reveal for the purchase of eight (8) of Reveal's CT-80. This purchase was part of a Pilot Program that followed immediately after the December 2004 TSA EDS-certification. TSA has now deployed these eight (8) machines to various airports, including JFK in New York City and Newark airport in New Jersey. The Pilot Program contract is attached hereto as **Exhibit F**.

27.  Only after Reveal's specific request earlier this year did the TSA include in the Pilot Program contract, by reference, section 3.5-1, entitled "Authorization and Consent." This section, which can be found in its entirety at http://fast.faa.gov, states:

> **3.5-1: Authorization and Consent**
>
> (a) The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent:
>
> (1) Embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract or
>
> (2) Used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with
>
> (i) Specifications or written provisions forming a part of this contract or
>
> (ii) Specific written instructions given by the Contracting Officer directing the manner of performance. The entire liability to the Government for infringement of a patent of the United States may be determined solely by the provisions of the "Indemnity" clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.
>
> (b) The Contractor agrees to include, and require inclusion of, this clause, suitably modified to identify the parties, in all subcontracts at any tier for supplies or services (including construction, architect-engineer services, and materials, supplies, models, samples, and design or testing services. However, omission of this clause from any subcontract does not affect this authorization and consent.

10

28.     TSA owns the eight (8) CT-80s purchased through the Pilot Program, trains TSA personnel to operate the machines, and independently maintains the machines.

29.     Reveal recently submitted a proposal in response to a TSA Request for Proposals published on July 27, 2005 ("the RFP"). Representatives of thirteen (13) companies, including L-3, attended a recent TSA presentation on the RFP. Attached hereto as **Exhibit G** is a true and accurate copy of the TSA's July 27, 2005 RFP, with "secret security information," ("SSI") removed.

30.     The RFP specifies at paragraphs B.4, F.4.2 and F.4.4 that the contract resulting from the RFP will be an Indefinite Delivery, Indefinite Quantity ("ID/IQ") contract. This means that TSA commits to buy only one unit from the parties whose proposals are chosen, and the delivery date of that unit is not specified. The original draft contract clauses are included in the RFP, **Exhibit G**, at Section I.

31.     It is understood as a matter of general practice, however, that after a particular proposal is accepted, the Government and the parties whose proposals are chosen will negotiate contracts specific to the TSA's particular needs for that product, with the quantity and delivery dates also specified in that contract.

32.     The draft contract clauses circulated with the July 2005 RFP included by reference the same FAA contract provision -- section 3.5-1, "Authorization and Consent" -- as the TSA included in Reveal's executed Pilot Program contract. This reference is shown at page I-2 of the RFP, at **Exhibit G**.

33.     Although the original draft contract clauses circulated with the RFP included reference to section 3.5-1, the most recent draft contract did not include this section. TSA has informed Reveal that the reference was removed so that the RFP would be consistent with prior

11

RFPs, *not* because of any intention on the part of the TSA to indicate that the procurement that will flow from the RFP will not be with the Government's "authorization and consent."

34. In addition, it is my experience that the absence of this language in the RFP does not mean that any specific contract that may flow out of this RFP to a particular vendor will not include the authorization and consent provision. Indeed, Reveal's Pilot Program contract did not initially include the Authorization and Consent provision, but the Government included it at Reveal's request, many months after this litigation commenced. If Reveal's proposal is chosen as part of the current RFP process, Reveal will ask the TSA to include section 3.5-1, the "Authorization and Consent" provision, in the purchase order or contract or in a side letter, to protect, in particular, its subcontractors and suppliers from unwarranted litigation, as well as to defend against L-3's continued efforts to destroy Reveal.

35. The RFP includes approximately seventy (70) pages of detailed and highly confidential specifications and requirements with which the proposed EDS system must either already comply or with which the proposing party must describe how its EDS system will comply, through future design and development. The Government considers these specifications and requirements to be SSI, and therefore the RFP attached at **Exhibit G** hereto includes only the Table of Contents for this section.

36. Similarly, Reveal's response to the RFP, in which Reveal responded to the seventy (70) pages of specifications and requirements, is considered SSI, and so is not provided as an Exhibit to this declaration.

### Recent Congressional and TSA Comment On Reveal's CT-80

37. Since the CT-80 was EDS certified by the TSA in December 2004 and the Pilot Program has been underway, various high-level TSA officials and members of Congress have

publicly expressed the Government's desire to deploy CT-80 machines for the TSA's use and as part of the Government's continuing effort, under the ATSA and other legislation, to secure the country's airports.

38. At a February 15, 2005 hearing of the Senate Committee on Commerce, Science & Transportation, Admiral David Stone, Assistant Secretary of the TSA, listed the TSA's "Recent Accomplishments." As one of these accomplishments, Admiral Stone specified the TSA's certification of the CT-80. Admiral Stone testified:

> [The TSA] Recently certified the Reveal Technologies CT-80, a third type of Explosive Detection System (EDS), and are in the process of conducting pilots in the operational environment, for the detection of explosives in checked baggage. This machine is smaller, less costly, and more compact, making it more appropriate for use in limited space and smaller airports where baggage throughput is smaller and larger EDS machines are not practical because of limited space or the size of the airport.

**Exhibit H** at 2.

39. At the same February 15, 2005 Senate hearing, after Admiral Stone described the CT-80, Senator John McCain asked, "When can we expect to see some of that?" Admiral Stone responded:

> The three Reveal pilots should start next month and last for 60 days. And then we look at then having a list developed of where those airports should be that need that, because it gets us away from the explosive trace devices which are manpower intensive and gives you a higher-quality security. So we're going to hear a lot about Reveal-type technologies in the coming months and how that's our future.

**Exhibit I** at 18-19.

40. At a March 3, 2005 congressional hearing, the Chairman of the House Appropriations Subcommittee on Homeland Security, Representative Hal Rogers, asked the TSA to specify in its proposed 2006 budget "clear plans for how emerging technologies, *such as*

13

*Reveal*, will be installed at airports to expedite the screening of checked baggage for explosives at those airports . . . ." **Exhibit J** at 3 (emphasis added).

41.    At the same March 3, 2005 hearing before the House Appropriations Subcommittee on Homeland Security, Chairman Rogers again expressed his desire for the prompt deployment of "new, modern, smaller, cheaper machines." Admiral Stone responded again by touting Reveal's CT-80. The following excerpt perhaps best summarizes their exchange:

> **Representative Rogers**:
>
> Why aren't we putting in these new, modern, smaller, cheaper machines? You can get them for a third or half the price of the big, old, original X-ray machines. And they're small; they can be put out there where the passengers check in with the airline. And you won't need the in-line system back-end thing.
>
> **Admiral Stone**:
>
> Mr. Chairman, I fully agree. Reveal, for instance, just came into certification specs six weeks ago. We've already started this month a pilot in Gulfport, Newark, JFK -- a 90-day pilot to get that Reveal technology out in the field and tested, because *we couldn't agree more that we need to* get away from the ETDs and *get that kind of technology out into the field*.

Id. at 10 (emphasis added).

42.    At a July 20, 2005 hearing of the House Subcommittee on Economic Security, Infrastructure Protection, and Cybersecurity, on the subject of "Improving Aviation Security," Clifford A. Wilke, Assistant Administrator and Chief Technical Officer of the Department of Homeland Security, stated:

> The Reveal CT-80 *provides TSA* with a smaller and less expensive EDS unit to include in its planning. At certain airports, the Reveal CT-80 may be appropriate to install as standalone units within and/or immediately behind airline ticket counters at airports. They would replace screening currently performed using ETD. For FY 2005, TSA has available for obligation $30 million to purchase and install CT-80s, of which about $25 million would be used to purchase the actual

units      and      $5      million      would      be      devoted      to      installation.
**Exhibit K** at 6 (emphasis added).

43.    Similarly, on July 28, 2005 Thomas Blank, Acting Deputy Administrator of the Department of Homeland Security stated at a hearing of the House Subcommittee on Economic Security, Infrastructure Protection, and Cybersecurity, "TSA is also testing a newly certified EDS unit the Reveal CT-80 that should *provide TSA* with an alternative to in-line systems for some airports." **Exhibit L** at 7 (emphasis added).

44.    At the same July 28, 2005 hearing, William DeCota, Director of Aviation for the The Port Authority of New York And New Jersey expressed his gratitude to the Government for choosing airports under his control as pilot sites for the CT-80:

> We also are grateful to have been the recipients at Newark Liberty and JFK airports of the pilot test deployment of the new Reveal CT-80 baggage screening equipment. These devices are smaller, though slower, than the [InVision] CTX 5500 and 9000 equipment now consuming much of the lobby areas of our terminals, and may in some situations provide alternatives to costly modifications to our facilities.

**Exhibit M** at 5.

Signed under the penalties of perjury this 12th day of September, 2005.

_____
Michael P. Ellenbogen