# **EXHIBIT I**

◄ Return to Full

## LexisNexis™ Congressional

Copyright 2005 Congressional Quarterly, Inc. All Rights Reserved. CQ Transcriptions
"All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content."

**February** 15, 2005 Tuesday

**TYPE: COMMITTEE HEARING**

**LENGTH:** 17769 words

**COMMITTEE:** SCIENCE AND TRANSPORTATION COMMITTEE

**SUBCOMMITTEE: SENATE** COMMERCE

**HEADLINE:** U.S. SENATOR TED STEVENS (R-AK) HOLDS HEARING ON THE FISCAL YEAR 2006 TRANSPORTATION SECURITY ADMINISTRATION BUDGET

**SPEAKER:**
U.S. SENATOR TED STEVENS (R-AK), CHAIRMAN

**LOCATION:** WASHINGTON, D.C.

**WITNESSES:**

DAVID **STONE,** ASSISTANT SECRETARY, TRANSPORTATION SECURITY ADMINISTRATION
CATHLEEN ANN BERRICK, DIRECTOR, HOMELAND SECURITY AND JUSTICE, GOVERNMENT ACCOUNTABILITY OFFICE
CHIP BARCLAY, PRESIDENT, AMERICAN ASSOCIATION OF AIRPORT EXECUTIVES
JEAN GODWIN, EXECUTIVE VICE PRESIDENT, AMERICAN ASSOCIATION OF PORT AUTHORITIES
JIM MAY, PRESIDENT/CEO, AIR TRANSPORT ASSOCIATION

**BODY:**

U.S. SENATE COMMITTEE ON COMMERCE, SCIENCE AND TRANSPORTATION HOLDS A HEARING ON THE FISCAL YEAR 2006 TRANSPORTATION SECURITY ADMINISTRATION BUDGET

FEBRUARY 15, 2005

SPEAKERS:

U.S. SENATOR TED STEVENS (R-AK)
CHAIRMAN
U.S. SENATOR JOHN MCCAIN (R-AZ)
U.S. SENATOR CONRAD BURNS (R-MT)
U.S. SENATOR TRENT LOTT (R-MS)
U.S. SENATOR KAY BAILEY HUTCHISON (R-TX)
U.S. SENATOR OLYMPIA J. SNOWE (R-ME)
U.S. SENATOR GORDON SMITH (R-OR)
U.S. SENATOR JOHN ENSIGN (R-NV)
U.S. SENATOR GEORGE ALLEN (R-VA)
U.S. SENATOR JOHN E. SUNUNU (R-NH)
U.S. SENATOR JIM DEMINT (R-SC)
U.S. SENATOR DAVID VITTER (R-LA)

U.S. SENATOR DANIEL K. INOUYE (D-HI)
RANKING MEMBER
U.S. SENATOR JOHN D. ROCKEFELLER IV (D-WV)
U.S. SENATOR JOHN F. KERRY (D-MA)
U.S. SENATOR BYRON L. DORGAN (D-ND)
U.S. SENATOR BARBARA BOXER (D-CA)
U.S. SENATOR BILL NELSON (D-FL)
U.S. SENATOR MARIA CANTWELL (D-WA)
U.S. SENATOR FRANK R. LAUTENBERG (D-NJ)
U.S. SENATOR BEN NELSON (D-NE)
U.S. SENATOR MARK PRYOR (D-AR)


*


STEVENS: Let me welcome the witnesses who are here to discuss the president's fiscal year 2006 budget for the Transportation Security Administration.

Since September 11 we've made major improvements in securing all modes of transportation in this country; still, much remains to be done.

I believe Congress will carefully consider the 120 percent fee increase proposed on travelers. The fee increase, we're told, could result in lost revenue for an industry that's already on the financial ropes.

Last year alone, the industry lost about $10 billion, and the question has to be asked, is this the right time to add another $1.5 billion in fees to an industry that already pays -- well, actually, they collect what their travelers pay, but they pay into the funds $15 billion in taxes and fees to a variety of government agencies.

I'm not going to make a long statement. I do hope that members will keep their statements short.

I do believe that TSA remains behind on procurement and installation of explosive detection machines in airports around the country. And the known traveler program is also behind, and the background checks

on airport workers remain an issue.

We're going to have questions about all of those.

I thank you, Admiral Stone, for coming, and Ms. Berrick. And I know you had to change your schedule to be here for our schedule. I appreciate your willingness to come and appear before us.

Senator Inouye?

INOUYE: Thank you, Mr. Chairman.

I look upon this oversight of TSA as one of the most important of this committee.

I have three principal area of concern.

In 2001, we agreed by nearly unanimous votes in the House and Senate that transportation security must be a national security function. However, between TSA's endless reorganizations and the recent talk about returning to private security screening companies, it's becoming apparent that this central guiding principle is being eroded.

And, Mr. Chairman, if we lose sight of this principle, I think we'll forget one of the most important lessons of September 11th.

The second concern is aviation security has received about 90 percent of TSA's funds and virtually all of its attention. There is simply not enough being done to address port, rail, motor carrier, hazardous material shipment and pipeline security. And I'm sure all of us agree that this must be changed.

The third, as you've noted, Mr. Chairman, the administration is preparing to increase aviation security funds. This makes no sense to me. The airline industry, as you pointed out, is bordering on total bankruptcy and the administration wants to add to its costs.

Yet, at the same time, the administration is demanding that its unaffordable tax cuts must be made permanent. And I just don't follow this thinking and, quite frankly, I can't believe that this proposal will be adopted by Congress.

Mr. Chairman, with your approval, I'll submit the rest of my statement for the record.

STEVENS: (OFF-MIKE)

Senator McCain, do you have anything?

MCCAIN: Thank you, Mr. Chairman.

Briefly, I understand many passengers, including myself, a frequent flyer, don't look forward to the prospects of paying an increased passenger security fee, which is proposed in the president's 2006 budget.

We're facing tough fiscal realities, and we need to make some tough choices.

Neither the airlines, already under huge financial strains, nor the general taxpayers, I think, should shoulder the entire burden of securing airline passengers.

I believe it's important the federal government continue to play a critical role in ensuring the safety and security of airline passengers, and in this instance, I think it's appropriate that those directly benefiting, even me, the passenger, join in helping to cover those costs.

I look forward to hearing from the witnesses today on their views on the proposed passenger security fee increase and the president's TSA budget.

In addition, I look forward to hearing from Admiral Stone in particular on the Department of Homeland Security's progress in implementing the many transportation security provisions that were included in the Intelligence Reform Act.

Thank you, Mr. Chairman.

STEVENS: Senator Dorgan?

DORGAN: Mr. Chairman, thank you.

This is obviously a very important issue. I think not only aviation security but all forms of transportation security are critically important in this time period, and I look forward to having an opportunity to visit with our witnesses about it.

I did just want to make a point that this committee supported the amendment which will now require -- and I believe they're very close to finishing the rule on it -- the prohibition of butane lighters on airplanes.

As you know, had Richard Reid had the butane lighter, the FBI said he would have blown up -- the shoe bomber would have blown up the airplane.

And so we've been working on that, and I understand that's about done, and I think we're just waiting for a day or two before that gets out.

But I think rail security, port security, aviation security -- all of these issues are critically important, and I'm anxious to discuss some of them today with our witnesses.

Mr. Chairman, thank you.

STEVENS: Senator Boxer?

BOXER: (OFF-MIKE)

STEVENS: Thank you.

Senator Nelson?

BEN NELSON: Thank you, Mr. Chairman.

I noted that in the budget and the proposed fee increase that this is for continuation of the current program, apparently does not involve any kind of upgrading of the mechanical or non-personal security screening.

I hope that in your comments you'll address how we're going to upgrade the screening process in the future to make it less cumbersome in certain areas and more secure in other areas. There have to be these upgrades that have been talked about for quite a period of time, but I don't see anything that's being addressed, and I hope that you will deal with that.

Thank you.

Thank you, Mr. Chairman.

STEVENS: Thank you very much.

We welcome your testimony, Admiral. Please proceed.

STONE: Sure.

Good morning, Chairman Stevens, Senator Inouye and distinguished members of the committee.

STEVENS: I'm sorry, I did not see Senator Pryor come in, and I apologize, Senator.

PRYOR: Thank you, Mr. Chairman.

All I want to say is thank you for being here today. We appreciate the witnesses; looking forward to the testimony.

Mr. Chairman, thank you for your leadership on this committee.

I'm a new member here and I'm excited about the tasks that lay ahead.

Thank you.

STEVENS: We're glad to have you. You're not exactly a stealthy senator. I'm sorry I missed you there.

Senator Burns? Do you have a statement, Senator?

BURNS: I don't have a statement. I'd just make some points, but I can do that later. I think you want to get to the witnesses.

STEVENS: Good idea. Thank you.

Proceed again, Admiral.

STONE: Thank you, sir.

Good morning, Chairman Stevens, Senator Inouye and distinguished members of the committee. I'm

pleased to testify before you this morning to discuss the president's fiscal year 2006 budget request for the TSA.

I look forward to working closely with the committee, protecting the nation's transportation systems and continuing under your direction and leadership the strong relationship we have forged with this committee.

For example, several members of the committee have focused on ensuring the security of air cargo. Consistent with requirements of the intelligence reform legislation and our FY 2005 appropriations, we are working to triple the number of air cargo inspections that are actually conducted and are currently analyzing comments to our air cargo security notice proposed rulemaking in order to issue a final rule by August 2005.

Furthermore, we are moving aggressively to double our air cargo inspection workforce from 100 to 200. The president's budget requests $5.6 billion for TSA in 2006 to stabilize and strengthen TSA's essential mission.

The request reflects an increase of $415 million for several initiatives and decreases of $258 million for programs being transferred to other components of DHS and for other adjustments.

This results in an overall net increase of $156 million over the amount appropriated to TSA in 2005.

In addition, the FY 2006 request is based on a new program structure that redefines TSA's programs, projects and activities to clearly align the agency's mission with its funding requirements.

The restructuring will better enable TSA to effectively and efficiently secure our nation's transportation systems and will provide TSA with needed flexibility to respond to the ever-evolving security landscape.

Under the new structure, TSA appropriations will be divided into three categories: aviation security, surface transportation security and transportation security support.

I would like to highlight increases to particular programs where we believe the commitment of additional resources will greatly enhance TSA's effectiveness and efficiency.

These areas include $174 million to complete high-speed operational connectivity, called HSOC (ph).

HSOC (ph) will enhance the ability of TSA to transmit on a timely basis vital threat and security information throughout areas where operations are being conducted.

In addition, it will increase training efficiency and screener effectiveness while minimizing costs, and also assist TSA in transmitting human resource data.

Finally and most importantly, HSOC (ph) will allow TSA to be a metrics-based organization, providing field data to headquarters via the performance management information system, known as PMIS.

I'd like to highlight also the $43.7 million over 2005 for emerging checkpoint explosive detection technologies.

To address the threat of explosives carried on persons, TSA is utilizing $28 million from 2005 to purchase and deploy the checkpoints at 40 of the nation's largest airports, 147 trace portals.

For 2006 we are requesting an increase of $43.7 million, for a total of $72 million in '06, to purchase an additional 195 portal units for deployment at an additional 41 airports.

We also anticipate that the proposed increase will enable us to purchase explosive detection document scanners designed to collect explosive particles from travel documents that a passenger has handled, as well as to invest in appropriate back-scatter technologies once approved.

There will be $180 million in additional funding for the screener workforce. TSA has experienced a recurring need to reprogram funds from other programs to support the 45,000 screener workforce.

The estimate for increased FY 2006 payroll funds is based on actual 2004 and 2005 experience to date, and incorporates higher benefits and other adjustments previously supported through reprogrammings.

The proposed increase would be directed mainly toward stabilizing the screener payroll base and should minimize the need for any screener workforce reprogrammings in the future.

The budget contains significant resources related to deployment of explosive detection systems.

Of the $617 million requested specifically for EDSETD, $394 million would be used to purchase and install EDS.

Furthermore, the president's budget includes funds for reimbursement to airports for their work related to reconfiguration of airport facilities to accommodate installation of in-line EDS under the eight letters of intent that have been executed.

The president's budget proposes language to maintain the 75 percent federal cost share for LOI. TSA believes that the current cost share is fair and equitable and that changing this cost sharing formula would not only disrupt current LOI commitments but also undermine security effectiveness at other airports.

TSA will continue to work in conjunction with stakeholders to identify airports where there is the greatest need for support for the installation of in-line EDS systems and to explore alternative mechanisms to fund in-line EDS installations in the future.

The president's budget proposes to adjust the manner by which aviation security screening activities are funded. The proposed budget is designed to shift costs to have the airline passenger rather than the general taxpayer shoulder the majority of the costs of aviation security, in the interest of fairness and equity.

The budget proposes to increase the passenger fee by $3, raising the fee of a typical flight from $2.50 to $5.50. The maximum fee for passengers traveling multiple legs on a one-way trip would rise from the current maximum of $5 to $8.

If this adjustment were to be adopted, passenger users would cover 73 percent of the estimated total aviation security screening costs through aviation security fees, as opposed to their current FY '05 level of 36 percent.

In addition, the budget proposes air carrier fee collections be set at $350 million in FY 2006, which would comprise 7 percent of aviation security screening costs, which is in sync with their current FY '05 7 percent level.

The overall FY '06 fee approach clearly shifts the burden of the fee more heavily onto the passenger user and provides relief for the U.S. taxpayer, reducing the taxpayer's burden from 57 percent in FY 2005 to 20 percent in FY 2006.

I'd also like to highlight our efforts to enhance security across America's surface transportation systems and to adopt a threat-based risk management approach to operational responsibilities across all modes of transportation.

In accordance with HSPD-7 and the national infrastructure plan, TSA is working closely with IAIP and is leading efforts to develop the TSA sector- specific plan.

This plan delineates roles and responsibilities between transportation stakeholders to ensure that efforts are systemic, complete and consistent with security efforts in other sectors.

It will serve as the framework for defining the responsibilities for risk management of the transportation sector.

Within this plan is the modal plan that will implement the sector-specific plan on an operational and mode-specific level.

The base plan was released for stakeholder review earlier this month, and I'm pleased to announce that as of yesterday stakeholders have secure Internet access to the modal plans for review.

Our efforts on the SSP and the modal plans are being expedited to meet the requirements set forth in the intelligence reform legislation for DHS to develop, prepare, implement and update a national strategy for transportation security and modal security plans by April 1, 2005.

In conclusion, I want to convey how proud I am of TSA. Our employees have sought to carry out their responsibilities with skill, dedication and professionalism.

This past year was particularly challenging with the large number of national special security events that took place and the return to high levels of airline passengers.

TSA will continue to strive to improve transportation security while maintaining the free flow of goods and people. We plan to do so while meeting and exceeding the high expectations that Americans expect of us.

I'm happy to also report the results of our 2005 customer service survey that were released late yesterday. Highlights included 92 percent of passengers were satisfied with their overall experience at the passenger checkpoint.

89 percent of passengers thought security was adequate, as opposed to excessive or inadequate; 85 percent of passengers believe screening procedures are similar between airports; and finally, 82 percent of passengers have confidence in TSA.

We know we have plenty of room for improvement. However, these numbers give perspective to what is often a slanted and distorted story regarding the performance of TSA.

Thank you for the opportunity to testify before you today.

I look forward to working with the committee in search of our FY 2006 funding request.

Mr. Chairman, this concludes my oral statement. I would be pleased to answer any questions, sir.

STEVENS: Thank you very much.

Ms. Berrick, the director of homeland security and justice at the GAO.

Please?

BERRICK: Thank you, Mr. Chairman and members of the committee, for the opportunity to discuss TSA's budget request today and efforts to secure the transportation system.

My testimony today describes DHS and TSA efforts in managing risks and allocating resources across transportation modes, and in integrating screening and R&D efforts to achieve efficiencies, as proposed in the president's budget.

TSA should be commended for the many initiatives they have undertaken since September 11th to strengthen security. These include purchasing and deploying equipment to screen checked baggage for explosives and hiring a federal workforce of over 40,000.

However, we have found that in allocating its resources, TSA could improve in conducting the systematic planning needed to prioritize their efforts.

With respect to baggage screening, we found that having initially fielded equipment to screen-check baggage for explosives, TSA has not conducted the planning needed to optimize efficiencies.

TSA has estimated that integrating screening equipment in-line with airport baggage conveyor systems, although requiring a significant up front investment, could result in savings of over $1 billion to the federal government over seven years for the nine airports they reviewed.

This estimated savings is due in large part to the significantly fewer number of screeners that would be required to operate the machines.

We also found that airport passenger and baggage screeners did not always receive the required training that they were required to have. This is due in part to a lack of high-speed Internet access at airport facilities.

Only 27 percent of airports currently have this access.

The president's budget request for additional funds to install this access should help airports make this training available to all screeners.

We also found that TSA plans to implement a threat-based risk managed approach to securing air cargo. However, TSA must take a number of actions before they can move forward with their plans.

These include developing a database to help them target high-risk shippers and finalizing criteria for profiling high-risk cargo.

DHS has also proposed in the budget request two key organizational changes designed to achieve synergy and avoid duplication of efforts. These changes include creating an office of screening coordination and operations that would combine several terrorist-related screening activities, and consolidating their R&D efforts at the DHS level.

We commend DHS in attempting to achieve efficiencies through this consolidation.

As they move forward, it will be important to define program commonalities and rules and responsibilities.

DHS will also need to address existing challenges that we have identified with its screening and R&D programs. These challenges include developing a comprehensive plan for managing the transportation workers identification credential and increasing coordination between DHS and other federal agencies, including the Department of Transportation, related to R&D activities.

We are encouraged that the president's budget request outlines that TSA plans to integrate a risk management approach into their decision-making processes.

Consistent with this approach, TSA will need to conduct rigorous planning and prioritization to help ensure they are focusing their resources on the areas of greatest need.

Mr. Chairman, this concludes my opening statement. I will be happy to respond to any questions.

STEVENS: Thank you very much.

If there is no objection, I would like to set a time limit of seven minutes on each senator, and we'll go back (ph) for another round if that is required.

Admiral, I was pleased to talk to you last evening about some of these subjects, and I do thank you for your courtesy of coming and changing your schedule, as I said.

You have an enormous responsibility. This is not just transportation or airlines security, it is the total transportation security for the whole country.

But we seem to be putting emphasis only on the air passengers to contribute to the costs of this security that we've insisted on putting in place throughout the transportation system.

Do you have any plans to put fees on any other portion of the transportation system as we go forward with these plans that you've documented in your statement and Ms. Berrick has commented upon?

STONE: I have no plans right now to assign additional fees.

It's my understanding...

STEVENS: I'm talking about other than airline passengers...

STONE: Other than aviation.

STEVENS: ... is anyone else going to pay other than the airline passengers?

STONE: In the other modes of transportation, sir?

STEVENS: In terms of putting up this security system we have, that covers rail, bus, air -- everything -- I presume that is what your statement says...

STONE: Yes, sir.

STEVENS: ... the total transportation programs of the United States are subject to your jurisdiction, and you have taxes only on the airline passengers.

Now, do you plan on putting fees or taxes on any other person that uses some of those transportation systems?

STONE: We have no plans to put additional fees on any of those other modal areas, other than those that I understand currently exist.

STEVENS: Well, tell me why. I mean, all of them -- you know, buses -- they're covered by your security system. Trains are covered by your security system. Boats are covered by your security system.

Why should only airline passengers contribute beyond taxpayers for the security system?

STONE: I think a user fee approach with all those modes of transportation merits review for the very aspect of this theme that there really has to be shared responsibility.

Right now, the general taxpayer has a share of roughly 57 percent of the aviation screening, and this just adjusts it down to 20 percent. There's always going to be that percentage of sharing.

And so I would agree that each mode of transportation merits review for what type of fees are paid for both by users as well as the general taxpayer.

STEVENS: Do you have plans for any additional security measures that apply to automobiles in general upon our highways?

STONE: I do not, sir, for automobiles.

STEVENS: Now, is that a subject that's left totally for local and state jurisdiction?

STONE: Currently, I do not have visibility on whether or not the states and local jurisdictions are reviewing the automobile piece of that.

Our responsibilities for highways, though, are very clear, and therefore the $20 million highway watch program, which we work with ATA, American Trucking Association -- is the foundation of that.

With regard to fees for automobiles in support of that, I have no plans for that.

STEVENS: Well, let me tell you a little story that I heard in one of the airports. I'll not say which one it was, because I don't want to get people running out and asking too many questions about it.

But one of the security people in an airport that I flew into told me that he had noticed an automobile in their parking lot several times. It had a very distinctive license plate. And the person appeared to be doing things erratically and was obviously from the Middle East.

He decided to put that license plate up on the net. And a couple weeks later he got a call from a distant city, all the way across the country, saying that they had seen this license plate, wanted to know what did he know about the people that were involved.

Well, he told them why he had done it. He just said this guy was just -- the automobile was suspicious and what it was doing.

And they tracked that automobile in the other city, and when it came back, he got notice all along the line of how that car was coming across the country.

And when they finally found it back in its original city, it did do some things that were fairly much out of the ordinary, and they picked this person up.

It turned out that was an employee of the airport. And under questioning, he had not flown because he's on the no-fly list.

But they had tracked him using license plates.

Now, aren't we missing a whole area of security threats by screening only the people at airports, only the people that get on and off airplanes?

We know there was a terrible disaster that came from airlines being used as weapons of mass destruction. But aren't the people who are capable of doing that using other means of transportation now?

They're not flying. They're on the no-fly list.

Now, don't you have any plans for extending the system of security?

STONE: We do. In fact, every morning we spend about two hours reviewing a report from the terrorist screening center.

To use the example you just gave, in which that type of information on suspicious cars, license plate, law enforcement action, is reviewed by TSA each morning from an intermodal point of view -- trains, mass transit, rail, highway, pipeline security -- all of that intelligence in the terrorist screening center is integrated into a two-hour morning brief where we look at each mode of transportation, what the threats

are, and how they interrelate to one another.

And so that very approach of, it's all related, it has to be intermodal, and the terrorist screening databases apply not just to aviation but need to be looked at across all modes.

And so that morning brief is the centerpiece of what we do, because it gets at that very issue of domain awareness and being able to follow up on leads and how they connect to one another.

BERRICK: And, Mr. Chairman, if I could add to that, GAO is currently doing several reviews looking at other modes of transportation. And the difference between aviation and other modes is that other modes of transportation are inherently open to promote the flow of goods and people.

For example, we're looking at rail security, so in looking at rail security, TSA will need to consider different security measures that would be appropriate for that environment. And one of the issues we're looking at is what's being done in other countries to secure their rail systems, and can that be applied to the United States.

You asked earlier about taxes for other modes of transportation. Right now, for other modes of transportation, the transit operators are primarily funding security enhancements. They get some grants and they also get some assistance from the Department of Transportation, but primarily they're shouldering the burden for security improvements.

STEVENS: Thank you very much. My time's up. I intend to go further on this when it comes around to my time again.

It does seem to me that other people beyond airline passengers ought to be paying for this security. The taxpayers, obviously -- we don't even call these as taxes. We call them fees now, right? They're taxes as far as the airline passengers are concerned.

But there's no such burden on other people who use other forms of transportation and I think that's wrong.

Senator Inouye?

INOUYE: Thank you very much. I'd like to follow up on your questioning.

Of the amount raised by this passenger fee, how much do you anticipate raising?

STONE: The passenger fee, a total for fiscal year 2006 would be $3.7 billion, 73 percent of the screening costs.

INOUYE: Of that amount, what is the new fee?

STONE: The new fee would raise from $2.50 to $5.50 the one-way flight and up to a cap of $8 for segment flight.

INOUYE: Of the amount being raised, how much is being spent for airline security?

STONE: $5.2 billion overall is the fee for aviation security, of which the passenger fee, if enacted, would

be 73 percent of that total. The airline's fee would maintain consistency with this fiscal year at 7 percent, and then the general taxpayers' fee would drop to 20 percent of that overall amount.

INOUYE: In other words, you're telling us that none of the increase will be spent for other modes of transportation?

STONE: Yes, sir. I'm saying that this all goes toward the aviation screening bill of $5.2 billion. And it just adjusts the share between passengers and the general taxpayer.

INOUYE: And for the other modes, taxpayers are paying 100 percent?

STONE: And in the other modes of transportation, as was indicated, there are various fee adjustments, but the TSA does not -- and the department -- intend on recommending additional fees at this time in those modes of transaction.

INOUYE: So the fees are being paid by the general taxpaying population.

STONE: By the general tax population and some degree of user fee, depending on the mode.

INOUYE: Your recent reorganization, where you put the maritime, land and aviation operations into an office of intermodalism...

STONE: Yes, sir.

INOUYE: ... will this improve maritime and rail transportation security?

STONE: Yes, sir, I believe it will.

We've taken what was previously an organization of TSA that had a block for aviation and then a block called maritime and land, and we combined them and broke them down in accordance with Homeland Security Presidential Directive 7, which has the modes of transaction of mass transit, rail, highway, pipeline, aviation, maritime, shipping and postal in order to give more of an intermodal focus.

It also helps stakeholders that are looking at TSA know where to come in in order to be serviced for their specific questions, be it mass transit or rail or highway.

So we see that this will be a powerful signal of our intent that we are responsible across transaction sectors. We have specificity with regard to those modes.

And the modal plans that are coming out on April 1st, which are constructed by threat, criticality, vulnerability, and then the appropriate risk mitigation measure, I think will integrate extremely well with that new alignment.

INOUYE: Besides sending a powerful signal, will it improve the operations?

STONE: I believe it will. It really helps us understand the entire domain by having that sort of a realignment and focus on those modes.

BERRICK: If I could add, Senator, we believe that the intent behind the restructuring, which is to achieve efficiencies and avoid duplication of effort, is a good approach.

However, the organizational change alone isn't going to ensure its success. We have to make sure that there's coordination and commonalities among the programs that are evaluated.

And also, several of these programs we've identified existing challenges that will need to be addressed. For example, in integrating the R&D efforts throughout Department of Homeland Security, certain issues are going to need to be resolved that we've identified in the past; for example, having deployment dates for its R&D efforts; also, having just a complete inventory of what all the R&D projects are throughout the department, which we didn't see.

So those issues will still need to be addressed in moving forward with this reorganization.

INOUYE: This reorganization will bring about efficiency, as you said. Will it mean cutting personnel or increasing personnel?

BERRICK: I don't know what the department's decisions are regarding personnel, other than the functions are going to be combined.

STONE: With regard to the proposed realignments for the Screening Coordination Office, the personnel that are currently engaged in that activity at TSA will transfer into that office and work, then, with their counterparts that would be coming in from Customs and Border Protection.

And so the bodies stay the same. The attempt to reduce the stovepipe approach, where you have, say, a program like international travel that Commissioner Bonner is working in that fashion today and then we have Registered Traveler, and there's US-VISIT.

The Screening Coordination Office will be designed to bring those individuals together under that office and have one seamless program rather than three stovepiped ones.

INOUYE: How much will it cost to bring about this reorganization?

STONE: For the Screening Coordination Office, it's a transfer of those funds from the respective agencies in there, so there's no additional costs involved. It's the transfer of those bodies and people into the Screening Coordination Office.

And then for the research and development piece, the desire by the department to integrate the laboratories, so that you don't have one laboratory working on a project that the TSA lab in Atlantic City has no visibility on -- to integrate that to reduce overlap and duplication, while at the same time empowering TSA to task that lab to achieve mission, is the goal of that realignment.

INOUYE: And, Ms. Berrick, do you approve of this reorganization?

BERRICK: We believe, again, that the intent behind the reorganization is a good one. And again, the intent is to achieve efficiencies and avoid duplication of efforts, because there are several screening systems throughout the department, and several within TSA -- six within TSA, specifically.

So the intent is a good one, but the organizational change alone isn't going to ensure success and that those goals are achieved. Commonalities among the programs need to be fully evaluated to ensure that efficiencies are achieved.

Also there has to be much coordination. And again there were some existing problems with some of these programs before this reorganization was proposed, and those problems will still need to be addressed.

INOUYE: And this intent will not address it.

BERRICK: I believe they're moving in the right direction, and I think the reorganization, in terms of trying to achieve efficiencies and commonality, is a good idea. It's just the implementation that's going to be what's important.

STONE: Sir, if I may add, and also to make sure, as we go about that, that we do no harm to the momentum that's been achieved in these programs, such as Registered Traveler and International Pass.

So I think Undersecretary Hutchinson and Admiral Loy have stated that the idea is not to do harm and slow down those programs. We need to move forward aggressively but integrate them.

INOUYE: Thank you very much.

STEVENS: Senator McCain?

MCCAIN: I want to thank the witnesses.

Ms. Berrick, from reading your report, it seems to me the area that you emphasize, and I think appropriately, is the risk management aspect of TSA: identifying, prioritizing and managing risk. Is that correct?

BERRICK: Yes, it is, Senator.

MCCAIN: And, Admiral Stone, would you agree with that?

STONE: That the key is that we have a risk-based approach? I would agree with that, yes, sir.

MCCAIN: And right now, in Ms. Berrick's view, the GAO's review, that's lacking.

STONE: I don't agree with that. We have a strategic threat assessment report which is a secret no-foreign document that we have all of our programs linked to. I think we have our emphasis and our money going where the threats are.

MCCAIN: Tell me, where is our area of greatest risk right now?

STONE: I believe the use of an aircraft as a weapon to be able to be delivered anywhere throughout the United States, whether that's to a chemical plant, or a nuclear plant, or an economic center or a political center, is a threat.

MCCAIN: That's still our area of greatest risk, even though that's been the area of our greatest

investment?

STONE: I think it's the greatest risk due to the preponderance of threat streams that indicate that, despite our efforts, there is a desire to use a weapon as a delivery vehicle and also, I would add, second to that, an aircraft as a target.

So both as a delivery system, as a target, I would list at the very top of our priority list, and therefore our strategy matches the threat and the risk.

MCCAIN: Ms. Berrick, go ahead.

BERRICK: Thank you, Senator.

With respect to conducting risk assessments, we do identify in our statement that TSA is moving in that direction, and they've started developing tools to integrate this into their decision-making processes. But we don't think that they're fully there yet.

You mentioned areas where there may be vulnerabilities. We did a review looking at general aviation, and there's 19,000 general aviation airports across the country, and found that, although there were some limited assessments of threats, a complete threat assessment wasn't conducted of the general aviation population.

And there were also only limited vulnerability assessments that were conducted to determine out of these 19,000 airports which are the most vulnerable and which should we be focused on.

And related to aviation security, we looked at airport perimeter security and access control, and also identified areas for improvement in conducting vulnerability assessments within the airports themselves: which airports are the most vulnerable; what should we do to improve access control to protect the airports?

MCCAIN: How would you view border security, Ms. Berrick, as a priority?

BERRICK: Border security is another area that we think a risk management approach should be applied.

Relative to aviation and the other modes of transportation, until this approach is fully integrated into decision-making processes and analysis, it's hard to determine where the resources should be allocated.

So I don't think right now we can answer the question should money be going to border security versus aviation versus any other mode, until this is really integrated into the process and these assessments are done.

And this is a very difficult thing to do for any organization that we've looked at, so it's definitely a challenge to integrate that.

MCCAIN: Do you want to speak, Admiral?

STONE: Yes, sir. I believe the key documents for TSA are the modal plans. The fact that we need to develop and provide to Congress by 1 April those modal plans that list each mode: mass transit, rail.

Currently the stakeholders now are reviewing those so that we can benefit from their view of how that risk mitigation plan should be developed. And that truly is the essence of a risk-based plan.

If you've got a modal plan that looks at threat criticality, vulnerability and then concrete steps to mitigate risk that has buy-in from the stakeholders, that's a powerful road map for how to secure transportation. So I believe that document is critical and why we're putting so much emphasis on it today.

BERRICK: I...

MCCAIN: Well, as a -- Ms. Berrick, go ahead. I'm about to -- go ahead.

BERRICK: I just wanted to add that I would agree that that's where TSA needs to start, is with these modal plans, and from that flows other tools -- risk management tools that they need to develop to integrate those into processes.

MCCAIN: Well, Admiral, one of my disappointments is that I can't identify as a passenger any significant improvements with the use of technology of the screening of passengers since TSA began its operations.

Time after time in hearings before this committee, I and other members urged that we develop technology which will expedite the movement of millions of people every day in and out of airports, and so far I have not seen -- now, I know explosive detection devices have been put in, and I think baggage screening has been put in. But as far as the individual passenger is concerned, I've seen very little change, except now I have to take off my jacket as well as my shoes.

So I urge you again: We've got to develop technology or the airlines will never fully recover as long as this is extreme inconveniences that passengers are experiencing.

And I'll be glad to hear your response to that, but does it concern you that 2 million people are crossing our border every year and coming into the United States? Isn't that a security concern?

STONE: Well, I believe it is, and I know that a lot of people are working real hard at Customs and Border Protection and the undersecretary for border transportation security to mitigate that risk.

With regard to the issue of technology, sir, I just highlight that the $28 million this year, so that we can have portals at some of our checkpoints and expanded (inaudible) to get away from the intrusive torso pat-down, the use of technologies, biometrics, iris scan, fingerprinting for Registered Traveler, and then the Reveal technology which was recently certified and that we have $15 million and are starting pilots at airports, which is a mini-CAT scan device -- those sorts of technologies, both in Registered Traveler, Reveal and then the portals are absolutely critical to easing the flow of people through checkpoints, to accelerate that and...

MCCAIN: When can we expect to see some of that?

STONE: The three Reveal pilots should start next month and last for 60 days. And then we look at then having a list developed of where those airports should be that need that, because it gets us away from the explosive trace devices which are manpower intensive and gives you a higher-quality security.

So we're going to hear a lot about Reveal-type technologies in the coming months and how that's our future.

R.T. -- today, we signed the MOU with Orlando for the private sector initiative for how we can roll out Registered Traveler in a more accelerated manner.

MCCAIN: What would be the effect, if any, of privatization of the screeners, in your view?

STONE: For our privatization of our screening force? I think to do so in a sweeping manner would cause tremendous churn of the entire workforce throughout the United States. We saw that churn as we went from private screeners to federalized screeners.

So I believe the process which is more thoughtful, where you provide an opportunity for an airport to decide what's best for them, and then allow them to decide if they want to revert back to a private screening regime, is the appropriate one.

MCCAIN: And you would be setting standards of performance, because originally the reason why we went away from private screeners is because of the lack of standards and lack of performance, right?

STONE: Right. We would be back in the business of having an oversight staff at an airport, much like San Francisco and Kansas City, where the federal security director and his or her staff oversee the standards at that airport.

MCCAIN: I thank the witnesses.

Thank you, Mr. Chairman.

STEVENS: Senator Dorgan?

DORGAN: Mr. Chairman, thank you very much.

We all understand, I think, that transportation security is not optional; it's a requirement. The 9/11 terrorist attack in this country using aircraft, last year's devastating terrorist attack in Spain using the rail system -- I mean, we all understand that this is not an option. It's a requirement. The question is how to do it.

And I want to talk to you just a little bit about the fees. The way the fees have been applied, and I think would be applied, I think are unfair to people in my part of the country, in rural areas.

When Senator Boxer would fly from -- a California constituent fly from Los Angeles to Washington, D.C., they'll pay the $2.50 fee. But every North Dakotan who flies from North Dakota to D.C. will pay that twice, because they're using two segments. There is no non-stop service from Bismarck to Washington, D.C., or Fargo to Washington, D.C.

So we've constructed a fee that is fundamentally unfair, in my judgment, to people in rural areas because they have to use more segments to get where they're going. Would you agree with that?

STONE: In that scenario that you described, for user fees and how we've constructed it, I would agree that there's a greater fee for those that are put in the position where they have to fly with segmented flights,

yes, sir.

DORGAN: And there's a greater fee despite the fact that when they get to their connection point -- in North Dakota's case, it's almost always Minneapolis -- they don't place any burden on security there because they've already been screened through security at the airport origin, Bismarck or Fargo or one of the North Dakota cities.

So they're charged twice because there are two segments, despite the fact that they impose no additional burden on the security system at the point where they transfer. Do you agree with that?

STONE: I would agree with that the way you've described that, yes, sir.

DORGAN: And so this unfairness will be exacerbated by a proposed increase in the fee. Do you agree with that?

STONE: Exactly. Those that are traveling in the manner that you describe will have a higher fee to pay as a result of this adjustment, sir.

DORGAN: So I don't know whether Senator Stevens was trying to make that point, but it seems to me whether you're in Alaska or whether you're in North Dakota or perhaps Arkansas, where you don't have many non-stop flights to the major hubs, we're always going to pay more, always perhaps double or triple the fees that are paid by people that are traveling from one large city to another, because there going non-stop; they'll pay one fee. And we're going with one or two transfers and we'll pay two or three fees.

And so I made the point when the fee was originally established, but increasing the fee will increase the unfairness for folks who live in our part of the country, rural areas, rural states. And so I don't think it makes much sense to recognize an unfairness and then see if we can exacerbate it with an increase in the fees.

So, I mean, we have to pay for all this, I agree with my colleague Senator McCain. One way or the other, security is not an option. It's a requirement. And we have to pay for it. The question isn't whether; it's how.

But frankly, I don't like the notion of paying for it in a way that always, inevitably, overburdens the folks in rural areas where you don't have non-stop flights.

So, Ms. Berrick, your assessment of that?

BERRICK: I would like to let you know, Senator, that we think it's worthwhile to do an assessment of these fees. And, in fact, GAO has an ongoing review right now looking at the cost of providing security when the airlines have that responsibility, to help do this assessment.

And we're going to be publishing a report in April of this year summarizing the results of that review, just to let you know that that's going to be coming forth.

DORGAN: All right.

Well, I just want to make the point on fees, that there's a basic inherent unfairness that exists, and the least

thing we ought to do is exacerbate that with these proposals.

I want to ask another question. I think it was a year or a year and a half ago we had a committee meeting that was closed, and we were presented secret material at that point.

And perhaps the chairman or the former chairman can help me with this. I don't know whether it was the GAO or the inspector general that provided us the results of an investigation of airport screening. It was done in secret. It has, to my knowledge, not been leaked, even after the committee hearing.

But it was an investigation at certain airports of the screening capabilities that existed. And most of the members of this committee walked out of that briefing just shell-shocked by what we had learned. It was unbelievable to me.

And I, of course, will not and cannot disclose the results, but you undoubtedly know those results. I assume you've studied that.

BERRICK: Yes.

DORGAN: Was that an inspector general or a GAO report?

BERRICK: It was both of us, actually. We were both involved in that.

DORGAN: OK, so you will recall the results. And I want to know, has anything changed since then? Because if not, we've got real serious trouble here. That investigation provided information that, as I said, was just shocking to me.

So where are we from that point until now, Ms. Berrick?

BERRICK: In terms of the actual undercover testing, we also agree that that's a very important area in terms of measuring performance on how well the screeners are doing, so we're continuing to look at it.

There have been some structural changes, in that TSA is conducting more of this testing. They've increased their Internal Affairs Office, who does this testing. They're testing more airports than what they've done before.

And in summary, we've seen some improvements, but it hasn't been dramatic in terms of the results.

DORGAN: The only way we can determine the capability of the screening procedures is to test it and attempt to foil it in the kind of investigations that have been done.

And I'm just asking, is there a qualitative analysis or a qualitative assessment about the improvement from then until now? Because if there is not measurable improvement -- and I think that's what you're suggesting -- I think we've got real serious trouble here.

BERRICK: If I could add, there's different ways to measure the performance of screeners. One is through this undercover testing. There's also a recertification program that TSA requires each screener to go through every year to retest their skills. So that also provides data.

There's also a system called the threat image projection system, where it flashes images of threat objects on a screen to see if a screener will detect it. And there's also some other initiatives.

So I think, in looking at performance of screeners, you'd have to look at all of those collectively. The undercover testing is one indicator, and it's important, but there are some others as well.

DORGAN: But if I might -- and Mr. Stone, you want to comment, I'm sure. If I might say this, that the testing that was done was done in a way that is designed to try to foil the system, a passenger who, by design, wants to bring a weapon on board. That's the purpose of that kind of testing. And the fact is the results were quite shocking.

And so I understand about improving screeners looking at the monitor and all that, but I'm much more interested in the undercover investigations in which they're trying to test by trying to foil the system and bring a weapon on board. I mean, obviously, that's where aviation security really counts, is making sure we get those folks and understand who they are and screen them out.

Mr. Stone?

STONE: I couldn't agree more, Senator.

The issue of those tests is to look at what are the causal factors. It's not just exhortation in the work place of telling screeners to do better and work harder.

Much of it is the technology. If you're going to be able to detect a certain type of explosive, you need to learn from what your covert testing are telling you and then make those investments.

And so that translation between what is the covert testing saying are the vulnerabilities and what are you investing is the key to it.

And then the other piece -- on those things that you can remedy through training, through the threat image projection system, in which we've had a 6 percent increase, and we measure it daily on how our screeners are doing on those X-ray images -- that measure every day the number of airports that are inspecting 100 percent of bags electronically, so we don't have equipment and people sitting out in an airport that aren't doing that, that are mitigating it and using alternative screening procedures.

Every day that report comes in now. It's analyzed. What are the causal factors? And we've got a dramatic change in the last year over our ability to ensure that 100 percent passengers are being screened, 100 percent bags are being electrically checked, covert test scores are being translated into programs.

And we'd like to provide a brief to the committee at the appropriate time on the last year, where we've gone on both security issues as well as covert testing.

DORGAN: Mr. Chairman, I wonder if I might make a request. It's been, I think, a year and a half or perhaps two years now since we had that analysis. I'm wondering whether the committee might not want to request a new type of testing, undercover testing, and see if we can compare the qualitative change in two years. Has there been a change or hasn't there been a change?

BERRICK: And if I could add, Senator, also, GAO will be publishing something within the next month

that details the results of TSA's covert testing efforts. That would provide data over the years since they initiated the program till today on what the changes have been.

DORGAN: Will that be classified?

BERRICK: It will be.

DORGAN: I would hope we'd have a hearing on that.

STEVENS: I think even the fact that we may hold other types of tests ought to remain classified, Senator.

Senator Boxer?

BOXER: I want to talk about port security for a minute.

We know that the U.S. Coast Guard has told us that the ports need $5.4 billion over 10 years to pay for upgrades. And what we've got here in this budget is $600 million, and that $600 million is not only for port security but for rail security and for energy facilities.

I am stunned that this purports to be a budget that takes care of homeland security. How can you possibly defend that type of a number here when we just about have enough to do a year's worth of port security and then we're throwing in rail and energy facilities?

STONE: The state and local government coordination and organization that's been set up to ensure that that $600 million is appropriately vetted through all the modes of transportation, including maritime -- TSA's role in that is to be the intellectual capital, to go and review that, to see what are the risks and how should those be racked and sacked within that organization.

We believe that that approach is a sound one; that you want to make sure that the entity responsible for transportation security is providing intellectual capital to vet where that $600 million should go. We believe that's a sound approach.

BOXER: Well, with all due respect, Mr. Stone -- and I really do respect you, and I think you're working so hard to do the right thing -- that was a really convoluted answer to a simple question, which is, "Is this enough money to deal with it?"

If you trust the Coast Guard -- I assume you trust the Coast Guard -- and they say they need, you know, essentially $5.4 billion, $500 million a year, just to meet the needs, and you haven't even thrown in there the rail security and the energy facility security -- and we know our nuclear power plants are sitting ducks at this stage, we know that rail -- and we worked so hard on this committee to get some bills before -- which I understand our new chairman is interested in trying to push them through the Senate, because a lot of the bills just sat at the desk there.

But I want to ask you again. You gave an answer that said, "Well, we have a committee, and they're going to stack these projects in priority."

Do you believe, in light of the fact that the Coast Guard said that they need $500 million for port security alone, that $600 million that's supposed to take care of port security, rail security and energy facility

security is a large enough number, yes or no?

STONE: I believe that that number is appropriate based on risk, in that the modal plan that comes out on April 1st from the Coast Guard, which is working with us on maritime modal plans, will show that, based on risk assessment, the money is going to the right place to mitigate risk.

There's not enough money in the world, probably, to drive it down to zero, but I believe that that approach is right.

BOXER: Well, OK.

We're spending $1 billion a week in Iraq -- $1 billion a week in Iraq. And our biggest concern is a terrorist attack, which we should be concerned about; we've got cells in this country.

And we're spending $1 billion a week in Iraq, and we are spending $600 million on rail, port and energy facility security. I mean, it just doesn't make sense to me.

I want to ask you about grade separation. I'm sure you read the terrible thing that happened when a mentally ill man caused a tragic train wreck in Glendale. People were going to work. They died because we have these horrific issues with grade crossings. What he did is he parked his car right on the tracks. He was going to commit suicide. Then he ran out of the car, and a disaster ensued.

We have so many of these unsafe situations across America, in every single state of the union, plenty of them in California.

Where can we go, what program can we tap, for solving these grade crossing problems, either by blocking them or funding them to make grade separation, so if we can't afford that, to at least block the right-of-way to cars? Where can I tell my people to go to look for federal funds? Because, you know, the terrorists are always going to look to the weak link.

STONE: I'm happy to look at that and have your people talk to TSA in our railroad mode -- we work very closely with the FRA -- and find out where that might be.

BOXER: Is there a program for...

STONE: For grade separation crossings?

BOXER: Yes.

STONE: Not that I'm aware of. But if there's a way that's linked to a terrorism nexus as a result of some sort of a threat stream, we'll be happy to sit down and talk through that.

BOXER: OK. I'd love to meet with you a little bit more on that.

And the last question I had, Mr. Chairman, is that what transit grants now -- because you did a lot of reshuffling -- can be spent on canine teams? Because I think those are quite effective, the canine teams.

STONE: Yes. The canine team transit grants -- you're asking for specificity...

(CROSSTALK)

BOXER: Yes, where would they go? Where would our people go, our airport people, our rail people -- what particular grant program?

STONE: We have a special branch; canine is their sole function in life. They work for our chief operating officer. That would be an outstanding place to go to find out how we can help mitigate risk and partner with those that need canine resources.

BOXER: Is there a special grant program that funds these canines?

STONE: I'm not aware of any specificity on that, unless you are on...

BERRICK: Right. I would add that it could come out of many different grant programs, because canines are used for many different sources. They're used on rail systems to sniff for explosives. They're used with air cargo. So it could come out of many different sources.

With respect to your question on safety with rail crossings, I would recommend the FRA, which is the Federal Railway Association within the Department of Transportation. They have a safety responsibility related to rail.

But there is a close intersection between what the Department of Transportation does and FRA does and what TSA does, because safety and security intersects in many areas, and sometimes they could implement a safety measure and it could have a negative impact on security. So there has to be close coordination between both groups.

BOXER: Well, Mr. Chairman, if I could -- oh, he's gone.

I would just say to my colleagues that this terrible situation that occurred on a grade crossing should be a wake-up call to all of us, because all of our states have these unsafe situations where the cars can just park right on these rail crossings. And the fact that this case was a mentally disturbed individual is one issue. But it just shows up a tremendous vulnerability here.

And I think you're right. I think it's safety and it's anti- terrorism, and so we should pool our resources. And I hope that as we go along with legislation, Mr. Chairman, we can take a look at these grade crossings, because all that someone has to do, a terrorist, is park a car there and leave. And we've got a crisis of major proportions we -- unfortunately, wreaked havoc on us in California.

Thank you very much.

STEVENS: Thank you very much.

Senator Nelson?

BEN NELSON: Thank you, Mr. Chairman.

Admiral Stone, you mentioned risk assessment, and you said the greatest risk that we still have, as it

relates to aircraft, is a flying bomb, a targeted effort to fly an airplane into some area of -- to create some sort of mass destruction.

I thought that securing the cockpit door -- we're talking about commercial airlines now, not general aviation. I think it might apply to general aviation.

But how can that be the concern today with the locked cockpit door, without access to the controls? How can that be? How can that still be the number one security risk that we're trying to plug through airport security where you've got to take off your coat, take off your shoes? Maybe you can explain that to me.

STONE: I think because, when you look at the threat streams and see the desire, the intent, to conduct those sorts of operations, and then you look at the criticality of it and you do these assessments and say, "Well, how critical would that be if that were to happen?"

BEN NELSON: No, I think it'd be very critical if it were to happen, but the question is haven't we taken steps to prevent that from being a logical extension of (inaudible) at the bomb.

STONE: Yes, sir. So the vulnerability piece we've greatly reduced through the layered security approach of hardened cockpit doors, federal flight deck officers, FAMs, increased security regimes at our nation's airports. So we've greatly reduced the risk of that. However, when asked, well, what do we believe is still a risk that we face that we need to be, in my belief, prepared for, that elevates it to the very top based on the threat and the criticality (inaudible).

BEN NELSON: But I hope we're not putting a lot of our emphasis into security to deal with something that has been largely thwarted by previous security measures. Because it seems to me checking the boarding pass twice -- I don't know what that does to deal with the major threat that you're concerned about.

BERRICK: If I could add, there's two pieces to this, several pieces, but two major ones. One is threat, and one is vulnerability. And somewhat independent, but then they come together. You can do an assessment of threats, and the threat can still be there.

I think where your question is going is actually how vulnerable is the aircraft if we have hardened cockpit doors, if we have federal air marshals, if we have screening, when is enough enough?

STONE: Yes, because more of the same at more cost doesn't necessarily make me feel safer flying on the airplane.

BERRICK: And that's, I think, where the risk management approach comes in that you have to assess these threats and vulnerabilities and then decide, based on the threat and the measures that we have in place, should we be putting more money here or other places.

BEN NELSON: Well, I quite agree with you. I come from the insurance business, so I do understand risk assessment, cost benefit analysis. And I don't see the relationship taking off the coat, showing the boarding pass twice to an airport personnel at the beginning, going through the line showing it as you walk through the security. Maybe you can explain to me how that isn't just a cost, how that relates to better security if the primary threat that we're still concerned about -- maybe the vulnerabilities have been addressed. But how does that contribute to making me safer?

STONE: Yes, I'd be happy to, Senator. For instance, the second threat that I talked about is using the aircraft as a target relates to what happened in Russia just a few months ago. And taking off the jacket was deemed as a risk mitigation.

BEN NELSON: But I go through the magnetometer.

STONE: So that we can see whether or not a person has something that looks bulky, round. In fact, as a result of us having folks remove their jackets, now what we're finding is packets of -- every day I get the report, packets of cocaine strapped under armpits. In other words, there's been a number of things we have not observed as a result of not being able to have in place taking off the jackets and coats.

So it's been enlightening to us about this issue of since those Russian aircraft were downed, what we found through torso pat-downs, having jackets taken off. And so, we believe those are appropriate measures for us because of the threat of the aircraft as a target, not only as a weapon.

BEN NELSON: Yes, but it may not be a security issue. It may be a drug issue. I'm not saying we ought to turn our eye away from that. But it hardly seems a justification for a fare increase, in effect, through this additional money. More costs should result in better security. And I'm not sure that that's the case.

Can you explain to me why we have to show the boarding pass to a person at the front of the line and then have to show it walking through the security? Or is that classified?

STONE: No, sir, I can explain that. I think there's an area for major improvement on this.

BEN NELSON: I hope so.

STONE: Because the airline hires those employees, the ticket checkers and the wise. And then you're showing that to a TSA employee at the checkpoint. We're proposing right now and looking at how we might be able to relieve the airline of that responsibility so that we can have a trained TSA screener look at that I.D. and then train that screener in the screener/passenger observation technique that's currently being used up in Portland, Maine as well as in Providence, Rhode Island where we look at behavioral characteristics while they're checking that and do a better job of that.

So there is an opportunity for us there to reduce some of the pressure on the airlines for hiring that individual and raising the bar on security. And we know that the verification of I.D. piece is a vulnerability for us, thus, secure flight and the desire to do commercial database testing to see if that adds value, thus, register travelers, see if we can get more people to volunteer to identify themselves.

BEN NELSON: But I agree with you. It seems to me that every time we do something that doesn't add to security, there's a cost associated with it. And now we want to raise the costs, but I haven't seen where there's a -- I would feel a little bit better about you trying to raise the costs if you came in and said, "Here's what we've done to bring down the unnecessary procedures that add to the costs." I think you'll probably bring those down, but I can almost guarantee you won't come back in and ask for a cost decrease.

STONE: Yes, sir. If I can add, there is no cost increase in this budget. The issue of the fees is just a reapportionment of what percentage does the passenger/user pay as opposed to the general taxpayer. The cost remains the same.

BEN NELSON: But the broad base of costs isn't going to go down unless you streamline the process. I see my time's almost out.

One final thing: As you say about preferred travelers, I want to make sure that this comes across right. If we're going to do risk assessment, is there a way to assess risk so that people who represent less risk will get a different kind of treatment without it being egalitarianism where you've got to treat everybody the same because if you don't, then it's not fair to other people? It's not about fairness here. It's about risk assessment.

Is there a way that you're truly working to do that? Because I've been hearing about it for three years. I see nothing about it. I'm not looking to get unfair advantage. I just don't want us to spend our money doing something that doesn't make sense.

STONE: I believe the registered traveler program gets at that issue of...

BEN NELSON: When's it going to happen?

STONE: Today we signed the MOU in Orlando, Florida, which is the sixth airport, which is the MOU that heads us down the road of how we can capitalize on the private sector to be able to accelerate that program. So it's a very high end of our list of things that need to get on with and get done. So you'll be hearing more about that from us.

BEN NELSON: Maybe that'll reduce that overall cost. I'm hoping that'll happen.

BERRICK: If I could add one thing.

STEVENS: Ms. Berrick, we do have to move on.

BERRICK: Sorry.

BEN NELSON: Thank you, Mr. Chairman.

STEVENS: Senator Pryor?

PRYOR: Thank you, Mr. Chairman.

I'd like to follow-up, if I may, Admiral Stone, on a question raised by Senator Inouye a few moments ago. And he talked about TSA with the new fee structure. Is that going to raise, what, $1.5 billion?

STONE: The difference between what the -- the $5.2 billion is the overall cost. And so, it reapportions what percentage the passenger pays versus the general taxpayer.

PRYOR: And how much will that raise? How much will the additional...

STONE: It shifts the burden for the user from this year, $1.7 billion -- in '06, the user would pay $3.7 billion. So you go from 36 percent, the user, to 73 percent. And then for the general taxpayer, this year it's $2.6 billion. It'll go down to $1 billion. And so it'll go for the general taxpayer instead of paying 57

percent of that, it'll go down to 20 percent.

PRYOR: OK.

STONE: That's the adjustment. The airline percentages stay roughly the same at 7 percent.

PRYOR: OK. Well, there are a number of groups and associations here in Washington that have sent us a letter. And one of the things in the letter it talks about is it raises an additional $1.5 billion from passengers and airlines. But, if I can quote the letter, it says, quote, "It will do nothing to improve security or the efficiency of the agency," end quote. I'd like to hear your comment on that.

STONE: I think that's misleading, in my view, that that's an additional generation of $1.5 billion. The amount stays the same. It's just a question of who's going to pay that, the general taxpayer or the passenger/user.

And that amount that we're looking at having appropriated to us for aviation security goes to programs that there's tremendous value added of mitigating the risk of what we see as one of the top -- two of the top threats that this nation faces, the use of an aircraft as a delivery vehicle and the use of an aircraft as a target. And so, we believe that the statement that you're not going to be getting any more for that -- you'll be getting $5.2 billion worth of aviation security at a very high end.

PRYOR: And what you're committing to the committee is that every dime you raise through those fees will go right into airport security?

STONE: Yes, that $5.2 billion goes to aviation screening security.

PRYOR: OK.

STONE: Yes, sir.

PRYOR: I'd like to change gears here and ask you about the explosive detection system. We have a number of small airports in Arkansas. I know a lot of members of the committee have a number of small airports. We have a couple of, you know, larger airports by our standards where a majority of the passengers go through theirs. But there are central air service airports, et cetera, out around the state. And I know other senators have similar situations.

But when I looked at your budget and I see that most of these smaller airports do not have an EDS system. Is that correct?

STONE: That's correct.

PRYOR: And I'm not sure I see the dollars in the budget to get them a system without a pretty hefty local match. Is that correct?

STONE: That's correct, sir.

PRYOR: And it just seems to me that a terrorist could enter the system through a rural airport just as easily or maybe more easily than he could through one of the larger airports. And I just question the

wisdom of that, where we're putting the burden on the smaller airports with lower volume of traffic. They can't generate the amount of revenue locally in order to provide for the system. Yet they're not getting the assistance from the federal government. Could you comment on that?

STONE: I think the issues for smaller airports is why this reveal-type technology is critical because we can then reduce the number of these explosive trace devices, which are personnel-intensive and have a higher quality of security at much less cost than the more expensive in-line system.

PRYOR: And what's the timeframe on those?

STONE: The pilots start next month and go for 30 to 60 days. Upon evaluation of those pilots at three sites, then we look at that and determine the rollout for how that would be able to be sent out to smaller airports.

PRYOR: Looking at the budget, I'm afraid that we are creating a system of haves and have nots. And like I said, I think a threat could enter the system just as easily at a rural or a smaller airport than one of the larger airports. So I would just caution you to try to keep your eye on that ball, if at all possible.

And I know that there's been some discussion about the cap placed on the number of screeners. I would like to ask first, in your view, Admiral, how is the morale among the screeners at the airports.

STONE: I think it varies from airport to airport. But I think I would give it as a good overall. But in some airports, very poor. And we have leadership issues where we've had to change leadership.

PRYOR: Are you addressing those? Are you addressing those issues?

STONE: Aggressively.

PRYOR: OK.

STONE: Yes, sir.

PRYOR: And the reason I ask is because I've had a number of occasions where I go through airport screening and I tell them what I do for a living. And, you know, they just pour out their heart and soul to me. And I tell you, I just sense that at some airports in particular, there's serious morale problems.

STONE: I would agree, sir. And that focus on finding out through our ombudsman program, through screeners, through I.G. reports and going after that aggressively -- because if you do not have a strong leader that cares about people, that airport will not be operated properly.

PRYOR: Now you've put a cap on the number of screeners? Is that right?

STONE: We have 45,000 full-time equivalent cap on the number of screeners that we hire.

PRYOR: OK. And has that been a good cap? Is that arbitrary? Does that make sense?

STONE: I think that cap -- right now we have a new model called the regal model that we're briefing the Department of Homeland Security on, which is a model that was sent to each federal security director to

tailor to his or her airport and provide us that. We're currently in the process of giving briefings and answering questions about that model to make sure that it doesn't have assumptions in it that are in error. But we believe that that 45,000 FTE number is one that needs to be revisited because of growth of airports.

When you look at Boston Logan opening up a new terminal, Houston Inter-Con -- as we go across the nation, that number -- we need to make sure that we're planning ahead on what needs to be done to meet those needs while at the same time, reducing our personnel requirements through technology in the workplace. So getting that model right is a high priority for us.

PRYOR: Now my last question might be considered a two-part question. It's about general aviation and the Transportation Security Administration access certificate. TSAC, I believe, is the acronym on that.

STONE: Yes.

PRYOR: I've had a number of folks, companies contact me and say that they would like to participate in that. They'd like to see you move forward on that. So I'd have a question there about what's the timeframe on that.

And secondly, getting general aviation flights back into Reagan National Airport -- we seem to get some calls at our offices about that as well.

STONE: Sure.

PRYOR: So could you comment on both those things?

STONE: Certainly. The approach of TSA is to look at three components. We're big believers in opening and maintaining access, maintaining the appropriate level of security and then respecting privacy and freedom.

So when you look at the questions that you asked about general aviation airports, the Transportation Security access certificate, we believe, provides enhanced access while maintaining appropriate security. And so, we're with the NBAA, AOPA (ph) and others to ensure that we have a game plan with them where individuals who volunteer then to become TSAC certified will then be able to have access.

General aviation at Reagan -- we also have met with Secret Service, with DHS. We're planning on giving briefings to the new DHS leadership on a plan for a phased approached at Reagan where we look at the threats. We believe this is a good time for us to lay out that plan and seek approval from DHS for a phased approach at Reagan. We pledge to keep this committee fully advised on how that planning ensures.

PRYOR: Thank you.

STEVENS: Thank you very much, Admiral.

Senator Burns?

BURNS: Thank you, Mr. Chairman.

You know, I want to associate myself with Senator Dorgan a while ago when he was talking about those fees in rural areas. We pay a higher fare, too. You can fly roundtrip between here and San Francisco twice what it costs me to fly one-way from Great Falls, Montana. And yet you want more fees. What are you going to spend this $1.5 billion for?

STONE: It's the same amount that currently is being collected from the general taxpayers, Senator. There's no increase in this amount. It's $5.2 billion. It just changes the proportion of what the user pays versus the general taxpayer.

BURNS: In other words, you get no more money other than what you're doing?

STONE: We do not, sir.

BURNS: I want the committee to remember when we put this whole thing together. We offered a series of amendments that we wouldn't have to create the TSA in the first place. We'd have put it in the Justice Department. And there was a reason for that, because they had screeners and they had security people that they could go to and we could immediately get it into place. That's number one.

Number two, they also had a computer system up. Now you've got a big, old computer system that we paid how much for?

STONE: The computer system for (inaudible)?

BURNS: Well, don't you have references to people and passengers and all these things?

STONE: We do.

BURNS: You had to set up a separate computer system for that, didn't you?

STONE: We have a performance management information system, yes, sir, to make sure that we're standards-based and meet Congress' intent of being held accountable for meeting metrics, yes, sir.

BURNS: Well, but, basically the system was set up in order to access, to find and search out and find these people that want to do bad things to this society.

STONE: The terrorist screening center.

BURNS: And we set up a completely different system where we didn't have to do that. We already had it in the Justice Department. And so, anytime that you say increase fees, it sort of catches my attention right away. And I don't see -- we ought to be looking for some efficiencies in screening these people. There has to be a better way than what they're doing now.

I don't know why you're jerking out all the tickets. It's kind of like Senator Nelson -- I don't see that -- we're just not doing a very good job at that. And do you have any assessment on what this will do to smaller markets?

STONE: Our assessment on the surveys that we had do not indicate a traumatic impact on that. In other

words, I've gotten -- briefings have been given to me that show that smaller markets are not negatively impacted disproportionately to larger markets. But I'm happy to review those and make sure that we (inaudible).

BURNS: I mean, I don't know who's doing your reports, but it's got to impact rural markets a lot more than the larger markets or the hubs because if you're at the end of the spoke, you're the one that's closest to the ground. And it looks like we're picking up a disproportionate measure of problems there. And I'm also getting some disparity in figures on the percentages of how much the airline passengers are paying with regard to the total cost of the system.

Most of the questions have already been answered. But I just sat and assessed. And I'm going to look at the airline industry and have some listening sessions. We're going to bring stakeholders together. We're going to find out how it's working.

I think your airline employee system of security -- I'm not real sure that that's been fully explored or handled in this case because I know we've got some people that are working on the tarmac and on the flight line that probably couldn't pass a security screen.

STONE: But we...

BURNS: So...

STONE: I'm sorry, Senator.

BURNS: Go ahead.

STONE: I was just...

BURNS: Would you like to comment on that?

STONE: ... going to answer that because I know how important that is. We have 1.3 million airport workers. And we've worked hand in glove with AAAE, other of the stakeholders. Those are vetted through our office of national risk assessment, those names.

For the last year, that's been a high priority to have fidelity to that to make sure that the linkages to terrorist databases to see if we've got a vulnerability at an airport. And I just wanted to reassure you that that continues to be a high priority. I see every week the numbers of airport workers that have been vetted through that process to make sure we keep our eye on the ball on that.

BURNS: Also on this percentage of what comes out of the general treasury or from the general taxpayer, they've got a stake in this, too, not only the airlines. You can't have the passenger pay the total fee because they are the ones at high risk. Because they were a very small part of what happened on 9/11 in New York. So I think the general public also has an obligation of some financial responsibility of security, even if it is airlines.

So thank you, Mr. Chairman. I got most of my questions answered.

Thank you very much for coming. I'll have a couple I might submit to you. I might write you a letter.

STONE: OK, Senators, thank you.

STEVENS: Senator Lautenberg?

LAUTENBERG: Thanks, Mr. Chairman.

And I would ask unanimous consent that my statement be included in the record as if read, my opening statement.

STEVENS: Yes, sir, it will be.

LAUTENBERG: And I listened -- I'm glad to see Admiral Stone here on the job.

STONE: Thank you.

LAUTENBERG: I don't know whether you look back and regret, but to the good, old days of being somewhere on a ship or down in the sea or somewhere where it was easy.

STONE: Not at all.

LAUTENBERG: Well, you've got a huge task. And as I reviewed something the 9/11 Commission said and I listened to something Senator Inouye earlier said, I compare the two on this. The commission said, "Over 90 percent of the nation's $5.3 billion annual investment in the TSA goes to aviation to fight the last war."

Now that's not a very encouraging statement when we see what we've got ahead of us. But I think they are largely right and we need to be ready to fight, heaven forbid, a war in the future. And we're not assured yet that we are doing so.

Rather than strengthening things like rail security, port security programs, they're being kind of chopped away at and spread all over the Department of Homeland Security. Now at Newark Liberty Airport in my home state, it's a very busy airport. And in others, we're seeing the affects of not having enough screeners. And I think you reduced the force by about 6,000 screeners in 2003, if I'm correct.

STONE: 2003, yes, sir.

LAUTENBERG: What I'm going to show you here is a knife similar to the one that was discovered after a woman had gone through screening at Newark. And she then discovered the knife in her bag and said to her sister who was accompanying her, "My God, I forgot to leave this knife home."

I don't want to make any jokes here. It's too serious. But she was given the knife by her brother because she was going out on a blind date in New Jersey. That doesn't tell you...

(UNKNOWN): (OFF-MIKE)

LAUTENBERG: I haven't tested the sharpness of this, but anyway, the fact that after all these years and all these expenditures and the effort that goes into the training -- and you know that Newark is a place

where we've been short of screeners and are trying to push to get it built back up. That something like this could go through -- they ran it through a second time and discovered the knife image very clearly there. The first time, apparently the bag wasn't even screened, just passed through. So when we look at these things, you see the breaches.

Mr. Chairman, I would have been on time this morning if I wasn't shut down at New York Airport, La Guardia Airport when the fellow ahead of me was the last one that they would take on the flight saying that I had arrived at the gate too late. And I watched this guy turn his ticket in and go in. And they refused me.

Now Senator Pryor said something about the response he gets from screeners and so forth and how they unburden themselves. And I get some of that, too. Most of the time, I get ignored. So there I was this morning trying to get here. But it almost made up for the 35- minute wait. I had to go through security in Washington Reagan National Airport last week.

We're just not able to keep abreast of these things. And we worry in our area about the target appeal for terrorism that goes from Newark Airport to the port of New York. And they say it's the most susceptible, most interesting target for terrorists in the entire country. And we have to do our evaluations more carefully on the fact that these grants ought to be given according to risk. This is a little apart from the subject at hand today.

And so, what I want to do, Mr. Chairman, in order to expedite things -- I just want to be sure what we're talking about when we look at the funding. We're going to increase our revenue flow by $1.5 billion a year. How exactly is that going to be parceled out? What part of that is going to go to screeners? Do we know?

STONE: There's not an increase in it. Our budget's $5.2 billion. And so, whether we change the proportions from the general taxpayer to the passenger, the budget is 45.2 billion.

LAUTENBERG: Right.

STONE: So all it does is change...

LAUTENBERG: So I may have misused the terminology, but the fact of the matter is that this is a fee to increase the revenue. And we have a fairly astute chairman here, and he knows a fee when he sees one. He knows a tax when he sees one. And a fee is only a tax when you have to pay it. Otherwise, it can be some abstract thing.

But that is a tax increase of some significant proportion. And we thought that we had covered so much of this. And with Senator McCain's view on technology, we've been testing things at Pomona Airport, you know, the FAA laboratory in New Jersey for such a long time. And yet, we get to a situation here where we're relying on people to do these jobs. We're relying on training programs, relying on directives. And we get a glitch like this.

And I don't know whether we'll ever be able to deal fully with it because we are after all human beings with frailties. But the effort has to be picked up.

And one of the things, Admiral Stone, that has been talked about is moving this to private hands. What's

the status of that?

STONE: Right now we have what's called the screener partnership program or otherwise known as Opt-Out where we've provided protocols for an airport to decide whether or not they would like to submit for transition from federalized screeners to privatized screeners. November 19th, we met the deadline to have that information out. We've only had one airport approach us on that. That's Elko, Nevada, 12 screeners.

We're continuing to work with airports to discuss the program. And so, that opportunity is there. I think it's the right approach to let airports chose for themselves.

We're very proud of both our five privatized airports as well as the 440 federalized airports. The standards are the same, and we're ensuring that our leadership maintains that. And that's the current state of the screening partnership program.

LAUTENBERG: Well, we know what a hard job it was to get the private companies to do their work effectively, especially since rates were negotiated then principally by the airlines. And I think, frankly, I'd rather keep it in government hands. It is working most of the time. We have to button up the difference, but on balance, it's a pretty good crew out there.

People work hard. They try their best. Whether they're sufficiently populated is our problem, not their problem, that they have enough people to do it.

BERRICK: Senator, if I could -- the time's out. I don't know if I can comment on the 45,000 screeners. The Intel Reform Act has mandated GAO to look at that screening cap. So we will be starting that within the next month, looking at that, looking at TSA's allocation across the airports.

A couple of problems that we found due to staffing was that because of staffing, screeners couldn't receive all of the training that they were needed because they were need to man the checkpoints or there weren't enough screeners to operate the explosive detection equipment. So there are some negative impacts of not having enough staff. And that's one of the things we'll be looking at.

LAUTENBERG: Good. Thank you very much.

STONE: If I could mention on the knife, I've got -- just to reassure the committee. The way these sorts of instants take place -- and they happen at many airports -- the process is that gets reported into TSA. An image of what the screener saw on this knife is provided to the leadership group to look at what the screener saw, how did they miss that. The ability of our screeners when you see these images to detect every, single knife certainly is not there. That's for the layered approach.

But what we do, though, is look at every, single incident every morning that takes place, look at the causal factors and what we're doing to remedy it.

LAUTENBERG: Thanks.

Thanks, Mr. Chairman.

STEVENS: Senator Lott?

LOTT: Thank you, Mr. Chairman, for having this hearing.

And thank you, Admiral Stone, for the job you're trying to do.

STONE: Thank you, sir.

LOTT: And I do think a lot of progress has been made over the years. We gave you a real challenge, put markers on it. And you've tried to meet all of those.

Having said that, that's a nice, furry, soft ball. Here comes the low, fast, inside fastball. You're going to have to do more with less. You know, $5.56 billion is too much. You're going to have to use more common sense. I think you can do what you need to do with fewer people. You're going to have to go with innovation.

I mean, simple, little, simple things like the frequent flyer- type. I don't know what you call it. But, I mean, how long does it take to make a decision? We've been yapping about that for years. Get on with it.

That's one of the things. You know, I mean, it's amazing that this stuff at the Reagan National general aviation. That has been going on, to my own personal knowledge, for three years. I was told by the head of the Secret Service in 2002, I guess it was, that by May we'll have that resolved.

Now we've got a chicken and egg situation. No, it's Secret Service. No, it's GSA. No, it's somebody else. Just do it. Quit fumbling around with it. That's the kind of thing that costs money.

Now I certainly am opposed to the new fees. I don't think you've made a case for them. And I'll do everything I can to shoot them down. I think I'll have a lot of help in that.

Now you say, "Well, if we don't get the fees, it just means that the taxpayers pay for it." Yes, well, maybe unless we can find ways to spend less overall. So it may be adding to the deficit, but maybe we can reduce the number. But I don't think you've made a case for more money. I think you all are too fat. And I think you're wasting money all over the place. And that's why I think you need to do more with less.

And beside that, who is supposed to pay these fees? Is it the passengers, or is it the airlines? The answer is, well, the passengers. But the airlines say, well, they have to eat it.

Now if you're going to go with these kinds of fees, maybe some day we're going to have to come up with a way where the passengers pay these security fees separately. I think they do that in other parts of the world. Get the airlines out of it. Make sure that passengers know they're paying a security fee and they have to pay it. And don't pass it on to the airlines.

Now, you know, I have airlines that have said, "Yes, that sounds good, but, you know, technologically how would you do it?" You'd have to have machines, I guess to do that. But you've got to think about something, some way to deal with this. If you're going to have fees, more fees, less fees, whatever, I'd like for passengers to know what they're paying for. They don't think they're paying for it now. They think the airlines are just eating it.

So I think if you're ever going to -- even the fees you have, assuming you're not going to get the new fees,

we need to come up with a way where the passengers pay these fees separately. Maybe we can't do it. And if you don't do it, you're not going to get more fees.

Do you have any reaction to any of that?

STONE: Well, I thought the wisdom of (inaudible) of having a $2.50 fee and establishing that, yes, a fee is good and that money then can be used directly for aviation security -- my comment would be very wise for Congress to establish that. And now all we're doing is saying that the general taxpayer today is paying 57 percent of that. And the user is only paying 36 percent, the airlines, 7.

Let's leave the airline right where they're at at 7 percent and just pass the burden from the general taxpayer to the user who is actually benefiting from that, but keep a 20 percent for the general taxpayer because there is a national security piece to it.

LOTT: Is there some way technologically we can do that, get it out of the price of the airline ticket and get it on to the passenger?

STONE: I'm not aware of that, no, sir, but I'd be happy to make sure that I find out.

LOTT: If we don't do that, they don't know they're paying it. It just adds more burden on the airlines.

STONE: We see that the airlines -- this is a pass-through to the passenger and don't concur with the airlines saying that the fact that they say it's 7 percent between '05 and '06. It really is just taking from the taxpayer and putting it on the user.

LOTT: Well, if the user is going to pay more, there needs to be a way for them to do it. You know, the only person in aviation that's really got a good deal these days are the passengers. They're doing great. You know, you've got nice planes, good transportation and a low, low, low, low price for their tickets. They're doing great.

And the airlines are slowly losing altitude or maybe fast losing altitude. So I think you need -- ask somebody to take a look at how could we make sure the passengers pay this fee if there is going to be one and if they know that that's what they're doing. I want them to know. And then if they don't want to fly because they don't want to pay the security fee, fine. I'd like for them to have that option.

STONE: Yes, sir.

LOTT: Mr. Chairman, since I'd like to hear the next panel, I'll stop at that point. Thank you very much, both of you, for being here.

STONE: Thank you, Senator.

BERRICK: Thank you.

STEVENS: (inaudible) raised an interesting question about the next panel. And I did have a discussion with the next panel. I still have some questions for this panel, but we can submit them for the record, if that's what you'd like to do. But we have had requests now from the Air Transport Association, the Airline Pilots Association, the Travel Industry Association, Interactive Travel Services Association, the Regional

Airline Association, Air Travelers Association, the National Business Travelers Association to listen to them with regard to these fees.

So the question that I would -- just if you'll permit me (inaudible), let me ask the people who are the next witnesses whether they would prefer to appear this morning or appear with a panel of those people I just mentioned at a later date.

(UNKNOWN): (OFF-MIKE)

STEVENS: Ms. Godwin, Mr. Barclay, Mr. May, what do you say?

(UNKNOWN): I'm happy to go with the judgment of the committee. We're perfectly prepared to show up at a later date, Senator.

LOTT: We know what their answer is going to be. It won't take long to say no.

STEVENS: That's true. That's true. Well, we'll proceed with the other hearing then, but I do want to say I'm going to submit some questions. I'm not sure but what our screening that's taking place now is really driven so much by the past and not really in tune with the future.

Now, for instance, I saw a display of a fellow of a 52-piece deck of cards that stood about five feet away from a person holding a big carrot. And he sliced off a piece of that carrot just by throwing the card. I saw another person take a credit card and cut through what would be the thickness of a person's neck in two seconds, much faster than a knife could do it.

We seem to be really zeroing in on how can we pick up knives. Has any knife been a cause of an attempted hijack since 9/11?

STONE: Not that I'm aware of, no, sir.

STEVENS: But we're spending a lot of money to get them, aren't we?

STONE: We sure are, sir. In the wake of the box cutters...

STEVENS: Are they the threat now? Isn't the threat now chemicals and substances and abilities to deal with trying to use a plane as a weapon, notwithstanding the fact that there are air marshals and they can't get through the door to the pilots? Now hasn't the system changed now? Do we really need to spend more money on trying to pick up knives and fingernail files?

STONE: I would agree with you the threat's changed in that the focus on box cutters and knives and the regulations pertaining to that should be revisited.

STEVENS: Well, I'm going to end this. But I've got to tell you, in my state, you know, we only have one main road. And we have a railroad. No one on the road and no one on the railroad pays any fees. But every time you get on an airplane, you pay a fee now. As a matter of fact, in most instances, you get in from the rural areas and you'd have to get on two, maybe three planes to get to Anchorage. Now there's a maximum they have to pay in one day, as I understand it.

STONE: Yes, sir.

STEVENS: You're going to increase that maximum by $3.

STONE: Yes, sir.

STEVENS: So those of us that don't have trains and roads and buses and taxis who commute from maybe Kenai in Alaska, which is about 50 miles south of Anchorage -- they commute back and forth -- they pay this fee twice a day. If you commuted across the river up there in New York or New Jersey, you wouldn't pay any security fee. Yet you're a great deal more of a risk to the nation's security than you are if you traveled from Kenai to Anchorage and back every day for work.

I think this fee system is very burdensome on people in rural areas. And for that reason, I hope to have another hearing on the whole subject of fees. But right now, I want to thank the two of you for what you've done in coming today. I do think we have some other questions we have to ask you.

For instance, I don't see anything in this proposal to fund the letters of intent that were issued for baggage screening devices. And there's a whole list, a priority list, as I understand it. Our airport in Anchorage is the 10th busiest airport. We're 15th on the security list. Little questions like that I'd like to have some time to ask you.

What really are we doing with regard to the situation where a woman gets on a -- I saw this. A woman getting on a plane at Sitka going 25 minutes to Juneau, elderly lady, a grandmother obviously with three kids. Her name popped up, so she goes through all of this stuff and she's going to be in the plane less time than it took to go through the screening process.

Shouldn't there be some differences for intra-state travel in a state like mine? You don't search people who are getting on buses. You don't search people that are getting in taxis. Yet we use airplanes for taxis, and we're searched every time we get on a plane. Now I think that this whole system is not sensitive to the situation of the passenger. It's just one-size-fits-all.

You know, you can go up to Nome, two planes a day. You've got two shifts a day. And they're going to search those two shifts of people going on the planes. And as a matter of fact, the people getting off have been searched, too, and they're just going within their own state and couldn't be a threat to anybody's economy or security.

I really think this thing needs really an intensive look. And we intend to continue these hearings. We intend to dig into this and find out why do we all have to wear the same pair of shoes to get on an airplane in different parts of the United States. And why don't the people who are the greatest risk, the ones that don't fly, the no- fly people -- they're in our communities -- how are we going to ferret them out.

I really think this committee -- that's why we insist on keeping the jurisdiction over this TSA. Our jurisdiction covers all means of transportation. Yet it seems that your main focus is airline transportation primarily because of what happened on 9/11. And that is a serious, serious thing.

But we've done everything we can to prevent that from re- happening. But I don't see what we're doing to prevent something even worse from happening in terms of chemical substances, biological substances and really the protection of massive areas as opposed to imposing these fees on people who use commuters

every day just to go back and forth in smaller states to make their living.

Do you have any final statement, my friend?

INOUYE: My short question -- how does our security system compare with the security systems in Europe and in Asia? Are we better, worse?

STONE: I have a view of that, which is that we have the best security system in the world, that the criteria we use, for instance, on our checked baggage...

INOUYE: So in other words, the aircraft coming in from Britain is not as secure as the one that goes to Britain?

STONE: We don't grant equivalency for passenger screening, for instance, from the U.K. to the U.S. In other words, they can't land at a sterile area and then board a flight from New York to Denver without going through our passenger screening. Those bags are also re-screened, whether it's from France, the U.K., Japan. We believe our screening systems that we use as well as our passenger screening set the mark on where they should be. And so, we're committed to making sure...

INOUYE: But the plane coming in from Paris could be loaded with explosives?

BERRICK: There are different procedures between what the U.S. employs and what other foreign countries do. And I think there are things that we can learn from what other countries are doing because they've been dealing with terrorism for many years. And aviation is an area -- real security is also an area. And there are differences in how passengers are pre-screened in terms of their names being matched against terrorist watch lists.

INOUYE: Is our system much more efficient than the other systems?

BERRICK: I don't think the assessment has been done to answer that question. There are differences between the two systems.

STONE: I would agree that from an efficiency point of view, there's a lot to be learned.

INOUYE: Who spends more money on it?

BERRICK: I don't know the answer to that question in terms of funds spent.

INOUYE: Thank you.

STEVENS: Thank you very much.

We appreciate (OFF-MIKE). I apologize for cutting it short (OFF- MIKE).

STONE: Thank you, Mr. Chairman.

BERRICK: Thank you, Mr. Chairman.

STEVENS: (OFF-MIKE) pursuing some of these items in subcommittee through the Surface Transportation, their security problems. We now have the next panel of witnesses, if we will.

No, they're right there. If they say they want to testify.

Do you want to testify today, Chip?

I want to ask again the airline people, Association of Airport Executives and the Association of Port Authorities. It was my intention to convene another hearing. Do you want to be heard today?

BARCLAY: Mr. Chairman, Jim May has already left, so...

STEVENS: Good.

BARCLAY: ... I think we'd better go with another day.

STEVENS: We'll convene another day of hearings. Thank you very much. Thank you.

END

**NOTES:**
[????] - Indicates Speaker Unknown
  [--] - Indicates could not make out what was being said.[off mike] - Indicates could not make out what was being said.

**PERSON:** TED STEVENS (94%); BILL NELSON (62%); CONRAD BURNS (57%); JOHN MCCAIN (57%); TRENT LOTT (56%); KAY BAILEY HUTCHISON (56%); OLYMPIA J SNOWE (56%); JOHN ENSIGN (55%); GEORGE ALLEN (55%); GORDON SMITH (55%); DANIEL K INOUYE (55%); DAVID VITTER (54%); BARBARA BOXER (52%); JOHN F KERRY (52%); MARIA CANTWELL (51%); FRANK R LAUTENBERG (51%); MARK PRYOR (50%);

**LOAD-DATE:** February 18, 2005