# **EXHIBIT J**

◀Return to Full

## LexisNexis™ Congressional

Copyright 2005 Congressional Quarterly, Inc. All Rights Reserved. CQ Transcriptions
"All materials herein are protected by United States copyright law and may not be reproduced, distributed,
transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions.
You may not alter or remove any trademark, copyright or other notice from copies of the content."

March 3, 2005 Thursday

**TYPE: COMMITTEE HEARING**

**LENGTH:** 14843 words

**COMMITTEE:** HOMELAND SECURITY SUBCOMMITTEE

**SUBCOMMITTEE: HOUSE** APPROPRIATIONS COMMITTEE

**HEADLINE:** U.S. REPRESENTATIVE HAROLD ROGERS (R-KY) HOLDS A HEARING ON
FISCAL YEAR 2006 TRANSPORTATION SECURITY ADMINISTRATION APPROPRIATIONS

**SPEAKER:**
U.S. REPRESENTATIVE HAROLD ROGERS (R-KY), CHAIRMAN

**LOCATION:** WASHINGTON, D.C.

**BODY:**

HOUSE COMMITTEE ON APPROPRIATIONS: SUBCOMMITTEE ON HOMELAND
SECURITY HOLDS A HEARING ON FISCAL YEAR 2006 TRANSPORTATION
SECURITY ADMINISTRATION APPROPRIATIONS

MARCH 3, 2005

SPEAKERS:
U.S. REPRESENTATIVE HAROLD ROGERS (R-KY)
CHAIRMAN
U.S. REPRESENTATIVE ZACH WAMP (R-TN)
U.S. REPRESENTATIVE TOM LATHAM (R-IA)
U.S. REPRESENTATIVE JO ANN EMERSON (R-MO)
U.S. REPRESENTATIVE JIM KOLBE (R-AZ)
U.S. REPRESENTATIVE ERNEST J. ISTOOK JR. (R-OK)
U.S. REPRESENTATIVE RAY LAHOOD (R-IL)
U.S. REPRESENTATIVE JOHN E. SWEENEY (R-NY)
U.S. REPRESENTATIVE ANDER CRENSHAW (R-FL)
U.S. REPRESENTATIVE JOHN CARTER (R-TX)

U.S. REPRESENTATIVE JERRY LEWIS (R-CA)
EX OFFICIO

U.S. REPRESENTATIVE MARTIN OLAV SABO (D-MN)
RANKING MEMBER
U.S. REPRESENTATIVE DAVID E. PRICE (D-NC)
U.S. REPRESENTATIVE JOSE E. SERRANO (D-NY)
U.S. REPRESENTATIVE LUCILLE ROYBAL-ALLARD (D-CA)
U.S. REPRESENTATIVE MARION BERRY (D-AR)
U.S. REPRESENTATIVE CHET EDWARDS (D-TX)
U.S. REPRESENTATIVE SANFORD D. BISHOP JR. (D-GA)
U.S. REPRESENTATIVE DAVID R. OBEY (D-WI)
EX OFFICIO

WITNESS:

DAVID STONE
ASSISTANT SECRETARY
HOMELAND SECURITY DEPARTMENT


ROGERS: The committee will be in order.

We'd like to welcome today Admiral David Stone, assistant secretary for the Transportation Security Administration, as he presents fiscal '06 budget request: in total, $5.6 billion, which is an increase of $156 million above the '05 level.

I'm pleased to see several key initiatives contained within the budget request, such as $250 million for aviation security capital projects, largely to fund the eight letters of intent -- a creation of this subcommittee -- to move explosive detection machines out of an airport's busy lobby and in line with airports baggage systems; $72 million for emerging checkpoint technologies, such as document scanners, backscatter machines and improved trace technologies so that we can better identify weapons and explosives; and $6 million to monitor and inspect the security of domestic and foreign repair stations.

Also, I'm happy to note that TSA does not plan on employing more than 45,000 screeners in 2006, FTEs.

In the future, I am hopeful that instead of hiring more screeners to address TSA's increasing workload challenges, that you will aggressively deploy cutting-edge technologies to do the same work.

However, there are many items proposed in the '06 budget that cause me some serious heartburn. In fact, I must point out that many of these are the same issues that we raised with TSA last year.

Some of the glaring examples: flatlining the funding for air cargo security program at $40 million.

Last year, we directed TSA to step up its air cargo security efforts, but that does not seem yet to be happening. There appears to be no new initiatives in this critical area, even though TSA will increase the

percent of cargo screened and plans to finalize a new rule to strengthen the known-shipper and freight forwarder program in the summer of '05.

Number two -- glaring example -- transferring research and development activities from TSA the science and technology director. It's unclear if any of the ongoing air cargo research that we directed you to aggressively pursue will be continuing.

These new technologies are how we will be able to screen all types of cargo, including pallets and containers carried on aircraft for explosives and other devices.

There are no plans for additional letters of intent beyond the eight that have already been signed.

We have between 27 and 45 additional airports throughout the country that need modifications so that they can operate more efficiently. Without solutions to their baggage screening problems, as air traffic mounts, as it is, these airports may no longer be able to screen 100 percent of all checked baggage.

Now, there's no clear plans for how emerging technologies, such as Reveal, will be installed at airports to expedite the screening of checked baggage for explosives at those airports that do not require a costly letter of intent program to modify their baggage and conveyor systems.

There's only $32 million for nonaviation security measures, such as maritime and land programs.

While I recognize that the maritime and the land grants programs were moved from TSA into a new one-stop shop, it appears that TSA has requested minimal funding to enhance security in these critical areas.

Particularly, I'm concerned about the lack of resources allocated for rail security. Given the Madrid bombings and recent actions to limit hazmat cargo shipments in the District of Columbia, I would think TSA would have increased the budget request for rail security, not decrease it as you did.

Congress did not form TSA to exclusively handle aviation security, but rather as an organization to oversee and enhance security for all modes of transportation.

Your budget continues to marginalize these other efforts.

I also have reservations about some of the requested bill language that TSA's included in the budget.

First, you're asking Congress to raise the aviation passenger security fees paid by airline travelers by roughly $2 billion.

While I recognize that when TSA was established it was to be funded by the users of the system, that's not occurred. In the past, Congress has had to supplement TSA's user fees by about $2 billion a year.

As we all know, airlines have come out strongly against that proposed fee increase, as has other people, and I'm sure it may be very difficult to adopt that proposal in the Congress.

Second, the TSA is again asking the Congress to nullify provisions of Vision 100 that require the government to contribute 90 percent of the funds for aviation capital security projects at large and

medium airports and 95 percent for small airports.

Your '06 budget asks for a 75 percent federal contribution for security projects.

The budget also requests that we waive other provisions of Vision 100 that would set aside a portion of the mandatory security funds for small- and medium-sized airports.

While I recognize that having a lower federal share and waiving funding for some airports would allow you to spread funding among more airports, these provisions are inconsistent with federal law and should be addressed by the appropriate authorizing committees, not us.

We will discuss these deficiencies as well as other key issues during your hearing today.

So, Admiral, welcome to the subcommittee. Your entire statement will be placed in the record without objection.

And in a moment, we look forward to hearing your oral testimony.

But first, let me recognize my good friend Mr. Sabo for any opening remarks he might...

SABO: Thank you, Mr. Chairman.

And, Admiral Stone, welcome to the committee again.

I'm glad to see that TSA did one thing we asked it to do last year, which was put the wait time data by airport and time of day on your Web site.

And I think you should publicize this a bit more.

Second, I have a number of concerns with the Bush budget request. Enhanced security efforts that should be funded aren't funded, and some of these that were called for in the intelligence reform bill enacted in December.

And third, I don't think the administration is being completely open with the Congress regarding the Secure Flight program.

We were told last August when CAPPS II program was gutted and named Secure Flight that the new program would focus on checking airline passengers against the government terrorist watch list.

But first, before we do that, the administration appears to be insisting that we need to test identity verification using commercial data sources.

We've heard a lot, some last few weeks, about the insecurity of commercial data with Choice (ph) Flying, the SIAC, Bank of America, as examples. And I don't have great confidence the department's able to ensure private date security.

In fact, in the past, TSA has shown they cannot. Now, I understand that other federal law enforcement agencies share my concern.

I must say, we've received, in recent days, assurance a watch list is going to move forward, but actions seem to indicate otherwise.

But I look forward to hearing your testimony and asking questions.

ROGERS: Admiral, the floor is yours.

STONE: Good afternoon, Mr. Chairman, Congressman Sabo and other distinguished members of the subcommittee. I am pleased to testify before you this afternoon (OFF-MIKE) the president's fiscal year 2006 budget request for the Transportation Security Administration.

The president's budget requests $5.6 billion for TSA in FY 2006 to stabilize and strengthen TSA's essential mission.

The request reflects an increase of $415 million for several initiatives and decreases of $258 million for programs being transferred to other components of DHS and for other adjustments.

This results in an overall net increase of $156 million over the amount appropriated to TSA in 2005.

Therefore, our 2006 request is based on a new program structure that redefines TSA's programs, projects and activities to clearly align the agency's mission with its funding requirements.

Restructuring will better enable TSA to effectively and efficiently secure our nation's transportation systems and will provide TSA with needed flexibility to respond to the ever-evolving security landscape.

Under the new structure, TSA appropriations would be divided into three categories: aviation security, surface transportation security and transportation security support.

The president is committed to restraining spending in order to sustain our economic prosperity. As part of this restraint, it is important that total discretionary and nonsecurity spending be held to levels proposed in the FY 2006 budget.

Some reforms designed to achieve this goals -- a proposal in the TSA budget to adjust the manner by which aviation security screening activities are funded.

The proposed budged is designed shift costs to have the airline passenger rather than the general taxpayer shoulder the majority of the cost of aviation security, in the interest of fairness and equity. The budget proposes is to increase the passenger fee by $3, raising the fee on a typical flight from $2.50 to $5.50.

The maximum fee for passengers traveling multiple legs on one-way trips would rise from the current maximum of $5 to $8. Under the current framework today, travelers on multiple legs pay 100 percent more than passengers on direct flights. Under our proposal, this amount decreases to only 45 percent more than for a direct flight.

In addition, the FY 2006 budget proposes to substantially decrease fee collection estimates for the air carrier security fee from the amounts proposed in 2005, thus reducing the burden on air carriers.

I note that the Government Accountability Office is currently analyzing the proper amount of the air carrier fee. The overall 2006 fee approach clearly shifts the burden of the fee more heavily onto the passenger-user and provides relief for the U.S. taxpayer.

The administration wants to work with Congress to achieve these reforms and savings.

I'd like to highlight increases to particular programs where we believe the commitment of additional resources will greatly enhance TSA's effectiveness and efficiency.

These areas include $100 million in additional funding for the screener workforce. The FY '06 budget proposes $180 million in additional funding for the screener workforce, since TSA has experienced a recurring need to reprogram funds from other programs to fully support a 45,000 F.T. screener workforce.

The estimate for increased 2006 payroll funds is based on factual 2004 and 2005 experience to date. It incorporates higher benefits and other adjustments previously supported through reprogrammings.

The proposed increase would be directed mainly toward stabilizing the screener payroll base and should minimize the need for any screener workforce reprogrammings in the future.

$174 million to complete high-speed operational connectivity, HISOC: HISOC will enhance the ability of TSA to transmit on a timely basis vital threat and security information throughout areas where operations are being conducted.

In addition, it will increase trained efficiency and screener effectiveness while minimizing costs and also assist TSA in transmitting human resource data.

Finally, and most importantly, HISOC will allow TSA to be a metrics based organization providing important field data to headquarters via the Performance Management Information System.

The $43.7 million increase over 2005 for emerging checkpoint explosive detection technologies: To address the threat of explosives carried on persons, TSA is already utilizing $28.3 million in 2005 funding to purchase and deploy to checkpoints at 40 of the nation's largest airports 147 static trace portals.

For 2006, we are requesting an increase of $43.7 million, for a total of $72 million, to purchase an additional 195 trace portals for deployment at an additional 41 airports.

We anticipate that the proposed increase will also enable us to purchase explosive detection document scanners designed to collect explosive particles from travel documents that a passenger has handled as well as to invest in backscatter technologies, once approved.

The budget contains significant resources related to the deployment of EDS systems. Of the $617 million requested specifically for EDS-ETDs, $394 million was used to purchase and install EDS.

Furthermore, the president's budget includes funds for reimbursements to airports for the work related to reconfiguration of airport facilities to accommodate installation on in-line EDS under the eight letters of intent that have been executed.

The president's budget proposes language to maintain the 75 percent federal cost share for LOIs. TSA

believes that the current cost share is fair and equitable, in that changing this cost-sharing formula would not only disrupt current LOI commitments, but also undermine security effectiveness at other airports.

TSA will continue to work in conjunction with stakeholders to identify airports where there's the greatest need for the installation of in-line EDS systems and to explore alternative mechanisms to fund in-line EDS installations in the future.

I'd also like to highlight our efforts to enhance security across America's surface transportation system and to adopt a threat-based risk management approach to our operational responsibilities across all modes of transportation.

In accordance with HSPD-7 and the National Infrastructure Protection Plan, TSA working closely with IAIP and the Department of Transportation, is leading efforts to develop a transportation sector- specific plan.

This plan delineates roles and responsibilities among transportation stakeholders to ensure that efforts are systematic, complete and consistent with security efforts in other sectors. It will serve as the framework for defining the responsibilities for risk management of the entire transportation sector.

Within this plan is the modal plan that will implement the sector-specific plan on an operational an mode-specific level.

The TSSP base plan was released for stakeholder review earlier this month. And I am pleased to announce that, as of this date, stakeholders have secure Internet access to the modal plans for review.

Our efforts on the TSSP and modal plans are being expedited to meet the requirements set forth in the intelligence reform legislation for DHS to develop, prepare and implement and update a national strategy for transportation security and modal security plans by 1 April 2005.

In conclusion, I want to convey how proud I am of TSA. Our employees have sought to carry out their responsibilities with skill, dedication and professionalism.

This past year was particularly challenging with the large number of national special security events that took place and the return to high levels of airline passenger flow.

TSA will continue to strive to improve transportation security while maintaining the free flow of goods and people. We plan to do so while meeting and exceeding the high expectations that Americans expect of us.

And I'm happy to report the results of the 2005 customer service survey that was released in February. Highlights include: 92 percent of passengers were satisfied with their overall experience at the passenger checkpoint, 89 percent of passengers thought security was adequate as opposed to excessive, 85 percent of passengers believed screening procedures are similar between airports, and 82 percent of passengers have confidence in TSA.

We know we have plenty of room for improvement. However, these numbers give perspective to what is often a distorted story regarding the performance of TSA.

With our recent issuance of our seven-point pledge to travelers, we have re-emphasized our commitment to air travelers to perform each day in a manner that demonstrates our understanding that we are truly servants of the American people. The pledge promises treating passengers with courtesy and respect, while providing the highest level of security.

Thank you for the opportunity to testify before you today.

I look forward to working with the subcommittee in support of the 2006 funding request.

Mr. Chairman, this concludes my oral statement. I'll be pleased to answer any questions.

ROGERS: Thank you.

Because of the number of members, we will abide by the five- minute rule.

Admiral, in just a few months, it will have been four years since 9/11 -- the same time, roughly, that we went from Pearl Harbor to absolute victory in World War II, that same period of time, four years.

When Pearl Harbor happened, we had nothing. We had no Army, no weapons, no tanks, no planes, no guns. Soldiers trained with broomsticks.

In those four years, we built 6,500 Naval vessels; almost 300,000 airplanes; 86,330 tanks; 64,500 landing craft; 3.5 million Jeeps and personnel carriers; 53 million dead-weight tons of cargo vessels; 12 million rifles, carbines and machine guns; 47 million tons of artillery shells; millions of tons of uniforms, boots, medical supplies, tents.

Ford Motor produced more war material than the entire Italian economy. In 1944, they had turned out B-24 bombers at the rate of one every 63 minutes. And I could go on -- incredible performance. And we won that war, obviously, and became the world power and obliterated the two Axis at the same time on both ends of the globe.

And here we are about the same time from 9/11 as we were from Pearl Harbor, and in most of the airports in our country, there are still checking for explosives, trying to mimic a dog, swiping the luggage with a smeller thing to test in a machine.

How can you defend that?

Would you admit that that's an absolute utter failure?

STONE: I believe in my heart that the fact that we've been able to deter a terrorist attack since 9/11 is the bottom line on our effectiveness to date.

But I also believe technology...

ROGERS: Look, I've been in airports -- and all of us have -- small- and medium-sized airports, not the big ones. And I remember one in particular -- I'm not going to say who it was; I don't want to get anybody in trouble here -- and I noticed that they must have had eight or 10 of the swab machines, the trace machines, in the lobby occupying places where people normally are, and they had no X-ray machines, all swabs.

And so I called the federal director of security there and chatted with that person. And I said, "When are going to get the X- ray machines for this airport? You've got 15 or 20 people out here working, swabbing these baggages, and we could do it with one machine and a fifth, or whatever, of the people. We could save tons of money. Why don't you have an X-ray machine here?"

"Oh," that person said, "we don't want an X-ray machine. Our people are perfectly happy."

Of course, they're happy, but the traveling public isn't.

And I find that attitude all throughout this agency.

And over half the airports now are just as I said. We're employing thousands and tens of thousands of screeners when we can get by with a lot less if your security directors would get those machines in those airports.

Is that right or wrong?

STONE: When I went down to Norfolk, that's exactly what the first thing the federal security director told me when I visited there 10 days ago. It's an all-ETD airport, and he said -- I said, "What do you need from headquarters?" He said, "Can you get us some of that Reveal-type technology, so we can get out of this ETD operation in Norfolk, Virginia."

So I think that resonates...

ROGERS: And what did you say?

STONE: I said, "You bet."

That's a high priority for TSA. We need to move away from our current technologies and reduce our personnel strength and be able to better detect the threats with new technologies.

So I think that resonates through all the leadership.

ROGERS: A recent GAO report said that two or three times more bags can be screened per hour by an EDS machine in line compared to a stand-alone system, and ten times more bags can be screened with an EDS system compared to the trace machines.

GAO also said that, and I quote, "A typical lobby-based screening unit consisting of a stand-alone EDS machine with three ETD machines had a baggage through quota of 376 bags per hour, requiring a staff of 19 screeners."

In contrast, you estimate, or TSA estimates, that about 425 bags per hour could be screened with one in-line machine and only use just over four screeners.

I mean, we're making these machines and we've given you money to buy them and install them, what's the problem? Why aren't they out there?

It's been four years. I mean, we won World War II in that period of time. Why can't we get these X-ray machines in airports?

STONE: Those cat-scan machines are going out.

As you know, from the funding levels we had in '05 and projecting in '06, and with the LOIs bringing those airports on line, and reduce over overall strength.

ROGERS: I was born at night, but not last night.

And you had plenty of time to get these machines to these airports. We will not -- our patience is over. This is it.

I want a deadline. When are you going to get those machines in those airports and get rid of those smelling machines in the lobby, so we can occupy that with passengers and airports will not be required to spend $10 zillion ripping up the back end of the airport to put in- line systems?

Why aren't we putting in these new, modern, smaller, cheaper machines? You can get them for a third or half the price of the big, old, original X-ray machines. And they're small; they can be put out there where the passengers check in with the airline. And you won't need the in-line system back-end thing.

STONE: Mr. Chairman, I fully agree.

Reveal, for instance, just came into certification specs six weeks ago. We've already started this month a pilot in Gulfport, Newark, JFK -- a 90-day pilot to get that Reveal technology out in the field and tested, because we couldn't agree more that we need to get away from the ETDs and get that kind of technology out into the field.

ROGERS: Well, let's talk about that a second.

They were certified December 21st, '04. On January 11th, '05, TSA announced you intended to acquire eight of those new smaller machines to begin operational testing in a few airports this spring: Newark, JFK, Gulfport, Biloxi, are the three testing sites. It's unclear what you're going to do beyond that pilot test.

In '05, we appropriated $30 million to install the next- generation EDS machines and that was done, I think, largely with the new Reveal, smaller machine in mind. Eight systems cost less than one-tenth at this funding level.

In other words, that $30 million we gave you, you only spent one- tenth of that money on those eight systems. And some rumor has it that you may spend about half of that remaining money to modify the old machines with new software, and there's a lot of problems with that.

So what do you say?

STONE: Those new machines that we were looking at -- recently, we were looking at $20 million for Reveal, $10 million for the new machines.

The new machines have not come into certification, so we're looking now to take as much of that

remaining $10 million, unless there is something that changes dramatically here in the very near term, on these other new mods.

ROGERS: There you go again.

(CROSSTALK)

ROGERS: There you go again.

You're going to decide to take the money we appropriated for one purpose and spend it for another.

STONE: No, no.

That $30 million is for Reveal-type technology or next generation, if there is some significant enhancement.

So right now, we agree that the preponderance of that money definitely needs to go to Reveal, which is proven, whereas the next generation mods have not come into specifications.

ROGERS: Well, look, I want a report on this. I'm unclear where you're going, and I know where this committee has told you to go -- it's not very smoky, it's plain.

And if I have one problem with TSA -- if I could say there is just one problem -- it would be the same problem as the whole department has: There is an arrogance out there.

There is an arrogance in this department. You will not listen to the Congress who funds your programs, and we're responsive to the people out there, and that's not going to last very long.

And I want to know what you plan to do, in detail, to get the new-generation machines in these airports and when...

STONE: Yes, sir.

ROGERS: ... and what you need to get there, and why you haven't got there already, and what you're going to do with the $30 million we gave you to do just that.

STONE: Yes, sir.

ROGERS: Forthwith. How soon?

STONE: As soon as possible.

Within the next 10 days, seven days, 10 days, we'll lay out that plan, make sure it meets all the requirements that you need to see and get that to you here forthwith.

ROGERS: Ten days?

STONE: Yes, sir.

ROGERS: Mr. Sabo?

SABO: Thank you, Mr. Chairman.

And, Admiral, I'd like to follow up on Secure Flight program.

When did you receive passenger data from the airlines?

STONE: I believe it was in November of 2004.

SABO: When did you begin testing the data your received from the airlines against the TFCE (ph) watch list?

STONE: February, I believe, early February.

SABO: February?

STONE: Those are the dates. It could have been the last week in January, or early February.

SABO: I thought you got it end of the year.

STONE: The data?

SABO: Yes.

(CROSSTALK)

STONE: ... that we got. I thought you meant when did we start testing.

SABO: When was testing scheduled to end?

STONE: The testing for that has just finished up in the last 10 days on the PNR data that we bounced against the watch list to find out whether or not we could adjudicate with a degree of accuracy.

SABO: Do you have a report on the findings from your testings yet?

STONE: It's being collated this week. We hope to be able to brief all concerned next week.

SABO: We'd been told that would be available end of February.

STONE: (OFF-MIKE)

SABO: Next week?

Can staff get briefed next week then?

STONE: Yes, sir. Our intent is to provide that brief by the end of next week.

SABO: How long after a watch list testing ends does TSA plan to pilot watch list checking with one or two air carriers?

STONE: Our date is to have an IFR published so that the target date is August 19th, to start with two airlines...

SABO: August 19th?

STONE: Yes.

SABO: Why will it take that long to begin the pilot? Don't you know what passenger information you need to perform a good watch list today?

STONE: We need to find out what airlines truly are committed and have the I.T. infrastructure to be able to support being the very first two airlines to pilot that program and come up online on it.

We've been working with ATA association to find out what do they think is a reasonable time line for that, so that they can properly execute that.

And so we need that timing to properly identify those airlines and make sure they're ready to go and committed to that date, as well as to construct that IFR and make sure it has the contents in it that are needed to have a successful rollout.

SABO: When will you finish the commercial data test?

STONE: We plan on providing a briefing with the company that has been contracted for to conduct that test to the GAO next week, to let them know what the content of that would be, based on the recommendations that that contractor's made, having looked at the commercial database test plan.

Following that, being able to proceed with the commercial database testing, we anticipate, by the end of March that that commercial database testing will be complete.

The purpose of that testing is to see: Is there anything valuable about that or helpful for us to be able to adjudicate people's names against the watch lists so that we don't have passengers standing at the ticket counter or not being able to use the kiosk?

We want to find out whether there's value added to commercial database testing to do that matching so that we don't inconvenience the American traveler any more than they already are through problems that we're experiencing today.

SABO: Frankly, my concern is that I think we should be way ahead of the curve on using the watch list. And the department seems to be so intrigued by this commercial database, which I think has both lots of effectiveness questions and lots of privacy issues involved.

We keep hearing from the top of the department that the watch list is going to proceed, regardless of what happens with commercial data. I just simply want to see that happen.

STONE: Yes, sir.

SABO: I know what we've been told. And that that isn't delayed simply to accommodate other things.

STONE: It will not be delayed.

SABO: I'm sort of curious. My understanding is that TSA requested a little over $33 million for Secure Flight and crew vetting, yet there's $94.3 million in the budget.

SABO: It seems to be a case where what your agency asked for -- it got over a $60 million increase from OMB. And that's sort of the opposite of what happens elsewhere. Did that figure go up because of TSA or for other reasons?

STONE: For the '06 budget funding for Secure Flight?

SABO: Yes.

STONE: It was our estimation that, as you roll out Secure Flight, after the two initial airlines come on board in August and September this fiscal year, that to be able to properly manage that with over 67 airlines that that would be the funding total required in FY '06 to be able to operate that...

SABO: But wasn't your original request for $33.6 million and somehow it ended up at $94.3 million after it got through OMB?

STONE: I'll check that to find out. It was my understanding that after review, what we would need for '06 in order to run that program, that that's the number that we identified at TSA as the requirement. But I'll verify that and get back to you, sir.

SABO: It might be some money that we can use for buying some more equipment.

Let me ask another, just quick, question. I always note that -- as a minority member I shouldn't be objecting to this -- but presidents play lots of games at budgets. And the fee increase as an offset to your appropriations request seems to be one of many I find in this budget.

My assumption is you have legislation prepared for -- I'm not sure which is the appropriate authorizing committee, whether it's the new committee or the old one -- so that we will know by -- I'm not sure when we mark up, Mr. Chairman, I assume early spring or early summer or something like that -- whether that is law that we can count on.

And I'm just curious, if it hasn't passed, will you have recommendations to us to make $2 million worth of accommodations and adjustments?

STONE: No, sir. We're counting on a compelling argument on convincing authorizers and appropriators as to the wisdom of this.

SABO: Well, it's an authorizing issues.

STONE: Sir, we're working on it. I testified last week with Chairman Stevens, over on the Senate side, on

the wisdom of this and how we believe it's the right thing to do.

SABO: Has legislation been drafted and prepared?

STONE: I've not seen it. I can check on that.

SABO: OK. I thank you.

ROGERS: I'm sure Senator Stevens gave you a warm welcome on that issue.

STONE: Yes, sir.

ROGERS: Would you say it was a hot welcome?

STONE: A thoughtful welcome. Yes, sir.

ROGERS: That's a good point, though, that Mr. Sabo raises. You're depending on the Congress coming up with an increase in the fee for passengers that would raise $2 billion that we would spend in this budget. And if that doesn't happen, we've got to find $2 billion from somewhere to make up the difference.

Can you help us find cuts we can make in your budget to make up that difference?

STONE: No, sir, I think that would be crippling to our budget, and significantly degrades security, if we...

ROGERS: And I'm sure that's the reason you're working so hard to get the authorizing committee to increase the fees.

STONE: Yes, sir.

ROGERS: You understand we can't do that. You understand we can't do that, that this committee...

STONE: Sir, we're working very hard on the authorizers on that.

ROGERS: But when you get that passed, you come back to us and tell us about it.

STONE: Yes, sir.

ROGERS: But otherwise, we've got to try to find another $2 billion out of general revenues. And in this year, that's not an easy undertaking.

Mr. Latham?

LATHAM: Thank you, Mr. Chairman.

And welcome.

I guess somewhat on the same subject: Was the fee originally developed -- was it pegged at the actual

costs of the security operations? And I guess, also -- and one problem I have, I guess, is calling it a service fee. And I'm not sure that passengers would consider strip searches and things like that a service, but it's something mandated by law.

And I'm not sure -- and also it has a big effect, I think, or the perception is, in the rural airports and a competitive nature about costing more to fly from a rural airport where you have to make connections, if you could address those things, I would appreciate it.

And also, I guess, whether or not this will help pay for the cost of the training for screeners themselves. Isn't that something that the agency should be paying for outside of direct costs, as far as screeners at the airport?

STONE: For the combined fees, under this proposal, of both for passengers and airlines, will pay for 90 percent of aviation screening, such as screener workforce, screener training, checkpoint support, the technology, airport I.T. All of that falls under the category of the core airport screening program.

We believe that that screening service that's provided should be primarily -- that burden of payment should be primarily on the user, much like the FAA...

LATHAM: Aren't they paying for a lot of other things, too, as far as all of the other security at the airports, as far as goods that are shipped and everything else as far as screening?

LATHAM: Are you putting that burden on the passengers?

STONE: No, the general taxpayer is paying for federal flight deck officers, air cargo, the operations center, the intelligence surface transportation, foreign repair stations. All of those other categories fall under the general taxpayer paying for that, not the passenger/user.

LATHAM: Your request is, what, $4.7 billion, and if you got this fee you'd have $4.1 billion. So you're saying that this would not cover the passenger fee cost -- the service cost?

STONE: The core airport screening portion of our budget is $4.5 billion. The combined fees of the passengers with the air carrier are $4.1 billion, so roughly 90 percent of that core airport screening bill is being paid in by the passenger/user and the air carrier.

LATHAM: I'm not sure if you have the authority or not, but should the airlines be able to list that cost as a line item on the ticket. I think the FAA probably has -- they have an opinion on that. And right now they can't, supposedly, break it out as to what it's costing for the service.

STONE: Our understanding would be it should be done the way the initial $250 million under APSA (ph) was done.

And with regard to the issue of whether or not we believe that that will reduce the passenger travel or this will cripple the airlines, our assessment is it will not.

LATHAM: What about rural airports? I mentioned that earlier.

STONE: Yes. With regard to rural airports, already, as I mentioned, for segmented flights out of rural

airports, there is a 100 percent doubling of the fee for segmented flights. This maintains an increase on segmented flights, but reduces it to only 45 percent.

Much like, initially, APSA (ph) had a doubling of that fee for segments, we think this increases it, but at a lower rate.

LATHAM: You started last year, the pilot program for registered traveler program. Would you give us any kind of an update on that to see where we're going?

STONE: Yes, sir. The pilot program is being evaluated. All five of the sites have been up and running.

The criteria that's being looked at is security enhancement as well as customer service. Both of those are the key ingredients of it.

When the report is done we'll be providing that to our new DHS leadership with a recommendation on how to move forward.

With regard to integration of those sites, throughout this fiscal year it's our intent to continue those and integrate them and also add Orlando this fiscal year.

Orlando will be an approach in which we allow the airport then to hire out and have someone else market that and collect the data. We believe that this is a useful pilot at Orlando, so we can look at whether or not the private sector can incentivize this and allow it, if decided for the entire program to be accelerated, to roll out.

But no decision has been made because we've not yet briefed DHS leadership on the results of the pilots sites.

We're very enthusiastic about our team, from both customer service feedback we've received from the industry, as well as it raises the bar on security by allowing us to verify ID.

From a security point of view, that opportunity to be able to have individuals volunteer their background information, iris scan, fingerprint and know who they are when they present themselves at that checkpoint, removes that hay from the haystack.

So from a security point of view, as well as customer service, we think there's a strong case for our team. And I'm eager to brief that when the results are available.

LATHAM: You don't have any idea at this point how successful it's been.

Mr. Chairman, how are we doing on time?

ROGERS: (OFF-MIKE)

LATHAM: One more question and it just has to do with the guidelines, if there are any, to state and local law enforcement related to seals broken on freight trucks.

As you know sometimes the truckers are being held liable if someone else breaks the seals because of

inspections. Is there any guidelines that you can talk about today?

It's a big issue with a lot of trucking companies that I have in my district.

STONE: I'll find out, sir. I'll report back to you on that.

LATHAM: I appreciate it. Thank you, Mr. Chairman.

ROGERS: Thank you.

Mr. Price?

PRICE: Thank you, Mr. Chairman.

Admiral, welcome to the subcommittee.

STONE: Thank you, sir.

PRICE: I appreciate your testimony.

I must say, though, that I was a bit surprised by your statement, in that it's rather unusual for testimony of this sort to start with broad pronouncements about fiscal policy. And yet you chose to do that, talking about the president's budget and the need for fiscal restraint, which of course, you're not going to find any dissent from here.

But the prescription is very much open to question. And since you raised it, I want to raise it with you and give you a chance to respond.

It's important, you say, that total discretionary and nonsecurity spending be held to levels proposed in the fiscal 2006 budget. And you go on to say that the president is proposing more than 150 reductions, reforms, terminations in nondefense discretionary programs.

You mentioned no other source of our fiscal woes, nor any other remedy than the nondefense discretionary portion of the budget.

Now, when you look at the $9 trillion to $10 trillion fiscal reversal this country has suffered in the last four years, do you have any idea what percentage of that came from discretionary domestic spending above projected levels?

STONE: No, sir, I don't have visibility on that.

PRICE: I think you might want to check that. That's been studied by think tanks around town.

STONE: Correct.

PRICE: And I assure you the percentage is in the single digits.

Any other sources that you could think of for this fiscal reversal, just in the nature of things? Any of this

maybe count as self-inflicted damage? And does any of this have to do with the shortfalls in your budget proposals?

The underfunding of our first responders -- the considerable underfunding of our first responders, the lack of protection of chemical plants, cargo still being unscreened, watch list in disarray, still problems with screeners -- you know, is our security situation actually being well-served by this fiscal mess that we're in?

STONE: I think our security situation is being well-preserved in that we have the metrics that demonstrate that, with regard to our security, and believe that the risk-mitigation measures that we've put in place in all modes of transportation, whether it's mass transit or rail or highway or pipeline or aviation and maritime, are reflective of a robust security posture that deters terrorist attacks.

PRICE: So you're suggesting that, even if our fiscal situation was far more healthy and we hadn't had this $9 trillion fiscal reversal, that you would expect the Homeland Security budget to look pretty much like it does in this submission?

STONE: I just opined that I thought we had, with the resources we've been provided, a robust deterrent to terrorist attack. That needs improvement, but I believe that the resources we've been provided allow us to deter that risk.

PRICE: Well, that wasn't my question exactly.

We're in a fiscal situation in this country that's constraining us in all sorts of areas, including homeland security.

You suggest, in your pronouncements about this -- that you opened your statement with -- that the problem is out of control discretionary domestic spending.

And I don't know. Do you think if we eliminated the entire domestic discretionary spending from the budget that we would have a balanced budget at that point?

STONE: No, I was suggesting that we do our part for efficiency and effectiveness to aid in our budget effort. That was all I meant to imply by that.

PRICE: Well, I think you might want to rethink that second paragraph of your statement. It seems to imply that the burden entirely rests with the domestic discretionary spending portion of the budget; for that matter, entitlement spending isn't mentioned; certainly, the president's tax cuts are not mentioned, nor much of anything else.

I perceive that that's the administration's strategy -- to peddle the risk that we're going over the cliff fiscally in this country because of excessive domestic discretionary spending.

And looking at cuts in things like the TRIO program -- or for that matter, in highway funding -- as though that were the solution. We're going broke because we're doing too much cancer research or because we're doing too much affordable housing.

PRICE: I think you're lending a good deal of support to that in the way you frame your statement.

And if you're going to make these fiscal pronouncements, I would suggest a more balance view for where our fiscal difficulties have come from.

ROGERS: The time of the gentleman has expired.

Ms. Emerson?

EMERSON: Thank you, Mr. Chairman.

Admiral, welcome.

I have a few questions, a couple of which are pretty easy and hopefully won't take very long. So I'll do those first.

And one has to do with inner-city bus security. I kind of feel like it's Groundhog Day, because we've had this same conversation last year.

And I'm hoping to get a different answer. But I don't think I will.

OK, we've appropriated $10 million for inner-city bus security last year, but apparently, none of that money was made available for screening of passengers in inner-city fixed route service and very little was used for upgrading physical security in the inner-city bus terminals.

I would think that you would agree that those should be high priorities, to use that money.

So now another $10 million is appropriated in FY '05, given your advisory role in the distribution of the inner-city bus security funding, what do you all intend to do to establish the appropriate priorities for inner-city bus security funding, for '05 and then beyond?

STONE: We plan on participating, as we have, in state and local government coordination. And a preparation group has been formed in which TSA has a seat at the table to make sure that we evaluate, in that forum, the vulnerability and the criticality of that, along with the threat and make sure that we input to that process what the priorities should be for that sort of funding.

And like you, we agree that that is an important amount of money to go toward mitigating the risk for inner-city bus -- individuals that use that mode of transportation. So we understand that that should be a priority. And our participation in that forum will be very supportive of that.

EMERSON: I don't know how many people are in those fora, if you will, but how much weight is given to what TSA's position is?

STONE: Well, I believe a significant amount of weight.

EMERSON: So in other words, whatever you all say goes.

STONE: Well, we are there. If you're taking about something in the maritime aspect, we're there partnered with the Coast Guard on that.

So it's a partnership arrangement. But my belief is that when you look threat criticality and vulnerability that the right risk mitigation decision is made on where those funds should go. And that's how it should be; it should be risk based.

EMERSON: We also talked last year about small, rural airports. And one of the things that I mentioned to you -- and I don't know if you remember -- was the fact that we had a disproportionate number of screeners out of a Missouri airport. I think we had 11 screeners and 29 daily passengers, which is a little bit out of whack. And certainly that costs taxpayers a lot of money.

So I would really appreciate you getting back to me as soon as you could to let me know if anything has been done to rectify that situation.

And then just a follow-up on Congressman Latham's mention of the fees, one of the things that is very problematic for those of us who have small commuter airports in our districts is the fact that those fees -- and anybody leaving from our little airports actually could end up with probably up to $16, depending on how many different legs of a flight they fly. But even if it's just two, if I'm flying back and forth to St. Louis to go home, or to Memphis, depending on where I'm going in my district, then I'm having to pay less than somebody from Cape Girardeau.

So I think there's a little bit of an inequity there, and somehow I hope that you all can figure out how to do that.

I guess I'm just really confused. Can you tell me about how many airline passengers do we have traveling through here every year?

STONE: Almost 2 million passengers a day, nationwide, domestic passengers.

EMERSON: So how many does that -- my math's -- 700 millionish?

STONE: Yes.

EMERSON: OK, so you all want to spend $4.7 billion on aviation security for 700 million passengers a year. But yet in your testimony, you say that you have 775 million passengers traveling on buses each year, over 9 billion passenger trips on mass transit per year, over 140,000 miles of railroad tracks, and yet, we're only going to spend $32 million on surface transportation needs, if you will, and security.

EMERSON: Is that not out of whack, somehow?

STONE: When you look at aviation security, TSA is the entity that is providing that. Wherein you look at surface transportation modes, you have all of the other monies and grants, whether it's Customs and Border Patrol's involvement in certain pieces of this, or the Coast Guard from a maritime perspective, or state and local government investments.

Across the board, you have different entities contributing to surface transportation, of which I think we greatly undersell what we are doing for $32 million.

For instance, we spend a tremendous amount of our time in mass transit, rail and highway. The highway

watch program, with $20 million, at least every morning we get briefed on the results of the highway program.

Our domain awareness of the highways is way up, whether it's the HAZMAT program, with 2.7 million truckers that we vet to find out if there's terrorist links.

In the area of mass transit and rail, in the wake of the Madrid bombings and the S.D. that went out; the hiring this year, by this summer, in June, is the target month to have 100 surface transportation inspectors out there verifying that security directive.

The areas with regard to both mass transit and rail where we did the TRIP pilot, where we now have technology, whether it's the X-ray that was used that provide us the density of explosives, whether it's the portal that was used in that TRIP pilot.

I can take -- if I get told we need 20 screeners or 30 screeners that are trained in that technology -- put a package together with K- 9s that have rail expertise and fly away those screeners and that portable equipment to a site because, based on threat, we'd like to ramp up security in that particular node, I have that capability, because we spent the last year testing that equipment and training our screeners and ensuring that we're ramping up our K-9 in the mass transit and rail arenas.

So an exportable package that, if the department needs that and calls and says, "Here's a threat we'd like to mitigate," we're prepared to do that.

So the thought that $32 million is reflective of not having emphasis, every morning my brain and our leadership is wrapped around mass transit, rail, highway, pipeline, what's the threat, what do we bring to the table, how do you coordinate that properly with all the other agencies involved. And so what's missing in the discussion is all of that activity, instead of just focusing on the $32 million, which is a small piece of it, in our view.

EMERSON: Well, obviously there are a lot of things that we don't see.

But I can also tell you that every time that I have been on a train since 9/11 -- well, which is probably a number of 50 -- I've never once had to go through security. Ever.

Thank you.

ROGERS: Mr. Serrano?

SERRANO: Thank you, Mr. Chairman.

I don't want to beat a subject to death, but I just want to join my friend, Mr. Price, in just telling you that there are some folks -- obviously, everyone -- but some members of Congress whose constituents live or die by some of the programs that are discretionary in nature or entitlement in nature.

And I'm surprised that you even touched that subject. I don't know who advised you to get into the general budget area rather than just to talk about your needs and how we can be helpful.

But it's certainly not a good approach in making more friends, when we have tight budget situations and

people like me want to be extremely supportive. But I don't want to hear that -- you know, representing the poorest district in the nation -- I have to somehow feel bad that I am helping those folks at the same time that I am trying to help you.

And so I would hope that you, you know, take some friendly and supportive advice that the president's got enough boys over there to fight those fights. Just give us your presentation and what we need to do for you. And you'll find out that we are supportive.

Let me ask you a question. The president's budget speaks almost about writing off all funding for Amtrak. Now, these days it seems to me that every budget having to do with transportation has a security aspect to it, of course.

So what can you comment on the fact that if we begin to cut back on Amtrak in general, what will that do to Amtrak's security in particular?

STONE: Well, we're partnered with Amtrak. Every Thursday we talk with them. Actually Thursday we have -- with regard to our intermodal approach on all these modes of transportation -- a briefing which we provide Amtrak and others which talks about what the intelligence threat is today and what we see in trends.

We talked about what the best practices are, what new technologies are available and what public education initiatives are out there.

STONE: So that partnership, on a weekly basis, that I chair that forum talking with them, is alive and well.

And so as Amtrak evolves and their situation changes, that weekly opportunity to discuss that and be able to assess how that may impact their security is there because that communication node has been established.

So I feel comfortable that if that were to take place that we would be partnered with Amtrak on what that would mean to their security status.

SERRANO: So whatever budget hits they take should in no way, in your opinion, diminish the ability for Amtrak to do the security work it needs to do?

STONE: No. What I would need to find out from Amtrak is that very -- question is as their budget evolves and their situation changes, we'd partner with them so they would feel they have a forum into TSA to say, "Here's what we're faced with," so we could understand that situation.

SERRANO: Now, at an open forum, Mr. Chairman, it's kind of a little nervous to say this, but what the gentlewoman stated before -- I'm a frequent Amtrak user and that is a concern of mine also -- it seems like there is very, very, very, very tight security at airports, or at least the attempt, and hardly any at the rail yards and in the rail stations.

And I say, you know, in an open forum, you wonder who is listening, but I'm sure people who would do us harm already know that.

But we should all be aware of the fact that there seems to be a totally different approach to how you get on a plane and how you get on a train.

STONE: That relationship of understanding the domain awareness of rail and being able to appreciate, whether it's our meeting last week with Norfolk Southern, getting together with American Association of Railroads, partnering with Amtrak to understand those vulnerabilities and come up with plans together on how to mitigate them is where we're spending a lot of our time, as we should.

SERRANO: Again, and maybe this is something that we should discuss in private later, but, you know, the whole issue of every piece of luggage is checked that goes into an airplane and nothing is checked, to my knowledge, that goes on a train.

STONE: That's correct. Unless there's special events where we've done that, where we've sent teams flown away there, like we did for the inauguration and the conventions, or national special security events, where you ramp up that security based on potential threats to that environment, that's a true statement. We have various levels of security that entities like Amtrak couldn't place.

I mean, we're monitoring that through this year, bringing on board our surface transportation inspectors to ensure compliance and partnering for the security directors there for mass transit and rail.

SERRANO: OK.

Thank you, Mr. Chairman.

ROGERS: To follow up on the gentleman's line of questioning -- which I commend -- you know, we've had the District of Columbia now pass an ordinance prohibiting rail shipments of hazardous materials through the District, largely due to safety and security concerns.

We had the Madrid bombings in March 11th of last year that killed 191 people. We have had that train accident a few weeks ago in South Carolina resulting in a release of toxic chlorine gas and nine people deceased and evacuation of a large area.

Just a few days ago, U.S. and Spanish authorities have confirmed that a crude sketch of Grand Central terminal in New York was found at the home of a suspect in the Madrid bombing case. And I could go on.

And yet, in your fiscal '06 budget request, there's not a single penny requested for specific rail security measures.

You may have covered this before, but I didn't catch the answer. Why is that?

STONE: The combination of other entities that are providing security, both locally on the scene, as well as...

ROGERS: Like who?

STONE: State and local governments that provide security at key nodes, railway stops, metro stations.

STONE: That level of security is in place and we partner, as we do here with Washington Metro, with

regard to the status of their security here.

But the 100 inspectors that I mentioned earlier, the 30 more K-9 units that will working at 10 key mass transit rail stops, the intelligence, our TSIS, is fully focused as much on mass transit and rail and highway and pipeline security as it is on aviation. The time that we spend in understanding that domain awareness within those modes of transportation is equal to, and in some cases, more than in aviation.

So I think that domain awareness and that investment in programs that I mentioned such as TRIP, so that we have that technology and if we have an exportable capability -- quite frankly, when we get briefed in the morning on a particular event, the first thing that comes into our minds is, "Well, we know we have this capability. We've trained our screeners. We have K-9s. We have the technology." We've put that package together, and it's ready to be presented to the Department of Homeland Security if they choose to deploy that.

That's a long way from where we were a year ago where that technology had not been tested, those screeners had not been trained in that environment, the K-9 packages had not been married up.

So I give that as an example that we totally agree about the severity and concern of those threats.

ROGERS: Well, DOT is responsible for rail safety issues. TSA is responsible for security on rail, right?

STONE: Yes, sir, that's correct.

ROGERS: But you're saying to me that, "No, it really is the state and locals."

STONE: It's a partnership in terms of enforcement...

ROGERS: Yes, but what are you contributing to that?

STONE: Tremendous domain awareness and intelligence feeds. Every day when we have something, first thing we do is say, "That's a threat. Let's make sure we are working with the local entities there," whether it's American Association of Railroads or the Trucking Association. We're going immediately to our partners to say, "Here's the intel threat. Here's the trend," and starting immediately on that domain awareness of potential threats.

I think a critical piece of our effort today on that is to make sure we're effectively monitoring that and then partnering with all those that have a stake in it.

Modal plans which will list threat criticality, vulnerability for mass transit, rail, highway, pipeline, and then concrete risk- mitigation steps for each of those modes, which are due the first of April, I believe, is that road map that shows that commitment to TSA's requirement to develop those plans, partner with stakeholders and have concrete risk-mitigation actions that people can look at and say, "That's the plan on how we're deterring that risk."

And I think that document will show that the effort that's gone into this and in partnering with the industry is making a difference.

ROGERS: Well, I think we may as well change the name of your organization to the Airline Safety

Administration, because it clearly doesn't cover transportation in general, as it stands now.

Ms. Roybal-Allard?

ROYBAL-ALLARD: Admiral Stone, as you are aware, last May there was an incident at the Los Angeles International Airport in which the FAA Oakland Center received a hijack alert from a Singapore Airline jet bound for Los Angeles.

When the FAA talked to the pilots, the pilots verified that it was a false alert due to the plane's equipment. However, neither the FAA or the TSA in Washington communicated the false alert to the local officers in Los Angeles or to the authorities at LAX.

Consequently, when the local air traffic control picked up the plane's hijack signal, they called up the SWAT team. Consequently, they boarded the plane, and it created a potentially dangerous and unnecessary situation.

According to the TSA and the FAA, they followed proper procedures and were not required to notify LAX of the false alert.

ROYBAL-ALLARD: My question is: Does this policy still exist? Has it been corrected to avoid potentially dangerous responses, what happened in Los Angeles? And if it hasn't been corrected, why not?

And the second part of that, another issue that came up as a result of that incident was as to whether or not the airport police had the authority to board the plane in the first place.

So the second part of my question is: Has TSA clarified the lines of jurisdiction with the local authorities on these issues?

STONE: On the first part, initially when that code came out from that aircraft, the hijacking code, everyone reacted properly -- TSA, DHS, DOD -- as they're trained to do.

When it became very clear that it was a nonthreat, as you pointed out, that information was never passed to the local entities. So as that aircraft approached, they had not known about the fact that it had already been evaluated clearly as nonthreat and responded the way they did.

In the wake of that, it became very clear that not only on real threats should you be reporting very quickly to civies and to airports and other entities in law enforcement, real threats, but also those that are not.

And in this case the lesson learned was that we should have immediately called our TSA organizations, the FAA and the tower there, through the FAA node, should have been called to say this is a nonthreat aircraft. That did not happen. There was a lesson learned from that.

And I had an opportunity to brief Mayor Hahn on that personally -- was that we learned from that and now pass all negative reports as well as any positive threat reports immediately to those on the ground that need to know that.

And so I thought that was a valuable lesson learned that we learned last year about making those reports very quickly so that you don't waste resources and have people responding to something that is not a real

threat.

We've talked with our federal security director at LAX, Larry Fetters, about making sure that it's very clear with regard to the airport police, FBI, LAPD, sheriff's office on law enforcement responses, if they're needed at LAX. I've been assured that they have protocols in place to make sure that the jurisdiction is clear there on various threats.

So both the lessons learned from that, both reporting as well as jurisdiction, we believe were valuable lessons learned that, based on that experience, won't be reoccurring.

ROYBAL-ALLARD: So things have been corrected then?

STONE: Yes, they have. In very short order after that incident took place last year.

ROYBAL-ALLARD: Congress required -- and I believe that the chairman mentioned this as an opening statement -- that the federal government reimburse airports with letters of intent, contracts, for 90 percent of their costs to install new state-of-the-art explosive detection systems for baggage. And in good faith, airports are spending millions of dollars to install these systems.

In addition, airports, such as Los Angeles International, relied on the 90 percent reimbursement, required by law, to determine the rate that they would use for their other sources of funding, such as the rates and charges they would assess the airlines.

However, as you know, last year the administration persuaded Congress to reimburse costs for '05 at the lower 75 percent rate. And this has cost large hub airports millions of dollars, tremendous problems.

And my question is: Why is the administration once again proposing to underfund the level that was required by law?

And if you could give me the number in terms of what it would cost to reimburse LOI airports at the 75 percent as well as at the 90 percent?

STONE: I think this year, FY 2005, would be a good reflective example of that.

Because the 75-25 was what we are operating under this fiscal year, it allows us to have roughly $150 million available for non-LOI transactions so that those transactions can then be spread out to airports that need support in their systems for both capacity and growth and security enhancements and efficiencies.

And so that money would not be available in this FY '05 budget. If it had been 90-10 rather than 75-25, we would not be able to help the myriad of airports that this year will be helped by having non-LOI funding available to them.

So we see there is a goodness to 75-25 in that the airports benefit from that across the board, rather than a select few.

ROYBAL-ALLARD: Well, first of all, this is a directive of Congress, and it didn't give that kind of flexibility to you to make that kind of decision.

And so I'm still not clear as to how you can just ignore a directive of Congress and do what you want.

STONE: I understand what you're saying on that, and we'll take that on board and get back with an answer to you on some further justification for that.

ROYBAL-ALLARD: Thank you.

ROGERS: I want to talk to you about the screener opt-out program.

Just for background, when TSA was formed and we created and federalized the screening force, five airports were allowed by Congress to contract out to private screeners, as a way to contrast with the federal screening force. But as of November 19th of last year, the law allowed other airports to seek permission from TSA to opt-out of the federal screening program and to contract privately for the screening force in their particular airport.

But I'm told that only one airport so far has submitted the paperwork to opt-out, and that's Elko, Nevada, which has 14 screeners. Is that correct? Just the one?

STONE: Yes, sir. So far, just one airport.

ROGERS: Why haven't more sought to opt-out of the program? Do you have a...

STONE: I might offer three reasons for that. One is some airports have opined that, until they get confirmation on what position the department will take on Safety Act coverage, that they're watching that before making a determination. We plan on providing briefings to the new leadership on that as an area of priority.

Secondly, airports have said that because the difference, in the last year, that wait times have declined, both average peak wait time as well as wait times, at our nation's airports and the screeners' performance has stabilized, that they're not very interested in reintroducing all of that churn of going back now after they finally got what they believe is a professional force in place, to go back and go through all that process again.

So they're looking for stability and performance metrics, which we think we're providing.

So those two reasons, both performance and then churn, would be two and three.

ROGERS: How important is it that TSA has really not made it clear that companies providing screening services would not be liable in the case of a terrorist incident -- in other words, liability?

STONE: Yes, sir. That Safety Act piece, which is what we've been told people are looking for: "Will there be coverage under the Safety Act for liability or not?" I'm told by some airports and companies that they're waiting to see how that falls out before they make a determination.

ROGERS: And whose hands is that in?

STONE: We currently have a presentation ready, TSA does, to present to the new leadership at the Department of Homeland Security so that a decision can be made and that information provided.

ROGERS: But is that a decision that the department has the power to make?

STONE: It resides currently within the Department of Homeland Security. The science and technology branch will see if those technologies that are applied by the screening companies are applicable under the Safety Act.

ROGERS: How soon do you figure we'll hear about that?

STONE: We're keen to get that up as an early decision in the first 30 days, is our goal. And we know there are a lot of decisions, and important ones, that need to be addressed by the new leadership, but that would be our goal at TSA.

ROGERS: So you're going to submit your recommendation...

STONE: Yes, sir, we will.

ROGERS: ... to the secretary within 30 days.

STONE: Yes, sir.

ROGERS: What about the airports? Are they -- I know you've talked about it some -- but I can't believe out of 435 or 440 airports, that a lot of them have not proceeded to seek out this option to employ their own screeners. How would they be compensated?

How would that work mechanically and fiscally?

STONE: For an airport to decide that they would like to...

ROGERS: They want to opt out. They come to you and say, "We'd like to opt out."

STONE: And we would provide the funding level that that airport is currently operating under federal dollars, so we'd take whatever that airport is being operated at and say, "Here's the pot of money." And then they would present their plan on how they would operate that airport.

TSA would review that plan and then provide approval to that entity, once the airport submits that.

So that process of, "Here's the pot of money that the airport is currently being operated under. Come in with your plan on how you would meet that security requirement for us to review," is the first steps for that.

ROGERS: So suppose X airport does just that. They come and say, "We'd like to opt out." You say, "OK, well, the past year, we spent $2.6 million to provide federal screening service at that airport."

Is that the amount of money that you would say that the local airport can talk about?

STONE: Yes, sir. That equivalency would be important. That's what we would...

ROGERS: So suppose, then, that X airport, OK, signs the deal and they go out and employ a private screening force to replace the federal screeners, and they get that done, let's say, for $2.1 million. Who gets the $500,000 difference?

STONE: Currently that would a savings for the federal government on how that would be done.

ROGERS: So you don't want to pay X airport $2.1 million...

STONE: Right.

ROGERS: ... of what they actually are expending for the private contract, not the federal equivalency?

STONE: That's correct.

ROGERS: Would that not be a good deal for the government?

STONE: To be able to reward them for being able to come in under that level?

ROGERS: No, to save us money.

STONE: Right.

ROGERS: I mean, if we can get the same screening operation at X airport done privately for $500,000 a year cheaper than doing it ourselves, why not do that? Is that a good deal?

STONE: Yes. The taxpayers, if they can get the exact same product that they were getting, quality of customer service...

ROGERS: Have you made it clear to the airports that that's the deal? That if they opt out, they would be authorized, assumedly, to seek out private screeners at the same dollar figure that's being spent...

STONE: Yes, sir.

ROGERS: They know that?

STONE: That's been the foundation of the program, so I'd be surprised to find if an airport did not know that.

We'll redouble our efforts to make sure that the program has that visibility.

But I think the concern would be -- it was quite traumatic to go from private to federal and to reintroduce that kind of churn again. Most airports told me in one-on-one meetings that they're not interested in that, because they don't want all of that churn.

ROGERS: Let me ask you about National Airport, Reagan National Airport.

In the conference report to the '05 appropriations bill, we wrote in that bill, and the Congress directed the secretary to report to us by March the 1st of this year, two days ago, on restoring access to National

Airport and other general aviation airports within 15 miles of that airport for security-qualified charter and general aviation operations.

That report, I was told, was to be developed in conjunction with the Secret Service and TSA. Where are we? We haven't got the report yet.

STONE: We've got -- we've met with the Secret Service, last month, reached agreement on what we think is a good plan, and are moving forward with that through BTS to the department to say, "Here would be the plan. Here's the threat criticality and vulnerability, and our game plan, in phases, at Reagan."

And that briefing and presentation is ready for the department leadership now to review. TSA feels it's a very solid and good plan.

ROGERS: Can you share with us what the recommendations are?

STONE: I'd be happy to provide a briefing and talk through that with you, sir.

ROGERS: You're saying this should be discussed privately?

STONE: Privately.

ROGERS: Well, then we shall do that.

So how soon will you present your recommendations to the secretary?

STONE: Well, we'd like to be able to get in within the first 30 days, to get this presentation provided to the leadership so that they can make a determination on the way ahead.

ROGERS: So when shall we receive the report that we directed to be done to us two days ago?

STONE: As soon as I can get that through that chain and to you, sir. I'll get that to you.

ROGERS: You're saying this has to be signed off by the secretary?

STONE: Yes, sir, it should because of the interagency requirement that exists on reopening of GA at Reagan.

ROGERS: Well, there's a lot of reports that are overdue. I mean, we've got stacks of reports that are not done yet, but nobody answers the phone down at the department anymore. There's nobody there. There are so many people not in office and that's hampering your work, the department's work.

STONE: I pledge to make this an item that I'll work very hard to get through to the new leadership and briefed up on, sir.

ROGERS: Well, that sounds like a long time. I mean, it sounds like if you got to get the secretary's approval and the Secret Service's approval and everybody else's approval, then we may as well do a Rip Van Winkle.

But Reagan Airport is important, too, for the general aviation community, particularly for charters.

ROGERS: I don't see why large charters should be treated any different from a regular scheduled airline. They have fewer passengers. They can go through the same screening process, the crew as well.

Why can't we just let charters come in there if they go through the same procedures as commercial pilots of planes and passengers do? What's wrong with that?

STONE: I think just the backdrop of how Reagan was shut down and how it was reopened that the charter piece has been viewed as something that needs to be done in the manner that's phased and is done incrementally with appropriate protections on it.

And so our plan has that as a priority item.

ROGERS: It's been four years. It doesn't take long to figure that one out.

STONE: I think the Maryland three airports and how we've now allowed transient pilots and aircraft in there is a signal of our desire to make sure that we're not restricting access when we have appropriate safeguards in place.

ROGERS: The report was due to us, by law, March the 1st. Of course, the secretary is brand-new -- I went to his swearing-in this morning -- and deserves a little time to catch up.

But this one needs to be done. So I'm going to say to you now -- if you'll convey this to the appropriate people there -- that the report is due April 1st. I'm going to give an extra 30 days, because we've got a new secretary, but I want that report. You've had plenty of time, and it's time.

STONE: Yes, sir.

ROGERS: Mr. Sabo?

SABO: Thank you, Mr. Chairman.

Let me go back on Secure Flight and double-check on something now.

We've been working on this watch list for a long, long time.

And did I understand your testimony, that you don't have the two airlines lined up to pilot this yet?

STONE: We do not formally have agreement on what two airlines will commence on August 19th. We have a number of airlines that have said that they're very interested in it and want to make sure that their I.T. systems are set and ready to go.

So we have some lead airlines that we know have expressed an interest that they would like to be the first to do this, but we have not codified: "Here are the two airlines that will commence this in August."

SABO: Mr. Chairman, it seems to me your World War II comparison is valid here again in terms of slowness of getting action.

We've been working on watch list forever it seems like, and I would assume that I would have thought that you'd have airlines lined up ready to do the checking now, once you're ready to do it.

Let me ask another question: Last year you indicated that explosion detection machines and screeners during non-peak hours could assist in screening of cargo. Has that happened?

STONE: It has. And even after the orange threat level passed, it's one of the ongoing risk mitigation actions that a number of our airports are still...

SABO: How many are doing that? Do you know?

STONE: I think it's over 50.

SABO: Could you give us a list of those who are using it and how much they're using it?

STONE: Yes, sir. We'll get that.

SABO: Now I have some questions for the record -- I'll add them all on -- on bonuses and who's received bonuses in the department.

STONE: Yes, sir. Be happy to provide that.

SABO: Thank you.

ROGERS: Mr. Price?

PRICE: Thank you, Mr. Chairman.

Admiral, let me flag one item for you briefly and then return to the matter the chairman was raising about the explosive detection systems.

The item I want to flag has to do with yet another report that's due, although it's not overdue. It's due in April -- April 18th, to be precise -- and it has to do with deployable flight recorders.

You're no doubt aware that members of the committee have been interested in the use of deployable black-box technology on commercial aircraft, from the point of view of improving the survivability of recorders and gaining immediate access to black boxes after an airline crash.

In last year's appropriations conference report, this committee requested a report from you on the extent to which the use of deployable recorders would improve your security analysis following aviation accidents to determine whether terrorism was a factor.

PRICE: It's my understanding that this report is due by mid- April, and in fact it's April 18th, six months after the date of enactment, which was October 18th, 2004.

I do believe this report will be valuable to the FAA with regard to the notice of proposed rule-making that they issued last week on improving black boxes.

It was unfortunate, I think, that the proposed rule-making failed to address the need to improve survivability and quick recoverability of the black boxes.

However, the FAA did express interest in learning more about deployable recorders and their benefits.

So I think it's imperative that the security benefits and the savings to our economy when we can rule out terrorism must be a major consideration in the FAA's evaluation of the cost and benefits of using the deployable technologies.

So I assume that report is on track, that we'll...

STONE: We talked about it this week. We're working very closely with the FAA. We intend on meeting that deadline date.

PRICE: Good. So we can count on that coming in on schedule.

Now, just briefly, in the time I have I'd like to return, a moment, to the budget aspects of this explosive detection systems matter.

I understand that TSA requested a total of $666 million for explosive detection equipment purchase and installation funding from OMB. Yet, the president's budget asked for only $394 million. And that's actually $81 million below this year's funding level.

That clearly is relevant to the questions that were raised earlier about these pending LOIs. You've issue eight, I understand.

I wonder how many LOIs could be entered into if you had gotten that $666 million request. Do you have any estimate of that?

And I'll say to you that I'm raising this question as someone who represents a mid-sized airport, an airport that, as a matter of fact, is extensively renovating one of its terminals. It would greatly benefit, I believe, TSA and the customers of that airport to incorporate one of these new systems.

But we're just wondering, you know, given this budget reality, how we can ever expect mid-sized airports like Raleigh-Durham and others all around the country to get some support, some assistance for the installation of these machines.

So that's the context in which I'm asking the question. But I am asking a specific budget question, as to anything you want to say about the reduction of that $666 million request and the cost of it in terms of LOIs foregone?

STONE: In general, if one takes a figure like $600 million or, say, "How many LOIs would you purchase if you picked an airport like JFK?" you get one piece of another out of that. So it would depend on how they were selected.

I would say that we're working with OMB, DHS, to make sure we've got a thoughtful criteria for that. If monies were apportioned in any manner to support LOIs, we want to make sure we have that criteria right

based on security, growth capacity and efficiency.

And so that gives a flavor for $600 million in one big Cat X airport.

However, when I talk with AAAE and others about TSA's approach on LOIs, obviously we're huge proponents of it, because you greatly reduce manpower, reduce your injuries, it's more efficient, effective. You can multiplex it, security goes up.

But at the same time, we tout Tampa, Jacksonville, Boise, Orange County which all have developed in-line systems without federal assistance. And so those also serve as role model airports for being able to invest in your airport to ensure that you have the best system possible, for all the reasons I mentioned.

So a case can be made also without federal dollars -- and those are just a few examples of airports that have done just that.

At the same time, we're also working on what type of creative financing can you have to -- if federal dollars are available, much like we do runways. Over a prolonged period of time, what kind of creative thinking can go into this?

So I'm hopeful that, by working with AAAE about creative approaches to it, looking at our overall financial situation, and at the same time, encouraging airports, like those that I mentioned, to move forward on in-line systems and investing in revealed-type technology, where rather than ripping out asbestos in the middle of an airport and having a very large bill -- to be able to get that type of technology -- at the ticket counters -- be able to demonstrate that you don't need large expensive LOIs, that you can get the same sort of security and efficiency and effectiveness through modern technology.

So that $30 million that the chairman talked about, there's a total commitment on our part to make sure that we give a good plan and show a commitment to doing the right thing on that type of technology.

PRICE: Well, I think as airports around the country are looking at this situation, including of course the budgetary bottom line, there's considerable discouragement, also considerable uncertainty, about what the future holds and what kind of support may be forthcoming in the out-years.

So I do think it's important to make solid, defensible budget requests, to project the kind of assistance they will make available, but also to have these other incentives in place, the kind of cooperative arrangements that you described.

PRICE: Because it appears that there's not going to be enough cash to go around to offer major federal support for a lot of these facilities.

STONE: Yes, sir.

PRICE: Thank you, sir.

ROGERS: Admiral, let me ask you quickly about the transportation worker identification card, a way for us to check anyone employed in transportation -- truck drivers, airplane pilots, port workers, whatever -- to be able to quickly be identified as legitimate.

We've been working on this now for a long time, three years. And on November 17th last year, you began testing a prototype technology, in process at some 34 sites in six different states, over a seven month period until July of this year. And I'm told some 200,000 workers, from maritime, rail, aviation and ground modes of transportation, will be participating in that test.

And then I'm told that you plan to finalize a rule-making that would permit the TWIC card to be used in the maritime environment by July '06; aviation, '07; and so on. That schedule is already one year behind plans reported to us in the fall of '03. And it, by that time, had already had numerous schedule slips, since the TWIC concept was originally conceived.

So this thing has just drug on and on and on and on. And there's a need out there for this card. Can't we move up the schedule of getting the testing done and getting these things out there?

STONE: I'm a proponent of that. We're going to look at every way, shape and form we can to make that happen, and keep you advised of what we believe we can do on that.

Florida, for instance, whose ports are counting on that, and are counting on that to be their card, those 14 ports in Florida, that program, even after the prototype ends in July and needs to be funded by TSA and extended, that prototype, until we can get the rule-making done in July of '06, and so we're already looking at how does one extend that then into that next fiscal year to make sure that there's continuity in it and growth.

But any opportunity to accelerate that and get that rule-making moved up, in partnership with the Coast Guard, we agree, is important, because that's a card that is intermodal and is going to be the foundation for our security in all modes of transportation.

ROGERS: So the Coast Guard would...

STONE: It's a joint rule-making with the Coast Guard.

ROGERS: Has that been agreed to?

STONE: Yes.

ROGERS: Can we move it up?

STONE: I'll meet with the commandant and talk about what we can do to accelerate that.

ROGERS: I think he's testifying here next week.

Why don't, before he testifies, you and he have a chat, so that he could report what you and he have agreed upon in terms of moving that process along?

STONE: Yes, sir, I'll talk with him.

ROGERS: There's no point why -- you know, we've been at this two or three years, and it would not be introduced into anywhere until July of '06, at the very earliest -- and I doubt that would happen -- and wouldn't be available in the aviation field until two years from now.

So that's unacceptable. Let's just get it over with.

You'll do that.

STONE: I'll get with him, sir.

ROGERS: Anything further, Mr. Sabo?

Admiral, thank you very much for testifying here today. We've kept you a bit overtime.

And we thank you for the work that you're doing down there. This is a tough business you're in.

And we've been tough on you here today, but it's tough love. We're all after the same thing, and that's the security of the country. And you're doing a good job with that, with a few exceptions.

So thank you for being here.

STONE: Thank you, Mr. Chairman.

ROGERS: Good luck to you.

END

**NOTES:**
[????] - Indicates Speaker Unknown
 [--] - Indicates could not make out what was being said.[off mike] - Indicates could not make out what was being said.

**PERSON:** HAROLD ROGERS (94%); SCOTT DAVID (61%); TOM LATHAM (57%); JIM KOLBE (56%); JO ANN EMERSON (56%); ANDER CRENSHAW (55%); RAY LAHOOD (55%); MARTIN OLAV SABO (54%); JERRY LEWIS (54%); JOHN R CARTER (54%); DAVID E PRICE (53%); JOSE E SERRANO (53%); CHET EDWARDS (52%); LUCILLE ROYBAL-ALLARD (52%); MARK SANFORD (51%); DAVID **STONE** (50%);

**LOAD-DATE:** March 7, 2005