# EXHIBIT 1

1 of 4 DOCUMENTS

Chisum on Patents
Copyright 2005, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

Chapter 16 Direct Infringement

*5-16 Chisum on Patents § 16.06*

## § 16.06 Corporate and Government Infringers

[Go To Supp]

Sections 154 and 271(a) define direct infringement in such general terms as "others" and "whoever." In applying these terms, the courts use standard principles of agency law in determining the liability of a principal for the infringing acts of an agent or servant. Many decisions depart from such standard principles by absolving the agent or servant from liability, at least as to damages, when he acted only in an official capacity.

A patent owner may sue the United States in the Court of Claims for reasonable compensation for any use of the patented invention "by or for" the United States, including use by a contractor or subcontractor with the authorization or consent of the United States.

A patent owner may sue cities, counties, and other political subdivisions of a State for infringement. The Eleventh Amendment and the doctrine of sovereign immunity present serious obstacles to an infringement suit directly against a State.

### [1]-- Liability of Principal for Agent's Acts

[Go To Supp]

The courts treat patent infringement as a species of tort[1] and apply general principles of agency law as to the liability of a principal for the acts of a servant or agent.[2]

In *Poppenhusen v. New York Gutta Percha Comb Co.* (1858),[3] the court instructed the jury as to the defendants' defense that the accused device was used without authority.

"The defendants are a corporation ... . A corporation can act only by their agents. It can act only by those who are in their employ. And when one in the employ of a corporation, in the business of his employment, does an act for their benefit, and which they adopt, and approve, and take advantage of, they will be deemed to have authorized the act, and will be as much bound by it as though expressly authorized."[4]

In *Westinghouse Elec. & Mfg. Co. v. Independent Wireless Co.* (1924),[5] infringement of plaintiff's patent occurred only when the operators of Independent Wireless connected circuits in a certain fashion on installations on board the ships of several steamship companies. Independent Wireless argued that it was not liable for any infringements because it had expressly forbidden its agents from any tampering with the wires of the installations.

Nevertheless, Judge Learned Hand enjoined Independent Wireless from committing further infringements.

"Are the defendants responsible for the acts of these operators? They were servants of the defendant Independent Wireless Telegraph Company, employed by it to operate the wireless installations on the ships of the defendants, the steamship companies, and what they did was unquestionably within the scope of their authority. It makes no difference, therefore, whether they were forbidden to tamper with the wires or not. In some instances they may have done so idly, not in the course of their duties; in such cases I

need not say that their acts were within the scope of their authority. But surely it cannot be seriously argued that the tort of a servant in the scope of his general authority is any the less the tort of his master because the master has expressly forbidden him to commit it. I cannot think it necessary to cite any decisions for so common a doctrine of law."n6

Judge Hand consoled Independent by extending the injunction to its operators.

"It cannot be a serious matter to the Independent Wireless Telegraph Company that I take them at their word, and assist them by an injunction to control their operators, whose insubordination has already occasioned them so much annoyance. They need not fear that if they show a co-operative spirit in preventing repetitions of the tort, they will suffer in contempt beyond the losses caused by the acts of their servants."n7

Judge Hand declined to enjoin the steamship companies, however: "I do not ... find anything in the affidavits to show that the steamship companies are privy to the practice, individually or by their servants. ..."n8

In *Duplex Envelope Co. v. Denominational Envelope Co.* (1935),n9 the plaintiff sought to hold the Union Envelope Co. (Union) liable for the construction in its shops by an employee of another corporation, Denominational Envelope Co. (Denominational), of infringing machines. One Isaac Rheutan was the secretary-treasurer of Union and a majority shareholder of Denominational (which was founded by Rheutan's son). Union would be liable only if it had knowledge of the character of the work in its shops, and the question became whether the knowledge of Isaac could be imputed to Union. The Fourth Circuit noted the general agency rule that "a corporation is affected with constructive knowledge regardless of its actual knowledge of all material facts of which an officer acquires knowledge while acting in the course of his employment and within the scope of his authority."n10  However, Isaac's knowledge acquired "by reason of his interest" in Denominational could not be charged to Union, and there was no showing that Isaac was authorized by Union to represent Union in the arrangements with Denominational: "Neither the secretary nor the treasurer of a corporation has authority, by virtue of his office, to bind the corporation in a contract of this kind."n11

### [a]-- Parent and Subsidiary Corporations--Shareholders.

[Go To Supp]

Corporations may be related as parent and subsidiary, the former owning a substantial portion or all of the shares of the latter, or in other ways.n12  Court decisions apply general principles of law in determining whether one corporation is liable for infringements by a related corporation.n13

An early Supreme Court decision, *York & Maryland Line R.R. Co. v. Winans* (1854),n14  held that a railroad corporation was liable for the use of infringing railroad cars on its line even though it conveyed in exchange for a percentage of net profits all management powers to its parent corporation. State law precluded any absolution of liability; further, the railroad corporation "is a principal, co-operating with another Corporation in the infliction of a wrong, and is directly responsible for the resulting damage."n15

In *A. Stucki Co. v. Worthington Industries, Inc.* (1988),n16  the Federal Circuit held that a corporation can be liable as a direct infringer under *35 U.S.C. Section 271*(a) for infringement by partially-owned subsidiaries only if "the evidence reveals circumstances justifying disregard of the status of [the subsidiaries] as distinct, separate corporations."n17  Mere stock ownership is not enough to pierce the corporate veil or to establish liability of the parent corporation as a successor in interest, especially when the ownership is acquired after infringement begins. The court held that a defendant corporation did not actively induce infringement when (1) the corporation learned that a company that it was considering acquiring owned a 50% stock interest in another company that was involved in ongoing patent infringement litigation, (2) after the corporation acquired the first company, the second company paid a large dividend early in order that the dividend could be included in the defendant's consolidated income statements, (3) after the dividend payment, a judgment for damages for patent infringement was entered against the second company, and (4) there was no evidence that the corporation controlled and dominated the second company.

The Delaware District Court addressed the liability of parent and subsidiary corporations at length in *Mobil Oil Corp. v. Linear Films Inc.* (1989),n18  It granted summary judgment of noninfringement by parent corporation ("the Delaware corporation") and its corporate successor when the actual infringing activity was conducted by its subsidiary ("the Oklahoma corporation"). In 1980, the Oklahoma corporation began making the accused product. In 1985, the

Delaware corporation was formed and became the sole shareholder of the Oklahoma corporation. In 1987, the patentee filed suit in Delaware against the Delaware corporation. In 1988, the Delaware parent corporation was merged into the Oklahoma subsidiary. Judge Latchum held that the parent corporation is not liable for direct infringement; the subsidiary is neither the "alter ego" nor the "agent" of the parent), emphasizing the difference between the agency and alter ego theories of parent corporation liability for subsidiary corporation activity.

> "Liability based upon a pure agency theory does not require the ownership of one entity by another... . Where an agency or alter ego relationship is premised upon the parent's domination and control, such domination and control may be general in nature and 'need not have any particular relationship to the cause of action being asserted'... In contrast, a plaintiff wishing to hold a parent corporation liable under the pure agency theory 'must demonstrate a relationship between the corporations and the cause of action.' "n19

As to the alter ego theory, Judge Latchum noted:

> "Fraud or something like it [such as a great injustice or inequity] is required. ... Any breach of contract and any tort--such as patent infringement--is, in some sense, an injustice. Obviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud. The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping."n20

> "The law requires that fraud or injustice be found in the defendant's use of the corporate form... .

> "Given that the alleged infringement ... was well underway by 1985, it can hardly be said that the Delaware corporation was formed for the purpose of infringing [plaintiff's] patents... ."n21

> "... [A]ll of the tangible and financial assets ... were held by the Oklahoma operating subsidiary ... . [D]efendants did not employ the corporate fiction to execute a fraud or inflict an injustice upon [plaintiff]... .

> "... [R]equiring [plaintiff] to enforce its patent rights against [the subsidiary] in another forum is not the kind of injustice--if, indeed, it is an injustice at all--which warrants piercing the corporate veil ... .

> "Under ordinary circumstances, a parent corporation will not be held liable for the obligations of its subsidiary... . Limited liability is the general rule, not the exception."n22

As to what law controls corporate liability on an alter ego theory, Judge Latchum found it unnecessary "to launch into a protracted choice of law analysis because ... regardless of which law is applied to the alter ego question--whether federal, Delaware or Oklahoma common law--the outcome is the same."n23

As to the agency theory, Judge Latchum noted:

> "A vital prerequisite to imposing liability based upon customary agency principles is finding a close connection between the relationship of the two corporations and the cause of action... . It is inconceivable that the Oklahoma corporation served as an agent for the subsequently-formed Delaware corporation in making and selling the accused [product]."n24

**[b]-- Successor Liability.**

[Go To Supp]

In *Hemstreet v. Compuscan Inc. (1990)* n25 the Northern Illinois District Court held that federal common or "intersticial" law, not state law, governs a successor's liability for a predecessor's patent infringement. From 1978 to 1983, the patentee sent letters to a "Compuscan" corporation, accusing it of patent infringement. In 1990, the patentee filed suit against defendant Compuscan Inc. Citing a series of incorporations and mergers, Compuscan moved for summary judgment on the ground that it was not the same legal entity as that the patentee had accused of infringement. The court denied the motion because there were disputed material fact issues on "the question of defendant's liability on a successor liability theory."

> "Successor liability is a doctrine which is typically governed by state law, as is the general law of corporations. However, plaintiff's complaint asserts defendant has infringed a patent, a cause of action governed by federal law. Thus, this is not a diversity case and the *Erie* doctrine does not apply. See *Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)* (in diversity case substantive law of state applies). Therefore, we are not obligated to apply Illinois state law. However, the Patent Act neither addresses nor provides choice of law direction on the issue of successor liability. In cases governed by federal statutes in which Congress has left a void, federal courts have been given the power to create federal common law in order to fill that void... . To date, a large body of federal intersticial law dealing with successor liability has developed in the labor and employment law arena... . While the successor liability doctrine is applied much more liberally in employment law cases than it is to tort actions such as this case, the basic rule and exceptions are relevant and therefore we will use this body of federal law to the extent it applies. To fill in the gaps left by the federal law cases, we will apply Illinois successor liability law. It should be noted that the successor liability doctrine varies insignificantly from state to state, thus the choice of Illinois law as opposed to some other state law will provide no advantage to either side. Further, as the parties have chosen to completely ignore the choice of law problem, they are not now in a position to challenge the application of Illinois law.

> ... .

> "Typically, a corporation that merely purchases for cash the assets of another corporation does not assume the seller corporation's liabilities ... . However, exceptions to this general rule have developed in an attempt to strike a balance between preventing wrongdoers from escaping liability and encouraging the transfer of corporate assets to their most valuable use ... .

>> 'In favor of successor liability is the interest in preventing tortfeasors from externalizing the costs of their misconduct by selling their assets free of any liabilities and distributing the proceeds to their shareholders. Against is the interest in a fluid market in corporate assets, which is impeded if purchasers acquire along the assets legal liabilities of unknown, sometimes unknowable, dimensions.'

>> "... [P]rotecting the fluidity of the market had traditionally been the dominating concern, but ... in recent years the focus had shifted ... . In other words, the courts have expanded the doctrine of successor liability.

> "Through this expansion, four exceptions to the presumption against successor liability have developed. Consequently, a corporation that succeeds to a prior corporation's assets can be held accountable on the seller's liabilities: (1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the two corporations; (3) where the purchasing corporation is a 'mere continuation' of the seller; and (4) where the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts... .

> ... .

> "The first exception is applied to bind a successor corporation where there is an express or implied assumption of liabilities on the part of the purchasing corporation. Here, there was an express agreement

by defendant to assume certain liabilities of Compuscan. Indeed, the purchase agreement provided by the defendant indicates that the buyer, defendant, was to assume the liabilities and obligations as provided by Schedule 3.2 of the Asset Purchase Agreement. Defendant did not, however, include Schedule 3.2 in the exhibits presented to this court. Accordingly, we cannot determine whether the liabilities that the defendant assumed included those at issue in this case. Consequently, a dispute over a material issue of fact exists on the question of successor liability.

"The second exception allows for the imposition of liability on the successor corporation where the transaction amounts to a merger ... . A de facto merger results when all four of the following criteria are present:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets and general business operations.

> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

> (3) The seller corporation ceases its ordinary business operations, liquidates and dissolves as soon as legally and practically possible.

> (4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

...

"We have not been provided with enough information to determine whether the transaction which took place in this case was a de facto merger. We do not know whether personnel from the seller corporation remained with the new Compuscan or whether the location of the operations remained the same. It seems clear, however, that the new Compuscan has continued the operations of the old Compuscan. There is also a dispute of fact with respect to factor #2. Plaintiff has not established that stock was transferred and defendant has not set forth evidence which would indicate there was no stock transfer involved in the purchase ... . Similarly, we cannot determine from the facts presented whether factors 3 and 4 have been satisfied. Nonetheless, neither can we find that the new Compuscan is not a successor under the de facto merger exception.

"Under the 'mere continuation' theory, courts have looked for common identity of stock, directors, and stockholders and the existence of only one corporation at the completion of the transfer ... . [T]he mere continuation' theory requires essentially the same inquiry as does the merger theory ... .

"Defendant has submitted an affidavit, made by defendant's President, Allen Harle, indicating that none of the former Compuscan directors are currently directors of the new corporation. Although Harle's position with both corporations would not appear to be sufficient to support a case for 'mere continuation,' ..., we do not have sufficient information regarding commonality of shareholders and stock and thus are unable to determine conclusively that defendants are not liable under the "mere continuation" exception ... .

"Finally, where the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability, successor corporations have been found liable. In this case, neither party has argued this theory of successor liability."n26

**[2]-- Corporate Officers, Directors and Shareholders**

[Go To Supp]

Whether a person who participates in an infringing act in the capacity of officer, director, manager or employee of a corporation is liable to the patent owner along with the corporation is the subject of a long history and many decisions.n1 The prevailing rule today is probably that announced by the Seventh Circuit in *Dangler v. Imperial Machine Co.* (1926):n2 corporate officers and directors are not liable absent some special showing, such as deliberate use of a corporation as an instrument to infringe.n3 Some authorities support a stricter rule derived from traditional principles of tort law: corporate officers and directors who specifically authorize infringing activity are liable individually for damages.n4

In upholding the personal liability of a director, officer, agent or employee, a number of decisions invoke the concept of inducement or contributory infringement, now codified in Sections 271(b) and 271(c).n5 In some cases it may be critical to determine whether the theory in fact is direct infringement (Section 271(a)) or inducement/contributory infringement (Sections 271(b) and 271(c)). For example, knowledge of the patent is an element of the latter but not the former.n6

### [a]-- Early Decisions.

Early decisions oscillated on the question of the liability of directors, officers, and employees.

In *Delano v. Scott* (1835),n7 the court held that a workman for an accused infringer could testify in a suit between the accused infringer and the patent owner. The patent owner argued that the witness was interested because he might himself be sued for infringement. The court noted that such would not be sufficient adverse interest to exclude the testimony but went on in dictum to indicate that such a workman would not be liable to damages.

> "[The statute provides] 'that if any person shall make, devise, and use, or sell the thing so invented, he shall forfeit and pay to the patentee.' In my opinion, this description does not, and was never intended to, embrace every workman who may be employed in making parts of a patented machine; nor one who may sell them as the shopman or clerk of another. The maker and seller intended by the act, is the principal who employs these subordinate agents; the person for whom, by whose direction, and on whose account, the machines are made and sold; the person who receives the profit of the sale; he is the seller and the maker. It is he who claims title and property in the thing, and who undertakes to transfer it to the purchaser. The workmen employed by him for stipulated wages, have nothing to do with his right, or with his invasion of the rights of another. They work under his direction, and sell on his account."n8

In *Morse v. Davis* (1862),n9 the court suggested a view contrary to *Delano*.

> "This action is an action of tort, against the defendant as a wrong-doer, and, certainly, as a general rule, a party cannot claim that no action shall be sustained against him for a tort, on the ground that he committed the injury as the agent of another."n10

Subsequent cases split between these two views. In *United Nickel Co. v. Worthington* (1882),n11 the Massachusetts Circuit Court adopted *Delano*. In *National Cash-Register Co. v. Leland* (1899),n12 the First Circuit specifically disapproved of *Worthington*.

> "[B]y the general principles of law, and by analogy with other torts a director of a corporation, who, as director, by vote or otherwise, specifically commands the subordinate agents of the corporation to engage in the manufacture and sale of an infringing article, is liable individually in an action at law for damages brought by the owner of the patent so infringed. As with other infringers, it is immaterial whether the director knew or was ignorant that the article manufactured and sold did infringe a patent."n13

A similar split developed over whether an officer or director should be subject to an injunction against infringement. In *Howard v. St. Paul Plow-Works* (1888),n14 the Minnesota Circuit Court held that an injunction should not issue against corporate officials personally except "in cases wherein it appears that the name of a corporation is used as a mere shield or cover for the protection against liability of the real parties in interest, or where by reason of the insolvency of the corporation a decree against it would be futile."n15 The injunctive decree against the corporation "is binding upon its officers and agents, without making them personally parties to the bill," and they should not be put to "the

costs of such an injunction."n16  In *Cleveland Forge & Bolt Co. v. United States Rolling-Stock Co.* (1889),n17  the Illinois Circuit Court noted its own practice not "to render a personal decree for damages or costs against an officer of a corporation, except in cases where there was such intentional and willful action of the officer ... as indicated an individual purpose to infringe the patent [or when] the company was organized for the express purpose of violating the patent" but reasoned that "there is a moral effect upon a defendant who is by name restrained by an injunction, which would not be felt if the mandate ran only against the officers, agents, servants, etc."n18

Most decisions did agree that it would not be appropriate to order an officer or director to account for the profits of infringement where those profits inured only to the benefit of the corporation as an entity.n19

**[b]-- Dangler and Subsequent Decisions Up to 1983.**

[Go To Supp]

**[i]-- Dangler.**

In *Dangler v. Imperial Machine Co.* (1926),n20  the Seventh Circuit reviewed the question of "the liability of officers of a corporation for its infringements," noting that "the authorities are not in accord."n21

> "The weight of authority, it seems, denies such liability in the ordinary case. That is to say, if the officers act merely as officers, they are not liable jointly with the corporation. It is only when the officers act outside the scope of their official duties that they become liable ... . There are, however, numerous authorities that hold the managing officers liable for damages committed by the corporation in case of infringements. The enforcement of this liability is seldom sought, except in case of insolvency of the corporation.
>
> "These latter holdings are on the theory that the corporation commits the tort only under the direction of the managing officers, and therefore these officers, including the directors who authorize the manufacture and sale of the infringing devices are liable ... . There are numerous cases which might be added to this list, where officers were held with the corporation, but they deal with activities of officers outside their official duties."n22

The court then adopted the apparent majority view.

> "After due consideration of the various authorities, as well as the reasons back of the two positions, we ... hold that, in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction. The uncertainty surrounding the questions of validity and infringement make any other rule unduly harsh and oppressive.
>
> "It is when the officer acts willfully and knowingly--that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability--that officers are held jointly with the company. The foregoing are by no means cited as the only instances when the officers may be held liable, but they are sufficient for the present case."n23

In *Dangler*, the individual defendants Dangler and Lapham were president and secretary respectively and directors of the Maxim Company and together held 40% of its stock. The plaintiff filed suit for infringement in 1916. However, "a reputable patent attorney advised [the company] that its machine could be lawfully made, and the business was continued."n24  In 1922, the District Court held for the plaintiff, and Maxim's business fell off sharply. Dangler and Lapham made a number of loans to Maxim to keep it in business. Maxim was declared bankrupt in January of 1923, soon after the Court of Appeals affirmed the District Court decree. Thereafter, the District Court held Dangler and Lapham liable for damages and profits, but the Seventh Circuit reversed. The case was "the usual one where a bona fide corporation embarked on a business which it found was covered by numerous patents."n25  The company acted with the advice of reputable counsel. It thus "falls far short of establishing any one of the situations for which the officer of the corporation may be held liable for the infringements of the corporation."n26

**[ii]-- Decisions After Dangler.**

Numerous cases subsequent to *Dangler* rely on it both as to the general rule of nonliabilityn27 and the "special showing" exceptions.n28

The Second Circuit's position was rendered unclear by *Claude Neon Lights, Inc. v. American Light Corp.* (1930).n29 The individual defendants were enjoined from infringement. The facts of the case suggested the existence of special circumstances; the defendants organized the company of "doubtful financial stability" specifically to manufacture the device covered by the patent. In its opinion upholding the decree, the court cited with apparent approval the inconsistent rules of *National Cash Register* and *Dangler*.

> "A director and officer of a corporation who, by a vote or otherwise, specifically commands subordinate agents of a corporation to engage in the manufacture and sale of an infringing article, is liable individually in an action for damages brought for such infringement. It is immaterial whether the director or officer knew or was ignorant that the article manufactured and sold did infringe the patent ... . But officers or directors of a corporation will not be held personally liable for damages resulting from infringement where they do not exceed their duties as officers and directors. They become liable when they do exceed their authority and use the corporation to carry out their own willful and deliberate infringement."n30

In *Telling v. Bellows-Claude Neon Co.* (1935),n31 the Sixth Circuit held that a stricter standard than that of *Dangler* applies when the corporation has been enjoined from infringement and the patent owner seeks to hold officers and directors of the corporation liable for the failure of the corporation to comply with the injunction: "Injunction having been decreed, the uncertainty noted in the Dangler Case which surrounds the question of validity and infringement, and which would make any rule other than that there applied unduly harsh and oppressive, no longer exists."n32

#### [iii]-- Non-Participants.

Under no circumstances will a person, whether director, officer, agent or otherwise, be liable for infringement if he did not direct or participate in the infringing activity: infringement is not "contagious."n33

#### [iv]-- Salespersons on Commission.

[Go To Supp]

A number of decisions uphold liability of a salesman on commission for sale of infringing products, even where venue or jurisdictional requirements preclude suit against the company for whom the products are sold,n34 but in *Sure Safe Industries Inc. v. C&R Pier Manufacturing* (1993),n35 the Southern California District Court dismissed a suit against an individual defendant sued for allegedly selling the infringing product from his home in an individual capacity; the evidence "merely indicates an employee willing to take business calls at home."n36

#### [c]-- Federal Circuit Decisions.

[Go To Supp]

The Federal Circuit has addressed the issue of personal corporate officer or director liability in a number of decisions.n37

In *Fromson v. Citiplate, Inc.* (1989),n38 the Federal Circuit noted that "[t]he cases are legion holding corporate officers and directors personally liable for 'participating in, inducing, and approving acts of patent infringement' by a corporation."n39 It held that the district court did not err in adding two corporate officers as defendants and holding them personally liable on a judgment of infringement rendered after a trial against their corporation. Prior to trial, the district court denied the plaintiff's motion to add the two officers as defendants, relying on the corporation's representation that it was in sound financial condition. After trial and entry of judgment, the corporation filed a voluntary bankruptcy petition. Adding the two officers after trial was proper under *Rule 15(c) of the Federal Rules of Civil Procedure.* "[T]he identity of interests between [the corporation] and [the two officers] is 'virtually complete' ... [The officers] each own 50% of [the corporation]. ... [They] are the sole directors ... . Both attended the entire trial... . [One] conceived and developed the infringing [products]."n40

In *Manville Sales Corp. v. Paramount Systems, Inc.* (1990),n41 Paramount, a corporation, infringed Manville's iris arm lighting device patent. DiSimone, Paramount's corporate secretary, obtained a copy of a drawing of Manville's de-

vice and sent it to Butterworth, Paramount's president. Butterworth gave the drawing to a Paramount employee for use in designing the infringing product. The district court found the two officers, DiSimone and Butterworth, guilty of direct infringement and inducement of infringement. The appeals court disagreed. For a corporation's officers to be personally liable as *direct* infringers for the corporation's acts, "there must be evidence to justify piercing the corporate veil."n42

> "Often a party asking a court to disregard the corporate existence will attempt to show that the corpora-
> tion was merely the alter ego of its officers. More generally, a court may exert its equitable powers and
> disregard the corporate entity if it decides that piercing the veil will prevent fraud, illegality, injustice, a
> contravention of public policy, or prevent the corporation from shielding someone from criminal liability
> ... . The court, however, must start from the general rule that the corporate entity should be recognized
> and upheld, unless specific, unusual circumstances call for an exception.'
>
> "... Although these facts support the conclusion that the officers had knowledge of their acts, these
> acts were within the scope of their employment and thus were protected by the corporate veil."n43

To hold the officers personally liable would be an abuse of equitable powers because the evidence shows the officers were not attempting to avoid liability under the protection of the corporate veil. For a corporation's officers to be liable as *active inducers*, they must have "*knowingly* induced infringement."n44 The two officers could not be guilty of inducement because they were not aware of the patent until suit was filed, and thereafter they acted in good faith belief, based on advice of counsel, that the corporation's product did not infringe.

In *Sensonics, Inc. v. Aerosonic Corp.* (1996),n45 the Federal Circuit held that the district court did not err in finding the individual defendant personally liable for inducing infringement by the defendant-corporation, of which the individual was the "founder, owner, president, chief executive officer, and chief of engineering." The court need not believe the individual's testimony that he had no "authority to control or discontinue production of the device after he became aware of [plaintiff's] patent rights."

> "The tort of 'inducement' under *35 U.S.C. § 271*(b), when applied to invoke personal liability, is prem-
> ised on a concept of tortfeasance whereby persons in authority and control may in appropriate circum-
> stances be deemed liable for wrongdoing, when inducing direct infringement by another. *See Water
> Technologies Corp. v. Calco, Ltd.,* ... (finding liability for inducement based on specific circumstances of
> personal control of Calco's manufacture of the infringing products) ... *Orthokinetics, Inc. v. Safety Travel
> Chairs, Inc.* ... corporate officers who actively aid and abet their corporation's infringement may be per-
> sonally liable for inducing infringement)."n46

In *Hoover Group, Inc. v. Custom Metalcraft, Inc.* (1996),n47 the Federal Circuit reviewed the case law on corporate officer-director liability. It held that the district court erred in finding a corporate officer and owner personally liable for his corporation's infringement: "[U]nless the corporate structure is a sham, as is not here asserted, personal liability for inducement to infringe is not automatic but must be supported by personal culpability. The district court did not find bad faith or fraud or culpable intent on the part of [the officer-owner]. The court erred in imposing liability although the corporate veil was not pierced."n48

### [3]-- The United States and Its Contractors

[Go To Supp]

A patent owner's exclusive remedy when his invention "is used or manufactured by or for the United States" without authority is a suit in the United States Court of Federal Claims for recovery of "reasonable and entire compensation."n1  This exclusive remedy includes use or manufacture by a contractor or subcontractor of the United States "with the authorization or consent of the Government."

For many years, the Court of Claims had exclusive jurisdiction of Section 1498(a) suits. On October 1, 1982, the Court of Claims was abolished.n2  Its trial functions were transferred to a newly created United States Claims Court, which was an Article I rather than an Article III federal court. Appeals from decisions of the Claims Court go to the Court of Appeals for the Federal Circuit, an Article III court parallel to the other Courts of Appeal.n3 "Effective October 29, 1992, the United States Claims Court became the United States Court of Federal Claims."n4  During the course

of these changes in the structure and name of the tribunal, the substantive remedy against the United States under *28 U.S.C. Section 1498*(a) has remained unchanged.

Court decisions have suggested that the theoretical basis for Section 1498 liability is an eminent domain taking of a patent license by the United States with a provision for reasonable compensation, not a suit for patent infringement enabled by a waiver of sovereign immunity.n5  In *Leesona Corp. v. United States* (1979)n6  the Court of Claims traced the history of Section 1498 and concluded that the statute authorizes an eminent domain taking of a patent license with reasonable compensation and does not include tort infringement remedies such as increased damages and attorneys fees.n7  In *Decca Ltd. v. United States* (1980),n8  it held that Section 1498 does not impose liability for contributory infringement or inducement of infringement on the United States.n9  In *W.L. Gore & Associates Inc. v. Garlock Inc.* (1988),n10  the Federal Circuit noted that "The patentee takes his patent from the United States subject to the government's eminent domain rights to obtain what it needs from manufacturers and to use the same. The government has graciously consented, in the same statute, to be sued in the Claims Court for reasonable and entire compensation, for what would be infringement if by a private person."n11  On the other hand, court decisions stress the substantive similarities of Section 1498 actions and patent infringement suits.n12

**[a]-- Historical Development.**

[Go To Supp]

As early as 1870, the Supreme Court declared that "the government cannot, after the patent is issued, make use of the improvement any more than a private individual, without license of the inventor or making compensation to him.n13  However, the doctrine of sovereign immunity, which bars unconsented suits against the United States,n14  presented a serious obstacle to direct recovery from the government. Before 1910, no statute gave consent to sue the United States for patent infringement. Jurisdiction of the Court of Claims under the Tucker Act was limited to contract claims.n15  Some cases upheld a Court of Claims suit against the United States when the facts surrounding the Government's making or use of the invention supported an implied contract to compensate the patent owner.n16  But absent such facts, a patent infringement claim was in the nature of a tort and beyond the consent of the United States to suit.n17

Patent owners could sue the government officer responsible for infringing activity undertaken in the name of the United States. In *Cammeyer v. Newton* (1876),n18  a suit against a government engineer for the construction and use of an apparatus at public expense on a harbor reef, the Supreme Court declared that "Public employment is no defence to the *employee* for having converted the private property of another to the public use without his consent and without just compensation."n19  However, in *Belknap v. Schild* (1896),n20  the Court held that a court could not enjoin use of property in possession of the Government in a suit against an officer. Such relief made the suit in effect one against the Government. The patent owner's proper remedy was an action at law for damages against the officer. Whether *Belknap* extended to an injunction against further making or acquisition of infringing items was unclear.n21

Patent owners could also sue those who contracted with the Government for both injunctive and monetary relief. In *Brady v. Atlantic Works* (1876),n22  the defendants in a suit for infringement of a patent on dredging-boats argued that the infringing boat was built under the specifications of a contract with the United States. The circuit court overruled the defense.

"[C]ontractors of the government derive no power ... by virtue of their contract, to take the property of private individuals without their consent, and to use and apply the same in fulfilling their contract obligations. Such a contractor may be the agent of the government to build a ship or dredge-boat, but he is not the agent of the government to seize and appropriate whatever materials he may select to fulfill his obligations."n23

In 1910, Congress enacted the predecessor to *28 U.S.C. Section 1498* , providing patent owners with a remedy for "reasonable compensation ... in the court of claims" for use of a patented invention "by the United States without license of the owner thereof or lawful right to use the same."n24  The act did not apply to articles "owned, leased, used by, or in the possession of, the United States" prior to its effective date. It gave the United States the benefit of "any and all defenses" that a defendant in an infringement action might plead. Finally, the Act excluded suits either by persons "in the employment or service of the government of the United States" or on account of "any device discovered or invented by such employee during the time of his employment or service."n25

The Supreme Court decided three important cases construing the 1910 Act. In *Crozier v. Fried. Krupp Aktienge-sellschaft* (1912),n26 it held that the remedy in the Court of Claims precluded any action against a federal officer to enjoin infringement: "the statute ... provides for the appropriation of a license to use the invention, the appropriation thus made being sanctioned by the means of compensation for which the statute provides."n27 In *William Cramp & Sons Ship & Engine Bldg. Co. v. International Curtis Marine Turbine Co.* (1918),n28 the Court limited the appropri-ated license theory of *Crozier* by holding that a patent owner could sue a contractor with the government for damages and profits, even though the infringing items were as specified in the contract. In *Marconi Wireless Telegraph Co. v. Simon* (1918),n29 the Court followed *William Cramp*, noting a government contractor would be liable as an infringing maker of the entire patented product but could not be liable for contributory infringement in supplying parts to the gov-ernment because the government's making and use would be licensed under *Crozier*.n30

Congress acted almost immediately to overturn *William Cramp* and *Marconi Wireless* for fear that infringement ac-tions would interfere with the process of government procurement during wartime.n31 In a naval appropriation bill, Congress altered "used by the United States" to "used *or manufactured by or for*, the United States" and altered "such owner may recover reasonable compensation for such use by suit in the Court of Claims" to "such owner's remedy shall be by suit against the United States in the Court of Claims for the recovery of his reasonable *and entire* compensation for such use *and manufacture*."n32

In *Richmond Screw Anchor Co. v. United States* (1928),n33 the Supreme Court held that the general statute barring the assignment of claims against the United States did not apply to a patent owner's claim against the United States based on the actions of a contractor. The Court commented on the purpose of the 1918 amendment.

> "The purpose of the amendment was to relieve the contractor entirely from liability of every kind for the infringement of patents in manufacturing anything for the government, and to limit the owner of the pat-ent and his assigns and all claiming through or under him to suit against the United States in the Court of Claims for the recovery of his reasonable and entire compensation for such use and manufacture. The word 'entire' emphasizes the exclusive and comprehensive character of the remedy provided. ... [I]t is more than a waiver of immunity and effects an assumption of liability by the government."n34

The language of the 1910 and 1918 Acts was unclear as to coverage of use of a machine, product, or process by a contractor doing government work. In *Wood v. Atlantic Gulf & Pacific Co.* (1924),n35 the defendant performed a gov-ernment dredging contract using the plaintiff's patented machinery. The district court expressed doubt whether the stat-ute "covers the use by a third person in a government work of a patented article."n36 But, assuming that such use was covered, the court required that the contractor's use of the patented item be required by the government contract or be with the knowledge of the government. The act "did not contemplate the use by the contractor for his own convenience, or for his own purpose in doing the government work, where he might have used that or any other tool."n37

In 1942, a wartime royalty adjustment bill significantly amended the statute by providing that "the use or manufac-ture of an invention ... by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."n38 This apparently resolved the doubt in *Wood* in favor of covering use and affirmed the *Wood* requirement of knowledge and consent.n39 It also removed any doubt whether the act applied to subcontractors of contractors with the govern-ment.n40

In 1948, the statute was codified in the Judiciary Code as *28 U.S.C. Section 1498*.n41 In 1952, Congress elimi-nated the bar on recovery by Government employees.n42 Recovery was precluded, however, if the employee "was in a position to order, influence, or induce use of the invention by the Government" or if the invention was discovered by a person while in government employment and "the invention was related to the official functions of the employee, in cases in which such functions included research and development, or in the making of which Government time, materi-als or facilities were used."

**[b]-- Exclusive Remedy in the Court of Federal Claims.**

[Go To Supp]

The patent owner's remedy under *28 U.S.C. Section 1498* in the Court of Federal Claims against the United States is exclusive as to any claim based on the patent as to use or manufacture by or for the United States. Thus, the patent

owner may not enjoin or recover damages for such use or manufacture in an infringement action in a United States District Court.n43

In *Sperry Gyroscope Co. v. Arma Engineering Co.* (1926),n44 the Supreme Court held that the statute bore on "the merits of the matter" and did not deprive a district court of subject matter jurisdiction. As a procedural matter, this would seem to mean that a bar under Section 1498 should normally be raised in the answer and may not be raised by motion prior to answer under *Rule 12(b) of the Federal Rules of Civil Procedure* n45 unless the plaintiff's own complaint reveals existence of the defense.n46 Under appropriate circumstances, the defense may be an appropriate one for summary judgment.n47 If summary judgment is inappropriate because of disputed material issues of fact, the district court may hold a hearing limited to the "fundamental" defense to the action under Section 1498.n48

An implication of treating Section 1498 as a question of defense on the merits rather than of subject matter jurisdiction might be that the defendant would be deemed to waive it by failure to plead it in a timely fashion.n49 In *Manville Sales Corp. v. Paramount Systems, Inc.* (1990),n50 the Federal Circuit so held.n51 Arguably, the public policy behind Section 1498, prevention of interference with Government procurement, mitigates against such a result, particularly where injunctive relief is sought.

If the defendant makes, uses, or sells an invention for both the United States and others, a district court may adjudicate a claim of infringement as to the latter.n52 If the defendant's nongovernmental activity is sufficiently limited, the court may dismiss the whole action on the principle of de minimis non curat lex ("the law does not concern itself about trifles").n53 However, a number of decisions have ruled against any "lax application of the *de minimis* rule."n54 In *J. & G. Development Co. v. All- Tronics, Inc.* (1961),n55 the defendant admitted making one sale of eight filter units to a nongovernment customer for $ 124.03 but relied upon de minimis because the bulk of its sales were to the United States or its contractors. To secure dismissal, the court required the defendant to "establish that the non-governmental sale was so unusual that it will not be repeated in quantities not de minimis, that it has no intention to sell the article in question to non-governmental buyers, and that it has not sought such sales."n56

Section 1498 applies to the pre-contractual design, manufacture and demonstration of prototypes as part of the United States Government procurement procedures.n57

Section 1498 does not relieve a contractor with the United States of obligations based on an express patent license or assignment. A suit to enforce such obligation may be filed against the contractor in a state court or United States District Court.n58 In *Bunting v. McDonnell Aircraft Corp.* (1975),n59 a Missouri court upheld jurisdiction over a suit by an employee-assignor to recover on an alleged contract by the employer-assignee to pay 10% of the net income from use of the patent, even though the alleged use was manufacture for the government.

Three cases illustrate the difficulty in applying the exclusivity provision of Section 1498 when alleged contract rights are involved. In *Western Elec. v. Hammond* (1943),n60 the plaintiff Western Electric sought a declaratory judgment that it had a license from the defendant-patentee to manufacture a certain apparatus for the government. A suit by the defendant-patentee against the government in the Court of Claims was then pending. The defendant argued for dismissal, noting that the declaratory judgment statute is procedural only,n61 that the patentee could not have sued the plaintiff for infringement in a district court, and that the question of a license would be decided in the Court of Claims action. The plaintiff countered that it was not a party to the Court of Claims action, that that action involved products of twenty- one other manufacturers, and that that action may not be resolved for three or four years. The First Circuit held that it was error to dismiss the action without giving the plaintiff an opportunity to prove his allegation regarding delay.

In *Grumman Aerospace Corp. v. Lockheed* (1972),n62 on the other hand, a New York court stayed an arbitration to determine royalties demanded by the patent owner Lockheed against Grumman under a patent pool cross-license agreement. Lockheed had filed suit in the Court of Claims against the United States as to the sales in question. The court noted that Lockheed was taking inconsistent positions, denying a license in the Court of Claims action and relying upon a license in the arbitration matter.

Finally, in *Zimmerman v. United States Government* (1970),n63 a government employee sought judicial review in a district court of a determination by the Department of the Army and the Commissioner of Patents to leave an invention to the plaintiff subject to a nonexclusive royalty-free license for all government uses. The Third Circuit held the potential remedy under Section 1498 exclusive, rejecting the plaintiff's arguments that "the government, by never using the invention, can cut off a resort to the Court of Claims" and that "in the absence of a determination of respective rights, no commercial contractor will be willing to purchase appellant's rights in the invention."n64

*Zimmerman* stretches the exclusivity of Section 1498 too far and appears inconsistent with cases excluding from Section 1498 disputes over patent licenses and assignments. Also, it relies on the doctrine of sovereign immunity and the Supreme Court's decision in *Larson v. Domestic & Foreign Corp.*,n65 both of which have been limited by a 1976 amendment to the Administrative Procedure Act.n66

In *Robishaw Engineering, Inc. v. United States* (1955),n67 the Eastern Virginia District Court refused to entertain a patentee's action against the United States for a declaratory judgment that the United States did not have a license to practice the patented invention. Section 1498 provided the exclusive remedy even though the patentee may not be able to file a Section 1498 action until the Government extends authorization and consent or accepts delivery of a patented product.n68 The court noted that "although § 1498 surely does not bar district courts from deciding all cases in which the government's rights in a patent are relevant, the statute does bar jurisdiction over an action, as here, that, distilled to its essence, is a dispute over whether the government has a license to use a patent without becoming liable to pay compensation."n69 The Administrative Procedure Act did not override Section 1498 in this context.

> "[T]his is not to say that every APA claim brought against the government by a patentee would fall within the ambit of § 1498. For example, § 1498 would not bar a patent applicant's APA claim challenging some aspect of the Patent & Trademark Office's handling of his application. ... Such a claim would not relate to the government's use of a patent. Similarly, a patentee who unsuccessfully bid for a government contract might bring suit against agency officials alleging they violated procurement regulations by wrongfully awarding the contract to a competing bidder. Although issues relating to the patent might well arise in the case, the action's central focus would not be on a dispute about the government's use of the patent or whether such use was licensed or unlicensed. Moreover, if [the patentee] sued federal officials under the APA challenging the constitutionality of the regulations on which the Army relies in claiming a royalty-free license, neither sovereign immunity nor § 1498 would be an obstacle to the suit."n70

Section 1498 barred plaintiff's action even though it seeks a declaratory judgment, "a remedy that is not available from the Court of Federal Claims."

> "[T]he mere absence of a specific remedy in the Court of Federal Claims cannot serve to create jurisdiction. This principle is confirmed by the example of injunctive relief, a remedy also unavailable in the Court of Federal Claims, but also plainly prohibited by § 1498. ... Moreover, the policy purpose behind § 1498 is to insulate the government and its private contractors from 'lawsuits disruptive of the procurement process.' ... To permit a party to obtain a declaratory judgment as to one issue in anticipation of a possible future § 1498 action surely serves to undermine the statute's purpose in a significant way. Although the requested declaratory relief, unlike an injunction, would not bind the government to take or refrain from taking any action, the litigation over declaratory relief alone disrupts the government's procurement process. In fact, a declaratory judgment action regarding the government's lack of a license and potential future liability for § 1498 compensation is particularly disruptive because it creates a likelihood of entangling the government in piecemeal litigation."n71

A number of opinions by the Comptroller General of the United States rely on Section 1498 as precluding authority of government agencies to settle claims of patent infringement absent specific statutory authority.n72

**[c]-- Authorization or Consent.**

[Go To Supp]

The second paragraph of Section 1498(a) provides that "For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States."n73

The impact of the "authorization or consent" requirement varies depending on whether the infringement relates (1) to a product manufactured for actual delivery to the United States or (2) to a product, machine, or process used by a contractor or subcontractor doing work for the United States.

In the first situation, the decisions generally hold that acceptance by the government of an accused product manufactured by a contractor or subcontractor brings the matter within Section 1498 even if the contract could be fulfilled with other noninfringing products. Two different theories are relied upon. In *Bereslavsky v. Esso Standard Oil* (1949)n74 the Fourth Circuit ruled that the "authorization or consent" requirement did not apply at all where the "product of the patent [is] used by the government itself."n75 Under this view, the requirement is operative only as to use by contractors and subcontractors (the second situation). Other decisions rely on the standard clause in United States Government supply contracts that expressly extend authorization and consent to "all use and manufacture ... of any patented invention embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract."n76

In *TVI Energy Corp. v. Blane* (1986),n77 the Federal Circuit held that a demonstration of a product pursuant to a Government bidding procurement procedure was covered by Section 1498 even though the demonstrating party had no contract with the Government and even though the Government had not issued an "authorization and consent letter." In *TVI Energy*, the Government invited the public to submit bids to supply disposable thermal targets. The Government procurement procedure required bidders to submit specimen targets and to conduct a live demonstration. The patentee and the defendant each conducted demonstrations. After observing the defendant's targets, the patentee filed suit for infringement. The district court dismissed the suit on the ground that the defendant was immune from suit under Section 1498.

The Federal Circuit affirmed, rejecting three arguments by the patentee as to why Section 1498 should not apply. First, the patentee argued that the defendant "was merely a *competitor* for a Government contract and not yet an approved Government *source*."n78 The court noted, however, that "[t]he significant point is that [defendant] was *required* to demonstrate the alleged infringing targets as part of the Government's bidding procedure" and that the defendant's "only purpose in demonstrating the targets was to comply with the Government's bidding requirements."n79 Thus, the demonstration was "for" the United States. Second, the patentee argued that the defendant did not act with the "authorization or consent" of the Government because there was no authorization or consent letter. The court noted:

> "Authorization or consent by the Government can be expressed in a form other than such a letter. ... In proper circumstances, Government authorization can be implied. In this case, for instance, Government authorization was expressed by the specific requirement that [the defendant] demonstrate, under the guidelines of the bidding procedure, the allegedly infringing targets ... The mere fact that the Government specifications for the targets did not absolutely require [the defendant] to infringe [the] patent at that demonstration does not extinguish the Government's consent. To limit the scope of § 1498 only to instances where the Government requires by specification that a supplier infringe another's patent would defeat the Congressional intent to allow the Government to procure whatever it wished regardless of possible patent infringement. The coverage of § 1498 should be broad so as not to limit the Government's freedom in procurement by considerations of private patent infringement."n80

Finally, the patentee argued that to deny it relief against the defendant would effectively deny it any judicial remedy in view of a letter from the Patent Law Division of the Army indicating that "[u]ntil a contract has been awarded and equipment delivered and accepted under the contract, there is in general no basis for an infringement claim against the government." The court noted that the letter only said "in general" and that such an opinion is not "the final authority."n81 In any event, it found it unnecessary to decide whether the patentee had a cause of action against the Government because, if it did, it would be against the Government in the Claims Court.n82 The court also noted that the "demonstration infringement" was "minimal" because the total value of the targets was only $ 500 and the defendant received "no commercial profit from the use of the targets."n83

However, Section 1498 does not shield the manufacturer or seller of an infringing item simply because it eventually ends up in the hands of the United States Government. In *Systron-Donner Corp. v. Palomar Scientific Corp.* (1965),n84 the defendant sold certain accused accelerometers to Micro Gee Products at a time when neither the defendant nor Micro Gee had any government contract. Thereafter, Micro obtained a government purchase order containing a "boiler

plate" authorization and consent clause and used the accelerometers in fulfilling the contract. The court held that there was no authorization or consent "even though some of the accelerometers did eventually become the property of the United States."n85  In *Great Plains Bag Corp. v. St. Regis Paper Co.* (1975),n86  Great Plains sold certain accused bags to ADM Milling, which used the bags for wheat soy blend to be distributed by private charitable organizations in foreign countries. ADM Milling operated under a contract with the United States Department of Agriculture, the specifications of which would allow use of other noninfringing type bags. The court denied a summary judgment, noting that it was "not prepared to apply Section 1498(a) in the absence of some governmental cognizance of or acquiescence in the alleged patent infringement."n87

> "A number of factors gleaned from the evidence militate against a finding of governmental authorization or consent. First, there is no direct contractual relationship between Great Plains and the Government. ... Second, the pertinent government specifications to ADM Milling do not require the use of a bag which infringes defendant's patents. ... Third, the contract between the Government and ADM Milling contains no 'authorization and consent' clause. ... Fourth, it appears that the bags are capable of nongovernmental usage either currently or over the life of the patents."n88

The second situation (use of a product, machine or process by a contractor or subcontractor in doing work for the United States) presents greater difficulty. The rationale of *Bereslavsky* clearly does not apply. The standard clause in United States Government supply contracts is limited, extending authorization and consent only where the invention is "utilized in the machinery, tools, or methods the use of which necessarily results from compliance by the Contractor or the using subcontractor with (a) specifications or written provisions now or hereafter forming a part of this contract, or (b) specific written instructions given by the Contracting Officer directing the manner of performance."n89  On the other hand, in contracts for research or development, the government extends "greater latitude," extending authorization and consent for "all use and manufacture of any patented invention in the performance" of the contract.n90

In *Croll-Reynolds Co. v. Perini-Leavell- Jones-Vinell* (1968),n91  the defendant constructed an apparatus for cooling concrete ingredients as part of a contract with the United States to build a dam. The contract did not require that the accused cooling method and apparatus be used and contained the standard provision on use of inventions. The Government did approve the cooling facilities and made separate payment for them as required by the contract. The Fifth Circuit held that such approval and payment "conclusively established authorization and consent."

> "It does not matter that there may have been other cooling devices or systems that might have been used. If some other system had been installed, another claimant under another patent might be the appellant here. Under Section 1498 the appellants' remedy, if any they have, is against the United States in the Court of Claims."n92

In *Roberts v. Herbert Cooper* (1959),n93  the plaintiff obtained on July 8, 1958, a temporary restraining order against the defendant's use of a patented process for the manufacture of tubing. The United States intervened and moved to dismiss on the basis of Section 1498, relying in part on a letter of July 11, 1958, from a government officer to the defendant expressly authorizing and consenting to use of the process in performance of the defendant's contract with the United States. The court dismissed the action.

In *Consolidated Vacuum Corp. v. Machine Dynamics* (1964),n94  the court held that there was insufficient evidence of authorization or consent in a suit against a manufacturer of certain shock testing systems.

> "The devices in question are shock testing systems, used to test equipment manufactured for the Government for use in its missile and space programs. Defendant Machine Dynamics ... sold the allegedly infringing devices to companies holding Government contracts and subcontracts. In each instance ... title to the device was taken by the contractor, not the Government. There is evidence the equipment can be used for purposes other than the testing of missile and space devices, and that the equipment has been advertised for sale in trade journals. ...
>
> "The contracts between the Government and purchasers of the shock testing equipment did not require the contractors to use the particular shock testing devices here involved; and it appears the Government did not directly authorize, consent to, nor know of their use."n95

In its contracts, the United States commonly requires the contractor to agree to indemnify it for any loss encountered by virtue of infringement and an action in the Court of Claims. In *Molinaro v. Watkins-Johnson CEI Div.* (1973),n96 the court held that such a right to indemnification was not inconsistent with authorization and consent by the United States.

> "[T]he indemnification clause is a device to protect the government in its acceptance of liability for patent infringement. If the Court of Claims finds the United States liable for the infringement, then the Government can recover its loss from the defendant. Indemnification, therefore, rather than being inconsistent with 'authorization and consent' is totally consistent with it."n97

**[d]-- By or For the United States.**

[Go To Supp]

On occasion problems have arisen in determining when manufacture or use is "by" or "for" the "United States." In *Bereslavsky v. Standard Oil Co.* (1949),n98 the plaintiff argued that sales of gasoline to the Defense Supplies Corporation, which was a wholly owned subsidiary of the Reconstruction Finance Corporation, which, in turn, was wholly owned by the United States, were not to the United States. The Fourth Circuit held that the Corporation was "a mere purchasing agency" for the United States.n99 Furthermore, the gasoline purchased was ultimately used by the United States armed forces.

In *Broome v. Hardie-Tynes Mfg. Co.* (1937),n100 the defendant supplied sluice gates for a dam under contract with the United States. The plaintiff argued that the dam project was in fact for "the Muskingum Watershed Conservancy District, a corporation of Ohio" and that the United States was merely lending and contributing funds to the project. The Fifth Circuit disagreed. The project was under the control of United States engineers. An injunction would "result in preventing the United States from going ahead with its public works and thus permit the very mischief the invoked statute was enacted to prevent."n101

In *John J. McMullen Assocs., Inc. v. State Board of Higher Ed.* (1967),n102 the plaintiff sought to recover for use of a stabilization tank on a vessel owned and operated for research purposes by Oregon State University. The University obtained the vessel at no cost from the United States army, the transfer specifying that the vessel could "be used only for ... health or educational purpose ... including research." In June 1963 the University obtained a $ 600,000 grant from the National Science Foundation to equip the vessel for oceanographic research. The grant specified that the vessel should be used "primarily for the conduct of basic scientific research," with provision for conveyance to the United States without cost should the vessel be used otherwise. In August of 1964, the National Science Foundation approved plans showing in detail the stabilization tank. Thereafter, research operation and use of the vessel was financed by grants and contracts from the Foundation (50%), the Navy (40%), and the Atomic Energy Commission (10%). The plaintiff argued that the tank was not used "for" the United States because title was in the State of Oregon and "where one donates funds for expenditure on a project by another, it does not necessarily follow that the project is being done 'for the donor.' " The District Court disagreed.

> "Where the Government finances the manufacture of a device and grants it to a private agency with the stipulation that it can only be used for specified purposes, and such use advances recognized vital interests of the U.S. Government, the conclusion is inescapable that such manufacture and use were 'for' the U.S. Government."n103

On appeal, the Ninth Circuit affirmed but restricted the holding "to the facts of this case."n104 The court declined to pass upon the general proposition that section 1498 covers all research grants.

> "Here, the patented articles were used in work of vital importance to the government. Additionally, the National Science Foundation grant appears to have been primarily a financing device for work of special interest to the United States Navy. Moreover, the ship employing the devices was used only for research approved and financed by the government."n105

In *Interdent Corp. v. United States* (1973),n106 the plaintiff sued the United States under Section 1498 in the Court of Claims as to sales of allegedly infringing items in Defense Department Post Exchanges. The Court of Claims held that Section 1498(a) "does not authorize a suit against the United States for unauthorized use, sale, or manufacture of a patented invention by a non-appropriated fund facility." In 1970, Congress amended Section 1491 covering contract claims against the United States to expressly cover contracts with such exchanges but made no similar change in Section 1498. A necessary implication of *Interdent* is that a patent owner would be free to sue in a district court for infringement one who makes or sells infringing items to such exchanges.

In *Hughes Aircraft Co. v. United States* (1976),n107 the Court of Claims held that manufacture and use of the plaintiff's patented invention in satellites in the "Skynet" Program, a joint United States-United Kingdom military defense program, was both use "for" the United States with its authorization and consent and use "by" the United States, because during the launch period the United Kingdom surrendered direct and exclusive control of the satellites to United States Government agencies.n108

### [e]-- Government Employees.

In 1952, Congress amended Section 1498 to allow Government employees "to bring suit against the Government."n109 An exception is made if the employee "was in a position to order, influence, or induce use of the invention by the Government." Congress also provided that Section 1498 "shall not confer a right of action on any patentee or any assignee of such patentee with respect to any invention discovered or invented by a person while in the employment or service of the United States, where the invention was related to the official functions of the employee, in cases in which such functions included research and development, or in the making of which Government time, materials or facilites were used."

The phrase "discovered or invented by a person while in the employment or service of the United States" presents interesting problems of interpretation.n110 In *Moore v. United States* (1919),n111 the plaintiff alleged in his petition that he worked on the invention starting in 1903, that he entered government employment in 1913, and that he "completed his invention" in 1914. The Supreme Court held that this petition "showed on its face that the device was discovered during the time he was in the employment or service of the government:" "No matter what the appellant may have done prior to May, 1914, it was in that month, he avers, that he completed his invention, and during the whole of that month he was in the employment or service of the government."n112 In *Stub v. United States* (1946),n113 the plaintiff was employed by the Government from October 14, 1936, to October 5, 1944, and filed the application for the patent on November 26, 1942. The Court of Claims held that the subject of the patent was "invented" during the period of Government service because the plaintiff could prove no date of actual reduction to practice prior to commencing Government service.

*Moore* and *Stub* indicate that a matter is "invented" during government service if it is first reduced to practice during that period.n114 *Moore* suggests that such a rule applies regardless of any conception prior to government service or diligence in reducing to practice.n115 Neither *Moore* nor *Stub* deals with the situation in which the person conceives the invention during government service but reduces it to practice after leaving such service. Arguably, such would fit within the phrase "discover."

The bar on invention discovered or invented during government service applies only "where the invention was related to the official functions of the employee" *and either* (1) "such functions included research and development" *or* (2) "Government time, materials or facilites were used" "in the making" of the invention. Requirements (1) and (2) are disjunctive. In *Myers v. United States* (1959),n116 the plaintiff was employed in the preliminary aircraft design section of the Navy Bureau of Aeronautics. During the period of such employment, plaintiff applied for the patent at issue on certain aircraft installations. The Court of Claims held the action barred by the proviso in Section 1498.

> "The proviso bars a right of action to an employee-patentee with respect to *any* invention related to the official functions of the employee. This language does not require that the employee be specifically hired to make inventions or to make a specific invention, or even that he be hired as an inventor. The meaning is clear that if an invention is made by the employee, is related to the work of the employee, and the official functions of the employee include research and development, no right of action is conferred by the proviso. Plaintiff's official functions during the entire time he was employed in the Preliminary Design section included research or investigation of what had already been done and included development or design of new aircraft and aircraft components."n117

Apparently, no decision has considered the effect of excepting from Section 1498 certain patents on inventions by government employees upon the patent owner's right to sue government contractors and subcontractors.n118  It could be argued that such suits are permitted because Section 1498 extends no remedy and therefore cannot be exclusive. However, the apparent intent of the exception is to free the full scope of government procurement and activity from patent claims based on certain inventions during government service. Thus Section 1498 and the exception can be read to exclude any infringement claim if Section 1498 would provide the exclusive remedy but for the exception.

The exception in Section 1498 relates only to the existence of a remedy against the United States by action in the Court of Federal Claims. The question of ownership of inventions by a government employee is determined by other principles of law.n119

**[4]-- States and State Agencies**

[Go To Supp]

It is generally agreed that patent rights apply to the activities of a State or of an agency of a State. However, the Eleventh Amendment and the related doctrine of sovereign immunity present significant obstacles to an infringement suit in federal court against a State, State agency, or State officer.n1  In 1992, Congress amended the Patent Act to abrogate state immunity from patent and plant variety protection infringement suits,n2  but the reasoning of a 1996 Supreme Court decision, which did not deal directly with patents or intellectual property, drew the amendment's constitutionality into question.n3

Several cases support the issuance of an *injunction* against further infringement against a nonconsenting state, at least where the decree is directed in name to a state officer.n4  In *Howell v. Miller* (1898),n5  the Sixth Circuit held that a federal court could enjoin a state printer and compiler from publishing and distributing a work in violation of the plaintiff's copyright; "A state cannot authorize its agents to violate a citizen's right of property, and then invoke the constitution of the United States to protect those agents against suit instituted by the owner for the protection of his rights against injury by such agents."n6  The court distinguished the Supreme Court's decision in *Belknap v. Schild* (1896),n7  which denied an injunction against continued use of a "caisson gate" that was the property of the United States. The relief sought in *Howell* would not disturb the State's possession of its tangible property (*i.e.* the manuscript of the infringing work).n8

In *Hercules, Inc. v. Minnesota Highway Dept.* (1972),n9  the court relied on the Supreme Court's decision in *Ex parte Young* (1908)n10  to hold that "state officers when they infringe patents [must] be subject to the injunctive process of a federal court."n11  Plaintiff's patent was on a process of using a certain compound for weed and pest control. It sued the Minnesota State Highway Department, which allegedly used the process, and the Dow Chemical Company, which allegedly contributed to the Department's infringement by supplying the chemical.n12

> "Neither the State of Minnesota nor its highway department or officers have any right to use a valid patent without license or compensation and ... doing so constitutes a violation of constitutional protections of rights in property.
>
> "... [A]s to remedy, the instant case falls within the language of *Ex Parte Young*--that is, there being no legal right to infringe in the Highway Department or its agents, an injunction against the infringing actions of the State 'does not affect the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official. ...' ... Indeed, the case for enjoining patent infringement by the state would seem to be even stronger than that for enjoining *Young,* since exclusive power over patents is vested in the federal government and its courts. Thus, if the Federal courts cannot hear a claim of patent infringement by a state because of the XI Amendment, a patentee will *never* have a forum for asserting the unconstitutionality of the taking of his patent."n13

*Hercules* denied any *damage* recovery against the State on Eleventh Amendment grounds but upheld the power to award damages against Dow Chemical Company as a contributor to the infringement by the state and its officers.

A State may waive its sovereign immunity and consent to suit in federal court. Generally, consent to suit is a question of state law and will be found only in a "clear declaration."n14  In *Warren Bros Co. v. Kibbe* (1925),n15  a district court found consent to suit for damages in a state highway commission statute which authorized the commission to pay royalties directly to a patentee for use of an invention by a contractor, to indemnify such contractors for infringement liability, and to prosecute or defend suits testing the validity of patents when deemed advisable.

In *Lemelson v. Ampex Corp.* (1974),n16 a district court applied the doctrine of *Parden v. Terminal Ry.*n17 to imply consent to suit for damages from the state's use of the patented invention. The plantiff sued the Illinois Bureau of Investigation for its use of a magnetic recording system in video document storage and retrieval. In *Parden*, the State of Alabama was found to have consented to an injured employee's suit in federal court under the Federal Employer's Liability Act by virtue of its operation of a railroad in interstate commerce. In *Employees v. Missouri Public Health Dept.,*n18 the Supreme Court limited the scope of *Parden* by holding that states did not consent to private enforcement suits under the Fair Labor Standards Act by operating schools and hospitals. In *Lemelson*, the district court held a patent infringement suit to be controlled by *Parden* rather than *Employees*.

> "[*E* ]*mployees* repeatedly emphasized the broad scope of the Commerce Clause and the multivariate contacts it has with state law. ... Patents, both constitutionally and by statute, are exclusively in the federal domain. ... In *Employees*, the Court's opinion also stressed that private enforcement was not essential to attain the policy objectives of the Fair Labor Standards Act . ... This differs from the patent case, where private enforcement is paramount. There are no other remedies available for patent infringement."n19

*Lemelson* is a questionable decision. *Pardin* found implied consent to suit from the State's activity in an area subject to special federal regulation. *Lemelson* seemed to predicate consent solely on the State's violation of the plaintiff's federal statutory rights. The activity out of which the claim arose was police investigation, an area of traditional governmental concern. That violation of a federal right is not sufficient without more to find consent to suit for damages is emphasized by the Supreme Court's decision in *Edelman v. Jordan* (1974).n20

In *Mills Music, Inc. v. Arizona* (1979),n21 the Ninth Circuit held a State liable for damages for copyright infringement for the use of the plaintiff's musical composition to promote a fair. The court noted specifically that its decision was consistent with *Lemelson*.

> "[A] state may not, consistent with the Constitution, infringe the federally protected rights of the copyright holder, and thereafter avoid the federal system of statutory protections. The 'exclusive Rights' of an author, guaranteed under the Constitution and Copyright Act, would surely be illusory were a state permitted to appropriate with impunity the rights of a lawful copyright holder. Accordingly, we conclude that the Eleventh Amendment's sovereign immunity does not permit a state to nullify the rights reserved and protected by Congress, acting pursuant to the Copyright and Patent Clause.
>
> "Finally, we note that the state's participation in the federally regulated activity is akin to 'the dramatic circumstances of the *Parden* case, which involved a rather isolated state activity ...' *Employees v. Department of Public Health & Welfare, ... 411 U.S. at 285.* The state voluntarily engaged in what is essentially a commercial activity. Its participation occurred well after federal legislation regulated the activity. The state has not shown, nor do we find upon independent examination, that the award in this case was so large as to interfere with the state's budgeting process."n22

The Supreme Court's *Atascadero* decision,n23 which did not involve intellectual property, precipitated a series of lower court decisions holding that States are immune from suit in Federal Court for copyright infringement. In *BV Engineering v. University of California* (1988),n24 the Ninth Circuit decided that its *Mills Music* decision had been effectively overruled by *Atascadero*.

In 1991, Congress amended the copyright statutes to abrogate state immunity.n25

In *Chew v. California* (1990),n26 the Federal Circuit held that States are immune from federal court patent infringement suits. Under *Atascadero*, in order to abrogate State immunity from suit on a federal statutory cause of action, Congress must make its intent unmistakably clear in the language of the statute itself. The general term "whoever" in *35 U.S.C. Section 271*(a) "is not the requisite unmistakable language of congressional intent necessary to abrogate Eleventh Amendment immunity."n27 Whether a patent owner would be entitled to a remedy under state law in state court "is a question not before us."n28

Similarly, in *Jacobs Wind Electric Company, Inc. v. Florida Department of Transportation* (1990),n29 it held that the district court properly dismissed the patentee's patent infringement suit against Florida's Department of Transportation

on Eleventh Amendment immunity grounds. Plaintiff's arguments that *Chew* does not apply to (a) suits against a state by a resident of that state, or (b) suits seeking a declaration of validity and infringement, not damages, are unpersuasive.

"Eleventh Amendment immunity obtains to bar suit by a resident or nonresident, absent waiver or Congress' legitimate exercise of the power to abrogate that immunity.

"... [Appellant's argument] essentially is a variation on the argument ... rejected in *Chew* that without a remedy for patent infringement in federal court, patentees are left without any remedy... .

"... [Appellant's argument] that it is left without any remedy in Florida and that a Florida court cannot pass on the validity of a patent are simply wrong. ... [It] could have sought relief in the Florida Legislature through a claims bill ... [It also] may assert a 'takings' claim against the state under the Fifth and Fourteenth Amendments. [N. 2 What a patentee may arguably 'lose' through being limited to a 'takings' claim or similar state court proceeding is not the ability to obtain any remedy but the benefit of provisions of *35 U.S.C. § § 284* and 285 (1988) relating to enhanced damages and attorney fees.] ... [A]lthough a state court is without power to invalidate an issued patent, there is no limitation on the ability of a state court to decide the question of validity when properly raised in a state court proceeding."n30

In the 1992 Patent and Plant Variety Protection Remedy Clarification Act, Congress sought to clarify that (1) States, their instrumentalities, and State officers and employees acting in their official capacity, are subject to Federal court patent infringement suits, and (2) a patent owner can obtain in such a suit all the remedies that can be obtained against a private entity.n31  The Act adds to Title 35's Section 271, which defines patent infringement, a new subsection (h), which provides:

"(h) As used in this section, the term 'whoever' includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this title in the same manner and to the same extent as any nongovernmental entity."

It adds to the Title's Chapter 29, which deals with patent infringement remedies, a new Section 296, which provides:

### [296.]--Liability of States, Instrumentalities of States, and State Officials for Infringement of Patents

(a) IN GENERAL. Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his official capacity, shall not be immune, under the eleventh amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person, including any governmental or nongovernmental entity, for infringement of a patent under section 271, or for any other violation under this title.

(b) REMEDIES. In a suit described in subsection (a) for a violation described in that subsection, remedies (includes remedies both at law and in equity) are available for the violation to the same extent as such remedies are available for such a violation in a suit against any private entity. Such remedies include damages, interest, costs, and treble damages under section 284, attorney fees under section 285, and the additional remedy for infringement of design patents under section 289."

In *Genentech, Inc. v. Eli Lilly & Co.* (1993),n32 the Federal Circuit held that the 1992 Act (1) abrogates state immunity from a declaratory judgment invalidity and noninfringement suit as well as from an infringement suit and (2) applies to cases filed before its effective date.n33

Genentech filed a suit in the Southern District of Indiana against the University of California and Eli Lilly seeking a declaration that a patent the University owned and had licensed to Lilly was invalid and not infringed and seeking relief for alleged antitrust and state law violations.

The district court held that the Eleventh Amendment prohibited the declaratory judgment suit against the University, an arm of the State of California. The Federal Circuit reversed, holding that the University "is not immune from suit as to the patent counts and as to those other counts that are defenses and compulsory counterclaims to the charge of patent infringement."n34  Despite new Section 296's title, which refers to liability for "infringement," it applies, by its

terms, to "any other violation" under the Patent Act.n35  It "necessarily includes permitting the states to be a defendant in a suit asserting that the patent is in violation of the law."n36  The plaintiff's antitrust and state law counts "are not within the statutory abrogation,"n37  but the counts that allege defenses to patent infringement, such as "contract-based estoppel and the defense of unenforceability based on antitrust violation, are as available to the accused infringer as the defenses of patent invalidity and noninfringement."n38  The plaintiff's charge that "the University committed fraud in the patent office in obtaining a Certificate of Correction under conditions that Genentech alleges did not meet the requirements of *35 U.S.C. § 255*" "if proved would in any event violate the patent law, and to that extent state immunity was abrogated by Public Law 102-560, which applies to 'the eleventh amendment [or] any other doctrine of sovereign immunity'. *35 U.S.C. § 296*(a)."n39

In 1996, in *Seminole Tribe of Florida v. Florida* (1996),n40  the Supreme Court addressed the Indian Gaming Regulatory Act, which was "passed by Congress under the Indian Commerce Clause, U.S. Const., Art. I, § 8, cl. 3" and which "imposes upon the States a duty to negotiate in good faith with an Indian tribe toward the formation of a compact, ... and authorizes a tribe to bring suit in federal court against a State in order to compel performance of that duty." The majority held "notwithstanding Congress' clear intent to abrogate the States' sovereign immunity, the Indian Commerce Clause does not grant Congress that power, and therefore [the Act] cannot grant jurisdiction over a State that does not consent to be sued."n41

> "[W]e granted certiorari ... in order to consider two questions: (1) Does the Eleventh Amendment prevent Congress from authorizing suits by Indian tribes against States for prospective injunctive relief to enforce legislation enacted pursuant to the Indian Commerce Clause?; and (2) Does the doctrine of *Ex parte Young* permit suits against a State's governor for prospective injunctive relief to enforce the good faith bargaining requirement of the Act? We answer the first question in the affirmative, the second in the negative ... ."n42

The majority overruled *Pennsylvania v. Union Gas Co.* (1989),n43  It "reconfirm[ed] that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government."n44

> "Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States. ... The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction. Petitioner's suit against the State of Florida must be dismissed for a lack of jurisdiction."n45

Dissenting, Justice Stevens argued that the majority's ruling would prevent Congress "from providing a federal forum for a broad range of actions against States, from those sounding in copyright and patent law, to those concerning bankruptcy, environmental law, and the regulation of our vast national economy.": "As federal courts have exclusive jurisdiction over cases arising under these federal laws, the majority's conclusion that the Eleventh Amendment shields States from being sued under them in federal court suggests that persons harmed by state violations of federal copyright, bankruptcy, and antitrust laws have no remedy."n46

The majority responded that the Justice Steven's conclusion "is exaggerated both in its substance and in its significance."

> "First, Justice STEVENS' statement is misleadingly overbroad. We have already seen that several avenues remain open for ensuring state compliance with federal law. ... Most notably, an individual may obtain injunctive relief under *Ex parte Young* in order to remedy a state officer's ongoing violation of federal law. ... Second, contrary to the implication of Justice STEVENS' conclusion, it has not been widely thought that the federal antitrust, bankruptcy, or copyright statutes abrogated the States' sovereign immunity. This Court never has awarded relief against a State under any of those statutory schemes; in the decision of this Court that Justice STEVENS cites (and somehow labels 'incompatible' with our decision here), we specifically reserved the question whether the Eleventh Amendment would allow a suit to en-

force the antitrust laws against a State. *See Goldfarb v. Virginia State Bar, 421 U.S. 773, 792 n. 22 (1975).* ... Although the copyright and bankruptcy laws have existed practically since our nation's inception, and the antitrust laws have been in force for over a century, there is no established tradition in the lower federal courts of allowing enforcement of those federal statutes against the States. Notably, both Court of Appeals decisions cited by Justice STEVENS were issued last year and were based upon *Union Gas. See Chavez v. Arte Publico Press, 59 F.3d 539 (C.A.5 1995); Matter of Merchants Grain, Inc., 59 F.3d 630 (C.A.7 1995).* Indeed, while the Court of Appeals in *Chavez* allowed the suit against the State to go forward, it expressly recognized that its holding was unprecedented. *See Chavez, 59 F.3d at 546* ("we are aware of no case that specifically holds that laws passed pursuant to the Copyright Clause can abrogate state immunity').''n47

### [5]-- Political Subdivisions of States

Generally, a city, county or other political subdivision of a State is liable for any infringement of a patent arising from its activities.n1 The Eleventh Amendment and the related doctrine of sovereign immunity of States does not extend to such entities.n2

In *Quad Environmental Technologies v. Union Sanitary District* (1990),n3 the district court held that a utility district's activities are "more akin to those of a municipal corporation than a state agency."

> "To determine whether a governmental agency is an arm of the state, Courts must examine the following factors: (1) would a money judgment be satisfied out of state governmental funds; (2) does the entity perform central governmental functions; (3) may the entity sue or be sued; (4) does the entity have the power to take property in its own name; (5) the corporate status of the entity... . To determine these factors, courts look to the way state law treats the entity."n4

The extent to which state law may alter, affect, or limit the liability of a political subdivision for patent infringement is a difficult question. Clearly, a state statute confining all suits against a political subdivision to a certain state court is not binding on a federal court in patent or any other type of litigation.n5 On the other hand, a federal court in an infringement suit must look to state law to determine whether the defendant is an entity distinct from the State itself.n6

An early decision, *Jacobs v. Hamilton County* (1862),n7 applied Ohio law exempting counties from liability for torts to an action for patent infringement. However, later decisions declined to follow *Jacobs.*n8 In *May v. County of Ralls* (1887),n9 the court held that a Missouri county could be sued at law for patent infringement even though under Missouri law counties could be sued only on express contracts.

> "Congress has exclusive control over the grant of letters patent, and may authorize suits for infringement to be brought in such form, and against such persons or corporations, as it deems expedient. It could not authorize a suit for infringement to be brought against a state under the eleventh amendment of the constitution, but no reason is perceived why it may not authorize a suit against a *quasi* municipal corporation, like a county, which has been created by a law of the state, and under state laws may be sued for certain purposes, no matter what may be the peculiar policy of the state with reference to relieving counties therein from liability for acts of county officials."n10

In *May v. County of Buchanan* (1886),n11 the court held that a patentee must comply with a state statute requiring that a claimant make a demand for payment on the board of supervisors of a county prior to filing suit.

Whether *Buchanan* is good law today is unclear. Arguably, a party should not be required to exhaust a state administrative remedy when the judicial remedy is within the exclusive jurisdiction of the federal courts. Nevertheless, in *Cooper v. Westchester County* (1941),n12 the court relied on *Buchanan* to dismiss a complaint against a county for patent infringement in use of a toll checking apparatus on a toll bridge for noncompliance with a state statute barring suit for damages unless a claim is submitted within thirty days after the occurrence. Noting the court's suggestion that "infringement is a continuing tort," the plaintiff in *Cooper* gave the required notice, refiled the action, and ultimately prevailed on the merits.n13

In *Quad Environmental Technologies v. Union Sanitary District (1990)* ,n14 the district court held the California Tort Claims Act's six-month claim presentation provision not applicable to a federal court patent infringement suit. It

noted that "Both [*May*] and [*Cooper*] held that patent infringement claimants had to comply with state statutory notice requirements."

"Neither of these cases has ever been followed or overruled.

"*May* and *Cooper* refer to compliance with notice requirements like those imposed by the CTCA as 'conditions precedent' to filing suit. They reason as follows: One may not sue the state or a state agency without the state's permission; such permission is provided by the state tort claims act. In order to avail themselves of the benefits of the state tort claims law, plaintiffs must comply with the statutes' notice requirements.

"That reasoning is inapposite to this case. Here the CTCA gives [plaintiff] nothing to which it is not already entitled. [It] can bring a claim against [defendant] without [defendant's] acquiescence, because [defendant] is not a state or state agency entitled to governmental immunity."n15

In *National League of Cities v. Usery* (1976),n16 the Supreme Court held that Congress could not, through exercise of its power to regulate interstate commerce, displace the power of the States and their political subdivisions to establish wages for its employees "in such areas as fire prevention, police protection, sanitation, public health, and parks and recreation."n17 Rights granted by the federal patent laws differ sharply from those involved in *Usery*. However, the doctrine of intergovernmental immunity might be relied on to limit the types of remedies that may granted for patent infringement in areas of traditional governmental activity.

### [6]-- Foreign Governments

The Foreign Sovereign Immunities Act of 1976 n1 abolishes the defense of sovereign immunity of foreign states (including political subdivisions, agencies, and instrumentalities thereof)n2 with respect to "commercial activity"n3 carried on in or directly affecting the United States.n4 The Act does not expressly mention patent infringement actions, but its provisions are sufficiently broad to include them. Section 1605 abolishes sovereign immunity in specified circumstances. Section 1606 then provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances."n5

Section 1605(a)(1) abolishes sovereign immunity in cases "in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."n6 This would appear to include not only activity by a foreign state in the United States but also activity abroad which induces or contributes to direct infringement of a United States patent within the United States.n7

**FOOTNOTES:**

(n1) Footnote 1. Compare *North American Philips Corp. v. American Vending Sales, Inc., 35 F.3d 1576, 1579, 32 USPQ2d 1203, 1205 (Fed. Cir. 1994),* discussed at § 16.02[5][b] N. 7 *supra* and § 21.02[3] N. 22.19, [b] N. 36.5 *infra* ("while it may be appropriate to speak loosely of patent infringement as a tort, more accurately the cause of action for patent infringement is created and defined by statute. *See 35 U.S.C. § 271*(a) (1988). The statute does not speak generally of the 'tort of patent infringement,' but specifically of a liability that arises upon the making, using, or selling of an infringing article.").

(n2) Footnote 2. E.g. *Crowell v. Baker Oil Tools, 143 F.2d 1003, 1004, 62 USPQ 512 (9th Cir. 1944), cert. denied, 323 U.S. 760 (1944)* ("It is obvious that one may infringe a patent if he employ an agent for that purpose or have the offending articles manufactured for him by an independent contractor."); *Duplex Envelope Co. v. Denominational Envelope Co., 80 F.2d 179, 182, 27 USPQ 325 (4th Cir. 1935); Soli-Tech Inc. v. Halliburton Co., 27 USPQ2d 1077, 1078 (E.D. Mich. 1993)* (partners "are jointly and severally liable for the tortious acts of" their partnership); *McDermott v. Omid International Inc., 723 F. Supp. 1228, 1236, 13 USPQ2d 1147, 1152 (S.D. Ohio 1988), aff'd, 883 F.2d 1026 (Fed. Cir. 1990)*(unpublished) ("Where the infringement is the result of the participation and combined actions of the defendants, they are joint infringers and are jointly liable for the infringement."); *Engineering Sports Prods. v. Brunswick Corp., 362 F. Supp. 722, 727, 179 USPQ 486, 489 (D. Utah. 1973)* (" *35 U.S.C. § 271*(a) might be invoked properly despite the apparent independence from the [foreign manufacturing] defendants of the domestic ski boot distributors upon the ground that the distributors generate domestic business which benefits the defendants and which establishes a quasi-agency relationship thus tying the domestic sales to the defendants."); *Kinnear- Weed Corp. v. Humble Oil & Ref.*

*Co., 324 F. Supp. 1371, 1381 (S.D. Tex. 1969), aff'd, 441 F.2d 631 (5th Cir. 1971), cert. denied, 404 U.S. 941 (1971)* (as to liability of investor in oil drilling venture; "Patent infringement is considered to be a tortious activity. ... To be an infringer, one must actively participate in, or directly benefit from, the infringement. ... Under Texas law, a 'non-operator', as simply the owner of an interest in realty (the leasehold estate), is not responsible for the torts or contracts of the operator or of the drilling contractor."); *Metal Film Co. v. Metlon Corp., 316 F. Supp. 96, 110-111, 167 USPQ 267 (S.D. N.Y. 1970); Westinghouse Elec. & Mfg. Co. v. Independent Wireless Tel. Co., 300 F. 748 (S.D. N.Y. 1924); Union Sulphur Co. v. Freeport Texas Co., 251 F. 634, 661 (D. Del. 1918), modified, 255 F. 961 (C.C.A. Del. 1919), cert. denied, 249 U.S. 618 (1919); Palmer v. Jordan Mach. Co., 186 F. 496, 509-11 (N.D. N.Y. 1911), rev'd, 192 F. 42 (C.C.A. N.Y. 1911)* (corporation not liable for infringing acts of president-stockholder committed prior to incorporation); *Wooster v. Marks, 30 F. Cas. 613 (No. 18,038) (C.C.S.D. N.Y. 1879); Poppenhusen v. New York Gutta Percha Comb Co., 19 F. Cas. 1059 (No. 11, 283) (C.C.S.D. N.Y. 1858); Stevens v. Felt, 23 F. Cas. 10 (No. 13,397) (S.D. N.Y. 1843).*

Cf. *L.A. Gear Inc. v. E.S. Originals Inc., 859 F. Supp. 1294, 1299, 32 USPQ2d 1613, 1617 (C.D. Calif. 1994)* (trademark license; the licensee is not the licensor's agent "[i]nasmuch as trademark license agreements do not in and of themselves create an agency relationship, ... and the trademark license agreement at issue indicates that [the licensor] in fact exercised only minimal control over [the licensee's] activities.").

(n3) Footnote 3. *19 F. Cas. 1059 (No. 11,283) (C.C.S.D. N.Y. 1858).*

(n4) Footnote 4. *19 F. Cas. at 1063.*

(n5) Footnote 5. *300 F. 748 (S.D. N.Y. 1924).*

(n6) Footnote 6. *300 F. at 749.*

(n7) Footnote 7. *300 F. at 754.*

(n8) Footnote 8. *300 F. at 749-50.*

(n9) Footnote 9. *80 F.2d 179, 27 USPQ 325 (4th Cir. 1935).*

(n10) Footnote 10. *80 F.2d at 182.*

(n11) Footnote 11. *80 F.2d at 182.*

(n12) Footnote 12. The liability of *individuals* as shareholders and officers of infringing corporations is discussed at § 16.06[2] *infra.*

(n13) Footnote 13. E.g. *Milgo Elec. Corp. v. United Business Communications, Inc., 623 F.2d 645, 658, 206 USPQ 281 (10th Cir. 1980), cert. denied, 449 U.S. 1066 (1980)*(liability of parent corporation on alter ego theory for acts of subsidiary corporation); *International Controls and Measurements Corp. v. Watsco Inc., 853 F. Supp. 585, 590, 31 USPQ2d 1344, 1348 (N.D. N.Y. 1994)* ("in patent cases, as in state corporation cases, it is fundamental that 'the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception' "); *Clinical Dynamics Corp. v. Dynatech Nevada Inc., 30 USPQ2d 1969, 1971 (D. Mass. 1994)* ("A parent company is liable for the actions of a separate and independent subsidiary only when compelling reasons justify disregarding corporate structure and piercing the corporate veil. ... If companies substantially disregard their own separateness, with an eye toward committing fraud or other injustice, the presumption favoring corporate status relaxes. ... However, there must be 'specific unusual circumstances' in order to pierce the corporate veil."); *Maxwell v. K mart Corp., 851 F. Supp. 1343, 1348, 30 USPQ2d 1593, 1596 (D. Minn. 1994)* (a company "can be liable as a direct infringer under section 271(a) for infringement by ... a related company, only if the evidence reveals circumstances justifying disregard of [the two] as distinct, separate corporations."); *Ensign-Bickford Co. v. ICI Explosives USA Inc., 817 F. Supp. 1018, 27 USPQ2d 1825 (D. Conn. 1993)* (Canadian parent corporation's participation in its subsidiary's testing of accused device in the United States constituted "use" in the United States); *TP Orthodontics Inc. v. Professional Positioners Inc., 20 USPQ2d 1017, 1027 (E.D. Wis. 1991)* ("No evidence supports disregarding [the subsidiary corporation's] corporate identity."); *Coleman v. Corning Glass Works, 619 F. Supp. 950, 226 USPQ 991 (W.D. N.Y. 1985), aff'd, 818 F.2d 874 (Fed. Cir. 1987)*(no evidence showing the degree of domination by a parent corporation over a subsidiary corporation necessary to disregard the subsidiary's separate corporate identity and hold the parent liable for infringing acts by the subsidiary); *Swift Chem. Co. v. Usamex Fertilizers, Inc., 197 USPQ 10 (E.D. La. 1977)*(parent corporation created subsidiary for purpose of carrying out infringing process); *Cold Metal Process Co. v. American Sheet & Tin Plate Co., 22 F. Supp. 75, 36 USPQ 377 (D. N.J. 1938), rev'd on other grounds, 115 F.2d 33, 47 USPQ 105 (3d Cir. 1940)* (liability of parent for infringement

by subsidiary corporation); *Lektophone Corp. v. Philadelphia Storage Battery Co., 8 F. Supp. 46, 23 USPQ 195 (E.D. Pa. 1934)* (liability of parent for infringement by subsidiary corporation).

(n14) Footnote 14. *58 U.S. (17 How.) 30 (1854).*

(n15) Footnote 15. *58 U.S. (17 How.) at 40.*

(n16) Footnote 16. *849 F.2d 593, 7 USPQ2d 1066 (Fed. Cir. 1988).*

(n17) Footnote 17. *849 F.2d at 596, 7 USPQ2d at 1068-69.*

(n18) Footnote 18. *718 F. Supp. 260, 11 USPQ2d 1833 (D. Del. 1989).*

See also *Upjohn Co. v. Syntro Corp., 14 USPQ2d 1469, 1472-73 (D. Del. 1990)* (granting summary judgment that parent corporation is not liable for direct infringement because of its subsidiary's allegedly infringing acts but denying summary judgment that parent is not liable for inducement of infringement; the patentee "establishes merely a normal, legitimate parent-subsidiary relationship and has not demonstrated that [the parent] exercises such complete domination and control over [the subsidiary] that would warrant disregard of the separate corporate entities ... . [The patentee] has failed to carry its burden to demonstrate that [the subsidiary] can be regarded as the alter ego or instrumentality of [the parent] thus rendering [the parent] liable for direct infringement.").

(n19) Footnote 19. *718 F. Supp. at 266 n.9, n.10, 11 USPQ2d at 1837 n.9, n.10.*

(n20) Footnote 20. *718 F. Supp. at 268, 11 USPQ2d at 1838.*

(n21) Footnote 21. *718 F. Supp. at 269, 11 USPQ2d 1839-40.*

(n22) Footnote 22. *718 F. Supp. 270, 11 USPQ2d at 1841.*

(n23) Footnote 23. *718 F. Supp. at 268, 11 USPQ2d at 1838.*

(n24) Footnote 24. *718 F. Supp. at 271-72, 11 USPQ2d at 1841-42.*

(n25) Footnote 25. *16 USPQ2d 1208 (N.D. Ill. 1990).*

See also *Hewlett-Packard Co. v. Bausch & Lomb Inc., 909 F.2d 1464, 15 USPQ2d 1525 (Fed. Cir. 1990)*, discussed at § 17.04[4][d] *infra*.

(n26) Footnote 26. *16 USPQ2d at 1210-12.*

A successor may be liable on a contributory or inducement of infringement theory. See § 17.04 *infra*.

(n27) Footnote 1. See generally Rotman, "Piercing the Corporate Veil: Is It the Proper Standard for Determining Personal Liability for Direct Patent Infringement?" *75 J. Pat. & Trademark Off. Soc'y 581 (1993);* Cooley, "Defending Corporate Officers in Depositions," *73 J. Pat. & Trademark Off. Soc'y 766 (1991);* Coolley, "Personal Liability of Corporate Officers and Directors for Infringement of Intellectual Property," *68 J. Pat. & Trademark Off. Soc'y 228 (1986);* Note, "Corporate Officers and Directors: Likely Targets in Patent Infringement Actions," 16 Delaware J. Corp. L. 1327 (1991).

For a discussion of the liability of corporate officers, directors, and employees for copyright infringement, see Nimmer, Copyright § 134.1 (1975).

As to the liability of *shareholders*, including parent corporations, for infringement by a corporation, see § 16.06[1][a] *supra*.

(n28) Footnote 2. *11 F.2d 945 (7th Cir. 1926).*

(n29) Footnote 3. E.g. *Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 16 USPQ2d 1587 (Fed. Cir. 1990)*, discussed at N. 41 *infra*; *U.S. Philips Corp. v. National Micronetics, Inc., 410 F. Supp. 449, 468, 188 USPQ 662, 678-79 (S.D. N.Y. 1976), aff'd, 550 F.2d 716, 193 USPQ 63 (2d Cir. 1977), cert. denied, 434 U.S. 859 (1977)* (not liable; "a corporate officer is generally not personally liable for an infringement when he acts solely within his duties as an officer and director;" though defendant was chief administrative officer, one of four founders of corporation and a large shareholder, he "in no way directed or instigated the infringing method of manufacture").

(n30) Footnote 4. E.g. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1578-79, 1 USPQ2d 1081, 1090 (Fed. Cir. 1986)*(citing Treatise; "To determine whether corporate officers are personally liable for the direct in-

fringement of the corporation under § 271(a) requires invocation of those general principles relating to piercing the corporate veil. Infringement is a tort, ... and officers of a corporation are personally liable for tortious conduct of the corporation if they personally took part in the commission of the tort or specifically directed other officers, agents, or employees of the corporation to commit the tortious act."; "The cases are legion in which courts have recognized and imposed personal liability on corporate officers for participating in, inducing, and approving acts of patent infringement."; because the corporate officers were, under the circumstances, properly found to be liable for the acts of the corporation, the finding that the corporation was a willful infringer means that the officers are willful infringers as well).

(n31) Footnote 5. E.g. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1578-79, 1 USPQ2d 1081, 1090 (Fed. Cir. 1986)* (citing Treatise; the district court erred in setting aside the jury's findings that the officers of a corporate infringer were personally liable for infringement, including willful infringement; "Corporate officers who actively aid and abet their corporation's infringement may be personally liable for inducing infringement under § 271(b) regardless of whether the corporation is the alter ego of the corporate officer."); *Power Lift, Inc., v. Lang Tools, Inc. 774 F.2d 478, 481, 227 USPQ 435, 437 (Fed. Cir. 1985)*(citing Treatise; Section 271(b) "may include liability of corporate officials who actively aid and abet their corporation's infringements."); *White v. Mar-Bel, Inc., 509 F.2d 287, 292-93, 185 USPQ 129 (5th Cir. 1975); International Mfg. Co. v. Landon, Inc., 336 F.2d 723, 728-29, 142 USPQ 421 (9th Cir. 1964), cert. denied, 379 U.S. 988 (1965); Universal Athletic Sales Co. v. American Gym, 480 F. Supp. 408, 416, 205 USPQ 840 (W.D. Pa. 1979); W.R. Grace & Co. v. Park Mfg. Co., 181 USPQ 490 (E.D. Ill. 1974).*

(n32) Footnote 6. See § 16.02[2] *supra* and § 17.04[2] *infra.*

Compare *Cooper Industries, Inc. v. Juno Lighting Inc., 1 USPQ2d 1313, 1314 (N.D. Ill. 1986), aff'd, 826 F.2d 1073 (Fed. Cir. 1987), cert. denied, 484 U.S. 1065 (1988)*("In all instances, the corporate officer to be held personally liable must have acted 'willfully and knowingly.' ") *with A. Stucki Co. v. Schwam, 634 F. Supp. 259, 264-265, 229 USPQ 903, 907-908 (E.D. Pa. 1986)*("[O]nly one of the listed examples in *Dangler* is based upon intent, i.e., the intent to use the corporation to carry out patent infringement and thereby avoid personal liability. ... The other example focuses upon the individual's direct participation in the infringing activity in a manner which exceeds the general supervision which is ordinarily expected of an officer and director ... [D]irect participation in the infringing activity by the principal officer of the corporation is a distinct basis for holding him liable with the corporation.").

See also *A. Stucki Co. v. Schwam, 634 F. Supp. 259, 264, 229 USPQ 903, 907 (E.D. Pa. 1986) (E.D. Pa. 1986)* ("Where the officer or director has directed or ordered the infringing method of manufacture or has controlled the sale of the infringing goods, he is jointly liable with the corporation for patent infringement without regard to his specific intent or knowledge.").

Cf. *Amicus Inc. v. Alosi, 723 F. Supp. 429, 432, 11 USPQ2d 1641, 1643 (N.D. Calif. 1989)* ("[T]here is ample support for the position that liability should be imposed on an individual officer for the infringements of his corporation when the individual is basically responsible for all the activities of the corporation. However, even if willfulness *were* a prerequisite to finding active inducement to infringe, the defendant still has not met his burden of showing that there is no genuine issue of material fact regarding his willfulness to induce infringement ... ."; the officer was "not automatically exonerated from joint liability for patent infringement by relying on the advice of counsel employed by a corporation" that was seeking to license the infringing technology to the officer's company).

(n33) Footnote 7. *7 F. Cas. 378 (No. 3753) (E.D. Pa. 1835).*

(n34) Footnote 8. *7 F. Cas. at 381.*

(n35) Footnote 9. *17 F. Cas. 852 (No. 9855) (C.C.N.D. N.Y. 1862).*

(n36) Footnote 10. *17 F. Cas. at 854.*

(n37) Footnote 11. *13 F. 392 (C.C.D. Mass. 1882).*

See also *Weston Elec. Co. v. Empire Elec. Instrument Co., 166 F. 867, 873-78 (C.C.S.D. N.Y. 1909), aff'd, 177 F. 1006 (2d Cir. 1910).*

(n38) Footnote 12. *94 F. 502 (1st Cir. 1899), cert. denied, 175 U.S. 724 (1899).*

See also *Cahoone Barnet Mfg. Co. v. Rubber & Celluloid Harness Co., 45 F. 582 (C.C.D. N.J. 1891); National Car-Brake Shoe Co. v. Terre Haute Car & Mfg. Co., 19 F. 514 (C.C.D. Ind. 1884).*

Cf. *Graham v. Earl, 92 F. 155, 161 (9th Cir. 1897)* (dictum; manager but not mere workman liable).

(n39) Footnote 13. *94 F. at 507-12.*

See also *National Car-Brake Shoe Co. v. Terre Haute Car & Mfg. Co., 19 F. 514, 515 (C.C.D. Ind. 1884)* ("if all the defendants have participated in the infringement they are all liable, though the individuals were acting simply as officers of the company in doing it. All parties who take part in a tort or trespass are liable. A man cannot retreat behind a corporation, and escape liability for a tort in which he actively participates.").

(n40) Footnote 14. *35 F. 743 (C.C.D. Minn. 1888).*

See also *Vapor Car Heating Co. v. Gold Car Heating & Lighting Co., 296 F. 201, 203 (S.D. N.Y. 1923), aff'd, 7 F.2d 284 (2d Cir. 1925)* (patentee estopped from charging corporation with infringement; defendant who "infringes ... in [no] other way than as officer" may not be enjoined); *Scott v. Fisher Knitting Mach. Co., 145 F. 915, 922 (2d Cir. 1906); Cazier v. Mackie-Lovejoy Mfg. Co., 138 F. 654 (7th Cir. 1905); Glucose Sugar Ref. Co. v. St. Louis Syrup & Preserving Co., 135 F. 540 (C.C.E.D. Mo. 1905); Panzel v. Battle Island Paper & Pulp Co., 132 F. 607 (N.D. N.Y. 1904), aff'd in part, rev'd in part, 138 F. 48 (C.C.A. N.Y. 1905); Hutter v. De Q. Bottle Stopper Co., 128 F. 283, 286 (2d Cir. 1904)* (there is "little justification for making [officers, agents and servants] defendants except in rare instances where it is shown that they have infringed the patent as individuals or have personally directed infringement."); *Greene v. Buckley, 120 F. 955 (C.C.W.D. N.Y. 1902), rev'd, 135 F. 520 (C.C.A. N.Y. 1904); Bower v. Atlantic, G. & P. Co., 104 F. 887 (C.C.S.D. N.Y. 1900)* (venue not proper as to corporation; corporate officer may not be enjoined when he has acted solely in his official capacity and there is no showing that a decree against the corporation will not give adequate relief); *Mergenthaler Linotype Co. v. Ridder, 65 F. 853 (C.C.S.D. N.Y. 1895)* (corporation not within court's jurisdiction; no injunction or accounting against individual officers who acted solely within their official capacities); *Kane v. Huggins Cracker & Candy Co., 44 F. 287 (C.C.W.D. Mo. 1890); Boston Woven Hose Co. v. Star Rubber Co., 40 F. 167 (C.C.D. N.J. 1889).*

(n41) Footnote 15. *35 F. at 747.*

(n42) Footnote 16. *35 F. at 747.*

(n43) Footnote 17. *41 F. 476 (C.C.N.D. Ill. 1889).*

See also *D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 259 F. 236, 242 (6th Cir. 1919)* (managing officer or director is not liable for damages or profits for acts "through usual relations between officers and corporation" but may be enjoined if an "active participant" in the infringement); *Edison Elec. Light Co. v. Packard Elec. Co., 61 F. 1002 (C.C.N.D. Ohio 1893)* (officers could be enjoined even though corporation was not within jurisdiction of court); *Iowa Bar Steel Wire Co. v. Southern Barbed Wire Co., 30 F. 123 (C.C.E.D. Mo. 1887); Consolidated Safety Valve Co. v. Ashton Valve Co., 26 F. 319 (C.C.D. Mass. 1886).*

(n44) Footnote 18. *41 F. at 476.*

(n45) Footnote 19. E.g., *Featherstone v. Ormonde Cycle Co., 53 F. 110 (C.C.S.D. N.Y. 1892)* (defendant can be enjoined as joint tortfeasor but is not liable for profits on sales derived by the corporation); *Iowa Bar Steel Wire Co. v. Southern Barbed Wire Co., 30 F. 123 (C.C.E.D. Mo. 1887).*

Cf. *Belknap v. Schild, 161 U.S. 10, 25-26 (1896); City of Elizabeth v. American Nicholson Pavement Co., 97 U.S. (7 Otto) 126, 140 (1877).*

Compare *Hitchcock v. American Plate Glass Co., 259 F. 948, 955 (3d Cir. 1919)* ("as an officer of the corporation he inspired, directed and brought about the infringements ... . For this tort he is liable. The measure of his liability--in a suit in equity for profits as distinguished from an action at law for damages--is the profits of the infringement which he actually received [in the form of dividends and salary]."); *Calculagraph Co. v. Wilson, 132 F. 20 (C.C.D. Mass. 1904), rev'd, 144 F. 91 (C.C.A. Mass. 1906).*

(n46) Footnote 20. *11 F.2d 945 (7th Cir. 1926).*

(n47) Footnote 21. *11 F.2d at 946.*

(n48) Footnote 22. *11 F.2d at 946-47.*

(n49) Footnote 23. *11 F.2d at 947.*

(n50) Footnote 24. *11 F.2d at 946.*

(n51) Footnote 25. *11 F.2d at 948.*

(n52) Footnote 26. *11 F.2d at 948.*

(n53) Footnote 27. *Panther Pumps & Equip. Co. v. Hydrocraft, Inc., 468 F.2d 225, 233, 175 USPQ 577, 582 (7th Cir. 1972), cert. denied, 411 U.S. 965 (1973)* (not liable; "The jury assessed damages of $ 5000 against each of the individual defendants. All of the infringing pumps, however, were manufactured and sold by the corporate defendant. The individual defendants participated in the infringement in their capacity as officers and agents for the corporation. There is no suggestion in the record that the corporation is not financially responsible or that the individuals derived any direct benefit from the infringement."); *Powder Power Tool Corp. v. Powder Actuated Tool Co., 230 F.2d 409, 414, 108 USPQ 155 (7th Cir. 1956); Smith v. Dental Prods., Inc., 140 F.2d 140, 150, 60 USPQ 260 (7th Cir. 1944), cert. denied, 322 U.S. 743 (1944); Fulton Co. v. Janesville Labs., 29 F.2d 913 (7th Cir. 1928); Fyrac Mfg. Co. v. Bergstrom, 24 F.2d 9, 11 (7th Cir. 1928); Trico Prod. Corp. v. Ace Prod. Corp., 30 F.2d 688 (2d Cir. 1929); Tinsel Corp. v. B. Haupt & Co., 25 F.2d 318 (E.D. N.Y. 1928).*

See also *Wilden Pump & Engineering Co. v. Pressed & Welded Prod. Co., 655 F.2d 984, 990, 213 USPQ 282, 287 (9th Cir. 1981)*("No cases have been cited where a non-management, salaried employee, without more, was found to be an individually liable infringer"); *Besly-Welles Corp. v. Balax, Inc., 291 F. Supp. 328, 160 USPQ 265 (E.D. Wis. 1968), aff'd in part, rev'd in part sub nom. Bendix Corp. v. Balax, Inc., 421 F.2d 809, 164 USPQ 485 (7th Cir. 1970), cert. denied, 399 U.S. 911 (1970); Upjohn Co. v. Italian Drugs Importing Co., 190 F. Supp. 361, 367-68, 128 USPQ 236 (S.D. N.Y. 1961)* (not liable for inducement under *35 U.S.C. § 271*(b) ).

(n54) Footnote 28. *Weller Mfg. Co. v. Wen Prod., 231 F.2d 795, 801, 109 USPQ 73 (7th Cir. 1956); General Motors Corp. v. Provus, 100 F.2d 562, 39 USPQ 526 (7th Cir. 1938); Southwestern Tool Co. v. Hughes Tool Co., 98 F.2d 42, 46, 38 USPQ 261 (10th Cir. 1938); Ruggles-Coles Eng'r Co., v. McGann Eng'r Co., 34 F.2d 519, 523 (M.D. Pa. 1929), aff'd, 41 F.2d 1005 (3d Cir. 1930).*

See also *White v. Mar-Bel, Inc., 509 F.2d 287, 292-93, 185 USPQ 129, 132-33 (5th Cir. 1975), reh'g denied, 511 F.2d 1402 (5th Cir. 1975)* (liable; "defendant's argument that he acted only as president of Mar-Bel and then only with the advice of counsel has a hollow ring. He was the incorporator, president, majority stockholder, and moving force which resulted in the manufacture of the accused device. He participated in the development and promotion of the sale of his machine ..."); *Rex Chainbelt, Inc. v. General Kinematics Corp., 363 F.2d 336, 348, 150 USPQ 319 (7th Cir. 1966)* (liable; defendant was incorporator, majority stockholder, president, and director of corporation and personally participated in design of accused devices); *International Mfg. Co. v. Landon, Inc., 336 F.2d 723, 728-29, 142 USPQ 421, 426 (9th Cir. 1964), cert. denied, 379 U.S. 988 (1965)* (liable; defendant was the "moving, active conscious force behind International's infringement. Under *35 U.S.C. § 271*(b) he is therefore subject to personal liability without regard to whether International is his alter ego."); *Bewal, Inc. v. Minnesota Mining & Mfg. Co., 292 F.2d 159, 167, 129 USPQ 440, 446 (10th Cir. 1961)* (liable; "Corporate officers are not liable for patent infringement where they have not been active other than as such officers, but if they wilfully and knowingly participate in, induce and approve acts of infringement, they are liable with the corporation for the wrongful acts."); *Marks v. Polaroid Corp., 237 F.2d 428, 435, 111 USPQ 60, 66 (1st Cir. 1956), cert. denied, 352 U.S. 1005 (1957)* (liable; defendant "was more than merely an officer of an infringing corporation. ... [H]e, individually was the moving, active conscious force behind Depix' infringement."); *Weller Mfg. Co. v. Wen Prods. Inc., 231 F.2d 795, 801, 109 USPQ 73, 77 (7th Cir. 1956)* (liable; defendant deliberately designed infringing device and "was at all times in control of the administrative and managerial policy of the corporation"); *Dean Rubber Mfg. Co. v. Killian, 106 F.2d 316, 320, 42 USPQ 493 (8th Cir. 1939), cert. denied, 308 U.S. 624 (1940); General Motors Corp. v. Provus, 100 F.2d 562, 564, 39 USPQ 526 (7th Cir. 1938)* (liable; "the facts tend to indicate a preconceived and deliberate conduct on the part of the officers to use the corporation merely to carry on the infringing and unfair practices and that these practices constituted conduct so palpable and so alien to the purpose of a bona fide corporation that from this alone it might be concluded that the conduct was willful, deliberate and personal on the part of the officials."); *Southwestern Tool Co. v. Hughes Tool Co., 98 F.2d 42, 45- 46, 38 USPQ 261 (10th Cir. 1938)* (liable; defendant used the corporation "as an instrument to carry out his own deliberate infringement."); *Denominational Envelope Co. v. Duplex Envelope Co., 80 F.2d 186, 194, 27 USPQ 16 (4th Cir. 1935)* (liable); *Max Daetwyler Corp. v. Input Graphics, Inc., 541 F. Supp. 115 (E.D. Pa. 1982); Universal Athletic Sales Co. v. American Gym, 480 F. Supp. 408, 416, 205 USPQ 840, 846 (W.D. Pa. 1979)*("S. David Brodsky we hold is liable as an inducer of the infringement of this patent and as an aider and abettor as well as the active corporate manager during these years. Officers of corporations engaging in these activities are liable ... The evidence also shows that David personally participated in the infringement of the patent. An officer of a corporation is individually liable for the torts he personally commits and cannot conceal himself behind the corporation when he is an actual participant in the tort."); *Molinaro v. Burnbaum,*

5-16 Chisum on Patents § 16.06

*201 USPQ 83 (D. Mass. 1977); Thompson Tool Co. v. Rosenbaum, 443 F. Supp. 559, 561 (D. Conn. 1977)*("corporate officers who willfully and knowingly participate in, induce and approve acts of infringement are personally liable."); *Pugh v. Roe, 440 F. Supp. 638, 646, 196 USPQ 303, 309 (W.D. La. 1977)*("Charles Roe and his wife are the sole stockholders of Life Saving Equipment Repair Co. As its executive officer, he actively conducted the day-to-day affairs of the small corporation, including the building of the personnel nets and stabilizers which infringed the Pugh patents. Defendant Charles Roe is liable, along with his corporation, for all damages which flow from the infringements sued upon herein."); *Superior Testers, Inc. v. Damco Testers, Inc., 315 F. Supp. 934, 167 USPQ 71 (E.D. La. 1970); State Bank of Annawan v. Rendispos Corp., 173 USPQ 136, 143 (S.D. Ill. 1971)* ("Factors to be considered when it is contended that a corporate officer should be adjudged personally liable for infringing acts done by his corporation include ... whether ... he had managerial control ... whether he actively participated in the designing and manufacturing of the infringing device, and whether ... he personally promoted the sale of the infringing device.").

(n55) Footnote 29. *39 F.2d 548, 5 USPQ 347 (2d Cir. 1930).*

See also *General Elec. v. Wabash Appliance Corp., 93 F.2d 671, 674, 36 USPQ 214 (2d Cir. 1938), cert. denied, 303 U.S. 641 (1938)* ("The individual appellees are officers and directors and the only stockholders of the corporation. Under these circumstances, the individuals are liable and the acts of the corporation are in effect theirs."); *Claude Neon Lights, Inc. v. Federal Neon Tube Corp., 52 F.2d 169, 169 (S.D. N.Y. 1931)* (suggesting that *Dangler* rule "is more favorable to corporate directors and officers" than the rule of Claude Neon v. American Light ).

(n56) Footnote 30. *39 F.2d at 551.*

(n57) Footnote 31. *77 F.2d 584, 25 USPQ 303 (6th Cir. 1935), cert. denied, 296 U.S. 594 (1935).*

(n58) Footnote 32. *77 F.2d at 585.*

(n59) Footnote 33. *King v. Anderson, 90 F. 500 (C.C.S.D. N.Y. 1898); Consolidated Fastener Co. v. Columbian Fastner Co., 79 F. 795, 801 (C.C.N.D. N.Y. 1897), aff'd, 84 F. 164 (C.C.A. N.Y. 1897).*

(n60) Footnote 34. *Scharmer v. Agnew Assocs., Inc., 167 USPQ 77 (E.D. N.Y. 1970); Egry Register Co. v. Atlantic Co., 38 F. Supp. 590, 49 USPQ 454 (W.D. N.Y. 1941); New Wrinkle, Inc. v. Fritz, 30 F. Supp. 89, 92, 43 USPQ 185 (W.D. N.Y. 1939)* ("It makes no difference in effect whether the agent sells or merely solicits orders for the sale. One who induces a sale is equally liable with him who sells."); *Patton v. Clegg, 274 F. 118 (E.D. Pa. 1921)* (agent may be enjoined from making further sales); *Palmer v. Landphere, 99 F. 568, 569 (C.C.D. Conn. 1900)* ("The question of liability of a mere skilled workman is not involved herein. The facts proved bring this defendant within the settled rule that any person who has made a separate profit to himself out of the sale of infringing goods, and even a servant who has derived a distinct and independent benefit from invasions of the patent, incurs a distinct separate liability."); *Steiger v. Heidelberger, 4 F. 455 (C.C.S.D. N.Y. 1880)* (injunction and accounting for profits in form of commissions on sales); *Maltby v. Bobo, 16 F. Cas. 563 (No. 8998) (C.C.S.D. N.Y. 1876).*

But cf. *Gassaway v. Vaultec, 2 USPQ2d 1433, 1435 (C.D. Calif. 1986)*("As sales manager it is not sufficient that he participated actively in selling these infringing devices to the corporation's many customers, even though that may technically be looked upon as inducing third parties to infringe the patent.")

(n61) Footnote 35. *27 USPQ2d 1557 (S.D. Calif. 1993),*

(n62) Footnote 36. *27 USPQ2d at 1560.*

(n63) Footnote 37. *Hoover Group, Inc. v. Custom Metalcraft, Inc., 84 F.3d 1408, 38 USPQ2d 1860 (Fed. Cir. 1996); Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 38 USPQ2d 1551 (Fed. Cir. 1996); Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 16 USPQ2d 1587 (Fed. Cir. 1990); Fromson v. Citiplate, Inc., 886 F.2d 1300, 12 USPQ2d 1299 (Fed Cir. 1989); Orthokinetics, Inc. v. Safety Travel Chairs, Inc., 806 F.2d 1565, 1 USPQ2d 1081 (Fed. Cir. 1986); Power Lift, Inc., v. Lang Tools, Inc. 774 F.2d 478, 481, 227 USPQ 435, 437 (Fed. Cir. 1985)*(citing Treatise; Section 271(b) "may include liability of corporate officials who actively aid and abet their corporation's infringements.").

Numerous district court decisions address personal liability of corporate officers and directors.

*Decisions Finding Personal Liability. Flowdata Inc. v. Cotton, 32 USPQ2d 1743, 1747 (S.D. Tex. 1994), rev'd in part, 62 F.3d 1430 (Fed. Cir. 1995)*(35 U.S.C. § 271(a) "imposes a personal liability" on a corporate officer who was "directly responsible for the design, production, and sale of his company's infringing" products); *Voice Systems and Ser-*

vices Inc. v. UMX Inc., 26 USPQ2d 1106, 1116 (N.D. Okla. 1992) (the accused corporate infringer's president "has himself committed acts of infringement by selling infringing [the corporation's] products, and he has controlled and directed [the corporation's] infringement."); T. A. Pelsue Co. v. Grand Enterprises Inc., 782 F. Supp. 1476, 1500, 25 USPQ2d 1001, 1017 (D. Colo. 1991) ("Exertion of control over a corporation's manufacture of infringing products is evidence of inducement of infringement"; "Officers and directors of a corporate infringer are liable for the corporation's infringement if they exceed their duties and participate directly in the infringing activity, deliberately organize a corporation for the purpose of infringing a patent, or otherwise act as the moving, active, conscious force behind an infringement. ... A finding of willful or deliberate infringement by an officer or director supplies a valid basis for holding the officer or director jointly liable for infringement by the corporation. ... Direct participation in the infringing activity by a principal officer of the corporation is a distinct basis for holding him jointly liable with the corporation. An officer or director is jointly liable for infringement where he directed or ordered the infringing method of manufacture or controlled the sale of the infringing goods."); Symbol Technologies Inc. v. Metrologic Instruments Inc., 771 F. Supp. 1390, 21 USPQ2d 1481 (D. N.J. 1991) (citing Treatise; finding liable for active inducement an individual who was corporate president, sole owner, one of three directors, conceiver of infringing device, and head of development team); Amicus Inc. v. Robinson, 18 USPQ2d 1730 (N.D. 1991) (closely-held small business enterprise's principal owners are liable for inducement because they knowingly and intentionally abetted its infringement, but they are not such willful infringers as to justify multiple damages because they acted in reliance on counsel's noninfringement opinion.); Manville Sales Corp. v. Paramount Systems Inc., 14 USPQ2d 1291, 1298 (E.D. Pa. 1989), further opinion, 14 USPQ2d 1299 (E.D. Pa. 1989), aff'd, 917 F.2d 544, 16 USPQ2d 1587 (Fed. Cir. 1990) (individuals are liable along with their company because they established the company to copy the patentee's product and exercised "sole and complete control over the decisions to manufacture and sell the infringing product."); Chisum v. Brewco Sales and Manufacturing Inc., 726 F. Supp. 1499, 13 USPQ2d 1657, 1667 (W.D. Ky. 1989), aff'd, 915 F.2d 1583 (Fed. Cir. 1990)(unpublished) (corporate officer is personally liable because he is the president and principal stockholder of the corporate infringer, is responsible for its total management and operation, and personally designed the infringing machines); Amicus Inc. v. Alosi, 723 F. Supp. 429, 11 USPQ2d 1641 (N.D. Calif. 1989); United States Surgical Corp. v. Hospital Products International PTY Ltd., 701 F. Supp. 314, 352, 9 USPQ2d 1241, 1273 (D. Conn. 1988) ("By virtue of his activities as an officer, director and controlling shareholder of the corporate defendants, Blackman was the moving force behind the infringement."); Gassaway v. Vaultec, 2 USPQ2d 1433, 1435 (C.D. Calif. 1986)(of three individual defendants, two are personally liable and one is not: "[As to Finkel and Bunka,] each of those persons is a principal executive officer and a principal stockholder of the corporate defendant. The two are its chief executives. Each of those persons participated in the design and the production of the offending device. Each of them is a guiding force behind the infringing activities and of the defendant corporation. As to the defendant Toomey, no individual liability is found. Toomey's essential activity in this connection was as sales manager for the corporation and for only a part of the period of infringement. He is no longer employed by the defendant corporation. As sales manager it is not sufficient that he participated actively in selling these infringing devices to the corporation's many customers, even though that may technically be looked upon as inducing third parties to infringe the patent. Toomey was not a significant shareholder, he was not in the category of executive officer or chief executive, although he did have the title of vice president in charge of sales."); Cooper Industries, Inc. v. Juno Lighting Inc., 1 USPQ2d 1313, 1315 (N.D. Ill. 1986)(allegations that individual defendant was the founder, president, and majority shareholder of the corporate defendant, was the "moving force" behind the alleged infringing activities and "willfully and deliberately induced, aided and abetted the past and continuing infringement" of the patent in suit "fall within the 'special showing' exception of Dangler and its progeny"); C.P.C. Partnership v. P.T.R., Inc., 230 USPQ 255, 260 (E.D. Pa. 1985)("An individual defendant cannot rely upon his position as a corporate officer to escape personal liability."); A. Stucki Co. v. Schwam, 634 F. Supp. 259, 229 USPQ 903 (E.D. Pa. 1986); Rohm & Haas Co. v. Dawson Chem. Co., 557 F. Supp. 739, 217 USPQ 515 (S.D. Tex. 1983), rev'd on other grounds sub nom. Rohm & Haas Co. v. Crystal Chem. Co., 722 F.2d 1556, 220 USPQ 289 (Fed. Cir. 1983), cert. denied, 469 U.S. 851 (1984)(defendant was the "moving force" behind both the infringing company and the specific infringing activity).

Decisions Finding No Liability. Young Dental Manufacturing Co. v. Q3 Special Products Inc., 891 F. Supp. 1340, 891 F. Supp. 1345, 36 USPQ2d 1468 (E.D. Mo. 1995) (officer-employee not liable).

(n64) Footnote 38. 886 F.2d 1300, 1304, 12 USPQ2d 1299, 1303 (Fed Cir. 1989).

(n65) Footnote 39. 886 F.2d at 1304, 12 USPQ2d at 1303.

(n66) Footnote 40. 886 F.2d at 1304, 12 USPQ2d at 1302.

(n67) Footnote 41. 917 F.2d 544, 16 USPQ2d 1587 (Fed. Cir. 1990).

Cf. *Amhil Enterprises Ltd. v. Wawa Inc., 34 USPQ2d 1640, 1643 (D. Md. 1994)* ("a corporate officer may be personally liable under *35 U.S.C. Section 271(b)* for inducing infringement where he actively aids and abets the corporation's infringement, regardless of whether circumstances justify piercing the corporate veil. ... The potential for personal liability of a corporate officer, however, is no substitute for a determination of whether the Court may exercise personal jurisdiction over that officer. Personal jurisdiction depends on the state's long-arm statute and the requirements of due process.").

Compare *Power Lift, Inc. v. Lang Tools, Inc., 774 F.2d 478, 227 USPQ 435 (Fed. Cir. 1985)* ; *Northgate Holdings Ltd. v. Net 30 Accessories, Inc., 1994 WL 507757 (S.D. N.Y. 1994)* (the patentee's "allegations that defendants, individually and collectively, sold infringing products states a claim upon which relief can be granted. [It] need not necessarily prove at trial that [the corporation] was the alter ego of [the officer]"); *Zenith Electronics Corp. v. ExZec Electronics Corp., 32 USPQ2d 1959, 1960 (N.D. Ill. 1994)* ("Under *35 U.S.C. § 271(b)*, corporate officers who actively assist with their corporation's patent infringement may be personally liable as an infringer regardless of whether there is evidence to justify piercing the corporate veil."); *Voice Systems & Services Inc. v. VMX Inc., 30 USPQ2d 1558, 1559 (N.D. Okla. 1994)* ("under the express language of Rule 65(d), a preliminary injunction is binding on an officer of a party to the action"; "The absence of any evidence as to piercing of the corporate veil is irrelevant. ... *Manville Sales Corp. v. Paramount Systems* ... discusses liability for patent infringement, not entry of a preliminary injunction. ... Rule 65, not *Manville*, addresses who is bound by an injunction.").

(n68) Footnote 42. *917 F.2d at 552*, 16 USQP2d at 1593.

(n69) Footnote 43. *917 F.2d at 552*, 16 USPQ2d at 1593-94.

See also *Total Containment, Inc. v. Environ Products, Inc., 921 F. Supp. 1355 (E.D. Pa. 1995); Dow Chemical Co. v. Eby Mine Service, 813 F. Supp. 749, 752, 27 USPQ2d 1708, 1710 (D. Colo. 1993)* ("Whether corporate officers are personally liable under § 271(a) for their corporation's direct infringement of another's patent must be determined by invoking general principles relating to piercing the corporate veil."); *Kinetic Instruments, Inc. v. Lares, 802 F. Supp. 976, 988-99, 25 USPQ2d 1122, 1130 (S.D. N.Y. 1992)* ("To hold a corporate officer personally liable for direct infringement under § 271(a), there must be evidence to justify piercing the corporate veil. ... The court may find that the corporation was the alter ego of its officer, or more generally it may use its equitable powers to pierce the veil to prevent fraud or injustice. ... However, ... to disregard the corporate entity, it must be established that the officer had a 'specific intent to escape liability for a specific tort.' ... A corporate officer will be held personally liable if he 'personally took part in the commission of the tort or specifically directed other officers, agents, or employees of the corporation to commit the tortious act.' ... A corporate official who actively aids and abets his corporation's infringements may be held personally liable under [§ 271(b)], whether or not the corporation is the alter ego of the officer. ... The defendant must have had specific intent to encourage the corporation's infringement and not just knowledge of the acts alleged to constitute infringement. ... The plaintiff bears the burden of showing both that the defendant's actions induced infringing acts and that he knew or should have known that his actions would induce infringement.").

Contra: *Symbol Technologies Inc. v. Metrologic Instruments Inc., 771 F. Supp. 1390, 1402, 21 USPQ2d 1481, 1490-91 (D. N.J. 1991)* ("*[35 U.S.C. § 271(a)]* has generally been interpreted to allow a finding of infringement against any entity be it an individual, corporation or otherwise. Even with respect to officers of corporations, it is hornbook law that there is no need to pierce the corporate veil in order to find personal liability ... . The *Manville* court provides no reason for departing from the generally settled law ...").

(n70) Footnote 44. *917 F.2d at 553, 16 USPQ2d at 1594*.

See § 17.04[2] *infra*.

See also *Total Containment, Inc. v. Environ Products, Inc., 921 F. Supp. 1355 (E.D. Pa. 1995); Zenith Electronics Corp. v. ExZec Inc., 32 USPQ2d 1959, 1960 (N.D. Ill. 1994)* ("Under *35 U.S.C. § 271(b)*, corporate officers who actively assist with their corporation's patent infringement may be personally liable as an infringer regardless of whether there is evidence to justify piercing the corporate veil."); *Dow Chemical Co. v. Eby Mine Service, 813 F. Supp. 749, 752-53, 27 USPQ2d 1708, 1710 (D. Colo. 1993)* (denying summary judgment against individual defendants' liability for inducing their company's infringement because there is a genuine issue of fact on their knowledge of the patent; "Personal liability may ... be imposed on corporate officers for actively inducing their corporation to infringe a patent, if the officers *knowingly* induced infringement."; "The individual defendants maintain that they were unaware of the ... patent until the complaint in this action was served. A jury, however, reasonably could infer that businessmen such as [defendants] would have been aware of the ... patent. Moreover, to the extent that certain aspects of the [accused] project seem

intended to disguise the system's use of the ... [patented] process, a reasonable jury could infer that the persons responsible for that system were aware of what they were trying to hide.").

(n71) Footnote 45. *81 F.3d 1566, 38 USPQ2d 1551 (Fed. Cir. 1996).*

(n72) Footnote 46. *81 F.3d at 1575, 38 USPQ2d at 1558.*

(n73) Footnote 47. *84 F.3d 1408, 38 USPQ2d 1860 (Fed. Cir. 1996).*

(n74) Footnote 48. *84 F.3d at 1412, 38 USPQ2d at 1862-63.*

The court noted:

"In *Orthokinetics* the Federal Circuit found the officers of that corporation personally liable for the infringement by the corporation, applying the 'general principles relating to piercing the corporate veil.' ... However, acts of a corporate officer that are within the scope of the officer's responsibility are not always sufficient grounds for penetrating the corporate protection and imposing personal liability. ... *See Manville Sales Corp. v. Paramount Sys., Inc.* ... . The policy considerations that underlie the corporate structure yield to personal liability for corporate acts only in limited circumstances.

"In general, a corporate officer is personally liable for his tortious acts, just as any individual may be liable for a civil wrong. This general rule 'does not depend on the same grounds as "piercing the corporate veil," that is, inadequate capitalization, use of the corporate form for fraudulent purposes, or failure to comply with the formalities of corporate organization.' ... When personal wrongdoing is not supported by legitimate corporate activity, the courts have assigned personal liability for wrongful actions even when taken on behalf of the corporation. However, this liability has been qualified, in extensive jurisprudence, by the distinction between commercial torts committed in the course of the officer's employment, and negligent and other culpable wrongful acts.

"Thus when a person in a control position causes the corporation to commit a civil wrong, imposition of personal liability requires consideration of the nature of the wrong, the culpability of the act, and whether the person acted in his/her personal interest or that of the corporation. ... The decisions have not always distinguished among the various legal premises, i.e. (1) justification for piercing the corporate veil based on such criteria as absence of corporate assets or use of the corporate form for illegal purposes; (2) corporate commitment of a commercial tort (such as interference with contract or business advantage, or patent infringement) caused by the officer acting as agent of the corporation; (3) actions similar to (2) but exacerbated by culpable intent or bad faith on the part of the officer; or (4) personal commitment of a fraudulent or grossly negligent act. For example, corporate officers have been held personally liable when they participated in conversion, ... breach of fiduciary duty, ... fraud, ... and malicious prosecution, ... and have been held not to be personally liable for commercial torts such as interference with contractual relations if they were acting in the corporation's interest ... . The fact- dependency of such issues is apparent in decisions relating to patent infringement. *Compare Fromson v. Citiplate, Inc.* ... finding personal liability of corporate officers/owners who gave false assurances of corporate solvency) *with Manville Sales* ... (it must be shown that corporate officers knew the acts would be infringing in order to incur personal liability for inducing infringement). In *Manville Sales* the court stated that 'to be personally liable for Paramount's infringement under section 271(a), there must be evidence to justify piercing the corporate veil.'

"In the case at bar it was not alleged that [the] corporate structure was a sham, or existed merely to shield Mr. Holden from liability for 'fraud or wrong' or violation of any legal duty. ... Although Mr. Holden, as the chief executive officer and principal owner, can be viewed as controlling [the corporation's] commercial activities, the district court did not pierce the corporate veil. However, the record shows that Mr. Holden made a straightforward commercial response to the assertions of patent infringement, including prompt consultations with counsel. It must be recognized that there were differences between the patented and the accused structures; it is relevant that we have reversed the district court's finding of infringement as to one of the two patents in suit.

"The district court also relied on *35 U.S.C. § 271*(b), which provides that 'whoever actively induces infringement of a patent shall be liable as an infringer,' and on this court's ruling that for a corporate officer to be personally liable for inducing infringement, it is not necessary that the corporate veil be pierced. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.* ... However, the officer must act culpably in that the officer must actively and knowingly assist with the corporation's infringement. *Water Technologies Corp. v. Calco, Ltd.* ... (the officer must have possessed specific intent to 'aid and abet' infringement). It is an insufficient basis for personal liability that the officer had knowledge of the acts alleged to constitute infringement."

*84 F.3d at 1411-12, 38 USPQ2d at 1861-62.*

(n75) Footnote 1. *28 U.S.C. § 1498 .*

See generally Lavenue, "Patent Infringement Against the United States and Government Contractors under *28 U.S.C. § 1498* in the United States Court of Federal Claims," *2 J. Intell. Prop. L. 389 (1995);* McGrath, "The Unauthorized Use of Patents by the United States Government or Its Contractors," *18 AIPLA Q.J. 349 (1990);* Colaianni, "Patent Litigation Before the New Claims Court," *66 J. Pat. Off. Soc'y 119 (1984),* 32 Cleve. St. L. Rev. 25 (1983); TeSelle, "Authorization or Consent to Infringe Patents in Production for the Government," *26 Geo. Wash. L. Rev. 583 (1958);* Annot. *26 A.L.R. Fed. 919 (1976);* Raubitschek, "Authorization and Consent--Another View," *56 J. Pat. Off. Soc'y 634 (1974).*

For a discussion of the measure of reasonable compensation, see § 20.03[6] *infra.*

(n76) Footnote 2. See § 11.06[3][e] *supra.*

(n77) Footnote 3. See § 11.06[3][e] *supra.*

(n78) Footnote 4. *Penda Corp. v. United States, 44 F.3d 967, 969 n.1, 33 USPQ2d 1200, 1201 n.1 (Fed. Cir. 1994), cert. denied sub nom. Cadillac Products, Inc. v. TriEnda Corp., 115 S. Ct. 1962 (1995).*

(n79) Footnote 5. E.g. *Chew v. California, 893 F.2d 331, 336, 13 USPQ2d 1393, 1397 (Fed. Cir. 1990), cert. denied, 498 U.S. 810 (1990)*("Congress has ... not provided a forum for patent infringement suit against the United States in Title 35. Rather it has provided for a suit for compensation in the United States Claims Court. ... Such a suit is based on principles related to the taking of property, namely a patent license, and subjects the United States to payment of appropriate compensation therefore, not to the liability or relief (such as treble damages) provided in the patent statute.").

Compare *Robishaw Engineering, Inc. v. United States, 891 F. Supp. 1134, 1139 (E.D. Va. 1995)* ("The United States government has the right to use all patented inventions. Courts have frequently suggested that this right emanates from the government's power of eminent domain; the government in effect 'takes' a license in any patent it uses. ... More recently, at least one court has taken the view that the government need not exercise its power of eminent domain because the statutes that define patent rights simply do not provide patentees with the power to exclude government use. See *De Graffenried v. United States ... .* In any event, the government is not obligated to negotiate and purchase a license from a patentee, and the patentee may not obtain an injunction against unauthorized use by the government."); *De Graffenried v. United States, 25 Cl. Ct. 209, 215-16, 24 USPQ2d 1594, 1599 (Cl. Ct. 1992).*

In *De Graffenried,* the Claims Court found no liability when the Government purchased machines covered by a patent before the patent's expiration but the machines were completed and delivered after expiration).

"There is no mention of liability for a 'sale' to the United States of a device covered by a patent. In contrast, with respect to private liability for patent infringement, the 'sale' of a patented device is specifically defined in *35 U.S.C. § 271* as an act of infringement and hence is compensable under *35 U.S.C. § 284.* By authorizing suit against the United States, Section 1498 constitutes a waiver of sovereign immunity. ... It is well established that any such waivers must be strictly construed. ... Since Section 1498 does not specifically authorize suits against the United States in instances of a sale of a patented device, it would violate the principles of sovereign immunity to interpret the statute as mandating compensation by the United States for such a sale." *25 Cl. Ct. at 215-16, 24 USPQ2d at 1599.*

(n80) Footnote 6. *599 F.2d 958, 202 USPQ 424 (Ct. Cl. 1979), cert. denied, 444 U.S. 991 (1979).*

(n81) Footnote 7. See § 20.03[6][b] *infra.*

(n82) Footnote 8. *640 F.2d 1156, 209 USPQ 52 (Ct. Cl. 1980), cert. denied, 454 U.S. 819 (1981).*

(n83) Footnote 9. See also *Deuterium Corp. v. United States, 16 Cl. Ct. 454, 458 n.2, 11 USPQ2d 1481, 1483 n.2 (Cl. Ct. 1989), further opinion, 19 Cl. Ct. 624, 14 USPQ2d 1636 (Cl. Ct. 1990)* ("the Government can be sued only for direct 'infringement' ... not for inducement or contributory infringement").

(n84) Footnote 10. *842 F.2d 1275, 6 USPQ2d 1277, 1284 (Fed. Cir. 1988).*

(n85) Footnote 11. *842 F.2d 1283, 6 USPQ2d at 1284.*

(n86) Footnote 12. *Lemelson v. United States, 752 F.2d 1538, 1548, 224 USPQ 526, 531 (Fed. Cir. 1984), on remand, 8 Cl. Ct. 789, 227 USPQ 562 (Cl. Ct. 1985)*("Although this court has noted that a section 1498 action and a title 35 action are only parallel and not identical, ... the principles of claim construction and reading claims on accused devices and methods are the same for either type of action."); *Lemelson v. United States, 6 USPQ2d 1657, 1658 n.2 (Cl. Ct. 1988)* ("Technically, the Government does not 'infringe' a patent ... Section 1498 does not use the term 'infringement,' but permits a patent owner to recover just compensation for unauthorized use by the United States of inventions 'covered by a patent.' While the statutory terms differ, the analysis employed under § 1498 to determine unauthorized use is identical to the two-step analysis employed to determine infringement under § 271 ..."); *Pratt & Whitney Canada Inc. v. United States, 2 USPQ2d 1540, 1540-41 (Cl. Ct. 1987)*(the "equitable" defense of laches (i.e., undue, prejudicial delay in filing suit) applies to compensation suits under Section 1498: "The legislative history of section 1498 makes it clear that although the language of [its predecessor] regarding defenses available to the government was omitted, the government is still entitled to assert any defense available to a private party in an infringement action under Title 35. The plaintiff argues that since laches is not always a total bar to recovery, but often only a limitation on damages, it is not one of the affirmative defenses available to the government under *28 U.S.C. § 1498* . ... [T]he defenses included in the enforceability provision of *35 U.S.C. § 282*(1) are the equitable defenses of laches, estoppel and unclean hands. Having concluded that the laches defense is available as a matter of strict statutory construction, it should be noted that the balance of equitable remedies and equitable defenses in this court may not be completely symmetrical. While this result is mandated by statute, it might have been more fair to provide claimants with equitable relief more comparable to that available against private infringers. On the other hand, in this era of merger law and equity carrying the distinction between legal and equitable defenses to their logical conclusion would undo the significance of any real law-equity merger. Further, the government ... has waived sovereign immunity. It has allowed itself all the defenses available to a private party, even though the plaintiff cannot avail itself of all the remedies available to a private party. Although this is indeed an asymmetrical situation, that does not render it unjust.").

(n87) Footnote 13. *United States v. Burns, 79 U.S. (12 Wall.) 246, 252 (1870)* (dictum; suit on express contract for use of patent).

(n88) Footnote 14. See generally Jaffe, "Suits Against Governments and Officers: Sovereign Immunity," *77 Harv. L. Rev. 1 (1963)*.

(n89) Footnote 15. Act of March 3, 1887, c. 359, 24 Stat. 505:

"All claims founded upon the constitution ... or any law of congress ... or upon any regulation ... or upon any contract, expressed or implied ... or for damages, liquidated or unliquidated ... in *cases not sounding in tort.* ..." (Emphasis added.)

(n90) Footnote 16. *United States v. Bethlehem Steel Co., 258 U.S. 321, 327 (1922)* (attitude of government officers was one of "submission" and "acceptance" rather than "repudiation"); *United States v. Berdan Firearms Mfg. Co., 156 U.S. 552 (1895)* (board selected plaintiff's gun in competition with others); *United States v. Palmer, 128 U.S. 262 (1888)* (patents granted on June 10, 1873 and December 8, 1874; in July 1874, plaintiff-patentee submitted his invention to an Army Board, which adopted his improvement, but adopted no express contract).

(n91) Footnote 17. *Bliss v. United States, 253 U.S. 187 (1920)* (plaintiff's petition alleged use without consent); *Farnham v. United States, 240 U.S. 537 (1916)* (government official expressly declined to adopt plaintiff's submitted invention); *Harley v. United States, 198 U.S. 229 (1905)* (government employee made no explicit demand for compensation for the use of his patent); *Russell v. United States, 182 U.S. 516 (1901)* (board adopted competitor's allegedly infringing rifle); *Schillinger v. United States, 155 U.S. 163 (1894)* (plaintiff never authorized use, and government officers consistently denied that there was any use in fact of the patent).

(n92) Footnote 18. *94 U.S. (4 Otto.) 225 (1876)*.

(n93) Footnote 19. *94 U.S. (4 Otto.) at 234*.

(n94) Footnote 20. *161 U.S. 10 (1896)*.

Accord: *International Postal-Supply Co. v. Bruce, 194 U.S. 601 (1904)* (*Belknap* applies even though government only leased the infringing machine for a term).

See also *Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 691, n.11 (1949)*("a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statu-

tory powers, if the relief requested cannot be granted by merely ordering the cessation of the conduct complied of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property.").

Compare *5 U.S.C. § 702* .

(n95) Footnote 21. See *Crozier v. Fried. Krupp Aktiengesellschaft, 224 U.S. 290 (1912).*

(n96) Footnote 22. *3 F. Cas. 1190 (No. 1794) (C.C.D. Mass. 1876), rev'd on other grounds, 107 U.S. (17 Otto) 192 (1883).*

See also *William Cramp & Sons Ship & Engine Bldg. Co. v. International Curtis Marine Turbine Co., 246 U.S. 28 (1918).*

(n97) Footnote 23. *3 F. Cas. at 1194.*

(n98) Footnote 24. Act of June 25, 1910, c. 423, 36 Stat. 851.

(n99) Footnote 25. In *Moore v. United States, 249 U.S. 487 (1919),* the Supreme Court held that this provision precluded suit even as to inventions discovered by employees on their own time and not part of their official duties. This absolute ban was lifted in 1952. See § 16.06[3][e] *infra.*

(N100) Footnote 26. *224 U.S. 290 (1912).*

(n101) Footnote 27. *224 U.S. at 305.*

(n102) Footnote 28. *246 U.S. 28 (1918).*

(n103) Footnote 29. *246 U.S. 46 (1918).*

(n104) Footnote 30. There can be no contributory infringement absent direct infringement. See § 17.03[1] *infra.*

(n105) Footnote 31. Then Acting Secretary of the Navy Franklin Roosevelt wrote a letter to the chairman of the Senate committee on the Navy, noting that "manufacturers are exposed to expensive litigation, involving the possibilities of prohibitive injunction, payment of royalties, rendering of accounts, and payment of punitive damages, and they are reluctant to take contracts that may bring such severe consequences." Quoted in *Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 342-43 (1928).*

See *TVI Energy Corp. v. Blane, 806 F.2d 1057, 1059-60, 1 USPQ2d 1071, 1072 (Fed. Cir. 1986)(" 28 U.S.C. § 1498* was adopted originally in 1910 and later amended in 1918. The Congressional history of § 1498 makes it clear that the policy behind the 1918 amendment was to relieve private Government contractors from expensive litigation with patentees, possible injunctions, payment of royalties, and punitive damages. The amendment provided that the patentees' sole remedy was a suit against the United States in the Court of Claims. The Act was amended in 1918 at the behest of the Secretary of the Navy who cited difficulties in procuring goods from private manufacturers necessary to meet military requirements of World War I.").

(n106) Footnote 32. Act of July 1, 1918, c. 114, 40 Stat. 704, 705 (Emphasis added.)

(n107) Footnote 33. *275 U.S. 331 (1928).*

(n108) Footnote 34. *275 U.S. at 343-44.*

(n109) Footnote 35. *296 F. 718 (S.D. Ala. 1924).*

(n110) Footnote 36. *296 F. at 719.*

(n111) Footnote 37. *296 F. at 722.*

(n112) Footnote 38. Act of Oct. 31, 1942, c. 634, § 6, 56 Stat. 1013.

(n113) Footnote 39. See TeSelle, "Authorization or Consent to Infringe Patents in Production for the Government," *26 Geo. Wash. L. Rev. 583, 591-92 (1958).*

The royalty adjustment act was primarily directed toward adjusting the royalties in licenses which government contractors had entered into with patentees under pre-war conditions. In 1925, the Fourth Circuit had held that the 1910 Act did not apply to relieve government contractors of express license obligations. *Newport News Shipbuilding & Dry Dock Co. v. Isherwood, 5 F.2d 924 (4th Cir. 1925), cert. dismissed, 269 U.S. 552 (1925).* See § 16.06[3][b] *infra.*

(n114) Footnote 40. In *Foundation Co. v. Underpinning & Foundation Co., 256 F. 374 (S.D. N.Y. 1919)*, the court refused to enjoin a subcontractor from using certain caissons in performing work on a United States government office building. The 1918 Act was intended to "prevent delays injurious to the government which necessarily follow the re-straining of any person from carrying out a contract to furnish patented articles, devices, et. al., manufactured for or to be used by or for the *United States." 256 F. at 375-76.*

(n115) Footnote 41. Act of June 25, 1948, c. 649, 62 Stat. 869, 941-42; Act of May 24, 1949, c. 139, § 87, 63 Stat. 89, 102; Act of Oct. 31, 1951, c. 655, § 50(c), 65 Stat. 727.

(n116) Footnote 42. Act of July 17, 1952, c. 930, 66 Stat. 757:

"A Government employee shall have the right to bring suit against the Government under this section except where he was in a position to order, influence, or induce use of the invention by the Government. This section shall not confer a right of action on any patentee or any assignee of such patentee while in the employment or service of the United States, where the invention was related to the official functions of the employee, in cases in which such functions in-cluded research and development,or in the making of which Government time, materials or facilities were used."

(n117) Footnote 43. E.g., *Richmond Screw Anchor Co. v. United States, 275 U.S. 331 (1928)*, discussed at § 16.06[3][a] *supra; Crozier v. Fried. Krupp Aktiengesellschaft, 224 U.S. 290 (1912); Trojan, Inc. v. Shat-R-Shield, Inc., 885 F.2d 854, 856, 12 USPQ2d 1132, 1134 (Fed. Cir. 1989)*(a district court may not grant injunctive relief precluding a party from bidding on government contracts under which the party would supply products that have been held to in-fringe the opposing party's patent; "a supplier or potential supplier of an infringing product *for the government* is 'im-mune' from injunctive relief barring manufacture, sale, or bidding to supply such a product."; Section 1491(a)(3) of Title 28 , which permits the Claims Court to afford "complete relief" on a contract claim against the Government, does not permit a district court to grant injunctive relief against an infringer bidding on government contracts: "[T]he type of equitable power granted by section 1491(a)(3) has no applicability to patent infringement litigation."); *W.L. Gore & Associates Inc. v. Garlock Inc., 842 F.2d 1275, 1283, 6 USPQ2d 1277, 1284 (Fed. Cir. 1988)*(the district court did not err in denying the infringer's request that the permanent injunction against infringement be modified to allow it to bid at a second tier subcontractor on a United States government supply contract because *28 U.S.C. Section 1498* of its own force is controlling and would make a Claims Court suit against the United States the exclusive remedy despite the ap-parently absolute injunction; "§ 1498 is paramount when the making is for or the selling is to the United States Gov-ernment and the injunction is necessarily subject to that condition whether it says so or not"; "Though injunctions may seem to say that making for and selling to the government is forbidden, injunctions based on patent rights cannot in real-ity do that because of § 1498(a)."); *Croll-Reynolds Co. v. Perini-Leavell-Jones-Vinell, 399 F.2d 913, 159 USPQ 518 (5th Cir. 1968), cert. denied, 393 U.S. 1050 (1969); Pollen v. Ford Instrument Co., 108 F.2d 762 (2d Cir. 1940); Robishaw Engineering, Inc. v. United States, 891 F. Supp. 1134, 1139-41 (E.D. Va. 1995)* ("The statute represents the patentee's exclusive judicial means of obtaining damages from the government. ... In other words, a patentee may never obtain damages from the government in a patent infringement action in district court. ... [W]hile § 1498 grants the pat-entee the right to seek compensation from the government, it takes away the patentee's right to bring a patent infringe-ment action against a government contractor."); *In re Mahurkar Patent Litigation, 831 F. Supp. 1354, 1393, 1397, 28 USPQ2d 1801, 1833, 1836 (N.D. Ill. 1993), aff'd, 71 F.3d 1573, 37 USPQ2d 1138 (Fed. Cir. 1995)* ("The first step is to exclude all catheters sold to the United States; under *28 U.S.C. Section 1498*(a) the patent holder must go to the Court of Federal Claims to collect for these sales."; the infringer "is entitled to continue selling infringing catheters to the United States and its agencies (principally the Veterans Administration)."); *Bath Iron Works Corp. v. Parmatic Filter Corp., 736 F. Supp. 1175, 15 USPQ2d 1807 (D. Me. 1990) ; Floyd Smith Aerial Equip. Co. v. Irving Air Chute Co., 276 F. 834 (W.D. N.Y. 1921); Lemelson v. United States, 3 Cl. Ct. 161, 179, 223 USPQ 1183, 1195 (Claims Ct. 1983)*("The Gov-ernment is liable only for direct infringement of a patent ... Therefore, it is incumbent upon plaintiff to adduce evidence that the Government actually used the accused devices in an infringing manner, or practiced the precise methods claimed.").

Cf. *Decca Ltd. v. United States, 640 F.2d 1156, 1166-67, 209 USPQ 52, 59-60 (Ct. Cl. 1980), cert. denied, 454 U.S. 819 (1981)* ("Section 1498 provides the *sole* remedy available to a patentee for an eminent domain taking of a li-cense in his patent. The remedy is monetary and must be pursued by means of an action in this court. ... Activities of the Government which fall short of direct infringement do not give rise to governmental liability because the Government has not waived its sovereign immunity with respect to such activities. Hence, the Government is not liable for its induc-ing infringement by others, for its conduct contributory to infringement of others, or for what, but for section 1498, would be contributory (rather than direct) infringement of its suppliers."); *Principle Business Enterprises, Inc. v. Weinberger, 216 USPQ 87 (D.D.C. 1982).*

5-16 Chisum on Patents § 16.06

Under Section 19 of the Tennessee Valley Authority Act , *16 U.S.C. Sec. 831r* , the exclusive remedy of a patent owner for use of his invention by the TVA or by a TVA contractor with the authorization and consent of the TVA is an action against the TVA "on the equity side of the appropriate district court of the United States, for the recovery of reasonable compensation for such infringement." See *Alco Standard Corp. v. Tennessee Valley Authority, 808 F.2d 1490, 1494, 1 USPQ2d 1337, 1339 (Fed. Cir. 1986), cert. dismissed, 483 U.S. 1052 (1987)*(because *28 U.S.C. Section 1338*(a) is the basis for a district court's jurisdiction over a suit under *16 U.S.C. § 831r* against the T.V.A. for reasonable compensation for infringement of a patent, the Federal Circuit has jurisdiction over appeals in such suits: "Although the statute specifies that the patentee's 'exclusive remedy' if its patent has been 'thus ... infringed ...' is a civil suit against TVA on the equity side of the district court to recover 'reasonable compensation for such infringement,' that fact does not make the resulting suit any the less one for infringement of a patent. ... It would be anomalous if appeals in patent infringement suits against TVA were heard by the regional circuit, when all other appeals in patent infringement suits come to this court. ... There is no reason to believe that Congress intended the regional circuits rather than this court to hear appeals in this narrow category of infringement cases.").

Under some circumstances, a patent application or owner who has been subject to a secrecy order under *35 U.S.C.§ 181* may have a remedy for compensation in a District Court. See § 1.06[2] *supra.*

(n118) Footnote 44. *271 U.S. 232 (1926).*

See also *Robishaw Engineering, Inc. v. United States, 891 F. Supp. 1134, 1140 n.9 (E.D. Va. 1995)* ("There is a split of authority as to the manner in which § 1498 bars an infringement action against a government contractor. Some courts have held that the statute deprives district courts of jurisdiction to entertain such an action. ... Other courts have held that § 1498 codifies an affirmative defense that may be raised by the contractor, but does not affect jurisdiction.").

Compare *Identification Devices, Inc. v. United States, 121 F.2d 895 (D.C. Cir. 1941), cert. denied, 314 U.S. 615 (1941)* (district court lacks subject matter jurisdiction where suit is in name against the United States).

(n119) Footnote 45. *Tinnerman Prod., Inc. v. Adel Precision Prod. Corp., 62 F. Supp. 348, 67 USPQ 91 (S.D. W. Va. 1945)* (question is neither one of venue nor one of jurisdiction).

Compare *Raymond Engineering, Inc. v. Miltope Corp., 231 USPQ 575, 578 n.5, n.6 (S.D. N.Y. 1986)*("Since *Sperry*, other cases have questioned whether section 1498 is an affirmative defense or a jurisdictional issue to be decided on a 12(b)(1) motion." "This court ... sees section 1498 as a jurisdictional matter as opposed to an affirmative defense because motions which challenge the authority of a court to hear a case should be treated as jurisdictional motions regardless of how it is labelled.").

(n120) Footnote 46. *Dearborn Chem. Co. v. Arvey Corp., 114 F. Supp. 369, 99 USPQ 201 (N.D. Ill. 1953); Pierce v. Submarine Signal Co., 25 F. Supp. 862, 40 USPQ 221 (D. Mass. 1939).*

(n121) Footnote 47. E.g., *Bereslavsky v. Esso Standard Oil Co., 175 F.2d 148, 82 USPQ 334 (4th Cir. 1949); Molinaro v. Watkins-Johnson CEI Div., 359 F. Supp. 467, 473, 178 USPQ 211, 215 (D. Md. 1973)* ("Since the Court is fully satisfied that there can be no real dispute as to 'use and manufacture by or for the United States' and as to 'authorization and consent,' a partial summary judgment is appropriate and a trial is not necessary to determine the applicability of section 1498.").

Compare *Evans v. McDonnell Aircraft Corp., 395 F.2d 359, 362, 158 USPQ 247, 249 (8th Cir. 1968)* ("the record reveals a material issue of fact as to whether McDonnell's manufacturing operations were exclusively oriented to the United States Government."); *Great Plains Bag Corp. v. St. Regis Paper Co., 188 USPQ 561 (S.D. Iowa 1975).*

(n122) Footnote 48. *Broome v. Hardie-Tynes Mfg. Co., 92 F.2d 886, 887, 35 USPQ 383 (5th Cir. 1937)* (*Sperry Gyroscope* does not "require the laborious and tedious processes of trying a patent suit, only to dismiss it at the end because plaintiffs' remedy lies in some other court."); *J. & G. Dev. Co. v. All-Tronics, Inc., 198 F. Supp. 392, 394, 131 USPQ 162, 164 (E.D. N.Y. 1961)* ("The lower courts, faced with the necessity of holding tedious trials only to dismiss actions at the conclusion thereof if this affirmative defense were sustained, have followed the practice of hearing this defense first and then dismissing the action if it is established.").

(n123) Footnote 49. In *Wood v. Atlantic Gulf & Pacific Co., 296 F. 718 (S.D. Ala. 1924)*, decided before *Sperry Gyroscope*, the district court considered the matter in a motion to reopen a decree.

Cf. *Manville Sales Corp. v. Paramount Systems Inc., 14 USPQ2d 1299 (E.D. Pa. 1989), aff'd, 917 F.2d 544, 16 USPQ2d 1587 (Fed. Cir. 1990).*

(n124) Footnote 50. *917 F.2d 544, 16 USPQ2d 1587 (Fed. Cir. 1990).*

(n125) Footnote 51. The court noted that "Even if the section 1498 defense had been raised at the appropriate time, the district court need not necessarily have dismissed the lawsuit: It could properly have entertained a timely motion to add the government as a party and transfer the case to the *Claims Court." 917 F.2d at 555 n.8, 16 USPQ2d at 1596 n.8.*

(n126) Footnote 52. See, e.g., *Nasatka v. Delta Scientific Corp., 58 F.3d 1578, 1579 n.1, 35 USPQ2d 1374, 1375 n.1 (Fed. Cir. 1995), cert. denied, 116 S. Ct. 912 (Fed. Cir. 1996)*("When a manufacturer sells a product to both the government and a third party, the normal course of events is parallel patent infringement proceedings in the Court of Federal Claims for sales to the government in accordance with *28 U.S.C. § 1498* and in the district court for the non-governmental sales. *AM Int'l, Inc. v. United States, 227 Ct. Cl. 632, 632-33, 213 USPQ 717, 718 ... (1981).*"); *Pollen v. Ford Instrument Co., 108 F.2d 762 (2d Cir. 1940); Luellen v. Baldwin Locomotive Works, 11 F.2d 390 (E.D. Pa. 1926), aff'd, 20 F.2d 449 (3d Cir. 1927); Floyd Smith Aerial Equip. Co. v. Irving Air Chute Co., 276 F. 834 (W.D. N.Y. 1921).*

See also *Corning Glass Works v. United States, 204 USPQ 436, 437 (Ct. Cl. 1979)*(Court of Claims stays § 1498 suit pending resolution of district court suit against supplier who sold device both to Government and commercially; "We cannot accept plaintiff's argument that a stay of proceedings in this court is an effective ouster of our exclusive jurisdiction under *27 U.S.C. § 1498* . A stay of proceedings merely postpones deciding the Government's liability to plaintiff pending the outcome of the district court action. ... Both [actions] involve the same patents and, since the Government was buying catalog items, the same issues of validity and infringement. ... [I]f the district court were to resolve these issues in plaintiff's favor, only an accounting trial might be necessary in this court. Courts generally favor suits against the supplier, as primary defendant, over suits against that supplier's customers, even where the customer's suit is filed first.").

(n127) Footnote 53. *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 269-70, 152 USPQ 446 (2d Cir. 1967)* (unsuccessful experiment permanently abandoned).

See § 16.03[1] *supra.*

(n128) Footnote 54. *Neff Instrument Corp. v. Cohu Elecs., Inc., 269 F.2d 668, 122 USPQ 554 (9th Cir. 1959); Systron-Donner Corp. v. Palomar Scientific Corp., 239 F. Supp. 148, 152, 145 USPQ 56, 60 (N.D. Calif. 1965)* (non-government sales represented 0.198% of total; dismissal denied because the "(c)ourt cannot say that over the life of these recently issued patents, defendant will not find and exploit a greater commercial market than now exists"); *Northill Co. v. Danforth, 51 F. Supp. 928, 929, 58 USPQ 575 (N.D. Calif. 1942), aff'd, 142 F.2d 51, 61 USPQ 206 (9th Cir. 1944)* ("Defendant testified that the month before the trial 99.41% of his sales of anchors were to the Government. This is an admission that 59% of his sales were to civilians. The case is not within the "de minimis" doctrine, for there is no evidence that these percentages will remain static during the life of the patent.").

Compare *Raymond Engineering, Inc. v. Miltope Corp., 231 USPQ 575, 579 (S.D. N.Y. 1986)*("Each of the cases which have cited the *de minimus* defense but refused to apply it have involved the continuing production of articles for which the defendant admitted there had been non-governmental sales. By contrast, the undisputed evidence here is that no sales of the [accused device] have been other than to United States Government contractors and that no solicitation of such sales has been made.").

(n129) Footnote 55. *198 F. Supp. 392, 131 USPQ 162 (E.D. N.Y. 1961).*

(n130) Footnote 56. *198 F. Supp. at 395, 131 USPQ at 165.*

(n131) Footnote 57. See, e.g., *Trojan, Inc. v. Shat-R-Shield, Inc., 885 F.2d 854, 856, 12 USPQ2d 1132, 1134 (Fed. Cir. 1989)*(" Section 1498(a) would be emasculated if a patent holder could enjoin bidding to supply infringing products."; "a patent owner may not use its patent to cut the government off from sources of supply, either at the bid stage or during performance of a government contract."); *TVI Energy Corp. v. Blane, 806 F.2d 1057, 1 USPQ2d 1071 (Fed. Cir. 1986)*, discussed at N. 77 *infra; Robishaw Engineering, Inc. v. United States, 891 F. Supp. 1134* (E.D. Va. 1995, discussed at N. 67 *infra; Raymond Engineering, Inc. v. Miltope Corp., 231 USPQ 575, 577 (S.D. N.Y. 1986)* ("Requiring a government contractor to receive a purchase order with the necessary authorization and consent clauses before even beginning the initial design and development work would impair the efficiency and quality of the current contracting system. When a government contractor reviews a product on consignment, its evaluation is made on behalf of the United States to determine whether the device is suitable for government use.").

(n132) Footnote 58. *Newport News Shipbuilding & Dry Dock Co. v. Isherwood, 5 F.2d 924 (4th Cir. 1925), cert. dismissed, 269 U.S. 552 (1925); Opinion of Comptroller General, 140 USPQ 205, 207* (Dec. 23, 1963) ("It seems well settled that notwithstanding the exclusive remedy afforded patent owners by the provisions of *28 U.S.C. 1498* for recovery of compensation from the Government by suit in the Court of Claims for the unlicensed use of and manufacture by or for the United States of patented inventions, a manufacturer licensed to use a patent remains liable for the payment of the royalty fixed in the license, even though the item is manufactured for the United States.").

(n133) Footnote 59. *522 S.W.2d 161, 185 USPQ 698 (Mo. Sup. Ct. 1975).*

(n134) Footnote 60. *135 F.2d 283, 57 USPQ 203 (1st Cir. 1943).*

See also *Superior Steel Door & Trim Co. v. Banner Metals Div., 479 F. Supp. 704, 710, 206 USPQ 5, 10 (E.D. N.Y. 1979)*(Superior, as supplier of items to U.S. Postal Service, seeks declaratory judgment that it is not infringing Banner's patent or that patent is invalid; case is justiciable despite fact that "Banner's remedy for alleged patent infringement on the part of Superior is an action against the United States Postal Service in the Court of Claims.").

The proposition stated in *Superior Steel Door* is questionable given the basic concept that the Declaratory Judgment Act is procedural-remedial and does not confer jurisdiction in cases where it would not exist if injunctive or monetary relief had been sought by the plaintiff or the defendant. See § 21.02[1][d] *infra.*

(n135) Footnote 61. See *Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667 (1950).*

(n136) Footnote 62. *72 Misc.2d 680, 339 N.Y.S.2d 314, 176 USPQ 438 (N.Y. Sup. Ct. 1972).*

(n137) Footnote 63. *422 F.2d 326, 165 USPQ 326 (3d Cir. 1970), cert. denied, 399 U.S. 911 (1970).*

(n138) Footnote 64. *422 F.2d at 331, 165 USPQ at 37.*

(n139) Footnote 65. *337 U.S. 682, 691, n. 11 (1949).*

(n140) Footnote 66. *5 U.S.C. § 702 .*

This amendment does not affect the general exclusivity of Section 1498 because it specifies that "Nothing herein ... (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."

See *Robishaw Engineering, Inc. v. United States, 891 F. Supp. 1134, 1141 (E.D. Va. 1995),* discussed at N. 67 *infra* ("Although the APA eliminated the sovereign immunity defense in many other circumstances, the limited waiver of sovereign immunity embodied in § 1498 falls squarely within the clause of § 702 of the APA that preserves the sovereign immunity defense where a 'statute that grants consent to suit expressly or impliedly forbids the relief which is sought.' ").

(n141) Footnote 67. *891 F. Supp. 1134 (E.D. Va. 1995).*

(n142) Footnote 68. The court noted that patent owners can face a hiatus during which a suit against a government contractor is barred but no suit can be brought against the United States. See text accompanying N. 57 *supra.*

(n143) Footnote 69. *891 F. Supp. at 1144.*

(n144) Footnote 70. *891 F. Supp. at 1145, n.25.*

(n145) Footnote 71. *891 F. Supp. at 1145-46.*

(n146) Footnote 72. *Opinion of Comptroller General, 178 USPQ 370* (May 4, 1973); *Opinion of Comptroller General, 155 USPQ 608* (July 27, 1967); *Opinion of Comptroller General, 115 USPQ 151* (Sept. 19, 1957).

Compare Section 1498(b) which confers general authority to settle claims of copyright infringement.

(n147) Footnote 73. *28 U.S.C. § 1498 .*

For the origin of this paragraph, see § 16.06[3][a] *supra.*

(n148) Footnote 74. *175 F.2d 148, 82 USPQ 334 (4th Cir. 1949).*

Accord: *AM Int'l, Inc. v. United States, 213 USPQ 717 (Ct. Cl. 1981)*(authorization and consent need not be shown when use of infringing machine is "by" the United States); *Drexler v. Koza, 88 F. Supp. 298, 85 USPQ 78 (W.D. Pa. 1950).*

(n149) Footnote 75. *175 F.2d at 150, 82 USPQ at 336.*

(n150) Footnote 76. *Stelma, Inc. v. Bridge Elec. Co., 300 F.2d 761, 132 USPQ 665 (3d Cir. 1962); Molinaro v. Watkins-Johnson CEI Div., 359 F. Supp. 467, 178 USPQ 211 (D. Md. 1973).*

For a discussion of authorization and consent clauses in government contracts, see TeSelle, "Authorization or Consent to Infringe Patents in Production for the Government," *26 Geo. Wash. L. Rev. 583, 598-602 (1958).*

Cf. *Robishaw Engineering, Inc. v. United States, 891 F. Supp. 1134, 1140 (E.D. Va. 1995)* ("the government typically inserts a standard 'authorization and consent' clause in its solicitations and contracts. See 48 C.F.R. § § 27.201, 52.227-1. When the contractor is supplying materials to the government, this clause, with one exception, provides that the government's authorization and consent occurs when the government accepts delivery under the contract. See *48 C.F.R. § 52.227-1(a)(1).* The exception is that authorization and consent may occur prior to delivery if the contractor's use of the patent 'necessarily results' from compliance with the government's written instructions. ... See *48 C.F.R. § 52.227-1(a)(2).* In sum, unless infringement necessarily results from the government's written instructions, a patentee may only obtain relief against the government under § 1498 as soon as, but not before, the government accepts delivery of the allegedly infringing ... item."); *Bath Iron Works Corp. v. Parmatic Filter Corp., 736 F. Supp. 1175, 1177, 15 USPQ2d 1807, 1809 (D. Me. 1990)* (contract clause provided: "The Government authorizes and consents to all use and manufacture, in performing this contract ... of any invention described in and covered by a United States patent ... (2) used in machinery ... whose use necessarily result from compliance by the Contractor or a subcontractor with (i) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Office directing the manner of performance."; "Plaintiff issued a revised purchase specification calling for a combined moisture separator/panel for the destroyer [to be delivered to the government], and ... the Navy approved issuance of the revised specifications.").

(n151) Footnote 77. *806 F.2d 1057, 1 USPQ2d 1071 (Fed. Cir. 1986).*

See also *Hughes Aircraft Co. v. United States, 29 USPQ2d 1974, 1993-94 (U.S. Ct. Fed. Cl. 1993)* (procurement contract clause provided that the Government gave its "authorization and consent" to structures "the delivery of which is accepted by the Government"; "Even if the terms 'authorization' and 'consent' had a particular contractual meaning between [the contractor] and the government, it is the statutory meaning of those terms that controls this case under Section 1498, between a patentee and the government. ... [T]he requisite authorization or consent was given no later than the time at which [the contractor] became contractually bound to manufacture a [product] containing an embodiment of the ... patent.").

(n152) Footnote 78. *806 F.2d at 1060, 1 USPQ2d at 1072.*

(n153) Footnote 79. *806 F.2d at 1060, 1 USPQ2d at 1072.*

(n154) Footnote 80. *806 F.2d at 1059, 1 USPQ2d at 1073.*

(n155) Footnote 81. *806 F.2d at 1073, 1 USPQ2d at 1060.*

(n156) Footnote 82. See *Robishaw Engineering, Inc. v. United States, 891 F. Supp. 1134, 1141 n.12 (E.D. Va. 1995)* ("While the patentee generally must wait to sue the government under § 1498 until after the government accepts delivery of the disputed item, the government's contractors are immune from suit as soon as they engage in manufacture or even bid to supply products to the government. ... As a result, there will often be a period--beginning with the contractor's bid for or performance under the government contract, and lasting until delivery under the contract--during which a patentee will have no remedy for the government contractor's use of its patent. Ultimately, the patentee may recover compensation covering this period when the government accepts delivery of the allegedly infringing items and the patentee sues the United States for compensation under § 1498."; "Far less clear is what happens were the government to reject delivery. The contractor plainly would become liable to the patentee if it disposed of the rejected items by selling them to a purchaser other than the government. But (the patentee) contends that the contractor could avoid all liability by, for example, simply tossing the rejected products in the garbage. Thus, (the patentee) assumes, without citation to supporting authority, that the contractor's immunity under § 1498 for the manufacture of infringing products continues even after the government rejects delivery of them. This assumption is debatable. Infringement occurs where

a patented invention is manufactured or used, even if never sold. *See 35 U.S.C. § 271(a)*. Given this, it seems a patentee could sue the contractor for infringement and argue that the government's rejection made clear, in retrospect, that the contractor's manufacture of the patented invention was without the government's authorization and consent. After all, the primary purpose of § 1498 immunity is to prevent interference with the government's procurement of needed materials. ... That purpose is no longer served once the government has announced that it does not want the products in question. On the other hand, the contractor in this scenario might persuasively argue that, if the purpose of § 1498 immunity is to encourage contractors to enter freely into contracts with the government, then manufacturing undertaken under government auspices must remain immunized by § 1498 despite the government's ultimate rejection of the finished product. In any event, it is unnecessary here to resolve this novel question.").

(n157) Footnote 83. *806 F.2d at 1061, 1 USPQ2d at 1073.*

For a discussion of experimental use as a defense to infringement, see § 16.03[1] *supra.*

(n158) Footnote 84. *239 F. Supp. 148, 145 USPQ 56 (N.D. Calif. 1965).*

(n159) Footnote 85. *239 F. Supp. at 151, 145 USPQ at 59.*

(n160) Footnote 86. *188 USPQ 561 (S.D. Iowa 1975).*

(n161) Footnote 87. *188 USPQ at 563.*

(n162) Footnote 88. *188 USPQ at 563.*

(n163) Footnote 89. See TeSelle, "Authorization or Consent to Infringe Patents in Production for the Government," 26 Geo. Wash. 583, 598-602 (1958).

(n164) Footnote 90. *Id.*

(n165) Footnote 91. *399 F.2d 913, 159 USPQ 518 (5th Cir. 1968), cert. denied, 393 U.S. 1050 (1969).*

(n166) Footnote 92. *399 F.2d at 915, 159 USPQ at 520.*

(n167) Footnote 93. *236 F. Supp. 428, 143 USPQ 345 (M.D. Pa. 1959).*

See also *Hughes Aircraft Co. v. United States, 534 F.2d 889, 901, 192 USPQ 296, 304-05 (Ct. Cl. 1976)*("Nor ... is there any requirement that authorization or consent necessarily appear on the face of a particular contract. ... On the contrary, 'authorization or consent' on the part of the Government may be given in many ways other than by letter or other direct form of communication--*e.g.*, by contracting officer instructions, by specifications or drawings which impliedly sanction and necessitate infringement, by *post hoc* intervention of the Government in pending infringement litigation against individual contractors.").

(n168) Footnote 94. *230 F. Supp. 70, 141 USPQ 623 (S.D. Calif. 1964).*

See also *Larson v. United States, 26 Cl. Ct. 365, 369-71, 24 USPQ2d 1388, 1391-92 (Cl. Ct. 1992)* (owner of patent on apparatus for applying splints to broken bones sought compensation from the United States because it reimbursed private health care providers for patients' splint-treatment costs: "Any use of plaintiff's casts and splints was for the benefit and convenience of the patient and provider, with no benefit to the government. The fact that the government has an interest in the program generally, or funds or reimburses all or part of its costs, is too remote to make the government the program's beneficiary for the purposes underlying § 1498."; "Even assuming that Medicare providers' activities were 'for' the government, liability would not attach unless the infringing activity occurred with the government's authorization or consent. ... Statutory waivers of governmental immunity, such as embodied in § 1498(a), must be narrowly construed. ... An implied authorization to infringe may be found under the following conditions: (1) the government expressly contracted for work to meet certain specifications; (2) the specifications cannot be met without infringing on a patent; and (3) the government had some knowledge of the infringement. ... [T]here were myriad alternatives to plaintiffs' splints. ... [A] Medicare participation agreement between the government and health care providers did not create an affirmative obligation to provide medical services, but was merely a billing arrangement whereby providers agreed to abide by certain rules in order to be reimbursed. ... [T]he government did not impliedly agree to any underlying infringement simply by approving payment of medical claims for general procedures."); *Kerwit Medical Products, Inc. v. N & H Instruments, Inc., 224 USPQ 679, 690 n.5 (N.D. Tex. 1984)*(sale of beds to Veterans Administration hospitals; "There is no evidence showing that the United States even implicitly authorized or consented to the alleged infringement."); *Windsurfing Int'l Inc. v. Fred Ostermann, GmbH, 216 USPQ 785, 790 (S.D. N.Y.*

5-16 Chisum on Patents § 16.06

*1982)*("Implicit authorization or consent for an alleged infringement has been found where government contracts *require* an infringement in order to secure fulfillment. ... However, where the government requirement can be satisfied without an infringement, authorization or consent will not be implied.").

(n169) Footnote 95. *230 F. Supp. at 72, 141 USPQ at 624.*

Cf. *Price v. United States, 202 USPQ 208, 213 (Ct. Cl. 1979).*

(n170) Footnote 96. *359 F. Supp. 467, 178 USPQ 211 (D. Md. 1973).*

Accord: *Dearborn Chem. Co. v. Arvey, 114 F. Supp. 369, 99 USPQ 201 (N.D. Ill. 1953)* (contractor does not waive rights under Section 1498 by entering into indemnity agreement).

As to the right of a contractor-indemnitor to participate in the Court of Claims action against the United States and the jurisdiction of the Court of Claims to render judgment based on the indemnity agreement, see *Bowser, Inc. v. United States, 420 F.2d 1057, 164 USPQ 460 (Ct. Cl. 1970).*

(n171) Footnote 97. *359 F. Supp. 473-74, 178 USPQ at 215-16.*

(n172) Footnote 98. *175 F.2d 148, 82 USPQ 334 (4th Cir. 1949).*

(n173) Footnote 99. *175 F.2d at 151, 82 USPQ at 337.*

(n174) Footnote 100. *92 F.2d 886, 35 USPQ 383 (5th Cir. 1937).*

(n175) Footnote 101. *92 F.2d at 888.*

(n176) Footnote 102. *268 F. Supp. 735, 154 USPQ 236 (D. Ore. 1967), aff'd, 406 F.2d 497, 160 USPQ 518 (9th Cir. 1969).*

Compare *Windsurfing Int'l Inc. v. Fred Ostermann, GmbH, 216 USPQ 785 (S.D. N.Y. 1982)*(use of windsurfers in Olympic Games held in United States not "by" or "for" the United States Government despite government approval of holding of games).

(n177) Footnote 103. *268 F. Supp. at 739, 154 USPQ at 239.*

(n178) Footnote 104. *406 F.2d 497, 160 USPQ 518 (9th Cir. 1969).*

(n179) Footnote 105. *406 F.2d at 498, 160 USPQ at 519.*

(n180) Footnote 106. *Interdent Corp. v. United States, 488 F.2d 1011, 180 USPQ 197 (Ct. Cl. 1973).*

Compare *Alco Standard Corp. v. Tennessee Valley Authority, 448 F. Supp. 1175, 197 USPQ 671 (W.D. Tenn. 1978)*(under Sec. 19 of TVA Act, exclusive remedy for use by TVA or by contractor with authorization or consent of TVA lies in U.S. District Court).

(n181) Footnote 107. *534 F.2d 889, 192 USPQ 296 (Ct. Cl. 1976).*

See also *Hughes Aircraft Co. v. Messerschmitt-Boelkow-Blohm, GMBH, 625 F.2d 580, 584, 208 USPQ 23, 26 (5th Cir. 1980), cert. denied, 449 U.S. 1082 (1981)* (Joint U.S.-German satellite program: "the Helios project was a joint effort, wherein the two partners participated fully in planning and carrying out nearly all aspects of the mission, for mutual benefit. The United States was to conduct three experiments aboard the vehicles; met a substantial portion of the project's costs; took responsibility for initial technical coordination for the project; and launched the vehicle. The United States was not just a passenger aboard a German spacecraft, as argued by the plaintiffs. The allegedly infringing control system, even though selected for use by the German Government, nevertheless was an integral portion of the spacecraft, and was used by the joint project as a whole.").

Compare *Decca Ltd. v. United States, 640 F.2d 1156, 209 USPQ 52 (Ct. Cl. 1980), cert. denied, 454 U.S. 819 (1981)*(United States cannot be guilty of contributory infringement or inducement of infringement; under *28 U.S.C. § 1498* , it takes an eminent domain license to use patented inventions and has not waived its sovereign immunity as to any other type of potential infringement liability).

(n182) Footnote 108. See *Hughes Aircraft Co. v. United States, 29 USPQ2d 1974, 1998 (U.S. Ct. Fed. Cl. 1993)*:

"[The two earlier *Hughes* ] cases stand for the principle that United States involvement in a joint international space program will be sufficient to make any use of the spacecraft a use 'by' or 'for' the government within the meaning of

Section 1498 if the project is a cooperative one with the potential of substantial benefits to the United States. Our view of those decisions is buttressed considerably by Congress' enactment in 1981 of *42 U.S.C. Section 2457*(1). That provision states in pertinent part:

'The use or manufacture of any patented invention incorporated in a space vehicle launched by the United States Government for a person other than the United States shall not be considered to be a use or manufacture by or for the United States within the meaning of section 1498(a) of title 28, unless [NASA] gives an express authorization or consent for such use or manufacture.'

"... The legislative history strongly suggests that Congress understood the preexisting case law, just as we have explained it above, to impose liability for cooperative ventures, and enacted the statute to ensure that the government would not be liable when it acted merely to accommodate other nations."

(n183) Footnote 109. *35 U.S.C. § 1498*(a) . See § 16.06[3][a] *supra*.

The right of suit provision of *28 U.S.C. § 1498*(a) does not apply to the secrecy order damage remedy under *35 U.S.C. § 183* . *Heinemann v. United States, 620 F.2d 874, 206 USPQ 418 (Ct. Cl. 1980)*. For a discussion of secrecy orders, see § 1.06[2][b] *supra*.

(n184) Footnote 110. For a discussion of ownership rights in inventions made during the course of employment, see § 22.03 *infra*.

(n185) Footnote 111. *249 U.S. 487 (1919)*.

(n186) Footnote 112. *249 U.S. at 489*.

(n187) Footnote 113. *63 F. Supp. 748, 68 USPQ 42 (Ct. Cl. 1946), cert. denied, 329 U.S. 751 (1946)*.

Compare *Leesona Corp. v. United States, 185 USPQ 156, 161 (Ct. Cl. Trial Div. 1975)* (inventor's original application filed prior to entering government service; inventor files continuation-in-part application after entering such service; "Since the claims are entitled to the ... filing date [of the original application], his subsequent employment history is irrelevant and the bar express in *28 U.S.C. § 1498* is inapplicable.").

(n188) Footnote 114. For a discussion of actual and constructive reduction to practice, see § § 10.03[1], 10.05, 10.06 *supra*.

(n189) Footnote 115. For a discussion of diligence and conception, see § § 10.04, 10.07 *supra*.

(n190) Footnote 116. *177 F. Supp. 952, 123 USPQ 354 (Ct. Cl. 1959)*.

(n191) Footnote 117. *177 F. Supp. at 955, 123 USPQ at 356*.

(n192) Footnote 118. Such a right was recognized prior to 1910 and was effectively eliminated by extension of the Court of Claims remedy in 1918. See § 16.06[3][a] *supra*.

(n193) Footnote 119. See Chapter 22 *infra*.

(n194) Footnote 1. For Supreme Court decisions interpreting the Eleventh Amendment, see *Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114 (1996)*, discussed at N. 40 *infra*; *Pennsylvania v. Union Gas Co., 491 U.S. 1 (1989), overruled in part, 116 S. Ct. 1114 (1996); Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985); Fitzpatrick v. Bitzer, 427 U.S. 445 1976); Edelman v. Jordan, 415 U.S. 651 (1974); Employees v. Department of Public Health & Welfare, 411 U.S. 279 (1973); Parden v. Terminal Ry. Co., 377 U.S. 184 (1964); In re State of New York, 256 U.S. 490 (1921); Ex parte Young, 209 U.S. 123 (1908); Hans v. Louisiana, 134 U.S. 1 (1890)*.

(n195) Footnote 2. Pub. L. 102-560, § 2(a)(2), 106 Stat. 4230 (Oct. 28, 1992), discussed at N. 24 *infra*.

See § 1.05[2][e] *supra*.

See also *Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 939-41, 27 USPQ2d 1241, 1246-47 (Fed. Cir. 1993), cert. denied, 510 U.S. 1140 (1994)* , discussed at N. 32 *infra*:

"State immunity from suit in federal court is founded upon the fundamental relationship and constitutional balance between the federal government and the states. ... In general, without the state's consent a federal court is without power to entertain a suit by a private person against the state.

"There are qualifications to the reach of the Eleventh Amendment, again in implementation of the constitutional plan. Thus Congress has legislatively abrogated state immunity in specific circumstances, based variously on the enforcement provision of § 5 of the Fourteenth Amendment (granting Congress authority to enforce 'by appropriate legislation' the provisions of the Fourteenth Amendment), ... or on the authority of the Commerce Clause ... . Such abrogation of immunity must be explicit and unambiguous, and must show clearly that Congress intended to subject the states to suit in federal court. ...

"A state may waive its immunity, in its entirety or as to any specified agency, action, or event. ... Waiver by a state can be effected by state statute or state constitution or by clear state conduct. A state statute may be construed to waive Eleventh Amendment immunity. ... A state may by its actions be deemed to have waived its immunity as to a specific cause.

"In addition to abrogation and state waiver of immunity, state officials may be sued as individuals in certain circumstances. *Ex Parte Young, 209 U.S. 123 (1908)*. ...

"... [I]n legislation enacted October 28, 1992 Congress abrogated state immunity from suit for violation of patent law. Patent and Plant Variety Protection Remedy Clarification Act, Pub. L. No. 102-560, 106 Stat. 4230 (1992). The Patent Clause, the Commerce Clause, and § 5 of the Fourteenth Amendment were mentioned as authority for this legislation. S. Rep. No. 280, 102d Cong., 2d Sess. 7-8 (1992) ('Senate Report')."

(n196) Footnote 3. *Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114 (1996)*, discussed at N. 40 *infra*.

(n197) Footnote 4. But cf. *Kraft Foods Co. v. Walther Dairy Prod., 118 F. Supp. 1, 24, 100 USPQ 215 (W.D. Wis. 1954), aff'd, 234 F.2d 279 (7th Cir. 1956), cert. denied, 352 U.S. 926 (1956)* (State intervened as defendant in infringement action but may not be held liable for infringement or for aiding infringement when "engaged in a governmental function, not for financial gain, but for the general welfare of its inhabitants.").

(n198) Footnote 5. *91 F. 129 (6th Cir. 1898)*.

(n199) Footnote 6. *91 F. at 136*.

For a discussion of government liability for copyright infringement, see 2 Nimmer, *Copyright* § 131.42 (1975).

See also *BV Engineering v. University of California, Los Angeles (The Regents of the University of California), 657 F. Supp. 1246, 1251 n.2, 3 USPQ2d 1054, 1057 n.2 (C.D. Calif. 1987), aff'd, 858 F.2d 1394, 8 USPQ2d 1421 (9th Cir. 1988), cert. denied, 489 U.S. 1090 (1989)*("Different rules govern a grant of injunctive relief against a state based on a cause of action 'arising under' federal law. Specifically, injunctions against future conduct in violation of federal law are not governed by the same rules of interpretation as are damage claims."); *Association of American Medical Colleges v. Carey, 482 F. Supp. 1358, 205 USPQ 42 (N.D. N.Y. 1980)*(preliminary injunction against state officers barring enforcement of "truth in testing" law which required filing of copyrighted tests, studies, and reports).

(n200) Footnote 7. *161 U.S. 10 (1896)*, discussed at § 16.06[3][a] *supra*.

(n201) Footnote 8. Compare *McCreery Eng'r Co. v. Massachusetts Fan Co., 180 F. 115 (C.C.D. Mass. 1910)* (court may not enjoin continued use of accused device embedded in county courthouse, which is property of State).

(n202) Footnote 9. *337 F. Supp. 795, 172 USPQ 644 (D. Minn. 1972)*.

(n203) Footnote 10. *209 U.S. 123 (1908)*. In *Young*, the Supreme Court held that a federal court could enjoin a state officer, such as an attorney general, from enforcing a state statute, such as a rate regulatory scheme, that violated the federal constitutional rights of the plantiff.

(n204) Footnote 11. *337 F. Supp. at 798, 172 USPQ at 647*.

(n205) Footnote 12. For a discussion of contributory infringement, see § 17.03 *infra*.

(n206) Footnote 13. *337 F. Supp. at 799, 172 USPQ at 648*.

(n207) Footnote 14. E.g., *Kennecott Copper Corp. v. State Tax. Comm'n, 327 U.S. 573, 577 (1946); Ford Motor Co. v. Department of Treasury, 323 U.S. 459 (1945); Smith v. Reeves, 178 U.S. 436, 445 (1900)*.

(n208) Footnote 15. *43 F.2d 582 (D. Ore. 1925)*.

(n209) Footnote 16. *372 F. Supp. 708, 181 USPQ 313 (N.D. Ill. 1974)*.

(n210) Footnote 17. *377 U.S. 184 (1964).*

(n211) Footnote 18. *411 U.S. 279 (1973).*

(n212) Footnote 19. *372 F. Supp. at 715, 181 USPQ at 316-17.*

(n213) Footnote 20. *415 U.S. 651 (1974).*

Compare *Mihalek Corp. v. State of Michigan, 595 F. Supp. 903, 225 USPQ 736 (E.D. Mich. 1984)*(state and state officials are immune from suit for damages and injunctive relief based on copyright and trademark infringement).

(n214) Footnote 21. *591 F.2d 1278, 201 USPQ 437 (9th Cir. 1979).*

See also *Johnson v. University of Virginia, 606 F. Supp. 321, 324, 226 USPQ 356, 358 (W.D. Va. 1985)*("[t]he 1976 [Copyright Act] waived the states' Eleventh Amendment immunity from liability for damages and equitable relief for copyright infringements").

Compare *BV Engineering v. University of California, Los Angeles (The Regents of the University of California), 657 F. Supp. 1246, 1250, 3 USPQ2d 1054, 1057 (C.D. Calif. 1987), aff'd, 858 F.2d 1394, 8 USPQ2d 1421 (9th Cir. 1988), cert. denied, 489 U.S. 1090 (1989)*(the defendant university, as an instrumentality of the State of California, is immune from a federal court suit alleging infringement of the plaintiff's copyright in computer software products; the Ninth Circuit's *Mills Music* decision, finding in the Copyright Act a Congressional abrogation of State sovereign immunity under the Eleventh Amendment, has been effectively overruled by the Supreme Court's decision in *Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985),* which held that a Congressional authorization of suit against a State must be expressed "in unmistakable language in the statute itself"; the Copyright Act, in providing that "anyone" who violates a copyright owner's exclusive rights shall be liable as an infringer, does not expressly state that States shall be so liable; "In the copyright, trademark, and patent area, it seems reasonable that an intention to bind the States should be implied, particularly in view of the circumstance that the federal courts are the only place where federal copyrights may be enforced (federal court jurisdiction being exclusive under *28 U.S.C. § 1338*(a) ). ... [However, the] chances of the new standard expressed in *Atascadero State Hospital* having been accidentally formulated or unintended to be taken literally are nonexistent.").

(n215) Footnote 22. *591 F.2d at 1286, 201 USPQ at 443.*

(n216) Footnote 23. *Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985).*

The Supreme Court recognizes three exceptions to States' immunity from federal court suit. A state is not immune if (1) it expressly waives its immunity, (2) Congress has "abrogated" the immunity, or (3) the state implicitly consents to suit by engaging or participating in federally-regulated activity. As to the exception of congressional abrogation, "Congress must express its intention to abrogate the Eleventh Amendment in unmistakable language in the statute itself." *Atascadero, 473 U.S. at 243.* As to the exception of implied consent, the Supreme Court has indicated that Congress must also manifest a "clear intent to condition participation" in the activity on a state's consent to waive its constitutional immunity. *Atascadero, 473 U.S. at 247.*

In *Atascadero,* the majority noted that "A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment. When Congress chooses to subject the States to federal jurisdiction, it must do so specifically." *473 U.S. at 246.* In *Welch v. State Dept. of Highways & Transportation, 483 U.S. 468 (1987),* the Court held that the Jones Act was not sufficiently specific even though it extended a damage remedy to "any" injured seaman.

(n217) Footnote 24. *BV Engineering v. University of California, 858 F.2d 1394, 8 USPQ2d 1421 (9th Cir. 1988), cert. denied, 489 U.S. 1090 (1989).*

See also *Lane v. First National Bank of Boston, 871 F.2d 166, 10 USPQ2d 1268 (1st Cir. 1989); Richard Anderson Photography v. Brown, 852 F.2d 114, 7 USPQ2d 1417 (4th Cir. 1988), cert. denied, 489 U.S. 1033 (1989).*

See generally Plunkett, "Plugging the State Immunity Copyright Loophole," *72 J. Pat. & Trademark Off. Soc'y 285 (1990);* DiJoseph, "The One and the Many--The Expropriation of Intellectual Property by the States: Copyright and the Eleventh Amendment," 9 Loyola Ent. L. J. 1 (1989); Dunaway & Dillon, "B.V. Engineering v. University of California, Los Angeles: A License to Steal?" 5 Santa Clara Computer & High Tech. L. J. 349 (1989); Note, "Sovereign Immunity to Copyright Infringement Actions After *Atascadero State Hosp. v. Scanlon, 473 U.S. 234 (1985),*" *50 Ohio St. L. J. 197 (1989);* Note, "States Escape Liability for Copyright Infringement?" *16 Pepperdine L. Rev. 663 (1989).*

In *BV Engineering*, the Ninth Circuit found "compelling" appellant's arguments that "it is inconsistent with the statutory scheme governing copyright law to immunize states from suit for infringement" and that "the policies behind the Eleventh Amendment are not implicated." Despite these arguments, and despite its recognition that "our holding will allow states to violate the federal copyrights laws with virtual impunity," it felt "constrained by the Supreme Court's mandate" in recent Eleventh Amendment decisions. *858 F.2d at 1400, 8 USPQ2d at 1426.*

(n218) Footnote 25. See Jones, "Copyrights and State Liability," *76 Iowa L. Rev. 701 (1991);* Petersen, "Copyright and State Government: An Analysis of Section 119.082, Florida's Software Copyright Provision," *20 Fla. St. U. L. Rev. 441 (1992);* Note, "Copyright and Patent Clause of the Constitution: Does Congress Have the Authority to Abrogate State Eleventh Amendment Sovereign Immunity After Pennsylvania v. Union Gas ?," *2 Seton Hall Const. L.J. 297 (1991);* Note, "The Constitutionality of the Intellectual Property Remedy Clarification Acts and the Award of Relief," *16 J. Corp. L. 521 (1991).*

(n219) Footnote 26. *893 F.2d 331, 13 USPQ2d 1393 (Fed. Cir. 1990).*

See also *Ciba-Geigy Corp. v. Alza Corp., 804 F. Supp. 614, 26 USPQ2d 1321 (D. N.J. 1992)* ; *University of California v. Eli Lilly & Co., 19 USPQ2d 1668, 1674 (N.D. Calif. 1991)* (Eleventh Amendment bars defendant's Section 291 patent interference counterclaim against state university, which brought patent infringement suit; the counterclaim could provide affirmative relief invalidating the state's patent).

Compare *In re Regents of the University of California, 964 F.2d 1128, 22 USPQ2d 1748 (Fed. Cir. 1992)* (the Eleventh Amendment does not bar the Judicial Panel on Multidistrict Litigation from consolidating for coordinated pretrial proceedings a state university's suit); University of California v. Eli Lilly & Co., 21 USPQ2d 1201, 1206-07 (N.D. Calif. 1991) (plaintiff state university's Eleventh Amendment immunity from unconsented federal court patent infringement suit does not automatically preclude transfer of its action to another district; "by filing suit as a plaintiff ... waives its immunity to counterclaims and affirmative defenses asserted as a set-off against the claims pursued by [plaintiff] ... . [Plaintiff] retains some control over the scope of its consent. For instance, consent to suit in state courts may not operate to waive Eleventh Amendment immunity to the same claims when brought in federal court... . In this manner, the Eleventh Amendment may be used offensively to control court proceedings through limitations or conditions placed on the state's waiver of immunity."; however, "[w]hile a state may decide not to enter federal court, it may not control the conduct of federal proceedings through a conditional waiver of its Eleventh Amendment immunity.").

In *Regents*, a state university brought two patent infringement suits in a California district court. The Panel ordered the two suits consolidated for pretrial proceedings with three related suits in Indiana. Refusing to overturn the Panel's order, the Federal Circuit rejected the university's argument that the order "forces [its] participation in litigation to which [it has] not consented" and "misperceives the nature of the transfer order." *964 F.2d at 1134, 22 USPQ2d at 1753.*

"The order simply coordinates in one court, before one judge, the pretrial procedures of existing actions; it does not require the [state university] to appear in actions to which [it is] not party, or to defend against claims to which [it is] not otherwise subject. The coordination of pretrial activities in pending proceedings, for the purpose of avoiding inconsistent and duplicative demands on parties, witnesses, and judges, neither enlarges the State's liability nor invokes federal judicial power beyond that already sought by the *State." 964 F.2d at 1134, 22 USPQ2d at 1753.*

The court found no merit in the university's argument that it "limited [its] waiver of immunity to the venue of the Northern District of California, and that transfer of even part of the actions [it] brought in California, for any purpose, is barred by the Eleventh Amendment." The court noted that "[t]he Eleventh Amendment is not designed to give procedural advantage to State litigants, but to shield States from unconsented actions against them." The university's reliance on *Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 307 (1990)* , which states that "issues of venue are closely related to those concerning sovereign immunity, as this Court has indicated by emphasizing that '[a] State's constitutional immunity encompasses not merely whether it may be sued, but where it may be sued' " "is inapt" because the university brought the suits.

(n220) Footnote 27. *893 F.2d at 334, 13 USPQ2d at 1936.*

(n221) Footnote 28. *893 F.2d at 336, 13 USPQ2d at 1397.* The court noted that "Congress has similarly not provided a forum for patent infringement suit against the United States in Title 35. Rather it has provided for a suit for compensation in the United States Claims Court. ... Such a suit is based on principles related to the taking of property, namely a patent license, and subjects the United States to payment of appropriate compensation therefore, not to the liability or relief (such as treble damages) provided in the patent statute." *893 F.2d at 336, 13 USPQ2d at 1397.*

The court dismissed the concern, expressed by the Ninth Circuit in *BV Engineering*, and pressed by the appellant in *Chew*, that, because federal courts have exclusive jurisdiction over patent infringement suits, patent owners will suffer a taking of their property without just compensation. A claim that *Congress* violates the 5th Amendment proscription against the taking of property without just compensation by failing to abrogate the States' Eleventh Amendment immunity is properly addressed to the United States, not a State. Similarly, a patent infringement suit is not the appropriate legal remedy for vindicating a "takings" claim against a State.

"While the *BV Engineering* court expressed concern about reaching a result that precluded any forum for bringing a copyright infringement action against a *state*, we think that this concern is misplaced to the extent it is premised on the assumption that, without a forum for an *infringement* suit, an owner of a patent or copyright has *no* legal recourse against a state. This decision ... simply forecloses one avenue of recourse--the specific relief for infringement of patent rights otherwise provided by federal statute." *893 F.2d at 336 n.5, 13 USPQ2d at 1397 n.5.*

In the suit in question, the plaintiff filed a claim with a state agency but her claim was rejected. She had six months thereafter to file suit on her claim but did not pursue that course of action in state court.

In *Jacobs Wind Electric Co. Inc. v. Florida Department of Transportation, 626 So.2d 1333, 29 USPQ2d 1763 (Fla. Sup. Ct. 1993),* the Florida Supreme Court held that its courts had "jurisdiction over takings and conversion claims against the state with respect to property that is the subject of a patent when the state is immune from suit for patent infringement in federal court": "state courts surely have jurisdiction when Congress did not or could not preempt the cause of action." *626 So.2d at 1336, 29 USPQ2d at 1765.*

(n222) Footnote 29. *919 F.2d 726, 16 USPQ2d 1972 (Fed. Cir. 1990).*

For a subsequent state court suit involving the same patent, see *Jacobs Wind Electric Co. Inc. v. Florida Department of Transportation, 626 So.2d 1333, 29 USPQ2d 1763 (Fla. Sup. Ct. 1993),* discussed at N. 28 *supra.*

(n223) Footnote 30. *919 F.2d at 728, 16 USPQ2d at 1973-74.*

(n224) Footnote 31. Pub. L. 102-560, § 2(a)(2), 106 Stat. 4230 (Oct. 28, 1992).

The Act takes "effect with respect to violations that occur on or after the date of the [Act's] enactment." Title 7 § 2541, Pub. L. 102-560 § 4.

In urging adoption of the Act, which was Senate Bill 758, Representative Hughes of the House of Representatives, Committee on the Judiciary, offered the following explanation.

"Mr. Speaker, I rise in support of S. 758, a bill which would clarify that States, their employees and officers acting in an official capacity, and instrumentalities of States are not immune from suit in Federal Court for violations of patents and plant variety protections.

"Prior to 1985 and the Supreme Court ruling in *Atascasdero State Hospital versus Scanlon*, intellectual property owners could obtain damages against States for violations of copyright and patent rights.

"In fact, *Atascadero* was contrary to previous Supreme Court decisions. The courts have since held that previous decisions had been wrong and State sovereign immunity could not be waived unless specifically stated by Congress.

"During the 101st Congress, the House approved legislation to waive State sovereign immunity for copyright violations. There have been, and continue to be, a number of instances involving violations of patent and trademark rights by States. We need to plug these loopholes as well.

"During the 101st Congress a bill relating to the waiver of State sovereign immunity in cases of patent violation was approved by committee but not enacted into law.

"The protection of intellectual property rights is of critical importance to the Nation's ability to complete in today's global market.

"To permit a State to use an individual's creative invention without any compensation is not only unfair but discourages others from investing time and money into developing new products and processes. States should be subject to the same remedies as a private entity that violates patent rights."

138 Cong. Rec. H11130, H11131.

(n225) Footnote 32. *998 F.2d 931, 27 USPQ2d 1241 (Fed. Cir. 1993), cert. denied, 510 U.S. 1140 (1994).*

(n226) Footnote 33. "(Plaintiff) invokes the general rule that change in law apply to cases that are pending before the courts, unless the interest of justice, or the law itself, requires otherwise. ... This general rule has been applied to congressional abrogations of state immunity.

"Public Law 102-560 provides in effect that there shall be no recovery for violations that occurred before October 28, 1992. ... Since Genentech's suit is for a declaration of rights and relationships, and not for recovery of damages for past violations under Title 35, and since violations of patent rights are continuing events, it appears to be unnecessary to decide whether there was an earlier non-statutory waiver of University immunity with respect to the patent counts." *998 F.2d at 944, 27 USPQ2d at 1249-50.*

(n227) Footnote 34. *998 F.2d at 949, 27 USPQ2d at 1254.*

(n228) Footnote 35. The court noted that "Public Law 102-560 explicitly abrogates state immunity from suit for all violations under Title 35, unlimited to the factual situation of *Chew* and *Jacobs Wind* where the only violation was infringement by the state." *998 F.2d at 942, 27 USPQ2d at 1248.* Section 296's heading cannot "take a significant portion of the textual subject matter out of the statute." *998 F.2d at 942, 27 USPQ2d at 1248.* Further, "[t]he conclusion that Public Law 102-560 is not limited to infringement by the state is reinforced by the explicit statement, in each section of the enactment, that its purpose is to place the states in the same position as nongovernmental entities as to the patent law." *998 F.2d at 942, 27 USPQ2d at 1248.*

(n229) Footnote 36. *998 F.2d at 943, 27 USPQ2d at 1249.*

The court noted:

"A declaratory action neither confers nor constrains jurisdiction or immunity. ... To determine jurisdiction or immunity as to a particular cause of action it is necessary to look to the substantive violation and other relevant criteria, not to the procedure for obtaining relief.

...

"Title 35 contains a variety of provisions that are subject to violation. E.g., Chemcast Corp. v. Arco Indus. Corp. ... (discussing violation of requirement of § 112 to disclose the best mode); J.A. LaPorte, Inc. v. Norfolk Dredging Co. ... (discussing violation of § 102(b) based on on-sale activity); Brooktree Corp. v. Advanced Micro Devices, Inc. ... (discussing violation of utility requirement of § 101)." *Id.*

(n230) Footnote 37. *998 F.2d at 944, 27 USPQ2d at 1250.*

(n231) Footnote 38. *998 F.2d at 946, 27 USPQ2d at 1251.*

(n232) Footnote 39. *998 F.2d at 946, 27 USPQ2d at 1251.*

(n233) Footnote 40. *116 S. Ct. 1114 (1996).*

(n234) Footnote 41. *116 S. Ct. at 1119.*

(n235) Footnote 42. *116 S. Ct. at 1122.*

(n236) Footnote 43. *491 U.S. 1 (1989).*

(n237) Footnote 44. *116 S. Ct. at 1131.*

(n238) Footnote 45. *116 S. Ct. at 1131-32.*

(n239) Footnote 46. *116 S. Ct. at 1134 n.1* (dissenting opinion).

(n240) Footnote 47. *116 S. Ct. at 1132 n.16.*

(n241) Footnote 1. *Sewage Comm'n of City of Milwaukee v. Activated Sludge, Inc., 81 F.2d 22, 24, 28 USPQ 173 (7th Cir. 1936); Reliance Constr. Co. v. Hassam Paving Co., 248 F. 701 (9th Cir. 1918); City of Akron v. Bone, 221 F. 944 (6th Cir. 1915); Cooper v. Westchester County, 42 F. Supp. 1, 52 USPQ 18 (S.D. N.Y. 1941); Asbestine Tiling & Mfg. Co. v. Hepp., 39 F. 324 (C.C.D. Ore. 1889); May v. Saginaw County, 32 F. 629 (C.C.E.D. Mich. 1887); May v. County of Ralls, 31 F. 473, 474 (C.C.E.D. Mo. 1887)* ("No exception has been made by the act of congress in favor of any wrong-doer. The provision is general in its terms, and may as well include counties as other corporations or individuals."); *May v. County of Logan, 30 F. 250 (N.D. Ohio 1887); Brickill v. The Mayor, 7 F. 479 (C.C.S.D. N.Y. 1880);*

*Munson v. The Mayor, 3 F. 338 (C.C.S.D. N.Y. 1880), rev'd on other grounds, 124 U.S. 601 (1888); Allen v. The Mayor, 1 F. Cas. 506 (No. 232) (C.C.S.D. N.Y. 1879); Bliss v. Brooklyn, 3 F. Cas. 706 (No. 1544) (C.C.E.D. N.Y. 1871).*

Cf. *Elizabeth v. Pavement Co., 97 U.S. 126 (1877).*

See also *Workman v. Mayor, 179 U.S. 552, 558 (1900)* (city subject to admiralty law and process; dictum that municipal corporation may not "in the exercise of administrative powers which the state law determines to be governmental ... with impunity violate the patent ... laws").

(n242) Footnote 2. *Griffin v. County School Board, 377 U.S. 218 (1964); Lincoln County v. Luning, 133 U.S. 529, 530 (1890)* ("The eleventh amendment limits the jurisdiction only as to suits against a state. ... (W)hile the county is territorially a part of the state, yet politically it is also a corporation created by, and with such powers as are given to it by, the state. In this respect, it is a part of the state only in that remote sense in which any city, town, or other municipal corporation may be said to be a part of the state.").

See § 16.06[4] *supra.*

(n243) Footnote 3. *17 USPQ2d 1667 (N.D. Calif. 1990), rev'd and remanded, 946 F.2d 870, 20 USPQ2d 1392 (Fed. Cir. 1991).*

(n244) Footnote 4. *17 USPQ2d at 1672.*

(n245) Footnote 5. E.g., *Mercer County v. Cowles, 74 U.S. (7 Wall.) 118 (1869); Markham v. City of Newport News, 292 F.2d 711 (4th Cir. 1961).*

(n246) Footnote 6. See, e.g., *Jagnandan v. Giles, 538 F.2d 1166, 1175 (5th Cir. 1976), cert. denied, 432 U.S. 910 (1977)* (state statutory and decisional law indicates that University of Mississippi is "part and parcel of the state"); *Handler v. San Jacinto Junior College, 519 F.2d 273, 279 (5th Cir. 1975)* ("In Eleventh Amendment cases, the question of whether or not the state is 'the real party in interest' is one of federal law, but federal courts must examine the powers, characteristics and relationships created by state law in order to determine whether the suit is in reality against the state itself."; junior colleges under Texas law are "like municipalities, independent political corporations, distinct from the state itself.").

Compare *Allen v. Brooklyn, 1 F. Cas. 464 (No. 218) (C.C.E.D. N.Y. 1871)* (municipal corporation not liable for use of infringing school seats since under state law public schools are under direction of a board of education) with *Allen v. New York, 1 F. Cas. 506 (No. 232) (C.C.S.D. N.Y. 1879)* (municipal corporation liable for use of infringing school seats because it is fiscally responsible for schools).

(n247) Footnote 7. *13 F. Cas. 276 (No. 7161) (C.C.S.D. Ohio 1862).*

Accord: *May v. County of Juneau, 30 F. 241 (C.C.W.D. Wis. 1887), aff'd on other grounds, 137 U.S. 408 (1890)* (patent invalid).

In *Jacobs*, the patent was on an element embodied in the county jail, and the court noted that the plaintiff would have a remedy against the contractor who built the jail. The court also noted that the personal and individual liability of county commissioners was not at issue.

(n248) Footnote 8. *May v. County of Logan, 30 F. 250, 260 (C.C.N.D. Ohio 1887)* ("The state could not, by either direct or indirect legislation, exempt its counties from liability for the infringement of patents, nor has it attempted to do so. The patentee's rights and remedies are created and defined by congress, which has, under the constitution, exclusive control of the subject."); *May v. County of Mercer, 30 F. 246 (C.C.D. Ky. 1887); Bliss v. Brooklyn, 3 F. Cas. 706 (No. 1544) (C.C.E.D. N.Y. 1871).*

(n249) Footnote 9. *31 F. 473 (C.C.E.D. Mo. 1887).*

(n250) Footnote 10. *31 F. at 474.*

Cf. *May v. Saginaw, 32 F. 629, 630 (C.C.E.D. Mich. 1887).*

(n251) Footnote 11. *29 F. 469 (C.C.N.D. Iowa 1886).*

(N252) Footnote 12. *39 F. Supp. 58, 49 USPQ 362 (S.D. N.Y. 1941).*

5-16 Chisum on Patents § 16.06

(n253) Footnote 13. *Cooper v. Westchester County, 42 F. Supp. 1, 52 USPQ 18 (S.D. N.Y. 1941);* 85 F. Supp. (S.D. N.Y. 1949).

(n254) Footnote 14. *17 USPQ2d 1667 (N.D. Calif. 1990), rev'd & remanded, 946 F.2d 870, 20 USPQ2d 1392 (1991).*

(n255) Footnote 15. *17 USPQ2d at 1673.*

(n256) Footnote 16. *426 U.S. 833 (1976).*

Compare *Fry v. United States, 421 U.S. 542, 547 (1975).*

(n257) Footnote 17. *426 U.S. at 851.*

(n258) Footnote 1. *28 U.S.C. § § 1330,* 1602-1611 . See H.R. Rep. No. 94-1487, 94th Cong., 2d Sess. (1976).

See generally Carl, "Suing Foreign Governments in American Courts: The United States Foreign Sovereign Immunities Act in Practice," *33 Southwestern L. J. 1009 (1979).*

(n259) Footnote 2. *28 U.S.C. § 1603*(a), (b) provides:

"(a) A 'foreign state', except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

"(b) An 'agency or instrumentality of a foreign state' means any entity--

"(1) which is a separate legal person, corporate or otherwise, and

"(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

"(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country."

(n260) Footnote 3. *28 U.S.C. § 1603*(d) provides that " 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." See *Mostek Corp. v. Inmos, Ltd., 203 USPQ 383 (N.D. Tex. 1978); United Euram v. Union of Soviet Socialist Republics, 461 F. Supp. 609 (S.D. N.Y. 1978).*

(n261) Footnote 4. *28 U.S.C. § 1603*(e) provides that " 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States."

(n262) Footnote 5. *28 U.S.C. § 1606 .*

(n263) Footnote 6. *28 U.S.C. § 1605*(a)(1) .

(n264) Footnote 7. See § 16.05[1] *supra* and § 17.03[1] *infra.*

1235VS

********** Print Completed **********

Time of Request:    September 12, 2005   06:14 PM EDT

Print Number:       1861:60614853
Number of Lines:    2189
Number of Pages:

Send To:   TARPINIAN, LORI
           MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO
           1 FINANCIAL CTR
           BOSTON, MA 02111-2657