# EXHIBIT 11

Westlaw.

599 F.2d 958                                                                                    Page 1
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

▷

United States Court of Claims.
LEESONA CORPORATION
v.
The UNITED STATES.
No. 130--70.

May 16, 1979.

United States was sued for infringement of patents relating to mechanically rechargeable metal-air batteries. Infringement was previously determined, 530 F.2d 896, 208 Ct.Cl. 871. At trial of damages issue, the Court of Claims, Nichols, J., held that: (1) damages were to be measured on an eminent domain, rather than a 'tort' theory; (2) multiple damages and attorney fees were not recoverable; (3) savings to the Government could not be awarded in addition to a reasonable royalty; (4) comparative royalty technique is the preferred method of determining just compensation; (5) although unpatented, original equipment anodes, cathodes and battery covers were to be included in the compensation base; (6) fact that by virtue of taking plaintiff lost his exclusive right to domestic manufacture of the batteries was a factor to be considered in fixing a reasonable royalty; (7) a royalty of ten percent was justified, and (8) plaintiff was entitled to damages for defendant's delay in payment of a reasonable royalty but such damages were not to be calculated from date of execution of the infringing contract.

Judgment for plaintiff.

Kashiwa, J., concurred in part and dissented in part and filed opinion.

West Headnotes

**[1] United States** ⟜97
393k97 Most Cited Cases
Theory of recovery against the Government for patent infringement is not analogous to that in litigation between private parties; when the Government has infringed, it is deemed to have "taken" the patent license under an eminent domain theory, and compensation is the just compensation required by the Fifth Amendment. 28 U.S.C.A. § 1498; 35 U.S.C.A. § 284 et seq.; U.S.C.A.Const. Amend. 5.

**[2] United States** ⟜97
393k97 Most Cited Cases
In determining damages attributable to Government's infringement of battery patent it was fundamental error to base recovery on a tort theory, rather than on an eminent domain theory, there being no clear indication that the Government intended to assume responsibility for any payment other than the just compensation required by the Fifth Amendment and absent an express assumption of such a duty, no further liability other than that which was constitutionally mandated could be assumed. 28 U.S.C.A. § 1498; 35 U.S.C.A. § 284 et seq.; U.S.C.A.Const. Amend. 5.

**[3] United States** ⟜125(6)
393k125(6) Most Cited Cases
Consent of the United States to suit is to be strictly construed.

**[4] United States** ⟜125(3)
393k125(3) Most Cited Cases
Any suit against the Government requires an express waiver of the Government's immunity from suit.

**[5] Eminent Domain** ⟜122
148k122 Most Cited Cases
Proper measure in eminent domain is what the owner has lost, not what the taker has gained. U.S.C.A.Const. Amend. 5.

**[6] Eminent Domain** ⟜122
148k122 Most Cited Cases
In eminent domain it is necessary to protect the public and the compensation must be just as to it. U.S.C.A.Const. Amend. 5.

**[7] United States** ⟜97
393k97 Most Cited Cases
One whose patent is infringed by the Government is entitled to only reasonable and entire compensation; unlike his counterpart in a private infringement suit, he is not entitled to be the recipient of increased damages heaped on other parties as punishment or deterrence. 28 U.S.C.A. § 1498; 35 U.S.C.A. § § 283, 284; U.S.C.A.Const. Amend. 5.

**[8] Patents** ⟜319(3)
291k319(3) Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                              Page 2

220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

**[8]** Patents 324.54
291k324.54 Most Cited Cases
In a patent suit between private parties, an award of increased damages is within the discretion of the trial judge and is not to be disturbed unless there is an abuse of such discretion. 35 U.S.C.A. § § 283, 284.

**[9]** Patents 319(3)
291k319(3) Most Cited Cases
Increased damages for a patent infringement are awarded only on a clear showing of willful and deliberate infringement. 35 U.S.C.A. § § 283, 284.

**[10]** United States 97
393k97 Most Cited Cases
The United States has the legal right to take a patent, subject to its obligation to pay just compensation. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[11]** United States 97
393k97 Most Cited Cases
Even if patent infringement action brought against the Government had been a suit between private parties, award of multiplied damages would have been inappropriate since although procurement procedure presented aspects of unfairness to patent holder there was no evidence that the Government's activities were a willful and deliberate attempt to violate patent holder's legal rights and gain use of patented batteries without payment of development cost, especially absent want of evidence of a deliberate government leak of patentee's bid price or of its known patented processes. 28 U.S.C.A. § 1498; 35 U.S.C.A. § § 284 et seq., 285.

**[12]** United States 147(11.1)
393k147(11.1) Most Cited Cases
        (Formerly 393k147(11), 393k147)
Attorney fees would not be ordered in patent infringement suit brought against the United States. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[13]** United States 97
393k97 Most Cited Cases
Lost profits in addition to royalty could not be awarded against the United States in patent infringement action. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[14]** United States 97
393k97 Most Cited Cases
Savings to the Government may be considered in determining reasonable compensation for government infringement of a patent; most proper

use of evidence of savings to the Government is in estimating what royalty willing
buyers and sellers would agree to. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[15]** United States 97
393k97 Most Cited Cases
Savings to the Government could not be awarded, in addition to royalties, as damages for Government's infringement of patent. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[16]** United States 97
393k97 Most Cited Cases
Even where savings to the Government are used as an acceptable measure of just compensation for patent infringement it is generally inappropriate to award the total savings as just compensation. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[17]** United States 97
393k97 Most Cited Cases
In determining compensation base for computing royalty due to Government's infringement of a patent the Court of Claims is not required to accept as dogma one of the parties' figures or the other, but can use them as perimeters for the Court's ultimate determination. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[18]** United States 97
393k97 Most Cited Cases
Actual value of subject patent was the proper measure of just compensation for a Government's infringement, rather than the total loss suffered by the entire corporate patentee as a consequence of losing both the exclusive domestic manufacturing rights and the procurement contract which was to usher patentee into the battery-manufacturing field, although some elements of business injury might be weighed in determining what the owner might have sold for, if willing to sell. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[19]** United States 97
393k97 Most Cited Cases
For purpose of determining reasonable and entire compensation due to Government's infringement of a patent, there is a difference between evaluating the value of the property taken in light of the patentee's business needs, and granting compensation for loss of business due to taking, or for any incidental losses; the former is proper, the latter is not. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

Page 3

**[20] United States ☜97**
393k97 Most Cited Cases
Comparative royalty technique is the preferred method for determining just compensation for government infringement of a patent. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[21] United States ☜97**
393k97 Most Cited Cases
One way to monitor the reasonableness and fairness of determination of just compensation for government infringement of battery patent was to compute the award by estimating a reasonable royalty on a proper compensation base, and then test such award by an examination of other available measures--savings to the Government, lost profits, etc. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[22] United States ☜97**
393k97 Most Cited Cases
Rationale for doctrine of permissible repair in awarding reasonable and entire compensation for government infringement of a patent is that one who has bought a patented item can repair and maintain it with nonpatented staple items because the protection and financial reward of the patent laws would be overextended if they embraced fungible component parts which are independent of the patent. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[23] Patents ☜255**
291k255 Most Cited Cases
Only when a patented item is "reconstructed" is it infringed. 28 U.S.C.A. § 1498.

**[24] United States ☜97**
393k97 Most Cited Cases
When the United States takes a compulsory compensable license in a patent by eminent domain, the Government is to be treated as a licensee entitled to benefits of the doctrine of permissible repair. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[25] United States ☜97**
393k97 Most Cited Cases
Under the "entire market value rule," it is not the physical joinder or separation of the contested items that determine their inclusion in or exclusion from the compensation base for computing a royalty due to Government's infringement of a patent, so much as their financial and marketing dependence on the patented item under standard marketing procedures for the goods in question. 28 U.S.C.A. § 1498;

U.S.C.A.Const. Amend. 5.

**[26] United States ☜97**
393k97 Most Cited Cases
Although anodes, cathodes and battery covers were not patented items, such items were to be included in compensation base for computing royalty due to Government's infringement of patent for mechanically rechargeable metal-air batteries since it was standard government practice to order anodes, cathodes and covers with the batteries as part of one procurement "package" and it was not unlikely that patent holder anticipated additional income from such parts when it estimated the value of the patents and such parts were designed to operate in conjunction with the special battery and had to conform to contract specifications and severability of the anodes was the key to the battery's value and fragile nature of the battery made it imperative that there be extra cathodes and covers to avoid a situation where damage occurred in the field. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[27] United States ☜97**
393k97 Most Cited Cases
Although unpatented anodes, cathodes and covers were included in compensation base for computing royalty due to Government's infringement of mechanically rechargeable metal-air batteries, the doctrine of permissible repair would not be ignored; rather, the court would use the original procurement order for 2,138 batteries as a reasonable estimate as to what parts were vital to operation of such batteries and would assume that option contract for extra anodes and cathodes was activated to procure "spare parts" which could not be part of the compensation base. 28 U.S.C.A. § 1498; U.S.C.A.Const. Amend. 5.

**[28] Patents ☜219(7)**
291k219(7) Most Cited Cases
Number of patents involved in a licensing agreement is not the material factor in determining the license's worth; it is the value of the rights embodied in those patents. 28 U.S.C.A. § 1498.

**[29] United States ☜97**
393k97 Most Cited Cases
Since holder of patent covering mechanically rechargeable metal-air batteries did not wish to give up its right to exclusive domestic manufacture, such right was to be recognized in computing reasonable royalty recoverable because of Government's infringement, i. e., taking of the patent. 28 U.S.C.A.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                                 Page 4
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

§ 1498; U.S.C.A.Const. Amend. 5.

**[30] Eminent Domain ☞122**
148k122 Most Cited Cases
The just compensation to which an owner is entitled
when his property is taken by eminent domain is
regarded in law from the point of view of the owner
of the right and not from that of the taker.
U.S.C.A.Const. Amend. 5.

**[31] United States ☞97**
393k97 Most Cited Cases
In light of unique value to plaintiff's business of its
patents governing mechanically rechargeable metal-
air batteries, a royalty of ten percent was justified on
the Government's taking-infringement. 28 U.S.C.A.
§ 1498; U.S.C.A.Const. Amend. 5.

**[32] United States ☞97**
393k97 Most Cited Cases
Although loss of greater part of battery development
costs along with other losses, might possibly be
recoverable as a business injury on a tort theory of
patent infringement, such was not recoverable on an
eminent domain theory based on Government's
infringement. 28 U.S.C.A. § 1498; 35 U.S.C.A. § §
283, 284; U.S.C.A.Const. Amend. 5.

**[33] United States ☞97**
393k97 Most Cited Cases
Party having burden of proof in a patent infringement
suit brought against the United States must suffer if
the scantiness of record fails to support a fully
informed and reasoned determination as to
reasonable and entire compensation. 28 U.S.C.A. §
1498; U.S.C.A.Const. Amend. 5.

**[34] United States ☞97**
393k97 Most Cited Cases
Holder of patents which have been infringed by the
United States was entitled to damages for
Government's delay in payment of a reasonable
royalty. 28 U.S.C.A. § 1498; U.S.C.A.Const.
Amend. 5.

**[35] United States ☞97**
393k97 Most Cited Cases
Delay damages to holder of battery patents which had
been infringed by the Government were not
calculated from date that Government executed
infringing contract with battery supplier,
notwithstanding that infringement constituted a
taking of plaintiff's exclusive right to domestic
manufacture of the batteries; where deliveries by

other contractor began on April 14, 1970 and ended
on February 1, 1971, a weighted average delivery
date of July 30, 1970 would be chosen since at such
time a little over one half of the value of the
deliveries had been made. 28 U.S.C.A. § 1498;
U.S.C.A.Const. Amend. 5.

**[36] United States ☞97**
393k97 Most Cited Cases
Statute providing for reasonable and entire
compensation for government infringement of a
patent does not provide compensation for loss of an
exclusive right of production, but only for the
manufacture or use of an item by
or for the Government. 28 U.S.C.A. § 1498.

**Patents ☞328(2)**
291k328(2) Most Cited Cases
3,276,909, 3,419,900, 3,436,270. Cited.
*962 A. W. Breiner, Arlington, Va., atty. of record,
for plaintiff.

John Fargo, Washington, D.C., with whom was Asst.
Atty. Gen. Barbara Allen Babcock, Washington,
D.C., for defendant. Thomas J. Byrnes and Vito J.
DiPietro, Washington, D.C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS,
NICHOLS, KASHIWA, KUNZIG, BENNETT, and
SMITH, Judges, en banc.

OPINION

NICHOLS, Judge:

In Leesona Corp. v. United States, 530 F.2d 896, 208
Ct.Cl. 871 (1976), this court held that certain claims
of three patents owned by plaintiff Leesona were
valid and infringed by the defendant United States.
The issue in this case is the determination of
'reasonable and entire' compensation due plaintiff for
that infringement under 28 U.S.C. s 1498, i.e., what
is called in these cases the 'accounting phase.' Trial
Judge Browne, to whom this phase was assigned
under our Rule 131(c), determined that Leesona was
entitled to judgment in the amount of $3,534,753.52,
which included attorneys' fees of $100,000 and delay
compensation for the period of November 6, 1969, up
to and including December 31, 1977. He also ordered
additional delay compensation at the rate of $470.51
per day from January 1, 1978, until payment on the
judgment. The government has excepted to the trial
judge's determination of what items constitute
'reasonable and entire' compensation, and to much of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                     Page 5
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

the accounting used in the opinion.

Our conclusion is that the trial judge's award is largely excessive because of his erroneous assumption that he was adjudicating a tort claim for patent infringement under various provisions of Title 35 of the Code. We do not adopt the opinion of the trial judge, although we do adopt the trial judge's findings of fact except as stated. These findings are not printed herein, as the facts necessary to our ultimate determination are incorporated in the opinion. We have made our own determination in the amounts that will appear below. We state by separate order what findings we reject without replacement, and what findings we adopt as corrected by us. Any fact statements not having counterpart in the findings may be taken as additional findings of the court.

## I
### A

The infringed patents relate to mechanically rechargeable metal-air batteries termed BB--626/U's. Each BB--626/U consists of a battery box, a cover, attendant hardware, twenty-two cathode envelope structures, and a can containing twenty-two zinc anodes.

The designs for which a patent has been found to be valid and infringed are (a) a cathode structure with an admixture of catalyst and Teflon binders (patent 3,419,900), (b) a specified arrangement of the cathode, using a Teflon-backed electrode (patent 3,276,909), and (c) a specified relationship of the replaceable anode to the chathode, requiring a minimum volume of electrode; this is the 'cathode envelope' concept (patent 3,436,270). In the liability trial, Trial Judge Cooper determined, and we agreed, that the three infringed patents were of substantial importance to the success of the BB-- 626/U battery, making them lighter, capable of handling more power and at higher power levels, and greatly reducing recharging time. 208 Ct.Cl. at 895, 530 F.2d at 910.

The operation of the battery is as follows: when packed for shipment, the BB-- 626/U's have 'dummy anodes' in their cathode envelopes; the real anodes are separately packed in a hermetically sealed envelope. An electrolyte is formed in the cells when the battery is filled with water. Then the real anode is taken out of the storage envelope and replaces the dummy anode, and \*963 only when all twenty-two anodes replace the dummy anodes is the battery operative. The battery is recharged by replacing the anodes, and the government anticipated that it would require 50 'recharges,' i.e., replacements of the twenty-two anodes, for the battery to be militarily useful. The method of packaging the anodes comes within the scope of a patent to which the United States has a royalty-free, nonexclusive license. Leesona Corp. v. United States, supra, 530 F.2d at 910, 208 Ct.Cl. at 894--95.

### B

Leesona, through the Leesona-Moos Laboratories division of the company, was engaged in the development of mechanically reconstructible batteries (the BB-- 626/U's). It determined to overcome the deficiencies of the then standard electronically 'rechargeable' batteries (the BB--451/U's). The company's research was focused on the military potential of such a battery and the patents were considered an important contribution to Leesona-Moos, and to Leesona's diversification program. In 1966, Leesona manufactured and tested batteries under a contract with the government for 22 metal-air batteries, 10 of which were to be mechanically reconstructible. The test performance of the '626 batteries was highly favorable, compared to the standard '451 batteries. Due to the outstanding performance of the '626 batteries, the Marine Corps decided to replace all the BB--451/U's with BB--626/U's. From the information available at the time, Leesona estimated that the value of the Marine Corps' annual procurement of '626 batteries would be in excess of $25--30 million, and that the procurement needs of the Army would be even greater. (Such procurement levels never took place; the parties suggest a variety of factors which may have been responsible--new technology, the end of the Vietnam War, and the failure of the contractor chosen by the government to make the batteries, Eagle Picher, to deliver a reliable product.) Anticipating a government contract for a large quantity of batteries, Leesona committed over $3 million of its funds to establish full-scale production facilities for the batteries. Given the success of the '626 batteries, Leesona assumed that the patents would be of great assistance in enabling it to maintain a highly competitive position in the battery filed. To ensure such a position, Leesona was unwilling to grant any other company a license to manufacture batteries within the United States, although agreements with other corporations do not prohibit the sale within the United States of batteries manufactured outside the United States.

### C

The government's initial procurement procedure for the batteries, the procedure which produced the litigation at hand, was fiercely assailed by the trial judge and in all candor was hardly a model of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                    Page 6
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

efficient management and laudable public relations. In April 1969 the Marine Corps requested authority to issue a negotiated letter contract to Leesona for procurement of 2,500 BB-- 626/U batteries, 753,456 anode-electroytes, 3,000 cathodes, and 575 'blower' covers. The Marine Corps justified the sole source procurement at that time, declaring that drawings and specifications would be inadequate at the present time for competitive bidding, and that start-up time would delay a bidder other than Leesona. A negotiated letter contract was issued to Leesona on May 12, 1969, for the manufacture of BB--626 batteries and associated components. Unit prices of each component were not fixed then, but the letter contract did give the figure of $3,700,000 as the government's maximum commitment for the items it desired. The same letter contract also limited government liability to.$1.8 million in the event of termination.

Leesona received and signed the letter contract. However, after receiving the signed letter contract, the Marine Corps refused to ratify it. The letter contract incorporated ASPR s 802.2 (Mar. 1964) which required acceptance by both parties before commencement of work. Two other manufacturers had learned of the issuance *964 of the letter contract for the BB--626/U batteries, from sources to which neither defendant nor plaintiff can point with certainty. But upon learning of the government's interest, these manufacturers requested that Invitations for Bids be issued, asserting that they had the potential to manufacture such batteries.

The government decided to withdraw the letter contract. Testimony from the parties' witnesses indicates that there were both economic and legal reasons for doing so. Apparently, one internal report at the Marine Corps suggested that greater cost savings could be effected if a competitive, rather than a sole-source, bid procedure were used. And defendant points out in the government's briefs that the Armed Services Procurement Regulations require procurement by formal advertising whenever such a method is feasible and practical. See ASPR 1--1001, 2--102.1, 3--102(a) (1973).

Leesona assisted the Marine Corps in assembling a data package used to prepare the government's request for bids. There is no indication in the record that Leesona received compensation for this service, nor that Leesona took any steps to identify the confidential nature of the information used in the preparation of the bid package.

Twelve companies were invited to make bids, five did so. The contract was awarded to the lowest bidder, Eagle Picher, Inc., on November 6, 1969. Leesona was the next-to-lowest bidder. Leesona contends that November 6, 1969, the effective date of the government's contract with Eagle Picher (contract No. M00150--70--C--0113), was the date of the government's taking, since on that date the government induced and contributed to the infringement of Leesona's valid patent by authorizing Eagle Picher to manufacture the batteries using plaintiff's patents.

The contract awarded Eagle Picher required delivery of the following items, with options for technical manuals, progress reports, etc.:

| Item No. | Supplies/Services | Quantity | Unit Price |
|----------|-------------------|----------|------------|
| 0001 | Batteries, BB--626/U Zinc Air mechanically rechargeable | 2,138 | $385.22 |
| 0002 | Kits, Anode charge BB--626/U | 68,182 | 26.10 |
| 0003 | Cells, single, used w/BB--626/U Battery | 2,948 | 14.32 |
| 0004 | Covers, electronic package used w/BB-626/U Battery | 732 | 90.14 |

A procurement worth $921,708.03 was added later by the government's exercise of certain options for additional

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                              Page 7
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

anode kits and cells for the battery. Eagle Picher effected a cost saving on Item 0001, above, so that the unit price of the batteries was reduced to $385.125 from the original $385.22.

## D

Trial Judge Browne awarded Leesona damages based on his view of the scope of 28 U.S.C. s 1498. That statute provides that the exclusive remedy for patent infringement by the government is an action in the United States Court of Claims, and in such an action, the owner of a valid claim is entitled to recover 'reasonable and entire' compensation for infringement.

[1] The theory for recovery against the government for patent infringement is not analogous to that in litigation between private parties. When the government has infringed, it is deemed to have 'taken' the patent license under an eminent domain theory, and compensation is the just compensation required by the fifth amendment. Title 28 U.S.C. s 1498 contains no directions or limitations as to the grant of damages other than its mandate of 'reasonableness' and 'entirety.' The trial judge's definition of that mandate colors his determination of allowable damages for Leesona. In his *965 opinion, he contends that 28 U.S.C. s 1498 was and is designed as a complete replacement for remedies for private infringement found in 35 U.S.C. ss 284 et seq. Therefore, he concludes that, at least in such extraordinary cases as this one, parties injured by the government can, under s 1498, obtain treble damages and attorneys' fees, such as private parties may obtain under 35 U.S.C. ss 284 and 285.

Given this position, Trial Judge Browne determined damages as follows:

He concluded that Title 35 U.S.C. s 284 requires, as a minimum, a reasonable royalty for use made of Leesona's patent. This is to be but one element of the 'reasonable and entire' compensation.

To determine this royalty, the trial judge used the contract awarded to Eagle Picher, and the options exercised by the government under that contract, as a compensation base. The value of the initial contract to Eagle Picher was estimated to be $2,667,122.81. This includes the anode kits, cathode cells, and covers requested in the original contract as well as the batteries. Trial Judge Browne did lower the value of the covers from $90.14 to $30 per unit as he considered the high-priced covers unessential for the patented item, although some covers were needed. To this $2.6 million figure he added the additional procurement of anode kits and cathode cells under the contract option. This was valued at $921,708.03. Total government procurement under the contract was thus $3,588,830.84.

The trial judge chose 10 percent as a reasonable royalty level, justifying that figure because of plaintiff's research and development outlays, and its steady protection of its exclusive right to manufacture (as opposed to the right to sell) the batteries in the United States, a right lost when the government authorized Eagle Picher to commence manufacturing the batteries. That royalty level applied to the compensation base results in a royalty of $358,883.

Trial Judge Browne argued that reasonable and entire compensation involves more than the 'reasonable royalty;' it allows an injured party the same remedies against the government that would be afforded a claimant against a private party, with the exception of the injunctive remedy. Therefore, since up to treble damages are allowed against a private party, Trial Judge Browne doubled the reasonable royalty figure, due to what he termed the government's 'willful and deliberate infringement and bad faith,' pointing to the procurement procedure discussed above.

He also allowed inclusion of estimated savings to the government--$768,719.10. Leesona's bid was higher, and it was and would be more expensive than the contract with Eagle Picher, he argued, precisely because Leesona's costs included development expenses easily ignored by Eagle Picher, who utilized Leesona's expertise. The savings to the government are the difference between the $4,401,572.42 which Leesona would have received had it been supplier and the $3,632,853.32 Eagle Picher did receive. These savings are savings on all components, including the anode kits and cathode cells in the original contract and those ordered under the government's option contract.

Lost profits in the amount of $660,235.84 were allowed. Trial Judge Browne allowed a 15 percent profit on the project, applying that percentage to the total dollar procurement of Leesona's anticipated contract, $4,401,572.42.

The trial judge ruled that contract preparation costs and the recovery of investment in the contract were not recoverable, citing General Dynamics Corp. v. United States, 202 Ct.Cl. 347 (1973). But he said that Leesona's expenditure of large sums in reliance on the letter contract, and the government's bungled procurement procedure were good cause for the multiplication of the reasonable royalty, as above.

Thus total compensation equalled $2,146,720.95. The trial judge then computed delay compensation from November 6, 1969. He accepted plaintiff's theory that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                          Page 8
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

injury began when the contract was awarded, not, as
defendant contended, as each shipment of batteries was
made. Utilizing the *966 approach taken in Pitcairn v.
United States, 547 F.2d 1106, 1120--24, 212 Ct.Cl. 168,
193--97 (1976), cert. denied, 434 U.S. 1051, 98 S.Ct. 903,
54 L.Ed.2d 804 (1978), the interest rate for delay
compensation was determined on the basis of the yield of
long-run AAA corporate bonds.

Finally, the trial judge determined that this case was an
exceptional one warranting the award of $100,000 in
attorney's fees, approximately one-third the cost to
plaintiff.

The trial judge's total award in tabular form is printed
following the opinion as Appendix A.

## II

### A

[2][3] The fundamental error of the trial judge is that he
has taken 28 U.S.C. s 1498, which is essentially an Act to
authorize the eminent domain taking of a patent license,
and to provide just compensation for the patentee, and he
has converted it to a consent to suit on a tort theory, and
the treatment of the United States as a tort-feasor. The
trial judge brands the conduct of the United States as
'despicable,' for doing what it had a legal right to do, says
it acted in bad faith, and assesses damages under rarely
used punitive provisions for the mulcting of private
parties who infringe patent rights in entire bad faith.

Before the 1910 enactment, 36 Stat. 851, the ancestor of
the present s 1498, the holder of a patent infringed by the
government sometimes could recover in this court on an
implied contract theory if he could show he had offered
the invention to the government, expecting to be paid, and
the government used it, expecting to be called on to pay.
E.g., Berdan Fire-Arms Mfg. Co. v. United States, 25
Ct.Cl. 355, 26 Ct.Cl. 48 (1890), aff'd, 156 U.S. 552, 15
S.Ct. 420, 39 L.Ed. 530 (1895). Some other patent
infringement cases came to this court on congressional
reference, for advisory opinions, but, otherwise, generally
the way was hard. In James v. Campbell, 104 U.S. 356,
357, 26 L.Ed. 786 (1882), an injunction suit, the Court
stated in dictum that the owner of a patent infringed by
the government had a fifth amendment right to just
compensation, but the avenues to enforce it were dubious.
Possibly officers of the United States could not be
enjoined because the United States itself was an
indispensable party who had not consented to be sued.
The holding there was that the patent was invalid.

The Tucker Act of March 3, 1887, 24 Stat. 505, now 28
U.S.C. s 1491, added a new category to Court of Claims
jurisdiction: 'claims founded upon the Constitution.' In

Schillinger v. United States, 155 U.S. 163, 15 S.Ct. 85, 39
L.Ed. 108 (1894), aff'g 24 Ct.Cl. 278 (1889), the majority
held that a patent infringement claim sounded in tort pure
and simple, where the implied contract theory was not
applicable, and, therefore, was excluded from Court of
Claims jurisdiction by the tort exclusion. Mr. Justice
Harlan, the elder, dissenting, urged that by authority of
James v. Campbell, supra, the Schillinger claim was
'founded upon the Constitution,' and thus was added to
Court of Claims jurisdiction by the new Tucker Act
language.

The Congress in 1910 thus could have adopted either of
two conflicting theories as to the legal nature of a patent
infringement by the government where the implied
contract theory of relief was inapplicable. It could have
adopted the tort theory and consented to suit as on a tort
claim. Or it could have adopted the Harlan theory.
Whatever ambiguity there may have been in the 1910 Act
itself, the Supreme Court in Crozier v. Krupp, 224 U.S.
290, 305, 32 S.Ct. 488, 491, 56 L.Ed. 771 (1912), clearly
construed it as following the Harlan theory. Instead of
consenting to suit for a tort, the Act did the following:
  * * * (T)he United States shall be considered as having
  ratified the act of the officer (who committed the
  infringement). * * * The adoption by the United States
  of the wrongful act of an officer is of course an
  adoption of the act when and as committed, and causes
  such act of the officer to be, in virtue of the *967
  statute, a rightful appropriation by the Government, for
  which compensation is provided. * * *

The Court then refers to the power of eminent domain
and says the Act exercises that power. It followed that an
injunction against the infringement was no longer
available, as it had been when the suit was filed, before
the 1910 Act.

Thus that statute adopts the infringement as the act of the
United States and makes it a rightful exercise of the
power of eminent domain. The problem that led to the
1918 amendment is discussed below.

This court has traditionally searched the law of eminent
domain for legal precedents and principles to apply in
determining the 'reasonable and entire compensation' to
be granted in a valid infringement action against the
government. See, e.g., Tektronix, Inc. v. United States,
552 F.2d 343, 346-- 47, 213 Ct.Cl. 257, 264 (1977);
Calhoun v. United States, 453 F.2d 1385, 1391, 197
Ct.Cl. 41, 51 (1972).

The trial judge used the language of s 1498 to justify the
award of double damages, profits, savings to the
government, and attorneys' fees in addition to a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                                                    Page 9
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

reasonable royalty he deemed due plaintiff for infringement. The 1918 amendment to the 1910 Act, the precursor of s 1498, added the words 'and entire' after 'reasonable' to define the compensation awarded a plaintiff whose patent was infringed by the government. Naval Appropriation Act of July 1, 1918, ch. 114, 40 Stat. 705. The present statute retains that amended language and allows patent owners to sue in the Court of Claims for recover of 'reasonable and entire compensation for such use and manufacture' of an infringed patent. Trial Judge Browne said that language was intended to expand government liability for patent infringement beyond the award of a reasonable royalty; indeed, an argument was made by plaintiff that the 'entire compensation' language was added to compensate for the loss of the injunctive remedy that patentees possess against private infringers. However, the trial judge made no award for loss of injunctive protection as such.

The government argued that the addition of the word 'entire' to the language of the statute was meant to underscore the exclusivity of the remedy of suit in the Court of Claims, reversing in effect the decision of Cramp & Sons Ship & Engineering Bldg. Co. v. International Curtis Marine Turbine Co., 246 U.S. 28, 38 S.Ct. 271, 62 L.Ed. 560 (1918), which allowed a patentee to sue a government contractor and enjoin infringement of the patent. That Court held that the 1910 Act only protected infringements in the government's own operations. The legislative history of the amendment, sparse as it is, and the amendment's subsequent interpretation by the courts does support defendant's view.

The sponsor of the 1918 amendment described the amendment as 'necessary and urgent,' and added that it 'would expedite the manufacture of war material.' The amendment, he explained, would 'prevent the injunctive process from the courts being used to prevent private manufacturers doing Government work. That is the whole change made in the law and the conditions are such as to require that it should be done.' 56 Cong.Rec. 7961 (remarks of Rep. Padgett).

Courts interpreting this amendment agree that its primary purpose was to stimulate contractors to furnish war materials to the government, without fear of becoming liable themselves for patent infringement. Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 343, 48 S.Ct. 194, 72 L.Ed. 304 (1928). This would bolster the government's argument. But plaintiff takes heart from language in Richmond Screw and other cases expressing the opinion that Congress, in passing that amendment, was also accepting government liability for the patent infringement of its contractors, and would ensure that the wronged patentee would obtain adequate compensation

for the rights taken from him. Richmond Screw, supra, at 345, 48 S.Ct. 194; see also Waite v. United States, 282 U.S. 508, 51 S.Ct. 227, 75 L.Ed. 494 (1931), rev'g 69 Ct.Cl. 153 (1930). However, *968 there is no automatic link between the government's assumption of liability for infringement by its contractors and an intent to allow compensation to the patentee in addition to a reasonable royalty as just compensation. The Supreme Court in Richmond Screw used language emphasizing the 'comprehensive nature' of relief under s 1498's predecessor because it was seeking to interpret that statute so as to avoid any doubts about its constitutionality. Thus, any remedy afforded by statute for a taking had to comport with fifth amendment standards. Richmond Screw, 275 U.S. at 345--46, 48 S.Ct. 194. The nature of the property taken by the government in a patent infringement suit has traditionally been a compulsory compensable license in the patent, and just compensation has in most cases been defined by a calculation of a 'reasonable royalty' for that license, or, when a reasonable royalty cannot be ascertained, another method of estimating the value of the lost patent. See, e.g., Tektronix, Inc. v. United States, supra, 552 F.2d at 347, 213 Ct.Cl. at 265; Pitcairn v. United States, supra, 547 F.2d at 1114, 212 Ct.Cl. at 180; Calhoun v. United States, supra, 453 F.2d at 1391, 197 Ct.Cl. at 51. There is no clear indication that the government intended to assume responsibility for any payment other than the just compensation required by the fifth amendment, and absent an express assumption of such a duty, no further liability other than that which is constitutionally mandated can be assumed. Schillinger v. United States, supra; United States v. Mescalero Apache Tribe, 518 F.2d 1309, 1315, 207 Ct.Cl. 369, 379 (1975), cert. denied, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). To extend the liability by inference or analogy would do violence to the doctrine of strict construction of the consent to be sued. United States v. Testan, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).

While Richmond Screw dealt with certain constitutional difficulties traceable to the impact of the 1910 and 1918 statutes on existing patent rights, it is to be noted that s 1498 was on the books in substantially its present form when all the patents involved in this case were applied for. In Richmond Screw there were troublesome retroactive changes in the incidents of a patent, much to the disadvantage of the patentee, for, as a practical matter, the loss of injunctive protection was from his point of view very much a change for the worse. There is, however, no attempt in s 1498, as we construe it, to authorize uncompensated expropriation of patents whenever issued.

The trial judge progressed from the conclusion that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                    Page 10
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

reasonable and entire compensation meant that the United States was assuming liability for more than the fifth amendment's mandated just compensation, to the view that reasonable and entire compensation included more than a reasonable royalty, the traditional benchmark used to measure just compensation for a taking of patent rights. He concluded that s 1498 was a substitute for Title 35, the section of the United States Code granting remedies to patentees and their assignees injured by private parties. Therefore, he concluded that the remedy of 'reasonable and entire' compensation awarded under s 1498 would be defined to include most of the elements of Title 35. The injunctive relief of 35 U.S.C. s 283 could not be awarded, of course, since this court lacks the power to grant such relief.

[4] However, as noted above, it is axiomatic that any suit against the government requires an express waiver of the government's immunity from suit. Incorporating all of the remedies of Title 35 into s 1498 without the explicit consent of Congress, which certainly could have provided for such incorporation had it so desired, would violate that requirement. This court has already made clear that the foundation and purpose of s 1498 are not completely analogous to those of Title 35. In Calhoun, supra, we said:
    * * * Although s 1498 resembles, in several ways, the statutory scheme dealing with the private infringer (Title 35), it is not wholly on all fours with that other pattern, and we should not disregard the different theoretical basis for *969 the patentee's suit against the Government where that difference impinges on the particular issue. * * * (Footnotes omitted.) 453 F.2d at 1391, 197 Ct.Cl. at 51--52.

A complete congruence between s 1498 and Title 35 would grant plaintiff a recovery in excess of the just compensation required by the fifth amendment, and in excess of the reasonable and entire compensation contemplated by Congress with the passage of s 1498. The difficulties with Trial Judge Browne's incorporation of Title 35 into the definition of a s 1498 recovery can be seen in certain elements of the award he granted Leesona.

**B**

[5][6][7] The trial judge's doubling of damages due to the government's 'bad faith', was an award based on the punitive aspects of Title 35. Section 284 authorizes double or triple damages, without express guidelines as to when this is to be done. Cases granting multiplied damages to victims of private infringers have a punitive ring, punishing those infringements characterized as 'willful and deliberate.' American Safety Table Co. v. Schreiber, 415 F.2d 373 (2d Cir. 1969), cert. denied, 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed. 682 (1970); Coleman Co. v. Holly Mfg. Co., 269 F.2d 660 (9th Cir. 1959); St.

Regis Paper Co. v. Winchester Carton Co., 410 F.Supp. 1304 (D.Mass.1976). The award granted by Trial Judge Browne punishes the U.S. Government for its mishandled procurement procedure; such a slap is meant to warn the United States to be less cavalier in the future when dealing with potential contractors and their patents. These additional damages are not based on any estimate of plaintiff's loss. The proper measure in eminent domain is what the owner has lost, not what the taker has gained. United States v. Chandler-Dunbar Co., 229 U.S. 53, 76, 33 S.Ct. 667, 57 L.Ed. 1063 (1913). The lesson might be salutary, but it is not one the United States has consented to. In eminent domain it is necessary to protect the public and the compensation must be just as to it. Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 42 L.Ed. 270 (1897). Perhaps the public must be protected against its own officials. An aggrieved party is entitled to receive only reasonable and entire compensation, not more than that. Tektronix, Inc. v. United States, supra, 552 F.2d at 351, 213 Ct.Cl. at 272. Unlike his counterpart in a private infringement suit, he is not entitled to be the recipient of increased damages heaped on other parties as punishment or deterrence.

[8][9] Even if this was a suit between private parties subject to the remedies of Title 35, we would not affirm an award of multiplied damages in this case. We are mindful of the fact that in private litigation an award of increased damages is within the discretion of the trial judge and not to be disturbed unless there is an abuse of such discretion, American Safety Table Co., supra; E-I-M Co. v. Philadelphia Gear Works, Inc., 223 F.2d 36, 42 (5th Cir. 1955), cert. denied, 350 U.S. 933, 76 S.Ct. 304, 100 L.Ed. 815 (1956). But increased damages are awarded only for a clear showing of willful and deliberate infringement, American Safety Table Co., supra at 378; Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772 (7th Cir. 1961).

[10] The trial judge justified a doubling of damages here due to 'the despicable conduct of defendant * * * (indicating) utmost bad faith on the part of the Government.' To whatever extent the trial judge may have based his conclusion of bad faith on the government's knowing or willful infringement of the patents, the answer is, as we have noted, that the government had the legal right to take the patents, subject to its obligation to pay just compensation for them. This bad faith activity was apparently, as we understand the trial judge, the procurement procedure whereby the government supposedly encouraged Leesona to develop and produce the batteries, then issued and subsequently refused to ratify the letter contract, in that process thus revealing Leesona's 'price' to other competitors, and finally obtained the same batteries at a lower cost from Eagle Picher. *970

599 F.2d 958                                                                                Page 11
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

It is true that the procurement procedure utilized in this case did harm Leesona. After the time and expense it had spent developing the batteries, and negotiating a sole-source contract, other manufacturers did, by statute and regulations, obtain the right to demand an open bid procedure. It was here that Leesona agreed to assist the government in preparing the request-forbids, although the reason for this assistance is not stated in the record. Leesona was placed in difficult straits. Once having developed a battery marketable for military purposes, the government was perceivably one of the few (if not only) available buyers. Leesona was probably anxious for the bidding to be completed so it could begin to recoup on its investment, and may have decided to expedite matters by helping to prepare the requests, assuming that it alone would be able to meet the required specifications.

[11] While it seems that the procurement procedure did present aspects of unfairness for Leesona, there is no evidence, however mishandled the whole procedure may have been, that the government's activities were a willful and deliberate attempt to violate plaintiff's legal rights and gain the use of the batteries without payment of the development cost. We could find no evidence of a deliberate government leak of Lessona's bid price or of its known patented processes. In essence, and however clumsily, defendant was attempting to break Leesona's patent monopoly in a manner the law made permissible. The trial judge seemed to have difficulty with the idea that the law accorded the United States rights not conferred on private parties.

It is to be noted that plaintiff's petition does not and never did, and we must suppose could not, contain a count under s 1491 on the implied contract theory such as that followed in Berdan Fire-Arms, supra, or for misuse of intellectual property to benefit a bidder's competitors, as in Padbloc Co. v. United States, 161 Ct.Cl. 369 (1963). We say this awarding defendant no accolades for its procurement procedures. See also Griffin v. United States, 590 F.2d 344, 215 Ct.Cl. 710 (1978), a recent case restating the implied contract rights of one submitting intellectual property for government use.

### C

[12] We also decline to grant the award of attorneys' fees in this case, again emphasizing that this is a punitive award not necessary to provide just compensation for the taking of Leesona's patent rights by the U.S. Government.

By order dated March 4, 1977, in this every case, we informed the parties that--

In view of this court's precedent and policy, evidence of attorneys' fees and litigation expenses is inadmissible as evidence in an accounting under 28 U.S.C. s 1498 since

it is not relevant to the issue of 'reasonable and entire compensation.' * * * 213 Ct.Cl. 722, 725.

In that order we informed the parties that the issue of whether attorneys' fees were to be included as part of reasonable compensation had been decided by this court in Calhoun v. United States, supra, where we emphasized the eminent domain nature of a s 1498 recovery. See also Dohaney v. Rogers, 281 U.S. 362, 368, 50 S.Ct. 299, 74 L.Ed. 904 (1930), where the Supreme Court held that attorneys' fees were not part of just compensation for land taken under eminent domain.

### D

[13] We also disagree with the trial judge's award of lost profits to Leesona. Our concerns here are the authority for award of such damages, and the problem of double counting. Trial Judge Browne cited our opinion in Tektronix, Inc. v. United States, supra, as authority for the award of both items.

With regard to lost profits, he stated that Tektronix would allow award of lost profits only after strict proof that the patentee would have reaped such profits, proof that the patentee in Tektronix lacked. The focus of the Tektronix opinion, though, is whether a reasonable royalty method, acknowledged *971 as the traditional method for determining just compensation for a s 1498 recovery, or some alternative method, such as examination of lost profits, ought to be used. In the present case, Trial Judge Browne awarded lost profits not as an alternative to the royalty but in addition to it. This is not akin to our suggestion in Tektronix that lost profits might be used in some circumstances to measure just compensation.

Our difficulty in determining a reasonable royalty will be discussed below. But assuming such a hypothetical royalty can be estimated, and assuming Leesona had received such a royalty, Leesona's venture would have contained some element of profit. Awarding lost profits in addition to the royalty would be double-counting, and the profits, especially those based on plaintiff's own projection, are over and above the reasonable and entire compensation for plaintiff's loss.

### E

[14] Finally, we refuse the additional award made to plaintiff based on savings to the government. The estimated savings were based on the difference between Leesona's bid and that of Eagle Picher. We do not dispute, indeed we agree, that savings to the government may be considered in determining reasonable compensation. Its most proper use, as we will develop below, is in estimating what royalty willing buyers and sellers would agree to. It has been done infrequently in the past and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                    Page 12
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q.: 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

generally only when the calculation of a reasonable royalty was difficult. Amerace Esna Corp. v. United States, 462 F.2d 1377, 199 Ct.Cl. 175 (1972) (dictum); Shearer v. United States, 101 Ct.Cl. 196, cert. denied, 323 U.S. 676, 65 S.Ct. 187, 89 L.Ed. 549 (1944); Olsson v. United States, 25 F.Supp. 495, 87 Ct.Cl. 642 (1938), cert. denied, 307 U.S. 621, 59 S.Ct. 792, 83 L.Ed. 1500, rehearing denied, 307 U.S. 650, 59 S.Ct. 1030, 83 L.Ed. 1529 (1939). But we find the same difficulty with these additional damages as we do with the lost profits.

[15] First, the trial judge ruled that savings be awarded in addition to a reasonable royalty, not as a substitute measure, as had been suggested in prior cases in this court. See, e.g., Amerace Esna Corp., supra, Olsson, supra. Like the lost profits, then, there is an element of double counting here, in excess of the reasonable compensation to which plaintiff is entitled.

[16] Second, the trial judge awarded Leesona as but one item the total savings accruing to the government as a result of its acceptance of Eagle Picher's bid rather than Leesona's. Even where savings to the government are used as an acceptable measure of just compensation, no court has awarded the total savings to the infringer as just compensation, still less as but a part of just compensation. As this court said in Olsson:
* * * (Due to the fact that the United States used plaintiff's patent to manufacture certain guns) plaintiff was relieved of the trouble, expense, and responsibility of manufacture and sale. In these circumstances it seems clear that plaintiff's reasonable and entire compensation paid contemporaneously with the appropriation of the use of his invention was only a percentage of the monetary value of the advantages accruing to the United States by reason of such use. The United States was entitled to claim the benefit of a large portion of the value of the savings in cost and other advantages by reason of its assumption of the care, trouble, risk, expense, and responsibility attending the incorporation of the invention in suit into an acceptable design and the manufacture of the guns. * * * 25 F.Supp. at 500, 87 Ct.Cl. at 661.

In Olsson, 25 percent of the total savings to the government were awarded to plaintiff; in the present case, this percentage should be higher for reasons to be stated. The court in Olsson made the interesting observation, and one highly relevant to the underlying difference between us and the trial judge in this case, that the award of the entire savings from the infringement to the patentee would be more characteristic of a *972 tort claim than of a suit for reasonable and entire compensation under the predecessor of s 1498. This was done by way of quoting 25 F.Supp. at 499, 87 Ct.Cl. at 659, from one of this

court's implied contract pre-1910 patent cases, Wood v. United States, 36 Ct.Cl. 418, 426 (1901) as follows:
Where a man tortiously infringes, all that he makes or saves by his wrongful act belongs to the patentee. Where he sells a right to manufacture or use his patented invention and sues in contract, his damages are what the defendant expressly agreed to pay or what the license express or implied, is reasonably worth. * * *

To understand the relevancy of the quote, it is also necessary to observe that in Olsson, as often in that era, the obligation to pay just compensation, when incurred, was spoken of as an 'implied agreement.' Id. 25 F.Supp. at 499, 87 Ct.Cl. at 659.

### III
### A
Even excluding the lost profits, double damages and savings to the government that were included by Trial Judge Browne as compensation items to Leesona, the disparity between defendant's suggested royalty figure-- $12,349.46--and the amount urged by plaintiff and the trial judge--$358,883.08--is still wide. Defendant suggests that a royalty of 1 1/2 percent be imposed on a compensation base consisting of the amount the Marine Corps agreed to pay for the batteries ordered after Eagle Picher's successful bid. Defendant excludes from the compensation base unpatented anodes, cathodes and blower covers that that were part of the initial procurement from Eagle Picher of November 6, 1969, as well as the anodes and cathodes ordered from Eagle Picher by the government's exercise of contract options for additional procurement.

Plaintiff's compensation base, not unexpectedly, includes all of the initial procurement from Eagle Picher as well as the anodes and cathodes ordered by the government from Eagle Picher under the option agreement that was part of the contract. Plaintiff's base is $3,588,830.84, and its suggested 10 percent royalty gives plaintiff an award of $358,883.08. These awards exclude delay damages, which will be discussed later in the opinion.

[17][18][19] Fortunately for this reviewing court, we are not required to accept as dogma one of the parties' figures or the other, but can use them as perimeters for our ultimate determination. The Conqueror, 166 U.S. 110, 131, 17 S.Ct. 510, 41 L.Ed. 937 (1897); United States v. Northern Paiute Nation, 393 F.2d 786, 800, 183 Ct.Cl. 321, 346 (1968). The task of determining a figure that renders just compensation is made even more difficult because plaintiff's theory of the case determined its collection and presentation of the evidence during the accounting phase of the trial. Plaintiff's presentation emphasized that when the government infringed the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                 Page 13
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

patents, Leesona Moos Labs found itself in the position of having spent a great deal of money to acquire technical and manufacturing capabilities for the production of its special batteries, but having little chance to enter the battery market in the future. Plaintiff's evidence placed scant emphasis on the actual value of the infringed patents to Leesona, which is what we must determine under s 1498, and more on the total loss suffered by the entire corporation as a consequence of losing both the exclusive domestic manufacturing rights and the procurement contract which was to usher Leesona into the battery manufacturing field. Just compensation in eminent domain does not recompense such injury. United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945). Some elements of business injury might be weighed in determining what the owner might have sold for, if willing to sell, as is developed in the same case. Plaintiff's injury here far exceeded even its own estimate of a reasonable royalty, and as pointed out above, the tort theory under which such injury might be compensable was not applicable in a s 1498 taking case. There is a difference between evaluating the value of the property taken in light of plaintiff's business needs, and *973 granting compensation for loss of business due to the taking, or for any incidental losses. The former is proper, the latter is not. Gulf Refining Co. v. United States, 58 Ct.Cl. 559, 577 (1923). That case neatly illustrates the proposition. The property taken was tank steamers; plaintiff was an oil company; business injury to plaintiff was not for consideration, but the fact that plaintiff as an oil company could put the tankers to more profitable use than other conceivable owners, was.

Past decisions have utilized a number of methods for determining just compensation in patent cases: a comparison of royalties charged others by the injured party for rights in the same or similar patents, Calhoun, supra 453 F.2d at 1393, 197 Ct.Cl. at 55--56; a determination of a royalty by postulating hypothetical negotiations between a 'willing buyer' and 'willing seller,' Georgia-Pacific Corp. v. United States Plywood-Champion Papers, Inc., 446 F.2d 295 (2d Cir.), cert. denied, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971); Tektronix, Inc., supra; basing the award on lost profits, Imperial Machine & Foundry Corp. v. United States, 69 Ct.Cl. 667 (1930); or savings to the government, Olsson, supra.

[20][21] The comparative royalty technique is the preferred method of determining just compensation, Carley Life Float Co. v. United States, 74 Ct.Cl. 682 (1932). This is the method best suited to our needs and the facts available to us, although it is not perfect, and its flaws will be illustrated by our apparent difficulties in applying it to the facts of this case. However, one way to

monitor the reasonableness and fairness of our determination of just compensation is to compute the award by estimating a reasonable royalty on a proper compensation base, and then test this award by an examination of other available measures--savings to the government, lost profits, etc. Cf. United States v. Northern Paiute Nation, supra. In a sense, we are taking a leaf from our practice under the Renegotiation Act, 50 U.S.C. App. s 1213, where we are required by statute to take certain factors such as risk and efficiency, into account when determining the reasonableness of profits. Tool Products Co. v. United States, 589 F.2d 506 (Ct.Cl.1978), Major Coat Co. v. United States, 543 F.2d 97, 211 Ct.Cl. 1 (1976). After a tentative determination, in renegotiation cases called a 'starting point,' we test it with factors such as savings and profits, as guidelines--none totally controlling but all testing our determination of the reasonable royalty and compensation base.

B

There are two questions to be answered in determining the compensation base to which the royalty should be applied: (1) ought the original equipment anodes, cathodes, and 'blower covers' be included in the base; and (2) should the extra anodes and cathodes supplied to the government by its exercise of an option for additional procurement be included? The issue is whether these items should be included as part of the base even if independently they do not infringe plaintiff's patents.

The government argues that all these additional items are 'spare parts' that fall within the confines of 'permissible repair' as expounded by the Supreme Court in Aro Mfg. Co. v. Convertible Top Replacement Co., 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) (Aro I). Plaintiff maintains that since that contested items derive their utility and value from the patented invention (the battery), and since they are necessary for the battery's operation, they are includable in the compensation base under the 'entire market value rule,' to be discussed below.

[22][23] The government bases its argument on the distinction made between repair and reconstruction. The rationale for the doctrine of permissible repair is that one who has bought a patented item can repair and maintain it with nonpatented staple items because the protection and financial rewards of the patent laws would be overextended if they embraced fungible component parts which are independent of the patent. Only when a patented item is 'reconstructed' is it infringed. In *974Heyer v. Duplicator Mfg. Co., 263 U.S. 100, 101--02, 44 S.Ct. 31, 32, 68 L.Ed. 189 (1923), the Supreme Court said:

* * * The owner when he bought one of these machines had a right to suppose that he was free to maintain it in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

Page 14

use, without the further consent of the seller, for more than the sixty days in which the present gelatine might be used up. * * * The machine is costly, the bands are a cheap and common article of commerce. * * *

See also El Dorado Foundry, Machine & Supply Co. v. Fluid Packed Pump Co., 81 F.2d 782 (8th Cir.), cert. denied, 299 U.S. 560, 57 S.Ct. 22, 81 L.Ed. 412 (1936).

[24] The Supreme Court in Aro I, supra, held that a licensee as well as a purchaser had the right to repair a patented item. And in Calhoun v. United States, 453 F.2d at 1391, 197 Ct.Cl. at 51--52, this court made it clear that when the United States takes a compulsory compensable license in a patent by eminent domain, the United States is to be treated as a licensee entitled under Aro I to benefit from the doctrine of permissible repair.

Trial Judge Browne relied on the entire market value rule to justify inclusion of the anodes, cathodes, and blower covers in the compensation base. He analogized those items to the 'plug-ins' in Tektronix. In Tektronix, this court included the plug-ins in the compensation base because even though they were separate and unpatented items, they were financially dependent on the market created by plaintiff's patent (for oscilloscopes); thus, plaintiff's patent substantially created the value of the plug-ins.

The government in the present case disagrees with this court's analysis, and especially with its reliance on Marconi Wireless Telegraph Co. v. United States, 99 Ct.Cl. 1 (1942), modified on other grounds, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943). In Marconi, the patent dealt with tuning apparatus. The issue was whether component parts of the electrical apparatus (transmitters, detectors, and amplifiers) could be included in the compensation base, even though they were not directly responsible for the tuning. Marconi allowed their inclusion, but did not allow inclusion of 'replacement parts for such things as experience had shown might be destroyed during normal use of the set.' 99 Ct.Cl. at 55.

We do not think that the discussion of 'replacement parts' in Marconi alters the meaning of the entire market value rule; indeed, replacement parts as such are distinguished from components which derive their existence and value from the patent. We think the application of the entire market value rule in Tektronix was correct, and that it is especially germane to this present case. In Tektronix, the plaintiff had patents to components of superior oscilloscopes which were purchased by the government in substantial numbers. To obtain alternative sources of supply (and at a better price), the government invited other manufacturers to bid on a contract to manufacture

such scopes, and tailored its specifications virtually to require opposing manufacturers to infringe plaintiff's patents. An opposing manufacturer underbid Tektronix, and the government accrued substantial savings, not only on the oscilloscopes, but also on the unpatented plug-ins used with the scopes.

[25] Under the entire market value rule, it is not the physical joinder or separation of the contested items that determines their inclusion in or exclusion from the compensation base, so much as their financial and marketing dependence on the patented item under standard marketing procedures for the goods in question. In Tektronix, we emphasized that '(n)ormally the patentee (or its licensee) can anticipate sale of such unpatented components as well as of the patented scopes.' 552 F.2d at 351, 213 Ct.Cl. at 272. We cited American Safety Table Co. v. Schreiber, 415 F.2d 373 (2d Cir. 1969), cert. denied, 396 U.S. 1038, 90 S.Ct. 683, 24 L.Ed.2d 682 (1970), a private patent infringement and accounting case. There, 'tables,' frames for a collar-pressing machine not covered by the patented die assembly which rested, unattached, to the frames, were included in the compensation base for the calculation of lost profits, even *975 though some tables could be and were sold separately from the infringed die assemblies. The district court noted that the defendant had sold tables to those who had previously bought the die assemblies, and that defendant's infringing sales had created the market for those tables, so that the situation became analogous to that where tables were sold as part of a complete machine.

American Safety Table depended in turn on the Supreme Court case of Hurlbut v. Schillinger, 130 U.S. 456, 9 S.Ct. 584, 32 L.Ed. 1011 (1889), where the patent involved was the technique for laying concrete pavement in detached blocks so that repaving or removal of one section would not affect others. The Supreme Court allowed plaintiff to recover the entire profit earned by defendant by the latter's laying of the concrete pavement, since 'the pavement itself was a complete combination in itself, differing from every other pavement, and the profit made by the defendant was a single profit derived from the construction of the pavement as an entirety.' Allowance of this profit was based on the fact that 'it clearly appears that the defendant's concrete flagging derived its entire value from the use of the plaintiff's invention, and that if it had not been laid in that way it would not have been laid at all.' 130 U.S. at 472, 9 S.Ct. at 589.

[26] We think that a situation similar to that in American Safety Table and Hurlbut exists in the present case; indeed, as in Tektronix, the entire market rule applies even more strongly because of the government's procurement practice, and because of the nature of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                    Page 15
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

invention. Here it was standard government practice to order the anodes, cathodes, and covers with the batteries as part of one procurement 'package.' It is not unlikely that plaintiff anticipated additional income from such parts when it estimated the value of the patents. These parts, while not patentable, were designed to operate in conjunction with this special battery; Trial Judge Browne found that they were not staple items (Finding 20) indeed, they had to conform to the specifications in the contract.

It is true that the design of the battery anticipates that many anodes will be necessary to keep the battery in operation. To operate on a normal 'life cycle,' it was anticipated that the 22 anodes for each battery would each be replaced 50 times. But the battery's very uniqueness lies in the fact that it uses a device like replacing anodes to be recharged, instead of relying on a cumbersome recharging device. In fact, the separability of the anodes is the key to the battery's value. In addition, the fragile nature of this special battery made it imperative that there be extra cathodes and covers to avoid a situation where damage would occur in the field, and the battery become useless because no cathodes or covers were available.

We recognize that Leesona could not prevent Eagle Picher from manufacturing and selling anodes, cathodes, and covers for a metal-air battery. But the point is that the Marine Corps wanted a mechanically rechargeable air battery and established specifications for such a battery. The government was not merely buying a battery. It was buying a mechanically rechargeable battery, and to be so rechargeable the anodes were needed. It was buying a battery designed to be used in ground combat, and additional cathodes and covers might be considered necessary in the first procurement. Thus, the initial procurement was a 'package' of 2,138 batteries and the additional parts necessary to make the batteries useful for military combat. It is not unlikely that the government would be buying the batteries and the additional components as one unit--they could be packaged and shipped together, as Eagle Picher's were, and one manufacturer would be responsible to the government for the battery's operation. Most importantly, however, Leesona's patents were needed to manufacture the battery cell, and without this battery no anodes, cathodes, or covers would be required. Therefore, it is likely that if Eagle Picher desired to manufacture the batteries for the government and obtained a license from Leesona for that purpose, the license **976 fee would be quite stiff because the right to manufacture the battery brings with it a market for and likelihood of obtaining the right to supply the initial set of anodes, cathodes, and covers. See Paper Converting Machine Co. v. FMC Corp., 432 F.Supp. 907 (E.D.Wis.1977).

[27] This does not mean that we will disregard the doctrine of permissible repair, and allow the patentee to postulate the right to supply anodes, cathodes, and covers ad infinitum to the government. Our problem is to define when the government is procuring the necessary parts for the battery to operate initially, and when the government is procuring additional parts. This determination is difficult since we are dealing with a new and relatively unused product which, to be initially operable and militarily useful, depends on a number of parts. The government itself was uncertain as to what constitutes a fully workable battery, and as to how many anodes, cathodes, and covers were needed to get an acceptable 'lifetime's' worth out of the original 2,138 batteries. Therefore, we will use the original procurement as a reasonable estimate as to what parts were vital to the operation of the 2,138 batteries, and assume that the option contract was activated to procure 'spare parts' which cannot be part of the compensation base.

Including in the compensation base the parts, including replacement parts, obtained with the original procurement, but excluding the additional parts obtained later under option clauses, the compensation base is $2,667,122.81.

C

Having defined the compensation base, it is now necessary to determine a reasonable royalty. Given the facts available for our use, we will establish a royalty rate by comparing other rates charged by Leesona for use of its patents, with adjustment for the special circumstances of this case. In doing so, we agree with Trial Judge Browne in both his methodology and with his ultimate conclusion as to the reasonable royalty due Leesona in this case.

The government suggests a 1 1/2 royalty as reasonable. It bases this figure on two factors, BCA's 1 1/2 percent licensing rate on its magnesium perchlorate battery patent, and on plaintiff's own licenses, which show royalties ranging from 1 1/2 to 5 percent.

We agree with the trial judge that none of the licenses discussed in the record are based on a situation directly comparable to the case at hand. First, we cannot compare plaintiff's licensing policies with those of RCA. RCA is a corporate giant, and no part of its present or future business depended directly on battery production. Compare Leesona, which had intended to use the Leesona Moos Labs and its patents as a springboard for entry into the battery manufacturing business. Therefore, the worth of Leesona's patents to Leesona is much greater than that of RCA's to RCA See Tektronix, Inc., supra, 552 F.2d at 348, 213 Ct.Cl. at 266.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

[28] Defendant also points to plaintiff's licensing agreements with others. Again, the situations are not comparable. Until Leesona had lost its exclusive right to manufacture batteries in the United States because of the government's infringement, it never granted any party the right to manufacture metal-air batteries domestically, although some licenses did allow sale within the United States of batteries manufactured abroad. Defendant argues that the 5 percent fee charged for foreign licenses includes more patents than the three in this suit, and that therefore the 5 percent is too high. But the number of patents involved in a licensing agreement is not the material factor in determining the license's worth; it is the value of the rights embodied in those patents. Leesona did not wish to give up its right to exclusive domestic manufacturing; it would have charged a high fee for a license that in effect would surrender its manufacturing exclusivity. Though we make an assumption contrary to fact in casting Leesona hypothetically in the role of a willing seller, we still assume the seller is Leesona, with Leesona's congeries of special interests.

**\*977** [29][30] Our focus on the special value to Leesona of the patents taken by the government is justified under the law of eminent domain. The just compensation to which an owner is entitled when his property is taken by eminent domain is regarded in law from the point of view of the owner of the right and not from that of the taker. United States v. Chandler-Dunbar Co., supra; Monongahela Navigation Co. v. United States, 148 U.S. 312, 344, 13 S.Ct. 622, 37 L.Ed. 463 (1893); 3 Nichols, Eminent Domain s 8.61 (3d ed. 1977).

Gulf Refining Co. v. United States, supra, illustrates how the special value to the owner may influence an award above the going market rate. Monongahela Navigation Co. had, besides the tangible property the government took, a franchise it did not take and did not want, which added to the profitability of its land. Held, the profitability of the land due to the franchise was an element that had to be considered. In Old South Ass'n v. Boston, 212 Mass. 299, 99 N.E. 235 (1912), land taken was while in plaintiff's hands tax exempt, but not while in anyone else's. Held, $25,000 added to award for value attributable to the tax exemption.

So it is with these batteries. The special value of the exclusive manufacturing rights, their importance to the diversification plans of Leesona, made their worth much greater and thus the hypothetical royalty charged by Leesona would have been much higher.

[31] Therefore, in light of the unique value of plaintiff's patents to its business, we agree with Trial Judge Browne

that a royalty of 10 percent is justified in this case. We recognize that this is not a perfect approximation; rather it is a type of 'jury verdict,' which we must estimate as best we can in the absence of hard proof warranting use of more precise criteria. Tektronix, supra, 552 F.2d at 351, 213 Ct.Cl. at 271.

As noted earlier, we can attempt to test the reasonableness of our 10 percent royalty by comparing it with other available tests. Note that a 10 percent royalty on a compensation base of $2,667,122.81 gives plaintiff an award of $266,712.28.

Compare this $266,712 figure to the alleged savings to the defendant on the initial procurement. One can estimate the total savings the government achieved by obtaining the difference between what it paid Eagle Picher and what Leesona bid on the battery contract. On the initial procurement, the government agreed to pay Eagle Picher $823,397.25 for the batteries, $1,779,550.20 for the anodes, $42,215.36 for the cathodes, and $65,982.48 for the covers. Trial Judge Browne reduced this final figure when estimating the compensation base, as he argued that standard covers were only worth $30/cover instead of the $90.14 Eagle Picher charged. But we kept the $90 figure for our estimate of savings to the government, as this is the amount the government did pay Eagle Picher. This totalled.$2,711,145.29.

Leesona bid $3,301,179.32 on the contract. Granted, there could have been some cost adjustments in Leesona's contract as there were in Eagle Picher's, but for our purposes we will assume none would have occurred. The difference between Leesona's bid and Eagle Picher's contract is $590,034.03. This can be said to represent the total savings to the government as a result of using Eagle Picher rather than Leesona.

The record is barren of specific evidence that defendant in evaluating the bids gave any consideration to the fact that Leesona owned the patents and Eagle Picher did not. However, the point could not have been overlooked. We must assume defendant was aware that an award to Leesona would avert litigation while an award to Eagle Picher would assure it. The conclusion is irresistible that defendant as a hypothetical willing buyer of a license to make and use the patented invention would not have paid over $590,034.03 applicable to this procurement. Such a license, at that cost, would have made the award to Eagle Picher exactly as expensive overall to the taxpayer as an award to Leesona. As defendant decided that the award to Eagle Picher was the most advantageous, the conclusion **\*978** is inevitable that it would have valued the license at under $590,034.03, and therefore, its liability in the inevitable lawsuit at a lower figure also. Thus the figure is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

a ceiling on the awardable royalty, but not a floor.

In Olsson v. United States, supra, one-fourth of the savings to the government were awarded plaintiff. That was a case where the inventor could not have manufactured the articles and defendant had to undertake doing so, with all the risks and expenses incident. In this case, research and development costs were required not only for the battery patent, but for a battery patent tailored to the specifications of the United States Marine Corps. Therefore, it would not be unfair to estimate that about one-half of the savings to the government in this case were due to the fact that Eagle Picher had no research costs and Leesona bore them all. One-half of $590,034.03 is $285,017.01--close to the compensation base of $266,712 we obtained by use of a reasonable royalty method. This is half what a tort theory award based on savings might be, and twice the portion given in the less appealing circumstances of the Olsson case.

[32] A floor on the royalty would be provided by the expense incurred by Leesona in developing its invention, less any compensation received from defendant in its pre-1969 development contracts. The figure, with a reasonable profit, could be amortized by the royalty attributable to the Eagle Picher procurement in the proportion such procurement bore to the anticipated sales of the invention during the patent life. In 1971 plaintiff estimated its 'battery development costs' as $1,700,000 in 1968 and $1,870,000 in 1969. This included development of manufacturing technique and facilities, not strictly research and development on the invention only. However, as we have said, plaintiff valued the patents largely for their capability to channel the flow of manufacturing orders to Leesona, so it is not reasonable to suppose that as a willing seller of patent licenses, Leesona would have ignored any part of its 'battery development costs.' The award of a royalty here must allow amortization of a reasonable portion of 'battery development costs.' But Leesona as late as September 1971 projected a sale of battery units to the military only starting at 3,800 in 1971 and rising gradually to 30,000 in 1980. A willing seller of a license covering the Eagle Picher procurement of 2,138 units would not have expected to amortize the whole or a major part of the 'battery development cost' out of the royalty on that one procurement. We are unable to say that a 10 percent royalty is not adequate in view of the above circumstances. The loss of the greater part of the 'battery development costs' with other losses, might possibly be recoverable as business injury on a tort theory (though we do not so hold), but it is manifestly not recoverable on the eminent domain theory under which the present claim is prosecuted.

If awarded the sole source contract originally proposed, plaintiff, plaintiff would have had to submit cost data to defendant which would have shown the amount allocated to amortization of battery development and would be priceless evidence here. They were prepared to show a total figure of $3,700,000, according to testimony. There is no evidence how much of this was estimated allocable to the contract. When required to compete, plaintiff cut its bid to reflect no more than the prices at which it would be able to sell when it was through the learning curve and in full volume production. In other words, it would have realized a loss on this initial procurement alone. The original sole source prices as proposed presumably reflected high start-up costs and perhaps a more liberal amortization of development cost. But we have no breakdown, no details. In Tektronix, supra, it was possible to estimate the infringer's costs and profits though partly by the loose mode of attributing to it the plaintiff's known costs. Here, no computation of that kind is made possible by the record before us.

[33] The award of a 10 percent royalty on a royalty base of $2,667,122.81 results in a figure, before delay damages, of $266,712. *979 This may quite possibly be less than plaintiff could be shown to be entitled to. Unhappily, the lengthy record in this accounting phase of the case is dominated by plaintiff's and the trial judge's pursuit of a large award, attempting to make good the injury to business on a tort theory, wholly inadmissible in eminent domain. To award plaintiff even as much as we do, it has been necessary to search the record for evidentiary clues as to the fair market value of the license taken, which have found their way there without much help from the plaintiff. Any amount properly awardable, with the missing facts fully developed, would be but a small fraction of what is claimed. Here, as in our renegotiation cases, the party having the burden of proof must suffer if a scantiness of record fails to support a fully informed and reasoned determination.

IV

[34] Finally, plaintiff is entitled to damages for defendant's delay in payment of a reasonable royalty for use of its invention. See Waite v. United States, 282 U.S. 508, 51 S.Ct. 227, 75 L.Ed. 494 (1931).

[35][36] We do not calculate the delay damages from the date that the Eagle Picher contract was executed, as did Trial Judge Browne. No taking of plaintiff's contract rights occurred on the day of contract execution, unless a tenable argument could be made that the government used Leesona's patents in inducing infringement on that day. However, this court in Pitcairn stated that unauthorized use of a patented item by the government did not constitute a taking of plaintiff's invention for once and for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

all; rather, '(t)he takings occurred whenever the
Government procured or used a device covered by any of
plaintiff's patents without a license.' Pitcairn, supra, 547
F.2d at 1115, 212 Ct.Cl. at 181. And Tektronix explicitly
rejected the use of the contract execution date as the date
the government 'procured' an infringing device. The
contract execution date was rejected because first, the
scope of the interest appropriated by the government at
that time might be uncertain, and, second, the use of the
execution date as a 'date of taking' might present problems
if the infringement went undetected until later
manufacture or use, since the statute of limitations would
run, see Irving Air Chute Co. v. United States, 93 F.Supp.
633, 117 Ct.Cl. 799 (1950). Finally, it is unreasonable to
assume that the infringing items were manufactured or
used before the contract was executed. Tektronix, Inc. v.
United States, 575 F.2d 832, 836--37, 216 Ct.Cl. ---, ---
(1978), cert. denied, 439 U.S. 1048, 99 S.Ct. 724, 58
L.Ed.2d 707 (1978).

Plaintiff argues that this is a special case, because the
taking was a taking of plaintiff exclusive right to domestic
manufacture of the air batteries, and that such exclusivity
was lost on the date Eagle Picher was authorized to
manufacture the batteries, and thus infringe plaintiff's
patents. But the problem is that s 1498 does not provide
compensation for the loss of exclusivity, only for the
manufacture or use of an item by or for the government.
Although we can and do heavily stress the importance of
exclusivity when determining the applicable royalty rate,

we cannot say that s 1498 provides compensation for its
loss independently of the statutorily defined bases for
compensation. Also, assuming that the government had
been licensed to use the patent, it normally would have
paid royalties on or after the delivery of the batteries.

Eagle Picher's deliveries to defendant began on April 14,
1970, and ended on February 1, 1971.

We choose a weighted average delivery date of July 30,
1970. At this time, a little over one-half of the value of the
deliveries had been made to the government. With proper
compensation estimated at $266,712.28, we calculate the
delay damages as indicated by Appendix B. They total
$171,239.95 for July 30, 1970 through December 31,
1978, with additional compensation at $58.46 per day
from January 1, 1979, until payment on the judgment.

*980 CONCLUSION OF LAW
Therefore, we determine that Leesona Corporation is
entitled to $266,712.28 as compensation for the taking of
its patent rights in the metal-air batteries BB--626/U's. It
is also entitled to delay damages of $171,239.95 from the
average delivery date of July 30, 1970, through December
31, 1978, with additional compensation at $58.46 per day
from January 1, 1979, to the day of payment of the
judgment. Judgment is entered accordingly.

APPENDIX A

Trial Judge Browne's Award
--------------------------

(a) Basic Compensation
    Base: $3,588,830.84 (after allowable
    deductions) Rate: 10%  $358,883.00

(b) Recapture of Research and Development Costs
    (Difference between amount Leesona would have
    received if it were awarded contract and actual
    Eagle Picher, Inc. receipts.)  768,719.10

(c) Lost Profits (15% of Total procurement if
    Leesona were awarded contract)  660,235.85

(d) Recapture of Capital Investment and Contract

    Preparation Costs (Not Recoverable)  0.00

(e) Savings to the Defendant Resulting from
    Efficiency, etc. (Taken into account in (a)
    above.)  0.00

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

Page 19

```
(f) Multiple Damages--Willful and Deliberate
    Infringement and Bad Faith (Additional Sum
    Equal to Basic Compensation
    = Double Damages  358,883.00  -------------

         Total Compensation      $2,146,720.95
         (Exclusive of Delay Compensation)

(g) Delay Compensation (From November 6, 1969,
    date of taking, to December 31, 1977, at
    applicable quinquennial rates.)        1,288,032.57

(h) Attorney Fees (approximately one-third of
    amount claimed)            100,000.00
         -------------

         Total Reasonable and Entire Compensation
         (to December 31, 1977)      $3,534,753.52

(i) Daily Delay Compensation Rate (from January 1,
    1978 to Date of Payment of Judgment.)      $    470.51
```

## APPENDIX B

```
             Calculation of Delay Damages
             ----------------------------
             No. of  Compensation
             Years  X  Percentage  X    Base
             ------    ----------    -----------

A--July 30 to
   Dec. 31,1970   .416       .065      $266,712.28  =  $  7,211.90

B--Jan. 1, 1970 to
   Dec. 31, 1975  5.0        .075             "     =    100,017.10

C--Jan. 1, 1976 to
   Dec. 31, 1978  3.0        .080             "     =     64,010.95
   -----------
      $171,239.95
```

```
         Calculation of Daily Delay Damages from
         January 1, 1979, to Payment of Judgment
         ---------------------------------------

Percentage       X       Compensation  /  Days
----------               ------------     ----
```

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958                                                                                            Page 20
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
(Cite as: 599 F.2d 958)

```
(  .08                      $266,712.28)  /  365

      $21,336.98                    /  365   =  $58.46
```

TOTAL DELAY DAMAGES:    $171,239.95 plus
$58.46 per day from January 1, 1979, to payment on
judgment.

**\*981** KASHIWA, Judge, concurring in part and
dissenting in part:

I concur with the majority in its reversal of the trial judge
on the underlying theory of plaintiff's relief under 28
U.S.C. s 1498 (1976). The grounds for reversal by the
majority are well stated in subparagraphs A, B, C, D, and
E of part II of the majority opinion. I also agree with the
majority views with relation to plaintiff's recovery due to
delay in payment expressed in part IV of the majority
opinion.

I respectfully dissent from the majority view of damages
to be awarded in this case expressed in subparagraphs B
and C of part III of the majority opinion.

The majority in subparagraph A of part III states:
    The comparative royalty technique is the preferred
    method of determining just compensation, Carley Life
    Float Co. v. United States, 74 Ct.Cl. 682 (1932). This is
    the method best suited to our needs and the facts
    available to us, although it is not perfect, and its flaws
    will be illustrated by our apparent difficulties in
    applying it to the facts of this case. * * *

The reason it is difficult to apply the comparative royalty
technique to the facts of this case is that during the
accounting trial plaintiff did not contend it was entitled to
a reasonable royalty. Rather, it presented the solitary and
novel theory that because it did not receive the
procurement contract, the loss of funds that would have
been paid to it under such contract caused it to decide to
close the Leesona-Moos Division which, in turn, caused
the loss of its investment in metal-air batteries. This novel
theory was completely rejected by even the trial judge,
and the trial judge decided the case on his own grounds.
But the trial judge's own grounds were thoroughly
rejected by the majority in subparagraphs A, B, C, D, and
E of part II of the majority opinion, as above mentioned.
Plaintiff simply did not submit proper proof of damages
to prove its case.

Defendant, on the other hand, argued for the award of a
reasonable royalty and **\*982** proved that in four licenses
involving the patents in suit, or their foreign counterparts,
plaintiff received a 5 percent royalty. It was shown that
these licenses also included know-how and additional
patents. Furthermore, defendant also proved that in a
tripartite license involving two of the patents in suit,
plaintiff received only a 1 1/2 percent royalty. This latter
license concerned a joint effort to develop technology
relating to fuel cells. In addition, defendant presented
evidence that RCA had negotiated a commercial license
for a patent on magnesium perchlorate batteries used to
power military radios for a 1 1/2 percent royalty rate.

The majority has attempted to rescue plaintiff's case in
subparagraphs B and C of part III by awarding plaintiff
$266,712 on an entire market theory. I cannot see how
such a theory can be adopted in the present case in that
the trial judge found:
    5. The packaged anodes, per se, prior to installation in
    the batteries, come within the scope of the claims of
    plaintiff's United States Patent 3,531,327, under which
    defendant has a royalty-free, non-exclusive license.
    When put to use in the batteries, the packaged anodes
    constitute indispensable elements of the infringed
    claims of the patents in suit.

This court found that such a license from plaintiff to
defendant existed in the first Leesona case, 530 F.2d 896,
910, 208 Ct.Cl. 871, 894 (1976). Plaintiff has not objected
to the above finding. I believe the finding that the licensed
patent aforementioned is indispensable to the metal-air
batteries dispute herein makes the entire market theory
inapplicable in this case. Assuming the figure $266,712 is
correct for the purpose of this argument, however, should
not Patent 3,531,327 above mentioned have some
percentage of that amount credited to it? If so, what
should the percentage be--50 percent or 90 percent?
Plaintiff has the burden of proof; it has failed in its proof.
Plaintiff and the majority may argue that such proof is
impossible. The impossibility makes the use of the entire
market theory unavailable to plaintiff. Plaintiff cannot
claim any damages under a patent which this court
decided was licensed by plaintiff to defendant. A license
is a complete defense.

My final objection to the majority's finding of $266,712

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

Page 21

damages, which the majority derives using a 10 percent royalty rate, is that the valuation methodology used by the majority is contrary to the holding in United States v. Miller 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943). Miller is fundamental in the law of federal eminent domain. In Miller the Court held that under the facts of that case, a 'single project multitaking case' authorized by Congress in August 1937 with a total of $19,400,000 appropriated, the date of valuation of all properties taken under the project was August 1937, the date of authorization, and not any subsequent date. The filing date of the condemnation suit in the case before the Court was December 14, 1938, so plaintiff argued the valuation date should be December 14, 1938, because property values rose as a result of the Government project in early 1938. The Court held that the date of authorization of the project, August 1937, controlled. The pertinent parts of the decision are as follows (at pages 375--377, 63 S.Ct. at pages 281--282):

> There is, however, another possible element of market value, which is the bone of contention here. Should the owner have the benefit of any increment of value added to the property taken by the action of the public authority in previously condemning adjacent lands? If so, were the lands in question so situate as to entitle respondents to the benefit of this increment?
>
> If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date, determine to take these other lands, it must pay their market value as enhanced by this factor of proximity. If, however, the public project from the beginning included *983 the taking of certain tracts but only one of them is taken in the first instance, the owner of the other tracts should not be allowed an increased value for his lands which are ultimately to be taken any more than the owner of the tract first condemned is entitled to be allowed an increased market value because adjacent lands not immediately taken increased in value due to the projected improvement.
>
> The question then is whether the respondents' lands were probably within the scope of the project from the time the Government was committed to it. If they were not, but were merely adjacent lands, the subsequent enlargement of the project to include them ought not to deprive the respondents of the value added in the meantime by the proximity of the improvement. If, on the other hand, they were, the Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increased in value due to the Government's activities.
>
> In which category do the lands in question fall? The project, from the date of its final and definite

authorization in August 1937, included the relocation of the railroad right-of-way, and one probable route was marked out over the respondents' lands. This being so, it was proper to tell the jury that the respondents were entitled to no increase in value arising after August 1937 because of the likelihood hood of the taking of their property. If their lands were probably to be taken for public use, in order to complete the project in its entirety, any increase in value due to that fact could only arise from speculation by them, or by possible purchasers from them, as to what the Government would be compelled to pay as compensation.

In other words, the rule prevents the owner from bootstrapping. In most cases the Government's taking tends to increase values of the properties in the project. Owners are prohibited from taking advantage of such increases in value under the Miller rule.

In the present case the Marine Corps, after testing the metal-air batteries at Camp Pendleton and in Vietnam, decided, as the trial judge found in fact finding 14, as follows:

> 14. The Marine Corps requested authority in April 1969 to issue a negotiated Letter Contract to Leesona for procurement of 2,500 BB--626( )/U batteries, 753,456 anode-electrolyte composites, 3,000 cathodes (bi-cells), and 575 'blower' covers. Since detailed cost data was not available at the time, it was contemplated that a Defense Contract Auditing Agency audit would be conducted after submission of the cost data being prepared by Leesona. Consequently a limit of $3,700,000 was placed on the proposed procurement, subject to reduction in light of the results of the DCAA audit.

Therefore, April 1969 was the date of authorization of the purchase of the 2,500 batteries, together with the above-mentioned accessories. Under the Miller rule, April 1969 is the cut-off date to determine fair market value of the patent rights taken by defendant via the defendant's eminent domain, powers. It was one project, as in Miller, and the date of the decision to purchase was April 1969. Therefore, the majority's computation of damages in subparagraphs B and C of part III is unsound. All the figures used by the majority came after April 1969 and the figures included added values to the metal-air batteries by reason of defendant's procurement of the 2,500 batteries. Defendant is not liable under Miller for these added values because of the very procurement in issue in this case. Plaintiff is clearly not entitled to such bootstrap values.

I admit that in eminent domain just compensation must be determined from the view of what the owner lost, as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

599 F.2d 958
220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270
**(Cite as: 599 F.2d 958)**

the majority argues. This is elementary. But it is also elementary that the owner is only entitled to fair market value of what the owner lost. United States v. Miller, supra. The federal eminent domain law regarding fair *984 market value when there is a 'single project multitaking case' is clearly spelled out in Miller and fair market value must be determined as the Court determined therein.

As stated in part IV of the majority opinion, the signing of the procurement contract with Eagle Picher was not the taking; but the procurement of each battery and manufacture of the batteries for defendant by Eagle Picher constituted the taking. However, the valuation of the patent rights taken is determined as of April 1969 for eminent domain purposes because this case is typically a 'single project multitaking case' as in Miller. All the evidence considered by the majority to conclude plaintiff was damaged in the sum of $266,712 was after April 1969, and such evidence cannot be used to determine damages in eminent domain proceedings. Miller clearly prohibits bootstrapping in such cases.

Therefore, returning to the only relevant evidence--the 1 1/2 and 5 percent licenses plaintiff voluntarily granted-- this court has before it upon which to determine a reasonable royalty, I find the 10 percent royalty rate the majority uses completely unfounded. I am of the opinion the 5 percent rate is the appropriate, reasonable royalty rate. That is the rate at which plaintiff voluntarily licensed a foreign competitor. And although both parties object to this rate, but on different grounds (plaintiff because it was a foreign license rather than a domestic license and defendant because the foreign license included additional patents), that is the most credible royalty rate in the evidence before this court. The compensation plaintiff is entitled to receive is $41,169.86, plus interest on this amount for delayed compensation at the rate and for the period of time set forth in part IV of the majority opinion.

220 Ct.Cl. 234, 599 F.2d 958, 202 U.S.P.Q. 424, 26 Cont.Cas.Fed. (CCH) P 83,270

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.