UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| L-3 COMMUNICATIONS SECURITY AND DETECTION SYSTEMS, INC., | ) ) ) ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) ) | NO. 04-11884-NG |
| REVEAL IMAGING TECHNOLOGIES, INC., | ) ) ) ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION ON
# PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

September 19, 2005

DEIN, U.S.M.J.

## I. INTRODUCTION

This matter is currently before the court on plaintiff's motion for a preliminary injunction by which L-3 Communications Security and Detection Systems, Inc. ("L-3") is seeking to enjoin the defendant Reveal Imaging Technologies, Inc. ("Reveal") "from making, using, selling or offering for sale in the United States, or importing into the United States, the explosives detection system known as the 'CT-80.'" (Docket No. 94). Of immediate consequence, L-3 is seeking to preclude Reveal from being awarded a contract by the Federal Transportation Security Administration ("TSA") for Reveal's CT-80 baggage screening equipment. L-3 contends that the CT-80 infringes on various patents held by L-3. In papers recently filed with the court, L-3 has informed the court

that the TSA expects to award the contract by **September 24, 2005**.

Oral argument was heard on the motion for a preliminary injunction on September 1, 2005. It was Reveal's position that L-3's patent infringement claims cannot be maintained because the CT-80s are to be used and manufactured by or for the United States Government and Reveal, therefore, is immune from suit under 28 U.S.C. § 1498. ("§ 1498"). At oral argument, L-3 conceded that if § 1498 is applicable to the TSA contract, at this juncture L-3 cannot establish that absent an injunction L-3 is likely to suffer irreparable harm. Consequently, this court requested supplemental briefing on the issue of the applicability of § 1498 to the TSA contract, and these pleadings were recently filed with the court.

After consideration of the initial and supplemental briefs filed in connection with the motion for a preliminary injunction, and arguments of counsel on September 1, 2005,[1] this court concludes that § 1498 is applicable to the TSA contract. Therefore, this court recommends to the District Judge to whom this case is assigned that L-3's motion for a preliminary injunction (Docket No. 94) be DENIED.

---

[1] By letter dated September 16, 2005, L-3 requested additional argument on the motion. In light of the rapidly approaching date of September 24, 2005, and the completeness of both the briefing and the earlier oral argument, this court concludes that no further oral argument is necessary at this time.

## II.  STATEMENT OF FACTS

### The Statutory Framework

Pursuant to 28 U.S.C. § 1498, "[i]f a patented invention is used or manufactured for the government by a private party, that private party cannot be held liable for patent infringement."  Crater Corp. v. Lucent Technologies, Inc., 255 F.3d 1361, 1364 (Fed. Cir. 2001).  It is Reveal's contention that this statute is applicable in the instant case, while L-3 contends that Reveal cannot establish the Government's "authorization and consent" to the infringing use, and that the statute, therefore, offers Reveal no protection.  The statute provides in relevant part as follows:

> **§ 1498.  Patent and copyright cases**
>
> (a) Whenever an invention described in and covered by a patent of the United States **is used or manufactured by or for the United States** without license of the owner thereof or lawful right to use or manufacture the same, **the owner's remedy shall be by action against the United States** in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . .
>
> For the purposes of this section, **the use or manufacture of an invention** described in and covered by a patent of the United States **by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be construed as use or manufacture for the United States.**

28 U.S.C. § 1498(a) (emphasis added).

Reveal argues that the first paragraph of the statute is controlling for direct sales to the Government, and that since the CT-80 is to be "used" by the United States, and was "manufactured ... for the United States," the statute bars the present action and L-3 is

-3-

limited to a suit against the United States in the Court of Claims.  Moreover, Reveal contends that even if it is obligated to otherwise establish that the Government gave its "authorization and consent" to Reveal's use of patented information, such consent must be implied from the Government's involvement in and the detailed specifications it provided for the development of the CT-80.

L-3 admits that the CT-80 is to be used by and manufactured for the Government.  However, L-3 contends that the language of the second paragraph § 1498 is also applicable, and that Reveal must separately establish "the authorization or consent of the Government" to such use.  Moreover, L-3 contends, the "authorization and consent" language was eliminated in the Request for Proposal ("RFP") issued by the Government to which Reveal is responding, and that this conclusively establishes that there is no such authorization and consent and that § 1498 is therefore not applicable.

As detailed below, this court concurs with Reveal's interpretation of the statute.  Since the CT-80 is to be directly sold to and manufactured for the Government, Reveal is immune from suit.  Moreover, even if the statute were to be read to require authorization and consent, it must be implied from the detailed specifications, supervision, and other involvement of the TSA.  Case law is clear that the absence of an express contractual acknowledgment of authorization and consent is not necessary to establish that such authorization and consent has been given.  Thus, even assuming that authorization and consent is required, the mere elimination of such a provision from the RFP is insufficient to deny Reveal the protections of § 1498.

## The Development of the CT-80

The facts relating to the design process of the CT-80 are not in dispute, and will be summarized here only briefly. Further details may be found in Reveal's briefs and supporting affidavits filed in opposition to the motion for a preliminary injunction. In particular, this court refers to the two declarations of Michael Ellenbogen, Reveal's president. (Docket Nos. 102, 119). In addition, this court refers to the briefs filed by L-3 in support of the motion for a preliminary injunction, especially for details about the contracting process. The relevant L-3 declarations include that of Mark Syrnick, vice president and general counsel of L-3 (Docket No. 112).

Shortly after September 11th, Congress enacted the Aviation and Transportation Security Act of 2001 (the "ATSA"), Pub. L. 107-71; 115 Stat. 597 (2001). Pursuant to the ATSA, all baggage screening is to be performed using Explosive Detection Systems ("EDS") certified by the TSA. An EDS is defined as "an automated device, or combination of devices, which has the ability to detect, in passenger checked baggage, the amounts, types and configurations of explosive materials as specified by the FAA [Federal Aviation Administration]." Docket No. 119 at ¶ 4.

On July 18, 2003, the TSA issued the Phoenix Request for Proposal ("Phoenix RFP"), which contained detailed specifications for TSA's requirements for the next generation EDS machine. In August 2003, the TSA awarded Reveal, then a start-up

company, a $4.7 million Phoenix Project grant.[2] The CT-80 was developed with the Phoenix grant funds, pursuant to Government specifications contained in a Cooperative Research and Development Agreement. The Agreement required input and sign-offs at various stages from the Phoenix R&D Project Manager at TSA. In December 2004, the CT-80 was certified as an EDS by the TSA after comprehensive and highly confidential testing at the Government's secure laboratory in Atlantic City, and following modifications ordered by the TSA. L-3 and General Electric are the only other companies with a product certified by the TSA to screen checked baggage.

After the TSA certification of the CT-80, the Government contracted with Reveal under a pilot program to purchase eight (8) machines, which are the only sales to date of the CT-80. The Government included the following Authorization and Consent section in the pilot program contract, which is also part of the Government's standard contract form:

**3.5-1: Authorization and Consent**

*(a) The Government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent:*

(1) Embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract or

---

[2] According to L-3, Reveal was founded in December 2002 by former L-3 employees. L-3 contends that these employees misappropriated L-3's trade secrets, a charge which Reveal denies. The issues relating to the alleged misappropriation of trade secrets are being addressed in an action brought by L-3 in Suffolk Superior Court.

>(2) Used in machinery, tools, or methods whose use necessarily results from compliance by the Contractor or a subcontractor with
>
>(i) Specifications or written provisions forming a part of this contract or
>
>(ii) Specific written instructions given by the Contracting Officer directing the manner of performance.  The entire liability to the Government for infringement of a patent of the United States may be determined solely by the provisions of the "Indemnity" clause, if any, included in this contract or any subcontract hereunder (including any lower-tier subcontract), and the Government assumes liability for all other infringement to the extent of the authorization and consent hereinabove granted.
>
>(b) The Contractor agrees to include, and require inclusion of, this clause, suitably modified to identify the parties, in all subcontracts at any tier for supplies or services (including construction, architect-engineer services, and materials, supplies, models, samples, and design or testing services.  However, omission of this clause from any subcontract does not affect this authorization and consent.)

See Docket No. 119 at ¶ 27, emphasis added.  The eight CT-80s have been installed by the TSA in various airports around the country, and Reveal continues to work with the TSA to collect data and use such data to refine the equipment.  Congress has been kept apprised of and has followed the development of the CT-80.

## **The Upcoming Contract**

On or about July 27, 2005, the Government issued a draft RFP for a "Reduced Size EDS unit," along with a form draft contract.  The CT-80, which is small enough to fit in an airport check-in desk, qualifies as such a unit.  The RFP itself contains approximately 70 pages of detailed and highly confidential specifications for the EDS systems.  The RFP is for an Indefinite Delivery/Indefinite Quantity contract, which means that any selected vendor will sell at least one EDS to the TSA.  Additional purchases will

be subject to contracts or purchase orders negotiated and executed directly with the vendors.  Both Reveal and L-3 have submitted bids.

The draft contract issued with the RFP contained the "Authorization and Consent" provision quoted above.  Although L-3 now concedes that the Authorization and Consent provision renders Reveal immune from suit under § 1498, it nevertheless moved for a preliminary injunction at the time the proposed RFP contained the Authorization and Consent provision.  On August 18, 2005, the TSA issued the final RFP.  The Authorization and Consent provision was intentionally omitted from the RFP.  According to Reveal, the "TSA has informed Reveal that the reference was removed so that the RFP would be consistent with prior RFPs, *not* because of any intention on the part of the TSA to indicate that the procurement that will flow from the RFP will not be with the Government's 'authorization and consent.'" (Docket No. 119 ¶ 33).  In any event, Reveal contends that the contractual provision is not necessary to render § 1498 immunity applicable, and that the authorization and consent provision may be added to the final contract.   L-3 on the other hand, contends that such omission makes it clear that no authorization and consent is intended.  See L-3's Supplemental Brief (Docket No. 121) at 7. Moreover, perhaps as an indication of the next battle between these competitors, L-3 asserts that it based its bid "on the understanding that the contract awardee will not receive immunity from patent infringement claims" and that "a post-award reinsertion of the authorization and consent clause would be impermissible because it would alter the fundamental basis upon which proposals were prepared, and it would significantly impact

the 'competitive positions' of the offerors." (Id. at 13).  See Ensign-Bickford Co., 1997 WL 70649, * 2 (Comp. Gen. Feb. 20, 1997) ( Comptroller General rejects losing bidder's challenge to the post-award addition of an authorization and consent clause at the request of the prevailing bidder absent evidence "that the protester would have altered its proposal to its competitive advantage had it been given the opportunity to respond to the change.").

### The Alleged Irreparable Harm

As detailed above, L-3 moved for a preliminary injunction initially at the time that the proposed RFP contained the authorization and consent clause.  L-3 contends that the fact that it will be irreparably harmed is presumed from the fact that it has a strong likelihood of success on the merits of its patent infringement claims.  See L-3's Memorandum in Support of Motion for Preliminary Injunction (Docket No. 98) at 6.  In addition, L-3 describes its irreparable harm as arising from the fact that Reveal

> is now poised to irreversibly saturate the small- and mid-sized airport market with its product.  The effect of that saturation will be dramatic, in two respects – market penetration and price erosion.  As to the first point, L-3 will be locked out of an entire market by the very persons who stole L-3's technology and infringed its patents.  Once a customer commits to a competing system, they are likely to obtain maintenance, support, upgrades, and follow-on products from that supplier.  On the second point, once price expectations are set in the marketplace, it becomes very difficult for the providers of the authentic, patented systems to reestablish customer expectations at a sustainable price point.

Id. at 2.

### III.  ANALYSIS

> 28 U.S.C. § 1498 was adopted originally in 1910 and later amended in 1918. The Congressional history of § 1498 makes it clear that the policy behind the 1918 amendment was to relieve private Government contractors from expensive litigation with patentees, possible injunctions, payment of royalties, and punitive damages. The amendment provided that the patentees' sole remedy was a suit against the United States in the Court of Claims. The Act was amended in 1918 at the behest of the Secretary of the Navy who cited difficulties in procuring goods from private manufacturers necessary to meet military requirements of World War I.

TVI Energy Corp. v. Blane, 806 F.2d 1057, 1059-60 (Fed. Cir. 1986). "In general, there are two important features of § 1498(a). It relieves a third party from patent infringement liability, and it acts as a waiver of sovereign immunity and consent to liability by the United States." Madey v. Duke University, 307 F.3d 1351, 1359 (Fed. Cir. 2002). The statute applies both "at the bid stage as well as during the performance of a government contract." Trojan, Inc. v. Shat-R-Shield, Inc., 885 F.2d 854, 856-57 (Fed. Cir. 1989). Moreover, it has been held to preclude the entry of an injunction against applicants for government contracts as "Section 1498(a) would be emasculated if a patent holder could enjoin bidding to supply infringing products." Id. at 856.

The basis for the statute has been held to arise from the government's eminent domain rights. Thus, as the court explained in W.L. Gore & Assoc., Inc. v. Garlock, Inc., 842 F.2d 1275 (Fed. Cir. 1988):

> The patentee takes his patent from the United States subject to the government's eminent domain rights to obtain what it needs from manufacturers and to use the same. The government has graciously consented, in the same statute, to be sued in the Claims Court for reasonable and entire compensation, for what would be infringement if by a private person.

-10-

Id. at 1283.

By its express language, § 1498(a) distinguishes between the situation where an invention "is used or manufactured by or for the United States" and one where the use or manufacture of an invention is "by a contractor, a subcontractor, or any person, firm, or corporation for the Government[.]" It is only in the latter situation where there must be a clear express or implied indication of the authorization or consent of the Government. As explained in Chisum on Patents, Vol. 5, § 16.06[3] (LexisNexis 2004):

> A patent owner's exclusive remedy when his invention "is used or manufactured by or for the United States" without authority is a suit in the United States Court of Federal Claims for recovery of "reasonable and entire compensation." This exclusive remedy includes use or manufacture by a contractor or subcontractor of the United States "with the authorization or consent of the Government."

Id. at p. 16-274. Thus, giving the plain statute its clear meaning, a direct sale to the Government by a direct seller would not require any additional authorization or consent. See, e.g., Bereslavsky v. Esso Standard Oil Co., 175 F.2d 148. 150 (4th Cir. 1949) (authorization and consent provision does not apply where the government is using the "product of the patent.").

The different treatment is expressly recognized and explained in Auerbach v. Sverdrup Corp., 829 F.2d 175 (D.C. Cir. 1987), a case relied on by L-3. There the court was addressing 28 U.S.C. § 1498(b), "a rarely construed waiver of immunity by the federal government for copyright infringement in certain circumstances." Auerbach, 829 F.2d at 178. As the legislative history of that section made clear, it "was passed to

-11-

correct a simple inequity. The United States, already liable for patent infringement and a host of other torts, was anomalously free from liability for copyright infringement." Id. at 178-79. See also L-3's Supp. Mem. (Docket No. 121) at 6, note 2 ("Auerbach concerned copyright infringement under 28 U.S.C. 1498(b), but the analysis applies equally to section 1498(a).").

> The relevant portion of § 1498(b), as quoted in Auerbach, provided as follows:
>
> Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization or consent of the Government, the exclusive remedy of the owner of such copyright shall be by action against the United States in the Claims Court. . . .

As the Auerbach court held,

> As we read the statute, it effects a policy that *government* wrongdoing in the realm of copyright infringement not go uncompensated. The first two clauses make this point explicitly. The final clause extends the waiver to third parties acting for the government *and* with the government's "authorization or consent." **Read in light of the first two clauses, the final clause indicates that private parties had best be certain the government intends to shoulder liability for their wrongful acts. Absent authorization or consent, says the statute in plain terms, they proceed at their peril.** . . . This construction of the statute is confirmed by the general rule that governmental waivers of liability must be construed narrowly.

Id. at 179. In the instant case, the Government is the entity which is using the allegedly infringing product. There is no need for any further "authorization or consent" to prevent third parties acting for the government from proceeding at their peril. See also W.L. Gore & Assoc., Inc., 842 F.2d at 1282-83 ("use or manufacture for the United States is immune

-12-

from suit for patent infringement in the district court against the user or manufacturer," and if the user or manufacturer "becomes a sub- or sub-sub contractor, a gracious government has also taken care of that possibility in the second paragraph of ¶ 1498(a)").

This court recognizes that the cases do not unanimously make the distinction that this court finds obvious in the two separate paragraphs of § 1498(a) (though no cases directly rejecting such a distinction have been identified by the parties either). Even if, however, evidence of authorization or consent were necessary, it is abundant in Reveal's case. For example, it is well established, and L-3 does not dispute, that authorization or consent may be either express or implied. See Auerbach, 829 F.2d at 180. Thus, it is not necessary that any contract contain an authorization and consent clause for such consent to be found. Id. Rather, as the court held in Hughes Aircraft Co. v. United States, 534 F.2d 889 (Ct. Cl. 1976):

> Nor, finally, is there any requirement that authorization or consent necessarily appear on the face of a particular contract. On the contrary, "authorization or consent" on the part of the Government may be given in many ways other than by letter or other direct form of communication – e.g., by contracting officer instructions, by specifications or drawings which impliedly sanction and necessitate infringement, by post hoc intervention of the Government in pending infringing litigation against individual contractors.

Id. at 901. Moreover, where, as here, compliance with government specifications is likely to result in the use of patented information, consent may be "implied by necessity." Auerbach, 829 F.2d at 180.

The instant case is similar to that presented in TVI Energy Corp. v. Blane, 806

F.2d 1057 (Fed. Cir. 1986). There, Blane was competing for a government contract, and in meeting the government's specifications Blane disclosed information which TVI believed infringed on its patent. In finding that Blane was immune from suit under § 1498, the court held, in language applicable to the instant case, as follows:

> Authorization or consent by the Government can be expressed in a form other than [an authorization or consent] letter. In proper circumstances, Government authorization can be implied. In this case, for instance, Government authorization was expressed by the specific requirement that Blane demonstrate, under the guidelines of the bidding procedure, the allegedly infringing [information]. The mere fact that the Government specifications . . . did not absolutely require Blane to infringe TVI's patent at that demonstration does not extinguish the Government's consent. To limit the scope of § 1498 only to instances where the Government requires by specification that a supplier infringe another's patent would defeat the Congressional intent to allow the Government to procure whatever it wished regardless of possible patent infringement. The coverage of § 1498 should be broad so as not to limit the Government's freedom in procurement by considerations of private patent infringement.

Id. at 1060 (internal citations omitted). Given the Government's extensive involvement in the development of the CT-80, no other conclusion than it was intended to be used by the Government can be reached.

> Where the Government finances the manufacture of a device and grants it to a private agency with the stipulation that it can only be used for specified purposes, and such use advances recognized vital interests of the U.S. Government, the conclusion is inescapable that such manufacture and use were 'for' the U.S. Government.

John J. McMullen Assoc., Inc. v. State Bd. of Higher Ed., 268 F. Supp. 735, 739 (D. Or. 1967), aff'd, 406 F.2d 497 (9th Cir. 1969).

Despite the extensive government involvement and all other indicia establishing

that Reveal is entitled to immunity under § 1428, L-3 relies exclusively on the unexplained removal of the authorization and consent provision from the RFP, and argues that this compels the conclusion that the Government has withdrawn its authorization and consent. This court concludes, however, that L-3 is reading far too much into this RFP modification.

As an initial matter, since it is well-established, and has been well-established for years, that the absence of an authorization and consent provision in a contract does not preclude a finding of authorization and consent (where needed) under § 1498, it is impossible to infer, much less unequivocally conclude, that by omitting the provision the TSA intended to withdraw the safeguards of § 1498. Rather, the TSA should be charged with knowledge of the applicable case law, and knowledge that the absence of the contract provision would not be controlling.

Furthermore, given the fact that the parties bidding on the RFP did not come to the table without a long history with the TSA, and the fact that the TSA's prior involvement in the development of EDSs would grant at least some of the applicants' immunity under § 1498, the TSA should be held to a standard of making its intentions clear. Thus, if the TSA intended to cancel the immunity which had been previously granted to the bidders, it should have expressly done so. Neither the parties nor the court should be forced to guess the meaning of an unexplained change in an RFP, especially where, as here, it is

clear that authorization and consent may be implied.[3]

Finally, this court again reiterates that, in this court's view, there does not need to be express authorization or consent under § 1498 given the direct sale by Reveal to the TSA.

In view of the fact that the sale to TSA apparently is covered by § 1498, L-3 cannot establish that it is likely to suffer irreparable harm absent the entry of an injunction. In addition, this court notes that the reasons given by L-3 in its original motion for a preliminary injunction (filed despite the presence of the authorization and consent provision), do not in this court's view, warrant the entry of a preliminary injunction. Rather, the harm that L-3 is likely to suffer appears to be the type which can be compensated by the payment of damages. At stake here are actions by the Government designed to make the airports safer from attack. Under such circumstances, the harm to the public from precluding the Government from considering all available alternatives outweighs any financial harm L-3 may suffer.

---

[3] This court also notes that RFPs may include provisions which allow bidders to "request deviations or file alternative proposals." Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 189 (1st Cir. 1999). No attempt has been made by this court to review all the details of the RFP, but such a provision, if it exists, would further negate the significance of the RFP modification.

## IV. CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that L-3's motion for a preliminary injunction (Docket No. 94) be DENIED.[4]

                     / s / Judith Gail Dein
                     Judith Gail Dein
                     United States Magistrate Judge

---

[4] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).