IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| L-3 COMMUNICATIONS SECURITY AND DETECTION SYSTEMS, INC.<br><br>Plaintiff,<br><br>v.<br><br>REVEAL IMAGING TECHNOLOGIES, INC.<br><br>Defendant. | Civil Action No. 04-11884 NG<br>(Magistrate Judge Judith Gail Dein)<br><br><br><br>**ORAL ARGUMENT REQUESTED** |

**L-3'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, L-3 Communications Security and Detection Systems, Inc. ("L-3"), respectfully objects to the proposed findings and recommendations set forth in the Magistrate Judge's Report and Recommendation on Plaintiff's Motion for a Preliminary Injunction (D.I. 129) for reasons set forth in detail below.

## I.   INTRODUCTION

L-3 is a market leader in the field of explosives detection systems ("EDS"). Reveal Imaging Technologies, Inc. ("Reveal") was founded by former L-3 executives who left L-3 in 2002, misappropriating core L-3 technology to develop a cut-rate EDS system.[1] This case relates to Reveal's patent infringement.

Reveal is now poised to saturate the small- and mid-sized airport market with its cut-rate infringing product. The effect of that saturation will be dramatic, in two respects — market penetration and price erosion. Once a customer commits to a particular EDS supplier, they typically obtain maintenance, support, upgrades, and follow-on products from that supplier.

---

[1] Reveal subsequently attempted to sabotage L-3's patent applications, leading the Judge in a parallel state-court trade secret misappropriation action to enter a preliminary injunction requiring it to remedy that effort and enjoining it from further such conduct.

Moreover, once price expectations are set in the marketplace, it is difficult for providers of an authentic, patented system to reestablish customer expectations at a sustainable price point given the massive research and development investment required to invent these systems. The irreparable harm to L-3 is detailed in the Declaration of Allen R. Barber in Support of L-3's Motion for Preliminary Injunction, D.I. #99. This harm is both irreversible and imminent as the TSA is about to announce its award of an EDS procurement contract that could reach $463 million, and because Reveal has been aggressively marketing its infringing systems to other buyers around the world. See D.I. 121 and attached Ex. B.

L-3 also has a high likelihood success on the merits in this patent infringement action, for two principal reasons. First, infringement is clear. The structure of the CT-80 is undisputed, and each claim limitation is directly and literally met by a feature of that system.[2] Second, validity cannot even be challenged, let alone defeated. A patent is presumed valid, and normally a high "clear and convincing" burden is needed to overcome that presumption. Here, Reveal is legally **precluded** from even challenging the validity of one of the patents-in-suit, under the doctrine of assignor estoppel, because one of Reveal's principals was an original named inventor on L-3's patent.

Reveal's opposition to this Motion did not refute the irreparable harm that will result from its imminent market saturation. See D.I. 101. Instead, Reveal argued that the Government has waived its sovereign immunity and consented to be sued for patent infringement pursuant to

---

[2] Any dispute regarding claim construction is a pure issue of law ripe for resolution by the Court. As discussed in Reveal's Motion for a Preliminary Injunction, D.I. #98, Reveal's effort to dispute the plain meaning of the claim language is implausible. In particular, Reveal asked the Court to violate a cardinal rule of claim construction, namely that limitations that are not present should not be imported into the claims.

28 U.S.C. § 1498, thus relieving Reveal of liability for its Government sales.  Reveal continued to insist that the Government has accepted liability even after the Government deleted a patent infringement "authorization and consent" clause from the final contract for the reduced sized EDS procurement.  See D.I. 111, 112 (L-3's supplemental filings on newly-discovered evidence) and 118 (Reveal's supplemental memorandum regarding immunity under 28 U.S.C. § 1498).  These objections focus on an error of law in the Magistrate Judge's resolution of that statutory issue.

**II.    SUMMARY OF OBJECTIONS TO REPORT AND RECOMMENDATION**

L-3 objects to the Report and Recommendation on three grounds:

First, Reveal's interpretation of the government immunity provisions of 28 U.S.C. § 1498, adopted by the Magistrate Judge (notwithstanding her acknowledgment that there is case law inconsistent with Reveal's position), violates the core principle of statutory construction of giving full meaning to each provision of a statute.  In effect, Reveal has asked the Court to read the "authorization and consent" requirement out of the statute which provides immunity for acts only if they are done by or for the government **and** with its authorization and consent.

Second, L-3 objects because the Recommendation is based, in part, on a late-submitted hearsay declaration in which Reveal's president inferred that the Government would grant its "authorization and consent" for patent infringement, thereby immunizing the winning bidder from liability.  This declaration should not have been credited because (1) the assertion that the authorization and consent clause was removed from the final contract to make it "consistent with prior RFPs" is contradicted by the evidence; (2) the assertion failed to provide any detail about the alleged communication, such that it was impossible to determine its reliability or accuracy; (3) the declaration purported to offer as evidence an unfounded, self-serving inference drawn by

Reveal's president; and (4) the alleged communication, during a procurement from the Government, would likely have been unlawful under government procurement law.

Third, the Magistrate Judge's Recommendation failed to consider irreparable harm to L-3 from potential sales which cannot even possibly be immunized. For example, sales to foreign entities are **never** protected by the immunity provisions of 28 U.S.C. § 1498, and Reveal admits that as recently as this past month it has made additional foreign offers to sell the infringing goods. At a minimum, a preliminary injunction should issue against those sales.

Reveal seeks to place L-3 in an unfair catch-22: A decision that Reveal is immunized from patent infringement is not binding on the Government, which, if sued in the Court of Federal Claims, may well argue that it has **not** granted authorization and consent, leaving L-3 with an eminent domain taking of its patent rights yet no remedy. Stated otherwise, a ruling by this Court that purports to find authorization and consent does not bind the Government in the Court of Federal Claims. Since there is no evidence the Government has accepted liability, and in fact all evidence (as discussed below) is to the contrary, it would be unfair to leave L-3 with no remedy in **any** Court for the clear infringement of its intellectual property.

### III.    FACTS

Reveal has repeatedly overstated the Government's involvement in the development of its infringing designed unit, the CT-80, in a transparent attempt to create the impression that some sort of "blanket" authorization and consent cloaks **all** of Reveal's infringing acts with immunity. Reveal's implication that the Government was involved in the development and design of the CT-80 from the start is contradicted by the facts. In reality, there is no evidentiary basis from which to infer authorization and consent, beyond the narrow immunity which the TSA explicitly wrote into the Pilot Program involving the testing and demonstration of eight CT-80's.

Reveal had already designed a system that infringed L-3's patents before it had any formal involvement or contract with the TSA. Reveal created its business and technology plan in January 2002, and immediately sought and obtained private investment. Reveal was incorporated in October 2002 and staffed by former L-3 executives. Its documents make clear that, starting in January 2002, Reveal was developing the CT-80 based on L-3's patents and trade secrets. Reveal submitted detailed specifications for its machine to the TSA in July 2003, see D.I. 10 Ex. B, that exposed its infringing activity. The TSA awarded Reveal a grant to work toward the official certification of the CT-80 in October 2003 (the "Phoenix Project"). Reveal employees had also sought patent protection for their work by filing a provisional patent application in **October 2002**, long before the Phoenix Project Grant in October 2003. Reveal filed several other provisional and utility patent applications in late 2002 and early 2003, and sought and obtained additional venture capital funding. Thus, all of the work developing the CT-80 up until October 2003 was done with **no government involvement at all**.[3]

Further, the Government did not grant its authorization and consent for the certification project, Reveal's first government contract. The RFP for that project did not contain Government-directed design specifications; rather, the Government specified performance requirements and contractors were free to submit any design or system that met those requirements. The grant was to obtain "certification" for an EDS and Reveal bid its **already designed** CT-80. It was not until early 2005, after the CT-80 was finally certified by the TSA, that Reveal first received authorization and consent. That authorization and consent was written into the contract and granted for a specific project: the Pilot Program, in which Reveal delivered

---

[3] Even after October 2003, Reveal remained responsible for all decisions regarding the design and manufacture of the CT-80. The TSA provided **performance requirements** for the machines, not instructions on the internal design specifications. **At no point has the Government required Reveal to submit an infringing design under any proposal.**

eight CT-80's for TSA testing and image collection. The TSA has never assumed any other liability for Reveal's patent infringement.

In the current procurement, the Government specifically deleted the authorization and consent clause, and an accompanying bond indemnification requirement. L-3 wrote to Reveal twice, asking if it had objected in its bid to the absence of an authorization and consent clause. Reveal refused to answer. This week, a TSA attorney indicated to L-3's counsel that it had not granted its authorization and consent. Any finding that the Government has consented to suit in the Court of Federal Claims is thus unsupported—and directly contradicted—by the evidence.

## IV. ARGUMENT

### A. 28 U.S.C. § 1498 Only Immunizes Infringement that Is "By or For" and "With the Authorization or Consent" of the Government

In its opposition to this Motion for a Preliminary Injunction, Reveal urged the Court to adopt an interpretation of 28 U.S.C. § 1498 that flies in the face of the "cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW, Inc. v. Andrews, 534 U.S. 19, 31 (2001). The plain language of the statute requires that the use or manufacture of an infringing item be "by or for the United States […] **and** with the authorization or consent of the Government" in order to be immunized. 28 U.S.C. § 1498 (emphasis added). Under Reveal's interpretation, when the Government purchases an infringing product, the "authorization or consent" language of the statute would be rendered entirely superfluous. Although the Magistrate Judge recognized that "the cases do not unanimously make the distinction" urged by Reveal (D.I. 129 at 13), she nonetheless adopted Reveal's interpretation. Such an interpretation cannot stand.

Moreover, the statute does not draw the distinction, suggested by Reveal, between direct government contractors and subcontractors. The second paragraph of § 1498 provides a definition for the term "use or manufacture for the Government" from the first paragraph, and immunizes the use or manufacture of an invention "by a contractor, a subcontractor, or any person, firm, or corporation for the Government" only if it is done "with the authorization or consent of the Government." There is no language creating a separate requirement that applies to subcontractors rather than contractors, contrary to Reveal's assertions. Authorization and consent is required for the use or manufacture of a patented article by any entity other than the Government itself.

Indeed, many of the cases cited by Reveal looked to an authorization and consent clause in the contract to determine whether or not authorization and consent has been given. E.g., Croll-Reynolds Co. v. Perini-Leavell-Jones-Vinell, 399 F.2d 913, 914-915 (5th Cir. 1969) (cited on Page 10 of Reveal's Supplemental Memorandum, D.I. 118) ("The **contract does contain a provision covering the use of inventions**. … 'The Government hereby gives its authorization and consent … for all use and manufacture … of any invention described in and covered by a patent[.]") (emphasis added); Croydon Co., Inc. v. Unique Furnishings, Ltd., 831 F. Supp. 480, 484 (E.D.N.C. 1993) (cited on Page 10 of Reveal's Supplemental Memorandum) ("Furthermore, in direct contrast to Gaylord's assertion that the Government did not consent to the alleged infringing manufacture, **the contract between the Government and Unique contains a provision titled 'AUTHORIZATION AND CONSENT.'**") (emphasis added); Raymond Eng'g Inc. v. Miltope Corp., 231 U.S.P.Q. 575, 577 (S.D.N.Y. 1986) (cited on Page 11 of Reveal's Supplemental Memorandum) (discussing "the **necessary** authorization and consent clause[.]") (emphasis added).

These cases make clear that that, far from being the "suspenders to an already bullet-proof belt," the presence or absence of an authorization and consent clause is persuasive evidence of whether or not the Government has waived its sovereign immunity and assumed liability for patent infringement.  See also Great Plains Bag Corp. v. St. Regis Paper Co., 188 U.S.P.Q. 561, 563 (S.D. Iowa 1975) ("A number of factors gleaned from the evidence **militate against a finding of governmental authorization or consent**. … **Third, the contract between the Government and ADM Milling contains no "authorization and consent" clause**. These clauses are relatively common in government contracts involving patented articles, and **provide strong indicia of governmental authorization or consent** -- either express or implied -- to use or manufacture patented articles.") (emphasis added).

The Magistrate Judge's recommendation relied on a 1949 case from the Fourth Circuit, Bereslavsky v. Esso Standard Oil Co., 175 F.2d 148, 150 (4th Cir. 1949) as well as a quotation from Chisum on Patents, Vol. 5 § 16.06[3] (2004) for the proposition that the "authorization and consent" provision of § 1498 does not apply when the infringing products are purchased by the Government.  This "blanket immunity" approach has been rejected in more recent decisions.  For example, in Applera Corporation v. MJ Research, Inc., 311 F.Supp. 2d 293 (D.Conn. 2004), the court rejected a § 1498(a) defense based on just such argument, where the defendant attempted to rely on Bereslavsky:

> Madey, 307 F.3d 1351 and Toxgon, 312 F.3d 1379 demonstrate the total absence of merit in defendants' arguments. **The determination of whether 28 U.S.C. § 1498(a) provides an effective affirmative defense requires analysis of the particular statements or aspects of the particular governmental grant or contract purportedly providing the Government's authorization or consent to be sued**, see e.g. Madey, 307 F.3d at 1354, 1359-60, which requirement applies with equal force to FFRDCs since, in the subsection immediately following the regulation cited by defendants, the regulations explicitly provide that a consent to infringement clause is optional for certain types of contracts, see 48 C.F.R. 27.201-2(a). **A jury instruction that mere use of patents under the authority of a government research grant satisfies the use for and authorization**

> **of requirements of 28 U.S.C. § 1498(a) would certainly be legal error.** See id. at 1359-1360.

Id. at 299 (emphasis added).

It is thus apparent that § 1498(a) does not provide a blanket exemption for all manufacturing activities that lead up to a product that is ultimately purchased by the Government, but rather that the affirmative defense "requires analysis of the particular statements or aspects of the particular governmental grant or contract purportedly providing the Government's authorization or consent to be sued." Id.

The Magistrate Judge's reliance on the Chisum quotation is similarly misplaced. Aside from the fact that Chisum is not controlling authority, the quoted material actually supports L-3:

> A patent owner's exclusive remedy when his invention "is used or manufactured by or for the United States" without authority is a suit in the United States Court of Federal Claims for recovery of "reasonable and entire compensation." This exclusive remedy includes use or manufacture by a contractor or subcontractor of the United States "with the authorization or consent of the Government."

This passage makes clear that (1) when the **Government** uses or manufactures an infringing product, the patentee's sole remedy is in the Court of Federal Claims, but (2) when a **contractor** manufactures or uses an infringing product, "authorization or consent" is required to establish jurisdiction against the Government in the Court of Federal Claims. In other words, L-3 cannot sue Reveal for the **TSA's** use of the CT-80; only for **Reveal's** activities in manufacturing and selling the CT-80 absent authorization and consent. If the Government accepts delivery of the infringing machines and begins to use them, then it will have assumed liability for its infringing **use** but not for Reveal's **manufacture**.

The contrary interpretation urged by Reveal and adopted by the Magistrate Judge leads to an absurd result: each and every time the Government purchases an article, it would be waiving sovereign immunity and assuming liability for patent infringement. Not only is that result

entirely impractical, but it is directly contradicted by the holding of Auerbach v. Sverdrup Corp., 829 F.2d 175 (D.C. Cir. 1987), a case quoted by the Magistrate Judge, in discussing the second paragraph of § 1498(b) (an analogous provision to § 1498(a)): "Read in light of the first two clauses, the final clause indicates that private parties had best be certain the government intends to shoulder liability for their wrongful acts. Absent authorization or consent, says the statute in plain terms, they proceed at their peril. … This construction of the statute is confirmed by the general rule that governmental waivers of liability must be construed narrowly." Id. at 179.

The holding of TVI Energy Corp. v. Blane, 806 F.2d 1057 (Fed. Cir. 1986), a case Reveal relied on heavily and that was cited in the Magistrate Judge's Recommendation, is consistent with this analysis. In TVI Energy, the Federal Circuit held that authorization and consent could be implied where the Government issued a bid solicitation that "expressly mandated" a "Product Demonstration." Id. at 1059. The court found that authorization and consent was granted, but only under the narrow circumstances presented, making clear that "the sole issue before us is whether a private party which infringes another's patent during Government bidding activities **such as those present here** is immune under 28 U.S.C. § 1498 from a District Court infringement action **for that test demonstration**." Id. at 1060 (emphasis supplied). Just as the TSA granted its authorization and consent for Reveal to perform the Pilot Program involving the eight CT-80's, the court found that the Government in TVI Energy granted its authorization and consent for the test demonstration of the products at issue in that case. Neither the Government in TVI Energy nor the TSA here has granted any further authorization and consent.

More to the point, later decisions make clear that the implied authorization and consent found in TVI Energy cannot be read more broadly than the particular facts of that case. For

- 10 -

example, in Larson v. The United States, 26 Cl. Ct. 365 (1992), the Claims Court held that there are strong limitations on when authorization and consent will be implied: "Statutory waivers of governmental immunity, such as are embodied in section 1498(a), must be narrowly construed. Therefore, 'authorization or consent requires explicit acts or extrinsic evidence sufficient to prove the government's intention to accept liability for a specific act of infringement.'" Id. at 369 (internal citations omitted).  In Parker Beach Restoration, Inc. v. The United States, 58 Fed. Cl. 126 (Fed. Cl. 2003), the Court of Federal Claims found that, "even if TVI applies," additional criteria must be met before authorization and consent will be implied. Id. at 133.  For example, the court noted that authorization and consent can be implied "by contracting officer instructions, by specifications or drawings which impliedly sanction and necessitate infringement, [or] by post hoc intervention of the Government in pending litigation against individual contractors." Id. (citing Hughes Aircraft Co. v. United States, 534 F.2d 889 (Ct. Cl. 1976)).  The court concluded that authorization and consent could not be implied because the contracting officer did not "impliedly sanction or necessitate infringement" and the Government "did not intervene in infringement litigation against the contractor." Id. at 133-134.  Consequently, the court dismissed the action, finding that the plaintiff patentee could not establish § 1498 jurisdiction over the Government.

In the instant case, this analysis can only lead to the conclusion that the Government has **not** given its authorization and consent, as discussed below.

> **B.    The Decision of Whether or Not the Government Intended to Immunize Reveal's Infringement Should Not Be Based on Unreliable Hearsay that is Contradicted by Clear Evidence**

The final RFP requests offers for a contract that would not include an authorization and consent clause.  Because the TSA included a draft authorization and consent clause in early documentation and then deleted it from the final RFP, authorization or consent cannot be

implied. Rather, the deletion compels the opposite implication – **that no authorization or consent is intended**.

In statutory and contractual interpretation, removal of language from a draft evidences the intent of the legislature, or the parties to the contract, that the removed language was purposefully excluded. E.g., Massachusetts Ass'n of Health Maintenance Organizations v. Ruthardt, 194 F.3d 176, 185 (1st Cir. 1999) ("Congress sometimes can speak as clearly by opting not to enact proffered language as by enacting it"); INS v. Cardoza-Fonseca, 480 U.S. 421, 442-43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."). Triple-A Baseball Club Assoc. v. Northeastern Baseball, Inc., 832 F.2d 214, 221-22 (1st Cir. 1987) (adopting narrow construction where a contract did not include provision found in earlier drafts); T.P. Inc. v. J&D's Pets, Inc., 1999 WL 135243, 5 (Del. Ch. 1999) (refusing to imply additional clause that was removed from prior drafts); Marcre Sales Corp. v. Jetter, 476 S.E.2d 840, 842 (Ga. App. 1996) (rejecting argument based on clause that was specifically deleted from a final agreement).

Realizing that the removal of the authorization and consent and indemnification clauses distinguishes this case from any of the instances where authorization and consent have been "implied," Reveal submitted a new declaration, announcing for the first time that the "TSA has informed Reveal that the reference was removed so that the RFP would be consistent with prior RFPs, *not* because of any intention on the part of the TSA to indicate that the procurement will flow from the RFP will not be with the Government's 'authorization and consent.'" (D.I. 119 ¶ 33). The Magistrate Judge's Recommendation appears to have relied on this declaration in finding that the Government had granted its authorization and consent. (D.I. 129 at 8).

Reveal's attempt to negate the obvious inference from the deletion of the authorization and consent clause is without merit. Not only is the declaration hearsay, but it does not provide any of the necessary details to evaluate its reliability. For example, the declaration does not indicate who at the TSA purportedly provided this information to Reveal (nor to whom it was provided). The declaration does not indicate when or where the communication took place. The declaration does not indicate that the person making the representation was authorized to speak on the issue on behalf of the TSA.

Most importantly, however, the declaration does not even indicate that the TSA has given its authorization and consent for patent infringement. Instead, the alleged communication only indicated that the change was made to make the RFP consistent with prior RFPs (a questionable assertion in and of itself, as discussed below). It is the inference of Michael Ellenbogen, L-3's president, that the change was made "*not* because of any intention on the part of the TSA to indicate that the procurement that will flow from the RFP will not be with the Government's 'authorization and consent.'" (D.I. 119 ¶ 33) (emphasis in original). Mr. Ellenbogen's self-interested inference is certainly not evidence, and should not serve as the basis for a finding that the Government has granted its authorization and consent.

Moreover, ex parte contact with the TSA that might afford any offeror an unfair advantage is prohibited during the bidding period. FAAAMS § 3.2.2.3.1.2.2. Although the declaration does not give sufficient detail to determine whether the communication in question was actually unlawful, the fact that this communication occurred outside of the "official channels" of open and fair communication casts further doubt on its reliability.

The alleged justification that the clause was removed to make the RFP "consistent with prior RFPs" is simply untrue. The FAA's own guidelines include a "prescription" that an

authorization and consent clause "should be used in SIR's and contracts … to the contract work is not halted because of patent infringement lawsuit, except when both complete performance and delivery are outside the United States, its possession, and Puerto Rico." FAAAMS 3.5-1 Clause Prescription. A review of prior RFPs in this industry reveals that the deletion of the clause makes the current RFP **inconsistent** with past RFPs. For example, the contract for Reveal's own CT-80 Pilot Project included just such a clause. Moreover, prior RFPs also included an indemnification clause, which was also present in the draft contract here but deleted from the final version.

Finally, the TSA has explicitly confirmed that it has not granted authorization and consent to any bidder in the reduced size EDS procurement process. On September 27, 2005, after the award was decided, Marc Efron, L-3's outside counsel, called Ross Dembling, a lawyer with the TSA who is working on the EDS procurement. See attached Ex. A, Declaration of Marc Efron, ¶¶ 1-2. Mr. Dembling indicated that he was aware of the instant litigation. Id. ¶ 3. Furthermore, he made clear that the TSA has not granted its authorization and consent for patent infringement, and may or may not ever do so.[4] Id. ¶ 4.

The deletion of the clause compels only one possible conclusion: that the TSA has not granted its authorization and consent and waived its sovereign immunity to be sued for patent infringement. The fact that a TSA attorney working on the procurement, which is the heart of the matter, has confirmed that authorization and consent has not been granted leaves no room for further speculation.

---

[4] In the unlikely event that the TSA does decide to provide its authorization and consent after awarding the contract, such action could invalidate the award under applicable government procurement law. See D.I. 121 at 8-14. In any event, those are not the facts that are before the Court.

### C. The Magistrate Judge's Recommendation Ignores the Irreparable Harm from Sales that Can't Possibly Be Immunized

The Magistrate Judge erred by ignoring the prejudice to L-3 that will occur from foreign sales, which clearly are not protected by Reveal's § 1498 theory (because they do not involve sales to the U.S. government, let alone sales for which "authorization and consent" has been provided). Reveal has acknowledged that it is aggressively pursuing sales opportunities throughout "Europe, the Middle East, Africa, [and] Asia Pacific," and has "signed international sales rep agreements with a number of sales representatives in counties in those same territories." (D.I. 117 Ex. A at 26-27, 29-32). Reveal has further acknowledged that any such sales would be from inventory manufactured in the United States. (Id. at 28-29). That "L-3 will be promptly notified" when such sales occur (D.I. 91 at 8), will not cure the harm from Reveal's entrenchment in foreign markets. Reveal's silence on the irreparable damage that will result from foreign sales is telling.

In fact, as recently as September 16, 2005, Reveal notified L-3, pursuant to Judge Dein's order, that it has bid on two foreign (non-immunized) projects, one in Mexico and one in the Bahamas. See attached Ex. B. There is thus an imminent risk of irreparable harm—if Reveal wins these bids, it will become entrenched in these markets, and it will be exceedingly difficult to determine monetary damages once the harm has occurred. Since Reveal does not even have an arguable immunity defense with respect to these infringing acts, a preliminary injunction should be granted at least with respect to these sales and offers to sell.

### D. Granting Immunity to Reveal May Result in an Eminent Domain Taking of L-3's Patent Rights Without Any Remedy

Reveal's proposed reading of the statute raises serious Constitutional questions. Granting Reveal immunity under § 1498 in the absence of any express or implied authorization and consent on the part of the Government will expose L-3 to the risk of an uncompensated eminent

- 15 -

domain taking of L-3's patent rights with no remedy in any court.  If L-3 were to sue the Government for patent infringement in the Court of Federal Claims, the first argument the TSA would likely make is that it had not waived its sovereign immunity to be liable for a contractor's infringing activities.  E.g., Carrier Corporation v. United States, 534 F.2d 244, 247 (Ct. Cl. 1976) ("Defendant [the United States] contends that it expressly withheld its authorization and consent and, therefore, that any use of plaintiff's invention was not a use for the Government within the meaning of Section 1498(a).").  It would likely rely on the same evidence cited here – that it originally had included an authorization and consent clause and later removed it.  Since the Government is not a party to this action, it will not, of course, be bound by the Court's decision on this issue.[5]  See Flynn v. Hubbard, 782 F.2d 1084, 1089 (1st Cir. 1986) ("It is black letter law that those not a party to an action are not bound by an adverse judgment against the named defendant.")

It should come as no surprise that the TSA would argue that it had not waived sovereign immunity for infringement.  The procurement contract at issue here could reach $463 million.  By contrast, the Pilot Program contract awarded to Reveal, which did include the authorization and consent provision, covered only $3.3 million worth of EDS machines.  By removing the indemnification clause from the final version of the contract at issue here, the TSA made clear (as it subsequently confirmed) that it has **not** chosen to accept that level of liability for a vendor's patent infringement.

---

[5] There are cases where the Government has intervened in a patent infringement lawsuit to indicate that it is authorizing infringement and waiving its sovereign immunity to be sued in the Court of Federal Claims.  E.g., Roberts v. Herbert Cooper Co., 236 F.Supp. 428 (M.D.Pa.1959).  See also Hughes Aircraft Co. v. United States, 534 F.2d 889, 901 (Ct. Cl. 1976) ("[A]uthorization or consent on the part of the Government may be given…by post hoc intervention of the Government in pending infringement litigation against individual contractors.") (internal quotation marks and citations omitted).  This is not such a case.

Courts have recognized, but not addressed, the Constitutional risk that inconsistent judgments between a district court and the Court of Federal Claims could result in a taking without judicial remedy.  E.g., TVI v. Blane, 806 F.2d at 1060; accord Bath Iron Works Corporation v. Parmatic Filter Corporation, 736 F.Supp. 1175, 1177 n. 2 (D. Me. 1990).  It is well established, however, that statutes should be construed whenever possible to avoid raising constitutional issues.  McConnell v. Federal Election Commision, 540 U.S. 93, 180 (2003) ("When the validity of an act of the Congress is drawn in question, and ... a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (internal citations omitted).  Reveal's proposed statutory construction, which reads the "authorization and consent" provision out of the statute, creates a situation where both the Government and the infringing contractor can each point the finger at the other, depriving the patent owner of jurisdiction in **any** court, and hence of **any** remedy for the Government's eminent domain taking.  Such an outcome would violate fundamental principles of due process.  See Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 642 (1999).[6]

Rather than avoiding an unconstitutional taking, Reveal's construction, adopted by the Magistrate Judge, invites one.  The principle of constitutional avoidance, as well as a common sense reading of the statutory language, militate against such a result.

## V.   CONCLUSION

The Magistrate Judge's Recommendation should thus be rejected and L-3's Motion for a Preliminary Injunction Granted.

---

[6] The Florida Prepaid Court recognized that a patent owner's rights are protected under the Due Process Clause of the Constitution: "Patents, however, have long been considered a species of property …. As such, they are surely included within the 'property' of which no person may be deprived by a State without due  process of law." Id. at 642 (internal citations and quotations omitted).

**Local Rule 7.1(d) Request for Oral Argument**

L-3 hereby requests a hearing at the Court's earliest convenience. It is respectfully suggested that oral argument would be helpful to clarify the statutory issue in dispute.

                                                  Respectfully submitted,

                                                  L-3 COMMUNICATIONS SECURITY
AND DETECTION SYSTEMS, INC.,

                                                  By its attorneys,

October 3, 2005                             ____/s/ Michael A. Albert_____
                                                  Michael A. Albert, BBO # 558566
                                                  James J. Foster, BBO # 553285
                                                  Robert M. Abrahamsen, BBO # 636635
                                                  Adam J. Kessel, BBO # 661211
                                                  WOLF, GREENFIELD & SACKS, P.C.
                                                  600 Atlantic Avenue
                                                  Boston, Massachusetts 02210
                                                  Tel.: 617.646.8000
                                                  Fax: 617.646.8646
                                                  malbert@wolfgreenfield.com