UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| L-3 COMMUNICATIONS SECURITY AND DETECTION SYSTEMS, INC., | ) ) ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-11884-NG |
| v. | ) | (Magistrate Judge Judith Gail Dein) |
| | ) | |
| REVEAL IMAGING TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

_____

### FIRST AMENDED ANSWER AND COUNTERCLAIMS OF REVEAL IMAGING TECHNOLOGIES, INC. TO PLAINTIFF'S SECOND AMENDED COMPLAINT

Reveal Imaging Technologies, Inc. ("Reveal") hereby files its First Amended Answer and Counterclaims to the Second Amended Complaint filed by Plaintiff L-3 Communications Security and Detection Systems, Inc. ("Plaintiff" or "L-3"). All allegations made by L-3 not specifically admitted by Reveal are denied.

### THE PARTIES

1.      Reveal admits the allegations contained in Paragraph 1 of the Second Amended Complaint.

2.      Reveal is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the Second Amended Complaint.

3.      Reveal admits the allegations contained in Paragraph 3 of the Second Amended Complaint.

4.     Reveal admits the allegations contained in Paragraph 4 of the Second Amended Complaint.


## JURISDICTION

5.     Reveal denies the allegations contained in Paragraph 5 and contends that jurisdiction for this matter properly rests in the United States Court of Federal Claims pursuant to 28 U.S.C. § 1498.


## COUNT ONE -- U.S. PATENT NO. 6,721,391

6.     In answering Paragraph 6, Reveal incorporates by reference its responses to Paragraphs 1 through 5 of the Second Amended Complaint.

7.     Reveal is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 of the Second Amended Complaint.

8.     Reveal denies the allegations in Paragraph 8 of the Second Amended Complaint.

9.     Reveal denies the allegations in Paragraph 9 of the Second Amended Complaint.

10.     Reveal denies the allegations in Paragraph 10 of the Second Amended Complaint.


## COUNT TWO -- U.S. PATENT NO. 5,642,393

11.     In answering Paragraph 11, Reveal incorporates by reference its responses to Paragraphs 1 through 5 of the Second Amended Complaint.

12.     Reveal is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 of the Second Amended Complaint.

13.     Reveal denies the allegations in Paragraph 13 of the Second Amended Complaint.

14.    Reveal denies the allegations in Paragraph 14 of the Second Amended Complaint.

15.    Reveal denies the allegations in Paragraph 15 of the Second Amended Complaint.

## COUNT THREE -- U.S. PATENT NO. 5,838,758

16.    In answering Paragraph 16, Reveal incorporates by reference its responses to Paragraphs 1 through 5 of the Second Amended Complaint.

17.    Reveal is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 of the Second Amended Complaint.

18.    Reveal denies the allegations in Paragraph 18 of the Second Amended Complaint.

19.    Reveal denies the allegations in Paragraph 19 of the Second Amended Complaint.

20.    Reveal denies the allegations in Paragraph 20 of the Second Amended Complaint.

## COUNT FOUR -- U.S. PATENT NO. 6,707,879

21.    In answering Paragraph 21, Reveal incorporates by reference its responses to Paragraphs 1 through 5 of the Second Amended Complaint.

22.    Reveal is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 22 of the Second Amended Complaint.

23.    Reveal denies the allegations in Paragraph 23 of the Second Amended Complaint.

24.    Reveal denies the allegations in Paragraph 24 of the Second Amended Complaint.

25.    Reveal denies the allegations in Paragraph 25 of the Second Amended Complaint.

## COUNT FIVE -- U.S. PATENT NO. 5,712,926

26.     In answering Paragraph 26, Reveal incorporates by reference its responses to Paragraphs 1 through 5 of the Second Amended Complaint.

27.     Reveal is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 27 of the Second Amended Complaint.

28.     Reveal denies the allegations in Paragraph 28 of the Second Amended Complaint.

29.     Reveal denies the allegations in Paragraph 29 of the Second Amended Complaint.

30.     Reveal denies the allegations in Paragraph 30 of the Second Amended Complaint.

## COUNT SIX -- U.S. PATENT NO. 5,905,806

31.     In answering Paragraph 31, Reveal incorporates by reference its responses to Paragraphs 1 through 5 of the Second Amended Complaint.

32.     Reveal is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 32 of the Second Amended Complaint.

33.     Reveal denies the allegations in Paragraph 33 of the Second Amended Complaint.

34.     Reveal denies the allegations in Paragraph 34 of the Second Amended Complaint.

35.     Reveal denies the allegations in Paragraph 35 of the Second Amended Complaint.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

36.     Reveal does not infringe any valid and enforceable claim asserted in U.S. Patent No. 6,721,391 ("the '391 Patent"), U.S. Patent No. 5,642,393 ("the '393 Patent"), U.S. Patent

No. 5,838,758 ("the '758 Patent"), U.S. Patent No. 6,707,879 ("the '879 Patent"), U.S. Patent

No. 5,712,926 ("the '926 Patent") or U.S. Patent No. 5,905,806 ("the '806 Patent").

### Second Affirmative Defense

37.     Reveal has not induced and does not contribute to the infringement of any valid

and enforceable claim asserted in the '391 Patent, '393 Patent, '758 Patent, '879 Patent, '926

Patent or '806 Patent.

### Third Affirmative Defense

38.     One or more of the asserted patents may be invalid for failure to meet one or more

of the provisions of Title 35 of the United States Code.

### Fourth Affirmative Defense

39.     Plaintiff's causes of action are barred, in whole or in part, by 28 U.S.C. § 1498.

### Fifth Affirmative Defense

40.     Plaintiff's claims are barred, in whole or in part, because the issuance of an

injunction would not be consistent with the public interest and would violate public policy.

### Sixth Affirmative Defense

41.     The '879 Patent is unenforceable by virtue of inequitable conduct committed by

Plaintiff in connection with the prosecution of the application for the '879 Patent.  The acts

comprising such conduct included the intentional withholding from the United States Patent and Trademark Office ("USPTO") of relevant prior art.

42.    During prosecution of the '879 Patent, the inventors, or their attorneys, agents, representatives or assignees knowingly withheld relevant prior art from the USPTO with respect to one or more claims of the '879 Patent.

43.    On or about April 3, 2002, Plaintiff filed the application for the '879 Patent, U.S. Application No. 10/116,714, claiming priority from U.S. Provisional Application No. 60/281,068. On the same day, April 3, 2002, Plaintiff filed the application for the '391 Patent, U.S. 116/718, which also claimed priority from the same U.S. Provisional Application No. 60/281,068. The two patents have the same inventors and concern closely related subject matter.

44.    On or about August 19, 2003, the USPTO Examiner cited U.S. Patent No. 5,974,111 ("the '111 Patent") in a First Office Action for the '391 Patent as the basis for rejecting claims in the application. Plaintiff did not respond to the '111 Patent issues because, for some unknown reason, the Notice of Allowance for the '391 Patent then issued before a response to the First Office Action was filed.

45.    The prosecution of the '879 Patent continued for more than seven months after Plaintiff received notice of the existence of the '111 Patent and eventually issued on March 16, 2004. Despite its knowledge of the obvious and material relevance of '111 Patent to the '879 Application during this lengthy period, Plaintiff did not disclose the existence of the '111 Patent to the USPTO during the prosecution of the '879 Patent.

46.    Upon information and belief, Plaintiff's failure to disclose the existence of the '111 Patent to the USPTO during the prosecution of the '879 Patent was made with intent to deceive.

47.    The '879 Patent is unenforceable as a result of the statements, misstatements, and omissions made during prosecution of the '879 Patent.

**Seventh Affirmative Defense**

48.    The '391 and '879 Patents are unenforceable by virtue of inequitable conduct committed by Plaintiff in the prosecution of these Patents. These patents share a common patent application and virtually identical specifications. The acts comprising such conduct included the intentional withholding from the USPTO of relevant prior art.

49.    During prosecution of these Patents, Plaintiff was aware of its own Operator, Functional and Technical Manuals and related documents, including Requests for Proposals from airports specifying and describing networked baggage screening systems for the detection of explosives. In addition, Plaintiff was aware of its own patents and articles disclosing and discussing networked baggage screening systems, including United States Patent No. 6,218,943.

50.    Rather than disclosing its networked baggage screening system and thus related material, Plaintiff disclosed to the USPTO only its stand alone baggage screening device.

51.    Currently, Plaintiff claims that Defendant's networked baggage screening system infringes the '391 and '879 patents. Defendant's baggage screening system is now described by Plaintiff in a manner that is functionally equivalent to that marketed by Plaintiff prior to the filing of the '391 and 849 Patents.

52.    During the prosecution of the '879 Patent, Plaintiff agreed that the art of record did not disclose a number of elements in the claims, such as a "unique item identifier" linking the information to an item of baggage, a "remote workstation", recording screening information", or a controlling information transfer via a "server". Plaintiff's own articles and materials disclosed

these prior art elements as part of its own preexisting networked system.  Further, Plaintiff

demanded that the Examiner produce evidence of a prior art "network server" if one existed,

when Plaintiff had previously disclosed such an element in its own documents.

53.    Despite the knowledge and the material relevance of these materials to these

Patent Applications, they were not disclosed to the USPTO by Defendant.

54.    Upon information and belief, Plaintiff's failure to disclose the existence of these

materials to the USPTO during the prosecution of these Patents was made with intent to deceive.

55.    The '391 and '879 Patents are unenforceable as a result of the statements,

misstatements, and omissions made during prosecution of the '391 and '879 Patents.


**<u>Eighth Affirmative Defense</u>**

56.    The '391 Patent, '393 Patent, '758 Patent, '879 Patent, '926 Patent and '806

Patent are unenforceable due to patent misuse.  Plaintiff engaged in patent misuse by knowingly

pursuing claims for infringement despite knowledge of the invalidity of the asserted claims of the

'391, '393, '758, '879, '926 and '806 Patents.

57.    On May 16, 2005, L-3 set forth its preliminary proposed claim constructions for

the 391, '393, and '758 Patents.  On June 13, 2005, L-3 set forth its preliminary proposed claim

constructions for the '926, '806 and '879 Patents.

58.    Using L-3's proposed claim construction, Reveal filed Requests for

Reexamination with the USPTO for the '391 Patent (on July 29, 2005), '393 Patent (on May 27,

2005), '758 Patent (on June 17, 2005), '879 Patent (on August 1, 2005), '926 Patent (on July 29,

2005) and '806 Patent (on July 29, 2005).  Reveal's Reexamination Requests and as well as other

prior art including L-3 own products provide clear evidence of the invalidity of each asserted

claim of each asserted patent using L-3's own claim constructions. The USPTO has granted requests for reexamination for all the Patents in suit and has concluded that there are substantial new issues as to patentability for all of the asserted claims of the patents in suit.

59.    On information and belief, Plaintiff's decision to continue its lawsuit knowing all the asserted claims of the Patents in suit are invalid the prior art including its own product sales and over prior art provided by Reveal in its Requests for Reexamination constitutes patent misuse and is a purposeful business decision by Plaintiff to improperly prohibit Reveal from selling its CT-80 EDS machines.

## REVEAL'S COUNTERCLAIMS

### PARTIES

60.    L-3 is a Delaware corporation with a principal place of business in Woburn, Massachusetts. L-3 is a wholly owned subsidiary of L-3 Communications Corporation, a multi-billion dollar conglomerate that supplies, among other things, intelligence, surveillance, avionics, and defense-based products.

61.    Reveal is a Delaware corporation with a principal place of business at 201 Burlington Road, Bedford, Massachusetts. Reveal is a venture-funded start-up company that was formed in the fall of 2002.

### JURISDICTION AND VENUE

62.    This Court has subject matter jurisdiction over Reveal's Counterclaim against L-3 pursuant to 28 U.S.C. §1331 (federal question jurisdiction), §1338 (a) (patent jurisdiction), §2201 (declaration summary jurisdiction), and Sections 4 and 16 of the Clayton Act, as

amended, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. § 1337 for violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

63.    Venue in this Court is proper pursuant to Sections 4 and 12 of the Clayton Act, as amended, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(c).


## COUNT I -- DECLARATORY JUDGMENT

64.    Reveal realleges and incorporates herein by reference the allegations of Paragraphs 60 through 63 of this Counterclaim.

65.    In its Complaint, L-3 alleges that it is the owner of U.S. Patent No. 6,721,391 ("the '391 Patent"), U.S. Patent No. 5,642,393 ("the '393 Patent"), U.S. Patent No. 5,838,758 ("the '758 Patent"), U.S. Patent No. 6,707,879 ("the '879 Patent"), U.S. Patent No. 5,712,926 ("the '926 Patent") and U.S. Patent No. 5,905,806 ("the '806 Patent").

66.    In its Complaint, L-3 alleges that Reveal infringes, induces infringement and contributes to infringement of the '391, '393, '758, '879, '926 and '806 Patents.

67.    Reveal expressly denies that it infringes, induces infringement or contributes to infringement of any asserted claim of the '391, '393, '758, '879, '926 and '806 Patents.

68.    An actual case or controversy exists as to whether Reveal has infringed, induced infringement or contributed to infringement of any valid claim of these patents.

69.    Reveal seeks a declaration by this Court that Reveal does not infringe on any valid claim of the asserted patents.

## COUNT II -- EXCEPTIONAL CASE

70.     Reveal realleges and incorporates herein by reference the allegation of Paragraphs 60 through 69 of the Counterclaim.

71.     Under 35 U.S.C. § 285, this is an exceptional case entitling Reveal to an award of its reasonable attorneys' fees.

## COUNT III -- FACTUAL ALLEGATIONS ON ANTI-TRUST CLAIM

72.     Reveal realleges and incorporates herein by reference the allegations of Paragraphs 60 through 71 of this Counterclaim.

73.     Reveal Imaging Technologies, Inc. ("Reveal") brings this counterclaim for damages against L-3 Communications Security and Detection Systems, Inc. ("L-3") under section 2 of the Sherman Anti-Trust Act and as an "exceptional case" under 35 U.S.C. § 285.  L-3's claims of patent infringement against Reveal are objectively baseless, and were brought for the purpose of preventing Reveal from entering into the market as a manufacturer and seller of explosive detection systems ("EDS") certified by the United States government for baggage inspection in U.S. airports.

74.     The United States government is the sole purchaser of EDS machines for U.S. airports and other governmental security purposes.  Reveal's CT-80 machine was recently certified by the U.S. Transportation Safety Administration ("TSA"), opening the way for the sale of the CT-80 to the government for placement in U.S. airports and for other governmental security uses.

75.     Until Reveal developed the CT-80, L-3 and GE (formerly InVision Technologies, Inc.), were the only two manufacturers of EDS machines in the United States with the

governmental certification necessary to allow their purchase by the United States government. The entry of Reveal into this market will disturb L-3's monopolistic position.

76.      L-3 seeks to use this suit and other baseless litigation, in conjunction with its superior economic position as the wholly owned subsidiary of a multi-billion dollar company, to maintain its partial monopoly on the sale of EDS machines in the U.S.


## THE CT-80

77.      Reveal is the manufacturer of the CT-80, an EDS machine designed to screen airport baggage for explosives.  The CT-80 is significantly lighter, smaller and less expensive than any other EDS machine on the market.

78.      Current EDS technology, including the CT-80, is based primarily on the use of computed tomography ("CT") (sometimes also known as "computed axial tomography" ("CAT")) scanning to screen baggage for explosives.

79.      The CT-80 was developed, tested, and recently certified by the TSA with funding support from the government, including $5.4 million to further the government's goal of developing the next-generation EDS technology to improve airport security in the United States.

80.      The United States government is the only purchaser of EDS machines for the nation's airports and for other governmental security purposes.

81.      Prior to Reveal's development of the CT-80, only L-3 and General Electric manufactured EDS machines certified by the United States government and, therefore, L-3 and General Electric were the only two companies manufacturing EDS machines eligible for purchase by the United States government for installation in the nation's airports and for other governmental security purposes.

82.     With the certification of Reveal's CT-80 by the TSA, Reveal became the third company with an EDS machine eligible for purchase by the U.S. government.

83.     L-3's EDS machine is approximately the size of minivans or SUVs, weighs close to 9,000 pounds, and costs approximately $1 million each.  In contrast, Reveal's CT-80 is approximately the size of a golf cart, weighs under 4,000 pounds, and costs one third of EDS machines produced by L-3.

84.     Unlike L-3's EDS machine, Reveal's CT-80 is small enough to fit into the check-in desk at airline ticket counters, so that a passenger's bag can be scanned for explosives while he/she is being checked in.

85.     The CT-80 also uses technology that is innovative and can reduce the number of "false positives" in baggage screening and, thus, provides more efficient baggage screening.

86.     The size and cost of Reveal's CT-80 and the certification of the CT-80 for sale to the United States Government pose a serious risk to L-3's market position.


**THE GOVERNMENT'S NEXT-GENERATION EDS GRANT PROGRAM**

87.     Following the September 11, 2001 terrorist attacks, Congress sought to accelerate improvements to EDS technology in order to improve baggage screening at airports in the United States.

88.     During Congressional hearings in 2001, the Inspector General for the U.S. Department of Transportation testified that there were only two (2) certified EDS manufacturers in the United States - - InVision (now General Electric) and L-3.  He also testified that

> . . . In an effort to promote competition, FAA's Fiscal Year 2001
> appropriation contained language requiring it to purchase equal amounts
> of bulk explosive detection equipment from both certified sources.  This

required FAA to purchase one L-3 examiner 6000 machine for every InVision Technologies CTX purchased.

89.    The Inspector General also reported to Congress that

there have been problems with L-3 Communications equipment, so the air carriers have been reluctant to accept these machines.  As a result, nine machines are being currently warehoused by L-3 until the problems with the machines can be resolved.

See Congressional Testimony by Honorable Kenneth Mead before House Subcommittee on Aviation of the Committee on Transportation and Infrastructure, 107th Congress (October 11, 2001) at p. 10

90.    After the attacks of September 11, 2001, the Government sought to encourage the development of a new generation of EDS machines that were better, smaller, and cheaper so that they could be placed in every airport in the country.

91.    In October 2002, the TSA informed the aviation security industry that it would commence two grant programs for the design, development, and testing of new EDS technology: the Phoenix Program and the Manhattan II Program.  The Phoenix Program would focus on designing and then deploying next-generation EDS technology for scanning checked baggage within a two-year window.  The Manhattan II Program would focus on developing and deploying next-generation EDS technology within a five to ten year window.

92.    In the fall of 2002, Reveal began developing products and services in the aviation security field.  Reveal's aim was to develop EDS solutions that would meet the government's needs and requirements and be eligible for the grants that would be available for the development of the next generation of EDS technology for the TSA.

93.    In August 2003, in response to the TSA's Phoenix Program Request for Proposal, Reveal applied for a grant from the TSA Phoenix grant program to develop a smaller, less expensive but highly accurate EDS for installation in U.S. airports.

94.    The Phoenix RFP stated that the TSA would play an active role in evaluating and approving the proposed EDS designs.  The proposal required that Reveal provide to the TSA, among other things, the design process, hardware fabrication and software architecture, detection algorithms, plans for configuration management, reliability, quality assurance, production, and logistics support, all with supporting illustrations, for the proposed EDS.

95.    On September 25, 2003, Reveal was awarded a $2.4 million grant by the TSA to develop and build Reveal's CT-80 baggage screener under the TSA's Phoenix Program.  This grant was eventually increased to $4.7 million and then to $5.4 million upon the successful completion of key technical milestones.  The TSA awarded other Phoenix Project grants to Analogic Corporation, Lockheed Martin and InVision.  L-3 also presented proposals to the TSA for multiple grants, but its proposals were rejected.

96.    L-3 has conceded that its failure to obtain government funding for the purpose of developing a next-generation EDS machine was a blow to its competitive position:

> The Phoenix and Manhattan II are integrated projects which provide substantial government funding for the development and improvement of EDS for checked baggage for the foreseeable future.  The failure to obtain that funding will severely undermine L-3's ability to participate in this critical and expanding market for the next ten years.

Complaint, L-3 Communications Security and Detection Systems, Inc. v. Analogic Corporation, at ¶22).

97.    Shortly after the TSA's public announcement of a Phoenix grant to Reveal (and the denial of L-3's proposal), L-3's counsel sent a letter dated October 15, 2003, alleging that Reveal and its officers were misappropriating L-3's intellectual property in connection with Reveal's proposal to the TSA.  L-3's counsel did not identify any specific patent or trade secret that Reveal allegedly was misappropriating or infringing.

98.     In response to the allegations proffered by L-3's counsel, Reveal proposed that the parties engage an independent third-party expert to compare L-3's allegedly misappropriated intellectual property with Reveal's CT-80 technology and make a determination as to whether the CT-80 incorporated any L-3 trade secrets or patented technology. L-3 failed to respond to Reveal's offer, choosing instead to commence litigation.

## L-3'S BAD FAITH LITIGATION IN THE MASSACHUSETTS SUPERIOR COURT

99.     In December 2003, L-3 brought numerous claims against Reveal and six of its employees (the "Reveal Parties") in the Massachusetts Superior Court alleging that Reveal Parties had misappropriated L-3's trade secrets and were in violation of certain non-competition and intellectual property assignment agreements with prior employers. L-3 was not a party to any of these agreements, but claimed the right to enforce them as "assignee and successor-interest." L-3 even alleged that, by joining Reveal, one employee was in violation of a 13-year old non-competition agreement that he entered with Hologic, Inc., a medical X-ray company that he had left over ten years earlier. L-3 sought monetary damages as well as injunctive relief to enforce these agreements to which L-3 was not even a party.

100.     L-3 was aware that Reveal was a small company with limited financial resources and sought to use the expense of this litigation to force Reveal out of the market.

101.     On December 2, 2004, the State Court dismissed all of L-3's contract-based claims holding that, as a matter of law and public policy, L-3 could not enforce agreements held by prior employers. The Court also questioned L-3's trade secret allegations, stating that, after a year of litigation, "neither this Court, nor, it appears, the Reveal Parties, yet knows what those

trade secrets are with sufficient definition to determine whether they are secrets, or if they have

been taken and are being used in any way by the Reveal Parties."

## L-3'S PATENT LITIGATION IN THE FEDERAL COURT

102.   During the course of the State Action, the Reveal Parties produced extensive

discovery to L-3 comprising tens of thousands of electronic files on 19 DVDs and CDs, and

nearly 5000 pages of documents.  These documents conveyed in detail the design specifications

for the hardware, software, algorithms, networking and physical architecture of the CT-80

machine.

103.   The Reveal Parties also produced to L-3 a due diligence review of L-3's patents,

including U.S. Patent No. 5,642,393 ("the '393 patent") and U.S. Patent No. 5,838,758 ("the

'758 patent"),  U.S. Patent No. 5,712,926 ("the '926 patent"); and U.S. Patent No. 5,905,806

("the '806 patent"), which was undertaken to ensure that Reveal's proposed technology did not

infringe on any existing patents.  Reveal also produced an independent analysis ("Aptec Report")

conducted for Reveal's venture capital firm investors *before* they invested in Reveal.  The Aptec

Report concluded that Reveal's trade secrets and confidential technology were unique and did

not infringe on existing proprietary technology.  Despite the detailed information produced by

Reveal confirming that L-3 has no basis for its claim, L-3 has continued with the State Court

litigation and brought this separate action alleging willful patent infringement

104.   On July 14, 2004, Mr. Ellenbogen, the President of Reveal, testified before the

U.S. House Subcommittee on Aviation on the subject of the development and deployment of in-

line explosive detection systems.  A senior L-3 executive was present at this hearing.  At that

hearing, the ranking member of the committee expressed his continued concern that Congress

was not doing enough to ensure that the latest EDS technology was being developed and deployed as quickly as possible. Mr. Ellenbogen then proceeded to inform the committee about the progress of the design and manufacture of the CT-80 for the TSA. The Chairman of the Committee, U.S. Representative John Mica, asked the TSA, in the presence of L-3's vice-president and general manager, when Reveal's machine would be certified. Randy Null, the Acting Assistant Administrator for Aviation Operations, responded that he hoped the CT-80 would undergo certification testing by the end of the summer and then sometime thereafter be certified as an EDS system.

105.    Shortly after this Congressional hearing, L-3 commenced this action for patent infringement.

106.    As part of the federal patent infringement case, Reveal's counsel agreed that L-3's litigation counsel could have access to and use the discovery produced in the State Action. Notwithstanding the discovery provided to L-3 in the State Action, L-3's patent infringement complaint was bereft of any factual allegations on how Reveal's CT-80 allegedly infringes on the Patents in suit.

107.    L-3 has admitted that the "EDS certification process is difficult and time-consuming." Knowing this and the related expense to be incurred by Reveal, L-3 chose to file its original complaint in this case against Reveal in August 2004 - - approximately one month after learning that Reveal's CT-80 would undergo the difficult, expensive and lengthy certification testing by the end of the summer.

108.    L-3's original complaint contended that Reveal's CT-80 infringes the '391 Patent, which patent was issued on April 13, 2004. L-3's complaint sought damages and injunctive relief.

109.     Twenty-three days later, L-3 filed its First Amended Complaint adding claims that the CT-80 infringes on two more patents.

110.     On December 21, 2004, the TSA certified Reveal's CT-80 as an EDS, making Reveal only the third EDS company in the United States and threatening to break L-3's partial monopoly on the market.  In a February 15, 2005 report to the U.S. Senate, the Assistant Secretary of the Department of Homeland Security ("DHS") described the certification of the CT-80 technology as one its major accomplishments for 2004.

111.     In recent testimony before Congress, the TSA has stated that Reveal's technology is the "future" of its approach to airport security.

112.     On March 3, 2005, Admiral Stone, the Assistant Secretary of the DHS, testified publicly before Congress that airports are requesting the type of next generation EDS technology made by Reveal and that providing those airports with "Reveal-type" technology is a high priority for the TSA.

113.     On March 16, 2005, L-3 sought to amend its complaint for a second time.  The Second Amended Complaint alleges that Reveal is infringing three additional L-3 patents: United States patent no. 6,707,879 (the '879 patent), no. 5,905,806 ("the '806 patent") and no. 5,712,926 ("the '926 patent").

114.     Each of these patents was issued well before the original Complaint in this matter was filed in August 2004.  The '879 patent issued in March 2004.  The '806 and the '926 patents issued in 1999 and 1998 respectively.  Therefore, L-3 was well aware of those patents prior to the filing of the Complaint.  By virtue of the discovery provided by Reveal to L-3 in the State Action, L-3 also has had access to detailed technical information regarding the operation of the CT-80 since at least July 2004.  Nonetheless, L-3 did not allege infringement of the '806, '926

and '879 patents until <u>after</u> the certification of the CT-80 and the pilot government program for

the CT-80 commenced.  L-3 asserted these three patents infringement claims in the hope of

derailing Reveal's negotiations with the TSA for purchase of the CT-80.

## L-3'S OTHER LAWSUITS TO PREVENT OTHER COMPANIES FROM BREAKING INTO THE EDS MARKET

115.    Reveal is not the only victim of L-3's predatory and anti-competitive litigation

practices.  L-3 has sued other security companies that have attempted to break into the EDS field.

116.    Specifically, as part of L-3's acquisition of the detection system business of

PerkinElmer, Inc., L-3 had agreed to sell to another EDS manufacturer, OSI, various product

lines, including the VCT-30, which was an EDS product developed by PerkinElmer under the

federal ARGUS grant program.  In OSI's January 2, 2002 public announcement, it made it clear

that acquisition of the EDS product was of crucial importance to it:

> As part of the agreement, OSI Systems will acquire from L-3
> PerkinElmer's businesses pertaining to carry-on passenger baggage
> screening including services, as well as all technologies and rights
> associated with PerkinElmer's ARGUS explosive detection X-ray
> system. . . . ARGUS is envisioned as a lower-cost technology to
> complement the larger, higher throughput current FAA certified
> Explosive Detection Systems (EDS).  The FAA has also issued a
> single grant for the development of an even smaller, Explosive
> Detection Device (EDD) named BANTAM.  OSI Systems is the
> lone recipient of this phase two contract. . . .
>
> Additionally, the acquisition of PerkinElmer's ARGUS technology
> when combined with our recently announced FAA grant for the
> development of BANTAM gives us a solid technology footing in
> the potential market for certified explosive detection systems.

117.    L-3 also confirmed in a press release that OSI had an agreement with L-3 to

purchase certain pieces of the PerkinElmer Detection Systems business, including the ARGUS

product line.

118.    However, after L-3 acquired PerkinElmer's Detection System business in July

2002, L-3 refused to sell OSI any part of the business, including the VCT-30.  In November

2002, L-3 sued OSI seeking a declaratory judgment in the Federal Court for the Southern District

of New York that it was not required to sell any part of the PerkinElmer's Detection System

business, including the EDS certified VCT-30, to OSI.  Recently, the Court granted OSI partial

summary judgment holding that L-3 owed OSI a fiduciary duty in connection with PerkinElmer,

Inc.'s sale of its Detection Systems business.

119.    In June 2004, L-3 sued Analogic, its own supplier of CT systems used in L-3's

EDS products, in the Delaware Chancery Court claiming that Analogic violated a so-called

"Teaming Agreement" by deciding to submit its own Phoenix grant proposal in partnership with

Lockheed Martin (L-3's predecessor company) to design and develop the next-generation EDS

machine for the TSA.  Analogic and Lockheed Martin were awarded a Phoenix grant, while L-3

was not.  In bringing the complaint, L-3 labeled Analogic a "competitor."  L-3 further admitted

that:

> The market for EDS is very competitive.  While only one company other than L-3
> [i.e. InVision]has currently been certified for the sale of EDS for checked baggage
> in the United States, many other companies are now attempting to enter the
> market and obtain certification for their equipment.  Several of those companies
> also submitted proposals in connection with the Phoenix and Manhattan II
> programs.  While L-3 currently has an excellent position in the market for EDS
> for checked baggage, L-3's ability to innovate and upgrade its product because of
> Analogic's breaches of the Teaming Agreement threatens to diminish, and
> ultimately eliminate L-3's ability to maintain its market share."

Analogic Complaint at ¶¶ 16, 18.

120.    The Teaming Agreement on which L-3 sued Analogic expressly provides that

Analogic is permitted to "engineer and manufacture electronic and other systems, components

and subassemblies and sell them to third persons, even if those third persons intend to use them

in the manufacture of devices competitive with the business which [L-3] intends to enter into the field."  The Teaming Agreement also expressly provides that Analogic could "design and/or manufacture CT devices, systems, components, or subassemblies, as well as other types of electronic devices, systems and/or subassemblies for a third party."

121.    These actions confirm the willingness of L-3 to use litigation as a predatory tactic to stifle competition.  This case commenced by L-3 against Reveal is knowingly and objectively baseless and intended solely to harass Reveal, to impose additional expense on a small company and to attempt to drive Reveal out of the EDS market.


**COUNT III -- VIOLATION OF THE SHERMAN ANTI-TRUST ACT, 15 U.S.C. § 2**

122.    Reveal realleges and incorporates herein by reference the allegation of Paragraphs 1 through 121 of the Answer and Counterclaim.

123.    L-3 has violated 15 U.S.C. § 2, which makes illegal the acts of "[e]very person who shall monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce among several States, or with foreign nations. . . ."

124.    There is a relevant product market in the United States for selling EDS machines to the United States government to install at domestic airports for the screening of airport baggage for explosives.

125.    There is a foreign market to sell EDS machines to foreign governments and airport authorities to install at airports for the screening of airport baggage for explosives.

126.    L-3 has attempted to monopolize the relevant market for EDS market in the United States, as well as the foreign EDS market, by bringing claims for willful patent infringement against Reveal's only EDS product (the CT-80) that are objectively baseless.

127.    L-3, knowing that its claims were objectively baseless, brought its claims with the intent to directly interfere with Reveal's business in the EDS market.  Specifically, L-3 brought its claims to maintain its dualopoly in the EDS market, prevent Reveal from competing with it in the relevant product and geographic market for EDS machines and drive Reveal out of business, if possible.

128.    L-3's litigation conduct has a dangerous probability of succeeding in eliminating Reveal as a competitor in the EDS market, especially given the enormous disparity of financial resources between Reveal and L-3.

129.    L-3's conduct has a direct, substantial, negative anticompetitive effect on interstate commerce.

130.    L-3's conduct has a direct, substantial, negative anticompetitive effect on export trade or export commerce with foreign nations.

131.    Reveal has suffered and will continue to suffer damages as a result of L-3's attempt to monopolize the relevant product market for EDS machines.


## COUNT IV -- ANTI-TRUST CLAIM FOR PATENT MISUSE

132.    Reveal realleges and incorporates herein by reference the allegations of Paragraphs 60 to 131 of this Counterclaim.

133.    The relevant market for evaluating the allegations in this Counterclaim is the market for EDS machines.  The relevant geographic component of this market is the United States.

134.    Plaintiff is a manufacturer of EDS machines, and until Reveal developed the CT-80, L-3 and GE were the only two manufacturers of EDS machines in the United States with the governmental certification necessary to allow their purchase by the United States government.

135.    Upon information and belief, Plaintiff's manufacturing capabilities constitute market power sufficient to establish an anti-trust claim for patent misuse.

136.    On information and belief, Plaintiff has misused the '391, '393, '758, '879, '926 and '806 Patents by asserting infringement of the Patent in suit which it knows to be invalid and/or unenforceable and is a purposeful business decision by Plaintiff to improperly prohibit Reveal from selling its CT-80 EDS machines in violation of anti-trust law.

137.    This is an exception case under the provisions of 35 U.S.C. §§ 285 and Reveal is accordingly entitled to an award of reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Reveal respectfully requests that this Court dismiss Plaintiff's claims in their entirety, deny Plaintiff's request for injunctive relief, enter judgment in favor of Reveal on all counts.  In addition, Reveal seeks the following relief under its Counterclaims against L-3:

a.    A declaration from the Court that the '391, '393, '758, '879, '926 and '806 Patents are invalid, unenforceable or void;

b.    A declaration from the Court that the '879 and '391 Patents are unenforceable because of Plaintiff's inequitable conduct;

c.    A declaration from the Court that the '391, '393, '758, '879, '926 and '806 Patents are unenforceable because of Plaintiff's patent misuse;

d.    A declaration from the Court that Reveal is not and has not been infringing, inducing infringement or contributing to infringement of any valid claim of the '391, '393, '758, '879, '926 and '806 Patents;

e.    A finding by the Court that this is an exceptional case under 35 U.S.C. § 285 and an Order requiring L-3 to pay to Reveal its reasonable attorneys' fees;

f.    That Reveal be awarded damages under its anti-trust counterclaim, to be trebled according to law, for injury to its business and property, together with the costs of suit, including reasonable attorneys' fees;

g.    That Reveal be awarded damages under its anti-trust counterclaim for patent misuse, to be trebled according to law, for injury to its business and property, together with the costs of suit, including reasonable attorneys' fees;

h.    That the Court issue a permanent injunction prohibiting, enjoining and restraining L-3 from continuing the violations of the laws as herein alleged; and

i.    That this Court award such other relief as it deems just and appropriate.

**REVEAL IMAGING TECHNOLOGIES, INC.,**

By its attorneys,

/s/ H. Joseph Hameline
H. Joseph Hameline (BBO# 218710)
A. Jason Mirabito (BBO # 349440)
Michael T. Renaud (BBO # 629783)
Mintz, Levin, Cohn, Ferris, Glovsky
  and Popeo, P.C.
One Financial Center
Boston, MA 02111
Tel.  (617) 542-6000
Fax  (617) 542-2241

Dated:  October 21, 2005