# EXHIBIT A
## TO
## MOTION FOR LEAVE TO FILE
## SUPPLEMENTAL INVALIDITY REPORT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| L-3 COMMUNICATIONS, SECURITY AND DETECTION SYSTEMS, INC.,<br>    Plaintiff,<br><br>    v.<br><br>REVEAL IMAGING TECHNOLOGIES, INC.,<br>    Defendant. | C.A. No. 04-11884-NG<br>(Magistrate Judge Judith Gail Dein) |

## SUPPLEMENTAL REPORT OF NORBERT J. PELC ON INVALIDITY

This report is submitted as a supplement to my report on invalidity dated October 18, 2005.

1. In my prior report I discussed the method of scoutview which has been used, particularly in medical applications, since before 1980. I also discussed an article by Dr. Fred Roder entitled "The Evolution of Computed Tomography As An Explosives Detection Modality" and a report which is cited in the references section of that article entitled "Dual-Energy Computed Tomographic Explosives and Suitcase Characterization Study" ("1987 Imatron Study"). I had not had access to that study by the time of my October 18, 2005 report. I had discussed the work performed as part of that study with Elan Scheinman, who described the study consistently with what is disclosed in the 1987 Imatron Study. I have now reviewed the 1987 Imatron Study, a copy of which is attached to this supplemental report. All citations in this report are to the 1987 Imatron Study unless stated otherwise.

**Overview of the Study**

2.  In general, the report discusses work performed by Imatron, Inc. under a contract with the University of California at Los Angeles ("UCLA") which was in turn funded by a contract between the Federal Aviation Administration ("FAA") and UCLA. I understand that this report was recently obtained from the Transportation Security Administration ("TSA") archives.

3.  The work was done using a Technicare 2060Q medical CT scanner connected to both a physician's console and an operator's console (pp. 3-4, Figs. 2.2 and 2.3). I am familiar with the Technicare 2060Q from my experience in medical CT, and the scanner is described generally in the 1987 Imatron Study, and a photograph is included. This CT scanner employs an x-ray source and an array of detector elements located on a gantry. It also has a patient bed that moves the patient through the gantry. During CT imaging, the object is stationary and the source rotates around the object. A projection scan is taken with the source stationary and the object moving through the beam on the patient bed. Based on the results of the projection scan, a decision can be made as to whether to take CT slices, and at what precise locations. The bed then moves the patient to the selected location and stops and a static CT slice is taken. In the 1987 Imatron Study, projection and CT scans of explosives and suitcases were performed, and the projection scan was used to decide where to take CT slices (p. 6, p. 14).

4.  Initially, Imatron performed a study using projection imaging (using the scoutview method I described in my previous report) and dual-energy computed tomography to characterize a several parameters, including density, of a number of explosives at the Bureau of Mines. The characterization tests were performed in June, 1987.

5.      The explosives were analyzed separately and also as placed in a packed suitcase. Projection images were acquired and CT scans were taken at intervals along the length of the luggage. The CT scanning enabled the investigators to generate a data set of the density parameters of various explosives and other items. In addition, data sets comprised of a large number (*e.g.*, 34 on p. 32) of contiguous CT slices were collected. These 3D data sets enabled the three-dimensional volumetric imaging of explosives (p. 12) and other items concealed in luggage (p. 32). This data characterizing the explosives could then be used to select the appropriate parameters for the detection of explosives in luggage.

6.      The second set of tests was performed at the TWA terminal at LAX from June 22 through August 7, 1987. Suitcases were selected from TWA baggage lines and brought to the trailer containing the Technicare CT scanner and peripheral equipment. TWA personnel brought the suitcases to the trailer and, I understand, were present for certain of the testing. Imatron personnel performed the tests.

7.      A suitcase would be run through the scanner and a projection image was acquired. Based on the projection image, the operator selected locations for static CT scans of the luggage (p. 32). The report noted that this selection process and the movement of the luggage to the appropriate location for the CT scan could be automated (p. 44). In each CT slice, regions of interest (ROIs) were selected for analysis based on density and size (p. 34). The area of the ROI (the number of pixels in the ROI, which I understand L-3 is willing to interpret as a volume) was computed and compared to a threshold (p. 34). The characteristics of items in the suitcases were compared to the characteristics for explosives.

8.      Image tapes from the scanning at LAX were also produced and brought to an off-site location for archiving and subsequent review and analysis.

3

9. The 3D CT data was also analyzed in a three-dimensional imaging mode using a Dimensional Medical Imaging (DMI) system (p. 32). From a 3D data set collected of a suitcase containing 5 sticks of water gel explosive, a sheet explosive, and clothing, the investigators produced a number of 3D visualizations including an image with the clothing stripped away, a 3D image of the water gel extracted from the suitcase, and a 3D image of the sheet explosive extracted from the suitcase (p. 34). To obtain the latter two images, the DMI system must have compiled 3D regions of connected voxels with similar densities.

**Results of the Tests**

10. The results of the CT scanning of the known explosives provided measured density distributions of a number of explosives. The data from multiple contiguous slices along a bag also allowed items in the bag to be analyzed and characterized in three dimensions.

11. At LAX, the investigators set thresholds for object size (volume, *e.g.*, 1.6 sq. in. on p. 34) and mass (*e.g.*, a pound on p. 34) to rule out smaller objects. A density threshold was also established so only objects of a density above 0.5gm/cc (a low end density for explosives) were analyzed.

12. The tests indicated that a density window or range could be selected for explosives and objects within that density range which exceeded a volume and/or mass threshold could be considered as suspect items. The objects themselves would be identified by combining pixels within a similar density range by means of an algorithm. An object which fell within the density range and met the volume and/or mass threshold could then be highlighted in color to show a potential threat, and then be obvious to the operator as a suspect item. Additional parameters for identifying suspect objects, such as measuring the total mass of an object were also suggested as appropriately utilized in any such system for detection of explosives.

4

13.     A high-speed process for detecting explosives was also suggested which would employ an algorithm to characterize the objects by density, volume and mass (p. 44). The study also suggested the use of a conveyor system for moving the luggage through the process, and also listed several engineering problems such as interscan delays, heat loading, and long reconstruction times that would need to be solved to increase throughput. Thus, the study envisions a CT system connected to a conveyor subsystem for moving baggage, and with high throughput image acquisition and reconstruction. In his deposition, Mr. Krug suggested definitions for the terms "on line" and "in real time." He said that to him the former means that the scanner is on a conveyor belt in line with other machines, and the latter means the answers are delivered in a short period of time. By these definitions, the CT system envisioned in the 1987 Imatron Study is on line and operates in real time.

14.     Finally, while the report focused on an automated process for explosive detection, it stated that the method could also be employed by an operator to perform further inspection (p. 45). While the report does not explicitly mention manual inspection, this would be obvious to the reader, especially after the report states that the 3D images provide a "radiographic strip search" (p. 45).

**Invalidity of the '758 Patent**

15.     As I stated in my earlier report, the 1987 Imatron Study anticipates or renders obvious claims 38-40, 43 and 55 of U.S. Patent No. 5,838,758 (the "'758 Patent"). The Study discloses, as in claim 38 of the '758 Patent, a conveyor for moving luggage, an x-ray inspection device operating as prescreener to locate suspect objects in luggage (*i.e.* suspect packages), the same conveyor for moving the luggage and a CT scanner to CT scan the luggage at the location of the suspect objects to detect explosives. Claims 39 and 40 claim a system where only suspect

5

regions are examined by the CT scanner. The Imatron system identified objects and took a CT slice through that suspect object or region.

16.     Claim 43 claims dual-energy CT scanning as part of the system. This was disclosed in detail in the Imatron Study; indeed, the study used dual-energy CT.

17.     Finally, Claim 55 claims a CT scanner which operates "on-line in real time." There is no clear disclosure in the specification as to what is meant by "on-line in real time." I am assuming that this meant, in 1990 (or 1995), a system which was operating and available and would provide data acquisition and rapid analysis (perhaps as opposed to data being sent elsewhere for analysis or stored for later analysis). This is consistent with Mr. Krug's definition. While the claim language is vague, the Imatron Study disclosed a computerized method to detect suspect regions in projection images, a method to collect CT data from those regions and computerized analysis of the data from CT slices of those regions using thresholds to minimize analysis and time, all with the use of a conveyor to move the luggage through the system and with emphasis on rapid acquisition and processing. This disclosure contains greater discussion, in fact, than any discussion in the '758 Patent directed to making the system "on-line, real time" system and renders Claim 55 invalid.

18.     In my opinion, based or the 1987 Imatron Study and related public use and disclosure, Claims 38-40, 43 and 55 of the '758 Patent are invalid.

### Invalidity of '926 and '806 Patents

19.     The same disclosure and related public use also render the U.S. Patent Nos. 5,712,926 ("926 Patent") and 5,905,806 ("806 Patent") '926 and '806 Patents anticipated and/or obvious.

20.    I have attached claim charts which apply the disclosures in the 1987 Imatron Study to the asserted claims in the '926 and '806 Patents.

Dated:    November 7, 2005

_Norbert Pelc_
Norbert J. Pelc