1

1      VOLUME: I

2      PAGES: 1 to 60

3      EXHIBITS: See Index

4

5      IN THE UNITED STATES DISTRICT COURT

6      FOR THE DISTRICT OF MASSACHUSETTS

7      - - - - - - - - - - - - - - - - - x

8      L-3 COMMUNICATIONS SECURITY

9      AND DETECTION SYSTEMS, INC.

10            Plaintiff            Civil Action

11                                 No. 04-11884-NG

12         v.

13                                 CERTIFIED ORIGINAL
                                   LEGALINK BOSTON

14     REVEAL IMAGING TECHNOLOGIES, INC.

15            Defendant

16     - - - - - - - - - - - - - - - - - x

17        DEPOSITION of NORBERT J. PELC, PH.D.

18           Friday, December 9, 2005

19                 9:49 a.m.

20         Wolf Greenfield & Sacks, P.C.

21            600 Atlantic Avenue

22            Boston, Massachusetts

23

24     Michelle Keegan, Court Reporter

11

1    listed on there, the 490 Distel Drive?

2        A.    That is my address.  I don't see it on the

3    document, but that is my home address, yeah, on the

4    last page.  The zip code is wrong.

5        Q.    What is the correct zip code?

6        A.    94022.

7        Q.    That's the correct one?

8        A.    Uh-hmm.

9        Q.    The documents that were brought and produced

10   to me today, were those produced in response to the

11   subpoena?

12       A.    I spoke with the Mintz attorneys about what

13   documents, if any, to bring because I was coming

14   from the west coast and all the documents that I

15   have were actually provided by Mintz.

16              And so we agreed that I would not bring

17   any documents and Mintz would produce the documents

18   that they had sent to me.

19       Q.    Okay.

20       A.    Or that we had exchanged.

21       Q.    Did you look at the Schedule A attached to

22   the subpoena to see if there was anything that you

23   considered or relied upon in forming your opinions

24   that perhaps Mintz had not provided to you?

Norbert J. Pelc, Ph.D.

12/09/05

12

1       A.  I glanced at it.

2       Q.  Okay.  Did you do a search for documents or

3  consider whether any additional documents should be

4  produced?

5       A.  I did look at my computer to see whether I

6  had old drafts.  And I did not.

7       Q.  What happened to the old drafts?

8       A.  My policy is to delete old drafts as new

9  drafts are made so as to avoid confusion.

10      Q.  And in your computer system what happens

11  after you delete a draft?  Where do the drafts go?

12  Are they archived somewhere?

13      A.  No.  This is my laptop.  I did this all on

14  my laptop.  I hit delete.  I empty the trash.

15          Could somebody go dig it out of the hard

16  drive?  I don't know, but I certainly can't.

17      Q.  Did you keep any notes or memos or anything

18  like is listed in item 3 of Schedule A?

19      A.  No.  I'm terrible with notes even on my own

20  private affairs.  I make notes, use them to write a

21  draft, for example, and then I toss them.

22      Q.  Okay.  And what about correspondence that

23  you've had with lawyers at Mintz Levin or anyone

24  else?

Norbert J. Pelc, Ph.D.                                    12/09/05

13

1      A.   The correspondence has only been with the

2   lawyers at Mintz.   I haven't had correspondence on

3   this case with anybody outside.

4      Q.   Okay.

5      A.   And it's all been either by e-mail or -- The

6   only other things that I have -- that I sent to

7   Mintz by mail were my invoices and then copies of my

8   previous testimony that were sent to Mintz, the

9   affidavits and reports that I filed in other cases.

10      Q.   **Are those items in this stack of material;**

11   **do you know?**

12      A.   I think the cover letter for those items is

13   there.   The document -- The previous testimony

14   documents are not in there.

15      Q.   **Are the invoices in here?**

16      A.   Yes.

17           MR. HAMELINE:   Bob, it's my assumption

18   you have all the documents that are referenced in

19   here, that we've produced them either with his

20   expert report or -- There are lists of the documents

21   that he relied on, so you should have all those

22   either in this case -- particularly in this case and

23   anything else that was produced in the state case.

24           MR. ABRAHAMSEN:   If not, it's included

Norbert J. Pelc, Ph.D.

12/09/05

14

1    in this stack of material; is that right?  For

2    example, I've never seen this letter here.

3                    MR. HAMELINE:  There are cover letters

4    to the materials that are there and there are the

5    bills, but the actual articles that are referenced

6    are not in this package.  They'd be a foot and a

7    half high.  I think they've all been Bates-stamped

8    and produced either with the report or during the

9    production.

10                    MR. ABRAHAMSEN:  That's fair.  I'm all

11    for saving trees.

12                    MR. HAMELINE:  Okay.

13                    MR. ABRAHAMSEN:  Again, I'm going to

14    take some time and review this later.  I may have

15    some questions on it.

16    BY MR. ABRAHAMSEN:

17        Q.  Let me ask you, are you represented at this

18    deposition today?

19        A.  I think so.

20        Q.  Okay.  Is Mr. Hameline your lawyer?

21        A.  I think so.  I'm treating him as if he is my

22    lawyer.

23        Q.  Okay.  So it's your belief that Mr. Hameline

24    is representing you at this deposition?

20

1    don't remember if Mr. Renaud was there.  I think

2    not.  Mr. Phinney was not the only Mintz attorney

3    who was present.

4        Q.  Okay.  And when was the first meeting or

5    other contact you had in connection with preparing

6    these reports in this case?

7        A.  Now more specifically with production of

8    these reports?

9        Q.  Correct.

10       A.  With respect to the invalidity reports, that

11   all happened long distance.

12       Q.  Okay.

13       A.  So we had telephone discussions.  And at

14   some point I recall that -- I think it -- my

15   recollection is that somebody from Mintz said, This

16   is sort of what the document should look like.  And

17   they sent me a document that had nothing to do with

18   this case but said, This is what it should look

19   like.  And then I started making a document that

20   looked like that.  Now, I might be confused whether

21   that was for the state case or the federal case.

22       Q.  Okay.  So you were given, basically, a

23   sample report of an unrelated case?

24       A.  Yeah, that's right.  For one of those cases.

Norbert J. Pelc, Ph.D.                                    12/09/05

21

1   So one of the reports that I've written in these

2   state, federal cases was like that.

3           At other times I would start completely

4   from scratch and write stuff.  At other times the

5   Mintz attorneys would send me first drafts that I

6   would edit.

7   Q.  With respect to the invalidity reports that

8   were marked as Exhibits 164 and 165, do you remember

9   whether you prepared the first draft of those

10  reports?

11  A.  My recollection is that Mintz prepared the

12  first draft of pieces of this.  And they sort of

13  came to me in pieces because some were written by --

14  I understand some of the first drafts were written

15  by Mr. Hameline and some were written by Mr. Renaud,

16  and then they would come to me.  I think it's fair

17  to say I tore them apart and rewrote them.

18          Also, some of the text that's in this

19  first report actually was taken from a document from

20  the state case.  So it's a document that I had

21  written that then got cut from that document, put in

22  here.  So even the first draft already contained

23  stuff that I had written from scratch.

24  Q.  It's your testimony that you did not retain

Norbert J. Pelc, Ph.D.

12/09/05

22

1    any of those drafts that were originally sent to

2    you, though?

3        A.   That's right, I have not retained any of

4    them.

5        Q.   Okay.   Now, you said you tore the drafts

6    apart?

7        A.   Yeah, yeah.

8        Q.   What did you mean by that?

9        A.   I guess I have my own particular style of

10   writing.   I agonize over the words I put on paper.

11   I wanted this to look and read like something I

12   would write both from a stylistic point of view but

13   also from a content point of view.   I took things

14   out, put things in, rearranged things.

15       Q.   What do you recall about a content point of

16   view, what you changed with regard to the substance

17   of the reports?

18       A.   They could go from the trivial to the very

19   serious.

20       Q.   Let's start with the very serious.

21       A.   Among the very serious ones, I recall an

22   invalidity argument that Mr. Renaud had suggested

23   that I eventually called him up and said I wouldn't

24   go along with that one.   I didn't think it made

Norbert J. Pelc, Ph.D.                                    12/09/05

23

1    sense.  So I deleted it altogether.

2         Q.  And what was that argument?

3         A.  I can't remember.  It was invalidity of some

4    claim by using some reference.  And I didn't think

5    that that's what the reference -- I didn't think the

6    reference was the best reference to use for an

7    argument like that.  So he said, Well, fine.  Get

8    rid of it.

9         Q.  Do you remember what the reference was?

10        A.  I don't remember the reference nor the

11   claim.  I guess since it was a discussion with

12   Mr. Renaud, it would have to be one of the Eberhard

13   patents.

14        Q.  Do the bills that you produced indicate how

15   much time you spent on various tasks, like drafting

16   reports, conversations, that sort of thing, or are

17   they more general as far as the amount of time

18   spent?

19        A.  The bills certainly separate out writing

20   from what I usually call regular consulting.

21   Regular consulting is somebody sends me some

22   references, wants me to read them, talk on the

23   phone, look things up, and so on.  So that -- I keep

24   track of those hours at a certain rate.

24

1              Putting together written testimony, as I

2    told you, is something that I take very seriously

3    and I find to be rather stressful, so I have a

4    higher rate for that.

5              So the invoices are broken up as to

6    regular versus writing and state versus federal.  So

7    you'll see that.

8         Q.  Okay.

9         A.  And I usually have -- Sometimes I have a

10   very broad sentence about what was going on, like I

11   worked on the invalidity report or something, but

12   not how many hours were on the telephone versus

13   reading versus whatever.

14        Q.  Okay.  I'll take a look at those later and

15   may ask some questions.

16        A.  Oh, sure.

17        Q.  Did you retain any e-mail correspondence

18   with the attorneys, or did you delete everything?

19        A.  I have some e-mail correspondence.  I delete

20   e-mails that are old, very old or very large.

21              For example, if they send me

22   Dr. Bijjani's deposition as an e-mail attachment --

23   My e-mail account tends to run close to full most of

24   the time, so I save the attachment and delete the

Norbert J. Pelc, Ph.D.                                    12/09/05

                                                                    25

1   e-mail.  Also, when things are old I delete them

2   just to keep the size of my e-mail account down.

3        Q.  Okay.  Now, when you completed your drafts

4   of the report or your modifications to their draft,

5   did you return or send drafts back to the Mintz

6   Levin lawyers?

7        A.  Yes.

8        Q.  Was that by e-mail also?

9        A.  That's right.  And I delete those, too, for

10  the same reason, because that gets to be a large

11  amount of data.  So I deleted those.

12       Q.  You deleted those from your sent items list?

13       A.  That's right.

14       Q.  And the reason you did that is, you say,

15  your memory?

16       A.  Twofold.  One is to avoid confusion.  Second

17  is the university yells at me.

18       Q.  For what?

19       A.  For my e-mail account being too big.  Just

20  storage space.

21       Q.  In one of the reports I notice you're

22  compensated at different rates for different tasks.

23       A.  I just explained that.  Regular versus

24  writing.

Norbert J. Pelc, Ph.D.                                    12/09/05

49

1    time the schedule of the state report was running

2    ahead of this case.  And those notes are destroyed.

3              In fact, I had to relearn some of these

4    things or be refreshed, if you'd like, about the

5    algorithmic issues in the CT-80.

6         Q.  Were any of your conversations with

7    Mr. Scheinman, Bijjani or Ellenbogen recorded in any

8    way?

9         A.  Not by me.  I don't know if they were.

10        Q.  Were you given any documents at your

11   meetings with those folks?

12        A.  No.  I think all the documents came ahead.

13   And every time I would get a FedEx package of

14   documents you'll see a cover letter among the things

15   that have been produced with a list of what was sent

16   to me.

17              And the only documents that we used, for

18   example, at the meeting when we were talking about

19   noninfringement were the patents themselves.

20        Q.  Okay.  Have you ever been given a document

21   describing the details of the detection algorithm

22   used by the CT-80?

23        A.  No.

24        Q.  You mentioned earlier that there were a few

Norbert J. Pelc, Ph.D.                                    12/09/05

50

1    aspects of your opinions that you may want to

2    amplify in the future.  Have you prepared any

3    supplemental opinions to be produced in this case?

4        A.   I've written a draft of some follow-on

5    opinions, yes.

6        Q.   Okay.  And where does that draft reside

7    currently?

8        A.   I have a copy of a draft and the Mintz

9    attorneys have a copy of that draft.

10       Q.   And you didn't bring a copy with you here

11   today, did you?

12       A.   No, I did not.  I brought nothing.

13            MR. ABRAHAMSEN:  I guess we'd ask that a

14   copy of that draft be collected today also.

15       Q.   So I assume you've discussed supplementing

16   your opinions with the Mintz lawyers?

17       A.   I have discussed supplemental opinions that

18   I have with the Mintz lawyers.  And again, they're

19   not -- They're amplifications more than anything

20   else and reactions to the things that I've

21   already -- I have not made it through the entire

22   rebuttal reports, but parts of it I have.  And so

23   some initial reactions to the rebuttal reports.

24       Q.   Okay.

Norbert J. Pelc, Ph.D.

12/09/05

51

1    A.   As to whether there is a supplemental

2    document or not, I don't know those things.   I

3    understand that there may be.

4    Q.   **Have you been informed one way or the other**

5    **whether there's an intent to file a supplemental**

6    **report or serve a supplemental report?**

7    A.   So I have to tell you I don't know the

8    difference between a report and an affidavit and

9    things like that.

10            I understand that Reveal intends to file

11   for summary judgment and that the summary judgment

12   motion will have a document attached to it that has

13   content from me.

14   Q.   **Okay.**

15   A.   I believe that the intent is to do that.

16   Q.   **Have you been shown a draft of the summary**

17   **judgment motion that you intend to file?**

18   A.   No.   The only part of it that could

19   eventually become part of that document is this new

20   material that I wrote.

21   Q.   **Have you been shown a draft of a declaration**

22   **or an affidavit to be used in the summary judgment**

23   **motion?**

24   A.   As I said, the only one is the one that I

52

1    wrote, the initial beginnings of a document that I

2    wrote.

3        Q.   Okay.   What have the Mintz lawyers told you

4    about their intent to file either -- to serve a

5    supplemental report or have you submit a declaration

6    or some other document?

7            MR. HAMELINE:   You can answer.   Sure.

8        A.   They intend to file for summary judgment and

9    that it will have attached to it a document that I

10   will write.

11       Q.   But that's the only thing you've been

12   instructed or asked to prepare in furtherance of

13   your opinions; is that correct?

14       A.   As I understand it, this document will be a

15   single document that summarizes all of my opinions

16   relevant to the motions for summary judgment.   Much

17   of it will come from cut and paste of the documents

18   that you already have with some additional material

19   that's coming from this thing that I just started to

20   write.

21       Q.   Okay.

22            MR. ABRAHAMSEN:   And Joe, you can get a

23   copy of that document today also?

24            MR. HAMELINE:   I can go over and ask for

Norbert J. Pelc, Ph.D.                                    12/09/05

53

1    it if the right people are there.

2                MR. ABRAHAMSEN:  It would be nice to

3    handle this while the witness is here in Boston.

4                MR. HAMELINE:  Sure.

5                MR. ABRAHAMSEN:  So why don't we adjourn

6    for now and reconvene.

7                How much time do you need?

8                MR. HAMELINE:  Well, I'll call you

9    because I don't know.  I don't know who's there.

10               (Recess taken)

11               MR. ABRAHAMSEN:  We had asked

12   Mr. Hameline to go back to his office and search

13   e-mails and other correspondence to try to identify

14   correspondence, drafts of reports, et cetera, that

15   the witness testified had been exchanged, the

16   witness's copy of the materials had been destroyed.

17               What has been produced is a copy of

18   something entitled "Affidavit of Norbert Pelc on

19   Invalidity" and nothing else.

20               Mr. Hameline, do you have something

21   you'd like to say on the record?

22               MR. HAMELINE:  I'm not sure that "would

23   like to say" is the right comment.

24               I'm certainly trying to assist you in

Norbert J. Pelc, Ph.D.                                    12/09/05

54

1    responding to the question you asked.  I went back

2    and I printed that out.  I looked in my computer and

3    didn't find anything in addition to what's been

4    produced here.

5                   MR. ABRAHAMSEN:  Was anyone else

6    available that could check their computer at your

7    office?

8                   MR. HAMELINE:  My secretary is gone, so

9    that's not --

10                  MR. ABRAHAMSEN:  Was Mr. Renaud

11   available to check?

12                  MR. HAMELINE:  I don't know if

13   Mr. Renaud is available.  I checked.  He didn't

14   respond to my phone mail or voice mail, so I don't

15   know.

16                  MR. ABRAHAMSEN:  And you checked your in

17   box on your e-mail; is that right?

18                  MR. HAMELINE:  Yeah.

19                  MR. ABRAHAMSEN:  You checked your sent

20   items list?

21                  MR. HAMELINE:  I checked all the places

22   that I thought these documents would be.  I'm not

23   going to go through and tell you what files I looked

24   in and folders I have on my computer.

Norbert J. Pelc, Ph.D.                                              12/09/05

55

1              MR. ABRAHAMSEN:  Was this draft sent by

2     e-mail?

3              MR. HAMELINE:  You'll have to ask

4     Dr. Pelc.  It's his document, not mine.

5     BY MR. ABRAHAMSEN:

6         Q.  **Was this draft sent to the Mintz Levin**

7     **lawyers by e-mail?**

8         A.  I sent that draft to the Mintz -- a draft of

9     that to the Mintz lawyers by e-mail.  Actually, if

10    you look at the date on the bottom --

11        Q.  **November 20th?**

12        A.  -- I think that's when I sent a draft to the

13    Mintz lawyers, but the date on top is obviously

14    today's date.

15        Q.  **Do you know whether Mr. Renaud is in the**

16    **office today?**

17             MR. HAMELINE:  I don't.

18        Q.  **Who was the lawyer that you communicated**

19    **with that sent you drafts and you sent revised**

20    **drafts back to?**

21        A.  Both Mr. Hameline and Mr. Renaud.

22        Q.  **Anyone else in this case that you --**

23        A.  Mr. Phinney I copy on some things.  In terms

24    of my correspondence during the preparation of the

Norbert J. Pelc, Ph.D.                                    12/09/05

56

1    reports, I sent -- at least my intent was and I

2    tried to send everything to both Mr. Hameline and

3    Mr. Renaud.  Whatever e-mails there were should have

4    been in Mr. Hameline's --

5        Q.  **And you'd copy one or the other on e-mails?**

6        A.  No.  I actually send to both.

7        Q.  **Okay.**

8            MR. ABRAHAMSEN:  Why don't we go off the

9    record for a minute.

10           (Off the record)

11           MR. ABRAHAMSEN:  We just had a

12   discussion off the record.  We had requested that

13   Mintz Levin -- Mr. Hameline go back to Mintz Levin's

14   offices and try and turn over -- identify documents,

15   correspondence with Dr. Pelc, including drafts of

16   reports and whatnot.

17           Mr. Hameline went back, claims that he

18   was unable to find anything on his e-mail system,

19   and has indicated that they're unwilling to do a

20   further search for documents and will require us to

21   serve a subpoena on Mintz Levin in order to obtain

22   such documents.

23           He's also indicated that if we serve a

24   subpoena immediately, no documents will be available

1    today for this deposition.

2              So we're stuck in a situation where we

3    have a witness here, we don't have documents that we

4    may want to question the witness about; therefore,

5    we'll have to continue the deposition and possibly

6    redepose this witness when we ultimately get these

7    documents.

8              If we need to do that, of course, we

9    will seek costs and fees, and whatnot, for our

10   efforts in having to do so.

11             MR. HAMELINE:  So I'd just state on the

12   record, since we've already had this discussion off

13   the record, that we disagree with this process, we

14   disagree with your conclusions and characterizations

15   and think it's inappropriate that you're going to

16   serve a subpoena on Mintz Levin in the middle of the

17   deposition.

18             And I would also note that in connection

19   with the deposition of Dr. Horn, which was taken a

20   couple of days ago, Dr. Horn had no drafts of any

21   reports, didn't produce drafts of any reports, and

22   Wolf Greenfield didn't produce drafts of any

23   reports.

24             Apparently it's a double standard that's

58

1   being applied here.  But if that's the process we're

2   going to take -- It doesn't seem like we're going to

3   resolve it at this juncture, so we'll conclude the

4   deposition from my perspective.  Obviously you have

5   a different perspective.

6              MR. ABRAHAMSEN:  That means that we have

7   no further questions for this witness at this time.

8              Actually, before we go off the record

9   let me spend a few minutes reviewing the document

10  that was produced and then we'll figure out whether

11  we're done for the day or not.

12             MR. HAMELINE:  I just wanted to note

13  that we did bring back a document for you.

14             MR. ABRAHAMSEN:  That was noted on the

15  record.

16             (Recess taken)

17             MR. ABRAHAMSEN:  We're back on the

18  record just to say we have no further questions of

19  this witness at the time.

20             (Whereupon the deposition

21             was adjourned at 12:29 p.m.)

22

23

24