# Exhibit A

| | |
|---|---|
| 1 | VOL. I, PAGES 1 - 315 |
| 2 | |
| 3 | |
| 4 | UNITED STATES DISTRICT COURT |
| 5 | DISTRICT OF MASSACHUSETTS |
| 6 | CIVIL ACTION NO. 04-11884-NG |
| 7 | |
| 8 | L-3 COMMUNICATIONS, SECURITY AND |
| 9 | DETECTION SYSTEMS, INC. |
| 10 | Plaintiff |
| 11 | v. |
| 12 | REVEAL IMAGING TECHNOLOGIES, INC. |
| 13 | Defendant |
| 14 | |
| 15 | - - - - - - - - |
| 16 | Deposition of Berthold K.P. Horn, Ph.D. |
| 17 | Wednesday, December 7, 2005 |
| 18 | 9:47 a.m. |
| 19 | Mintz Levin Cohn Ferris Glovsky and Popeo, P.C. |
| 20 | One Financial Center |
| 21 | Boston, Massachusetts |
| 22 | - - - - - - - - |
| 23 | Reporter: Deborah Roth, RPR/CSR |
| 24 | |

```
 1    PRESENT:

 2

 3    Robert M. Abrahamsen, Esq.

 4    Wolf Greenfield & Sachs, P.C.

 5    600 Atlantic Avenue

 6    Boston, Massachusetts 02210

 7    617 720 3500

 8    For the Plaintiff

 9

10    Michael T. Renaud, Esq.

11    H. Joseph Hameline, Esq.

12    Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.

13    One Financial Center

14    Boston, Massachusetts 02110

15    617 542 6000

16    For the Defendants

17

18

19

20

21

22

23

24
```

1    directed to validity, correct?

2    A. Yes.

3    Q. Do you have any other written opinions

4    related to the patents-in-suit other than Horn

5    Exhibit 2 and Exhibit 3 that are before you now?

6    A. Not at this point.

7    Q. Did you at one point have drafts? Did you

8    have a draft of the infringement opinion which is

9    Horn Exhibit 2 at some point?

10   A. As I was editing, there were various forms

11   on my computer, but they were overwritten by later

12   versions.

13   Q. So it was your practice to not maintain

14   drafts of your expert report as you went?

15   A. I generally avoid that because it's very

16   confusing.

17   Q. Did you ever provide a draft of your expert

18   report to anyone for review?

19   A. I discussed drafts with Bob Abrahamsen. As

20   I was completing a section, I would ask his view

21   of format and phrasing.

22   Q. And how many drafts of the expert report do

23   you think you -- the infringement, of the report

24   do you think you had?

1   A. I don't think that's a specific number. As

2   I am developing it on the computer, I might save

3   that every hour or so, in case I make a mistake

4   while I am editing.

5   Q. How many conversations did you have with

6   Mr. Abrahamsen about your infringement opinion

7   draft?

8   A. The infringement, we had a meeting and a

9   number of phone calls. I don't remember the exact

10  number.

11  Q. And you said "a meeting." Where was that

12  meeting?

13  A. Here. Across the road at their offices.

14  Q. Who was present for the meeting?

15  A. Bob, and I think at one time Jim Foster may

16  have looked in.

17  Q. Okay. Anybody else?

18  A. I am embarrassed to say, if there was

19  somebody else, I don't remember their name.

20  Q. There may have been someone else?

21  A. Yes, briefly.

22  Q. Did you ever talk to any L-3 employees

23  before giving your opinion on infringement?

24  A. No. I have not talked to anybody from L-3

1    Q. Do you know whether the stack of documents

2    which is Exhibit 4 includes all of the documents

3    that you highlighted or may have put notes on?

4    A. Yes. I checked this morning, and somebody

5    very carefully went through and copied the

6    highlighting onto those copies.

7    Q. Do you know whether all of the highlighted

8    documents you provided to Wolf and all of the

9    documents that may have had your handwriting on

10    them were produced today as Exhibit 4?

11    A. Well, I would have to go through a lot. My

12    cursory check earlier indicates that that is the

13    case.

14    Q. Did you take any notes during your work

15    preparing the expert reports?

16    A. Yes, I may have.

17    Q. Where are those notes today?

18    A. They are gone. I crumble them and throw

19    them out as soon as I use them in the report.

20    Q. Why do you throw the notes away?

21    A. It's confusing to have them lying around.

22    Plus, no one can read my scribble.

23    Q. What about the notes would cause confusion?

24    A. I work on a lot of things. If I have

1   pieces of paper lying around on my desk, and then

2   I'm going to be saying, "I wonder what that was."

3       The easiest thing to do is, when I've

4   used it to prepare the report, I chuck it out.

5       Q. It is your practice that notes prepared

6   during the process of forming your opinion, you

7   don't keep them?

8       A. Yes. A lot of the note preparation would

9   be directly on the computer and just find its way

10  into the report.

11      Occasionally, I will use a piece of

12  paper to scribble something, make a little sketch

13  or something of that sort.

14      Q. And none of those sketches were -- none of

15  those sketches still exist?

16      A. That's correct.

17      Q. Has that always been your practice as an

18  expert, not to keep drafts and not to keep notes?

19      A. Yes.

20      Q. Do you know how much you billed to date in

21  the state case to L-3?

22      A. No. You know, I would be guessing. I

23  wasn't prepared to talk about the state case.

24      Q. Is it more than $20,000?