# Exhibit B

```
 1          INFORMATION UNDER PROTECTIVE ORDER

 2                      VOLUME 1

 3                    PAGES 1 - 247

 4                    EXHIBITS 1 - 14

 5        IN THE UNITED STATES DISTRICT COURT

 6          FOR THE DISTRICT OF MASSACHUSETTS

 7                   No. 04-11884 NG

 8       - - - - - - - - - - - - - - - - - - - -

 9     L-3 COMMUNICATIONS SECURITY AND

10     DETECTION SYSTEMS, INC.,

11             Plaintiff

12         vs.

13     REVEAL IMAGING TECHNOLOGIES, INC.,

14             Defendant

15       - - - - - - - - - - - - - - - - - - - -

16         DEPOSITION OF RICHARD C. LANZA, Ph.D.

17         Thursday, December 15, 2005 9:45 a.m

18         Mintz Levin Cohn Ferris Glovsky & Popeo, PC

19         One Financial Center, Boston, MA 02111

20

21

22

23

24       Reporter: Janet M. Konarski, RMR, CRR
```

```
 1    APPEARANCES:

 2

 3    MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, PC

 4    (By H. Joseph Hameline, Esquire)

 5    One Financial Center

 6    Boston, Massachusetts 02111

 7    (617) 542-6000

 8    Counsel for the Defendants

 9

10    WOLF GREENFIELD & SACKS, P.C.

11    (By Robert M. Abrahamsen, Esquire)

12    600 Atlantic Avenue

13    Boston, Massachusetts 02210

14    (617)646-8000

15    Counsel for the Plaintiff

16

17

18

19

20

21

22

23

24
```

1   2A, I don't see any other drafts of your report; is

2   that correct?

3       A.  That's it.

4       Q.  Let me ask you what is referenced in a

5   document, which is a letter from Jeremy Jeffers dated

6   October 7, 2005, to yourself. It says, "Enclosed

7   please find documents for your review."

8       A.  Mm-hmm.

9       Q.  Do you know what was enclosed?

10      A.  It wasn't just enclosed. It was two

11  boxes, and I believe -- I'm not sure whether all of

12  those were sent over here, the two boxes of documents,

13  both from Reveal and from L-3.

14      Q.  Were these expert reports?

15      A.  I don't believe they were. They were

16  patent information. I have to recall exactly what was

17  in all of them. There was a quite a bit of material.

18      Q.  Prior to your receipt of the material on

19  October 7, 2005, what work had you done in connection

20  with this case?

21      A.  Nothing.

22      Q.  So, when you -- I assume you had been

23  retained previously by L-3?

24      A.  No. Actually, you mean -- I'm sorry, by

1  L-3?

2  Q. Yes. In connection with this case? Were

3  you retained as an expert in this litigation, the L-3

4  v. Reveal Imaging litigation?

5  A. Yes.

6  Q. And you were retained by L-3

7  Communications, or you were retained by the law firm?

8  A. I believe I'm retained by the law firm.

9  I'm not sure what you're --

10  Q. I apologize. I was not trying to draw a

11  distinction between the law firm and L-3. I was using

12  it colloquially by L-3. So, you were retained for

13  litigation by L-3's counsel?

14  A. Yes.

15  Q. When were you retained by L-3's counsel in

16  connection with this litigation?

17  A. That was in October, and I'd have to

18  check.

19  Q. What year?

20  A. Of this year.

21  Q. So, prior to that, you had not done any

22  work in connection with this litigation. Is that fair

23  to say?

24  A. That's correct.

1      Q.  You had done work in connection with the

2   state case?

3      A.  Yes.

4      Q.  All right.  Had you looked at the patents

5   at issue in this litigation prior to October of 2005?

6      A.  I'm not completely certain.  I don't -- I

7   would have to really look into my, into my piles of

8   material in the state case.  I'm not certain whether

9   I --

10        MR. HAMELINE:  Let me mark as the next

11  exhibit, as Exhibit 3, the Initial Disclosure of Expert

12  Testimony of Dr. Lanza.

13        (Initial Disclosure of Expert

14         Testimony of Dr. Lanza marked Exhibit 3.)

15  BY MR. HAMELINE:

16     Q.  Dr. Lanza, I've placed in front of you

17  what has been marked as Exhibit 3.  That is your

18  initial Rule 26 expert report?

19     A.  Yes.

20     Q.  And that is your signature on the last

21  page, Page 17?

22     A.  Yes.

23     Q.  And you signed that on October 18, 2005?

24     A.  That's correct.

1   Q. How much time have you spent?

2   A. Probably about 25 hours, 30 hours.

3   Q. Have you billed?

4   A. I have not billed yet.

5   Q. So, let me ask you a bit about the

6   drafting process of the report, which is Exhibit 2.

7   I'm going to also get to the second report in a moment.

8   A. Mm-hmm.

9   Q. Can you tell me how that report was

10  prepared? Actually physically prepared?

11  A. As I recall, I wrote a draft and sent it

12  to Wolf Greenfield. I believe there was an e-mail, in

13  fact, that I received from Wolf Greenfield as to what

14  they felt -- they gave as a representative example of

15  what reports had looked like in this area before, not

16  for Reveal. And so that would be the sort of style

17  they felt would be appropriate, and I think we then re

18  -- we had several iterations back and forth, mostly

19  stylistic ones. I think there were not any other --

20  they were stylistic ones and adding the material on the

21  patent numbers and so on been.

22  Q. Okay. So, you prepared an initial draft

23  of the report, based in part on a format that they gave

24  you from another report, from another case?

1    A. Right. Mm-hmm.

2    Q. Did you produce that format in this

3  package of documents?

4    A. I don't think I ever printed it out. It

5  may have been -- it's probably mentioned in that --

6  it's on one of the e-mails.

7    Q. Okay. When you sent the report to Wolf

8  Greenfield, who did you send it to?

9    A. Bob Abrahamsen.

10    Q. Did you send it by e-mail?

11    A. Yes.

12    Q. And then when you -- what was the next

13  step in the process? Did you mark it up? Did he mark

14  it up? Was there a conversation? What happened?

15    A. There was a conversation, and we went back

16  and forth, marking up documents. I think some of them

17  may have actually been actual paper documents which

18  were sent over.

19    Q. What happened to the paper documents?

20    A. I believe I submitted all the paper

21  documents I had. There is -- you know, there is -- if

22  you notice, there was actually, I believe, in some of

23  the piles of stuff there was a copy, which I had made

24  notes on, but mostly I don't keep every piece of paper.

1    My office is already filled to the top.

2        Q. Maybe we can look at it during the break,

3    but I haven't seen any draft, other than the couple of

4    pages we marked as Exhibit 2A, and in what we've

5    produced here. Did you retain copies of those reports,

6    if you know?

7        A. No, I wouldn't. I don't think I did.

8        Q. But, I think -- I thought you just said

9    that you thought that you produced some of those?

10       A. Some of which?

11       Q. Some of the drafts of the reports?

12       A. I sent them to Bob. Yes.

13       Q. Okay.

14           MR. HAMELINE: And, Bob, did you

15   produce --

16           MR. ABRAHAMSEN: I honestly don't recall

17   receiving any reports, any drafts, other than the one

18   that is here.

19           MR. HAMELINE: All right.

20       Q. So, Dr. Lanza, let me see if I can go

21   through the iterations of the draft, then. First of

22   all, do you know how many iterations of the draft there

23   were?

24       A. Probably one, really. I mean I think

1  that, as I recall, that was -- I had written up a draft

2  and then got a response with some comments and then

3  basically said it was okay. In fact, I think if you

4  read one of the e-mails, it would say just that, "It

5  looks okay to me."

6      Q. And how many drafts went back and forth?

7  Do you know?

8      A. I think it just probably one. It was

9  really not --

10      MR. ABRAHAMSEN: Are you talking about the

11  initial report still?

12      MR. HAMELINE: Yes. Only the initial.

13      MR. ABRAHAMSEN: I think there may have

14  been some confusion.

15      MR. HAMELINE: Okay.

16      A. Yes. I think one or two. It was not a

17  thing which I can remember going through ten times.

18      Q. All right. Did you look in your files to

19  see if you had any copies of those drafts? And by

20  "this," I'm referring to your computer files?

21      A. I think that I probably do not, and it's

22  mostly because of the way I do the drafts. I don't

23  retain drafts. You just rewrite the file, and it's --

24  the drafts are included in it.

1	Q. Right. Did you send them by e-mail to
2	Mr. Abrahamsen?
3	A. I believe I did.
4	    MR. ABRAHAMSEN: Object to the form.
5	A. I think -- I believe I did send them by
6	e-mail, though I did -- I'm pretty certain I did.
7	Q. Did you look in your sent items file in
8	your computer --
9	A. I don't have a sent.
10	Q. -- for drafts?
11	A. I don't have a sent items.
12	Q. What kind of computer software do you use?
13	A. I'm using Eudora.
14	Q. And does Eudora have any kind of file
15	saving?
16	A. It doesn't -- Eudora, as you know, is only
17	a handler. It doesn't save them, necessarily.
18	Q. Okay. And does your computer system save
19	files or items that are sent?
20	A. Well, in the sense that MIT does a system
21	backup, it could, but it's a really large system, and
22	they don't retain everything forever.
23	Q. Did you look or did you attempt to find
24	any of these drafts that were sent?

1  A. No, I didn't. I would have to look -- I

2  would have to deal with the computer people at MIT.

3  MR. HAMELINE: All right. Let me mark as

4  the next exhibit your Rebuttal Expert Disclosure, which

5  is going to be marked as Exhibit 4.

6  (Rebuttal Expert Disclosure

7  of Richard C. Lanza marked Exhibit 4.)

8  BY MR. HAMELINE:

9  Q. Exhibit 4 is entitled Rebuttal Expert

10  Disclosure of Richard C. Lanza, and appears to be your

11  signature on Page 35?

12  A. Mm-hmm.

13  Q. Is that correct?

14  A. That's correct.

15  Q. Okay. And it's dated November 7, 2005.

16  Is that --

17  A. That's correct.

18  Q. Okay. The same series of questions that I

19  asked you about your initial report I want to ask about

20  Exhibit 4. Who prepared the initial draft?

21  A. Well, I prepared the initial draft. I

22  mean it was really an iteration, I think, with Wolf

23  Greenfield.

24  Q. Okay. Did you send an initial written

| | |
|---|---|
| 1 | really actively doing -- I was running a conference. |
| 2 | Q. The rebuttal report is dated November 7th. |
| 3 | A. Mm-hmm. |
| 4 | Q. So, I assume sometime from the end of your |
| 5 | conference until November 7th, you were engaged in |
| 6 | preparing the rebuttal report? |
| 7 | A. Right. And I had gotten back, I believe, |
| 8 | on November 1st or 2nd. |
| 9 | Q. So, between November 1st and 2nd? |
| 10 | A. Right. |
| 11 | Q. Do you recall exchanging reports with Wolf |
| 12 | Greenfield? |
| 13 | A. I would have to check really my e-mail, |
| 14 | see if I -- all of it, because I have, as I say, all |
| 15 | the e-mails that I sent. Most of this would have been |
| 16 | done, I'm sure, by e-mail. |
| 17 | Q. Schedule A, No. 2, asks for all drafts of |
| 18 | your reports. Did you look for all drafts of your |
| 19 | reports? |
| 20 | A. Yes. |
| 21 | Q. How did you look? Where did you look? |
| 22 | A. I looked in my pile of papers I have on my |
| 23 | desk on this. |
| 24 | Q. Did you look on your computer? |

```
 1      A.  I didn't really look on the computer.

 2      Q.  Do you think they exist on your computer?

 3      A.  Well, I don't know.  I couldn't really

 4  answer that question, because the problem is when you

 5  delete something, does it stop existing?  I don't know.

 6      Q.  I don't know your computer system.

 7      A.  Well, I mean deleting in principle deletes

 8  them, but in practice, as you know, one can with some

 9  work find bits and pieces of everything.

10      Q.  Would you be willing to look for drafts of

11  your reports?

12      A.  I could.  Is that a request?

13      Q.  That is a request.  Yes.

14          MR. ABRAHAMSEN:  What exactly --

15          THE WITNESS:  I'm not quite sure.

16          MR. ABRAHAMSEN:  Are you asking him to

17  look in his e-mail system for stuff that was sent?  Are

18  you trying to figure out whether the computer system

19  archived versions of something?

20          MR. HAMELINE:  My question is a little

21  broader than that.  It comes from Schedule A.  No. 2

22  says, "All drafts of your reports."  I asked Dr. Lanza

23  if he had looked for drafts of his report.  I think he

24  said, "No."  So, now I'm asking if he will look for
```

1   drafts of his reports.

2   A.  You said on my computer.

3   Q.  Okay. I didn't know whether you would

4   distinguish between looking for paper. Did you look

5   for paper versions of drafts of your report?

6   A.  I believe the paper, the draft version I

7   just -- any draft of that sort I would have sent over

8   to Wolf Greenfield.

9   Q.  Okay. And did you look for drafts of your

10  report on your computer?

11  A.  I did. I did. But, as I said,

12  essentially what I do is when a draft -- when I change

13  the draft, it just, it becomes -- it's no longer a

14  draft, so I don't retain drafts, per se. I mean you

15  have to make a special effort to treat the document as

16  a secondary document. Once you've modified it, it

17  becomes the new document.

18  Q.  But, you sent paper drafts to Wolf

19  Greenfield?

20  A.  I don't recall whether I sent -- there may

21  have been some paper drafts, but there were probably

22  almost certainly all by e-mails.

23  Q.  The next item is Schedule A, No. 3, refers

24  to, "All notes, memoranda," etc., relating to work