# Exhibit D

```
 1                    VOLUME: I

 2                    PAGES: 1 to 60

 3                    EXHIBITS: See Index

 4

 5        IN THE UNITED STATES DISTRICT COURT

 6         FOR THE DISTRICT OF MASSACHUSETTS

 7     - - - - - - - - - - - - - - - - - - x

 8     L-3 COMMUNICATIONS SECURITY

 9     AND DETECTION SYSTEMS, INC.

10          Plaintiff       Civil Action

11                          No. 04-11884-NG

12          v.

13

14     REVEAL IMAGING TECHNOLOGIES, INC.

15          Defendant

16     - - - - - - - - - - - - - - - - - - x

17         DEPOSITION of NORBERT J. PELC, PH.D.

18          Friday, December 9, 2005

19             9:49 a.m.

20          Wolf Greenfield & Sacks, P.C.

21            600 Atlantic Avenue

22            Boston, Massachusetts

23

24       Michelle Keegan, Court Reporter
```

| | |
|---|---|
| 1 | A P P E A R A N C E S: |
| 2 | |
| 3 | WOLF GREENFIELD & SACKS, P.C. |
| 4 | By Robert M. Abrahamsen, Esq. and |
| 5 | James Foster, Esq. |
| 6 | 600 Atlantic Avenue |
| 7 | Boston, Massachusetts 02210 |
| 8 | (617) 646-8000 |
| 9 | Counsel for the Plaintiff |
| 10 | |
| 11 | MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C. |
| 12 | By H. Joseph Hameline, Esq. |
| 13 | One Financial Center |
| 14 | Boston, Massachusetts 02111 |
| 15 | (617) 542-6000 |
| 16 | Counsel for the Defendant |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

1   A. I glanced at it.

2       Q. Okay. Did you do a search for documents or

3   consider whether any additional documents should be

4   produced?

5       A. I did look at my computer to see whether I

6   had old drafts. And I did not.

7       Q. What happened to the old drafts?

8       A. My policy is to delete old drafts as new

9   drafts are made so as to avoid confusion.

10      Q. And in your computer system what happens

11  after you delete a draft? Where do the drafts go?

12  Are they archived somewhere?

13      A. No. This is my laptop. I did this all on

14  my laptop. I hit delete. I empty the trash.

15          Could somebody go dig it out of the hard

16  drive? I don't know, but I certainly can't.

17      Q. Did you keep any notes or memos or anything

18  like is listed in item 3 of Schedule A?

19      A. No. I'm terrible with notes even on my own

20  private affairs. I make notes, use them to write a

21  draft, for example, and then I toss them.

22      Q. Okay. And what about correspondence that

23  you've had with lawyers at Mintz Levin or anyone

24  else?

1  don't remember if Mr. Renaud was there. I think

2  not. Mr. Phinney was not the only Mintz attorney

3  who was present.

4  **Q. Okay. And when was the first meeting or**

5  **other contact you had in connection with preparing**

6  **these reports in this case?**

7  A. Now more specifically with production of

8  these reports?

9  **Q. Correct.**

10  A. With respect to the invalidity reports, that

11  all happened long distance.

12  **Q. Okay.**

13  A. So we had telephone discussions. And at

14  some point I recall that -- I think it -- my

15  recollection is that somebody from Mintz said, This

16  is sort of what the document should look like. And

17  they sent me a document that had nothing to do with

18  this case but said, This is what it should look

19  like. And then I started making a document that

20  looked like that. Now, I might be confused whether

21  that was for the state case or the federal case.

22  **Q. Okay. So you were given, basically, a**

23  **sample report of an unrelated case?**

24  A. Yeah, that's right. For one of those cases.

1   So one of the reports that I've written in these

2   state, federal cases was like that.

3       At other times I would start completely

4   from scratch and write stuff. At other times the

5   Mintz attorneys would send me first drafts that I

6   would edit.

7   **Q. With respect to the invalidity reports that**

8   **were marked as Exhibits 164 and 165, do you remember**

9   **whether you prepared the first draft of those**

10  **reports?**

11  A. My recollection is that Mintz prepared the

12  first draft of pieces of this. And they sort of

13  came to me in pieces because some were written by --

14  I understand some of the first drafts were written

15  by Mr. Hameline and some were written by Mr. Renaud,

16  and then they would come to me. I think it's fair

17  to say I tore them apart and rewrote them.

18      Also, some of the text that's in this

19  first report actually was taken from a document from

20  the state case. So it's a document that I had

21  written that then got cut from that document, put in

22  here. So even the first draft already contained

23  stuff that I had written from scratch.

24  **Q. It's your testimony that you did not retain**

1   any of those drafts that were originally sent to

2   you, though?

3       A. That's right, I have not retained any of

4   them.

5       Q. Okay. Now, you said you tore the drafts

6   apart?

7       A. Yeah, yeah.

8       Q. What did you mean by that?

9       A. I guess I have my own particular style of

10  writing. I agonize over the words I put on paper.

11  I wanted this to look and read like something I

12  would write both from a stylistic point of view but

13  also from a content point of view. I took things

14  out, put things in, rearranged things.

15      Q. What do you recall about a content point of

16  view, what you changed with regard to the substance

17  of the reports?

18      A. They could go from the trivial to the very

19  serious.

20      Q. Let's start with the very serious.

21      A. Among the very serious ones, I recall an

22  invalidity argument that Mr. Renaud had suggested

23  that I eventually called him up and said I wouldn't

24  go along with that one. I didn't think it made

1    that case it was the prosecution file history.

2    Q. Okay.

3         MR. ABRAHAMSEN: Let's go off the

4    record.

5         (Off the record)

6         (Recess taken)

7         MR. ABRAHAMSEN: Joe, we have a request

8    that since we have this witness here today in Boston

9    and apparently the e-mails and drafts, and whatnot,

10   have been deleted from his computer, we'd ask that

11   you go back to your offices at Mintz Levin and print

12   copies of what's been sent and received from this

13   witness so we can look at them here today.

14        MR. HAMELINE: I can look. I don't

15   think I have them.

16        MR. ABRAHAMSEN: Mr. Renaud or whoever

17   corresponded with the witness.

18        MR. HAMELINE: I can go look. I doubt

19   we have them. I mean, the process is -- word

20   processing is to edit the document.

21        MR. ABRAHAMSEN: But the e-mails with

22   documents attached, drafts attached, those should

23   exist in your system.

24        MR. HAMELINE: I don't know.

1    MR. ABRAHAMSEN: If you could do us a

2    favor, go back and take a look at your sent items

3    list, your in box, and see if you can identify those

4    things, we can finish up here today.

5    MR. HAMELINE: Sure. I can go over and

6    take a look. I doubt they exist.

7    MR. ABRAHAMSEN: Okay. You'll ask

8    Mr. Renaud to do the same?

9    MR. HAMELINE: If he's there. I think,

10   like you, his wife is expecting. And I don't know

11   what his --

12   MR. ABRAHAMSEN: In May, right?

13   MR. HAMELINE: Yeah, but I know he had

14   an appointment yesterday and he may have an

15   appointment today. I know he left early last night.

16   I don't know whether he's around or not, but I'll

17   ask.

18   MR. ABRAHAMSEN: Okay.

19   BY MR. ABRAHAMSEN:

20   **Q. Dr. Pelc, during your meetings with**

21   **Mr. Scheinman, Mr. Bijjani or Mr. Ellenbogen, did**

22   **you take any notes during those meetings?**

23   A. The meeting with Mr. Scheinman was a

24   telephone meeting. I've never met him in person.

1   it if the right people are there.

2       MR. ABRAHAMSEN: It would be nice to

3   handle this while the witness is here in Boston.

4       MR. HAMELINE: Sure.

5       MR. ABRAHAMSEN: So why don't we adjourn

6   for now and reconvene.

7       How much time do you need?

8       MR. HAMELINE: Well, I'll call you

9   because I don't know. I don't know who's there.

10      (Recess taken)

11      MR. ABRAHAMSEN: We had asked

12  Mr. Hameline to go back to his office and search

13  e-mails and other correspondence to try to identify

14  correspondence, drafts of reports, et cetera, that

15  the witness testified had been exchanged, the

16  witness's copy of the materials had been destroyed.

17      What has been produced is a copy of

18  something entitled "Affidavit of Norbert Pelc on

19  Invalidity" and nothing else.

20      Mr. Hameline, do you have something

21  you'd like to say on the record?

22      MR. HAMELINE: I'm not sure that "would

23  like to say" is the right comment.

24      I'm certainly trying to assist you in

1   responding to the question you asked. I went back

2   and I printed that out. I looked in my computer and

3   didn't find anything in addition to what's been

4   produced here.

5            MR. ABRAHAMSEN: Was anyone else

6   available that could check their computer at your

7   office?

8            MR. HAMELINE: My secretary is gone, so

9   that's not --

10           MR. ABRAHAMSEN: Was Mr. Renaud

11  available to check?

12           MR. HAMELINE: I don't know if

13  Mr. Renaud is available. I checked. He didn't

14  respond to my phone mail or voice mail, so I don't

15  know.

16           MR. ABRAHAMSEN: And you checked your in

17  box on your e-mail; is that right?

18           MR. HAMELINE: Yeah.

19           MR. ABRAHAMSEN: You checked your sent

20  items list?

21           MR. HAMELINE: I checked all the places

22  that I thought these documents would be. I'm not

23  going to go through and tell you what files I looked

24  in and folders I have on my computer.

1      MR. ABRAHAMSEN: Was this draft sent by

2  e-mail?

3      MR. HAMELINE: You'll have to ask

4  Dr. Pelc. It's his document, not mine.

5  BY MR. ABRAHAMSEN:

6      **Q. Was this draft sent to the Mintz Levin**

7  **lawyers by e-mail?**

8      A. I sent that draft to the Mintz -- a draft of

9  that to the Mintz lawyers by e-mail. Actually, if

10  you look at the date on the bottom --

11      **Q. November 20th?**

12      A. -- I think that's when I sent a draft to the

13  Mintz lawyers, but the date on top is obviously

14  today's date.

15      Q. Do you know whether Mr. Renaud is in the

16  office today?

17      MR. HAMELINE: I don't.

18      **Q. Who was the lawyer that you communicated**

19  **with that sent you drafts and you sent revised**

20  **drafts back to?**

21      A. Both Mr. Hameline and Mr. Renaud.

22      **Q. Anyone else in this case that you --**

23      A. Mr. Phinney I copy on some things. In terms

24  of my correspondence during the preparation of the

1  reports, I sent -- at least my intent was and I

2  tried to send everything to both Mr. Hameline and

3  Mr. Renaud. Whatever e-mails there were should have

4  been in Mr. Hameline's --

5  **Q. And you'd copy one or the other on e-mails?**

6  A. No. I actually send to both.

7  Q. Okay.

8  MR. ABRAHAMSEN: Why don't we go off the

9  record for a minute.

10  (Off the record)

11  MR. ABRAHAMSEN: We just had a

12  discussion off the record. We had requested that

13  Mintz Levin -- Mr. Hameline go back to Mintz Levin's

14  offices and try and turn over -- identify documents,

15  correspondence with Dr. Pelc, including drafts of

16  reports and whatnot.

17  Mr. Hameline went back, claims that he

18  was unable to find anything on his e-mail system,

19  and has indicated that they're unwilling to do a

20  further search for documents and will require us to

21  serve a subpoena on Mintz Levin in order to obtain

22  such documents.

23  He's also indicated that if we serve a

24  subpoena immediately, no documents will be available

1 today for this deposition.

2     So we're stuck in a situation where we

3 have a witness here, we don't have documents that we

4 may want to question the witness about; therefore,

5 we'll have to continue the deposition and possibly

6 redepose this witness when we ultimately get these

7 documents.

8     If we need to do that, of course, we

9 will seek costs and fees, and whatnot, for our

10 efforts in having to do so.

11     MR. HAMELINE: So I'd just state on the

12 record, since we've already had this discussion off

13 the record, that we disagree with this process, we

14 disagree with your conclusions and characterizations

15 and think it's inappropriate that you're going to

16 serve a subpoena on Mintz Levin in the middle of the

17 deposition.

18     And I would also note that in connection

19 with the deposition of Dr. Horn, which was taken a

20 couple of days ago, Dr. Horn had no drafts of any

21 reports, didn't produce drafts of any reports, and

22 Wolf Greenfield didn't produce drafts of any

23 reports.

24     Apparently it's a double standard that's

1    being applied here. But if that's the process we're

2    going to take -- It doesn't seem like we're going to

3    resolve it at this juncture, so we'll conclude the

4    deposition from my perspective. Obviously you have

5    a different perspective.

6         MR. ABRAHAMSEN: That means that we have

7    no further questions for this witness at this time.

8         Actually, before we go off the record

9    let me spend a few minutes reviewing the document

10   that was produced and then we'll figure out whether

11   we're done for the day or not.

12        MR. HAMELINE: I just wanted to note

13   that we did bring back a document for you.

14        MR. ABRAHAMSEN: That was noted on the

15   record.

16        (Recess taken)

17        MR. ABRAHAMSEN: We're back on the

18   record just to say we have no further questions of

19   this witness at the time.

20        (Whereupon the deposition

21        was adjourned at 12:29 p.m.)

22

23

24