IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| L-3 COMMUNICATIONS SECURITY AND DETECTION SYSTEMS, INC.<br>    Plaintiff,<br><br>v.<br><br>REVEAL IMAGING TECHNOLOGIES, INC.<br><br>    Defendant. | Civil Action No. 04-11884 NG<br>(Magistrate Judge Judith Gail Dein) |

**DECLARATION OF PAUL HURD IN OPPOSITION TO
REVEAL'S MOTION FOR SUMMARY JUDGMENT OF
NON-INFRINGEMENT AND INVALIDITY WITH REGARD TO
U.S. PATENT NOS. 5,642,393 AND 5,838,758**

  I submit this declaration under penalty of perjury in opposition to Reveal's Motion for Summary Judgment of Non-Infringement and Invalidity with Regard to U.S. Patent Nos. 5,642,393 and 5,838,758, and in particular to address a few issues raised by the affidavits of Michael Ellenbogen and Richard Bijjani which I understand Reveal submitted in support of its motion:

  1. I am currently employed by L-3 Communications Security and Detection Systems, Inc., and am one of the four inventors named on U.S. Patent No. 5,642,393 ("the '393 patent). I was employed by Vivid Technologies, Inc. ("Vivid") at the time the invention described in the '393 patent was conceived, and am familiar with the circumstances surrounding its conception, as well as Vivid's limited efforts to bring that concept to market.

  2. Paragraph 3 of the Ellenbogen Affidavit states that "The BAA did not want to use a CT device for the Level 3 position due to cost, scanning time and technical

concerns." That statement is incorrect. The BAA had not decided against using CT devices, but had decided only that it did not want to use the particular CT scanning device being marketed by InVision for the level 3 position.

3. Paragraph 5 of the Ellenbogen Affidavit states that "The Vivid concept was for a system or device to be used after the dual energy, x-ray projection scan of the entire bag." This statement is incorrect because that was not the only concept concerning the system. Another concept, for instance, involved the use of a dual-energy, single-view scan as a first one of the multiple probes employed by the device. While it was possible that a bag may have been scanned by a separate dual-energy, single-view device at level 1, it was recognized that the level 2 or 3 system could not necessarily assume that such a scan had been performed because a significant number of bags reached level 2 or 3 simply because of bag tracking errors, etc. It was also recognized that it might be desirable to take a new single-view projection image of each bag when it reached the later level so as to accurately register the position of the bag to allow the correct positioning of the subsequent probes. The paragraph is also inaccurate because the Hologic device employed a detector array, not "one x-ray detector."

4. Paragraph 6 of the Ellenbogen Affidavit is inaccurate because, at the time the invention described in the '393 patent was made, it was contemplated that, following a dual-energy, single-view x-ray scan of the bag to identify suspicious regions, the system would CT scan such regions as accurately as possible given the limitations of the available equipment. The inability of the C arm of the Hologic device to rotate all the way around the object was recognized as a limitation of the design, not as a "desirable characteristic." The C arm of the Hologic device could "cover[] an angle

greater than 90 degrees, and [could] take images of the bag at any number of points through the arm's arc." The resultant CT slices would then be analyzed to identify remaining suspicious areas, and an x-ray diffraction probe would be employed to further scrutinize such suspicious areas.

5. Paragraph 6 of the Ellengogen Affidavit is misleading because, although designs may have been further developed on paper, the only physical model Vivid created was that demonstrated at the InterAirport Show in Germany.

6. Paragraph 8 of the Ellenbogen Affidivit is inaccurate because the multi-probe device was specifically designed to employ a CT scanner as one of its probe stages. Also, as noted above, it was contemplated that the probe could either follow a dual-energy, single-view scan at level one or could itself employ such a scan as one of its probe stages.

7. Although I have not reviewed his Affidavit, I have been informed that Richard Bijjani has commented on the reasons he believes the name "MVT" was chosen for the product developed by PerkinElmer that employed three source/detector array pairs to accumulate multiple x-ray projection views and used such views to perform a crude tomographic reconstruction. Multiview tomography is a generic term that would include any scanning technique that performs a tomographic reconstruction using multiple views, including that performed by a so-called "third-generation" CT scanner, a C-arm type scanner, or multiple stationary sources and associated detectors arranged to take different views. Because "third generation" CT scanners (in which an x-ray source and an array of detectors are mounted on a rotating gantry) were the most common type of CT scanners in the marketplace at the time, the use of the term "CT

975036.1                                - 3 -

scanner" to describe a product might have misleadingly connoted to customers that the product employed a "third generation" configuration. The generic term MVT, short for "multiview tomography," was thus chosen as the name of the new product that did not employ a "third generation" design, so as to avoid suggesting that it did.


January 12, 2006                                /s/ Paul Hurd
                                                Paul Hurd


## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed through the U.S. District Court's electronic filing system which will serve opposing counsel who are registered participants as identified on the Notice of Electronic Filing (NEF). All opposing counsel who are non-registered participants are being served by First Class Mail.

                                                /s/ James J. Foster