UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| L-3 COMMUNICATIONS, SECURITY AND DETECTION SYSTEMS, INC., | ) ) ) ) | |
| Plaintiff, | ) ) ) | C.A. No. 04-11884-NG (Magistrate Judge Judith Gail Dein) |
| REVEAL IMAGING TECHNOLOGIES, INC., | ) ) ) ) | |
| Defendant. | ) ) | |

**REPLY BRIEF OF REVEAL IMAGING TECHNOLOGIES, INC.
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
ON U.S. PATENT NOS. 5,642,393 AND 5,838,758**

"The Alice-in-Wonderland view that something means whatever one chooses it to mean makes for enjoyable reading, but bad law. Claims are best construed in connection with the other parts of the patent instrument and with the circumstances surrounding the inception of the patent application." Autogiro Co. of America v. United States, 384 F.2d 391, 397 (Ct. Cl. 1967). For L-3, claim construction is truly an Alice-in-Wonderland exercise.[1] L-3 argues that the claims mean exactly what L-3 chooses them to mean, neither more, nor less; despite clear and consistent descriptions in the specifications to the contrary and admissions (by the inventors and L-3's own expert) that the invention could *not* have been implemented, in the manner now proposed by L-3,

---

[1] "When I use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean – neither more nor less."

"The question is," said Alice, "whether you can make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master – that's all."

Lewis Carroll, *Through the Looking Glass.*

at the time of the invention.  Testimony and the expert report from L-3's own witnesses that are inconsistent with L-3's current argument are "corrected."  The words of the patents are simply disregarded and the plain meanings of the patents, as integrated documents, are given no real credence.

In support of its arguments, L-3 had provided an expert report, which its own expert then contradicted in depositions.  Now, L-3 has "corrected" its expert's and inventors' deposition testimony in an effort to preserve the possibility that the claims might mean what L-3 needs them to mean in order to support L-3's suit.[2]  L-3's arguments with respect to the '758 Patent also contradict its arguments on the '393 Patent.  This reply brief highlights a few of L-3's recent efforts to reinvent the facts, the patents, the well-established case law, and the prior art.

### L-3's Contradictory Positions Have Highlighted Its Untenable Claim Constructions

First, L-3 has found it necessary to rewrite and "correct" the factual record because its expert, Dr. Richard Lanza, and the inventors on the patents at issue repeatedly contradicted L-3's litigation position in their depositions.  A chart illustrating these incredible contradictions and "corrections" is attached as Exhibit A.[3]  For example, in its Statement of Undisputed Facts, Reveal had quoted Dr. Lanza's expert report, in which he stated that CT imaging of all airport luggage was not a viable option in 1990 because of the intolerable delay CT imaging would cause.[4]  L-3 then stated in its response to Reveal's Statement of Undisputed Facts that this

---

[2] L-3's corrections to the deposition of its expert, Dr. Richard Lanza, were provided to Reveal *after* the exchange of summary judgment briefs.

[3] The patentee is required to "define precisely what his invention is."  Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting White v. Dunbar, 119 U.S. 47, 52 (1886)).  Even L-3's own experts cannot keep L-3's argument straight.  Plainly, this is not the required evidence of the ordinary and customary meaning being applied to the patent claims.

[4] See Declaration of H. Joseph Hameline, Esq. with Exhibits in Support of the Reply Brief of Reveal Imaging Technologies Regarding U.S. Patent Nos. 5,838,758 and 5,642,393 ("Hameline Dec.") Ex. 1 (Reveal Statement of Undisputed Facts) at 7; Ex. 3 (Lanza Report) at 4.

precise quote from Dr. Lanza's Report was "not true"![5]  But Dr. Lanza had explained at his deposition that in 1990 and through the 1990s CT scanning was too slow to be used for this purpose and that CT scanning of an entire bag was not viable at that time.[6]  L-3 then attempted to "correct" this testimony, *after* Dr. Lanza's deposition had concluded, by way of his errata sheet.[7]  Reveal's CT-80 performs a CT scan of the entirety of each bag, something that was not viable in 1990 and, therefore, could not be covered by the '758 Patent.

Similarly, with respect to the '393 Patent, Dr. Lanza admitted in his deposition that "the CT-80 is a *fixed* geometry machine."[8]  The '393 Patent specification, consistent with the inventors' descriptions in their depositions, provides that the "material specific probe" is a *variable* geometry device. '393 Patent, Col. 7, ll. 20-23; Col. 9, ll. 3-7.  In short, according to the inventors, the "material specific probe" employs variable, select angles to avoid clutter or overlying materials in a bag when taking an x-ray.[9]  L-3 has attempted to "correct" Dr. Lanza's testimony, recognizing that Dr. Lanza has essentially admitted that Reveal did not infringe.[10]

Dr. Lanza also had to "correct" his definition of "spatial information" and "geometry" in the middle of his deposition (following a break with counsel) because he could not keep his definitions and story straight.[11]  L-3 has similarly attempted to "correct" the unhelpful testimony of its 30(b)(6) deponent and one of the '393 inventors, Paul Hurd, who continues to be employed by L-3.[12]

---

[5] Hameline Dec. Ex. 2 (L-3 Response to Reveal Statement of Undisputed Facts) at 15.
[6] Hameline Dec. Ex. 5 (Lanza Dep.) at 74, 88, 100.
[7] Hameline Dec. Ex. 6 (Lanza Errata) changing Lanza testimony at deposition pages 74, 88, 100.
[8] Hameline Dec. Ex. 5 (Lanza Dep.) at 202.
[9] Hameline Dec. Ex. 7 (Krug Dep.) at 99, 103, 106-108; Ex. 8 (Tortora Dep.) at 80.
[10] Hameline Dec. Ex. 6 (Lanza Errata) changing Lanza testimony at deposition page 202.
[11] Hameline Dec. Ex. 5 (Lanza Dep.) at 186.
[12] Hameline Dec. Ex. 9 (Hurd Dep) at 132, 154; Ex. 10 (Hurd Errata) changing Hurd testimony at deposition pages 132, 154.

L-3's claim construction is contorted, confused and contradictory. In addition, the law is clear that L-3 cannot create an issue of fact by submitting affidavits or "corrected" testimony that contradict prior testimony.[13] Additional examples of L-3's attempted rewriting of the testimony in this case are also set forth in Exhibit A.

### L-3 Fails To Follow The Federal Circuit Mandate On Claim Construction

L-3 has also attempted to rewrite the case law on claim construction by arguing, in essence, that the specification (including the Background of the Invention, Summary of the Invention, Figures and Preferred Embodiments) is irrelevant. The goal of L-3's argument is to manipulate the claim language, in a vacuum, notwithstanding that the result is inconsistent with the specification and the technology existing at the time. This flies in the face of the law as

---

[13] See Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 35 (1st Cir. 2001) ("We have refused to allow issues of fact to be created simply by submitting a subsequent contradictory affidavit."); Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) . "If a party simply could offer a contradictory, post-deposition affidavit to defeat summary judgment without providing a 'satisfactory explanation' for the contradiction, the purpose of summary judgment would be defeated." Mahan v. Boston Water & Sewer Comm'n, 179 F.R.D. 49, 53 (D. Mass. 1998). On the issue of correcting deposition testimony to contest summary judgment, see Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc., 397 F.3d 1217, 1225-26 (9th Cir. 2005):

> Under our "sham" affidavit rule, "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991). We think this type of "sham" correction [to deposition testimony] is akin to a "sham" affidavit. While the language of FRCP 30(e) permits corrections "in form or substance," this permission does not properly include changes offered solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment. Cf. Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488-89 (9th Cir. 1991) (dismissing with prejudice and granting Rule 11 sanctions against a party and its counsel because the attorney, in an effort to avoid summary judgment, made substantive changes to the party's deposition testimony in violation of FRCP 30(e)). The Tenth and Seventh Circuits have interpreted FRCP 30(e) similarly. See, e.g., Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1281-82 (10th Cir. 2003) ("We see no reason to treat Rule 30(e) corrections differently than affidavits, and we hold that Burns's attempt to amend his deposition testimony must be evaluated under [the sham affidavit doctrine]."); accord Garcia v. Pueblo Country Club, 299 F.3d 1233, 1242 n. 5 (10th Cir. 2002) ("'The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home and plan artful responses. Depositions differ from interrogatories in that regard. A deposition is not a take home examination.'") (quoting Greenway v. Int'l Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992)); Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th Cir. 2000) ("We also believe, by analogy to the cases which hold that a subsequent affidavit may not be used to contradict the witness's deposition, that a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.' ") (citations omitted). We agree with our sister circuits' interpretation of FRCP 30(e) on this point, and hold that Rule 30(e) is to be used for corrective, and not contradictory, changes.

recently set forth in Phillips v. AWH Corp., 415 F.3d. 1303 (Fed. Cir. 2005), where the Federal Circuit stated that the specification is the "primary basis for construing the claims." Id. at 1315. The Federal Circuit mandates that the claims be read "in the context of the entire patent, including the specification." Id. at 1313. Claims do not stand alone; they are part of a "fully integrated written instrument" and the specification is "always highly relevant" and the "single best guide to the meaning of a disputed term." Id. at 1315. As a result, this Court should "rely heavily on the written description for guidance as to the meaning of the claims." Id. at 1317.

### L-3's Claim Construction Is Utterly Inconsistent With The '758 Patent Read As A Whole

The '758 specification describes the x-ray inspection unit that performs the initial screen (of the entire bag) as a dual energy x-ray projection scanner in thirty-one (31) columns of specification. The specification makes it clear that this initial x-ray scan is not a CT scan. Indeed, throughout the thirty-one (31) columns of the written specification there is no description of the initial x-ray inspection as CT scanning (i.e., there is no discussion of a rotating gantry or CT reconstruction, etc., in connection with the initial scan). In the '758 Patent, this x-ray projection scan of the entirety of each bag is followed by a static CT slice at the location of any suspect object. As stated in the specification, CT scanning is "not employed otherwise." '758 Patent, Col. 32, l. 35. This plain meaning is consistent with the object of the invention, the technology available at the time and the overall specification, as discussed in Reveal's earlier briefs.

L-3 attempts to misconstrue the description, in Column 32, of the "dual energy x-ray inspector" (described in the prior 31 columns). This dual energy x-ray inspector is not discussed or disclosed as a CT scanner at any point in the 32-column specification. L-3 attempts to overlook this fact and instead focuses on one reference in the specification to the possible use of

5

a less accurate dual energy x-ray inspector using "coarser grained pixels." Col. 32, l. 43. L-3 then argues, without any factual basis, that the CT-80 performs such a coarse-grained scan in its initial CT screening. Even if the initial screening in the '758 Patent could be construed as a CT scan (and it cannot), the CT-80 helical CT scan, in fact, does not employ "coarser grained pixels" and L-3 provides absolutely *no* factual support to the contrary.

### L-3's Claim Construction Is Utterly Inconsistent With The '393 Patent And Prosecution History Read As A Whole.

Similarly, with respect to the '393 Patent, L-3 objects to Reveal's straightforward interpretation of the "multi-view probe" because it would purportedly limit the invention to a preferred embodiment. Reveal's interpretation is consistent with the specification, the prosecution history and the inventors' testimony. Reveal's claim construction treats the patent (including the specification) as one integrated document. In contrast, L-3 proposes an interpretation which is inconsistent with the objective of the invention, the specification generally, the practical application of the multi probe system as a "level three" device and the inventors' testimony.

In particular, the '393 Patent employs the term "multi-view probe," which is described as a device which takes a "limited number of radial views," using "several examination angles" to distinguish this "low cost x-ray inspection device" from "very expensive" "CT scanners." The distinction between the multi-view system and CT scanning is not some additional limitation being imported into the claim (as argued by L-3); it is the essence of the invention, as set forth clearly in the written description. As the Federal Circuit has repeatedly pointed out, where the specification distinguishes the invention from prior art on the basis of certain alleged advantages, the claims cannot then be read so broadly as to embrace the very features that have been rejected by the specification. See, e.g., SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems,

6

Inc., 242 F.3d 1337, 1341-1344 (Fed. Cir. 2001) (summarizing cases). "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." Watts v. XL Systems, Inc., 232 F.3d 877, 882 (Fed. Cir. 2001). "[T]he specification aids in ascertaining the scope and meaning of the language employed in the claims inasmuch as words must be used in the same way in both the claims and the specification." Autogiro, 384 F.2d at 397. This is not tantamount to improperly reading a limitation from the written description into the claim. SciMed, 242 F.3d at 1340.

The inconsistencies in L-3's arguments are laid bare in its arguments concerning the prescreening technique described in U. S. Patent No. 5,182,764 ("Peschmann"), which was distinguished in the '393 prosecution history. On one hand, in order to maintain that Peschmann does not anticipate the '393 Patent, L-3 must read *out* of Peschmann obvious references to CT scanning, arguing that Peschmann's statements disclosing "prescanning … using the CT system while the rotating module [gantry] is moving" and acquiring data that "can be subjected to CT reconstruction," Col. 9, ll. 15-18, 37-38, do not disclose CT scanning. On the other hand, to support its argument that the CT-80 infringes the '758 Patent, L-3 must also read disclosure of helical CT prescanning *into* the '758 specification, even though the '758 Patent discloses only an x-ray projection scan and says nothing whatsoever about a CT prescan. So on L-3's view, a discussion of an x-ray projection prescan alone in 1990 can be read as disclosing a helical CT prescan, but actual discussion of a CT system acquiring data that can be subjected to CT reconstruction cannot be read as disclosing CT scanning.

Similarly, it is difficult to reconcile L-3's position on Peschmann with its interpretation of the '393 Patent. L-3 claims that the '393 Patent covers CT scanning even though the '393 Patent specifically distinguishes its claimed invention from CT scanning, yet it reads Peschmann (who

7

teaches the use of a rotating gantry acquiring data and CT reconstruction) as purportedly not disclosing CT scanning.  L-3 also argues that Peschmann does not disclose "employing a geometry."[14]  Geometry as defined by L-3 would mean only the slice location for the subsequent static CT scan.  That is precisely what the '758 Patent, the Peschmann Patent and the prior art all had disclosed and practiced. In short, the prior art disclosed a prescan which examined the bag and determined the location, as appropriate, for a static CT slice.  That is *not* what the inventors of the '393 Patent conceived as *new* and *inventive*.[15]  And it is *not* what the '393 Patent discloses and claims.  '393 Patent, Col. 5, ll. 38-40; Col. 8, ll. 42-44, 63-65.  The '393 Patent claims a variable geometry for the material specific probe by which it is arranged at an angle to avoid clutter, not the fixed ninety-degree angle of the standard static CT slice. Id.

Lastly, L-3 argues that Peschmann does not disclose CT prescanning because the Peschman Patent states in the Objects and Summary of the Invention section that "CT scanning is then undertaken only at the selected locations."  Peschmann, Col. 2, ll. 43-45.  This is interpreted by L-3 to mean that CT scanning, despite the clear disclosure to the contrary in Col. 9, ll. 15-48, cannot be done as part of the prescan.  In contrast, the '758 Patent, which states in a much more limited way that the second scan "provides further, more detailed, inspection by the CT scanner, which is not employed otherwise," somehow does not limit the '758 Patent.  L-3's contradictions and inconsistencies are legion because its claim construction is contrived and does not hold up to any real scrutiny.

---

[14] L-3 submits that "spatial information" is the manner in which the target object and surrounding objects occupy a three-dimensional region within a CT slice.  Hameline Dec. Ex. 4 (Lanza Declaration) at ¶ 54.  It is difficult to understand, however, how what L-3 discusses as a "two-dimensional image" from a CT slice, id. at ¶ 16, (assuming the multiview probe could generate a CT slice), could provide the three-dimensional orientation of objects in a bag.
[15] Hameline Dec. Ex. 7 (Krug Dep.) at 122-124; Ex. 8 (Tortora Dep.) at 80.

8

### L-3's Arguments That The '758 Patent Is Not Invalid Are Flawed.

L-3 argues at length that the Imatron Report and related documents would not enable one of ordinary skill in the art to practice the invention. The Imatron Report provides forty-five (45) pages of detailed disclosure of a system employing an x-ray projection scan followed by a static CT scan to detect explosives in luggage. In contrast, the '758 Patent provides essentially no disclosure. If the Imatron Report does not contain sufficient disclosure to invalidate the '758 Patent, the '758 Patent is not enabled. If the '758 Patent contains a sufficient written description to be enabled, it is invalidated by the much more complete description in the Imatron Report. See Rasmusson v. SmithKlineBeecham Corp., 413 F.3d 1318, 1325-26 (Fed. Cir. 2005) (standard for proper enablement of a prior art reference for purposes of anticipation under section 102 is less rigorous than the standard for enablement for allowance of a patent claim). Either way, the '758 Patent is invalid.

L-3 also argues that the Imatron system was not a "prescreener" because it took a CT scan of every bag after the x-ray projection scan, as admitted by Mr. Scheinman in his deposition. Mr. Scheinman did indeed state that the system, as commercially marketed by Imatron, was configured to do so as an additional precaution. The Imatron report in contrast did not disclose this additional step. Of course, this argument is a red herring because the fact that the Imatron System did more than the '758 Patent claims does not mean that it did not disclose in full the inventions at issue in the '758 Patent.

9

**CONCLUSION**

For all of the foregoing reasons, L-3's attempt to conjure up a defense to Reveal's motion for summary judgment must fail.

Respectfully submitted,

**REVEAL IMAGING TECHNOLOGIES, INC.,**

By its attorneys,

Dated: February 15, 2006

/s/ H. Joseph Hameline
H. Joseph Hameline (BBO# 218710)
A. Jason Mirabito (BBO # 349440)
Michael T. Renaud (BBO # 629783)
Mintz, Levin, Cohn, Ferris, Glovsky
 and Popeo, P.C.
One Financial Center
Boston, MA 02111
(617) 542-6000

**Certificate of Service**

I hereby certify that this document filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filings (NEF) and paper copies will be sent to those indicated as non-registered participants on February 15, 2006.

/s/ H. Joseph Hameline
H. Joseph Hameline, BBO #  218710

LIT 1558655v.2