

Wolf Greenfield
SPECIALISTS IN INTELLECTUAL PROPERTY LAW

March 13, 2006

Honorable Nancy Gertner
Honorable Judith G. Dein
United States District Court, District of Massachusetts
One Courthouse Way
Boston, MA 02210

Re:   **Civil Action No. 04-11884-NG**
      **Rebuttal Letter of Plaintiff L-3 Communications**

Dear Judges Gertner and Dein:

At the conclusion of the summary judgment hearing on March 6, 2006, the Court invited L-3 to submit a letter rebutting Reveal's lengthy argument.

Reveal invites the Court down a path of legal error in ways that the Federal Circuit has frequently had occasion to correct. It also mischaracterizes the content of the patents themselves and of the testimony about them. The situation here is actually quite common: A pioneering patent in a field covers all subsequent developments that fall within its broad scope even if later-invented features would themselves be patentable.

The '758 patent first enabled a CT scanner to be commercially viable for high volume baggage inspection. It defines a system that employs an x-ray unit that is sufficiently sophisticated to screen and clear bags independently, requiring only a subset of the bags to be subjected to more detailed and time-intensive static CT slice analysis. This approach enhances system throughput and precision, making L-3's invention the gold standard for the industry since L-3 developed it in the 1990s.

Nothing in the prior art did this. Imatron (which Reveal has not even shown to be prior art) suggested using an x-ray unit only to assist the CT scanner – **not to clear bags independently**. Each system Reveal cites required that **every bag** be subjected to a time-intensive static CT slice analysis. This disadvantage was fatal to commercialization.

The '393 patent was the first to conceive of a multi-view x-ray inspection probe that obtains spatial information to guide the placement of a "material sensitive" probe (i.e. one that can determine what material is inside), such as a dual-energy CT scanner.

Reveal is practicing precisely the inventive concepts of both patents. That it does so with a 2005-era machine rather than a 1990 machine does not avoid infringement. Reveal's own animation of its CT-80 device demonstrated how it infringes: It starts with a screener which, using x-rays, examines every bag and clears some, while sending others to step two – an inspection using static CT slices. That is precisely what claim 38 of the

'758 patent covers. If Reveal does these steps with newer hardware, it may be entitled to an "improvement patent," but it still infringes L-3's pioneering, dominant patent.

Accordingly, to defend this case, Reveal is left with only one strategy – to argue that the Court should somehow narrow the scope of the patent claims' plain meaning. None of its efforts to narrow the claims withstands scrutiny:

• Reveal argues that the '758 patent's "x-ray inspection unit" does not cover CT x-ray units. But it is undisputed that CT systems use x-rays to obtain their data. Reveal's argument is legal error because a claim to a genus covers all of its species. In any event, the patent expressly discloses CT systems as one of covered types of x-ray systems.[1]

• Reveal argues that one of the inventors narrowed claim language at his deposition. First of all, Reveal misquotes him; secondly, he was not talking about the scope of the claims but only about one particular machine (embodiment) he had worked on; and third, Federal Circuit law is that inventor testimony cannot narrow claim scope.

• Reveal argues that the "purpose" of both inventions was to avoid using CT for screening. Here too it gets both the facts and law wrong. The Federal Circuit holds "purpose" to be legally irrelevant to claim construction. Moreover, the inventors were not seeking to avoid the use of CT at all, but merely to avoid time-consuming static CT slice scanning of every bag (or at locations other than those deemed of interest). Reveal's system accomplishes that precise result – exactly as taught in the patent: Its screener step independently clears some bags, while others get static CT scanning of suspicious areas.

• Reveal argues that this Court should make exactly the error that the Federal Circuit recently reversed in Gillette, by treating a quantity ("several") that follows the transition word "comprising" as a maximum rather than a minimum.

• Finally, Reveal argues that if a single machine performs both functions, it is outside the scope of the '758 patent. It points to Figure 18A, which shows a two-machine embodiment. But Figure 18B shows the one-machine embodiment adopted by Reveal.[2]

This letter begins (in Part I) by setting the record straight on the technology and the prior art. It then turns (in Part II) to rebutting Reveal's legal errors.

I.    RELEVANT ASPECTS OF THE TECHNOLOGY

   A.   **The Technology Behind the '758 Patent**

The pioneering concept behind the '758 patent was to split the baggage clearance process into two fundamentally different tasks: a screener[3] that clears some bags,

---

[1] Col. 32, lines 38-40 & Fig. 18B.

[2] Id. (disclosing that Fig. 18B is a CT scanner that does both the screening step and static CT slice step).

[3] This term is used interchangeably with "pre-screener."

whittling down the number that need to be subjected to stage two – a <u>scanner</u> that takes static CT slices of only those bags (and locations in the bags) that present actual threats. The inventors developed the necessary screener (an x-ray unit sophisticated enough to clear at least some bags independently) to precede the more intensive static CT-slice analysis. This invention made CT scanners commercially viable for high-volume baggage inspection for the first time, by increasing throughput and precision.

No prior art did this. The art cited by Reveal used an x-ray unit only to assist the subsequent CT scanner – **not** to clear bags independently. As a result, every allegedly prior art system **had to take time-intensive static CT slices of each bag** – a fatal commercial flaw. No prior art focused CT slice analysis solely on areas of interest within the bag as identified by a screener. This concept was an innovation in the '758 patent.

Reveal focuses on the Imatron report; but even if that document were prior art – which Reveal has not shown[4] – Imatron sent **every bag** on to a scanner which took at least two static CT slices of every bag. It did not have a "screener" as in the patent.[5]

The '758 invention was a breakthrough. L-3 developed a sophisticated x-ray inspection unit (described in detail in the first 31 columns of the patent) that could analyze a bag <u>without taking static CT slices of the bag</u>. The patent depicts two versions: In the Fig. 18A approach, different machines are used for the two stages. **In the Fig. 18B approach, the same machine does both.** The Fig. 18B system is exactly what Reveal's CT-80 does. It is a high-volume baggage inspection system that uses a screener to clear bags, and then moves only <u>non-cleared</u> bags back on the conveyor belt to the right position to analyze them with more detailed static CT slice analysis at areas of interest.[6]

This system had critical advantages such as throughput speed. Reveal distorts this point, suggesting that the claimed advantage was that no CT scanning machine would be used. The patent does not preclude the use of CT machines for one or both purposes – in fact, it expressly discloses an embodiment where a CT scanner does both the screening step and the subsequent static CT-slice step.[7] As long as it <u>uses x-rays to clear some</u>

---

[4] There is no evidence establishing either the <u>date</u> of the Imatron report or that it was <u>publicly available</u>.

[5] Imatron's first step analyzed only a single projection image, which was not sophisticated enough to ascertain the materials through which the x-rays passed. Unlike the dual-energy systems disclosed in the '758 patent, the Imatron system thus required that every bag be subjected to at least one static CT slice. As the Imatron report stated: "<u>At least one scan would be required per suitcase</u> to detect sheet explosives, which would not be visible in a projection image." Hamelin Decl., Ex. 17 at 44 (emphasis added).

[6] Reveal's counsel argued that there was no significant distinction between the **screening** covered in claim 38 and the **pre-<u>scanning</u>** performed in the alleged prior art. He argued that those pre-scanning systems were like claim 38 but with the added "feature" of taking CT slices of every bag. But a key inventive aspect of claim 38 is the screener that **obviates the need for time intensive CT slice analysis of every bag**. Calling those CT slices of every bag a "feature" is disingenuous – it was a **flaw**, hindering throughput and thus impairing commercial viability. It is as if L-3 had invented a car that ran without gasoline and the infringer claimed that prior art cars did the same thing, but with the added "feature" of using gasoline.

[7] <u>See</u> Fig. 18B and Col. 32, lines 38-40.

bags, it serves as the "screener" half of the invention. Claim 38 covers any system with such a screener which then sends non-cleared bags to a more detailed CT slice analysis.

Reveal's CT-80 undisputedly does that. Reveal's own animation demonstrated its infringement: It showed a screener that uses x-rays to examine every bag, clears some, and proceeds with the "further detailed inspection" of the rest using one or more static CT slices. Reveal has thus adopted precisely the inventive concept embodied in claim 38, and achieves its intended benefits (better performance and higher throughput than could be achieved if a static CT slice were required of every bag as taught by the prior art). For the screener half, Reveal uses a helical scanner, which is a more contemporary version of the examples that were shown in the patent.[8] **But claim 38 is not limited to any particular embodiment or implementation of the screener concept**, as long as it uses x-rays to examine a bag (which the CT-80 does), and acquires sufficiently detailed "x-ray transmission data" so as to identify bags that warrant further detailed CT slice inspection. Reveal's helical scanner meets both requirements. Even if the CT-80 improved upon products available at the time of the patent, it still meets the claim limitations and therefore infringes.[9]

### B.   The Technology Behind the '393 Patent

The '393 patent is about detecting a specific material of interest (e.g. an explosive) in baggage. Prior art systems included CT and other "probes" (detection devices) whose x-rays penetrated the bag to determine the material inside. Because CT scanners can be expensive, one motivation of the inventors was to develop a lower cost device that could reliably detect various explosives located anywhere in the bag (col. 2, lines 38-40). Having done so, however, they broadly claimed their new invention – as they were entitled to do – without any limitation precluding the use of CT scanners.

Claim 13 of the '393 patent covers a system for detecting a specific material of interest in baggage. The idea is to first use a multi-view x-ray inspection device to figure out where to position, and how to point, a "material sensitive probe" (i.e. a scanner that can identify what kind of matter is in a suspect part of the bag).[10] The first step (the multi-view probe) provides two pieces of information: (1) spatial information (i.e. where

---

[8] To head off any confusion, it should be noted that Reveal's "helical scan" is not the same as a "static CT slice analysis." The difference is that in the helical scan the bag is moving and thus provides significantly less precise information than would a static CT slice where the belt is held stationary during the rotation of the gantry. Otherwise, the CT-80 would not be required to back up the belt and perform a static CT slice analysis of suspect bags that aren't cleared by the screening operation. Thus, while the CT-80 performs a helical scan of every bag, it does not perform the more detailed static CT slice analysis of every bag.

[9] Reveal focuses on the differences between its helical scanner and the embodiments disclosed in the '758 patent. **But that is not the test of infringement.** Amgen Inc. v. Hoechst Marion Roussel, Inc. 314 F.3d 1313, 1347 (Fed. Cir. 2003) (vacating construction where "the court eschewed the cardinal principle that the accused device must be compared to the claims rather than to a preferred or commercial embodiment").

[10] A dual energy CT system is a material sensitive probe because it undisputedly can acquire information about specific materials being examined.

in 3D-space the suspect area is), and (2) a "geometry" (where the probe is pointed at the bag) so the material sensitive probe can better examine the suspicious region.

No prior art system did this. Some devices employed a single view x-ray pre-scan for step one, but <u>none</u> showed a multi-view probe that acquires spatial information followed by a material-sensitive probe that is positioned based on that information.[11] Reveal's prior art theory, which relies primarily upon the Peschman patent, is ill-founded. The patent office already considered that reference and agreed with the inventors that it was different from claim 13 because Peschman taught the use of a material sensitive probe <u>before</u> subjecting the bag to a multi-view inspection. Peschman did not disclose the concept of using a multi-view inspection probe to <u>glean information about the bag and guide the subsequent examination</u> by a material sensitive probe.

Moreover, Reveal is precluded by the doctrine of assignor estoppel from challenging the validity of the '393 patent. Reveal never even tried to rebut this point. Indeed, the doctrine of assignor estoppel is particularly compelling here, as one of the named inventors is the founder, president and CEO of Reveal.

There can be no serious dispute that Reveal's helical scan and subsequent acquisition of static CT slices perform all of the functions recited in the claim.

## II. REBUTTAL TO LEGAL CONTENTIONS REVEAL ADVANCED AT THE HEARING

Because the plain and ordinary meaning of the claim language covers Reveal's product, Reveal is compelled to request exceptions or narrowing limitations. Its purported exceptions are legally flawed and based on mischaracterizations of the record.

### A. The Term " X-ray Inspection Unit" in the '758 Encompasses CT

The Court should generally give the words of a claim their ordinary and customary meaning to a person of ordinary skill in the art in question. <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). The evidence here is clear that the ordinary meaning of "x-ray inspection unit" would be broad enough to cover a CT inspection unit that uses x-rays. Indeed, the patent expressly covers CT x-ray inspection units (as shown in Fig. 18B). That Reveal uses a later-developed type of CT scan does not take Reveal's system out of the patent's scope.

Reveal argued (in Slide 12) that the written description called the screener a "dual energy x-ray inspection device." Self-evidently, a dual energy <u>CT</u> x-ray inspection device is one example of a "dual energy x-ray inspection device." Even if this passage in

---

[11] A single view scan provides insufficient information to determine the thickness of objects and to discriminate between different objects. It is like the difference between monocular and binocular vision – only with both eyes can one get the depth perception necessary for true 3D vision.

the written description were a claim limitation (which it is not), it can no more exclude a CT scanner than a reference to "motor vehicle" would exclude a Chevy.[12]

Reveal argues that "x-ray inspection unit" should be construed to exclude CT x-ray inspection units because the CT x-ray inspection units available in 1990 were not "suitable." The Federal Circuit, however, has repeatedly rejected this exact argument – that a claim reads only on embodiments that existed, were known, or could have worked or been made at the time of filing. See cases cited on p. 12 of L-3's Reply Brief. See also U.S. Steel Corp. v. Phillips Petroleum Co., 865 F.2d 1247, 1250 & n.4, n.5, 1253 & n.11 (Fed. Cir. 1989). U.S. Steel is particularly instructive on this point. The Federal Circuit held that a patent for production of crystalline polypropylene covered the defendant's products even though the accused product was far superior to substances in existence at the time of the 1953 application, and even though the superior modern version was possible because of patented catalyst technology that won the inventors Nobel prizes.

Likewise, even if Reveal's product uses new components or features superior to what was available in 1990, that fact is irrelevant: Reveal still infringes L-3's pioneering patent covering the screener-scanner combination. The CT-80 inspects bags using x-rays. That makes it an x-ray inspection unit. A new screener-scanner combination is still screener-scanner combination – the inventors' pioneering concept.[13]

Reveal cited no authority in support of its position on this argument.[14]

B.   **There Was No Waiver of Claim Scope In Either Patent.**

Reveal also argued that the '758 patent's inventors "waived" coverage of any CT x-ray inspection unit. The Federal Circuit, however, has set a high bar for a waiver,

---

[12] At the hearing, the Court questioned why different words were used in claim 38 for the x-ray inspection unit and the CT scanner if it was contemplated that they could cover the same device. The answer is that the two terms have overlapping, but not identical, scope. This happens all the time in patent claim drafting: For example, if a claimed device uses "a motor vehicle" for step one and "a car" for step two, nothing prevents the first step from also being performed by the car, which is plainly a type of motor vehicle. See, e.g., Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d 1308, 1318-20 (Fed. Cir. 2003) (holding that "photosensitive detector" and "light beam demodulation" functions recited in the claims could both be performed by a single photosensitive detector). The inventors were simply exercising their right to cover the full scope of their invention, which is not limited to (although it certainly covers) CT-type screeners. They drafted the specification (specifically, Figure 18B) to expressly cover the embodiment in which a single component performs both elements.

[13] See also Bio-Technology Gen. Corp. v. Genentech, Inc., 80 F.3d 1553, 1559 (Fed. Cir. 1996) ("That BTG patented its unique purification method is irrelevant: '[T]he existence of one's own patent does not constitute a defense to infringement of someone else's patent.'")

[14] At the hearing, the Court asked if innovation would be discouraged by construing patents to cover improved products developed after a patent issued. The patent statutes actually encourage such follow-on research by awarding patents to those who develop new and nonobvious improvements to a patented invention. The developers of the helical CT scanner could have sought that benefit. In any event, the policy issue is well settled by the Federal Circuit in favor of improvements not being immune from infringement of the underlying patent.

requiring that the intrinsic[15] record contain "words or expressions of manifest exclusion."[16] The Federal Circuit is quite strict about how clearly and expressly a patentee must act in order to waive claim scope. For example, in Gemstar-TV Guide Int'l, Inc v. Int'l Trade Comm'n, 383 F.3d 1352, 1366 (Fed. Cir. 2004), it held that the statement that an "innovative cursor ... is required" was not an expression of manifest exclusion or restriction of systems without such cursors, because the statement was merely conveying advantages of a cursor in the preferred embodiment.

Here, the inventors did not come anywhere near as close as in Gemstar to express exclusionary language. They did not exclude CT from their invention – on the contrary, they cited it as one example. The statements about the benefits of avoiding CT, to which Reveal cites, referred to avoiding the need to do static CT slices of all bags.

Similarly, the reference in the written description to a CT scanner (1002) being not "employed otherwise" than for the second scan (col. 32, lines 35) described only the patent's Fig. 18A embodiment (where separate hardware was used for the two systems). This was not a general disclaimer of ever using the same hardware to do the screen and scan functions – indeed, that approach was shown in Fig. 18B. Reveal is trying to lift a limitation from one piece of the device and impose it on another.[17]

As to the '393 patent, because the plain words of claim 13 read directly on the CT-80, Reveal must resort to arguing that the words do not mean what they say. For reasons argued in the briefs (which will not be repeated here), there is nothing in the patent that limits the term "geometry" or suggests that it is anything more than pointing the material sensitive probe at the suspicious region to acquire material specific information about it. Selecting where to slice is selecting such a geometry.

Nor does Reveal gain by arguing that the commercial motivation of the inventors was to avoid use of a CT scanner. While the inventors hoped to develop an inspection system less expensive than a conventional CT scanner, that is not a disclaimer of claim scope that prohibits the patent from covering any system that employs a CT scanner to perform any part of the system's functions. Indeed, the patent discloses such usage.

---

[15] Twelve of the slides in Reveal's PowerPoint presentation were quotations from recent deposition transcripts, none of which were part of the patent record. As such, they could not have communicated to the public an intent to waive. Inventor testimony cannot alter the intrinsically-determined meaning of claim language. See Infra.

[16] Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002)(exclusion must be "in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope")(emphasis added).

[17] Reveal likewise claims waiver from the sentence in the written description that "The CT scanner 1002 ... takes a relatively long time to process each CT scan, and so is not suitable to be solely responsible for detecting and indicating suspect specific materials on-line in real time." (Col. 32, lines 23-29). But, as in Gemstar, this language refers only to one particular embodiment of the scanner. There is no express and general waiver of subject matter. Indeed, in Fig 18B and accompanying text, the patent expressly covers such use of a CT system. Moreover, the sentence does not disclaim helical CT scanning, which was not even in existence at the time and which is the way Reveal carries out the patented function.

A disclaimer disavowing claim scope typically arises when there is prior art that is close to the invention which the patentee must distinguish to obtain the patent. That is not the case here. The prior art does not disclose any system that employs a multi-view x-ray inspection probe which guides the subsequent examination of a bag via a material sensitive probe, with a CT scanner serving as either component. Therefore, there was simply no reason for the inventors to disclaim such a system.

Not only has the Federal Circuit set a very high bar for finding the sort of clear and unambiguous disavowal of claim scope necessary to narrow a claim, but it has further held that **the motivations of the inventor cannot be such a disavowal**. E-Pass Techs., Inc. v. 3Com Corp., 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention.").

Indeed, commercial motivations may, and often do, lead to patentable inventions without thereby limiting the scope of the resulting patent itself. For example, if the high cost of gasoline drives someone to invent a car that can run on a range of conventional and alternative fuels, a broadly worded patent covering the use of such a vehicle will be infringed even if the infringer chooses to run it on gasoline.[18] Under Federal Circuit law, motivation simply cannot be read into the claims as a limitation on claim scope.

C.  **Claims Are Not Limited to Preferred Embodiments.**

Reveal repeatedly tries to limit claim scope based on matter outside the claims (and sometimes even outside the patents) (e.g. Slide 6), or based on what is in the "preferred embodiments" (Slide 7). The law is clear that claim scope cannot be limited in these ways. See cases cited on page 15 of L-3's Opposition Brief.

D.  **The Relevant Aspects of Reveal's System Are Shown in Fig. 18B.**

While claim 38 cannot be <u>limited</u> to the disclosed embodiments, it plainly may not be construed to <u>exclude</u> from its scope an expressly disclosed embodiment.[19] Reveal's argument that the CT-80 does not infringe the '758 patent thus cannot survive the presence in the specification of Figure 18B (and accompanying text). The Fig. 18A approach uses two machines, and moves the bag through one and then the second. The Fig. 18B approach uses the same CT machine for both functions (moving the bag to reposition it between the screening and the scanning stages). **This figure encompasses, in all respects relevant to this motion, precisely what Reveal's machine does.** Reveal's request that the Court construe the claims so narrowly as to not even cover an

---

[18] See Northrop Grumman Corp. v. Intel Corp., 325 F.3d 1346, 1355 (Fed. Cir. 2003) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the patent is limited to that context.").

[19] See, e.g., Pfizer, Inc. v. Teva Pharms., USA, Inc., 429 F.3d 1364, 1374 (Fed. Cir. 2005) ("A claim construction that excludes a preferred embodiment is rarely, if ever, correct.") (punctuation omitted).

expressly-disclosed embodiment is illustrative of Reveal's willingness to argue far outside the bounds of patent law in an effort to avoid liability.

### E. If the Cited Krug Testimony Helps Anyone, it is L-3, Not Reveal.

Reveal leans heavily on deposition testimony of Krug (one of the inventors). Inventor testimony is not a proper basis for claim construction.[20] It undermines the public notice function of patents (requiring that claim language be discernable from evidence available to the public). His testimony cannot affect the claim's meaning.[21]

In any event, Reveal seriously mischaracterizes Krug's testimony in three respects. First, Krug expressly was not opining as to the meaning of any claim terms. Indeed, the questioner specifically avoided asking any such questions of Krug in connection with the '393 patent, most likely because he had "clarified" earlier in the deposition that Krug did not have an understanding of what was meant by particular claim terms in the patent documents and thereafter limited all questions to "outside the scope of the context of the patent." (See Krug Tr. at 58-61).

Second, Krug's statements that CT scanning was impractical referred solely to the impracticality of taking numerous static CT slices of every bag, and at locations other than those of interest, because such an analysis would be too time consuming. Reveal does not do this – it does what the patent teaches: taking static CT slices only of the bags not cleared by the screener, and then at suspect areas predetermined by the screener.[22]

Third, Reveal's slide 14 quoted the original uncorrected transcript, but not Krug's corrected testimony. Krug actually pointed out that a CT device "scanning in full rotation and generating computed tomography reconstruction" could "be used as a prescanner under appropriate circumstances." (Abrahamsen Opp. Decl., Ex. AA, showing corrections to testimony on slide 14).

Likewise, the other inventors of the '393 patent (whose testimony Reveal ignores) confirmed under oath that the prototype device's inability to perform a more detailed multi-view scan was viewed as a technical limitation, not as an advantageous feature to which their invention and its claims would be limited. They recognized that a more detailed CT scanner, while perhaps being more expensive, would do a better job at

---

[20] E.g., Oakley, Inc. v. Sunglass Hut Int'l, 316 F.3d 1331, 1342 n.2 (Fed. Cir. 2003) (inventor's admission during his deposition is "of little value in the…claim construction"); Markman v. Westview Instruments, Inc., 52 F.3d 967, 983 (Fed. Cir. 1995) (en banc) (noting that an inventor's testimony regarding the meaning of claims was "entitled to no deference") (emphasis added).

[21] E.g., Phillips, 415 F.3d at 1318-19 (emphasizing that extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope" and citing the risk of "undermining the public notice function of patents) (emphasis added); Arlington Indus. v. Bridgeport Fittings, Inc., 345 F.3d 1318, 1330 (Fed. Cir. 2003) (explaining that an inventor's testimony "is of little consequence in the claim construction analysis").

[22] Reveal's theory that the inventors expressly disclaimed Reveal's system is also internally inconsistent. Reveal argues repeatedly that its system is new, different, and was unknown in 1990. Something unknown cannot have been expressly disclaimed.

identifying areas of interest for the subsequently-employed material sensitive probe. See Tortora Tr. at 47-48 (Abrahamsen Opp. Decl., Ex. W); Hurd Opp. Decl. (D.I. 187), ¶ 4. They would not have, and did not, limit their patent to exclude such a system.

Of course, this is all extrinsic evidence which properly should not be the basis for the Court's claim construction. The point here is that, even if relied upon, it certainly does not support Reveal's theory that the inventors' testimony limits claim scope.

### F.     "Several" is a Minimum.

Finally, Reveal again made reference to its theory that this Court should make the same error that was recently reversed by the Federal Circuit in the Gillette case. As the Federal Circuit majority explained, a numerical quantum or range set forth in a patent after the transition word "comprising" must be construed as a minimum, not a maximum. Reveal is urging this Court to adopt the *dissent's* position, which would be error.

### Conclusion

Reveal adopted exactly the inventive concepts pioneered by L-3's patents. The '758 inventors were undisputedly the first to develop a system that combines x-ray screening (to clear some bags) with static CT slice scanning (both of which could be conducted by a single CT machine). The '393 inventors were likewise the first to develop a system that uses a multi-view x-ray inspection probe to guide the subsequent examination of a bag with a material sensitive probe. The CT-80 embodies these exact elements, and obtains their intended benefits (greater throughput and accuracy). It is fundamental to patent law that doing so with newer hardware or extra features simply does not undermine infringement. Reveal might have been entitled to get its own improvement patents, but as with anyone who builds on a preexisting core concept that is still under patent, Reveal needs a license to the dominant patent before it can make and sell systems within the scope of L-3's inventions.

For the above reasons and those argued in the briefs and at oral argument, L-3 respectfully requests that its motion for partial summary judgment be granted.

Respectfully submitted,

/s/ Michael A. Albert
Michael A. Albert, BBO # 558566
James J. Foster, BBO # 553285
Robert M. Abrahamsen, BBO # 636635
WOLF, GREENFIELD & SACKS, P.C.

Counsel for Plaintiff L-3 Communications Security
  And Detection Systems, Inc.,

cc: H. Joseph Hameline, Esq.